# Attachment 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
05 Civ. 2149 (JSR)

---------------------------------------------x

IROQUOIS GAS TRANSMISSION SYSTEM L.P.,

Plaintiff,

- against -

ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD., Hamilton, Bermuda (AEGIS), and CERTAIN UNDERWRITERS AT LLOYD'S,

Defendants.

---------------------------------------------x

July 20, 2005
10:22 a.m.

DEPOSITION of the Defendant CERTAIN UNDERWRITERS AT LLOYD'S, by JOHN HODGETT, pursuant to Notice, held at the offices of Donovan, Parry, McDermott & Radzik, Esqs., Wall Street Plaza, 88 Pine Street, New York, New York, before Abner D. Berzon, a Registered Professional Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

22

HODGETT

A. No.
Q. Do you know if a broker has any authority to set premiums?
A. I don't.
Q. You don't know?
A. I don't know.
Q. Do you know who sets the premiums?
A. Wellington would set the premium for Wellington's business.
Q. Now, let's talk about the policy that's in question here. You have some familiarity with that policy?
A. Yes.
Q. Can you explain in general terms what coverage is provided by the policy?
A. Policy provides Horizon with hull and machinery coverage for the specified vessels.
Q. Was the Gulf Horizon one of those specified vessels?
A. Yes.
Q. And were there co-assureds on that policy?

23

HODGETT

A. There was a provision for there to be additional assureds where required by the contracts.
Q. And do you acknowledge that Iroquois was a co-assured under that policy?
A. No.
Q. Why not?
A. I don't know.
Q. You don't know why not?
A. I don't know whether they are or not.
Q. As we sit here today, you do not know whether Iroquois is or is not a co-assured on that policy? Is that your testimony?
A. Correct.
Q. Have you checked any documents to determine whether Iroquois is a co-assured?
A. What do you mean by that? Have I checked any documents? What documents?
Q. We've just seen some correspondence this morning that was

24

HODGETT

produced by your counsel. Have you reviewed a file on this matter before coming here?
A. I have reviewed the files given to me by Price Forbes that claim to be the JLT files.
Q. Who is Price Forbes?
A. They are Horizon's current broker.
Q. And they replaced JLT Risk?
A. Yes.
Q. Do you know why they replaced JLT Risks?
A. No.
Q. Have you ever dealt with JLT Risk --
A. Yes.
Q. -- on this claim?
A. Yes.
Q. When did you first deal with JLT Risk on this claim?
A. In December of last year.
Q. And who did you deal with there?
A. Bryn Thomas.

25

HODGETT

Q. Let me clarify. By last year, you mean 2004?
A. 2004.
Q. And could you give me that again?
A. B-r-y-n Thomas.
Q. And what was the nature of your dealings with Bryn Thomas?
A. He came to my office and informed me about the loss, of the existence of the loss.
Q. And what then did you do?
A. I wrote -- I'm sorry, backtrack there. I kept the file, I phoned Gerry Kimmitt, and then I wrote the comments which I believe you have a copy on the file on the 1st of December.
Q. And Gerry Kimmitt is a lawyer in Texas?
A. Gerry Kimmitt is a lawyer in Texas.
Q. And you sought his advice on Texas law?
A. No, I sought his advice

HODGETT

regarding coverage and the late notice of that claim.

Q. Did you have any knowledge of prior notice to December of 2004?

A. No.

Q. Do you know if Wellington Underwriting, PLC had such notice?

A. I don't know.

Q. How long did you continue to deal with Bryn Thomas at JLT?

A. Bryn Thomas was the broker who brought the file in to me physically.

Q. Could you define "file" for me. Does that mean a claim?

A. It's a folder with paper in it, like that (indicating).

Q. A manila folder, indicating.

A. It was pink.

Q. It was a pink manila folder, okay.

And what did the file contain?

A. I don't remember.

Q. But you retained it?

A. I retained it, talked to Gerry,

HODGETT

wrote my comments on it, gave it back.

Q. Gave it back to --

A. To JLT.

Q. Is that the usual procedure?

A. Yes.

Q. Now, did you have other dealings with Bryn Thomas?

A. Very few. Subsequently, the majority of my dealings were with Paul Bennett.

Q. And Paul Bennett is with Price Forbes?

A. No, he's with JLT.

Q. He's with JLT?

A. Yes.

Q. All right. And what was the nature of your exchanges with Paul Bennett?

A. I believe you've been given copies of them.

Q. We'll get to that. But as your recollection, did you have phone calls with him in addition to the e-mails and correspondence?

HODGETT

A. Yes.

Q. And have you produced all the e-mails relevant to this claim?

A. I have produced all the e-mails relevant to this claim to my lawyers.

Q. And of all the documents that have been recently produced, are there other documents that have not been produced to us?

A. I don't know.

MR. KOSTER: Well, I'm going to ask for a privilege log or some sort of explanation, if documents have not been produced.

MR. RADZIK: We've produced all documents that have been tendered to us by Wellington, with the exception, of course, of privileged communications. I will provide a privileged log listing those.

Q. Now, does Wellington's file contain documents, e-mails, correspondence, phone notes, or anything else that you have not produced to your lawyers?

HODGETT

A. No, it does not. Everything in Wellington's file has been produced to our lawyers.

Q. And does that include communications with other parties on the risk?

A. All communications with that other parties on the risk have been copied to our lawyers.

Q. And how often did you communicate with other parties on the risk?

A. I don't remember.

Q. Can you give me an estimate of the frequency of your communications?

A. No.

Q. When did you cease dealing with either Bryn Thomas and Paul Bennett at JLT and begin dealing with Price Forbes?

A. My recollection is around March of 2005.

Q. And who did you deal with at Price Forbes?

A. Tim Friday.

HODGETT

of the risk they're comfortable with. The slip policy is the version of that slip that goes to the Lloyd's policy signing office and has the Lloyd's seal on it, which is a typed document with the lines underwriters have written on the original slip reduced to a line of type.

Q. And what sort of document would be in the Lloyd's policy signing office?

A. The slip policy.

Q. The slip policy? And can you give me some indication of what the slip policy looks like. Is it the equivalent of Exhibit 2, of Exhibit 1, or of nothing we've got here today?

MR. RADZIK: I think to speed things up --

A. It would be closer to 2. Sorry, to this one.

MR. KOSTER: Number 1.

MR. RADZIK: Weproduced Exhibits A and B on our first initial response to production of documents. A and B, I think, are what constitutes the

HODGETT

slip policy, is my understanding.

MR. KOSTER: Okay.

Q. Do you know of your own knowledge what documents get provided to the assured in relation to the policy?

A. No.

Q. You don't know?

A. No.

Q. Now, when this loss was reported to you, at whatever point, did you check the policy to determine when it was the subject of cover?

A. I looked at the policy.

Q. And when you say you looked at the policy, what type of document did you look at?

A. A copy of the slip.

Q. And did you determine anything with respect to the existence of cover for this risk?

A. No.

Q. Why not?

A. I instantly -- I referred it to my lawyers and provided them with what I

HODGETT

then knew for their advice.

Q. And did you ask for their advice with respect to coverage or with respect to a late notice defense?

A. Both.

Q. Did you form an independent judgment as to the extent of cover under the policy?

A. No.

Q. So anything you testify to here today is based upon the opinion of your lawyers?

A. Yes.

Q. What type of cover did you believe to be implicated by the incident which is the subject of this dispute?

A. I passed it to my lawyers regarding advice regarding coverage.

Q. And you formed no opinion before sending it to them and you have no opinion now?

A. Correct.

Q. Is that within the scope of your duties as a claims agent to determine

HODGETT

whether a risk is covered?

A. I have the authority to do that, if I decide that is what is best for Wellington.

Q. Well, who has the ultimate authority at Wellington to accept a risk or to decline a risk?

A. I'm sorry. Are we back to risk or are we on claims still?

Q. Claims.

A. Who has the ultimate authority?

Q. Yes.

A. The ultimate authority is the group head of claims.

Q. In this particular case, did you refer to the group head of claims?

A. No.

Q. Do you know if Wellington has ever declined cover of this claim?

A. No.

Q. It has not?

A. Wellington has never declined cover on this claim.

Q. Do you know who Terry Cornick of

HODGETT

A. No. It's the function of the broker to inform the underwriters which he needs to inform, and it is the function then of Lloyd's for the Lloyd's underwriters and LIRMA for the company underwriters for the following -- to inform the following market.

Q. If there is an assured on a policy or a co-assured not working through a broker, is there anything in this policy that tells him who to notify specifically?

A. I don't know.

Q. Have you examined this policy?

A. I don't know what any additional assured would receive.

Q. Well, if he had the policy, just the policy, is there anything in the policy that tells him who specifically he's to notify his claim to?

A. It tells him to specifically give notice to underwriters.

Q. And does it specify in the policy who that would be and how they're to be contacted?

HODGETT

A. I don't know. I haven't read it all.

MR. KOSTER: Let's mark this document as Exhibit 3.

(Plaintiff's Exhibit 3, document on the stationery of AON Natural Resources Group, dated May 17, 2004, marked for identification, this date.)

Q. I'm going to place before you, Mr. Hodgett, a document on the stationery of AON Natural Resources Group, dated May 17, 2004. In the upper left-hand corner, it says "To: Underwriters at Lloyd's and Insurance Companies, c/o JLT Risk Solutions," and a number of other insurance companies.

Did there come a time that that notice was presented to the underwriters?

A. Yes.

Q. And when was that presented to the underwriters?

A. The 1st of December 2004.

Q. Is it your testimony you were not aware of any claim on this issue

HODGETT

that's in litigation before December of 2004?

A. Yes.

Q. Do you recognize any of the parties either stamped or handwritten at the top, "Bennett, LD 0280715," for example?

A. I assume Bennett is Paul Bennett.

Q. Are you able to identify any other stamps on there?

A. No.

Q. Am I mistaken that it's previously been admitted by underwriters that they knew of this claim as of May of 2004?

MR. RADZIK: That was a mistake on my part in the -- I was just informed that -- I produced the documents indicating that it was December when underwriters were actually informed. So my prior statements to -- as to the May 17th are a mistake.

MR. KOSTER: As I recall, the

HODGETT

statements appeared in your answer.

MR. RADZIK: Possibly. That was our previous understanding.

Q. Do you know if anyone within the Wellington organization was aware of this claim in May of 2004?

A. No.

Q. No, you don't know or are you saying outright that you've checked and nobody knows?

A. To my knowledge, nobody at Wellington knows. Sorry, sorry, knew, before December.

Q. Who was it? Bryn Thomas came to you in December. Did he say this is a new claim?

A. I don't recall specifically recall the exact words of the conversation.

Q. Well, what was the basis on which he approached you?

A. He brought the file to me, put it in front of me, and it was clearly the first advice. I'm sure there was a

54

HODGETT

A. Yes.

Q. Do you agree with that?

A. The policy provides that coverage, yes.

Q. And referring to the first page of that series of documents, it is a message from Jim Montano at AON to Colin Williams with various copy parties, and I'm reading from the second sentence, and it says, "The claims arising from the event have indeed been referred to H & M Underwriters and we recently sent them a package of correspondence, pleadings, reports and other documents so that they can become familiar with the claims." Do you see that?

A. Yes, I do.

Q. And that message is dated June 10, 2004; correct?

A. Yes.

Q. Do you have any reason to believe that's an inaccurate or incorrect statement?

A. I'm sure that Jim Montano

55

HODGETT

believed it to be true. He sent the documents to JLT, but they didn't send them to me, or bring them to me.

Q. Well, he talks about a package of correspondence, pleadings, reports, and other documents. Was that batch of documents ever brought to Wellington?

A. A batch of documents were brought to Wellington on the 1st of December 2004, which I have no personal knowledge if those are the same ones he's referring to, but no reason to believe they aren't.

Q. They are not? Did you say you have no reason to believe that they are not or are?

A. That they aren't, are not.

Q. Whatever you saw in December, do you recall seeing pleadings?

A. I believe they were pleadings in the batch of documents I first saw.

Q. Within Wellington, basically involving claims, how are claims for attorney' fees handled?

56

HODGETT

A. If it's not any kind of coverage dispute, just a normal defense cost, the broker would collect them from the underwriters and pay the attorneys. For coverage disputes, they would be paid direct by underwriters through Lloyd's -- sorry, Lloyd's underwriters would be paid direct by Lloyd's to the attorneys.

Q. And when Wellington learned about this claim, at whatever time it learned about it, you became aware of the NIPA litigation, did you not, the underlying litigation --

A. Yes.

Q. -- that's the subject matter of the dispute?

A. Yes.

Q. Had you previously been aware of that, had Wellington previously been aware of that?

A. I had not previously been aware of that. And, to my knowledge, Wellington had not been previously aware of that.

Q. You testified before that, as we

57

HODGETT

sit here today, Wellington has not denied cover on this claim; is that correct?

A. Correct.

Q. Do you plan to deny cover?

A. I don't know.

Q. When will that decision be made?

A. I don't know.

Q. Well, it's July, it's been six months, and you've notified at least since December?

A. Uh-hum.

Q. Is there a time-frame within which you normally take action on claims?

A. We have taken action on the claim.

Q. And what's the action you have taken?

A. We have referred it to our lawyers. We will accept their advice.

Q. Well, can I take it then, since you've not declined cover, that their advice has not been -- has been to not decline cover?

MR. RADZIK: Object to the form

HODGETT

of the question. I think you started to probe into attorney/client privileged information.

Q. Have you at this point received advice from your attorneys?

A. We have received a lot of advice from our attorneys.

Q. And you have not yet declined cover --

A. No.

Q. -- as of this date?

A. Correct.

Q. If Lloyd's had received the notice that it received at some point in 2004 in February or March of 2003, would its response have been different?

A. Yes.

Q. And how would it have responded?

A. I would have instructed a surveyor, I would have instructed whatever experts were there. We could have become involved in the repair that, at that time, would have been ongoing, we could have had some say in that, we would have instructed

HODGETT

counsel. At that time, we could have investigated certain possibilities at that time. We could have done all manner of things at that time. We could have -- and -- but we were denied that opportunity.

Q. Would you have advised the insured not to defend the matter?

A. I don't know what my advice to the insured would be.

Q. Would Wellington have instructed the insured not to retain expert witnesses?

A. Wellington would have retained its own experts and would have judged the claim on the merits of what those experts said. Wellington would have instructed its own surveyors and would have judged the matter on the basis of what they said and Wellington would have instructed counsel on behalf of itself and probably the insured jointly.

Q. When you were notified, did you instruct experts or surveyors?

HODGETT

A. No.

Q. Do you know if there are any defenses that Iroquois asserted in the NYP/NIPA litigation that you would have directed them not to assert if you had been advised earlier of the claim?

A. I don't know.

Q. Are there any defenses that you would have demanded that Iroquois assert?

A. I don't know.

Q. Have you ever been precluded from participating in the litigation?

A. We have been precluded from participating in the litigation, certainly for in excess of a year, because we were unaware of it.

Q. But since that time?

A. Since that time, I believe we've joined the litigation.

Q. And how have you joined the litigation, the underlying litigation?

MR. ZERBE: I'm going to object to the form. Could we get some clarification? There's been a lot of

HODGETT

reference to "the litigation."

MR. KOSTER: I'm referring to the underlying litigation surrounding the claim.

MR. ZERBE: The limitation proceeding?

MR. KOSTER: The limitation proceeding.

Q. Have you participated in that at all?

A. I don't know what my lawyers have done regarding that.

Q. Let me ask you to refer again to Exhibit 2, I believe it is, and page 10, and just above -- about the middle of the page, there's a portion that says "Agree allow 20 percent no claims bonus hereon, based on net premiums paid, collectable at expiry, subject no paid claims hereon in respect of the following security only." What's a no claims bonus?

A. It means that they would receive a return of 20 percent of the premium if they didn't make a claim on the policy

HODGETT

Q. -- 2005?
A. Yes.
Q. When did you receive a copy?
A. I assume the same day.
Q. Okay.
MR. KOSTER: And the documents that were produced here today, let's mark those as Exhibit 6. Can you mark this and give it to the witness.
(Plaintiff's Exhibit 6, batch of printed out e-mail exchanges comprising documents from witness's file commencing April 1st, marked for identification, this date.)
Q. Now the batch of documents we've mark as Exhibit 6 were documents produced to us by your counsel this morning, and I believe you describe those as comprising documents from your file; correct?
A. They actually came from JLT's file.
Q. Did they include exchanges with you?
A. Yes, they do.

HODGETT

Q. And they commence on April 1st, correct?
A. Yes.
Q. So this document marked Exhibit 5 that was sent on March 4, which you said you received shortly thereafter, is not included in that batch; is that correct?
A. If you say so.
Q. Well, I'm just referring to the documents. Let me clarify again. I'm unclear. Have you produced what's in your file to your attorneys or what's in JLT's file that JLT gave to you?
A. Both.
Q. And which documents came from your file? Any documents produced here today -- did any of the documents produced here today come from your file, that exist only in your file?
A. No.
Q. So if I understand it, the only things you've produced are things that have been produced to you by other people;

HODGETT

you haven't produced any part of your file?
A. The only things I have in my file are things that are produced to me by other people.
Q. Well, just to state this as an example. If you sent the matter to Mr. Kimmitt, did you send a letter to him?
A. I forward things by e-mail to Mr. Kimmitt.
Q. So there's an e-mail?
A. There are e-mails in my file from me to my lawyer.
Q. And are there e-mails in your file to you from anybody else --
A. No.
Q. -- that haven't been produced?
A. I don't know what's being produced here.
Q. Well, I'm going to ask that you examine that and ask your counsel to report back to me if there's something that has not been produced that's in your files?

HODGETT

A. Well, my counsel has a full copy of my file. I'm sure that my counsel has produced to you everything that, in his opinion, you should have.
Q. Are you aware that there was a 4/4ths running down cover for this type of loss on both the hull policy and the P & I policy?
A. I became aware of that.
Q. And is that in your experience unusual?
A. Yes.
Q. Have you ever seen it before?
A. I don't remember.
Q. Do you know why, from your experience, in circumstances where a loss would be covered by two policies, why one would be notified and not the other?
A. I'm sorry, can you repeat that.
(Question read.)
A. No.
Q. Let me direct your attention to the documents that were produced this morning, and those have now been placed

HODGETT

before you as Exhibit 6. Are there any documents missing from this series?
A. I don't know.
Q. Well, let's cover the first message, which is the message of April 1, 2005, from yourself to Paul Bennett.
A. Uh-hum.
Q. And what was the purpose of that message?
A. To inform Paul Bennett that the e-mail that he had sent to me I had forwarded to my lawyer.
Q. And that e-mail was the one from Willie Farmer to Paul Bennett?
A. Yes.
Q. Did you respond to this at all verbally?
A. No.
Q. And the comment is WHF Willie Farmer? It's at the bottom of the page?
A. Yes.
Q. And he states at the end of this, his middle paragraph there, the long paragraph, "I am not sure the

HODGETT

unintentional delay in their received notification would have affected the situation." Did you see that?
A. I see that.
Q. Did you comment on that that?
A. No.
Q. Did you deny it at the time?
A. No.
Q. And in the middle of that paragraph, he states: "Granted the towers clauses request the underwriters provide in writing permission to enter into a limitation action, but in this instance we believe such permission would have been granted with the circumstances known at the time." Did you comment to him verbally on that?
A. No.
Q. Did you dispute it?
A. No.
Q. Did you review the section of the policy itself to determine whether permission was required with respect to the limitation action portion of that

HODGETT

clause?
A. No.
Q. Do you have any opinion on that?
A. No.
Q. Referring then to the -- it's about the fifth document. It's from Paul Bennett to Willie Farmer, at the top, dated April 8, 2005, and at the bottom of the page is a message from Paul Bennett to John Hodgett. It says -- I'm sorry, I'm referring to the one at the very bottom, which is from Willie Farmer to Paul Bennett. It says "The assured has been awaiting a response from H & M Underwriters regarding their coverage in this matter since December 2004, following referral to coverage counsel." Did you respond to that in April?
A. Yes.
Q. And how did you respond?
A. By the e-mail that's dated the 8th of April.
Q. And could you read that, please.

HODGETT

A. "No answer is due from us until the 19th of April. Meantime, Jerry Kimmitt is in contact with Horizon and he tells me that they have no problem with his or our position. Jerry will be issuing a full coverage opinion in the next week or so. And on receipt of same, we will provide our considered response.
"Please also remind Willie that it took the insured or their brokers 22 months to advise us of this loss and their current pressure is not appreciated."
Q. What was the basis of your statement that no answer was due until April 19th?
A. The action that was taken against us -- I think -- I think there should be another e-mail from me to Paul Bennett on the 11th of April clarifying that.
Q. Can you tell me how many pages down you are?
A. It's 1 of 4 on the third --
Q. How many down from the top?

74

HODGETT

A. Of the third batch. I'm sorry, it's five batches down from the top.
Q. I'm sorry, I'm still not finding it.
MR. SCHMIDT: It's about four pages down from where we were.
Q. And what's the date of that?
A. The 11th of April.
Q. 10:50?
A. Yes.
Q. And what was that response?
A. "Paul, 19th of April is the day our answer is due in Iroquois' demand for additional insured status, which to my knowledge is the only claim being made against us. Horizon have made no demands upon us for either defense or indemnity. Or am I missing something?"
Q. Going back to the reference that I directed you to initially, which was the message of April 8 that you're referring to, you state that Jerry Kimmitt is in contact with Horizon and he/me that they have no problem with his or our position?

75

HODGETT

A. Sorry, where am I looking?
Q. You're looking at the message of April 8.
MR. SCHMIDT: First page of the third bundle.
A. Okay.
Q. What was your position at that time?
A. My position was that Gerry Kimmitt was dealing with it.
Q. Well, that's not what you say. You say that "Horizon has no problem with his or our position."
A. Uh-hum.
Q. And your testimony is that the position you were referring to was simply, what?
A. Is the position that Gerry told Horizon on our behalf.
Q. And what did he tell Horizon on your behalf?
A. I don't know.
Q. Was there a difference between his position and your position?

76

HODGETT

A. He's my lawyer. He expounds my position.
Q. Do you know what he expounded on your behalf to Horizon?
A. No.
Q. Referring to your response, which was on the 11th, there is a message at the bottom there from Willie Farmer to Paul Bennett.
A. Uh-hum.
Q. It says, at the top of the next page, "Regardless, my main objective is to secure focus on the claim being presented by NAPA/Iroquois/Thales, try and work through the difficulty of the delayed report and hopefully equally place the responsibility for this claim on the rightful parties." And did you receive a copy of that?
A. Yes.
Q. And did you respond to that? Or is that your response of April 11th?
A. That seems to be the next e-mail in the sequence.

77

HODGETT

Q. Am I correct that the next document is just a duplicate in the packet that I have, is just a duplicate of the prior one? It has Paul Bennett April 11 up on top, 10:52. Now there's another one at 10:54. Is that a different document?
A. I don't -- I mean, this (indicating) has just got a thanks to me from Paul Bennett.
Q. Now, the following document is also dated April 11 and it's time dated 1613 hours, and that is a continuation of this series;correct?
A. It's a continuation of correspondence between Paul Bennett and Willie Farmer, but not copied to me.
Q. Was that copied to you at the time?
A. These, the top two e-mails, were not copied to me at the time.
Q. And you came into possession of them when?
A. Last Friday.
Q. And how did that -- because you

HODGETT

documents that were produced the day before yesterday --

MR. RADZIK: Last Friday, I believe.

MR. KOSTER: -- let's mark as -- you wanted to mark the first one first. This one doesn't have a date. I can't tell.

MR. RADZIK: I think the signatures are dated.

MR. KOSTER: Let's mark this -- let's mark the document dated November 15, 2004 as 7 and the document with the words "assured Horizon offshore, Inc., as 8.

(Plaintiff's Exhibit 7, document dated November 15, 2004, marked for identification, this date.)

(Plaintiff's Exhibit 8, Reservation of Rights letter with the words "Assured Horizon Offshore, Inc.," marked for identification, this date.)

Q. Now, referring to these documents, which your counsel has produced, the first one, No. 7, dated

HODGETT

November 15, 2004, is from Jim Montano, who is at AON -- correct?

A. Correct.

Q. -- to Paul Bennett at JLT; correct?

A. Yes.

Q. And this recites the claim by Healy & Baillie acting for Iroquois for defense and indemnity; correct?

A. Yes.

Q. And when did this come to your attention?

A. Either on or shortly before the 1st of December.

Q. On or shortly before the 1st of December?

A. The 1st of December.

Q. And in what context did it come to your attention?

A. It was brought to me by JLT.

Q. Along with everything else at that time?

A. Along with whatever else that was in their file at that time.

HODGETT

Q. And the handwriting at the bottom, whose handwriting is that?

A. Mine.

Q. And I think I can read it, but just in case we run into trouble later, could you read what you inscribed down there.

A. It says "WP, leader has referred file to Jerry Kimmitt of Legge Farrow, etcetera, Houston, for opinion regarding" late -- sorry, "for opinion regarding coverage/late notice and will respond when received. Meantime, insured must act as prudent uninsured."

Q. And what are the words to the left of "meantime"?

A. To the left of that, it says, "if package policy is alleged to provide cover," and there is following on in that -- this is not a complete copy. The bottom has been cut off of this.

Q. Can you tell me, do you recall what you wrote down there?

A. It says something along the

HODGETT

lines of broker to provide full coverage details.

MR. KOSTER: Could I ask for a full copy of this in due course.

MR. RADZIK: I'll try to get it, but this will be in the original file of JLT. We don't have copies of it.

MR. SCHMIDT: That would be the claims file you're speaking of, Ed?

MR. RADZIK: Yes.

Q. Where do you keep a note of what you wrote on this?

A. On the broker's file.

Q. So if JLT brings you this and you write a note on it and you give it back to him --

A. Yes.

Q. -- what if later on there's any dispute as to what was said or what you wrote? Don't you keep a log or some indication of what it is -- what action you take when claims are brought to you?

A. No.

Q. None whatsoever?

438066 EPB.

**Bennett, Paul - GBR3742**

---

**From:** Hodgett, John [John.Hodgett@wellington.co.uk]

**Sent:** 01 April 2005 10:37

**To:** 'Paul_Bennett@JLTGROUP.COM'

**Subject:** RE: Horizon Offshore Contractors, Inc L/B GULF HORIZON Dmg to Su bmerged Power Cable - New York Power Authority D/L:

Paul, I have forwarded this to Jerry for his input. John.

-----Original Message-----
**From:** Paul_Bennett@JLTGROUP.COM [mailto:Paul_Bennett@JLTGROUP.COM]
**Sent:** 31 March 2005 16:18
**To:** Hodgett, John
**Cc:** john.gaughan@xchanging.com
**Subject:** FW: Horizon Offshore Contractors, Inc L/B GULF HORIZON Dmg to Su bmerged Power Cable - New York Power Authority D/L:
**Importance:** High

***************************************************************
Important: We would draw your attention to the notices at the bottom of this e-mail, particularly before opening and reviewing any file attachment(s).
***************************************************************

Gentlemen,
In view of the e-mail and attachment, we would appreciate any comments you may wish to make in view of P & I Underwriters request.
Regards.
Paul Bennett
-----Original Message-----
**From:** Willie Farmer [mailto:wfarmer@MCGRIFF.COM]
**Sent:** 31 March 2005 16:12
**To:** Paul Bennett (E-mail)
**Cc:** Mike Phillipus; Rick Bryan; Marcy Holmes
**Subject:** Horizon Offshore Contractors, Inc L/B GULF HORIZON Dmg to Submerged Power Cable - New York Power Authority D/L:

Paul, per our telecon, attached is the e-mail I was discussing. Sorry for the delay, yesterday was one of those difficult days.

Please note Colin Williams' e-mail of March 24, 2004. Dependant on Mr. Kimmitt's advice to underwriters, we would hope this matter can be resolved without difficulty. Not quite sure on what basis underwriters are reviewing the coverage other than what is stated in the reservations, however it does seem the assured's actions were those of a prudent operator and likely underwriters would have approved the same course of action. Granted the Towers Clauses requests the underwriters provide in writing permission to enter into a Limitation action but in this instance, we believe such permission would have been granted, with the circumstances known at that time. Also if my understanding is correct, the assured was able to maintain the action in the U.S. District Court for the Southern District of Texas, rather than being in a district court in the State of New York. Therefore unless I am missing something underwriters have not been prejudiced. I am not sure the unintentional delay in their receipt of notification would have affected the situation.

Regardless, we are in need to resolve the matter, as direction is needed in the litigation filed against P&I interest, in which the subject of the Hull & Machinery clauses will become a major point of discussion.

Best Regards,

WHF

PLAINTIFF'S
EXHIBIT
6
7-20-05

**Bennett, Paul - GBR3742**

**From:** Bennett, Paul - GBR3742
**Sent:** 08 April 2005 16:24
**To:** 'Wfarmer@MCGRIFF.com'
**Subject:** FW: 917-241 Horizon Offshore Contractors Collision Liab/Towers L iability Dmg to NYPA Submerged Power Cable D/L: 02/27/03

Please see response from John Hodgett.
Regards.
Paul Bennett
-----Original Message-----
**From:** Hodgett, John [mailto:John.Hodgett@wellington.co.uk]
**Sent:** 08 April 2005 16:19
**To:** 'Paul_Bennett@JLTGROUP.COM'
**Subject:** RE: 917-241 Horizon Offshore Contractors Collision Liab/Towers L iability Dmg to NYPA Submerged Power Cable D/L: 02/27/03

Paul, No answer is due from us until 19th April. Meantime, Jerry Kimmitt is in contact with Horizon and he tells me that they have no problem with his or our position. Jerry will be issuing a full coverage opinion in the next week or so. and on receipt of same we will provide our considered response.

Please also remind Willie that it took the Insured or their brokers 22 months to advise us of this loss and their current pressure is not appreciated.

Best Regards John.

-----Original Message-----
**From:** Paul_Bennett@JLTGROUP.COM [mailto:Paul_Bennett@JLTGROUP.COM]
**Sent:** 08 April 2005 15:31
**To:** Hodgett, John
**Subject:** FW: 917-241 Horizon Offshore Contractors Collision Liab/Towers L iability Dmg to NYPA Submerged Power Cable D/L: 02/27/03

***************************************************************
Important: We would draw your attention to the notices at the bottom of this e-mail, particularly before opening and reviewing any file attachment(s).
***************************************************************

John,
Can you advise the situation re defense of Horizon under the Hull policy.
Your urgent assistance is appreciated.
regards.
Paul
-----Original Message-----
**From:** Willie Farmer [mailto:wfarmer@MCGRIFF.COM]
**Sent:** 08 April 2005 15:26
**To:** Paul Bennett (E-mail)
**Cc:** Rick Bryan; Mike Phillipus
**Subject:** 917-241 Horizon Offshore Contractors Collision Liab/Towers Liability Dmg to NYPA Submerged Power Cable D/L: 02/27/03

Paul,

Further to our conversation this morning, please let me know what Mr. Hodgett can advise. I realize the news regarding P&I's recommendations to Iroquois is probably upsetting but this is a situation that is not in our assured's control. The assured has been awaiting a response from H&M underwriters regarding their coverage in this matter since December 2004, following referral to coverage counsel. We now have a

substantial expense fee outstanding along with the ongoing litigation.

I tried calling but either you are on the phone constantly, have technical difficulties, or just took it off the hook to keep me from pestering you.

Regardless do need your advice today.

***********************************************************

JLT Risk Solutions Ltd
6 Crutched Friars, London EC3N 2PH. Co Reg No 1536540
Tel: (44) (0)20 7528 4000 Fax: (44) (0)20 7528 4500
http://www.jltgroup.com
Lloyd's Broker. Authorised and regulated by the Financial Services Authority

---

The content of this e-mail (including any attachments) as received may not be the same as sent. If you consider that the content is material to the formation or performance of a contract or you are otherwise relying upon its accuracy, you should consider requesting a copy be sent by facsimile or normal mail. In any event, please check this message and any identified file attachment(s) upon receipt and notify the sender immediately if there is any manifest transmission error, omission or corruption. This does not change or reduce any party's duty of utmost good faith when contracting for insurance or reinsurance. The information in this e-mail is confidential and may be legally privileged. If you are not the intended recipient, please notify the sender immediately and then delete this e-mail entirely - you must not retain, copy, distribute or use this e-mail for any purpose or disclose any of its content to others.
Opinions, conclusions and other information in this e-mail that do not relate to the official business of JLT Risk Solutions Ltd shall be understood as neither given nor endorsed by it. Please note we intercept and monitor incoming / outgoing e-mail and therefore you should neither expect nor intend any e-mail to be private in nature.
We have checked this e-mail for viruses and other harmful components and believe but not guarantee it virus-free prior to leaving our computer system. However, you should satisfy yourself that it is free from harmful components, as we do not accept responsibility for any loss or damage it may cause to your computer systems.

***********************************************************

---

This e-mail has been scanned for viruses by MCI's Internet Managed Scanning Services - powered by MessageLabs. For further information visit http://www.mci.com

---

The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. Access to this message by anyone else is unauthorised. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.

The registered office of Wellington Underwriting plc is 88 Leadenhall Street, London, UK EC3A 3BA. UK

Wellington Underwriting plc is listed on the London Stock Exchange.

Wellington Underwriting Agencies Limited is authorised and regulated by the Financial Services Authority.

Wellington Syndicate Services Limited is an Appointed Representative of Wellington Underwriting Agencies Limited.

---

PAUL BENNETT

394608

**Bennett, Paul - GBR3742**

**From:** Jim_Montano@ars.aon.com
**Sent:** 15 November 2004 16:15
**To:** Paul_Bennett@JLTGROUP.COM
**Cc:** Edwin.Laizer@arlaw.com; colin.williams@simsl.com
**Subject:** Gulf Horizon alleged damage to NYPA power cables - 27th February 2003 Our Ref : OR03/304718/FFO/CPW [Virus Checked]

Paul,
Pls see below msg from Steamship's Colin Williams, discuss with leading H&M underwriters and revert to us with their comments.
Regards,
Jim
----- Forwarded by Jim Montano/TX/ARS/US/AON on 11/15/2004 10:09 AM -----

"Williams, Colin" <colin.williams@simsl.com>
11/15/2004 05:37 AM

To: "'ed.laizer@arlaw.com'" <ed.laizer@arlaw.com>, "'jim_montano@ars.aon.com'" <jim_montano@ars.aon.com>
cc:
Subject: Gulf Horizon alleged damage to NYPA power cables - 27th February 2003 Our Ref : OR03/304718/FFO/CPW [Virus Checked]

PLAINTIFF'S
EXHIBIT
7
7.20.05

Dear Ed/Jim,

We note that Healy and Baillie, acting for Iroquois, are demand defence and indemnity iro these claims from Horizon's insurers and, in the absence of a response, will be seeking a declaration from the Courts iro this matter.

You will recall that this case involves the alleged damage to a sub-sea power cable by the Gulf Horizon's anchors and, as such, this would appear to be a matter covered by the Member's hull underwriters rather than us. We have raised this point on several occasions in the past and feel that it should be resolved without further ado in order that the case can be dealt with by the appropriate insurer. Accordingly, please advise whether hull underwriters accept that this is a matter for them rather than Aegis and, if not, please advise why they do not feel that they are involved in this matter, given the clear nature of the cover wording.

Regards.
Colin Williams

W.P. Leader has referred file to Gerry Kinnitt @ Legge Farrow etc Houston for opinion regarding coverage/late notice & will respond when received.

DDI : 0207 650 6497
Fax : 0207 377 2912

**********************************************************************
This message has been checked for all known viruses by the Cable & Wireless Email protection service, powered by Message Labs.
**********************************************************************

If "Package Policy" is Maritime Insured must act as alleged to provide cover prudent uninsured.