# Attachment 2 (a)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

IROQUOIS GAS TRANSMISSION SYSTEM L.P.,

Plaintiff,

-against-

ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD., Hamilton, Bermuda; CERTAIN UNDERWRITERS AT LLOYD'S; AON RISK SERVICES OF TEXAS, INC.; and AMERICAN HOME ASSURANCE CO.,

Defendants.

05 CV 2149 (JSR)

----------------------------------------

August 9, 2005
10:06 a.m.

DEPOSITION of JAMES I. MONTANO, taken by Plaintiff, pursuant to Notice, held at the offices of DECHERT, LLP, 30 Rockefeller Plaza, New York, New York before Wayne Hock, a Notary Public of the State of New York.

T. I. Montano

A. Various items of correspondence and documents.

Q. Did you read any prior testimony given in this case?

A. No.

Q. Who is Peter Matlock?

A. Peter Mortlock, M O R T L O C K?

Q. Yes.

A. Who is Peter Mortlock?

Q. Yes.

A. He's a human being living in Texas.

Q. Is he employed by Aon?

A. No.

Q. Who is he employed by; do you know?

A. I believe he's employed by JLT.

Q. Risk?

A. I don't recall their full name.

Q. The insurance that's the subject matter of this claim was placed by Aon; is that correct?

A. Yes.

Q. And who in Aon's office placed

T. I. Montano

the insurance or dealt with the placing of the insurance?

A. Peter Mortlock.

Q. And he was in Aon's office at that time?

A. Yes.

Q. And is he a licensed Texas broker?

A. I can't say for sure.

Q. How long had he been with Aon at the time you knew him there?

A. I have no idea.

Q. Did he subsequently leave Aon?

A. Yes.

Q. And when was that?

A. I believe it was in 2004.

Q. And he went from Aon to live in London and work for JLT Risks?

A. No, no, JLT has an office in Houston.

Q. And since last year he's worked at that office?

A. Yes, as far as I know.

Q. Can you tell me what position he

T. I. Montano

held at Aon when he was there?

A. Title or function?

Q. Either.

A. Account executive, relationship manager, producer, I don't know what titles they went under. But he was responsible for placing insurance and handling accounts.

Q. Now, when did this claim come to your attention?

MR. ZERBE: Objection to form. Can you be more specific in terms of definition of a claim?

Q. When did the claim involving the Gulf Horizon in an incident that occurred on or about February 27, 2003 first come to your attention?

A. My recollection is the event was reported to me on February 28, 2003, the day after.

Q. And who made that report to you?

A. Bill Arnold.

Q. Bill Arnold is whom?

A. Bill Arnold was the risk manager

T. I. Montano

at Horizon Offshore Contractors.

Q. And how did that notice come to you?

A. Via e-mail.

Q. Have you produced that e-mail?

A. I believe I have.

Q. After receiving that notice, what then did you do?

A. Undertook to notify the P and I underwriters of the vessel as instructed by Mr. Arnold.

Q. What was the purpose in notifying the P and I underwriters?

MR. ZERBE: Objection to form. The purpose of whom?

Q. What was the purpose of Aon being requested to notify the P and I underwriters?

A. Well, as the insurers of Horizon, they should know of a loss that could possibly arise in a claim under the coverage.

Q. Were there other liability underwriters on this risk?

T. I. Montano
A. Yes.
Q. And --
A. On what risk, the Horizon Offshore Contractors risk?
Q. The Gulf Horizon incident on February 27, 2003.
A. Yes.
Q. And did you notify those underwriters?
A. Yes.
Q. And can you tell me what underwriters those were that you notified?
A. My recollection is excess P and I underwriters and general liability and excess liability underwriters.
Q. Can you tell me, if you can, regarding the policy itself, where did you go in your office to locate the policy?
MR. ZERBE: Objection.
Q. Policies.
A. I suppose a file cabinet.
Q. Do you know where -- do you know if this policy was placed through Aon's office in Houston?

T. I. Montano
MR. ZERBE: Objection.
I'm not sure we have a common understanding in terms of which policy is encompassed within your question.
MR. KOSTER: I'm talking about all the policies that were carried by Horizon.
A. You said this policy.
Which policy?
Q. I'm going to place before you a certified copy or a copy IRO/AE 00300 and ask if you recognize it.
A. (Reviewing).
Are both of these the same?
Q. Yes.
A. Yes, I've seen this policy before.
Q. And how long had Aon placed policies for Horizon before this policy; can you give me an estimate?
A. My recollection is not ever.
Q. Do you know if this policy -- if this is the policy that was provided to Iroquois?

T. I. Montano
MR. ZERBE: Objection.
Provided by whom?
MR. KOSTER: By Aon or by Horizon.
MR. ZERBE: Objection to form.
Q. Was it provided by Aon?
A. My understanding is that we provided a copy of this policy to Horizon -- when I say we, I did not do this, it was not requested of me to do this. It was provided to Horizon to provide to Iroquois.
Q. And was that provided to Horizon in Texas?
A. Yes.
Q. And if I could direct your attention to the first sheet and ask you just to read the notice on that.
A. You're calling this the notice, the words in the box?
Q. Yes.
A. "This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and

T. I. Montano
delivered as a surplus lines coverage pursuant to the Texas insurance statutes. The state board of insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage and this insurer is not a member of the Property and Casualty Insurance Guarantee Association created under Article 21.28(c) insurance code. Article 1.14-2 insurance code requires payment of 4.85 percent tax on gross premium."
Q. Is that a form required by Texas law?
A. I don't know.
Q. Do you know if the 4.85 tax was paid with respect to this coverage?
A. No.
Q. You don't know?
A. Yes, I don't know.
Q. Who would know that in Aon?
A. Who would know that? I don't know.
MR. KOSTER: Can we have this

T. I. Montano

marked as the next exhibit.

(Whereupon, a multi-page document was marked Deposition Exhibit 29 for identification.)

Q. Mr. Montano, where would a holder of such a policy go to register a complaint in a case such as this?

MR. ZERBE: Objection to form.

MR. KOSTER: In what respect?

MR. ZERBE: It's ambiguous. Your question referred to a case such as this.

Q. If someone had been issued a policy with this cover sheet on it by Aon and they had a complaint, does it tell them where to go to register their complaint?

A. Unless it's in the policy, I don't see it. But I will assume that --

Q. What does it say on the first page?

A. The state board of insurance. It does not say where to go with regard to filing a complaint, but the second page

T. I. Montano

does.

Q. What does that say?

A. "You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at 1-800-252-2439. You may write the Texas Department of Insurance, post office box 149104, Austin, Texas 78714-9104. Fax number (512) 475-1771.

Q. And did that document entitled Important Notice apply to this policy?

MR. ZERBE: Objection to form.

A. I can only assume so since it's part of the policy.

Q. What was the coverage of the hull policy; do you know?

A. What --

Q. I'm sorry, what was the geographical coverage of the hull policy?

A. My recollection? I can look in the policy or do you want me to give you my recollection of what it was?

Q. Give me your recollection.

T. I. Montano

A. Worldwide.

Q. Subject to institute and warranty limits?

A. Yes.

There should be a navigation provision on navigation limits in here somewhere, trading on page --

MR. ZERBE: You can refer to the Bates number on the bottom right-hand corner.

A. IRO/AE 00303 "trading worldwide subject to American Institute Trading Warranties, clause 1.210," parentheses, "July 1, 1972," closed parentheses, "or held covered at rates to be agreed by leading underwriters only and war, et cetera risks worldwide subject to London Market War Risk Trading Warranties including any subsequent amendments thereto during the term of this policy. Tows in excess of seven hundred fifty nautical miles or outside the Gulf of Mexico held covered at rate, terms and conditions to be agreed. Warranted tug,

T. I. Montano

tow, towage and stowage arrangements approved by agreed surveyor and warranted all recommendations complied with."

MR. ZERBE: For the record, that's pan page IRO/AE 00303 on Exhibit 29.

Q. So losses or claims might have occurred anywhere in the world and still constitute a claim covered by this policy?

A. Yes.

Q. After the original notice by e-mail from Horizon, what further correspondence did you have in the immediate aftermath of the incident?

A. My recollection is we started receiving some reports from attorneys that were appointed in New York by Horizon to attend to the situation.

Q. Do you recall those attorneys by name?

A. Skoufalos --

Q. It's the Skoufalos firm?

A. Yes.

Q. Anyone else?

T. I. Montano

your files to the McGriff firm?

A. This indicates that I sent certain files to the McGriff firm, yes, sir.

Q. Did you keep copies of the materials that you sent to the McGriff firm?

A. Yes.

Q. And have you produced copies of those files that you kept?

A. Produced to whom?

Q. In response to this notice of deposition calling for Aon's files regarding underwriting and claims.

MR. ZERBE: I'll just note for the record that we have objected to the attempt to serve document requests by means of a notice of deposition of a party witness and I'll also note for the record that the issue of the document production prior to Mr. Montano's deposition has been discussed among counsel and we've provided these documents as a result

T. I. Montano

of those discussions to the extent they relate to the issue of the reporting of notice under the Lloyd's policy.

I'll also note for the record that I've reviewed the transcript from the proceedings before Judge Rakoff on July 22 and there was no request for production of documents that was raised in the course of that dialogue before Judge Rakoff.

Nonetheless, we have provided the documents which were sent to you yesterday as well as this morning for the purpose of presenting documents relevant to the issue of notification under the Lloyd's hull policy.

MR. KOSTER: Mr. Montano, a document that was previously referred to as the documents produced today or last night, rather, ARS-TX 0001 to 0101, let's mark that as the next exhibit.

(Whereupon, a multi-page

T. I. Montano

document was marked Deposition Exhibit 31 for identification.)

Q. And these documents which were produced and have now been marked Exhibit 31, did you have a hand in selecting those documents as documents relating to the claim and the notice?

A. Can I confer with counsel?

Q. I'd rather you didn't.

A. My recollection is we received a subpoena for various documents at one point. The subpoena called for information with regard to the claim. It also asked for information, documents with regard to the placement. I would have gone through the documents pertinent to the claim. Somebody else would have gone through the documents pertinent to the placement and I did not have a hand in doing that.

Q. The placement?

A. The placement side.

Q. But so far as the claim side is concerned you did?

T. I. Montano

A. Yes.

Q. And I notice --

A. And some of the materials in there are with regard to the placement or the servicing of the account rather than the claim.

Q. I notice in here that there are, so far as I can tell, very few handwritten notes with one exception of something on a pad of Aon Risk Services dated 1/23/03.

Actually, can you tell me what that is? It's within the Exhibit 31, it's 0006A.

Can you tell me whose handwriting that is and what that is?

A. Well, according to the form, it says it's prepared by B. Chaloupka, and that's Bernice Chaloupka who works in our office.

Q. And what did Miss Chaloupka have to do with relation to the claim?

A. Nothing.

Q. Is she a claims agent?

A. No.

T. I. Montano

A. Okay. I've looked at it.

Q. What caused you to change your mind?

A. I do not recall.

Q. Did you review the policies?

A. Probably.

Q. Did you review all the policies potentially applicable to this claim at that time?

A. I don't recall if I reviewed all the policies, no.

MR. KOSTER: I'm going to show you another series of documents, a series of e-mails that bear the Bates stamp numbers A 0034 to A 0040, and ask that they be marked as the next exhibit.

(Whereupon, an e-mail dated August 15, 2003 was marked Deposition Exhibit 34 for identification.)

MR. ZERBE: Do you want the witness to read the entire --

Q. I'm just going to ask you, are you familiar with this document? You've

T. I. Montano

seen it before?

MR. ZERBE: Well, I'll note for the record this appears to be a number of e-mails, over seven pages, from August of 2003.

MR. KOSTER: I'll note that the last one was from -- to Mr. Montano so presumably he was privy to everything that followed.

A. Could you repeat the question, please?

Q. Yes.

Are you generally familiar with this e-mail exchange?

A. Now that I see it, I have some recollection, yes.

Q. Referring to page six of the series Bates stamp number A 0039, do you see there an e-mail that you sent to somebody named Charlie, I believe Charlie Cerise?

A. Yes.

Q. And regarding the posting of an LOU, are you familiar with that?

T. I. Montano

A. Yes.

Q. And can you tell me what information or input you had with respect to that?

A. It looks like I was telling Charlie Cerise, who is the attorney from Horizon with regard to the limitation action in Houston, who the underwriters are that would have to post security.

Q. And the posting of security was for purposes of a limitation action?

A. Yes, sir.

Q. And was it also required that you obtain counter-security?

A. I see that that was -- that's in the message. I don't recall if that was actually at the end of the day required or was done.

Q. And the security that was posted, to your understanding, was posted in lieu of a bond being posted to represent the value of the vessel?

A. Yes, sir.

Q. Were the hull underwriters

T. I. Montano

notified of this at any point?

A. Notified of any of this, what do you mean?

Q. This being the posting of an LOU.

A. At any time?

Q. Yes.

A. I would have to say yes.

Q. At what time?

A. I can't say for sure, but I would guess that when they were placed on notice under the hull policy or shortly thereafter.

Q. By the way, did you suspect any hull claims as a result of this incident for damage to the hull of the Gulf Horizon?

A. No, I was never notified that the hull was damaged.

Q. Was that discussed at any of the meetings you had with Horizon or any telephone conversations you had?

A. I don't recall.

MR. KOSTER: I'm going to ask

T. I. Montano

that another batch of e-mails be marked constituting A 0081 to A 0086.

(Whereupon, an e-mail dated June 10, 2004 was marked Deposition Exhibit 35 for identification.)

Q. Exhibit 35 appears to be some exchanges you had with Colin Williams; correct?

A. Yes.

Q. Now, referring to page four --

MR. ZERBE: Bates number?

MR. KOSTER: Bates number 0084.

Q. -- Mr. Williams writes to you and says, "dear Jim," the first paragraph he recites, "apart from lawyer's report on the merits of the case generally" --

A. I'm sorry, what page are you on?

Q. Page four of the exchange in paragraph one of his e-mail beginning "firstly."

Do you see that?

A. Yes.

Q. And then there's a parenthetical comments that goes on. "Apart from a

T. I. Montano

lawyer's report on the merits of the case generally, there's the question of why this is not covered under member's hull policy. See the fourth paragraph of our e-mail message of 16th April. We await your further news in this regard."

Do you see that?

A. Yes.

Q. There does not appear to be a copy of the e-mail message of April 16.

Would your file have that in it?

A. Does my file have an e-mail message of April 16?

Q. Yes.

A. I can't say for sure. The fourth paragraph says our e-mail message of 16th April which I would guess would be his.

Q. Presumably it was to you?

A. Yes.

Q. And did you respond to it?

A. I don't recall.

Q. Well, did you respond to the message that he sent you that we just

T. I. Montano

referred to dated May 14, 2004?

A. It looks like I responded on May 17, 2004.

Q. And what did you advise?

A. You want me to read it?

Q. Yes, please.

A. "Colin, we have conferred with the assured regarding coverage, claims, and counterclaims arising from the subject casualty and respond to your queries as follows. With respect to coverage under the assured's H and M policy on the Gulf Horizon, such cover does indeed apply to collision and/or contact with fixed and floating objects. Horizon's CGL insurers are aware of all claims and counterclaims so far asserted. No additional information regarding claims for damage and/or fines and penalties regarding archeological sites has been forthcoming. Regards, Jim."

Q. When you say you conferred with the assured, that was Horizon?

A. Yes.

T. I. Montano

Q. And was that at the meeting you earlier referred to?

MR. ZERBE: Objection. There was testimony about two meetings.

A. No.

Q. Was that at the May, 2004 meeting?

A. Yes.

Q. And had you previously reviewed the hull policy to determine whether there was cover?

A. I don't recall if I did or not.

Q. Mr. Williams comes back to you in the next message in the chain of May 18, the following day, and says, "please advise why H and M underwriters were not involved in the first claim," that is the claim for damage to the power cables, "B the Gulf Horizon."

Do you see that?

A. Yes.

He does say are, not were.

Q. Excuse me?

A. I think you read it are, not

T. I. Montano

what does that mean?

A. That means the placement with underwriters at Lloyd's was done through JLT Risk Solutions in London. In other words, they were the placing broker, we were the retail broker or the producing broker.

As you know, to place business at Lloyd's, you have to be a Lloyd's broker.

MR. KOSTER: We've been going for an hour and a half.

Do you want to take a short break?

MR. ZERBE: Sure.

(Whereupon a break was taken)

MR. KOSTER: Can you mark these.

(Whereupon, a three-page document was marked Deposition Exhibit 36 for identification.)

(Whereupon, a letter dated May 17, 2002 was marked Deposition Exhibit 37 for identification.)

Q. I had just asked the reporter to

T. I. Montano

mark a document just for identification, one of which refers to a James Isidro Montano, and I want to ask if those are particulars pertaining to you.

A. (Reviewing).

Yes.

MR. KOSTER: Let the record show that Exhibit 36 is a listing with the Texas Department of Insurance consisting of three pages.

Q. Can you tell me what those reflect as to your qualifications or your licenses?

A. Well, there's three types of licenses listed here: Surplus lines agent, adjuster, and general lines agent.

Q. And do you hold all three of those?

A. Yes.

Q. And the next page?

A. It says the license types are general lines agency, surplus lines agency, and reinsurance broker.

Q. And the next page?

T. I. Montano

A. Employment from Citadel Insurance Company.

Q. Who is Citadel Insurance Company?

A. Citadel Insurance Company is a Texas company, C I T A D E L, wholly owned by Aon Risk Services of Texas, Inc.

Q. So are you a licensed broker?

A. I'm a licensed, according to this, reinsurance broker. Or the agency is. Because the agency profile shows Aon as -- refers to Aon Risk Services of Texas, Inc. as reinsurance brokers.

Q. Not specifically to you?

A. No, that's not to me.

MR. ZERBE: You were referring in your last answer to which page of Exhibit 36 as far as the reinsurance broker listing?

Q. Is that the one that just refers to Aon generally?

MR. ZERBE: Is that the second page?

THE WITNESS: That's the second

T. I. Montano

page, yes.

MR. KOSTER: They all say page one of one so we'll staple them together.

With your permission, I'll just mark them one, two, three.

Q. And I've asked the reporter to mark another document on the letterhead of Aon, a letter dated May 17, 2002 directed to Horizon from Bernice A. Chaloupka.

A. (Reviewing).

Q. Have you had a look at that?

A. Yes.

Q. Have you seen that before?

A. Yes.

Q. Were you aware that on the certificate attached, Iroquois Gas Transmission System was a co-assured?

MR. ZERBE: Objection to form.

MR. KOSTER: In what respect?

A. I was not --

THE WITNESS: Do you want me to answer the question?

MR. ZERBE: You used the term

T. I. Montano

"co-assured" and I'm not sure -- the document will reflect what it reflects. I think you were characterizing this document as reflecting Iroquois as a co-assured.

Q. Did Aon issue a certificate of insurance in favor of Iroquois?

A. I'm sorry but I didn't answer the previous question.

Do you want me to answer that question?

Q. Please do.

THE WITNESS: Could you repeat the question?

(Whereupon the requested portion was read back by the reporter)

A. I don't know. When you say was I aware, I was not aware that they were on this certificate of insurance until it was shown to me by Mr. Zerbe within the last few days. So I have not seen this until yesterday.

Q. I thought you told me you had seen it before and when you told me that

T. I. Montano

you were referring to yesterday? Had you seen it before yesterday?

A. Had I seen this certificate of insurance before yesterday?

Q. This cover letter from Aon.

A. No.

Q. Were you aware that Iroquois Gas was issued a certificate of insurance by Aon?

A. Was I aware before yesterday?

Q. Yes.

A. I don't recall. I believe they were, yes.

Q. And when did you form that belief?

A. I don't recall.

Q. You've referred to at least two meetings with Horizon personnel at Horizon.

Do you recall any others?

A. With Horizon at Horizon?

Q. With Horizon at Aon or at Horizon or at a hotel or anyplace.

A. With regard to?

T. I. Montano

Q. The incident we're discussing.

A. No.

Q. There were just the two meetings that you can recall?

A. Yes.

Q. And you referred to other phone calls with either Mr. Arnold or Mr. Gibbens; correct?

A. Yes.

Q. And do you recall how many of those there might have been?

A. No.

Q. Do you recall whether at any of the meetings or the phone calls that you had with -- meetings you had with or phone calls with Horizon there was any discussion about Iroquois' rights under these insurance policies?

A. No.

Q. None whatsoever?

A. That's my recollection, yes.

MR. KOSTER: I'm going to ask that this be marked as the next exhibit, which is Exhibit 38.

T. I. Montano

(Whereupon, a letter dated August 21, 2003 was marked Deposition Exhibit 38 for identification.)

Q. The document that's now been marked as Exhibit 38 contains on its top a letter dated August 21, 2003 from Bill Gibbens to Jeff Bruner at Iroquois and it contains underneath a letter dated August 21, 2003 to Jeff Bruner I believe from yourself.

Do you recall that?

A. Do I recall --

Q. Your letter.

A. Yes.

Q. And what was the purpose of your writing that letter on August 21, 2003?

A. I guess the gist of it, the purpose of this letter was to inform Mr. Bruner about the contractual liability provisions and how they applied and the Horizon general liability policy.

Q. And that went direct to Mr. Bruner; correct, at Iroquois?

A. Not correct. I believe I sent

T. I. Montano

Q. Did you handle the loss regarding the fire on board the Gulf Horizon?

A. The fire of May 18?

Q. Yes.

A. I'm still involved in that claim, yes, sir.

Q. In a claim such as that, if there's a claim on the hull policy for the hull damage, does that come back through you?

A. Generally yes, but that hasn't occurred yet.

Q. I understand.

Were there any rebates on this or any special commissions?

A. Not that I know of.

Q. Do you know what the regulatory requirements are under Texas law for the sale of a policy such as this?

A. No.

Q. Do you know if the insurance has to be on file or approved by the Texas Department of Insurance?

T. I. Montano

A. No.

Q. Do you know if the carrier has to be authorized by the Texas Department of Insurance to write that insurance?

A. Do I know that it has to be?

Q. Yes.

A. No, I don't know that.

Q. Did you know anything about the underlying construction contract in terms of handling this claim?

A. No.

Q. Just referring to section three which is Exhibit 29 on page 00323, there is a provision regarding builder's risks for is it a premium based on a percentage of value of the contract?

A. I believe that's what those numbers refer to.

Q. And in the normal course of placing that part of the insurance with the underwriters who covered that part of the insurance, would you provide them with those figures, with the contracts and with the contract values? Would Aon?

T. I. Montano

A. Would Aon provide underwriters on builder's risks of contract values? Yes.

Q. Do you know if that was done in this instance?

A. I don't know.

Q. Do you know who within Aon would know that?

A. Yes.

Q. Who?

A. Margie Goodall.

Q. Did you become aware that the AEGIS policy provided for four-fourths cover? You're familiar with the breakdown, the traditional breakdown between three-quarters on the hull of RDC and one-quarter with the P and I club?

A. Yes.

Q. And that's how P and I clubs developed; right?

A. Right.

Q. To cover that one-fourth?

A. Right.

Q. And more recently -- by recently

T. I. Montano

in the terms a few decades -- they began to write four-fourths; right?

A. They who?

Q. P and I underwriters.

A. Yes. Some do, some don't.

Q. And some hull underwriters carry P and I; correct?

A. Correct.

Q. Were you aware that there was duplicate four-fourths cover between the P and I and the hull policy regarding certain losses?

A. Horizon's coverages?

Q. Yes.

A. I don't recall.

Q. Well, did you become aware of that?

A. Did I become aware that there was duplicate coverage under the hull and P and I?

Q. Yes.

A. I never thought of it as being duplicate coverage.

Q. Well, if it potentially covers

82

T. I. Montano

the same risk, why wouldn't you think of it as being duplicate coverage?

A. I thought there would be other insurance clauses that might have come into play, but that would be my opinion.

Q. Well, apart from other insurance clauses, what would be the point of selling an assured duplicate cover for the same risk?

A. There would be no point.

Q. Would there be added premium if that was done?

A. I suppose if you get a premium for each cover, then two covers cover the same risk.

Q. Wouldn't such double cover cause confusion as to notification of an incident or a claim?

MR. ZERBE: Objection to form.

A. I suppose it would.

Q. Would an assured or a co-assured have reason to assume that there was double coverage for the same risk?

MR. ZERBE: Objection to the

83

T. I. Montano

form. You're asking for speculation.

A. I can only speculate.

Q. Go ahead.

A. Yes.

Q. Yes, an assured or a co-assured should assume there was double coverage for a risk?

A. No, I don't think that was your question. I think your question was would an assured be confused or lead to confusion --

Q. That was my prior question.

A. Repeat the question then.

Q. Would an assured have any reason to assume there was double cover for the same risk?

A. Again, I'm speculating that the answer would be no.

Q. Did you at any point become aware of the insurance requirements that were contained in the Horizon/AEGIS construction contract?

A. No.

MR. ZERBE: I'm sorry, I think

84

T. I. Montano

you referred to the Horizon/AEGIS construction contract.

Q. The Horizon/Iroquois construction contract.

A. No.

Q. Referring back to Exhibit 38 which is your letter of August 21, 2003 to Jeff Bruner, so when you wrote in that letter at the conclusion, "thus we would concur with Horizon as stated in their letter to you of July 23 that there should be no issue of coverage for Horizon's direct liability, if any, or for Horizon's contractual indemnity liability to Iroquois, if any, with regard to the either the LIPA or NYPA claims," you had not reviewed the contract?

A. My recollection is I had not ever reviewed the contract.

Q. What was your statement based on, or did you not need to see the contract to make that statement?

A. My recollection is I would not need to see the contract to make that

85

T. I. Montano

statement.

Q. Am I correct that the FFO cover or the RDC was limited to the value of the vessel during the policy period?

A. Under the hull policy?

Q. Yes.

A. That's my recollection, yes.

Q. And do you know what the limit was for the Gulf Horizon at the time of this incident?

A. If this is the policy that applies, then this says $15,200,000.

MR. ZERBE: Referring to page IRO/AE 00318 of Exhibit 29.

Q. Two more pages down.

Is there a very different reference there?

A. This is headed Horizon Offshore Contractors, Inc., section one, war/terrorism, et cetera worksheet and this page IRO/AE 00320, the Gulf Horizon across from that agreed value is USD nineteen million and across from that is Ecuador and I don't know why Ecuador is in

T. I. Montano

him and asked him to respond.

Q. Now, you've testified that you notified JLT Risks regarding the hull in, was it June of 2004?

A. No, I believe it was May.

Q. May of 2004.

And would you have expected JLT Risks to pass that directly on to the concerned hull underwriters?

A. Yes.

Q. Do you know if they did that or not?

A. When I talk about the hull underwriters, the hull underwriters at Lloyd's, because there were other hull underwriters on the slip that I reported to directly and sometime we forget about those other companies.

With respect to the London placement on the hull risk, yes.

Q. Have you disclosed your direct correspondence with the other underwriters on the hull risk?

A. I'm sorry?

T. I. Montano

Q. You said you had direct correspondence with others on the hull risk.

A. Well, when you see my notice under the report of loss under the hull policy, it includes other insurers besides London underwriters and so I would have sent those directly to those companies, so I would have sent those to Continental, American Employers, Firemans Fund, Markel, and Royal.

MR. ZERBE: Let the record note the witness is referring to ARS-TX 0043.

Q. And this -- that document is what you sent directly to them?

A. I sent this document directly to everyone listed here.

Q. Including the underwriters at Lloyd's?

A. Care of JLT Risk Solutions, so I would have not sent this directly to the underwriters at Lloyd's, I would have sent this to JLT.

T. I. Montano

Q. But you sent it direct to the other parties?

A. Yes.

Q. Had you notified those other parties at any time before May, 2004?

A. My recollection is no.

Q. Would you have expected JLT Risks to relay that notice direct to the underwriters at Lloyd's?

A. Yes, sir.

Q. And do you know if that was done?

A. Yes.

Q. Was it done?

A. As far as I know it was done.

Q. By whom?

A. My recollection it was Paul Bennett.

Q. There's been testimony in this case by a Mr. Hodgett that he did not receive actual notice until December 1, 2004.

Did you investigate that at all?

A. Yes.

T. I. Montano

MR. ZERBE: Objection to form.

Go ahead.

A. Yes, I did.

Q. And what did you discover?

MR. ZERBE: Can we get a time frame on this?

Q. When did you investigate?

A. I think it was last week.

Q. And what did you determine as a result of your investigation?

A. I determined that what he said was more or less accurate.

Q. And did you determine why that was the case?

A. I was told why that was the case.

Did I determine that was the case?

Q. What were you told?

A. I was told by Paul Bennett that when I inquired about that, because obviously I was surprised that if the notice went in in May was not reported to underwriters under December which would be

94

T. I. Montano

extraordinary, I was told by Paul Bennett that Mr. Hodgett told him he wasn't accepting notice until he was able to provide him with the full wording of the policy. Apparently the full working of the policy was not available from JLT in May of 2004.

Q. Let me see if I understand what you understand to have been the case.

Paul Bennett from JLT Risks went to see Mr. Hodgett at some point in May?

A. Yes.

Q. And Mr. Hodgett told him that he would not accept the notice of claim until the full policy was produced?

A. The full wording, that's the gist of what Mr. Bennett told me.

Q. And Mr. Bennett told you that last week?

A. I believe so, yes.

Q. And where does Mr. Bennett -- where is he employed now?

A. He's still with JLT.

Q. He's the one that's with JLT in

95

T. I. Montano

Texas?

A. No, no, no, he's with JLT in London. Mr. Mortlock went to JLT in Houston.

Q. Sorry.

Was Mr. Bennett able to provide you with any documentary evidence to support this?

A. Support?

Q. This scenario under which he went to present the claim and was told by Mr. Hodgett not to present it until he had the policy?

A. No, and I didn't ask for any.

Q. That would have been my next question.

Would that be a normal request from an underwriter, to your knowledge, or do you have any knowledge on that procedure?

A. I'm familiar with the London and the Lloyd's system so that would be -- I think that would be unusual.

Q. And do you know why it took so

96

T. I. Montano

many months to comply with that condition, if that's what it was, that Mr. Hodgett placed on the presentation of the claim?

A. Do I know why? I can only speculate.

Q. No, why it took so long to produce the policy.

A. I'd be speculating as to why it took so long to present the policy.

Q. Give us your best speculation.

A. Inefficiency at JLT. They were responsible for producing the full wording and having it agreed.

Q. Do you know if the full policy was otherwise available to Lloyd's?

A. No, I don't.

Q. Were there any other claims pending on this policy at this point?

A. I don't recall.

Q. What about Mr. Sunny, did that involve the same policy?

A. Mr. Sunny was not reported to the hull underwriters.

Q. Why not?

97

T. I. Montano

A. Because the vessel itself was not damaged nor any appurtenance of the vessel caused the damage.

Q. What about the fire claim, had that occurred at this time?

A. The fire claim had not occurred until May 18, 2004 and it was -- the coverage is under a totally separate towage policy.

Q. In terms of protecting the interests of a liability underwriter, whether it's FFO or P and I in with respect to this incident, were necessary actions taken by the P and I cover that was invoked, AEGIS?

A. To protect the interest of the P and I underwriter?

Q. Yes, the liability underwriter. Were --

A. I don't understand the question.

Q. Were surveyors appointed, expert and so on?

A. Yes.

Q. In the case of a Lloyd's claim,

T. I. Montano

would Lloyd's normally look to Aon's office in Texas for an incident arising out of a claim there to make recommendations regarding expert or surveyors or would they make their own?

A. It works different ways. Often they would look to us, often they have their own surveyors, adjusters, and attorneys in mind on the point of a major casualty or any casualty.

Q. Was Aon involved in the renewals of this policy after 2003?

A. Yes, I believe so.

MR. ZERBE: I'll just clear up in your question, you said renewals, plural?

Q. Renewal of the policies.

A. Yes, I believe so, yes.

Q. And in conjunction with renewals, do you report claims?

A. If requested.

Q. Were you requested to advise on claims pending at the time of these renewals?

T. I. Montano

A. I don't recall if loss information was requested from them on renewal of the hull policy.

Q. Would your records reflect that?

A. No.

Q. Would the placement department's records reflect that?

A. Reflect that I was not requested --

Q. No, reflect what was reported to the hull underwriters for a renewal.

A. It should.

Q. Mr. Hodgett testified that he's never been advised of a claim by Horizon as opposed to Iroquois for this cover.

Do you know that to be the case?

A. Do I know that's what he testified to?

Q. Do you know whether Horizon ever submitted a hull claim regarding this incident for liability cover?

A. Per our notice of May 17, 2004, we notified underwriters of the occurrence. To my knowledge, Horizon has

T. I. Montano

not made a claim under this policy for coverage or reimbursement by underwriters for this occurrence.

Q. But it is a party to the notice? The notice was made on its behalf.

A. On behalf of Horizon?

Q. Yes.

A. Yes.

Q. Do you know Mr. Kimmitt, an attorney in Texas?

A. No.

Q. Were you privy to any discussions regarding obtaining an opinion from Mr. Kimmitt on cover?

A. No. I think one of the items of correspondence saying it was being referred to Mr. Kimmitt, but I don't recognize his name.

Q. Do you know -- at some point Aon in combination with JLT sent the files to McGriff?

MR. ZERBE: Objection to form.

Q. Well, Aon sent files to McGriff; correct?

T. I. Montano

A. Correct.

Q. What was the reason for the change of brokerage?

A. I can't speculate. I would only be speculating.

Q. Well, did anybody tell you?

A. No.

Q. Did you ask anybody, did you say it's a big account, why are we losing it?

A. I think so, yes, I think I asked somebody.

Q. And what were you told?

A. I think they were -- I was told that they were unhappy with the service on the fire claim of May 18, 2004.

Q. Do you know of an organization entitled either North Bank Towing or Odyssea?

A. Do I know of those organizations?

Q. Yes.

A. Yes, sir.

Q. And does McGriff act as broker for those organizations?

T. I. Montano

A. I don't know.

Q. Do you know if those organizations are shareholders, stockholders, or noteholders of Horizon?

A. I don't know.

Q. Do you know if there was any reinsurance placed by Lloyd's with respect to the cover that we're talking about?

A. I don't know.

Q. Has Aon placed JLT Risk on notice on a claim that Aon may make on JLT?

A. Not that I know of.

MR. KOSTER: I'm going to mark again another document that I believe has already been marked.

(Whereupon, a memorandum dated September 20, 2004 was marked Deposition Exhibit 40 for identification.)

Q. Referring to Exhibit 40, Mr. Montano, do you recall receiving that?

A. No.

Q. You do not recall receiving

T. I. Montano

that? It's addressed to you from Paul Bennett.

A. Yes, I see that, but do I recall actually receiving it? No.

Q. Do you recall reading it at any point?

A. Yes.

Q. When?

A. No, I don't recall exactly when I read it for the first time.

Q. I'm a little confused.

Was it misrouted; you never saw it?

A. No, I'm saying I don't remember actually receiving this piece of paper and reading it on 20th of September, 2004. Or maybe it came in after hours and I read it on the 21st of September. Or maybe it came in on a late Friday and I didn't read it until Monday. I don't recall specifically reading this message.

Q. Well, let me ask you about it.

It says, "we refer to your loss advice dated 17 May, 2004. We would

T. I. Montano

advise that we have received a request from leading underwriters for an update on this loss."

And that's referring to the Gulf Horizon; correct?

A. All I can do is assume that my reference refers to -- I'd have to refer to the notice of loss dated May 17 which has my file number 03M58-A, then yes.

MR. ZERBE: That number is 03-M5058-A.

There's some initials on the upper right-hand corner of that document. Do you recognize those initials?

THE WITNESS: Yes.

MR. ZERBE: Or the handwriting.

THE WITNESS: That's my handwriting.

Q. So that would indicate you saw it at some point?

A. Yes.

Q. Would that indicate to you that the notice of loss that you sent was

T. I. Montano

received?

A. Yes.

Q. At least as of September?

A. Yes, sir.

Q. And it says, "we have received a request from leading underwriters."

Who do you understand leading underwriters to be?

A. Leading underwriters at Lloyd's and I don't recall who the particular syndicate was.

Q. In light of your prior testimony, are you now suggesting this was misleading advice from JLT?

A. In that underwriters had not been advised of the loss or the report?

Q. Well, he represents as a fact that something was reported to them and they made a request for an update on the loss, not a request for the policy.

A. That's right.

Q. Do you know whether that request was -- did your investigation last week indicate or disclose anything regarding

106

T. I. Montano

whether that part of it was true?

MR. ZERBE: What part?

A. Which part?

Q. That Mr. Bennett was not only asking for a copy of the policy but that they asked for updated information.

A. This led me to believe that he advise the underwriters that the loss underwriters asked for additional information. I can only assume that if underwriters ask for additional information with regard to the loss, they know about the loss. That would be common logic.

Q. Just a couple of follow-up questions.

Regarding this fire claim, where did that occur?

A. Off the east coast of the United States in the Atlantic Ocean.

Q. Where was the vessel enroute to?

A. Israel, offshore Israel in the Mediterranean Sea.

Q. And that claim is still pending?

107

T. I. Montano

A. Yes.

Q. And that's being handled in your office?

A. Yes, certain aspects of it, yes.

Q. And you expect that when it's resolved, it will be paid through your office, the loss will be paid?

A. Yes.

Q. Going back to your testimony regarding the vessel valuation, would the actual value for purposes of the insurance be something that the placement office would be in a better position to answer than you in the claims department?

A. Well, once it's in the policy, this is an agreed value policy. I mean, it is what it is as written in the policy.

MR. KOSTER: Give us two minutes.

(Whereupon a break was taken)

Q. Would you look at 321 in the Bates stamps.

Now, I'd like you to look at page 338, specifically line eighty-four where it refers to "subscriptions hereto

108

T. I. Montano

there to the value of the vessel hereby insured provided always that our liability in respect of any one such casualty shall not exceed our proportionate part of the value of the vessel hereby insured."

Do you see that?

A. Yes, sir.

Q. Now, would you go to the previous page and take a look at lines twelve through fourteen where it says -- actually eleven through fourteen where it says, "the subject matter of this insurance is the vessel called the blank and by whatsoever name or names said vessel is or shall be called which, for purpose of this insurance, shall consist of and be limited to her hull, launches, lifeboats, rafts, furniture, bunkers, stores, supplies," and it goes on.

Do you see that?

A. Yes, sir.

Q. Now referring back to 321, why wouldn't that value be $19 million?

A. I believe this is, since it says

109

T. I. Montano

total value, that is total value and the parts we were just reading referred to the hull and machinery cover. Total value refers to both the hull and machinery cover and the IV, the increased value cover which we discussed earlier.

Q. I'm not sure I understand.

Which now are you saying in your view it is, 15.2 or nineteen?

MR. ZERBE: I'm sorry, what is?

Q. The value for purposes of liability cover, not hull cover.

What's the hull value for purposes of this cover that we're talking about? What's the vessel value?

A. The vessel value for hull and machinery coverages, which include the collision liability, is the 15.2 or 15.6, whatever it was. Page 00321 where it lists the total value of nineteen million, that's the cover under the H and M policy plus the value under the IV. As you know, the IV refers to primarily total losses of the vessel.

T. I. Montano

Q. Define IV.

A. Increased value.

MR. KOSTER: We're getting argumentive and I don't want to get argumentive.

I have no further questions. We have a dispute regarding the interpretation of that policy that's not immediately relevant.

MR. ZERBE: Do you have any questions?

MR. RADZIK: Yes.

EXAMINATION BY

MR. RADZIK:

MR. RADZIK: Good afternoon, Mr. Montano. I'll try to speak up so you can hear my questions.

My name is Ed Radzik and I represent underwriters at Lloyd's and certain insurers. I just have some follow-up questions to ask you.

Q. First of all, could you refer to what's been marked as Exhibit 31, which was the stack of documents that were

T. I. Montano

delivered to us by Mr. Zerbe last evening.

A. Yes, sir.

Q. And I'd like you to look at your letter of July 17, 2003 addressed to Mr. Jeffrey Bruner of Iroquois Gas Transmission. It starts at Bates stamp ARS 058 and it continues through 060.

Do you have that letter in front of you, sir?

A. Yes, sir.

Q. This letter is a follow-up or a response to Mr. Bruner's letter to you dated June 9, 2003; is it not?

A. That's what it states, yes, sir.

Q. Do you have that letter in your file packet anywhere?

A. I don't have it with me.

Q. Is that something that would be contained in your file back in Texas?

A. It should be, yes, sir.

Q. Is that something that you can provide for us at the conclusion of this deposition? Through your counsel, of course.

T. I. Montano

A. Yes, sir.

Q. In other words, you can send it to Mr. Zerbe and he can distribute it to us.

A. Yes, sir.

Q. But the upshot of your letter indicates that it encloses nine separate notifications of occurrences that you sent out with respect to two losses, one having to deal with the vessel Sunny and the other having to deal with the Gulf Horizon; is that correct?

A. Yes, sir.

Q. And on the second page of the letter you state, "we believe the enclosures clearly evidence notice to all appropriate insurers with respect to the subject casualties."

Those are your words, sir?

A. Yes, sir.

Q. Now, none of the nine notices that you included in this letter went out to any of the hull and machinery underwriters; is that correct?

T. I. Montano

A. That's correct.

Q. As a matter of fact, the first notice or attempt to notify hull and machinery insurers occurred almost one year later on May 17, 2004; correct?

A. Correct.

Q. Now, in your letter you go on to explain about the specialist operations feature contained in the P and I club rules, specifically Rule 17B.

Do you see that, sir?

A. Second paragraph on page two?

Q. Correct.

A. Yes, I see it.

Q. Am I correct in stating that the specialist operations feature of the P and I cover deals specifically with contractual liability of Horizon arising out of things like pipe laying operations; is that your understanding of what the specialists operations feature is?

A. No, that's not my recollection.

Q. What is your recollection?

A. I think it also would apply to

T. I. Montano

direct liability, not only contractual liabilities, but I could be wrong.

Q. So it's not only contractual but direct liability for pipe laying operations?

A. Yes, sir.

Q. So in your view, the AEGIS policy would clearly cover the events as they were described in connection with this occurrence? And I mean the occurrence of February 27, 2003.

A. That was my view, yes.

Q. And is it still your view today?

A. Yes.

Q. And further in the same letter we have a reference to the P and I club Rule 25XX as it pertains to contract and indemnities.

Do you see that reference, sir, in the bottom paragraph on page two?

A. Yes, sir.

Q. Am I correct in stating that this feature of the P and I cover would extend to Horizon's contractual liability

T. I. Montano

with respect to the occurrences occurring on February 27, 2003?

MR. ZERBE: Objection to form.

A. Sorry, could you repeat that?

MR. RADZIK: Could you read it back.

(Whereupon the requested portion was read back by the reporter)

A. Yes.

Q. And was it your view then back in July of 2003 that that feature of the P and I cover came into play in this incident?

A. Yes.

Q. And does it remain your view that that coverage so extends?

A. Yes.

Q. In the same group of Exhibit 31, I'd like to now focus your attention to Bates stamp ARS-TX 0035, the lower right-hand corner Bates stamp, do you see that e-mail, sir?

A. Yes, sir.

Q. And is that the e-mail from Bill

T. I. Montano

Arnold that you referred to earlier in your testimony --

A. Yes.

Q. -- in response to questions from Mr. Koster as to your first notification of the February 27, 2003 occurrence?

A. Yes, sir.

Q. And if we could now refer to, in the same batch of documents, to Exhibit 31 Bates stamp 0038.

Do you see the exchange there between yourself and Mr. Simon Dawes of the JLT Group on that page?

A. Yes.

Q. Am I correct in stating that Mr. Simon Dawes at the time was your liaison or your contact at JLT solutions for the purposes of this claim?

MR. ZERBE: Objection to form.

A. Simon Dawes was my primary contact with regard to this account, yes, at JLT.

Q. And what was the purpose of this e-mail to Mr. Dawes?

T. I. Montano

A. To advise him of what I exactly say in there, "please notify underwriters to determine if they wish to appoint someone on their/insured's behalf."

Q. You recognized at that point that it was important for underwriters to have someone appointed on their behalf to investigate; is that a fair statement?

A. That's a fair statement, yes, sir.

Q. And at that time --

MR. RADZIK: Strike that.

Q. Is it your understanding that the FFO features of both the P and I policies and the collision provision in the hull and machinery policies require a determination of fault, of actual negligence on the part of the assured in order for there to be a trigger?

MR. ZERBE: Objection to form.

A. Would you repeat the question, please?

MR. RADZIK: Would you read the question back.

126

T. I. Montano

over to the new broker McGriff?

A. Correct.

Q. And did you ever receive a response from Mr. Phillibus regarding this notice?

A. My recollection is that I did not.

Q. I refer you in the same stack of documents ARS-TX 0094.

Do you have that document, sir?

A. Yes, sir.

Q. Is that the notice that Horizon sent out basically advising to underwriters and others whom it may concern that Aon was essentially being replaced by McGriff, Seibels and Williams of Texas, Inc.?

A. That's correct.

MR. RADZIK: I have no further questions. Thank you very much, sir.

EXAMINATION BY

MR. ZERBE:

Q. Mr. Montano, I wanted to just ask a few questions following up on some

127

T. I. Montano

testimony you gave in response to Mr. Koster's questioning with regard to notification to the various underwriters under the hull insurance policy.

I'll ask you to look again at Exhibit 31.

You testified about giving notice directly with respect to the carriers listed on ARS-TX 043, the various underwriters on the security below underwriters at Lloyd's; is that correct?

A. That's correct.

Q. Could you go to the next page ARS-TX 0044.

Do you recognize this document?

A. Yes.

Q. What does this reflect; how is this different from the prior page 0043?

A. Well, at the bottom of it it says, "please acknowledge receipt by signing and returning a copy of this notice" and it's signed by Gina Hartigan, who I believe is with Gulf Coast Marine Insurance Company in New Orleans for Royal

128

T. I. Montano

Insurance Company, and her claim number 014857, I believe.

Q. And does 0044 reflect when this document was received by Aon?

A. 0044?

Q. Yes.

A. No, that's a Bates stamp.

What do you mean?

Q. Does the face of this document indicate when you received this page in any way?

A. It would be May 18, 2004, Tuesday at 11:06, yes.

Q. Turning to the next page ARS-TX 0045, do you recognize the signature under the acknowledgment of receipt portion of this document?

A. I'm assuming it's Brenda Bowman's signature. I haven't seen it before.

Q. And who was Brenda Bowman with?

A. CNA Marine which must have been part of MOAC for Continental Insurance Company.

129

T. I. Montano

Q. Were they a participant in the hull insurance policy?

A. Yes.

Q. And turning to ARS-TX 0046, do you recognize this document?

A. Yes.

Q. Is that your handwriting in the upper right-hand corner?

A. Yes.

Do you want to know what it means?

Q. Yes.

A. The F stands for file and I think the rest of that says hull.

Q. You received this -- you believe you received it on or about the date of the document?

A. Yes.

Q. Turning to the next page ARS-TX 0047, is that your signature?

A. Yes, it is.

Q. Do you recall sending this document on or about June 7, 2004 to the various addressees?

T. I. Montano

A. Yes.

Q. And who did you send this to?

A. I sent it to JLT, I sent it to MOAC, All American Employers, Fireman's Fund, Markel, and Royal.

Q. And turning to ARS-TX 0048, is that your signature?

A. Yes, sir.

Q. And did you send this document to the addressees on or about June 24, 2004?

A. Yes, sir.

Q. That was sent to the same addressees that received -- to which you addressed a copy of your June 7, 2004 letter?

A. Yes.

Q. I believe you might have testified then in response to a question early on in the deposition from Mr. Koster that you were never in direct contact with the underwriters under the hull policy.

Does reviewing these documents refresh your recollection on the issue of

T. I. Montano

whether you were ever in direct contact with any of the hull underwriters?

A. Yes, I need to clarify that I was not in direct contact with underwriters at Lloyd's or other companies in the London market that the business was placed into through JLT but I was in direct contact with the other underwriters on the hull policy.

MR. ZERBE: Thank you.

MR. KOSTER: Nothing further.

(Whereupon a break was taken)

MR. SCHMIDT: On behalf of American Home, I have no questions but I would like to reiterate American Home's reservation of rights with respect to the conduct of this proceeding in light of Judge Rakoff's stay and to specifically reserve the right to take further testimony if and when that stay is ever lifted.

MR. KOSTER: Let me just add to that that this witness was provided in response to a 30(b)(6) motion and

T. I. Montano

while counsel agreed that he would be provided regarding claims and the other portion was stayed, if the stay is lifted at some point then that agreement remains in effect.

Am I correct?

MR. ZERBE: Yes, if the stay is lifted, to the extent there is a request for a further deposition with regard to subjects unrelated to claims covered by your 30(b)(6) notice, we will then consider your request at that time and produce the appropriate person.

(TIME NOTED: 1:26 p.m.)

______________________ (Signature of witness)

Subscribed and sworn to before me this_________ day of________________, 2005.

______________________

* * *

INDEX

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| J. I. Montano | Mr. Koster | 5 |
| | Mr. Radzik | 110 |
| | Mr. Zerbe | 126 |

EXHIBITS

| DEPOSITION | FOR IDENTIFICATION | PAGE |
|---|---|---|
| 29 | Multi-page document | 18 |
| 30 | Letter dated February 21, 2005 | 29 |
| 31 | Multi-page document | 31 |
| 32 | E-mail dated May 12, 2003 | 43 |
| 33 | E-mail dated May 20, 2003 | 46 |
| 34 | E-mail dated August 15, 2003 | 50 |
| 35 | E-mail dated June 10, 2004 | 54 |
| 36 | Three-page document | 66 |
| 37 | Letter dated May 17, 2002 | 66 |
| 38 | Letter dated August 21, 2003 | 73 |
| 39 | One-page document | 87 |
| 40 | Memorandum dated September 20, 2004 | 102 |