# Attachment 8

4/7/03

CG1200

# Crossing Agreement
## Long Island Sound

THIS AGREEMENT is made this 30ᵗʰ day of October, 2002 (this "Agreement"), by and between the **POWER AUTHORITY OF THE STATE OF NEW YORK** ("NYPA" or "Grantee"), a corporate municipal instrumentality and political subdivision of the State of New York, having an office at 123 Main Street, White Plains, New York, 10601; and **IROQUOIS GAS TRANSMISSION SYSTEM, L.P.** ("Iroquois Gas"), a Delaware Limited Partnership, having an office at One Corporate Drive, Shelton, Connecticut, 06484, by Iroquois Gas' agent, **IROQUOIS PIPELINE OPERATING COMPANY** ("Iroquois Pipeline") (NYPA and Iroquois Gas may be hereinafter referred to collectively as the "Parties", and individually as "Party", as the context requires).

## PREAMBLE:

**WHEREAS**, by Grant of Easement from the New York State Office of General Services ("OGS") dated June 28, 1996 and recorded in the records of the said OGS and in the Westchester County Clerk's office on August 14, 1997 in Book 11788 of Deeds at page 312 (the "NYS Easement"), the Grantee installed four parallel solid-dielectric 345 kV cables ("the Sound Cable Project" or "Y-49 Cable"), under Long Island Sound between transition stations in the City of New Rochelle, Westchester County and the Town of North Hempstead, Nassau County, New York; and

**WHEREAS**, the Grantee obtained the NYS Easement following receipt from the Public Service Commission of the State of New York ("PSC"), pursuant to Article VII of the Public Service Law of the State of New York ("PSL"), of an Opinion and Order Granting Certificates of Environmental Compatibility and Public Need for the Sound Cable Project with Conditions (Opinion No. 88-14 issued May 18, 1988 ("Art. VII Certificate") as the Sound Cable Project is more particularly described therein; and

**WHEREAS**, the Grantee also obtained the appropriate permits from the United States Army Corps of Engineers ("Corps") for construction of the Y-49 Cable; and

**WHEREAS**, the Y-49 Cable's electric capacity is primarily dedicated to Long Island Lighting Company d/b/a LIPA ("LIPA"); and

**WHEREAS**, Iroquois Gas has received authorization (the "FERC Authorization") from the Federal Energy Regulatory Commission ("FERC") to install a 24-inch steel, natural gas pipeline ("Pipeline") along a route which will require the Pipeline to cross the NYS Easement and the Y-49 Cable; and

**IRO/AE 00755**

**FMIC 001725**

WHEREAS, Iroquois Gas has received from the Corps, New York District, a Department of the Army Permit, pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. §403) and Section 404 of the Clean Water Act (33 U.S.C. §1344) ("Corps Permit") for the installation of the Pipeline beneath Long Island Sound and the East River; and

WHEREAS, the route of the Pipeline authorized in the Corps Permit crosses the Y-49 Cable installed within the NYS Easement at a designated location under Long Island Sound, which location, and the immediately surrounding area, is more particularly described in Exhibit "B" annexed hereto and made a part hereof (the "Crossing"); and

WHEREAS, Iroquois Gas has requested the Grantee to consent to the Crossing and the grant by OGS to Iroquois Gas of a certain easement under and across Long Island Sound to enable Iroquois Gas to construct, install, operate, maintain and repair the Pipeline (the "Iroquois Gas Easement"); and

WHEREAS, the Grantee is willing to provide such consent to Iroquois Gas to the extent permissible under the NYS Easement and subject to the terms thereof and the issuance of the Iroquois Gas Easement; and

WHEREAS, the Parties wish to set forth in this Agreement their respective rights and obligations with respect to the construction and installation of the Pipeline and the respective rights and obligations of the Parties with respect to the operation, maintenance, repair, and replacement of the Y-49 Cable and the Pipeline (the Y-49 Cable and the Pipeline are herein referred to collectively as the "Facilities").

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Terms not otherwise defined elsewhere in this Agreement shall be defined as follows:

A.      "Applicable Laws" means all laws (including Environmental Laws), treaties, ordinances, judgments, decrees, injunctions, writs, consent orders and orders of any court, arbitrator or Governmental Authority and rules, regulations, orders and interpretations of any federal, state, county, municipal, regional, environmental or other governmental body, instrumentality, agency, authority, court, or other body having jurisdiction over the NYS Easement, Iroquois Gas Easement, the Parties, Crossing, Pipeline or Y-49 Cable as is in effect from time to time.

IRO/AE 00756

FMIC 001726

B.    "Applicable Permits" means any Permit required to be obtained or maintained in connection with construction and installation of the Pipeline, and the operation, maintenance, repair, removal, reinforcement and replacement of the Pipeline or the Y-49 Cable, as the case may be, including, but not limited to, the Corps Permit, Art. VII Certificate for the Y-49 Cable, NYS Easement, Iroquois Gas Easement and the FERC Authorization.

C.    "Art. VII Certificate" shall have the meaning set forth in the Preamble.

D.    "Best Engineering Practices" means, with respect to the design, installation and construction of the Pipeline at the Crossing, those practices, methods and acts engaged in or approved by a significant portion of engineering experts in the field of gas transmission facilities, the fields of civil, mechanical and metallurgical engineering, and the field of high voltage electric cable and cathodic protection, which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, would have been expected to best to prevent accidents relating to and interference with the Y-49 Cable.

E.    "Corps Permit" has the meaning set forth in the Preamble.

F.    "Critical Day" means any day during which NYPA's System operator, LIPA's System operator, or NYISO determines, in the exercise of Prudent Utility Practice, that there is a material risk that the projected demand in any part of the Long Island electricity system may exceed available electric supply or when local or national events, or potential events, as reasonably determined by such system operators, place System Integrity, as hereinafter defined, at risk.

G.    "Crossing" shall have the meaning set forth in the Preamble.

H.    "Environmental Laws" means all applicable former, current and future federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), Environmental Permits (as such term is defined herein) and New York State Department of Environmental Conservation Technical Administrative Guidance Memoranda and other guidance documents issued or published by any Governmental Authority (as such term is defined herein), in each case, relating to pollution, protection of the environment, natural resources or human health and safety, including laws relating to the presence, Release (as such term is defined herein) of, or exposure to, Hazardous Substances (as such term is defined herein), or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or arrangement for such activities with respect to, Hazardous Substances.

IRO/AE 00757

FMIC 001727

I.    "Environmental Permits" means the Permits required under or pursuant to Environmental Laws.

J.    "Facilities" shall have the meaning set forth in the Preamble.

K.    "Good Engineering Practice" means any of the practices, methods and acts engaged in, or approved by a significant portion of the gas transmission industry or electric transmission industry (as the case may be) which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, would have been expected to accomplish the desired result in a manner consistent with reliability, safety, environmental protection, expedition, project economics and Applicable Laws for similar facilities; provided, however, that in the event and to the extent that a different standard is set forth in any Applicable Permit and validly governs the activity in question, then Good Engineering Practice shall mean such different standard, unless the standard set forth in such Applicable Permit is a lesser standard. Good Engineering Practice is not intended to be limited to consideration of any one practice, method or act, to the exclusion of all others, but rather, is intended to require the consideration of a spectrum of possible practices, methods or acts.

L.    "Governmental Authority" means any federal, state, local, domestic or foreign government or any court, administrative or regulatory agency, board, committee or commission or other governmental entity or instrumentality, domestic, foreign or supranational or any department thereof.

M.    "Hazardous Substances" means (i) any petroleum, petroleum products or byproducts and all other hydrocarbons, petrochemicals, crude oil or any fraction thereof, coal ash, radon gas, asbestos, asbestos-containing material, urea formaldehyde, polychlorinated biphenyls, chlorofluorocarbons and other ozone-depleting substances; and (ii) any chemical, material, substance or waste (including thermal discharges) that is prohibited, limited or regulated by or pursuant to any Environmental Law.

N.    "No-Objection Letter" means any letter provided by any Party to OGS pursuant to which such Party does not object to the grant or extension of an OGS easement.

O.    "NYISO" means the New York Independent System Operator or any successor organization thereto that administers the wholesale electricity markets in New York State substantially as a whole, including without limitation, any regional transmission organization authorized by FERC.

P.    "NYISO System Operation Procedures" means the applicable rules, procedures, practices, manuals, and tariffs of the NYISO.

IRO/AE 00758

FMIC 001728

Q.    "NYPA's System" means NYPA's electric transmission system.

R.    "NYS Easement" is defined in the Preamble.

S.    "OGS" is defined in the Preamble.

T.    "Permit" means any valid consent, ruling, judgment, decree, waiver, exemption, variance, franchise, certificate, permit, authorization, approval, consent, license or similar order, including any application submitted to obtain same, of or from any Governmental Authority.

U.    "Release" means any actual or threatened release, spill, emission, emptying, escape, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment or within any building, structure, facility or fixture.

V.    "System Emergency" means the existence of a physical or operational condition or the occurrence of an event which, at the time of such condition or occurrence: (i) impairs or will imminently impair the safety and/or reliability and/or operation of NYPA's System and/or LIPA's System, or of service to NYPA's customers and/or LIPA's customers; or (ii) is imminently likely to endanger life or property.

W.    "Pipeline Emergency" means the existence of a physical or operational condition or the occurrence of an event which, at the time of such condition or occurrence: (i) impairs or will imminently impair the safety and/or reliability and/or operation of the Pipeline, or of service to Iroquois Gas' customers; or (ii) is imminently likely to endanger life or property.

X.    "System Integrity" means the adequate and reliable state of operation of NYPA's System and LIPA's System.

Y.    "Pipeline Integrity" means the adequate and reliable state of operation of the Pipeline.

Z.    "System Pre-Emergency" means a condition that reasonably could be expected, if permitted to continue, to contribute to a System Emergency or to a degraded operating condition as defined in NYISO System Operation Procedure 0.3 ("Procedure 0.3"). Degraded operating conditions include the Alert, Warning, Major Emergency, and Restoration as defined in Procedure 0.3.

AA.    "Y-49 Cable" shall have the meaning set forth in the Preamble of this Agreement, and any addition, substitution or replacement thereof, in whole or in part.

IRO/AE 00759

FMIC 001729

BB.    "Prudent Utility Practice" means any of the practices, methods or acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods or acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Prudent Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to delineate acceptable practices, methods, or acts generally accepted in the region.

CC.    "LIPA's System" means LIPA's electric transmission and distribution system.

## ARTICLE II
## NO OBJECTION TO IROQUOIS GAS EASEMENT

The Grantee in exchange for the consideration and covenants set forth herein, does not object, to the extent permissible under the NYS Easement and subject to the terms thereof, this Agreement and Applicable Laws, to (1) the grant by OGS to Iroquois Gas of the Iroquois Gas Easement, (2) the Crossing, and (3) the construction, and installation, operation, maintenance, repair, and replacement of the Pipeline by Iroquois Gas.  In the event that the Iroquois Gas Easement is not granted by OGS on or before the date which is one year from the date of this Agreement, then either Party may terminate this Agreement on twenty (20) days prior written notice to the other Party.  Iroquois Gas shall provide a copy of the Iroquois Gas Easement to Grantee upon request.

## ARTICLE III
## PIPELINE INSTALLATION AND CONSTRUCTION
## PROCEDURES AT THE CROSSING

A.    Iroquois Gas shall perform and furnish or cause to be performed and furnished, and be responsible for all costs and expenses associated with, all work, materials, equipment and services in connection with the design, engineering, construction, installation, testing and operation of the Pipeline at the Crossing.  Set forth in Exhibit A attached hereto (and made a part hereof) are the procedures, plans, specifications and technical requirements ("Scope of Work") which shall be followed by Iroquois Gas in performing the installation and construction of the Pipeline at the Crossing (the "Work").  For purposes of this Agreement, the Work shall be deemed complete on the day which is one hundred twenty (120) days after the date upon which the Pipeline commences

IRO/AE 00760

FMIC 001730

commercial operation. Iroquois Gas shall notify the Grantee of the date upon which the Pipeline commences commercial operation. The Scope of Work has been reviewed by the Grantee and Grantee acknowledges that it has no objection to Iroquois Gas proceeding with the Work in accordance with the Scope of Work. The Scope of Work may not be modified or changed unless such modification or change is agreed to by the Parties. The Scope of Work reflects the Best Engineering Practices in effect at the current time. Notwithstanding the foregoing, the Grantee acknowledges and agrees that the procedures set forth in the Scope of Work must be consistent with the terms and conditions of any Applicable Permits. In the event of any conflict or inconsistency between the Scope of Work and the Applicable Permit, the Parties shall mutually resolve the conflict or inconsistency.

B.      Iroquois Gas shall perform and furnish or cause to be performed and furnished, at its sole cost and expense, the Work in accordance with: (i) all Applicable Laws; (ii) the Scope of Work; and (iii) Applicable Permits. With respect to those items of Work described in the Scope of Work which involve the use of heavy structures or heavy equipment at the Crossing, Iroquois Gas shall provide the Grantee and LIPA with at least thirty (30) days prior written notice of the estimated date on which such Work is scheduled to commence. With respect to all other items of Work described in the Scope of Work, Iroquois Gas shall provide the Grantee and LIPA with at least twenty-one (21) days prior written notice of the estimated date on which such Work is scheduled to commence at the Crossing. Iroquois Gas shall provide the Grantee and LIPA with weekly updates as to any changes in the scheduling of the Work. Iroquois Gas shall permit the Grantee, LIPA or their representatives access to the Work at all times including, but not limited to, any and all marine and underwater operations performed by Iroquois Gas in connection with the Work.

C.      Prior to the commencement of the Work, Iroquois Gas shall meet with NYPA's System operator and LIPA's System operator to coordinate and schedule the Work in an effort to prevent the performance of the Work at the Crossing on a Critical Day. Either the Grantee or LIPA shall have the right to immediately stop the construction and installation of the Pipeline at the Crossing upon oral notice to Iroquois Gas, if, and only if, as determined by Grantee's system operator or LIPA's system operator, as the case may be, (1) a System Emergency or System Pre-Emergency or Critical Day has occurred, (2) the continuation of the construction and installation of the Pipeline jeopardizes the continued transmission and delivery of electrical energy through the Y-49 Cable, and (3) additional reserve capacity from other locations on the Grantee's system or LIPA's system, as the case may be, is not available to Grantee or LIPA, as the case may be, at comparable prices. Upon receipt of such notice from Grantee or LIPA, Iroquois Gas shall immediately stop the construction and installation of the Pipeline at the Crossing and shall immediately confirm such stoppage to Grantee and LIPA.

IRO/AE 00761

FMIC 001731

D.    Iroquois Gas shall defend, indemnify and hold harmless the Grantee from and against any and all costs and expenses incurred as a result of damage to the Y-49 Cable arising out of or connected with the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents and employees in connection with the Work.

E.    Iroquois Gas shall furnish, at its sole cost and expense, the Grantee, LIPA and OGS with any permits, surveys, maps and other documentation that may be required by OGS or any Governmental Authority, in connection with this Agreement.

F.    The approval by the Grantee of the Scope of Work shall not result in any liability to the Grantee, it being intended by the Parties that such approval indicates only that the Grantee has no objection to Iroquois Gas proceeding with the Work pursuant to the Scope of Work.

G.    In the event that the Y-49 Cable is damaged or rendered inoperable, during the Work, and such damage or inoperability arises out of the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees: (i) Iroquois Gas shall pay all costs and expenses to repair and restore the Y-49 Cable to the operational status as existed before the damage or rendering of inoperability; and (ii) the Grantee shall make arrangements for and provide, at Iroquois Gas' sole cost and expense, equivalent replacement electrical capacity during the period the Y-49 Cable is inoperable or out of service.  Notwithstanding the foregoing, the Grantee agrees to use commercially reasonable efforts at all times to mitigate any damages for which Iroquois Gas may be responsible pursuant to this Section G.

H.    Iroquois Gas has caused the area near the Crossing to be surveyed and investigated.  In connection with such survey and inspection, the following reports have been previously provided to the Grantee: (1) Iroquois Eastchester Pipeline Route Alignment Sheet Plan and Profile, Sheet 11 of 16, Drawing No. H-1183.04-20.1-DRW-04-011-3, dated June 21, 2002, (2) Eastchester Extension Project Diver Inspection of Cable Crossing Sites in Long Island Sound, dated January 2002, and (3) NYPA Cable Crossing Design Report - by INTEC Engineering - June 2002.  Iroquois Gas accepts the matters set forth in such reports as representing the current conditions at the Crossing (except for the condition of the Y-49 Cable).

I.    In the event that, during the Work, either Party learns that the Facilities of the other Party is/are damaged or destroyed, such Party shall immediately notify the other Party orally, which notice shall be promptly confirmed in writing. The Parties agree to cooperate with each other in good faith to develop a plan to govern the procedures to be followed if any repairs are required.  The procedures and protocols for performing the Work shall, to the maximum possible extent, apply to such repairs.

-8-

IRO/AE 00762

FMIC 001732

## ARTICLE IV
## OPERATION, MAINTENANCE AND REPAIRS AT CROSSING AFTER PIPELINE CONSTRUCTION

A.     As between the Parties hereto, Iroquois Gas shall perform and furnish or cause to be performed and furnished, and be responsible for all costs and expenses associated with, all work, services, materials and equipment in connection with the operation and maintenance of, repairs to, and relocation of, the Pipeline at the Crossing (collectively, "Iroquois Repair Work"). Except for payments and expenses for which Iroquois Gas is responsible under the Service Agreement (as herein defined), the Grantee shall perform and furnish, or cause to be performed and furnished, and be responsible for all costs and expenses associated with, all work, services, materials and equipment in connection with the operation and maintenance of, repairs to, and relocation of, the Y-49 Cable (collectively, "Grantee Repair Work" and together with Iroquois Repair Work, "Repair Work"); provided, however, that Iroquois Gas shall bear all costs and perform all work associated with the relocation and replacement of the Pipeline protective structures (*e.g.*, concrete mats, rock, rip-rap, *etc.*) in the event Grantee requires access to the Y-49 Cable at the Crossing as set forth in Article IV Section B.

B.     Iroquois Gas shall pay any and all additional costs and expenses reasonably incurred by the Grantee due to the presence of the Pipeline over the Y-49 Cable which are incurred by the Grantee in connection with Grantee Repair Work. In the event Grantee intends to perform Grantee Repair Work on the Y-49 Cable at the Crossing or in the event of an emergency affecting the Y-49 Cable at the Crossing and, in either case, there is no practical way to perform such work other than by relocating, removing and replacing the Pipeline protective structures (*e.g.*, concrete mats, rock, rip-rap, *etc.*), Iroquois Gas shall, at its sole cost and expense, make immediate arrangements for and provide to Grantee unobstructed access (except for the presence of the Pipeline) to the Y-49 Cable at the Crossing.

C.     As between the Parties hereto, Iroquois Gas shall perform Iroquois Repair Work in accordance with: (i) all Applicable Laws; (ii) Good Engineering Practice; and (iii) all Applicable Permits, and, except for payments and expenses for which Iroquois Gas is responsible under the Service Agreement, the Grantee shall perform Grantee Repair Work in accordance with: (i) all Applicable Laws; (ii) Good Engineering Practice; and (iii) all Applicable Permits.

D.     Neither Iroquois Gas, on the one hand, nor the Grantee, on the other hand, shall operate the Facilities or perform Repair Work, in any manner that: (i) results in or could be reasonably expected to result in any damage to the Facilities; (ii) otherwise results in or could be reasonably expected to result in (x) personal injury or loss of life, (y) physical damage or physical harm to property, NYPA's System, LIPA's System or

-9-

IRO/AE 00763

FMIC 001733

the Pipeline, or (z) damage or harm to System Integrity, Pipeline Integrity or public safety; (iii) has or is reasonably likely to have an adverse effect on the operation and quality of service provided by NYPA's System, LIPA's System or the Facilities; and/or (iv) creates or contributes, or could be reasonably expected to create or contribute to a System Emergency, System Pre-Emergency or Pipeline Emergency.

E.     The Grantee shall have access to the Y-49 Cable as necessary for the purpose of conducting all normal business incident to inspecting, operating, maintaining, repairing and replacing the Y-49 Cable. Iroquois Gas shall have access to the Pipeline as necessary for the purpose of conducting all normal business incident to inspecting, operating, maintaining, repairing and replacing the Pipeline.

F.     Whenever a Party intends to perform Repair Work at the Crossing, such Party shall give reasonable advance written notice to the other Party setting forth when and where such activities will be conducted and a description (in reasonable detail) of the nature of the Repair Work to be conducted. In addition, whenever a Party intends to perform work on any of its facilities (at any location) and such activities could reasonably be expected to have an adverse impact on the Facilities, such Party shall give reasonable advance written notice to the other Party setting forth when and where such activities will be conducted and a description (in reasonable detail) of the nature of the work to be conducted and a description of the potential adverse impact upon the Facilities. The aforementioned notification requirements shall apply in all cases, including emergencies, provided that in the case of an emergency, the notice shall be given as soon as is reasonably practicable under the circumstances.

G.     Except in cases of emergency affecting the Pipeline, either the Grantee or LIPA shall have the right to immediately stop the performance of Iroquois Repair Work at the Crossing upon oral notice to Iroquois Gas, if, and only if, as determined by the Grantee's system operator or LIPA's System operator, as the case may be, (1) a System Emergency or System Pre-Emergency or Critical Day has occurred, (2) the Iroquois Repair Work jeopardizes the continued transmission and delivery of electrical energy through the Y-49 Cable, and (3) additional reserve capacity from other locations on Grantee's system or LIPA's System, as the case may be, is not available to Grantee or LIPA, as the case may be, at comparable prices. Upon receipt of such notice from Grantee or LIPA, Iroquois Gas shall immediately stop the Iroquois Repair Work at the Crossing and shall immediately confirm such stoppage to Grantee and LIPA.

H.     Each Party and LIPA shall have the right to have a representative present to observe any Repair Work being conducted at or near the Crossing which reasonably could be expected to have an adverse impact on such Party's Facilities including, but not limited to, any and all marine and underwater operations.

I.     In the event that either Party learns that the Facilities of the other Party

-10-

IRO/AE 00764

FMIC 001734

is/are damaged or destroyed, such Party shall immediately notify the other Party orally, which notice shall be promptly confirmed in writing. The Parties agree to cooperate with each other in good faith to develop a plan to govern the procedures to be followed if any Repair Work is required. A sample repair plan is annexed hereto and made a part hereof as Exhibit C, which is hereby incorporated into and made a part of this Agreement.

J.      Subject to the terms and conditions of Article VI hereof, (1) Iroquois Gas agrees to provide to the Grantee copies of all maintenance and inspection reports relating to the area of the Pipeline at the Crossing, including, but not limited to, the results of any "smart pig" and cathodic testing, and (2) the Grantee agrees to provide to Iroquois Gas copies of all maintenance and inspection reports relating to the area of the Y-49 Cable at the Crossing.

K. :    In the event that the Y-49 Cable is damaged or rendered inoperable, during any Iroquois Repair Work, and such damage or inoperability arises out of the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees, then Iroquois Gas shall pay all costs and expenses to repair and restore the Y-49 Cable to the operational status as existed before the damage or rendering of inoperability. In the event that the Pipeline is damaged or rendered inoperable, during any Grantee Repair Work, and such damage or inoperability arises out of the negligence, acts, omissions or willful misconduct of the Grantee, its contractors, subcontractors, agents or employees, then Grantee shall pay all costs and expenses to repair and restore the Pipeline to the operational status as existed before the damage or rendering of inoperability. Notwithstanding the foregoing, the Party whose Facility has been damaged or rendered inoperable agrees to use commercially reasonable efforts at all times to mitigate any damages for which any other Party may be responsible pursuant to this Section K.

## ARTICLE V
## PAYMENT

A.      After the execution and delivery of this Agreement by the Parties, the Parties agree to promptly negotiate, execute and deliver an agreement ("Service Agreement") which will govern the rights and obligations of the Parties with respect to certain payments to be made by Iroquois Gas to the Grantee. The terms and conditions of the Service Agreement shall provide as follows. Iroquois Gas shall pay all costs reasonably incurred (1) by Grantee and LIPA in reviewing and preparing this Agreement as well as any and all plans, specifications and documents relating to the Scope of Work, (2) by Grantee and LIPA in retaining consultants reasonably necessary for oversight of the Work, and (3) by Grantee and LIPA for oversight of the Work by Grantee and LIPA. Set forth in Exhibit D attached hereto is a list of the costs already incurred by Grantee and

-11-

IRO/AE 00765

FMIC 001735

LIPA in connection with the foregoing as well as a reasonable estimate of said costs that will be incurred by Grantee and LIPA through the end of the Work. The Service Agreement shall also provide that after the completion of the Work, Iroquois Gas shall pay the Grantee and LIPA for the costs reasonably incurred by Grantee related to review and oversight of any Iroquois Repair Work; provided, however, before any costs shall be incurred by Grantee or LIPA relating to review and oversight of Iroquois Repair Work, Grantee and LIPA shall submit to Iroquois Gas for review an estimate of the costs expected to be incurred by Grantee and LIPA relating to review and oversight of Iroquois Repair Work. The remaining terms and conditions of the Service Agreement shall be mutually satisfactory to the Parties. Iroquois Gas shall make an advance payment of One Hundred Thousand and no/100 ($100,000.00) Dollars (the "Deposit") towards the costs expected to be billed to Iroquois Gas under the Service Agreement. In the event that the costs billed under the Service Agreement at the completion of the Work are less than the amount of the Deposit, then and in such event the Grantee shall promptly refund to Iroquois Gas the amount of the Deposit which remains unused.

      B.     For any other amounts for which a Party is entitled to reimbursement under this Agreement, the Party incurring such costs and expenses shall invoice the Party responsible under this Agreement to pay such costs and expenses on a monthly basis for all such reimbursable costs and expenses incurred during the previous month. The Party responsible for paying such costs and expenses shall pay all invoiced amounts within thirty (30) days of receipt of such invoice. Any overdue amounts shall bear interest from the due date through the date of payment at a rate of 1.5% per month.

### ARTICLE VI
### CONFIDENTIALITY

      A.     Each Party (the "Receiving Party") shall keep confidential and shall cause its trustees, directors, officers, affiliates, employees, contractors, agents and other representatives (including financial advisors, attorneys and accountants) (collectively, the "Representatives") to keep confidential (except to the extent disclosure may be compelled by a Governmental Authority or required pursuant to Applicable Laws, and then only after compliance with Section B of this Article VI) any and all documents and information that are designated "confidential" and that are (i) furnished or disclosed by another Party hereto (the "Disclosing Party") in connection with this Agreement or (ii) learned by the Receiving Party, during the course of performance of this Agreement (the "Confidential Information"); provided, however, that the obligation hereunder to maintain Confidential Information shall expire two (2) years after any such Confidential Information is first furnished, disclosed or learned. The term "Confidential Information" shall not include any such documents or information that (i) is or becomes generally available to the public other than as a result of a disclosure by the Disclosing Party or its Representative, (ii) is

IRO/AE 00766

FMIC 001736

developed by the Receiving Party or its Representative independently and without use of, and does not contain or reflect, information furnished by the Disclosing Party or its Representative, or (iii) is or becomes available to the Receiving Party on a non-confidential basis from a source (other than the Disclosing Party or its Representative) which, to the best of the Receiving Party's knowledge after due inquiry, is not prohibited from disclosing such information to the Receiving Party by a legal, contractual or fiduciary obligation to the Disclosing Party. The Receiving Party shall not without the prior written consent of the Disclosing Party, release or disclose Confidential Information to any person, other than to its Representative on a need to know basis and who have first been advised of the confidentiality provisions of this Article VI and have agreed to comply with such provisions.

B.    In the event that the Receiving Party or any of its Representatives receive a subpoena or are otherwise ordered by a Governmental Authority or by Applicable Law to disclose any of the Confidential Information, the Receiving Party shall notify the Disclosing Party promptly so that the Disclosing Party may seek a protective order or other appropriate remedy or, in the Disclosing Party's sole discretion, waive compliance with the terms of this Article VI.

1.    In the event that no such protective order or other remedy is obtained, or that the Disclosing Party does not waive compliance with the terms of this Article VI, the Receiving Party shall furnish only that portion of the Confidential Information which the Receiving Party is advised by counsel is legally required and, except where disclosure on a non-confidential basis is required such as under New York State Freedom of Information Law, shall exercise its reasonable best efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information so furnished.

2.    Notwithstanding anything in this Article VI to the contrary, if FERC or its staff, during the course of an investigation or otherwise, requests information from the Receiving Party that is otherwise required to be maintained in confidence pursuant to this Agreement, the Receiving Party shall provide the requested information to FERC or its staff within the time provided for in the request for information. In providing the information to FERC or its staff, the Receiving Party shall, consistent with 18 C.F.R. Section 388.112, request that the information be treated as confidential and non-public by FERC and its staff and that the information be withheld from public disclosure. The Receiving Party shall notify the Disclosing Party, when it is notified by FERC or its staff, that a request for disclosure of, or decision to disclose, Confidential Information has been received, at which time either of the parties may

-13-

IRO/AE 00767

FMIC 001737

respond before such information would be made public, pursuant to 18
C.F.R. Section 388.112.

C.    In the event of litigation relating to the confidentiality provisions of this
Article VI, if a court of competent jurisdiction determines in a final, nonappealable order
that this Article VI has been breached by a Party or its Representatives, then such
breaching Party shall reimburse the other Party for the reasonable costs and expenses
(including legal fees and expenses) incurred in connection with all such litigation.

D.    By providing Confidential Information, neither the Grantee nor Iroquois
Gas makes any warranties or representation as to its accuracy or completeness. In
addition, by supplying Confidential Information, neither the Grantee nor Iroquois Gas
obligates itself to provide any particular information or Confidential Information to the
other Party nor to enter into any further agreements or proceed with any other
relationship or joint venture.

E.    Each Party shall use at least the same standard of care to protect
Confidential Information as it uses to protect its own confidential information from
unauthorized disclosure, publication or dissemination.

F.    Upon termination of this Agreement for any reason, each Party shall,
promptly upon receipt of a written request from the other Party, destroy, erase or delete
or return to the other Party without retaining copies thereof, any and all written or
tangible Confidential Information received from the other Party.


# ARTICLE VII
## INSURANCE

A.    During the period commencing with the start of installation of the Pipeline
in the Long Island Sound and (except as set forth in Section A.5 below) continuing until
the date which is one hundred twenty (120) days after the Pipeline has commenced
commercial operation, Iroquois Gas, at its own cost and expense, shall procure and
maintain, and/or cause its contractors and subcontractors to procure and maintain, the
following minimum insurance:

1.    Workers' Compensation Insurance in accordance with statutory
requirements and Employer's Liability insurance with a
minimum liability limit of $1,000,000 per accident. Maritime
Employers Liability and/or Jones Act Coverage will be required
of Iroquois Gas' contractors and subcontractors when
applicable.

-14-

IRO/AE 00768

FMIC 001738

2. <u>Commercial General Liability Insurance</u> with a minimum liability limit of $1,000,000 per occurrence, $2,000,000 general aggregate. Such policy shall include standard Contractual Liability coverage. NYPA shall be named as additional insured with respect to operations relating to this Agreement for incidents arising out of the negligence of Iroquois Gas, its contractors or subcontractors.

3. <u>Commercial Automobile Liability Insurance</u> with a minimum liability limit of $1,000,000 per occurrence. This insurance shall apply to all owned, non-owned, and hired automobiles used by Iroquois Gas.

4. <u>Umbrella Liability Insurance Policy</u> with coverage for Commercial General Liability, Automobile Liability, and Employer's Liability with a minimum liability limit of $30,000,000 per occurrence. Such policy shall contain sudden and accidental pollution coverage.

5. Maritime Liability Insurance and/or Protection and Indemnity Insurance covering all owned, hired and non-owned marine craft with a combined single limit of not less than $5,000,000. Notwithstanding that the Work shall not be deemed complete until the date which is one hundred twenty (120) days after the Pipeline has commenced commercial operation, Iroquois Gas shall have no obligation to maintain the insurance set forth in this Section A.5 after the actual completion of the Work; provided, however, that in the event any Repair Work at the Crossing shall require Iroquois Gas to use marine vessels to perform such Repair Work, Iroquois Gas shall procure and maintain (or cause its contractors or subcontractors to procure and maintain) the insurance required by this Section A.5 during the performance of such Repair Work.

6. Contractors Pollution Liability Policy in the amount of $10,000,000 per occurrence, $10,000,000 general aggregate will be in place during construction of Eastchester Extension with a five (5) year completed operations endorsement.

7. Iroquois Gas shall deliver to the Grantee, prior to the start of construction, certificates of insurance showing that the insurance requirements set forth in this Article VII A are in full force and effect and that not less than thirty (30) days written notice will be given to the Grantee prior to cancellation, termination or material alteration of the insurance. The provision of such insurance, however, shall in no manner relieve or release Iroquois Gas, its

-15-

IRO/AE 00769

FMIC 001739

agents, contractors, subcontractors, and invitees from liability, or limit such liability as to any and all obligations herein assumed.

8.  In the event that any of the above insurance policies are available only on a claims-made basis, then the dates of coverage (including the retroactive dates) and the time period within which any claim can be filed will be so stated on the certificate of insurance and Iroquois Gas shall not permit any lapse in coverage to occur.

9.  Iroquois Gas shall notify the Grantee's Claims Departments, in writing, of all accidents arising out of its performance under this Agreement verbally within forty-eight (48) hours, to be confirmed in writing within five (5) days, after Iroquois Gas learns of such occurrence. Such notice by Iroquois Gas to the Grantee shall not relieve Iroquois Gas of any of its obligations under this Agreement nor be construed to be other than mere notification.

10.  In the event that Iroquois Gas causes or permits any of the required insurance to lapse or be cancelled and fails to promptly provide equivalent coverage, the Grantee may, at its option, purchase comparable insurance and charge back the costs of such insurance to Iroquois Gas, which charge shall be due and payable in full by Iroquois Gas on the Grantee's demand therefor.

11.  Iroquois Gas shall also be responsible for ensuring that all contractors and subcontractors performing work at the Crossing obtain reasonable limits of insurance in forms and with companies consistent with those set forth in this Article.

12.  Iroquois Gas and its contractors and subcontractors shall name NYPA as additional insured under all of Iroquois policies of insurance as set forth in this Article.

13   All policies of insurance required to be obtained by Iroquois Gas pursuant to the terms of this Article VII A shall be primary to any insurance policies held or obtained by Grantee.

B.     (1) The Parties agree to carry, at their own cost and expense and throughout the term of this Agreement, policies of insurance covering fire, liability, worker's compensation, property all-risk, comprehensive bodily injury, property damage liability and automobile liability, products, completed operations, explosion and collapse, contractual and personal injury liability and other forms of insurance relating to, in the case of Iroquois Gas, the Pipeline and, in the case of the Grantee, the Y-49 Cable. Such insurance shall be in such amounts, have such deductibles and retentions and be

-16-

IRO/AE 00770

FMIC 001740

underwritten by such companies as would be obtained by a reasonably prudent operator in the electric power business or gas transmission business, as applicable, and shall be primary and noncontributory with any insurance carried by the other Party and it shall not require that such other Party pay any premium thereunder. Notwithstanding the foregoing, either Party may self-insure against any of the liabilities set forth in the first sentence of this Article VII B (1) if such Party satisfies all applicable statutory and regulatory criteria with respect to the self-insurance of the relevant liability and provides notice to the other Party of such Party's intention to self-insure. Upon receipt of any notice of cancellation or expiration of any such insurance policy, the Party receiving such notice shall immediately give written notice to the other Party.

(2) The Parties agree to furnish each other with certificates of insurance evidencing the insurance coverage set forth in this Article VII B and, upon reasonable request, a copy of any insurance policy referred to therein.

(3) Except for worker's compensation insurance, each Party shall be named as an additional insured under the general liability insurance policies maintained by each Party pursuant to this Article VII B.

ARTICLE VIII
ENVIRONMENTAL MATTERS

A. The Parties agree to cooperate with each other concerning (i) any plans to prevent or respond to spills of Hazardous Substances at or near the Crossing, to the extent such plans are required by any Governmental Authority, (ii) the selection of a response measure or remedial action and any follow-up or other reports required under applicable Environmental Laws in connection with any Release described in paragraph B below, and (iii) obtaining any Permits required by any Governmental Authority as a result thereof.

B. Each Party shall upon discovery immediately notify the other Party orally, which notice shall be promptly confirmed in writing, of any Release of Hazardous Substances (i) at or near the Crossing or (ii) originating from, or relating to, any facilities, equipment or systems owned by the other Party that are located at the Crossing. In the event of any such Release, such notifying Party shall make all initial notifications to Governmental Authorities required under Applicable Laws.

C. Notwithstanding anything to the contrary in the foregoing, Iroquois Gas shall make all initial notifications to Governmental Authorities required under Applicable Laws and shall take all required initial response measures to contain and isolate any Release of Hazardous Substances, at its own expense, which is caused by Iroquois Gas during the Work.

IRO/AE 00771

FMIC 001741

## ARTICLE IX
## INDEMNIFICATION AND LIMITATION OF LIABILITY

A.    Iroquois Gas shall indemnify, save harmless, and defend the Grantee and
its parent corporations, subsidiaries, affiliates, shareholders, officers, trustees, directors,
employees, contractors, subcontractors and agents (the "Indemnified Parties") against all
claims, demands, losses, damages, judgments, and associated costs and expenses for
property damage, personal injury, bodily injury, and/or death suffered by third parties,
including reasonable attorneys' fees and other costs of legal defense and of investigating
any proceeding commenced or threatened, arising out of the negligence, acts, omissions or
willful misconduct of Iroquois Gas or its contractors, subcontractors or agents. In
accordance with the above, the Indemnified Parties shall have the right to demand that
Iroquois Gas undertake to defend the Indemnified Parties with counsel reasonably
approved by the Indemnified Parties, against all lawsuits for which Iroquois Gas has a
duty to defend, indemnify and save harmless the Indemnified Parties.

B.    Iroquois Gas shall defend, indemnify and hold harmless the Indemnified
Parties from any and all loss, damage, penalty or injury, including reasonable attorneys'
fees, expenses and other costs of legal defense and of investigating any proceeding
commenced or threatened, arising out of any violation of Applicable Laws and/or
Applicable Permits by Iroquois Gas in the performance of the Work, its parent,
subsidiaries, affiliates, shareholders, officers, directors, employees, contractors,
subcontractors and agents. This indemnification and hold harmless obligations shall be
separate from and independent of any other indemnification and hold harmless obligation
set forth in this Agreement.

C.    Grantee shall indemnify, save harmless, and defend Iroquois Gas and its
partners, subsidiaries, affiliates, officers, trustees, directors, employees, contractors,
subcontractors and agents (the "Iroquois Indemnified Parties") against all claims,
demands, losses, damages, judgments, and associated costs and expenses for property
damage, personal injury, bodily injury, and/or death suffered by third parties, including
reasonable attorneys' fees and other costs of legal defense and investigating any
proceeding commenced or threatened, arising out of the negligence, acts, omissions or
willful misconduct of the Grantee, or its respective contractors, subcontractors or agents.
In accordance with the above, the Iroquois Indemnified Parties shall have the right to
demand that the Grantee undertake to defend the Iroquois Indemnified Parties with
counsel reasonably approved by the Iroquois Indemnified Parties, against all lawsuits for
which the Grantee has a duty to defend, indemnify and save harmless the Iroquois
Indemnified Parties.

D.    Neither the Grantee nor its parent corporations, subsidiaries, affiliates,
shareholders, officers, trustees, directors, employees, contractors, subcontractors or
agents shall be liable to Iroquois Gas or its parent corporation, subsidiaries, affiliates,

-18-

IRO/AE 00772

FMIC 001742

partners, shareholders, officers, directors, employees, contractors, subcontractors or agents for incidental, special, indirect or consequential damages of any nature based on any theory of action including, but not limited to, breach of warranty, breach of contract, strict liability or negligence, arising out of performance under this Agreement. Except as otherwise provided in Article III Section G of this Agreement, neither Iroquois Gas nor its partners, subsidiaries, affiliates, officers, directors, employees, contractors, subcontractors or agents shall be liable to the Grantee and its corporate parents, subsidiaries, affiliates, trustees, officers, directors, employees, contractors, subcontractors or agents for incidental, special, indirect or consequential damages of any nature based on any theory of action including, but not limited to, breach of warranty, breach of contract, strict liability or negligence, arising out of performance under this Agreement.

E.     The Grantee acknowledges and agree that (a) the obligations of Iroquois Gas under this Agreement are the obligations of the partnership; (b) the Grantee shall have no recourse against any Partner in Iroquois Gas and its sole recourse shall be against the partnership assets, irrespective of any failure to comply with Applicable Law or any provisions of the Agreement; and (c) the Grantee shall have no right of subrogation to any claim of Iroquois Gas for any capital contributions from any Partner to Iroquois Gas.

F.     The total liability of the Grantee to Iroquois Gas on all claims of any kind accruing, whether in contract, warranty, indemnity, tort (including, but not limited to, negligence), strict liability, or otherwise, arising out of this Agreement shall not exceed twenty-five million dollars ($25,000,000.00).

G.     The obligations to indemnify and hold harmless set forth shall survive the expiration or termination of this Agreement.

## ARTICLE X
## TERM, DEFAULT, TERMINATION AND REMEDIES

A.     This Agreement shall become effective as of the date written above upon receipt of the amount of the payment set forth in Article V.

B.     Iroquois Gas shall immediately pay the Grantee any and all amounts due and owing under this Agreement upon termination.

C.     Iroquois Gas may terminate this Agreement for convenience upon thirty (30) days written notice to the Grantee. If Iroquois Gas terminates this Agreement for convenience, Iroquois Gas shall, within a reasonable time after termination of the Agreement, provide for the removal of the Pipeline at the Crossing and restoration of the Crossing to substantially the condition existing prior to installation of the Pipeline, and

-19-

IRO/AE 00773

FMIC 001743

Iroquois Gas shall be responsible for all costs and expenses associated with such removal and disposal of the Pipeline and restoration of the Y-49 Cable.

D.    Events of Default. The occurrence of one or more of the following events so long as the same is continuing shall constitute an "Event of Default" under this Agreement:

(i)    The failure by either Party to pay any and all amounts due under this Agreement which continues for a period of ten (10) days after notice of such non-payment is delivered to the defaulting Party.

(ii)    The failure by either Party to substantially perform any material obligation under this Agreement and which failure continues for a period of thirty (30) days after notice thereof has been received by the defaulting Party.

(iii)    The revocation or loss of any license, Permit, or other governmental approval materially affecting Iroquois Gas' ability to operate the Pipeline, provided that Iroquois Gas has waived and/or exhausted any and all rights to appeal.

(iv)    The failure by Iroquois to substantially perform any of the Work and which failure continues for a period of ninety (90) days after notice thereof has been received by Iroquois Gas.

E.    Notice and Opportunity to Cure Event of Default. Upon actual discovery of an Event of Default, a Party claiming the occurrence of such Event of Default must promptly provide the alleged defaulting Party with written notice of the Event of Default and any remedy sought ("Notice of Default"). The defaulting Party shall either:

(i)    At its sole cost and expense cure the Event of Default within the time period designated in Sections D(i), D(ii), D(iii) or D(iv) above; or

(ii)    If an Event of Default under Section D(ii), D(iii) or D(iv) above reasonably requires additional time to cure then such defaulting Party will, at its cost and expense, from the date such Party receives written Notice of Default, have (a) a sixty (60) day cure period from the date of the Notice of Default, or (b) if the defaulting Party provides a commercially reasonable cure plan to the other Party that requires more time than provided in Section E(ii)(a) of this Article X, then the defaulting Party shall be

-20-

**IRO/AE 00774**

**FMIC 001744**

extended such additional time to cure the Event of Default and the other Party shall have no right to seek remedies for breach of this Agreement, provided that the defaulting Party diligently pursues such cure plan.

F.    Remedies. If an Event of Default shall have occurred and be continuing, the non-defaulting Party, subject to the terms and conditions of this Agreement, shall be entitled to such remedies and damages as are available at law and equity. The non-defaulting Party also has the right to commence an action to terminate this Agreement; and, in the event of a final, non-appealable ruling by a court of competent jurisdiction finding that the non-defaulting Party has grounds to terminate this Agreement, such non-defaulting Party shall have the right to terminate this Agreement and withdraw its No-Objection Letter to the rights described in Article II of this Agreement. The termination of this Agreement shall not discharge any of the Parties from any obligations which may have accrued under this Agreement prior to such termination.

G.    If either Party is required or otherwise deems it advisable to remove its Facilities from the area at the Crossing, such Party shall bear all costs and expenses associated with such removal, except that Iroquois Gas shall, at its sole cost and expense, make immediate arrangements for and provide to Grantee unobstructed access (except for the presence of the Pipeline) to the Y-49 Cable at the Crossing. If Iroquois Gas abandons the Pipeline, Iroquois Gas shall remove, subject to Applicable Laws, the Pipeline and all protective structures (e.g., concrete mats, rock, rip-rap, etc.) at the Crossing as necessary to provide Grantee unobstructed access to the Y-49 Cable.

## ARTICLE XI
## CREDIT ASSURANCE

If at any time, Iroquois Gas' creditworthiness is impaired (a material adverse change in rating below BBB by Standard & Poors and Baa2 by Moody's), Iroquois Gas shall deliver reasonable performance assurance in the form of cash or an irrevocable and unconditional letter of credit, naming the Grantee as beneficiary. The letter of credit shall be an irrevocable and unconditional letter of credit issued by a major U.S. bank (or foreign bank with a U.S. branch office) with a credit rating of at least "A" by Standard & Poors and "A2" by Moody's (the "Issuer") and shall be in a form reasonably acceptable to the Party in whose favor the letter of credit is issued. Each letter of credit shall be a Credit Support Document. The letter of credit shall be in an amount to be reasonably determined by the Grantee to provide adequate assurance for Iroquois Gas' obligations hereunder during the performance of the Work and Iroquois Gas Repair Work. The letter of credit shall be immediately effective and shall permit the Grantee to make demand(s) for and receive payment from the Issuer for any amounts due the Grantee under this

-21-

IRO/AE 00775

FMIC 001745

Agreement or the Service Agreement and shall require Issuer to honor on sight any written demand by the Grantee for payment under the letter of credit.

## ARTICLE XII
## FUTURE AGREEMENTS

A.     The Parties acknowledge that the Pipeline will also cross a power transmission line ("Y-50 Cable") owned by Consolidated Edison Company of New York, Inc. ("Con Edison") and LIPA, located under Long Island Sound. Therefore, Iroquois Gas will be entering into an agreement with Con Edison and LIPA pursuant to which *inter alia*, Con Edison and LIPA will consent to OGS issuing the Iroquois Gas Easement. Iroquois Gas covenants that the terms and conditions of its agreement with Con Edison and LIPA for the Y-50 crossing (whether such agreement be written or oral or embodied in one or more documents, letters, etc.) shall be substantially the same as the terms and conditions of this Agreement.

B.     The Parties also agree that in the event that after the date hereof either Party intends to construct facilities in the Long Island Sound which will cross the Facilities or any other facilities owned by the other Party, then and in such event (1) the terms and conditions of any agreement between the Parties with respect to such future crossing shall be substantially the same as the terms and conditions of this Agreement, and (2) the Parties which are not constructing said facilities shall provide (if requested) a No Objection Letter to OGS. Unless otherwise agreed to in writing by the affected Parties, the procedures, plans, specifications and technical requirements set forth in the Scope of Work shall apply to any such future crossing, subject to reasonable modifications and changes that may be necessitated by analysis of site-specific conditions.

C.     If requested by the Grantee, Iroquois Gas agrees to cooperate with the Grantee in obtaining an extension of the NYS Easement for a period expiring no sooner than the expiration of the Iroquois Gas Easement. If OGS requires Iroquois Gas to consent to such extension of the term of the NYS Easement or to provide a No Objection Letter in connection therewith, Iroquois Gas hereby agrees to provide such consent or No Objection Letter upon the same terms and conditions as such consent and No Objection Letter was provided herein by the Grantee to Iroquois Gas.

D.     Iroquois Gas represents that the Crossing is not located in a heavy shipping lane nor anchor high strike area (as designated by the United States Coast Guard). Iroquois Gas shall promptly notify the Grantee if either of the foregoing conditions change. Consistent with Good Engineering Practice, Iroquois Gas will install (at its own cost and expense) such additional equipment at the Crossing as is necessitated

-22-

IRO/AE 00776

FMIC 001746

by any increased risk of damage to the Y-49 Cable due to a change in the foregoing conditions.

## ARTICLE XIII
## MISCELLANEOUS

A.    Independent Contractor.  At all times during the term of this Agreement, neither Party shall be deemed to be an independent contractor nor an employee, partner, joint venture participant or agent of the other Party.  Neither Party shall represent that any such relationship exists.

B.    Governing Law.  This Agreement is made in, and shall be interpreted, construed, governed and enforced in accordance with the laws of the State of New York. Each of the Parties hereby agrees to submit to the nonexclusive jurisdiction of the United States District Court for the Eastern District of New York and/or any New York State Supreme Court sitting in Nassau or Suffolk Counties for the purposes of all legal proceedings arising out of or relating to this Agreement.  Each of the Parties hereby irrevocably waives, to the fullest extent permitted by law, any objection to the selection of this venue and any claim that any proceeding brought in such a court has been brought in any inconvenient forum.

C.    Force Majeure.  Notwithstanding anything to the contrary contained herein, a Party shall not be liable for its failure to perform obligations, except for payment obligations, set forth in this Agreement if and to the extent such failure has been occasioned by the occurrence of a force majeure event. The term "force majeure event" as used herein shall include acts of God, fires, floods, storms, hurricanes, strikes, labor disputes, riots, insurrections, acts of war (whether declared or otherwise), unforeseeable acts of governmental or judicial bodies, the breakdown, malfunctioning or failure of all or any part of the subject facilities or necessary equipment caused by an event of force majeure, or any other unforeseeable causes beyond the reasonable control of and which do not involve the fault, negligence or willful misconduct of the Party claiming force majeure. The Parties understand and agree that a failure or inability by any of the Parties to obtain and/or maintain sufficient funds to perform their obligations shall not constitute a force majeure event.  If either Party, because of an event of force majeure, is rendered wholly or partly unable to perform its obligations hereunder, that Party shall be excused from whatever performance is prevented by the force majeure to the extent so prevented, provided that such suspension of performance shall be of no greater scope and of no longer duration than is required by the force majeure, and further provided that (i) the Party claiming force majeure gives the other Party written notice describing the particulars of the occurrence within three (3) days of its occurrence, and (ii) the Party claiming force majeure uses reasonable diligence to remedy its inability to perform.

-23-

IRO/AE 00777

FMIC 001747

D.    Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either Party, including by operation of law, without the prior written consent of the other Party, which shall not be unreasonably withheld, delayed or conditioned, except (i) in the case of NYPA (A) to an affiliate of NYPA in connection with the transfer of the Y-49 Cable to such affiliate or (B) to a lending institution or trustee in connection with a pledge or granting of a security interest in the Y-49 Cable and this Agreement and (ii) in the case of Iroquois Gas (A) to an affiliate of Iroquois Gas or a third party in connection with the transfer of the Pipeline to such affiliate or third party or (B) to a lending institution or trustee in connection with a pledge or granting of a security interest in all or any part of the Pipeline and this Agreement; provided, however, that no assignment or transfer of rights or obligations by and Party shall relieve it from the full liabilities and the full financial responsibility, as provided for under this Agreement, unless and until the transferee or assignee shall agree in writing to assume such obligations and duties and the other Party have consented in writing to such assumption.

E.    Severability. If any article, phrase, provision, or portion of this Agreement is adjudged to be invalid, illegal or unenforceable by any court of competent jurisdiction, such article, phrase, provision, or portion so adjudged shall be deemed separate, distinct, and independent, and the remainder of this Agreement will be and remain in full force and effect and will not be invalidated or rendered illegal or unenforceable or otherwise affected by such adjudication.

F.    Amendments. All modifications to this Agreement shall be in writing and signed by duly authorized representatives of each Party.

G.    Inurement. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

H.    Counterparts. This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

I.    No Waiver. No failure or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder. No waiver, termination, or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon any of the Parties unless it is in writing and is signed by an authorized representative of the Party to be charged therewith.

-24-

IRO/AE 00778

FMIC 001748

J.    Entire Agreement.  This instrument constitutes the entire Agreement by and among the Parties hereto with respect to the matters addressed herein and supersedes any and all other agreements, understandings and negotiations or discussions, either oral or in writing, express or implied, by and among the Parties hereto.

K.    Section Headings.  The section headings herein are inserted for convenience only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

L.    Corporate Authorization.  The Parties hereto hereby represent and warrant that this Agreement is legally binding and that the respective officers executing this Agreement have been duly authorized to do so.

M.    Notices.  Any notice, consent, authorization, determination, or other communication required or permitted to be given or made pursuant to this Agreement shall be in writing and shall be sufficiently given or made if:

1.    Mailed by U.S. certified or registered mail, postage prepaid, return-receipt requested; or

2.    Telecopied to the facsimile number set forth below and followed by a copy delivered in accordance with Section M.1 or M.3; or

3.    Delivered by nationally recognized express or overnight courier.

Notices shall be sent as follows:

If to NYPA:
Power Authority of the State of New York
123 Main Street
White Plains, New York  10601
Attention:  Charles Lipsky, Vice President and Chief Engineer
Tel. No.: (914) 681-6758
Facsimile No.: (914) 681-6534

Emergency Notification by Telephone
Available Three Hundred Sixty-five (365)
Days Per Year and Twenty-four (24)
Hours Per Day:
(315) 792-8228


If to Iroquois Gas:

-25-

IRO/AE 00779

FMIC 001749

Iroquois Pipeline Operating Company
One Corporate Drive, Suite 600
Shelton, Connecticut 06484
Attention:  Vice President, Engineering & Operations
Tel. No.:  (203) 925-7200
Facsimile No.: Facsimile No.: (203) 925-7213

Emergency Notification by Telephone
Available Three Hundred Sixty-five (365)
Days Per Year and Twenty (24)
Hours Per day:
1 (800) 888-3982

If to LIPA:
Long Island Lighting Company d/b/a LIPA
333 Earle Ovington Boulevard
Suite 403
Uniondale, New York 11553
Attention:  Office of General Counsel
Tel. No.: (516) 222-7700
Facsimile No.: (516) 222-9137

Emergency Notification by Telephone
Available Three Hundred Sixty-five (365)
Days Per Year and Twenty (24)
Hours Per day:
(516) 545-4007

    Notices shall be deemed effective when received.  The Parties may designate a
different notice destination by written notice to the other Party given in accordance
herewith.

**Signature Page to Follow**

IRO/AE 00780

FMIC 001750

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be executed by their duly authorized agents and representatives as of the day and year first above written.

**POWER AUTHORITY OF THE STATE OF NEW YORK**

By: _____
(Signature)

Name: Charles I. Lipsky, P.E.
(Print)

Title: Vice President & Chief Engineer

Date: October 30, 2002


**IROQUOIS GAS TRANSMISSION SYSTEM, L.P.**
By Its Agent,
**IROQUOIS PIPELINE OPERATING COMPANY**

By: _____
(Signature)

Name: Craig R. Frew
PRESIDENT
(Print)

Title: _____

Date: 10/17/02


**IROQUOIS GAS TRANSMISSION SYSTEM, L.P.**
By Its Agent,
**IROQUOIS PIPELINE OPERATING COMPANY**

By: _____
(Signature)

Name: Jeffrey A. Bruner
Vice President, General Counsel & Secretary
(Print)

Title: _____

Date: 10/17/02


-27-

IRO/AE 00781

FMIC 001751

-28-

IRO/AE 00782

FMIC 001752

EXHIBIT "A"

## *GENERAL PIPELINE INSTALLATION PROCEDURE*
## *AT Y-49 CABLE CROSSING LOCATION*

A.    Preliminary site investigation: IGTS has performed a preliminary site investigation that includes geophysical as well as bathymetric surveys. The surveys have located the cable crossing locations and these data and proposed crossing coordinates have been provided to NYPA.

B.    IGTS will diver-inspect the proposed crossing location to confirm the suitability of the seabed conditions. The diver will use a hand held magnetometer or equivalent device to confirm the location of the cables beneath the seabed in the Crossing. IGTS will also attempt to determine the depth of cover of soil over the cables using an electronic, hand-held cable locator tool. IGTS will fix the coordinates of the cable crossing and provide this information to NYPA.

C.    Prior to laying the Pipeline, the Pipeline contractor will independently (from IGTS) confirm the cable crossing locations. The contractor will use divers to locate the cables using hand-held electronic equipment. This requirement shall be included in the Pipeline construction contract specifications, a copy of which shall be provided to NYPA.

D.    The contractor will lay an articulated concrete mat (type to be determined) on the seabed over the cable crossing location. Details of the proposed mat will be provided to NYPA prior to installation of the mat. Divers and/or a camera equipped remote operated vehicle (ROV) will monitor this operation.

E.    As the Pipeline is being laid it will be pre-trenched using a plow or jetting tool. During the pipe laying operation the trenching tool will be stopped and raised clear of the seabed approximately 200-ft before the cable crossing location. No trenching will occur within 200-ft either side of the cables.

F.    The divers will confirm the appropriate placement of the mats with respect to the cable position prior to Pipeline installation. An as-built record will be made of the position of the mat relative to the cable orientation prior to installing the Pipeline.

G.    The Pipeline will be laid across the mats. Divers will confirm the correct placement of the Pipeline relative to the mats.

H.    Divers will place sand bags under the Pipeline in the trench at predetermined locations on both sides of the cable crossings to support the pipe prior to backfilling the

IRO/AE 00783

FMIC 001753

trench.

I.      Divers will place protective articulated concrete mats over the Pipeline. These will extend back approximately 100 feet from the cable on both sides of the Crossing.

J.      An as-built record will be made of the work progress and completed protective mat installation.

K.      Crushed stone will be placed over the exposed Pipeline in the trench on both sides of the cable crossings. No crushed stone will be placed over the protective concrete mats at the cable crossings.

L.      Under no circumstances shall the IGTS gas Pipeline be located closer than four feet in any dimension from the NYPA cable. The installation of the Pipeline shall be in accordance with the study performed by IGTS (NYPA Cable Crossing Design Report). The installation shall meet the criteria stated in said report. Should the Pipeline settle beyond the amount stated in that study it will become the responsibility of IGTS to correct the situation and return the separation to a minimum of five (5) feet.

M.      Burying the Pipeline in the Sound by plowing methods will be permitted to resume beyond a point which is at least 200 lineal feet from the Crossing Point. Burying the Pipeline by plowing is absolutely prohibited within a 200 foot radius of the Crossing Point.

N.      Iroquois Gas will utilize sacrificial anodes for cathodic protection. Additional cathodic protection anodes will be installed by Iroquois Gas within the Crossing.

O.      Iroquois Gas shall utilize fusion bond epoxy-coated line pipe with a three and three-quarter inch (3 _") thick reinforced concrete coating outer layer for buoyancy control, stability and mechanical protection.

P.      Iroquois Gas shall notify NYPA of the completion of construction within the Crossing and as soon as practicable thereafter, will cause a reproducible "as-built" survey of the Crossing installation by a licensed New York State surveyor to be delivered to NYPA.

Q.      Iroquois Gas shall mark the Crossing with buoys prior to construction or as otherwise directed by NYPA.

R.      Iroquois Gas shall require its lay barge contractor to prepare, develop and submit to Iroquois Gas an anchor plan for its approval prior to the commencement of the Work. Iroquois Gas shall make such anchor plan available to NYPA upon request.

IRO/AE 00784

FMIC 001754

S.      Iroquois Gas, its contractors and subcontractors shall not perform any Work at the Crossing which will require lifting and placing of the concrete mattresses during a heavy sea condition that in the reasonable judgment of the Grantee's representative will create a significant risk of damage to the Y-49 Cable. In addition, Iroquois Gas, its contractors and subcontractors shall not perform any Work at the Crossing during: (a) the presence of any named storm affecting the area of the Crossing which has the potential to produce wave heights greater than Sea State 4 (maximum wave heights of 2.4 meters); and/or (b) a severe weather condition affecting the area of the Crossing which has the potential to produce wave heights greater than Sea State 4 (maximum wave heights of 2.4 meters); (c) a mechanical malfunction on the lay barge and/or stand by vessel which impacts the anchor plan and/or positioning of the lay barge.

T.      Iroquois Gas has represented that the Crossing is located beyond heavy shipping lanes and high anchor strike areas. Iroquois Gas will notify NYPA as soon as practicable upon recognition of any change in these conditions and will promptly furnish and install, at its cost, any additional protection to the Y-49 Cable to reflect any increase in risk presented by such change or changes.

U.      Iroquois agrees to provide additional protection at the crossing in the form of either (in Iroquois Gas' sole discretion) (a) a Kevlar fabric wrap of the pipeline at each of the individual Y-49 cable crossings, or (b) a blanket of Kevlar material between the pipeline and the cables at each of the individual Y-49 cable crossings. If a Kevlar wrap is to be used, Iroquois agrees to provide four layers of Kevlar fabric, wrapped and fastened around the pipe where it crosses each of the Y-49 cables. For this method, Iroquois agrees to wrap an approximately 40 foot long section of the pipeline such that when layed over each of the Y-49 cables, the actual pipeline/cable crossing point will lie within the central twenty feet of the 40 foot length of Kevlar wrapped pipe. Each of the four layers will be of Kevlar fabric with an individual fabric layer thickness of 10 mils or greater. If a blanket is used, Iroquois agrees to provide four or more layers of Kevlar fabric within the blanket. The Kevlar material may be directly attached or adhered to the lightweight concrete mattresses for purposes of installation or may be placed separately as blankets. The total thickness of the Kevlar blankets (or layers as may be attached or adhered directly to the lightweight concrete mattresses) shall be 0.25 inches or greater, including the effects of bulking. Iroquois agrees not to significantly weight the Kevlar blankets with material having a specific gravity greater than that of sea water.

V.      The Grantee will conduct an acoustic (sonar) survey of the Crossing on an annual basis to verify the condition of the Crossing. This survey will be performed once each calendar year for the first five years following commercial operation of the Pipeline. At the end of such five year period, Iroquois Gas will consult with the Grantee with regards to the frequency of future surveys based on the conditions observed during previous years.

IRO/AE 00785

FMIC 001755