HEALY & BAILLIE, LLP
Attorneys for Plaintiff
61 Broadway
New York, NY 10006
(212) 943-3980
Richard V. Singleton (RS-9489)
John C. Koster (JK-4086)
David D. Jensen (DJ-2261)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IROQUOIS GAS TRANSMISSION SYSTEM L.P., | **(ECF Case)** |
| Plaintiff, | 05 Civ. 2149 (JSR) |
| -against- | |
| ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD., Hamilton, Bermuda; CERTAIN UNDERWRITERS AT LLOYD'S; AON RISK SERVICES OF TEXAS, INC.; and AMERICAN HOME ASSURANCE CO., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## IROQUOIS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................2

    a)    The Pipeline Project and Horizon's Contract .........................................................2
    b)    The Lloyd's Hull Policy ..........................................................................................3
    c)    The February 27, 2003 Anchor Drag Incident ......................................................4
    d)    The Texas Limitation Proceedings .........................................................................5
    e)    Lloyd's, Once Notified, Refuses to Accept or Deny Coverage..............................6

ARGUMENT.....................................................................................................................8

I.    THE LLOYD'S POLICY OBLIGATES LLOYD'S TO INDEMNIFY IROQUOIS
    AGAINST COSTS INCURRED IN A CONTEST OF THE VESSEL'S LIABILITY......8

    a)    Texas law governs the interpretation of the Lloyd's Hull Policy............................8
    b)    The Hull Policy sets forth a duty to reimburse incurred attorney's fees ...............11

II.    IROQUOIS IS AN "ASSURED" AS TO ALL CLAIMS ASSERTED IN THE NYPA
    LITIGATION ................................................................................................................13

    a)    Under the Hull Policy, Iroquois is an additional assured to the extent required by
        contract ....................................................................................................................13
    b)    The Construction Contract requires inclusion of Iroquois as an insured for all
        covered risks growing out of the pipeline project ..................................................13

III.    THE LLOYD'S POLICY COVERS THE NEGLIGENCE AND INDEMNITY CLAIMS
    ASSERTED IN THE NYPA LITIGATION ....................................................................17

    a)    NYPA's claims are predicated on the occurrence of an insured event and are
        within the coverage grant ........................................................................................17
    b)    Courts have construed the language of the Hull Policy to cover contract damages
        that result from covered risks .................................................................................18

IV.    ANY LATE-NOTICE DEFENSE FAILS AS A MATTER OF LAW ...........................20

    a)    Lloyd's must show actual prejudice to avoid coverage.........................................20
    b)    Prejudice does not exist on these facts as a matter of law.....................................21

V.    RECOVERY UNDER CLAUSE (B)..............................................................................23

VI.  BECAUSE LLOYD'S HAS NEVER RESPONDED TO IROQUOIS, THE COURT
     SHOULD AWARD IROQUOIS ATTORNEY'S FEES IN THE INSTANT ACTION..24

CONCLUSION ......................................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Advani Enterprises, Inc. v. Underwriters at Lloyd's*, 140 F.3d 157 (2d Cir. 1998) ............ 8

*Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 2005 AMC 1116, (S.D.N.Y. 2005) .................................................................................................. 35

*Board of Comm'rs v. M/V Rachael Guidry*, 425 F. Supp. 661 (E.D. La. 1977) ................ 12

*Bee Line Transport Co. v. Conn. Fire Insurance Co. of Hartford*, 76 F.2d 759 (2d Cir. 1935) ................................................................................................................. 19

*Bender Shipbuilding & Repair Co. v. Brasileiro*, 874 F.2d 1551 (11th Cir. 1989) .......... 19

*Cheek v. Williams-McWilliams Co.*, 697 F.2d 649 (5th Cir. 1983) .................................. 17

*Commercial Underwriters Insurance Co. v. Royal Surplus Lines Insurance Co.*, 345 F. Supp. 2d 652 (S.D. Tex. 2004) ........................................................................ 10

*Contract Marine Carriers, Inc. v. Royal Exch. Assurance of Am., Inc.*, 1993 AMC 1841, (S.D.N.Y. 1993) ................................................................................................ 11

*Crocker v. National Union Fire Insurance Co.*, No. SA-04-CA-389, 2005 U.S. Dist. LEXIS 2806 (W.D. Tex. Feb. 15, 2005) ............................................................. 22

*Folksamerica Reins. Co. v. Cleanwater of New York, Inc.*, No. 03-9124, 2005 U.S. App. LEXIS 13041 (2d Cir. June 30, 2005) ......................................................... 8

*Gibson & Associates v. Home Insurance Co.*, 966 F. Supp. 468 (N.D. Tex. 1997) .......... 18

*Great Am. Ins. Co. v. J. Aron & Co.*, 1995 AMC 2860, 2863 (S.D.N.Y. 1995) ............... 10

*Hanson Productions Co. v. Americas Insurance Co.*, 108 F.3d 627 (5th Cir. 1997) ........ 21

*Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 1988 AMC 223 (2d Cir. 1987) ................................................................................................................... 24

*Insurance Co. of North America v. Aberdeen Insurance Services, Inc.*, 253 F.3d 878 (5th Cir. 2001) .................................................................................................... 20

*Lafarge Corp. v. Hartford Casualty Insurance Co.*, 61 F.3d 389 (5th Cir. 1995) ............ 19

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) ................................................................... 8, 9

*Leather's Best International, Inc. v. MV "Lloyd Sergipe"*, 760 F. Supp. 301, 1991 AMC 1929 (S.D.N.Y. 1991) .................................................................................... 24

*Little v. MGIC Indemnity Corp.*, 836 F.2d 789 (3d Cir. 1987) ........................................ 19

282704.TOA

*Marine Transit Corp. v. N.W. Fire & Marine Insurance Co.*, 67 F.2d 544 (2d Cir. 1933) .......................................................................................................... 19

*Matador Petroleum Corp. v. St. Paul Surplus Lines Insurance Co.*, 174 F.3d 653 (5th Cir. 1999) ...................................................................................... 21

*Meadows & Walker Drilling Co. v. Pacific Employers Indemnity Co.*, 324 F. Supp. 282 (S.D. Tex. 1971) .......................................................................... 19

*Norfolk S. Railway Co. v. James N. Kirby, Pty Ltd.*, 125 S. Ct. 385 (2004) ...................... 8

*Okada v. MGIC Indemnity Corp.*, 823 F.2d 276 (9th Cir. 1986) ...................................... 20

*Puritan Insurance Co. v. Eagle S.S. Co.*, 779 F.2d 866, 1986 AMC 1240 (2d Cir. 1985) .......................................................................................................... 24

*Ridglea Estate Condominium Association v. Lexington Insurance Co.*, 398 F.3d 332 (5th Cir. 2005) ........................................................................................ 21

*Stuyvesant Insurance Co. of N.Y. v. Nardelli*, 286 F.2d 600 (5th Cir. 1961) ................... 21

*St. Paul Guardian Insurance Co. v. Centrum G.S. Ltd.*, No. 3:97-CV-1478, 2003 U.S. Dist. LEXIS 15337 (N.D. Tex. Aug. 29, 2003) ........................................... 21, 22

*State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409 (2d Cir. 1990) .......................................................................................................... 9

*Travelers Indemnity Co. of Conn. v. Presbyterian Healthcare Resources*, No. 3:02-CV-1881, 2004 U.S. Dist. LEXIS 6373 (N.D. Tex. Feb. 25, 2004) ................... 22

*Thypin Steel Co. v. Certain Bills of Lading*, 2002 AMC 2859, 2875-76 (S.D.N.Y. 2002), aff'd 82 Fed. Appx. 738 (2d Cir. 2003) ............................................. 35

*Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310 (1955) ........................ 8

## STATE CASES

*America Home Assurance Co. v. Mainco Contractor Corp.*, 204 A.D.2d 500, 611 N.Y.S.2d 305 (2d Dept. 1994) ..................................................................... 16

*Ceron v. Rector, Church Wardens & Vestry Members of Trinity Church*, 224 A.D.2d 475, 638 N.Y.S.2d 476 (2d Dept. 1996) ........................................... 16

*Clapper v. County of Albany*, 188 A.D.2d 774, 591 N.Y.S.2d 258 (3d Dept. 1992) .................................................................................................. 14, 16

*Devoe v. Great America Insurance Co.*, 50 S.W.3d 567 (Tex. Ct. App. 2001) ............... 18

*Filley v. Ohio Casualty Insurance Co.*, 805 S.W.2d 844 (Tex. Ct. App.--Corpus Christi 1991) ................................................................................................21

*Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691 (Tex. 1994) .......................................21

*Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203 (Tex. 1999) ................11, 12

*Insurance Co. of N. America v. Aberdeen Insurance Services, Inc.*, 253 F.3d 878, 889 (5th Cir. 2001  (applying Texas law); see also Mattiola Construction Co. v. Comm'l Union Insurance Co.*, 60 Pa. D. & C. 4th 412 (Pa. Ct. Comm. Pleas 2002) ....................................................................................................................20

*Kimble v. Aetna Casualty & Surety Co.*, 767 S.W.2d 846 (Tex. Ct. App.-- Amarillo 1989) ....................................................................................................21

*Kinney v. G.W. Lisk Co.*, 76 N.Y.2d 215, 557 N.Y.S.2d 283 (1990) ...............................15

*Lennar Corp. v. Great America Insurance Co.*, No. 14-02-00860-CV, 2005 Tex. App. LEXIS 4214 (Tex. Ct. App.--Houston June 2, 2005) ....................................21, 23

*Mass. Bonding & Insurance Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396 (Tex. 1967) ........................................................................................................17

*Metropolitan Life Insurance Co. v. Worton*, 70 S.W.2d 216 (Tex. Ct. App. 1934) .........10

*P.G. Bell Co. v. U.S. Fidelity & Guaranty Co.*, 853 S.W.2d 187 (Tex. Ct. App.-- Corpus Christ 1993) ............................................................................................22

*Roblee v. Corning Committeeunity College*, 134 A.D.2d 803, 521 N.Y.S.2d 861 (3d Dept. 1987) ....................................................................................................15

*Tibbetts v. I.B.M. Corp.*, 161 A.D.2d 581, 555 N.Y.S.2d 160 (2d Dept. 1990) ...............16

*Whalen v. City of New York*, 270 A.D.2d 340, 704 N.Y.S.2d 305 (2d Dept. 2000) ..........15

*Wheeler v. Allstate Insurance Co.*, 592 S.W.2d 2 (Tex. Ct. App.--Beaumont 1979) ...................................................................................................................21

## STATE STATUTES

Tex. Admin. Code § 21.203(9)-(10) ..................................................................................24

## MISCELLANEOUS

Eric Mills Holmes, Appleman on Insurance § 111.1(B) (2d ed. 2000) ..............................11

Tex. Ins. Code Art. 21.42 ................................................................................................12

v

HEALY & BAILLIE, LLP
Attorneys for Plaintiff
61 Broadway
New York, NY 10006
(212) 943-3980
Richard V. Singleton (RS-9489)
John C. Koster (JK-4086)
David D. Jensen (DJ-2261)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| IROQUOIS GAS TRANSMISSION SYSTEM L.P.,<br><br>                                    Plaintiff,<br>        -against-<br><br>ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD., Hamilton, Bermuda; CERTAIN UNDERWRITERS AT LLOYD'S; AON RISK SERVICES OF TEXAS, INC.; and AMERICAN HOME ASSURANCE CO.,<br><br>                                    Defendants. | **(ECF Case)**<br><br>05 Civ. 2149 (JSR)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF IROQUOIS' MOTION FOR SUMMARY JUDGMENT** |

## PRELIMINARY STATEMENT

Plaintiff Iroquois Gas Transmission System, L.P. submits this memorandum of law and the accompanying Rule 56.1 Statement of Undisputed Material Facts ("R. 56.1") and the Affidavits of Paul W. Diehl, Esq., Michelle L. Wieler, Richard V. Singleton, Esq. and John C. Koster, Esq. in support of its motion for summary judgment against Defendant Certain Underwriters at Lloyd's ("Lloyd's"). Plaintiff seeks: (1) judgment for $475,064.46; (2) the Court's declaration that Lloyd's is obligated to reimburse such further fees as they are incurred by Iroquois; (3) judgment for attorney's fees incurred in the instant action, to be determined by a supplemental submission by Plaintiff; and (4) other relief as the Court deems just and proper.

## FACTUAL AND PROCEDURAL BACKGROUND

### a) The Pipeline Project and Horizon's Contract

Plaintiff Iroquois Gas Transmission System, L.P. ("Iroquois") is a Delaware limited partnership operating out of Shelton, Connecticut that owns a 412 mile natural gas pipeline from the Canadian-New York border to the Bronx, New York.  R. 56.1, ¶¶ 1, 3.  In April 2002, Iroquois awarded Horizon Offshore Contractors, Inc. ("Horizon") a contract to construct the underwater segment of this pipeline, which connects the Bronx with Northport, Long Island via Long Island Sound (the "Construction Contract").  R. 56.1, ¶ 4.  Under the Construction Contract, Horizon agreed to "provide all necessary labor, equipment, supervision to perform and shall perform the work of constructing [the] 24-inch diameter gas pipeline."  Id. at IRO/AE 00007.

To complete the pipeline extension it was necessary to cross four undersea 345,000-volt electric transmission cables owned by The Power Authority of the State of New York ("NYPA").  NYPA refused to agree to such a crossing absent a written agreement with Iroquois regarding responsibility for any damage to its cables.  R. 56.1, ¶ 8.  Accordingly, Iroquois and NYPA entered into a "Crossing Agreement" that allowed the Iroquois pipeline to cross the NYPA Cables.  R. 56.1, ¶ 9.  The Crossing Agreement provided that Iroquois would indemnify NYPA against damage resulting from "the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees."  R. 56.1, ¶ 10.  In addition, the Crossing Agreement provided that Iroquois would indemnify NYPA from "all costs and expenses incurred as a result of damage to the [cables] arising out of [such circumstances]".  R. 56.1, ¶ 11.

The Construction Contract required Horizon to "furnish and maintain, at its own expense" ten enumerated lines of insurance, including "Marine Protection and Indemnity

Insurance" and "Marine Hull and Machinery Insurance." R. 56.1, ¶ 5. The Construction Contract required Horizon to name Iroquois as an additional insured, to waive any right of subrogation against Iroquois, and to include a cross-liability provision "in the event of one insured incurring liability to any other insured." Id. All the policies provided by Horizon were subject to Iroquois' approval. Id. On the other hand, the Construction Contract required Iroquois to maintain only one insurance policy: builders' risk coverage insuring against loss or damage to the pipeline project itself. R. 56.1, ¶ 6. Thus, the Construction Contract placed the burden of insuring against all other liabilities arising out of construction of the underwater pipeline segment entirely upon Horizon.[1]

### b) The Lloyd's Hull Policy

To demonstrate compliance with the Construction Contract's insurance provisions, Defendant Aon Risk Services of Texas, Inc. ("Aon"), which had placed the insurance, issued a "Certificate of Insurance" to Iroquois on May 17, 2002. R. 56.1, ¶ 12. The Certificate set forth twelve lines of insurance pertaining to the project, including (inter alia) two lines of "Protection & Indemnity" insurance, two lines of "Excess Liabilities" insurance, and a line of "Hull & Machinery" insurance -- the Lloyd's Hull Policy. Id. The Lloyd's Hull Policy revolves around an eight-page policy slip bearing the number LE0280715 ("Policy Slip"). R. 56.1, ¶¶ 13, 14. The Policy Slip contains three separate sections. The sections set forth property damage coverages and incorporate a number of additional policy forms and clauses. Id. Under Section 1(A), the Policy Slip incorporates the American Institute Hull Clauses (June 2, 1977) and the American Institute Tug Form (August 1, 1976). Id. This portion of the policy provides liability coverage applicable to claims arising from the Anchor Drag incident (see "c" below), but it is not

---

[1] An earlier draft of the contract required Horizon to obtain *every* listed insurance policy. It was modified when Horizon objected that Iroquois could more readily obtain builder's risk coverage, R. 56.1, ¶ 7, and this was agreed.

readily apparent from the policy forms that this coverage is in fact being provided.

Horizon, which has its principal place of business in Houston, Texas, purchased the Hull Policy as "named insured" through Aon, an insurance agent and broker licensed by the Texas Department of Insurance. R. 56.1, ¶¶ 15-18. Aon's office is also located in Houston, Texas. R. 56.1, ¶ 19. The GULF HORIZON is based in Texas, at Houston, Texas, its home port. The policy was addressed and delivered to Horizon at its Houston, Texas business address. R. 56.1, ¶ 20. The policy forms included notices required by the Texas Department of Insurance and directed the insured to contact the Texas Department of Insurance "to obtain information on companies, coverages, rights, or complaints." R. 56.1, ¶ 21. Aon testified that an insured with complaints about the Hull Policy should direct those complaints to the Texas Department of Insurance. R. 56.1, ¶ 22. The policy provides coverage to Horizon's 14 listed vessels "Worldwide," subject to trading warranties. R. 56.1, ¶ 23. There was at least one other claim under the Hull Policy, which occurred in the Atlantic Ocean while the GULF HORIZON was en route to Israel, and which will be paid through Aon's Houston, Texas office. R. 56.1, ¶ 24.

### c) The February 27, 2003 Anchor Drag Incident

On February 27, 2003, one of the NYPA Cables tripped while Horizon was working in its vicinity. R. 56.1, ¶ 25. NYPA claims the resulting outage was caused when one of the GULF HORIZON's anchors dragged and contacted its Cable No. 4 (the "Anchor Drag"). R. 56.1, ¶ 26. NYPA further alleges that as a result of this contact, Cable No. 4 was taken out of service and repaired. R. 56.1, ¶ 27. This contact occurred while the GULF HORIZON was performing work pursuant to the Construction Contract. R. 56.1, ¶ 25. The GULF HORIZON is listed as an insured vessel on the Hull Policy. R. 56.1, ¶ 28.

### d) The Texas Limitation Proceedings

Following the Anchor Drag Incident, Horizon commenced a proceeding in the United States District Court for the Southern District of Texas on August 18, 2003 to limit its liability for the Anchor Drag Incident (the "Limitation Proceeding"). R. 56.1, ¶ 32. Horizon pleaded that while no written claims had been asserted as of the date of its Limitation Proceeding, it "anticipate[d] that the owner of the electric cable, as well as other persons or entities, may assert or attempt to assert claims or suits against [Horizon], alleging property damages, financial losses, and other damages, and/or the right to indemnity/contribution in connection with the aforesaid alleged incident." R. 56.1, ¶ 33. Anticipating NYPA's claim, Iroquois appeared in the Limitation Proceeding as a claimant on November 12, 2003 and filed a claim against Horizon for indemnity in the event it was required to pay damages to any other entity. R. 56.1, ¶ 34.

In addition, Iroquois' initial claim in the Limitation Proceeding sought unrelated contractual damages resulting from a suspension of construction work, indemnity in the event Iroquois was held liable for damage to archaeological sites caused by Horizon, and damages for other contract breaches by Horizon. Id. Iroquois filed these unrelated claims in the Limitation Proceeding out of concern that it would lose the right to assert them if it did not. R. 56.1, ¶ 35. After the Texas court lifted the limitation injunction as to Iroquois on February 25, 2004, Iroquois and Horizon litigated these unrelated matters in New York state court using different lawyers. R.56.1, ¶¶ 36, 37. The only substantive legal services provided by Iroquois' Limitation Proceeding attorneys in respect of these claims was to assert them in the initial claim filed in Horizon's Limitation Proceeding. R. 56.1, ¶ 38.

On July 21, 2004 NYPA filed a cross-claim against Iroquois in the limitation proceeding, setting forth causes of action for indemnity and negligence, and seeking damages in excess of $18 million, plus fees and costs. R. 56.1, ¶ 39. NYPA had previously notified Iroquois of its

claim in March of 2003 and filed a claim against Horizon in the Limitation Proceeding in November of 2003. R. 56.1, ¶ 29. NYPA's indemnity claim recounted the terms of the Crossing Agreement and alleged that the damage to the NYPA cables "arose out of or was connected with the negligence, acts, omissions, or willful misconduct of Iroquois, its contractors, subcontractors, agents, or employees in connection with the Iroquois Pipeline Project." R. 56.1, ¶ 40. Factory Mutual Insurance Co., NYPA's subrogated property insurer, and the Long Island Power Company ("LIPA"), a user of the NYPA cable, also cross-claimed against Iroquois. LIPA's claim sounded solely in tort alleging that Iroquois was negligent in the pipeline construction. Iroquois answered NYPA's cross-claim on September 1, 2004 and has defended Iroquois against all cross-claims. R. 56.1, ¶ 41. This defense has included extensive document discovery, pleading and motion practice, research, depositions, the retention of expert witnesses, and continued prosecution of Iroquois' claim for indemnity from Horizon (the only Iroquois claim against Horizon at issue in the Limitation Proceeding). R. 56.1, ¶ 42. As of June 30, 2005 the total fees incurred in this defense are $975,064.46. R. 56.1, ¶ 43.

### e) Lloyd's, Once Notified, Refuses to Accept or Deny Coverage

After the February 27, 2003 Anchor Drag Incident, Aon notified all of Horizon's applicable insurers of the Anchor Drag incident -- both "Protection & Indemnity" insurers and both "Excess Liabilities" insurers -- but not Lloyd's. R. 56.1, ¶ 44. On July 17, 2003 Aon advised Horizon and Iroquois that it had notified "all appropriate insurers." R. 56.1, ¶ 45. Aon created a chart purporting to show all of Iroquois' and Horizon's coverage for the NYPA claims. Aon's chart excluded the Hull Policy. R. 56.1, ¶ 46. Iroquois also sent its own notices to Horizon's insurers. R. 56.1, ¶ 47. Iroquois' representative testified that the Certificate of Insurance (R. 56.1, ¶ 12) she reviewed when sending out the companies' own loss notices did not indicate that the Hull Policy covered liabilities. R. 56.1, ¶ 48. Furthermore, it was not readily

apparent that the Hull Policy was applicable to the loss because this policy's liability coverage was duplicative of that provided by Defendant Associated Electric & Gas Insurance Services Ltd. ("Aegis"). R. 56.1, ¶ 49. Accordingly, Ms. Wieler did not send any notice to Lloyd's.

Although Aegis (another underwriter providing protection and indemnity coverage) recognized as early as May 2003 that the Hull Policy potentially applied to the Anchor Drag incident, R. 56.1, ¶ 50, it was (apparently) not until April 16, 2004 or May 14, 2004 that Aegis specifically told Aon to notify Lloyd's of the Anchor Drag incident, R. 56.1, ¶ 51. On May 17, 2004 Aon transmitted a notice of loss to JLT Risk Solutions, Inc. ("JLT") in London for onward transmission to Lloyd's. R. 56.1, ¶ 52. At the same time, Aon notified the other underwriters on the Hull Policy (besides Lloyd's) and received back confirmations that its notices had been received. R. 56.1, ¶¶ 53-54. Lloyd's responded to Aon's notice by refusing to accept the notice without a copy of the policy's wording, and JLT relayed this information to Aon. R. 56.1 Disputed 1-4.[2]

On December 1, 2004 Lloyd's referred the matter to outside counsel for an opinion. R. 56.1, ¶ 59. After it received counsel's opinion, it refused to provide any response to Iroquois or the other insurance companies, stating only that there had not been a denial of coverage to Horizon. R. 56.1, ¶¶ 60-61. It refused to attend roundtable discussions with the other carriers to discuss the coverage issues. R. 56.1, ¶ 62. Lloyd's has never denied coverage, accepted coverage, paid Iroquois' expenses, or stated a reason for not doing one of the foregoing. It has

---

[2] Lloyd's designated representative testified that Lloyd's never received notice of the Anchor Drag until December 1, 2004. R. 56.1, ¶ 51. The evidence indicates, however, that Lloyd's received notice several months before that date: (1) JLT confirmed receipt of Aon's notice on June 1, 2004 and stated it was submitting the notice to Lloyd's; (2) Aon submitted two additional items to JLT for onward transmission to Aon in June, 2004; and (3) JLT wrote to Aon on September 20, 2004 and stated that "we have received a request from leading Underwriters for a update on this loss." R. 56.1, ¶ 52-54.

purposefully chosen to ignore Iroquois' claim and the obligations it owes under its policy, thereby necessitating this action.

## ARGUMENT

I.    **THE LLOYD'S POLICY OBLIGATES LLOYD'S TO INDEMNIFY IROQUOIS AGAINST COSTS INCURRED IN A CONTEST OF THE VESSEL'S LIABILITY**

a) **Texas law governs the interpretation of the Lloyd's Hull Policy**

Iroquois' claims against Lloyd's arise under the maritime law of the United States because they arise from a contract, the principal objective of which is maritime in nature: insurance covering commercial vessels upon navigable waters. See Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 125 S. Ct. 385, 393 (2004); 160 L.Ed.2d 283. Folksamerica Reins. Co. v. Cleanwater of N.Y., Inc., No. 03-9124, 2005 U.S. App. LEXIS 13041, *20-21 (2d Cir. June 30, 2005) (noting that in light of Kirby, package policy providing general commercial liability coverage and shipowner's legal liability coverage was a maritime contract because it "is primarily or principally concerned with maritime objectives, although there were incidental non-maritime elements").

The Supreme Court ruled long ago that in light of the long history of state regulation over insurance policies -- exemplified by the McCarran Act -- federal courts sitting in admiralty should apply state law to insurance questions pertaining to marine insurance policies, except where such law conflicts with an established admiralty rule. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 320-21 (1955). Following Wilburn, the Second Circuit has directed that state law be used "to determine 'the scope and validity of the [marine insurance] policy provisions involved and the consequences of breaching them." Advani Enters., Inc. v. Underwriters at Lloyd's, 140 F.3d 157, 162 (2d Cir. 1998) (quoting Wilburn Boat, 348 U.S. at 316) (alterations in source). Choice-of-law rules governing insurance policies are to be determined by application of the Lauritzen v. Larsen choice-of-law factors to ascertain and

evaluate applicable points of contact. See id. (quoting Lauritzen v. Larsen, 345 U.S. 571, 582 (1953). A court must apply the law of the state "with the most significant nexus with the insurance contract" to interpret and construe the policy. See State Trading Corp. of India v. Assuranceforeningen Skuld, 921 F.2d 409, 417 (2d Cir. 1990) (quotations omitted); see also Great Am. Ins. Co. v. J. Aron & Co., 1995 AMC 2860, 2863 (S.D.N.Y. 1995) ("most significant nexus to the contract"). It is the points of contact associated with the insurance contract, not the points of contact that may fortuitously surround the claim or occurrence, that provide the applicable choice-of-law factors.[3]

A number of federal courts have concluded that the state in which a policy is issued and delivered is the state whose laws should apply to determine issues arising from the contract. In State Trading, the Second Circuit noted that this reasoning had been expressly adopted by the Court of Appeals for the Fifth Circuit, as well as other courts. See State Trading, 921 F.2d at 417 (citations omitted). Dominant factors in insurance choice-of-law analysis are the place the policy is issued, the location of the insured, and the location of the subject matter of the insurance policy. See Contract Marine Carriers, Inc. v. Royal Exch. Assurance of Am., Inc., 1993 AMC 1841, (S.D.N.Y. 1993) (New York had greatest connection because it was where policy was issued and where the named plaintiff and defendant's agent were domiciliaries, even though the insured had offices in other states).

Texas clearly has the most significant connections with the Hull Policy in this case. The policy was procured in Texas and issued in Texas by a Texas agent from its Texas office and listed the insured's address in Texas. Horizon has its principal place of business in Texas and the vessel at issue, the GULF HORIZON, sails out of Houston, Texas as its home port. The policy

---

[3] Potentially differing rules between Texas law and New York law on the role of prejudice in relation to an insurer's claim of "late notice" makes the choice-of-law issue important.

documents came with disclosures required by the Texas Department of Insurance and directed complaints to that agency. It is noteworthy that Texas law itself asserts control over the Hull Policy: Under the Texas Insurance Code, the Hull Policy is expressly made subject to Texas law because it is "payable to any citizen or inhabitant of this State" and was issued by an insurance company doing business in Texas. See Tex. Ins. Code Art. 21.42; see also Commercial Underwriters Ins. Co. v. Royal Surplus Lines Ins. Co., 345 F. Supp. 2d 652, 659 (S.D. Tex. 2004) (if a policy meets the requirements of Art. 21.42 then it is subject to Texas law); Metro. Life Ins. Co. v. Worton, 70 S.W.2d 216, 217-18 (Tex. Ct. App. 1934) (same). Texas' dominant interest in regulating insurance policies that are sold in Texas to Texas insureds is apparent.

The other "contacts" in this case relate to the events triggering a claim, not to the law governing the policy, and do not in any event overcome the above factors. The critical issue is: What sovereign has the strongest interest in regulating the terms and content of the policy that was written? That has to be the law of Texas. The place of the activity triggering a claim under the policy (New York) and the domicile of Iroquois (Connecticut), an "additional insured", which did not procure the policy are tangential to the insurance contract itself and do not directly bear on the insurance contract between Lloyd's and Horizon. The coverage was "Worldwide" and covered several vessels other than the GULF HORIZON, which had no involvement whatsoever in the construction in the Long Island Sound. Moreover, the event or events giving rise to an insurance claim could have occurred anywhere. However, Texas alone had the ability to control the terms and conditions of the Hull Policy and thus has the strongest interest in the contract. Texas law thus governs the policy.

**b) The Hull Policy sets forth a duty to reimburse incurred attorney's fees**

The Hull Policy incorporates two coverage forms providing liability coverage, and amends those forms to include liabilities arising from "contact" with objects other than vessels. As relevant to this matter, the Hull Policy provides as follows:

> COLLISION AND TOWER'S LIABILITY
> And it is further agreed that:
> (a) if the Vessel hereby insured shall come into collision [or contact] with any other vessel, craft or structure, floating or otherwise (including her tow) . . . and the Assured, or the Surety, in consequence of the insured Vessel being at fault, shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums, we, the Underwriters, will pay the Assured or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as our subscriptions hereto bear to the value of the Vessel hereby insured, provided always that our liability in respect of any one such casualty shall not exceed our proportionate part of the value of the Vessel hereby insured;
> (b) in cases where the liability of the Vessel has been contested or proceedings have been taken to limit liability with the consent in writing, of a majority (in amount) of the Underwriters on the hull and machinery, we will also pay a like proportion of the costs which the Assured shall thereby incur or be compelled to pay.

R. 56.1, ¶ 63.

This language sets forth two <u>independent</u> obligations to indemnify. First, under clause (a), Lloyd's promises to pay the insured for any "damages" the insured is held liable to pay and does in fact pay, if the liability results from contact with a fixed object and is "in consequence of the insured Vessel being at fault." Second, under clause (b), Lloyd's promises to pay the insured for any "costs" that the insured either incurs or is compelled to pay, where "the liability of the Vessel has been contested." Clause (a) is an indemnity against <u>loss</u> because it requires the insured to pay the damages. Clause (b), however, is an indemnity against <u>liability</u>, because it is triggered by the insured <u>incurring liability</u>. <u>See Ingersoll-Rand Co. v. Valero Energy Corp.</u>, 997 S.W.2d 203, 207 (Tex. 1999); <u>see also</u> Eric Mills Holmes, <u>Appleman on Insurance</u> § 111.1(B) (2d ed. 2000).

The language of clause (b) does <u>not</u> provide that Lloyd's has the duty -- or the right -- to defend. <u>See</u> <u>Bd. of Comm'rs v. M/V Rachael Guidry</u>, 425 F. Supp. 661, 663-64 (E.D. La. 1977) (construing very similar language). The absence of a duty to defend on the part of Lloyd's merely means that, as between the insurer and the insured, it is the duty of the insured to defend. However, after the insured does so, the insurer is liable for defense costs. <u>Id.</u> at 663-64. The Court of Appeals for the Fifth Circuit has ruled on virtually identical policy language that an insurer *not* obligated under clause (a) because the insured has not paid a judgment *is* obligated under clause (b) to pay for attorneys' fees and costs once the insured "incur[red]" liability for the fees. <u>Stuyvesant Ins. Co. of N.Y. v. Nardelli</u>, 286 F.2d 600, 603 (5th Cir. 1961) (applying Florida law). This is in accord with the basic principle that a claim for indemnity against <u>liability</u> accrues when the liability "becomes fixed and certain." <u>See</u> <u>Ingersoll-Rand</u>, 997 S.W.2d at 205. Because "[t]he attorney's fees are certain to be incurred as soon as an attorney is retained," the critical distinction is whether the agreement is to indemnify against a liability owing to a third party, including fees on account of that liability, or is instead an agreement to reimburse incurred attorney's fees. <u>See</u> <u>id.</u> at 210. Here, clause (a) is on account of third-party liabilities, and clause (b) is on account of fees incurred in contests of the vessel's liability. Iroquois' claim thus accrued "when facts [came] into existence that authorize[d] the claimant to seek a judicial remedy," <u>see</u> <u>id.</u>, that is, when liability of the vessel was contested and Iroquois thereby incurred liability for fees and costs.

II.    **IROQUOIS IS AN "ASSURED" AS TO ALL CLAIMS ASSERTED
IN THE NYPA LITIGATION**

a) **Under the Hull Policy, Iroquois is an additional assured to the extent
required by contract**

The Hull Policy grants coverage to additional insureds as follows:

It is understood and agreed that <u>where required by contract</u>, bid or work order,
Additional Assured and/or Waivers of Rights of Subrogation are automatically
included hereunder, subject further to Notice Clauses as may be required by
written contract only and that coverage provided hereunder shall be primary in
respect of any coverage carried by said additional assureds <u>where required by
written contract</u>.

R. 56.1, ¶ 64 (emphasis added).   In addition, the Hull Policy incorporates a "Cross Liability
Clause as required by contract" (IRO/AE 00316, Lloyd's Docs. p. 9) that provides:

In the event of claims being made by reason of Personal Injury, Property Damage
etc. suffered by one Assured hereunder (including persons in the employ thereof)
for which another Assured hereunder is or may be liable, then this Policy shall
cover such Assured against whom a claim is made or may be made in the same
manner as if separate policies had been issued to each Assured hereunder.

R. 56.1, ¶ 65.

The Hull Policy itself anticipates that coverage may extend to instances where one
insured is liable to the other, as it includes the cross-liability provision requiring Lloyd's to
provide separate coverage to both insureds.  Nothing more is required.  Thus, whether Iroquois is
an "assured" under the Hull Policy turns only on whether the Construction Contract required
Horizon to include Iroquois as an additional insured.

b) **The Construction Contract requires inclusion of Iroquois as an insured for
all covered risks growing out of the pipeline project**

The Construction Contract between Horizon and Iroquois (1) required Horizon to
maintain ten enumerated lines of insurance at its own expense (¶¶ 2.1-2.2), (2) provided that all
policies would be "arranged with insurers acceptable to [Iroquois]" with "such terms and
conditions as are acceptable to [Iroquois]" (¶ 2.3), (3) required that "in the event of one insured

incurring liability to any other insured, the policy or policies shall cover the insured against whom claim is or may be made, in the same manner as if separate policies had been issued to each insured" (¶ 2.4.3), and (4) required waiver of subrogation against Iroquois (¶ 2.4.2).  R. 56.1, ¶ 5.

The Construction Contract expressly required Horizon to name Iroquois as an additional insured:

> **Additional Terms.**    All insurance policies provided by [Horizon] and Subcontractors shall be endorsed to provide that
> .1  [Iroquois] and its parental, partner, divisional, affiliate, or subsidiary companies and all employees thereof shall be included as additional insured
>    . . .
> .4  any requirement to name [Iroquois] and its parent, partner, divisional, affiliate or subsidiary companies as an additional insured or waive subrogation on any of [Horizon]'s policies or that [Horizon]'s policies shall be primary to those of [Iroquois] and its parent, partner, divisional, affiliate or subsidiary companies' policies shall be excess and non-contributing to any other policies of [Horizon] shall be limited to those risks covered by [Horizon]'s insurances for which [Horizon] has agreed under the terms of the contract to assume responsibility or indemnify Company and it's parents, partner, divisional, affiliate or subsidiary companies.

R. 56.1, ¶ 66 (emphasis added).

These terms clearly required Horizon to maintain insurance for the benefit of Iroquois for all covered risks arising out of the Construction Contract.  Moreover, they expressly contemplate insurance against Iroquois' own negligence.  Whether one party is intended to procure insurance for the benefit of another party is determined by the terms of the contract between the parties.  See Clapper v. County of Albany, 188 A.D.2d 774, 775-76, 591 N.Y.S.2d 258, 259-60 (3d Dept. 1992).[4]  The contract's stated requirement is that Iroquois be included as an additional insured as

---

[4] The Construction Contract is expressly governed by New York law.  Hence, whether Horizon is "required by contract" to include Iroquois as an additional insured is a question of the import attached to the terms of the Construction Contract by New York law.  The fact that the underlying contract in this case is governed by New York law does not mean New York law or any other non-Texas law would govern the contract of insurance.  Only one law, Texas law, applies to the insurance contract.  Any other rule would subject the insurance contract to the law of any forum Horizon or its vessels happened to enter into, incurred a triggering claim in, or did

to "those risks covered by [Horizon]'s insurances for which [Horizon] has agreed under the terms of the contract to assume responsibility or indemnify." Because Horizon agreed to assume responsibility for insuring against all risks except those covered by the builder's risk policy, Iroquois is an additional insured as to all risks covered by the enumerated policies.

Horizon's obligation to procure insurance is <u>independent</u> from its obligation to indemnify; the two contractual delegations are distinct. <u>See</u> <u>Kinney v. G.W. Lisk Co.</u>, 76 N.Y.2d 215, 218, 557 N.Y.S.2d 283, 285 (1990) ("An agreement to procure insurance is *not* an agreement to indemnify or hold harmless."). Unlike an agreement to indemnify, an agreement to procure insurance contemplates coverage for liabilities resulting from the promisee's own fault. <u>See</u> <u>id.</u> ("an agreement to procure insurance specifically anticipates the promisee's 'continued responsibility' for its own negligence"). Moreover, it would be patently unreasonable to conclude that the provision requiring inclusion of Iroquois as an additional *insured* is limited to Horizon's obligation to indemnify:

> Indeed, if the only purpose of the insurance requirements of the agreement was to protect the [promisee] from vicarious liability for [the promisor's] negligence, the [promisee] would have been sufficiently protected by the provision requiring [promisor] to obtain its own insurance coverage, without further requiring that the [promisee] be included in [the promisor's] policy as a named insured.

<u>Roblee v. Corning Community College</u>, 134 A.D.2d 803, 805, 521 N.Y.S.2d 861, 863 (3d Dept. 1987); <u>see also</u> <u>Whalen v. City of New York</u>, 270 A.D.2d 340, 343, 704 N.Y.S.2d 305, 308 (2d Dept. 2000) ("if the purpose of the insurance requirement of the contract was only to insure the City and Perini for Thunderbird's negligence, there would be no reason to list them as additional insureds").

The other insurance provisions of the Construction Contract duly manifest this intent. The fact that the Construction Contract made the policies subject to the approval of Iroquois

business in, after purchasing the policy.

alone indicates that the parties intended that the policies would protect Iroquois. See Tibbetts v. I.B.M. Corp., 161 A.D.2d 581, 583, 555 N.Y.S.2d 160, 161 (2d Dept. 1990) (approval provision shows the "unmistakable intent" of the parties "to obtain insurance for the benefit and protection of" the promisee); see also Am. Home Assurance Co. v. Mainco Contractor Corp., 204 A.D.2d 500, 501, 611 N.Y.S.2d 305, 306 (2d Dept. 1994).

The terms requiring Horizon's policies to incorporate a cross-liability clause and to waive subrogation further show this intent because they have no effect whatsoever unless Iroquois is insured against its own negligence, rather than just that of Horizon. If Iroquois is not insured as to its own negligence, it would be impossible for one "insured" to incur liability to another insured (because if Iroquois was negligent, it would not be an "insured"), and likewise, because Lloyd's would never pay for a loss arising from Iroquois' fault, no right of subrogation would arise in the first instance.

Because the Construction Contract required Horizon to procure insurance for the benefit of Iroquois and to name Iroquois as an additional insured, Iroquois "is insured for all liability arising out of the activities covered by the agreement." Ceron v. Rector, Church Wardens & Vestry Members of Trinity Church, 224 A.D.2d 475, 476, 638 N.Y.S.2d 476, 478 (2d Dept. 1996) (emphasis added); see also Clapper, 188 A.D.2d at 776, 591 N.Y.S.2d at 260 ("all liability arising out of the activities contemplated by the subcontract"). The parties agreed to place the burden of insuring against various enumerated risks on Horizon, and one of the risks arising under the contract was the risk that a Horizon vessel would damage the undersea property of another, such as the NYPA cables, and thereby expose Iroquois to claims and potential liability. Horizon's provision of insurance policies was an integral part of its performance of the Construction Contract. The parties' contractual agreement should be enforced.

### III.  THE LLOYD'S POLICY COVERS THE NEGLIGENCE AND INDEMNITY CLAIMS ASSERTED IN THE NYPA LITIGATION

#### a) NYPA's claims are predicted on the occurrence of an insured event and are within the coverage grant.

Both of NYPA's claims -- negligence and contractual indemnity -- seek to hold Iroquois liable for damages sustained by NYPA as a result of the GULF HORIZON's contact with the NYPA cables.  Both claims are negligence-based and arise out of the Anchor Drag incident. Iroquois' liability under the Crossing Agreement exists only where there is damage due to "the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees."  R. 56.1, ¶ 10.  Both claims are within the specific coverage of the Hull Policy:  (1) the damages sought by NYPA are within the policy's indemnification promise -- to indemnify the insured against liability "by way of damages to any other person" as a "consequence of the insured Vessel being at fault" due to "collision or contact with any other . . . structure"; and (2) in consequence of NYPA's claim, the "the liability of the Vessel has been contested" and Iroquois has incurred attorney's fees.  See Cheek v. Williams-McWilliams Co., 697 F.2d 649, 656 (5th Cir. 1983) (applying Louisiana law) (accident-related "breach of contract" claim against insured was covered by indemnity policy because insured's "potential liability to [the claimant] was negligence-based").

Moreover, the NYPA claims do not seek to recover the performance NYPA expected of Iroquois under the Crossing Agreement.  They are not the type of "contract" claims that are outside the coverage of a liability insurance policy.  It is well-established that an insured's acts in performing a contractual obligation can give rise to a covered liability claim when the insured's intentional acts in performing the contract cause damage that is unexpected and unintended from the standpoint of the insured.  See Mass. Bonding & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396, 400 (Tex. 1967) (farmer's rice crop was damaged when insured negligently applied pesticide pursuant to contract).  The critical inquiry is whether there has been "damage" to

trigger the application of the liability insurance clause.  If the only "damage" is disappointment of the claimant's contractual expectations ("economic loss"), then there has not been an accident to trigger coverage.  See Gibson & Assocs. v. Home Ins. Co., 966 F. Supp. 468, 474 (N.D. Tex. 1997) ("courts have denied coverage in cases where the only damage alleged was the failure of a product to perform in accordance with contract specifications because such damage is not encompassed by the policy's definition of 'occurrence'"); Devoe v. Great Am. Ins. Co., 50 S.W.3d 567, 571 (Tex.Ct.App. 2001) (critical inquiry is whether the event causing damage was "the natural and probable consequences of repairing a garage," the contractual undertaking).

The expected consequences of the Crossing Agreement and the Construction Contract were that the Iroquois' pipeline would traverse the NYPA Cables, and that the NYPA Cables would themselves remain unharmed.  NYPA's indemnity and negligence claims do not seek to recover these expectations.  They rather are seeking compensation on account of the vessel's contact with NYPA's power cables, an insurable tort event, and seek damages resulting therefrom.

### b) Courts have construed the language of the Hull Policy to cover contract damages that result from covered risks

In 1933 the Court of Appeals for the Second Circuit considered a claim for damage to cargo predicated on very similar policy language.  See Marine Transit Corp. v. N.W. Fire & Marine Ins. Co., 67 F.2d 544, 545 (2d Cir. 1933).  The insurer contended it was not obligated to reimburse the vessel owner for its cargo-damage settlement with a cargo owner because the policy covered only "the legal liability . . . of a tower," and the discharged claim was contractual, "that of a carrier of wheat."  See id. at 547.  The court rejected this contention as "unsound":

> That which was insured was the legal liability of the tug and its owner, the
> libelant, for such a collision as actually did take place.  There was nothing in the
> policy to limit this to the legal liability of a tower nor to exclude the legal liability
> of a carrier.  It was the legal liability arising from an occurrence of the conditions
> named regardless of the particular legal relationship of the assured to the person

> entitled to assert such liability. For whatever legal liability for such a collision the
> assured had to respond in damages, the defendant agreed to the extent of its policy
> to make reimbursement.

Id. at 547 (citation omitted). The Second Circuit again ruled in 1935 that virtually identical

policy language required the insurer to reimburse the vessel owner for cargo damage claims, not

just for the damages sustained by the towed vessel itself. See Bee Line Transp. Co. v. Conn. Fire

Ins. Co. of Hartford, 76 F.2d 759, 761 (2d Cir. 1935). If the covered contingencies occurred and

"as a result . . . the insured incurred a legal liability, the policy covered. This legal liability arose

from the occurrence of a named contingency regardless of the particular legal relationship of the

assured to the person entitled to assert such liability." Id.

More recently, the Court of Appeals for the Eleventh Circuit has noted that virtually

identical policy language "has been held to cover contractual liabilities which arise out of a

collision," and that "the current position in the United States appears to allow recovery for both

contract and tort liability arising from collision damage to another vessel." Bender Shipbuilding

& Repair Co. v. Brasileiro, 874 F.2d 1551, 1560 & n.9 (11th Cir. 1989) (citing Marine Transit

and Bee Line). The Bender court denied recovery because there was no "collision" in Bender to

trigger liability coverage for the liquidated delay damages incurred pursuant to the insured's

contract, see id. at 1560-61, but it is apparent that the court would have allowed recovery had

such a collision occurred and triggered coverage.

Finally, even the fact that damages may be measured by a contractual formulation does

not vitiate coverage. [5] In Meadows & Walker Drilling Co. v. Pacific Employers Indemnity Co.,

---

[5] Even if some claims in the Limitation Proceeding eventually turned out not to be
subject to coverage it does not relieve Lloyd's of its triggered obligation to reimburse defense
fees. Instead, any defense costs that are not on account of covered claims must be paid subject to
reimbursement after a valid judgment determines the predicate questions to liability under the
policy. See Lafarge Corp. v. Hartford Cas. Ins. Co., 61 F.3d 389, 398 (5th Cir. 1995) (applying
Texas law) ("even though some of the claims were not covered under the policy, apportionment
of costs would not be feasible in this case because the claims all arose from a single accident");
see also Little v. MGIC Indem. Corp., 836 F.2d 789, 794 (3d Cir. 1987) (policy providing for

324 F. Supp. 282, 285 (S.D. Tex. 1971), the insurer contended that it was not obligated to indemnify the insured for damages it paid following a blowout that occurred while the insured was drilling an oil well pursuant to a contract. The insured's contract required it to indemnify the other party against damage, and the insurer contended that it was not obligated to cover the insured because under the contract damages had been measured by "the expense incurred after the blowout in regaining control and depth rather than by the loss of value due to the occurrence." Id. The court rejected the argument:  "By either measure, the judgment represented a legal claim for damages for injury to property." Id. Likewise, in Insurance Co. of North America v. Aberdeen Insurance Services, Inc., 253 F.3d 878, 889 (5th Cir. 2001) (applying Texas law), the court ruled that the insured could recover liquidated "delay" damages assessed pursuant to a contract because the damages were "a direct consequence of the March 2 pipeline break," an insured event. See also Mattiola Constr. Co. v. Comm'l Union Ins. Co., 60 Pa. D. & C.4th 412, 420, 424 (Pa. Ct. Comm. Pleas 2002) (construing Aberdeen Insurance as allowing recovery of liquidated contract damages where "a direct consequence of [the insured's] tortious conduct" and stating that authorities limiting recovery of "contract" damages are predicated on absence of "property damage" to trigger coverage).

## IV.    ANY LATE-NOTICE DEFENSE FAILS AS A MATTER OF LAW

### a) Lloyd's must show actual prejudice to avoid coverage

It is unclear why notice to the Lloyd's Underwriters was delayed by Aon and JLT, but for the purposes of Iroquois' motion it is undisputed that Lloyd's had notice by -- at the latest -- December 1, 2004. R. 56.1, ¶ 55. While it is unfortunate that transmission of the loss notice was late, this simply does not provide a basis for Lloyd's to avoid coverage under its policy. Texas

---

reimbursement of incurred defense costs required insurer to pay defense costs with right of reimbursement if some losses are not covered by policy); Okada v. MGIC Indem. Corp., 823 F.2d 276, 282 (9th Cir. 1986) (same).

law requires that an insurer show it has been prejudiced to avoid coverage due to the failure of a late notice requirement. See Hanson Productions Co. v. Americas Ins. Co., 108 F.3d 627, 630 (5th Cir. 1997) (applying Texas law) (under Hernandez, insurer must show actual prejudice to avoid coverage due to late notice); Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691, 692 (Tex. 1994) (it is a "fundamental principle of contract law" that only a "material breach" of contract will excuse the obligation to perform, and material breach exists only where there is actual prejudice); Lennar Corp. v. Great Am. Ins. Co., No. 14-02-00860-CV, 2005 Tex. App. LEXIS 4214, *84 (Tex. Ct. App.--Houston June 2, 2005); Kimble v. Aetna Cas. & Surety Co., 767 S.W.2d 846, 850 (Tex. Ct. App.--Amarillo 1989); Wheeler v. Allstate Ins. Co., 592 S.W.2d 2, 3 (Tex. Ct. App.--Beaumont 1979).[6]

### b) Prejudice does not exist on these facts as a matter of law

When an insured provides late notice to its insurer, Texas courts have found prejudice to exist only in limited circumstances. First, if notice comes after judgment has been entered against the insured, the insurer has been prejudiced, even if it is possible to set aside the judgment. See Kimble, 767 S.W.2d at 851 (critical factor is "change of position" that occurred on entry of default judgment). Second, Texas courts have found prejudice to exist where an insurer is not notified until just before the trial date and cannot secure the cooperation of the insured. See Filley v. Ohio Cas. Ins. Co., 805 S.W.2d 844, 847 (Tex. Ct. App.--Corpus Christi 1991).

---

[6] The Fifth Circuit has twice reiterated its holding in Hanson Productions Co. v. Americas Ins. Co., 108 F.3d 627 (5th Cir. 1997), that Texas law requires a showing of prejudice to avoid coverage due to late notice under any insurance policy construed under Texas law. See Ridglea Estate Condominium Ass'n v. Lexington Ins. Co., 398 F.3d 332, 338 (5th Cir. 2005) (applying Texas law); Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co., 174 F.3d 653, 658 (5th Cir. 1999) (applying Texas law). A Texas appellate court has likewise concluded that prejudice applies to any late-notice defense. See Lennar Corp. v. Great Am. Ins. Co., No. 14-02-00860-CV, 2005 Tex. App. LEXIS 4214, *84 (Tex. Ct. App.--Houston June 2, 2005).

As a general matter, "an insured's failure to notify an insurance company of a claim filed against it by a third party will not constitute prejudice unless that notice is given after a default judgment is taken against the insured." P.G. Bell Co. v. U.S. Fid. & Guar. Co., 853 S.W.2d 187, 191 (Tex. Ct. App.--Corpus Christ 1993). Loss of the ability to mitigate damages or to negotiate a more favorable settlement is not prejudice *as a matter of law*. See Crocker v. Nat'l Union Fire Ins. Co., No. SA-04-CA-389, 2005 U.S. Dist. LEXIS 2806, *37 (W.D. Tex. Feb. 15, 2005); St. Paul Guardian Ins. Co. v. Centrum G.S. Ltd., No. 3:97-CV-1478, 2003 U.S. Dist. LEXIS 15337, *36 (N.D. Tex. Aug. 29, 2003) ("Texas courts, at least up to now, have been quite specific and definitive as to what constitutes prejudice to the insurer regarding untimely notice of claim; *and the inability to obtain a more favorable settlement is not one of them*."). To show that it has a triable issue of fact with respect to its pleaded late-notice defense, Lloyd's must minimally come forward with evidence showing that Iroquois' late notice *actually* prevented it from engaging in settlement negotiations or from asserting defenses in the litigation. See Travelers Indem. Co. of Conn. v. Presbyterian Healthcare Res., No. 3:02-CV-1881, 2004 U.S. Dist. LEXIS 6373, *26-27 (N.D. Tex. Feb. 25, 2004); see also St. Paul, 2003 U.S. Dist. LEXIS 15337 at *37 (no specific evidence showing prejudice).

No such prejudice has -- or can -- result here. First and foremost, no judgment by default or otherwise, has been taken against Iroquois in the Limitation Proceeding. Indeed, the Limitation Proceeding is still in the discovery stage, and was in a very early discovery stage in May, and even in December, of 2004. In fact, following a motion to transfer the Limitation Proceeding, which was not decided until early 2004, such discovery as took place during 2004 was solely documentary. No depositions were taken until April 2005. Secondly, *the Hull Policy does not give Lloyd's the right to defend* the Limitation Proceeding. The responsibility for defending the action lies on the insured, Iroquois. The "prejudice" proffered by Lloyd's corporate representative -- Lloyd's might have mitigated the loss by becoming involved in the

litigation, the experts, or the surveys had it been notified earlier, R. 56.1, ¶ 67 -- are all matters that Lloyd's has no right to dictate in the first instance.[7]  Iroquois, responsible for conducting its defense, could have spurned such directions from Lloyd's, so it is hard to see how this can be a source of "actual prejudice" to Lloyd's.  Moreover, as the cases above demonstrate, Lloyd's contentions in this regard do not constitute prejudice as a matter of law.

Finally, to whatever extent Lloyd's could show it was prejudiced, Lloyd's representative admitted that Iroquois has not precluded it from participating in the Limitation Proceeding, which is still in its discovery stages.  R. 56.1, ¶ 68.  (The representative also admitted that Lloyd's has no specific objection to any action taken by Iroquois in the Limitation Proceeding. R. 56.1, ¶ 69.)  There simply is no basis for a showing that Iroquois' delayed notice *actually* prejudiced any underwriter's rights in the litigation.  See, e.g., Lennar Corp., 2005 Tex. App. LEXIS 4214 at *87 (insurer not notified until some claims had already been settled did not come forward with evidence showing actual prejudice).  Iroquois would welcome Lloyd's participation in the Limitation Proceeding, and the very point of this action is to compel Lloyd's to do so.

## V.    RECOVERY UNDER CLAUSE (B)

As of June 30, 2005 Iroquois had incurred $975,064.46 in attorney's fees and costs in its defense of NYPA's claims.  R. 56.1, ¶ 43.  The policy provides for a deductible as follows:

> Deductibles:
> USD 500,000 each accident or occurrence including total loss.
> Subject to Annual Aggregate Deductible of USD 1,500,000 excluding total loss
> (Sections 1 & 2), to be reviewed by Leading Underwriters following a change in
> the fleet schedule hereon.

R. 56.1, ¶ 70.

---

[7] The only policy provision that even comes close is the notice of loss provision which grants Lloyd's the right to survey the vessel and direct where the vessel was repaired. R. 56.1, ¶ 71.  However, the vessel was not damaged in this instance and the provision is inapplicable.

As Iroquois has not satisfied the aggregate deductible, it accordingly prays for recovery of $475,064.46, its attorney's fees less the $500,000 per-accident deductible.

### VI.  BECAUSE LLOYD'S HAS <u>NEVER</u> RESPONDED TO IROQUOIS, THE COURT SHOULD AWARD IROQUOIS ATTORNEY'S FEES IN THE INSTANT ACTION

Parties may recover attorney's fees in <u>marine insurance cases</u> on a showing of bad faith. <u>See Ingersoll Milling Mach. Co. v. M/V Bodena</u>, 829 F.2d 293, 309 1988 AMC 223 (2d Cir. 1987); <u>Puritan Ins. Co. v. Eagle S.S. Co.</u>, 779 F.2d 866, 873, 1986 AMC 1240 (2d Cir. 1985). Bad faith exists where a party (1) acts entirely without basis to (2) harass, delay, or for other oppressive reasons. <u>See Puritan Ins.</u>, 779 F.2d at 873. Whether claims are colorable ("with basis") depends on whether a reasonable attorney could conclude that *facts* could be established to support the claim. <u>See Leather's Best Int'l, Inc. v. MV "Lloyd Sergipe"</u>, 760 F. Supp. 301, 314, 1991 AMC 1929 (S.D.N.Y. 1991); <u>Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH</u>, 2005 AMC 1116 (S.D.N.Y. 2005). In <u>Thypin Steel Co. v. Certain Bills of Lading</u> the court found bad faith and awarded attorney's fees because the breaching parties were experienced commercial parties who realized the significance of the commercial documents they received, but instead "did nothing" and "lay in the weeds" in the hope that the problem would go away. <u>See Thypin Steel Co. v. Certain Bills of Lading</u>, 2002 AMC 2859, 2875-76 (S.D.N.Y. 2002), <u>aff'd</u> 82 Fed. Appx. 738 (2d Cir. 2003).

Lloyd's should pay attorney's fees because it chose to ignore Iroquois' claim for coverage as an insured and thereby instigated the necessity of this lawsuit in the first instance. In December 2004 no significant facts relevant to Lloyd's obligations under the policy were significantly in dispute. Whether Lloyd's was obliged to provide coverage was a matter of drawing conclusions from the terms of the Lloyd's policy, as applied to the facts of the claim. Had Lloyd's responded to Iroquois' claim -- as Texas law requires, <u>see</u> Tex. Admin. Code § 21.203(9)-(10) (insurer must promptly provide "a reasonable explanation of the basis in the

insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement" and must "affirm or deny coverage of a claim to a policyholder within a reasonable time") -- whatever issues Lloyd's had with coverage for the claim could have been addressed. Instead, Lloyd's chose to play hardball by ignoring Iroquois and spurning the other insurance companies' requests to talk. Because Lloyd's acted without basis for the purpose of delaying and/or avoiding Iroquois' claim, the court should find Lloyd's has acted in bad faith and award Iroquois its costs in prosecuting the instance action, to be established by supplemental filing.

## CONCLUSION

Summary Judgment should be entered herein in favor of Iroquois Gas Transmission System, L.P.

Dated: New York, New York
       August 17, 2005

                                                Respectfully submitted,

                                                HEALY & BAILLIE, LLP

                              By:               _____
                                                Richard V. Singleton (RS-9489)
                                                John C. Koster (JK-4086)
                                                David D. Jensen (DJ-2261)
                                                Attorneys for Plaintiffs
                                                61 Broadway, 32nd Floor
                                                New York, New York 10006-2701
                                                (212) 943-3980