DONOVAN PARRY McDERMOTT & RADZIK
Edward C. Radzik (ER-2473)
Attorneys for Defendants, Lloyd's Underwriters
Wall Street Plaza
88 Pine Street - 21st Floor
New York, NY 10005-1801
(212) 376-6400

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

IROQUOIS GAS TRANSMISSION
SYSTEM L.P.,

                              Plaintiffs,

            - against -

ASSOCIATED ELECTRIC & GAS
INSURANCE SERVICES LTD.,
Hamilton, Bermuda; CERTAIN
UNDERWRITERS AT LLOYD'S; AON
RISK SERVICES OF TEXAS, INC.; and
AMERICAN HOME ASSURANCE CO.,

                              Defendants.
-------------------------------------------------------X

**ECF CASE**

05 Civ.2149 (JSR)

**AFFIDAVIT OF EDWARD C.
RADZIK IN SUPPORT OF
LLOYD'S UNDERWRITERS'
MOTION FOR SUMMARY
JUDGMENT**

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF NEW YORK         )

        EDWARD C. RADZIK, being duly sworn, deposes and says:

        1.        I am an attorney at law admitted to practice before this Honorable Court,

and am a member of the firm of **DONOVAN PARRY McDERMOTT & RADZIK,**

attorneys for Defendants, Underwriters at Lloyd's and Certain Insurers subscribing to Marine Hull & Machinery Policy No. LE0280715 (hereinafter "Lloyd's Underwriters") .

2.    I am fully familiar with all pleadings and proceedings heretofore had herein and in this action and make this affidavit in support of Defendants, Lloyd's Underwriters' motion for summary judgment on the issue of late notification pursuant to Rule 56 of the Federal Rules of Civil Procedure.

3.    The following facts are asserted on the basis of information contained in records, documents and correspondence forwarded to Donovan Parry McDermott & Radzik and the undersigned in connection with their representation of Defendants, Lloyd's Underwriters, as attorneys and on the basis of the undersigned's personal investigation in this matter and I believe these facts to be true.

4.    Annexed hereto as Exhibit "A" is a true and accurate copy of the court transcript from the July 22, 2005 motion hearing in this case before Judge Jed S. Rakoff.

5.    Annexed hereto as Exhibit "B" is a true and accurate copy of a letter dated August 19, 2005, from counsel for Lloyd's Underwriters to counsel for Iroquois requesting that Iroquois' voluntarily withdraw its Motion for Summary Judgment to the extent that it seeks relief beyond a the issue of late notification.

6.    Annexed hereto as Exhibit "C" is a true and accurate copy of a letter dated August 22, 2005, from counsel for Iroquois to counsel for Lloyd's Underwriters advising that Iroquois has no intention of withdrawing any part of their motion.

7.    Annexed hereto as Exhibit "D" is a true and accurate copy of a letter dated August 23, 2005, from counsel for Lloyd's Underwriters to counsel for Iroquois in response to the previous letter annexed as Exhibit "C".

8.    Annexed hereto as Exhibit "E" is a true and accurate copy of the Lloyd's slip policy containing the terms of Lloyd's Policy at issue in this action (LE0280715).

9.    Annexed hereto as Exhibit "F" is a true and accurate copy of the American Institute's Hull Clauses (dated June 2, 1977) , part of which are incorporated by the Lloyd's Policy Ex. "E".

10.    Annexed hereto as Exhibit "G" is a true and accurate copy of the American Institute's Tug Form dated (August 1, 1976), part of which are incorporated by the Lloyd's Policy Ex. "E".

11.    Annexed hereto as Exhibit "H" is a true and accurate copy the Construction Contract dated April 12, 2002, between Iroquois and Horizon, which was marked as Exhibit "12" at Michelle Wieler's deposition on August 3, 2005.

12.    Annexed hereto as Exhibit "I" is a true and accurate copy of AON Risk Services' Confirmation of Coverage dated June 28, 2002.  Exhibit "I" contains the terms of

the Lloyd's Policy and was delivered to Horizon by AON's own cover which was marked as Exhibit "24" at John Hodgett's deposition on July 20, 2005.

13.     Annexed hereto as Exhibit "J" is a true and accurate copy of a Report of Loss dated May 17, 2004, sent to Lloyd's Underwriters c/o JLT by AON on behalf of Horizon, the primary insured, which was marked as Exhibit "3" at the deposition of John Hodgett on July 20, 2005 and Exhibit "26" at the deposition of Michelle Wieler on August 3, 2005.

14.     Annexed hereto as Exhibit "K" is a true and accurate copy of a Reservations of Rights letter signed by the lead underwriter and the lead company of the Lloyd's Policy on or about December 23, 2004.

15.     Annexed hereto as Exhibit "L" is a true and accurate copy of an e-mail from Jim Montano to JLT dated November 15, 2004. This e-mail was contained in JLT's claim file which was presented to John Hodgett. The handwritten notes at the bottom of the page are those of Mr. Hodgett.

16.     Annexed hereto as Exhibit "M" is a true and accurate copy of a map of Iroquois' Pipeline obtained from Iroquois' website and marked as Exhibit "16" at Michelle Wieler's deposition on August 3, 2005.

17.     Annexed hereto as Exhibit "N" is a true and accurate copy of the Crossing Agreement between Iroquois and Horizon.

- 4 -

18.     Annexed hereto as Exhibit "O" is a true and accurate copy of the Master Service Agreement between Horizon Offshore Contractors, Inc. and Horizon's subcontractor, Racal NCS, Inc. (the entities now known as Thales GeoSolutions).

19.     Annexed hereto as Exhibit "P" is a true and accurate copy of timely notices AON sent to Horizon's insurers, excluding Lloyd's Underwriters.

20.     Annexed hereto as Exhibit "Q" is a true and accurate copy of the written notices that were timely sent by Iroquois, *via* certified mail, to each of Horizon's insurers, excluding Lloyd's Underwriters.

21.     Annexed hereto as Exhibit "R" is a true and accurate copy of Iroquois' Complaint in this Action dated February 14, 2005.

22.     Annexed hereto as Exhibit "S" is a true and accurate copy of Iroquois' Amended Complaint in this Action dated March 23, 2005.

23.     Annexed hereto as Exhibit "T" is a true and accurate copy of Iroquois' Second Amended Complaint in this Action March 23, 2005.

24.     Annexed hereto as Exhibit "U" is a true and accurate copy of Iroquois' Response to Defendant Certain Underwriters at Lloyd's Request for Admissions.

25.     Annexed hereto as Exhibit "V" is a true and accurate copy of a Motion to Transfer Venue filed by Iroquois in the Texas Limitation Action dated December 15,

2003, wherein Iroquois argued that New York is applicable to all claims arising out of the Anchor Drag Incident.

26.    Annexed hereto as Exhibit "W" is a true and accurate copy of the Affidavit of Ken Webb, Iroquois' "Director of New Projects", filed by Iroquois in the Texas Limitation Action, in support of its Motion to Transfer Venue, dated December 15, 2003.

27.    Annexed hereto as Exhibit "X" is a true and accurate copy of an Order from the Texas Limitation Action, dated February 27, 2004, by United States Magistrate Judge Nancy K. Johnson.

28.    Annexed hereto as Exhibit "Y" is a true and accurate copy of Iroquois' Motion for Leave to File an Amended Claim and Cross-Claims in the Texas Limitation Action, dated August 1, 2005.

29.    Annexed hereto as Exhibit "Z" is a true and accurate copy of a Memorandum and Recommendation dated May 12, 2005, by United States Magistrate Judge Nancy K. Johnson.

30.    Annexed hereto as Exhibit "AA" is a true and accurate copy of a the deposition transcript of John Hodgett taken on July 20, 2005.

31.    Annexed hereto as Exhibit "BB" is a true and accurate copy of a the deposition transcript of Michelle L. Wieler taken on August 3, 2005.

32.    Annexed hereto as Exhibit "CC" is a true and accurate copy of the deposition transcript of James Montano taken on August 9, 2005.

33.    Annexed hereto as Exhibit "DD" is a true and accurate copy of a Certificate of Insurance dated November 20, 2002 marked as Exhibit "27" at Wieler deposition.

34.    Annexed hereto as Exhibit "EE" is a true and accurate copy of a Certificate of Insurance dated May 17, 2002 marked as Exhibit "28" at Wieler deposition.

35.    Annexed hereto as Exhibit "FF" is a true and accurate copy of a letter from AON to Horizon dated January 24, 2003, Regarding Coverage Applicable to Iroquois.

Dated:    New York, New York
          August 26, 2005


                              _____
                              EDWARD C. RADZIK
                              Attorney for Defendants, Lloyd's Underwriters


Sworn to before me this
26th day of August, 2005


_____
Notary Public
MATTHEW T. LOESBERG
Notary Public, State of New York
No. 02LO6051626
Qualified in New York County
Commission Expires _December 4, 2006_

- 7 -

# Exhibit "A"

Hearing Transcript

1

57mrlroc

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ————————x
2
3  IROQUOIS GAS TRANSMISSION
3  SYSTEMS,
4
4          Plaintiff,
5
5     v.                05 Civ. 2149 (JSR)
6
6  ASSOCIATED ELECTRIC & GAS
7  INSURANCE, et al.,
7                       Conference
8          Defendants.
8
9  ————————x
9                    New York, N.Y.
10                   July 22, 2005
10                   4:30 p.m.
11  Before:
11
12      HON. JED S. RAKOFF
12                       District Judge
13
13
14      APPEARANCES
14
15  HEALY & BAILIE
15  Attorneys for Plaintiff
16      29 Broadway
16      New York, New York  10006
17      (212) 943-3980
17  BY: JOHN KOSTER, ESQ.
18
18  NOURSE & BOWLES LLP
19  Attorneys for Defendant Associate Electric & Gas
19      One Exchange Plaza
20      55 Broadway
20      New York, New York  10006
21      (212) 952-6200
21  BY: JOHN VAYDA, ESQ.
22

22   KENNEDY LILLIS SCHMIDT & ENGLISH
23   Attorneys for Defendant American Home
23      75 Malden Lane, Suite 402
24      New York, New York  so 038
24      (212) 430-0802
25   BY:  CHARLES SCHMIDT, ESQ.
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300


2

57mriroc
1          APPEARANCES
2
2   DONOVAN PARRY McDERMOTT & RADZIK
3   Attorneys for Lloyd's underwriter defendants
3      Wall Street Plaza
4      88 Pine Street
4      New York, New York  10005
5      (212) 376-6400
5   BY:  EDWARD RADZIK, ESQ.
6
6
7   DECHERT LLP
7   Attorneys for Defendant Aon
8      30 Rockefeller Plaza
8      New York, New York  10112
9      (212) 698-3500
9   BY:  RODNEY ZERBE, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Hearing Transcript

**SOUTHERN DISTRICT REPORTERS, P.C.**
**(212) 805-0300**

3

57mrlroc
1        (Case called)
2        THE COURT:  Good afternoon.  Pending before the Court
3   is the motion to stay or dismiss.  At the time it was
4   originally scheduled, there was only one defendant in issue,
5   which was Associated Electric & Gas Insurance.  My
6   understanding is that plaintiff does not oppose the motion to
7   stay but does oppose the motion to dismiss the alterative
8   prongs.  Is that right?
9        MR. KOSTER:  That is correct, your Honor.
10       THE COURT:  Before I hear you on that issue, since we
11   now have other folks involved, let me find out what their
12   position is.  If I were to grant this motion either as a stay
13   or as a dismissal, we would have to see if it operates as a
14   stay or a dismissal as to them.
15       MR. KOSTER:  May it please the Court, may I have two
16   minutes to set the stage as to how this came about?
17       THE COURT:  Sure.  Go ahead.
18       MR. KOSTER:  My client owns and operates gas
19   pipelines.  We hired a Texas company to build the one across
20   Long Island Sound, and the contract required them to place
21   insurance for our benefit.  There was an accident.  It involved
22   tens of millions of dollars.  It is the subject of litigation
23   down in Texas.
24       As our fees began to run up and expenses began to be
25   incurred, we turned to our contracting party and said, how

**SOUTHERN DISTRICT REPORTERS, P.C.**
**(212) 805-0300**

4

57mrlroc
1   about that insurance?  They said the first level of cover is

2  Aegis.  So we sued Aegis.  Aegis appeared and said they weren't

3  liable for a number of reasons but (a) their cover had been

4  used up, it was limited to a million less $50,000, and in any

5  event they had a right to arbitrate in London.  We continued

6  discussions with them.

7           The documents disclosed that there was other

8  insurance.  That was with Lloyd's.  We sued Lloyd's,

9  represented by Mr. Radzik.  They appeared and gave 14 or 15

10  different reasons why they shouldn't be liable.  Amongst others

11  was late notice.

12           So we sued Aon, because they were the borrower charged

13  with fixing the insurance and making the notice.  And we sued

14  American Home, Mr. Schmidt's client, who is the holder of some

15  drop-down insurance.  That is how we came to be here.

16           THE COURT:  That is very helpful.

17           MR. KOSTER:  We have not disputed that where there is

18  a signed arbitration agreement, the Federal Arbitration Act

19  says the court shall stay the action.  In that context we have

20  not opposed that.

21           THE COURT:  I understand.  The arbitration that you

22  are acquiescing in is an arbitration just involving you and

23  Aegis?

24           MR. KOSTER:  That is correct, your Honor.

25           THE COURT:  That is why I want to know what the

5

57mrlroc

1  position is of the other parties.

2           MR. KOSTER:  I understand.

3           THE COURT:  Who wants to speak first?

4           MR. RADZIK:  Your Honor, Edward Radzik for Lloyd's

5  underwriters.  We have no opposition one way or the other.  We

6  have a separate defense which will eventually percolate to a

7  motion for summary judgment.  On Wednesday we produced John

8   Hodgin from Wellington Underwriting in London.  He was produced

9   here in New York for a deposition.  We have a deposition

10  scheduled of Iroquois coming up on August 3rd.  Under the

11  present schedule, the motions for summary judgment are to be

12  made by August 26th.

13          THE COURT:  So you do not want it stayed as to you.

14  You want to make your motion.

15          MR. RADZIK:  Your Honor, we want to adjudicate this

16  late notice.

17          THE COURT:  Assuming, for the sake of argument, that I

18  disagreed with your motion, we would then have to put you on

19  hold, because there is no sense trying your case until we know

20  the outcome of the arbitration.  True?

21          MR. RADZIK:  That would be true, your Honor.

22          THE COURT:  Let me hear from the next defendant.

23          MR. ZERBE:  Your Honor, Rodney Zerbe, representing

24  Aon.  We do not object to the application to stay the

25  proceedings against Aegis on grounds of arbitration.  I will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

57mriroc

1   note, however, that we believe it might have an impact on the

2   remaining claims, which might require awaiting the outcome of

3   the arbitration.

4          THE COURT:  My question to you is the same as the one

5   I put to counsel from Lloyd's.  You have a choice, and I am

6   happy with either choice.  We could stay it as to Aegis,

7   continue it with respect to any other party who wanted through

8   the summary judgment stage.

9          If you have what you believe is a total defense right

10  now regardless of how the arbitration comes out, I might as

11  well decide that.  If, on the other hand, you have a defense

12  that is only going to arise depending on how the arbitration

13  comes out, then we ought to stay it as to you now.

14          MR. ZERBE:  We do have defenses which we believe wo

uld
15  support a motion to dismiss or for summary judgment.  I can
go
16  through those for you.
17       THE COURT:  I want to know which of the two
18  alternatives you want.  Do you want to stay the case as to y
our
19  client now, in which case you don't lose your right to make
any
20  motions but you are not going to get a decision on any motio
ns
21  that could be made right now until the arbitration is over?
Or
22  do you want to finish discovery, go through the summary
23  judgment process, make the motions that you think are winner
s
24  regardless of the arbitration outcome, and I will rule on th
em?
25  That is again without prejudice to your raising other motion
s

**SOUTHERN DISTRICT REPORTERS, P.C.**
**(212) 805-0300**

7
     57mrlroc
1  that are dependent on the arbitration once the arbitration i
s
2  over, depending on how it comes out.
3       I am happy to do it either way.  It is really your
4  choice.
5       MR. ZERBE:  In the interests of economy we would
6  support a stay of the action pending the outcome.
7       THE COURT:  As to Aon.
8       MR. ZERBE:  That is correct.  The reason for that i
s
9  that I believe Iroquois is contending that the Aegis policy
is
10  the policy that should respond to their claim or, in the
11  alternative, it should be the Lloyd's policy.  We think ther
e
12  might be inconsistent results.
13       THE COURT:  I might not reach you in any event.
14       Let me hear from other counsel.
15       MR. SCHMIDT:  Charles Schmidt for American Home, yo
ur

Hearing Transcript

```
16   Honor.  My client's policy is an excess policy through the
17   Aegis policy for which the stay is sought.  As pled by the
18   plaintiff and to the best of my understanding at this stage
```
of
```
19   the litigation, my policy does in fact follow form.  Therefo
```
re,
```
20   the determination in the arbitration would, it seems to me,
21   likely be applicable to the claims against my client as well
```
.
```
22   I think that would militate in favor of a stay as against
23   American Home.
24        THE COURT:  I think where we are at, unless I have
25   missed anyone, putting aside the dismissal issue which we wi
```
ll

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

57mrlroc
```
 1   get to in a second, is that if there is a stay, it should be
```
a
```
 2   stay now as to all parties except Lloyd's.  Lloyd's will mak
```
e a
```
 3   summary judgment motion.  If Lloyd's wins that summary judgm
```
ent
```
 4   motion, obviously they are out of the case.  If they lose th
```
at
```
 5   summary judgment motion, the stay will then go into effect a
```
s
```
 6   to Lloyd's as well pending the completion of the arbitration
```
.
```
 7        MR. KOSTER:  May I address that, your Honor?
 8        THE COURT:  Yes.
 9        MR. KOSTER:  We, too, would probably be making a
10   cross-motion for summary judgment on the late notice defense
```
.
```
11   Should we prevail on that, then I think it is highly likely
12   that Aon would be out of the case entirely, because they are
13   being sued because they didn't make the notice.  If notice w
```
as
```
14   not made that needed to be made, they are being sued.  But w
```
e
```
15   are scheduled to take their testimony and we do need their
16   testimony.
17        THE COURT:  When is that?
```

18          MR. KOSTER:  We have just learned this afternoon that

19   the witness we had scheduled for August 1st, because of the

20   rather tight schedule we are under, will probably not be

21   available.  The two witnesses we need, down in Texas, we would

22   like to take them both in one trip and not have to go back and

23   forth.  But sometime later, about the third week in August.  Am

24   I correct, Mr. Zerbe?

25          MR. ZERBE:  I think it is the second and fourth.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

57mrlroc

1          MR. KOSTER:  They are available the second and the

2   fourth week in August.

3          THE COURT:  So you want to have the stay not –

4          MR. KOSTER:  Take effect immediately.

5          THE COURT:  Or maybe take effect except as to two

6   depositions?  Are there any other depositions that anyone wants

7   to take that should not be stayed?

8          MR. KOSTER:  Lloyd's has scheduled our deposition for

9   the 3rd of August, and that will go ahead.

10          THE COURT:  So it would be the three depositions,

11   right?

12          MR. KOSTER:  Yes.

13          THE COURT:  Does everyone agree with that?

14          MR. KOSTER:  Then I think cross-motions for summary

15   judgment will likely determine the status of at least two of

16   the additional defendants.

17          THE COURT:  These will be motions that you would make

18   vis-a-vis whom?  Lloyd's?

19          MR. KOSTER:  Our motion would be vis-a-vis Lloyd's.

20          THE COURT:  Yes.  So everything I said before I think

21   is still correct, with the addition that the stay would not

22   extend to the three specified depositions just mentioned.  That

23   leaves only the question of whether there should be a dismis

sal

24  rather than a stay.  Let me hear from Aegis counsel on that.

25      MR. VAYDA:  Your Honor, frankly, that is an extreme

ly

**SOUTHERN DISTRICT REPORTERS, P.C.**
**(212) 805-0300**

1

o

57mrlroc

1  tough question.  The arbitration act uses the word "stay."

The

2  leading case on this issue, the Montauk Oil case, with the

3  Integration of the New York suable clause, clearly discusses

4  the relevance of a stay order.  Yet there are cases out ther

e

5  which dismiss.

6      THE COURT:  My recollection is that the Second

7  Circuit, though it as never ruled on this directly, has in

8  dicta suggested that while a dismissal is possible, it is no

t

9  preferred, that the preferred way to go is the way the statu

te

10  suggests, which is a stay.  There are obvious reasons for th

at.

11  Dismissal raises questions about the statute of limitations

and

12  things like that.  Why would I want to dismiss?  Other than

13  getting it off my calendar, which would only be a temporary

14  benefit because it would come right back anyway, why would I

15  want to dismiss as opposed to putting a stay on?

16      MR. VAYDA:  One of the reasons to dismiss is simply

17  because the action will be resolved in London.  The theoreti

cal

18  underpinnings of the reason that the Supreme Court in Montau

k

19  Oil suggested and advocated a stay was to come back here for

20  enforcement purposes.  I don't think anyone would contend th

at

21  this would need an enforcement proceeding.  If this arbitrat

ion

22  results in an award in which Aegis is responsible as a resul

t

23  of the arbitration, I think everyone would accept that Aegis

24  will pay it, and then an enforcement proceeding will be

25  unnecessary.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1

1

57mriroc

1    THE COURT:  You may be right as a practical matter,
2    but I think the safer course is to stay, as the statute
3    suggests.  That is what I will do.  I will issue a written
4    order.  The bottom line will be this action is stayed in its
5    entirety as to all parties pending the outcome of the
6    arbitration between the plaintiff and Aegis with the excepti
on
7    that the three depositions that have been referenced here in
8    court today, two being taken by Iroquois and one by Lloyd's,
9    will go forward, and Lloyd's summary judgment motion will go
10   forward and not be stayed, the summary judgment of Lloyd's.
11   Any cross-summary judgment motion against Lloyd's by Iroquoi
s
12   will go forward.  But the stay is as to every other aspect o
f
13   the case.
14       It is my practice whenever I impose a stay to requi
re
15   the parties jointly to send me a letter.  This can be done b
y a
16   single letter that any of you can draft that recites that it
17   has been checked with the other parties and they all agree w
ith
18   it, every six months telling me the status of the arbitratio
n.
19   That way the case doesn't get lost, so to speak, and I am
20   reminded of its existence.
21       This has only happened once, but I mention it in an
22   excess of caution.  There was one case involving an arbitrat
ion
23   in Brazil where the arbitrators, for reasons unknown, still
had
24   not commenced the arbitration in any meaningful way after th
ree
25   years, at which point I lifted the stay.  I just mention tha
t.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1

2

57mrlroc

1    I am sure that is not going to happen here.

2        Every six months, why don't we say on January 15th and

3    July 15th and every six months thereafter, let me know what the

4    status is.  Hopefully, it won't go on that long.

5        Anything else?

6        MR. KOSTER:  Yes, your Honor, the schedule.  We will

7    be permitted to take the depositions.  The parties have been

8    exchanging a number of documents.  We have been proceeding very

9    diligently.  There is one part of the scheduling order that I

10   would like clarification on.  That is the preparation and

11   submission of expert reports.  Because events have been moving

12   very rapidly and documents have been being exchanged, we have

13   been in touch with an expert.  We would like to have a deferral

14   of that date, because it is premature.

15       THE COURT:  Maybe you misunderstood what I said

16   before.  I thought you were asking for an across-the-board

17   stay.  You still want to have discovery go on in numerous

18   respects, it sounds like.

19       MR. KOSTER:  I certainly want to have discovery go on

20   with the outstanding witnesses of Aon.

21       THE COURT:  That is very different.  Where have you

22   been in the last five minutes?

23       MR. KOSTER:  I thought I heard everything, your Honor.

24   Maybe I missed it.

25       THE COURT:  I thought I stated the case was stayed in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1

3

57mrlroc

1   all respects except for three depositions and two summary

2   judgment motions.

Page 11

3        MR. KOSTER:  That would stay the instruction and
4    reports of experts.
5        THE COURT:  And all discovery.  If that is not what
6    you want, let me know now.
7        MR. KOSTER:  It is not what I want in the sense, your
8    Honor, that there are outstanding notices to admit.  I would
9    between us and Lloyd's, certainly want to see those complete
10       THE COURT:  Another possibility is we could complete
11   discovery of all parties, which might make sense, since you are
12   already well along, and then institute the stay.  I didn't
13   think that was what you folks were asking for.
14       What I don't think I want to do, now that I know it
15   involves more than just three depositions, is pick and choose.
16   I will start with plaintiff's counsel, your choice, and then I
17   will hear what the others stay before I decide.  Either it is
18   the order I just was about to grant, which is that everything
19   in the whole case is stopped except for three depositions and
20   two summary judgment motions, or, if you prefer, the case will
21   continue to the completion of all discovery and then stop, be
22   suspended, other than the two summary judgment motions.  But I
23   am not going to pick and choose as among the discovery.
24       Which would you prefer of those two alternatives?
25       MR. KOSTER:  I would prefer that the existing
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                           1

      57mrlroc
1    discovery be concluded.
2        THE COURT:  I don't know what that means.  But that
3    wasn't the choice I gave you.
4        MR. KOSTER:  I apologize, your Honor.  I certainly

5   want to see Lloyd's' response to our requests to admit.  We
6   intend to provide them with our response.  We intend to obtain
7   the testimony of the Aon witnesses, and on that basis there
8   will be cross-motions for summary judgment.
9        THE COURT:  So of the two choices, of the Hobson's
10  choices I am giving you, you want the latter, all discovery
11  being completed?
12       MR. KOSTER:  I would hate to opt for that, your Honor,
13  to the extent that it requires the parties –
14       THE COURT:  I am not going to give you what you are
15  looking for, which is just the little bit of discovery, and it
16  is not so little, just the portion of discovery you want.
17  Either it is all or nothing.  Well, it is not all or nothing.
18  Either it is all or three depositions that were specified.
19       MR. KOSTER:  Then I will settle for the three
20  depositions.
21       THE COURT:  All right.  Does anyone else want to take
22  an opposite position?
23       MR. RADZIK:  Not an opposite position, your Honor, but
24  just to point out under the present scheduling order, motions
25  for summary judgment are due by August 26th.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                               1
5
    57mrlroc
1        THE COURT:  Yes.
2        MR. RADZIK:  We are contemplating now three
3   depositions in August.
4        THE COURT:  One is due next week, right?
5        MR. RADZIK:  The 3rd.  We are not certain on the other
6   ones.
7        THE COURT:  That is long before the moving papers.
8   The others I heard were either going to be the second or the
9   fourth week of August.  How about the second week of August?
10       MR. ZERBE:  Your Honor, two points with regard to the

11   Aon depositions.  If the impetus is to focus the discovery o
n
12   the issue of the Lloyd's late notice defense, the 30(b)(6)
13   notice that was served on Aon would have required production
of
14   two witnesses, one who had knowledge of the underwriting and
15   the placement of the policy and the second who had the more
16   knowledge and involvement in the submission of claims.  I wo
uld
17   submit that only one witness would be necessary from Aon wit
h
18   regard to the issue for which the summary judgment motions a
re
19   contemplated.
20        THE COURT:  I am willing to limit it in that respec
t.
21   When can you have that one witness?
22        MR. ZERBE:  He has a much broader availability.  I
23   think we can do it within the first two weeks of August, if
24   that meets other schedules.
25        THE COURT:  There you are.  So I don't think you ar
e

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1

6

57mriroc
1   going to need one.  There are going to be just two depositio
ns
2   now.  One is August 3rd, the other is in the first two weeks
of
3   August.  So you will have plenty of time to draft your motio
n
4   papers.  OK?
5        MR. RADZIK:  Fine.
6        THE COURT:  Very good.  Thank you so much.
7        (Adjourned)
8
9
10
11
12
13
14
15

Hearing Transcript

16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# Exhibit "B"

## DONOVAN PARRY McDERMOTT & RADZIK

WALL STREET PLAZA
88 PINE STREET
NEW YORK, NEW YORK 10005-1801

TELEPHONE (212) 376-6400
TELECOPIER (212) 376-6490

Writer's Direct No.: (212) 376-6439

August 19, 2005

**Via Telefax (212) 425-0131 and Mail**

Richard V. Singleton, Esq.
John C. Koster, Esq.
David D. Jensen, Esq.
Healy & Baillie
61 Broadway - 32nd Floor
New York, NY 10006-2834

> RE:   Iroquois Gas Transportation Systems L.P. v.
>        AEGIS and Certain Underwriters at Lloyd's
>        U.S.D.C. - S.D.N.Y. - 05 Civ. 2149 (JSR)
>        **Our File: GM-05-3502 ECR/CEM**

Gentlemen:

We have reviewed **Iroquois'** Motion to Summary Judgment which we received *via* FedEx yesterday, August 18, 2005.

**Iroquois'** Motion goes far beyond the scope of what was presented to Judge Rakoff at the court conference on July 22, 2005. Indeed, Mr. Koster represented to the Court and the other parties that **Iroquois** was intending to file its own motion in respect of the late notice issue. Based upon this representation, Judge Rakoff expressly stayed all other issues in this matter pending the outcome of the arbitration with **AEGIS**.

Under the circumstances, we request that you voluntarily withdraw **Iroquois'** motion to the extent that it seeks any relief beyond a declaration in respect of the late notification issue.

Very truly yours,

Edward C. Radzik

ECR:pm

**DONOVAN PARRY MCDERMOTT & RADZIK**

Healy & Baillie
August 19, 2005
Page - 2 -

cc:    **Via Telefax (212) 952-0345**
John P. Vayda, Esq.
Nourse & Bowles
One Exchange Plaza
55 Broadway - 30th Floor
New York, NY 10006-3030

       **Via Telefax (212) 430-0810**
Charles E. Schmidt, Esq.
Kennedy Lillis Schmidt & English
75 Maiden Lane
New York, NY 10038

       **Via Telefax (212) 698-3599**
Rodney M. Zerbe, Esq.
Dechert LLP
30 Rockefeller Plaza - Room 2305
New York, NY 10112
(Your Ref: 303154)

Exhibit "C"

# H&B

# HEALY & BAILLIE, LLP

61 Broadway
New York, NY 10006-2834
T: +1 212-943-3980 F: +1 212-425-0131
www.healy.com

JOHN C. KOSTER
jkoster@healy.com

DIRECT DIAL (212) 709-9236
DIRECT FAX (212) 487-0336

**PLEASE NOTE:** The information contained in this facsimile message may be privileged and confidential and is intended only for the use of the individual named below and others who have been specifically authorized to receive it. Additionally, if you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this communication in error, or if any problems occur with this transmission, please notify us immediately by telephone: (212) 943-3980.

August 22, 2005

| | **Company/Name** | **Fax#/City/State/Country** |
|---|---|---|
| **To:** | Donovan Parry McDermott & Radzik | (212) 376-6488 |
| | Attention: Edward C. Radzik, Esq. | New York, New York |
| **Cc:** | Nourse & Bowles, LLP | (212) 952-0345 |
| | Attention: John P. Vayda, Esq. | New York, New York |
| | Dechert LLP | (212) 698-3599 |
| | Attention: Rodney M. Zerbe, Esq. | New York, New York |
| | Kennedy Lillis Schmidt & English | (212) 430-0810 |
| | Attention: Charles E. Schmidt, Esq. | New York, New York |
| **From:** | John C. Koster | |
| | Page 1 of 9 pages | |
| **Re:** | Iroquois v. AEGIS, et al. | |
| | Donovan Parry's Ref.: GM-05-3502 ECR/CEM | |
| | Our Ref.: 100705-0006 | |

**Please see attachment.**

282924.1

# H&B

# HEALY & BAILLIE, LLP

61 Broadway
New York, NY 10006-2834
T: +1 212-943-3980   F: +1 212-425-0131
www.healy.com

DIRECT DIAL (212) 709-9236
DIRECT FAX (212) 487-0336

JOHN C. KOSTER
jkoster@healy.com

August 22, 2005

**VIA TELEFAX (212) 376-6488**
**AND MAIL**

Edward C. Radzik, Esq.
Donovan Parry McDermott & Radzik
Wall Street Plaza
88 Pine Street, 21ˢᵗ Floor
New York, NY 10005-1801

        Re:    Iroquois Gas Transmission System L.P. v.
               Associated Electric & Gas Insurance Services Ltd.
               Our Ref.: 100705.0006

Dear Mr. Radzik:

        Please be advised that regarding the request in your telefax letter of August 19, 2005 we have no intention of withdrawing any part of our motion for summary judgment. The motion is entirely proper:

        1.    Judge Rakoff's order of July 25, 2005 provided for two summary judgment motions without restriction as to subject matter, not merely a motion and cross-motion on "late notice" (see attached).

        2.    Nothing said by Judge Rakoff at the hearing on July 22, 2005 precluded Iroquois from making its own unrestricted summary judgment motion (see attached).

        3.    If the sole point of Iroquois' position was opposition to a "late notice" summary judgment motion by Lloyd's, a cross-motion would not be necessary. Iroquois would simply file its opposition to Lloyd's motion. There is no "declaration" Iroquois could seek with respect to Lloyd's "late notice" affirmative defense since such a claim would be essentially a request for the Court to rule on a hypothetical based on the

Page 2
August 22, 2005

assumption that liability otherwise exists under the policy. <u>Unless Lloyd's concedes coverage</u>, subject only to its "late notice" defense, the additional points, namely the existence of cover and Iroquois' status as a co-assured under the policy, are entirely proper issues for Iroquois to take up as part of its summary judgment motion and for the Court to consider.

4.    Coverage under the policy and Iroquois' status are purely questions of contract construction and of law. The policies are before the Court, and the Court is in a position to rule on these issues.

5.    Given that the additional issues are intertwined with, and predicate to, a consideration of any "late notice" defense, and given the language of the Court's order of July 25, 2005, we believe the Court might justifiably call us to task if Iroquois had not made these issues part of its summary judgment motion.

6.    The Courts' July 25th order required summary judgment motions to be made in accordance with the Court's Scheduling Order of April 15, 2005. The Scheduling Order provides that any party intending to move for summary judgment needed to file a Notice no later than one week after the close of discovery, i.e., in this case, by August 19th (see ¶¶ D-6 and E). Iroquois did so. Our check of the docket indicates Lloyd's has not done so. Hence, had Iroquois failed to file its own Notice and motion covering the points Iroquois deems proper, the case might have been left in limbo. If this was your intent, your concern is understandable, but Iroquois is not to blame for Lloyd's having missed the deadline.

Very truly yours,

HEALY & BAILLIE, LLP

By: _____
John C. Koster

JCK/bp
Enclosures

cc:    John P. Vayda, Esq.
       Nourse & Bowles
       One Exchange Plaza
       55 Broadway
       New York, NY  10006-3030

282903.1

Page 3
August 22, 2005

Rodney M. Zerbe, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY  10112-2200

Charles E. Schmidt, Esq.
Kennedy Lillis Schmidt & English
75 Maiden Lane, Suite 402
New York, NY  10038-4816

282903.1

19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
IROQUOIS GAS TRANSMISSION SYSTEM          :
L.P.,                                     :
                                          :          05 Civ. 2149 (JSR)
            Plaintiff,                    :
                                          :              ORDER
        -v-                               :
                                          :
ASSOCIATED ELECTRIC & GAS INSURANCE       :
SERVICES LTD., Hamilton, Bermuda;         :
CERTAIN UNDERWRITERS AT LLOYD'S; AON      :
RISK SERVICES OF TEXAS, INC.; and         :
AMERICAN HOME ASSURANCE CO.,              :
                                          :
            Defendants.                   :
------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-25-05

JED S. RAKOFF, U.S.D.J.

        This action is stayed in its entirety as to all parties

pending the outcome of the arbitration between plaintiff Iroquois Gas

Transmission System L.P. ("Iroquois") and defendant Associated

Electric & Gas Insurance Services Ltd., except that (1) the two

depositions referenced in open court, see tr. 7/22/05 (indicating one

witness from Aon Risk Services of Texas, Inc. and one witness from

Iroquois), may go forward, as long as the depositions take place

within the first two weeks of August, and (2) a motion for summary

judgment against plaintiff Iroquois by defendant Certain Underwriters

at Lloyd's ("Lloyd's"), and a motion for summary judgment by Iroquois

against Lloyd's, may be brought according to the schedule set forth

in the Case Management Plan dated April 15, 2005.

        SO ORDERED.

                                        _____
                                        JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York

57mriroc

1    THE COURT: You may be right as a practical matter,

2    but I think the safer course is to stay, as the statute

3    suggests. That is what I will do. I will issue a written

4    order. The bottom line will be this action is stayed in its

5    entirety as to all parties pending the outcome of the

6    arbitration between the plaintiff and Aegis with the exception

7    that the three depositions that have been referenced here in

8    court today, two being taken by Iroquois and one by Lloyd's,

9    will go forward, and Lloyd's summary judgment motion will go

10    forward and not be stayed, the summary judgment of Lloyd's.

11    Any cross-summary judgment motion against Lloyd's by Iroquois

12    will go forward. But the stay is as to every other aspect of

13    the case.

14    It is my practice whenever I impose a stay to require

15    the parties jointly to send me a letter. This can be done by a

16    single letter that any of you can draft that recites that it

17    has been checked with the other parties and they all agree with

18    it, every six months telling me the status of the arbitration.

19    That way the case doesn't get lost, so to speak, and I am

20    reminded of its existence.

21    This has only happened once, but I mention it in an

22    excess of caution. There was one case involving an arbitration

23    in Brazil where the arbitrators, for reasons unknown, still had

24    not commenced the arbitration in any meaningful way after three

25    years, at which point I lifted the stay. I just mention that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57mriroc

1    all respects except for three depositions and two summary

2    judgment motions.

3              MR. KOSTER:  That would stay the instruction and

4    reports of experts.

5              THE COURT:  And all discovery.  If that is not what

6    you want, let me know now.

7              MR. KOSTER:  It is not what I want in the sense, your

8    Honor, that there are outstanding notices to admit.  I would,

9    between us and Lloyd's, certainly want to see those completed.

10             THE COURT:  Another possibility is we could complete

11   discovery of all parties, which might make sense, since you are

12   already well along, and then institute the stay.  I didn't

13   think that was what you folks were asking for.

14             What I don't think I want to do, now that I know it

15   involves more than just three depositions, is pick and choose.

16   I will start with plaintiff's counsel, your choice, and then I

17   will hear what the others stay before I decide.  Either it is

18   the order I just was about to grant, which is that everything

19   in the whole case is stopped except for three depositions and

20   two summary judgment motions, or, if you prefer, the case will

21   continue to the completion of all discovery and then stop, be

22   suspended, other than the two summary judgment motions.  But I

23   am not going to pick and choose as among the discovery.

24             Which would you prefer of those two alternatives?

25             MR. KOSTER:  I would prefer that the existing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

*Rec'd Bill Acton*
*4/21/05*
OFFICE COPY

Effective March 29, 2004

Revised Form D — For cases assigned to Judge Rakoff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------ x
Iroquois Gas Transmission System L.P.,
                        Plaintiff(s),

                    -v-

Associated Electric + Gas Insurance Services, Ltd.
and certain underwriters at Lloyd's,
                        Defendant(s).
------------------------------------------ x

CIVIL CASE MANAGEMENT PLAN
(JUDGE RAKOFF)

05 Civ. 2149 (JSR)

This Court requires that this case shall be **ready for trial** on
September 27, 2005.

After consultation with counsel for the parties, the following Case Management Plan is adopted.
This plan is also a scheduling order pursuant to Rules 16 and 26(f) of the Federal Rules of Civil Procedure.

A.    The case (is)  (is not) to be tried to a jury.  [Circle as appropriate]

B.    Joinder of additional parties must be accomplished by May 31, 2005.

C.    Amended pleadings may be filed without leave of Court until May 31, 2005.

D.    Discovery (in addition to the disclosures required by Fed. R. Civ. P. 26(a)):

      1.    **Documents.** First request for production of documents, if any, must be served by
      April 29, 2005.  Further document requests may be served as required, but no document
      request may be served later than 30 days prior to the date of the close of discovery as set forth in item
      6 below.

      2.    **Interrogatories.** Interrogatories pursuant to Rule 33.3(a) of the Local Civil Rules of the
      Southern District of New York must be served by April 29, 2005.  No other interrogatories
      are permitted except upon prior express permission of Judge Rakoff. No Rule 33.3(a) interrogatories
      need be served with respect to disclosures automatically required by Fed. R. Civ. P. 26(a).

      3.    **Experts.** Every party-proponent of a claim (including any counterclaim, cross-claim, or third-
      party claim) that intends to offer expert testimony in respect of such claim must make the disclosures
      required by Fed. R. Civ. P. 26(a)(2) by July 1, 2005.  Every party-opponent of such
      claim that intends to offer expert testimony in opposition to such claim must make the disclosures
      required by Fed. R. Civ. P. 26(a)(2) by July 22, 2005.  No expert testimony (whether
      designated as "rebuttal" or otherwise) will be permitted by other experts or beyond the scope of the
      opinions covered by the aforesaid disclosures except upon prior express permission of the Court,
      application for which must be made no later than 10 days after the date specified in the immediately
      preceding sentence. All experts may be deposed, but such ~~depositions must occur within the time
      limit for all depositions set forth below.~~

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-20-05

4.    Depositions. All depositions (including any expert depositions, see item 3 above) must be completed by _August 5, 2005_. Unless counsel agree otherwise or the Court so orders, depositions shall not commence until all parties have completed the initial disclosures required by Fed. R. Civ. P. 26(a)(1) or until four weeks from the date of this Order, whichever is earlier. Depositions shall proceed concurrently, with no party having priority, and no deposition shall extend beyond one business day without prior leave of the Court.

5.    Requests to Admit. Requests to Admit, if any, must be served by _July 12, 2005_ [insert date that is no later than 30 days prior to date of close of discovery as set forth in item 6 below].

6.    All discovery is to be completed by _August 12, 2005_. Interim deadlines for items 1-5 above may be extended by the parties on consent without application to the Court, provided the parties are certain they can still meet the discovery completion date set forth in this paragraph, which shall not be adjourned except upon a showing to the Court of extraordinary circumstances.

E.    Post-discovery summary judgment motions in the form prescribed by the Court's Individual Rules of Practice may be brought on without further consultation with the Court provided that a Notice of any such motion, in the form specified in the Court's Individual Rules of Practice, is filed no later than one week following the close-of-discovery date (item D-6 above) and provided that the moving papers are served by _August 26, 2005_, answering papers by _September 9, 2005_, and reply papers by _September 16, 2005_ [the last of these days being no later than six weeks following the close of discovery]. Each party must file its respective papers with the Clerk of the Court on the same date that such papers are served. Additionally, on the same date that reply papers are served and filed, counsel for the parties must arrange to deliver a courtesy non-electronic hard copy of the complete set of papers to the Courthouse for delivery to Chambers.

F.    A final pre-trial conference, as well as oral argument on any post-discovery summary judgment motions, shall be held on _September 23, 2005, 4pm_ [date to be inserted by the Court], at which time the Court shall set a firm trial date. The timing and other requirements for the Joint Pretrial Order and/or other pre-trial submissions shall be governed by the Court's Individual Rules of Practice.

G.    All motions and applications shall be governed by Judge Rakoff's Individual Rules of Practice. Counsel shall promptly familiarize themselves with all of the Court's Individual Rules, as well as with the Local Rules for the United States District Court for the Southern District of New York.

SO ORDERED.

JED S. RAKOFF
U.S.D.J.

DATED:  New York, New York
        _April 15, 2005_

**Exhibit "D"**

DONOVAN PARRY MCDERMOTT & RADZIK

WALL STREET PLAZA
88 PINE STREET
NEW YORK, NEW YORK 10005-1801

TELEPHONE (212) 376-6400
TELECOPIER (212) 376-6490

Writer's Direct No.: (212) 376-6439

August 23, 2005

**Via Telefax (212) 425-0131**
John C. Koster, Esq.
Healy & Baillie
61 Broadway - 32nd Floor
New York, NY 10006-2834

     RE: Iroquois Gas Transportation Systems L.P. v.
        AEGIS and Certain Underwriters at Lloyd's
        U.S.D.C. - S.D.N.Y. - 05 Civ. 2149 (JSR)
        **Our File: GM-05-3502 ECR/CEM**

Dear Mr. Koster:

    Reference is made to your letter dated August 22, 2005, responding to our letter dated August 19, 2005.

    We disagree entirely with your position. The transcript of the July 22nd court hearing clearly demonstrates that all issues with the exception of late notification under the Lloyd's Policy are stayed pending the outcome of the London arbitration between your client and AEGIS.

    Your assertion that we have failed to give notice of Lloyd's motion is not correct. You will recall that we gave you and the Court notice of our intention to file a motion for summary judgment on the late notification issue in open court on two occasions; first, at the initial pre-trial conference held on April 15, 2005 (prior to the date Lloyd's Answer was due) and again on July 22, 2005.

    Your assertion that discovery has closed is likewise incorrect. Discovery has been stayed by virtue of Judge Rakoff's July 22, 2005 Order. Even if you take the position that discovery on the limited issue of late notification is closed, the earliest date would be August 19, 2005, when AON supplied additional documentation requested by the undersigned at the deposition of Mr. James Montano.

**DONOVAN PARRY MCDERMOTT & RADZIK**

Healy & Baillie
August 23, 2005
Page - 2 -

---

       Lest there be no confusion, we will be serving our motion papers in respect of Lloyd's motion on August 26, 2005. We will also be filing opposition papers to Iroquois' motion in accordance with the April 15, 2005 Scheduling Order without prejudice to our position that the issues raised in Iroquois' motion in respect of coverage and seeking a money judgment at this time are not appropriate.

                       Sincerely,

                       Edward C. Radzik

ECR:pm

cc:    **Via Telefax (212) 952-0345**
       John P. Vayda, Esq.
       Nourse & Bowles
       One Exchange Plaza
       55 Broadway - 30th Floor
       New York, NY 10006-3030

       **Via Telefax (212) 430-0810**
       Charles E. Schmidt, Esq.
       Kennedy Lillis Schmidt & English
       75 Maiden Lane
       New York, NY 10038

       **Via Telefax (212) 698-3599**
       Rodney M. Zerbe, Esq.
       Dechert LLP
       30 Rockefeller Plaza - Room 2305
       New York, NY 10112
       (Your Ref: 303154)

**Exhibit "E"**



LE0280715

Sheet    of

**Type:**  Package Policy.

**Form:**  MAR91. (English Jurisdiction deleted) slip policy.

**Assured:**  Horizon Offshore Contractors, Inc. and/or as per Named Assured Clause attached and/or as may be agreed.

Address:   2500 City West Boulevard, Suite #2200, Houston, Texas 77042, U.S.A.

**Vessels:**  As per schedules attached.

Including if required new and/or acquired and/or managed and/or chartered vessels, from time at risk to the Assured or declared hereto by the Assured, including increase in values/amounts, automatically held covered, subject to a maximum individual combined vessel value/amount not exceeding top value/sum insured hereon and further subject to terms, conditions and rates as comparable vessels insured or as may be agreed by Underwriters.



**Period:**  12 months at 00.01 a.m. 1 May, 2002 Local Standard Time and/or date to be agreed by Underwriters.

In respect of Section 3:-
Open cover to accept construction and/or installation work as declared (whether directly exposed or not) for which the Assured is responsible and which commences during the period as above including all refurbishment, pre-fabrication, load out, transportation, installation and maintenance and until final completion and operational acceptance by Client and/or Customer and for a further discovery period not exceeding 12 months from such acceptance. However, in the event the Assured hereon does not renew beyond above dates for coverage under Sections 1, 2 and 3, notice of cancellation is deemed given by Underwriters in respect of all declarations (except for those for which construction is completed in which case maintenance or discovery period up to policy limit but not exceeding 60 days after expiry date) attaching to this section from the expiry of such notice.

**Interest/Sums Insured:**

Section 1

A)  Hull, machinery, equipment, appurtenances, gear, stingers, bury gear, cranes, derricks, remotely operated vessels, and everything connected therewith whether on board or not on board.

B)  Disbursements and/or Increased Value. Policy Proof of Interest, Full Interest Admitted, Without Benefit of Salvage.

C)  War etc. Risks Insurance including War Risks Protection & Indemnity Clauses (including crew)



LE0280715

JLT

Sheet    of

Agreed Values/Insured Amounts as per schedules attached.

Section 2

A) Onshore Real and/or Personal Property

B) Miscellaneous Marine Equipment.

Amounts/values as agreed at inception as per schedule attached.

Including Equipment and Property at risk to the Assured (whether rented, purchased, leased, hired or operated by the Assured and including property of others in the Care, Custody, Control of the Assured is responsible) subject to limit of liability of USD 2,000,000 any one item.

Subject to limit of liability USD 10,000,000 any one location per occurrence.

Section 3

Builders Risks (open cover) covering - platforms and/or pipelines and/or risers and/or other marine construction work and/or salvage work including land fabrication and procurement. As may be declared and accepted by Underwriters.

Limit:  up to USD 20,000,000 (100% of Estimated Final Contract Value) any one declaration both sections separately, plus amounts as per policy wording any one accident or occurrence.

**Trading:**    Worldwide subject to American Institute Trading Warranties Cl.210 (July 1, 1972) or held covered at rates to be agreed by Underwriters and War etc. risks world-wide subject to London Market War Risk Trading Warranties including any subsequent amendments thereto during the term of this policy.

Tows in excess 750 nautical miles or outside of Gulf of Mexico held covered at rate, terms and conditions to be agreed.  Warranted Tug, Tow, Towage and Stowage arrangements approved by agreed surveyor hereunder and Warranted all recommendations complied with.



**Conditions:**    Section 1

A) Subject to American Institute Hull Clauses (June 2, 1977) Cl.A1B amended to all risks of physical loss or physical damage.

Lines 23 and 24 deleted and replaced by:
Should the vessel at the expiration date of the policy be in distress, she shall, provided previous notice be given to Underwriters hereon, be held covered until arrival at safe port.

Line 63 words from "nor shall the vessel" through to word "waters" on line 64 and lines 158-184 are deleted.

Including Collision and Tower's Liability amended to include collision and/or contact with fixed and floating objects per lines 78-111 of the American Institute Tug Form (August 1, 1976) Cl.A230, with line 79



LE0280715

JLT

Sheet    of

amended by adding words "or contact" after word "collision" for separate minimum limit of USD 1,000,000 each accident or occurrence or hull value whichever the greater.

In respect of Collision Liability arising from vessel's equipment (e.g. floating stingers), it is agreed that such equipment is deemed part of vessel to which it is currently or previously assigned.

Deductibles:
USD 500,000 each accident or occurrence including total loss.
Subject to Annual Aggregate deductible of USD 1,500,000 excluding total loss (Sections 1 & 2), to be reviewed by Leading Underwriters following a change in the fleet schedule hereon.

In respect of Assured's operations with Chevron USA deductibles to be shown as a maximum of USD 25,000 subject to Indemnity Clause as attached.

In consideration of the premium charged including cargo risks hereon on miscellaneous property including property separated from vessels, in transit, storage etc. subject to a separate limit of USD 5,000,000 any one accident or occurrence subject to Institute Cargo Clauses (A) 1/1/82 Cl.252, Institute Cargo Clauses (Air) 1/1/82 Cl.259 and Institute Strikes Clauses (Cargo) 1/1/82 Cl.256, with English Law and Practice deleted on all clauses.
Deductible USD 75,000 any one accident or occurrence.

Institute War Clauses (Cargo) 1/1/82 Cl.255 without deductible.

B) Increased Value Amount against Actual and/or Constructive and/or Compromised and/or Arranged Total Loss including General Average, Salvage, Salvage Charges, Sue & Labour and Running Down Clause subject to American Institute Increased Value and Excess Liabilities Clauses (November 3, 1977) Cl.A175 amended as Hull section hereon and to follow settlement thereof where applicable.

C) Including American Institute Hull War Risks and Strikes Clauses (December 1, 1977) Cl.A237, American Hull Insurance Syndicate Addendum to American Institute Hull War Risks and Strikes Clauses (December 1, 1977) (April 1, 1984) with waiting period in clause 3 amended to six (6) months and words "or deliberate act of person or persons" added after the word operations and further amended to include Nationalization 100% without waiting period and Deprivation in respect of units/locations scheduled at inception, otherwise to be agreed.

Notice period in respect of war and terrorism amended to 48 hours.

Including Terrorist Risks Wording as LPO 437 (4/82), Old Mines Clause, Blocking and Trapping Risks Conditions as LPO 444.

Subject to Onus of Proof and Confidentiality wording in respect of Confiscation, Nationalization, Expropriation and Deprivation only.

War, Confiscation, Nationalization, Expropriation and Deprivation exposures to be agreed at additional premium to be agreed by Underwriters.

LE0280715

901
JLT

Sheet     of

American Institute S.R. & C.C. Endorsement (Hulls) September 8, 1959 Cl.A503.

Including War etc. Risks Protection and Indemnity up to hull agreed value or USD 1,000,000 whichever the greater also applicable to vessels covered under Assured's Club entry.

Missing Vessels Clause.

General Section 1 Conditions

Agree in respect of bareboat chartered material barges deductible USD 100,000excludingTotal or Constructive Total Loss for vessels valued less than USD 1,000,000 but USD 250,000 excluding Total or Constructive Total Loss all other vessels. Full annual premium if lost. Rate 2.75% per annum/pro rata (minimum 30 days) plus surcharge of 25% if including Protection and Indemnity as SP 23 (excluding crew and employees of the Assured). Including amendments thereto as required by contract in respect of work for Chevron USA Inc., subject to separate minimum limit USD 1,000,000 each accident or occurrence and deductible USD 100,000any one occurrence.

Including Removal of Wreck/Debris Clause (including legal and contractual) but always excluding clean up and containment of seeping and polluting substances, for separate limit USD 1,000,000 any one accident or occurrence, deductible USD 100,000 any one accident or occurrence.

Cancelling Returns Only, notwithstanding C.R.O. basis, for units projected to be idle for periods greater than 90 days or units undergoing upgrade modification or cold stacked units, liberty is granted to the Assured to declare such risks on port risks/limited navigation basis returning daily pro rata 50% not under repair or daily pro rata 25% if under repair.

Reactivation Clause to be agreed.

General Average, Salvage, Salvage Charges and Sue & Labour up to Agreed value and such limit in addition - final limit to be agreed Leading Underwriters (combined single limit over all 3 sections).

Warranted existing class maintained. However, it is noted that, where and as applicable due to the non-operational status and/or type and/or geographical limits of operation and navigation of a scheduled vessel, a United States Coast Guard Certificate of Inspection or a United States Coast Guard Letter of Compliance or a Load Line Certificate shall satisfy the requirements of any Classification requirement herein. It is further noted that any such Classification requirement shall not apply to any vessels where size and/or type and/or navigational operation do not require inspection and/or load line certification from the appropriate regulatory agency.

Including Institute Clauses for Builders Risks Clauses 1/6/88 Cl.351 (English Law and Practice clause deleted) in respect of refitting, repair of vessel(s) as applicable, but not to the extent of restricting coverage afforded herein, with option to suspend coverage hereunder for period(s) as may be agreed, subject automatic reattachment upon completion to be agreed, returning pro rata status at inception premium, if above repair work etc. covered elsewhere. No new buildings attaching hereunder or to be agreed by Leading Underwriters, excluding latent defect.

LE0280715

JLT

Sheet    of

It is understood and agreed that where required by contract, bid or work order, Additional Assured and/or Waivers of Rights of Subrogation are automatically included hereunder, subject further to Notice Clauses as may be required by written contract only and that coverage provided hereunder shall be primary in respect of any coverage carried by said additional assureds where required by written contract.

Conflicting Conditions Clause to be agreed by Leading Underwriter.

LSW 1001 Several Liability Notice.

Institute Service of Suit Clause (USA) 1/11/92 Cl.355.

Additional Vessels Clause.

Privilege to Charter Clause.

Including in addition Salvage, Salvage Charges, Sue and Labour and General Average payable in full irrespective of contributory value.

Seaworthiness Admitted.

Liberty to tow or be towed.

Unintentional Errors and Omissions in Reporting Clause.

Port of Refuge Expenses Clause.

Assignment and/or Mortgagees and/or Loss Payable Clause, as agreed by Underwriters.



Permission for crew to effect repairs, with those costs directly related to insured losses to be included in any claim, subject to approval of underwriters adjuster/surveyor.



Including Protective Co-Insurance Clauses and Loss Payees as agreed by Underwriters.

Permission granted to engage in any legal trade including carriage of explosives which warranted carried in accordance with IMO Coastguard regulations.

Agree 2% allowance on Hull/Increased Value premiums in respect of survey fees on an actual incurred basis, subject invoices.

Direct or Reinsurance as agreed.

Oil Pollution Act Disclaimer Clause.

Subject U.S. Jurisdiction & Law and Practice.

Contracts (TP) Act clause to be agreed.

LUAGM

LSW 3000 (15 days)

Full wording to be agreed by Underwriters.

**Subject full operational review by Global Maritime, with scope of review to be agreed within 90 days of attachment, and subject all recommendations complied with.**



LE0280715

JLT
Sheet    of

**Clause 13, Stand-by Charges (page 16):**(Amount) amended to "10%" of the Full Contract Value or USD 1,000,000 whichever the greater.

**Clause 17, Forwarding Charges (page 19):**(Amount) amended to "10%" of the Full Contract Value or USD 1,000,000 whichever the greater.

**Discovery** 12 months.

Including Endorsement 1 - Defective Part Exclusion Buy-Back at rate as may be agreed each declaration.

Excluding faulty welds as per wording.

Agree provide Seepage and Pollution cover hereunder in respect of Assured's Builders Risks projects as required subject prompt advice to Underwriters and for limit up to USD 20,000,000 each occurrence per project as declared and agreed each declaration by Leading Underwriters.

This section is to be primary to any other insurance purchased by the Assured in respect of projects as declared where full contract value is covered hereunder only.

Including Nationalisation and Deprivation and Terrorist Risk Wording LPO 437 (4/82) to be agreed subject to paragraph below .

**In respect of War, Strikes & Political Risks – to be agreed.**

Notwithstanding anything contained herein the coverages included above in respect of property insured hereunder is included in coverage hereunder until the completion and acceptance by the Assured's client of the project, including pipelines and associated equipment whilst being laid and work to/onboard any fixed or floating platform, other than in respect of property/equipment fixed onland, on a fixed structure or on the sea-bed for which coverage is held covered subject to the attached War Direct Physical Damage Wording and subject to the attached War Direct Physical Damage Wording LSW667 (Modified) as attached subject to an aggregate limit in respect of any one country (being the Full Contract Value of the project but always subject to an overall aggregate limit of USD 10,000,000 any one country) subject to advice to Underwriters prior to project commencement and subject to Additional Premium at rate to be agreed Leading Underwriters only.

Notice period in respect of war and terrorism amended to 48 hours.



General Conditions (in respect of All Sections) –all to be agreed

Paramount Deductible Clause (applicable to Sections 1 and 2 only).

Preferred Attorneys, Adjusters, Surveyors schedules as attached.

Cross Liability Clause as required by contract.

Deliberate Damage Clause.

Institute Radioactive Contamination Exclusion Clause 1/10/90 Cl.356 dated 1st October 1990 including USA Endorsement dated 13th March 1991.

Other than Owners Limitation Clause deleted where required by written contract.



Provision to move equipment from vessel to vessel and/or as required.

Assignment and/or Mortgagees and/or Loss Payable Clause, as agreed by Underwriters.

Section 2

A) Against all risks of direct physical loss or physical damage including fire and extended all risks coverage, to the property from any external cause per wording to be agreed Leading Underwriter.

B) Against all risks of direct physical loss or physical damage including fire and extended all risks coverage, to the equipment from any external cause per wording to be agreed Leading Underwriter.

The subject matter insured under this section is covered whilst in use or otherwise on land, in air or afloat.

Both A and B)

Replacement Cost Basis, New for Old.

Including Removal of Debris but always excluding clean up and containment of seeping and polluting substances and for an additional USD 1,000,000 limit, subject to a deductible of USD 100,000 any one accident or occurrence.

Deductible 5% of value subject minimum USD 50,000each accident or occurrence. Subject to Annual Aggregate Deductible as Section 1.

Property and/or equipment insured hereunder whilst stored, in transit or otherwise, also subject Institute Cargo Clauses (A) 1/1/82 Cl.252, Institute Cargo Clauses (Air) 1/1/82 Cl.259 and Institute Strikes Clauses (Cargo) 1/1/82 Cl.256 to extent not restricting coverage otherwise afforded herein, with English law and practice deleted on all clauses. Deductible as above.

Institute War Clauses (Cargo) 1/1/82 Cl.255 without deductible.

Notice period in respect of war and terrorism amended to 48 hours.

Confiscation and Expropriation wording LPO 324 (8/71) including Nationalisation and Deprivation Clauses to be agreed.



Section 3

As per WELCAR2001 wording with following amendments:

Named Assured hereon covered Principal Assured.

**Clause 9, Sue and Labour Clause (page 15):**"25% of the scheduled value" amended to "25%" of the Full Contract Value.

**Clause 11, Removal of Wreck, Wreckage and/or Debris (page 16):**"25%" amended to USD 1,000,000 any one accident or occurrence.

**Clause 12, Tests, Leak and/or Damage Search Costs (page 16):**(Amount) amended to "10%" of the Full Contract Value or USD 1,000,000 whichever the greater.

**LE0280715**

Sheet    of

| Order: | Sections 1A), 1B), 2 & 3: | 52.50% Order. |
| | Section 1C): | 40.00% Order. |

Premium:    As per worksheet attached.

U.S. Broker:    Aon Risk Services of Texas, Inc.
2000 Bering Drive, Suite 900,
Houston, Texas 77057-3790, U.S.A.

U.S.
Classification:    Non Regulated.

**LE0280715**    **JLT**

Sheet    of

# SECTION 3 – Scope of Work

As follows each declaration or as may be agreed by Leading Underwriters:

The scope of Marine Warranty Survey work will require the Warranty Surveyor to assess the following items for a pipeline installation or to be agreed:

1. **Transportation of Pipe**
   **Review and approve and/or attend:**
   Barge and Tug suitability survey (sometime "waived", or nominally surveyed when the particular barge is known to the Warranty Surveyor)
   Barge stability and bollard pull requirement
   Barge ballast arrangement and longitudinal strength (waived when adequacy of barge strength is obvious).
   Sea-fastening design
   Pipe loading and uploading
   Pipe barge sailaway

2. **Pipelaying procedures**
   **Review and approve:**
   Weather monitoring
   Pipe coat specification
   Mooring of barge
   Pipe tension versus water depth for a specific diameter of pipe
   Shut down based on limiting sea state

3. **Pipe Laying**
   **Attendance:**
   Warranty Surveyor mariners may attend a few of the following operations (depending on size and scope of job):
   a)    Shore Pull
   b)    Normal pipe lay
   c)    Tie-in
   d)    Trenching
   e)    Pipeline crossing
   f)    Other critical operations

To be agreed James Miller (Zurich Specialties London Limited)






| | LE0280715 | JLT |
|---|---|---|
| | | Sheet    of |

**Several Liability Notice LSW 1001 (Insurance)**

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.





LE0280715

901
JLT

Sheet    of

## HORIZON OFFSHORE CONTRACTORS, INC.
## ANNUAL WORKSHEET

Section 1 - Hulls/Disbursements etc.

Vessels

| As per worksheets attached | Hull | = | USD | 2,863,267 |
| | I.V. | = | USD | 323,438 |
| War/Terrorism as attached | | = | USD | 158,063 |

Section 2 - Equipment/Property

| A) USD 20,000,000 (provisional) | @ | 0.8606% | = | USD | 172,120 |
| B) USD 10,000,000 (provisional) | @ | 0.8606% | = | USD | 86,060 |
| War/Terrorism as attached schedule | | | = | USD | 21,000 |

| Total | = | USD | 3,623,948 |

Including 2.5% prompt payment credit if premiums are paid to Underwriters within 65 days of inception = USD 3,533,349

Section 3 - Builders Risks

A) As per rating/deductible schedule attached.                As declared

B) Additional Premium in respect of this section to be USD 3,000,000 net absolute payable quarterly, in lieu of an additional annual aggregate deductible. Underwriters to retain/earn a minimum premium of USD 2,000,000 net absolute returning USD 1,000,000 net absolute to the Assured, with such return to reduce dollar for dollar if claims exceed USD 2,000,000 up to and/or exceeding USD 3,000,000.

Premium developed from any declarations made hereon to be in addition.





| LE0280715 | | JLT |

Sheet    of

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 1 - HULL AND MACHINERY WORKSHEET

| VESSEL | HULL USD | HULL RATE | HULL PREMIUM USD |
|---|---|---|---|
| AMERICAN HORIZON | 8,000,000 | 1.72922% | 138,338 |
| PHOENIX HORIZON | 12,000,000 | 1.82739% | 219,287 |
| CAJUN HORIZON | 5,600,000 | 3.13268% | 175,430 |
| GULF HORIZON | 15,200,000 | 1.55295% | 236,048 |
| CANYON HORIZON | 19,200,000 | 1.39453% | 267,750 |
| LONE STAR HORIZON | 19,200,000 | 1.42577% | 273,748 |
| PEARL HORIZON | 6,400,000 | 2.27588% | 145,656 |
| STEPHANITURM* | 15,200,000 | 1.63774% | - |
| *HORIZON MB100 | 2,400,000 | 2.78906% | 66,937 |
| ATLANTIC HORIZON | 17,000,000 | 1.68013% | 285,622 |
| PACIFIC HORIZON | 24,000,000 | 1.43023% | 343,255 |
| PECOS HORIZON | 16,000,000 | 1.48538% | 237,661 |
| SEA HORIZON | 20,000,000 | 1.60905% | 321,810 |
| BRAZOS HORIZON | 8,000,000 | 1.89656% | 151,725 |
| | 188,100,000 | | 2,863,267 |

* On long term charter – to attach with effect from date to be agreed Leading Underwriters.





| | LE0280715 | 507 JLT |
|---|---|---|

Sheet   of

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 1 - DISBURSEMENTS WORKSHEET

| VESSEL | INCREASED VALUE USD | IV RATE | IV PREMIUM USD |
|---|---|---|---|
| AMERICAN HORIZON | 2,000,000 | 0.75000% | 15,000 |
| PHOENIX HORIZON | 3,000,000 | 0.75000% | 22,500 |
| CAJUN HORIZON | 1,400,000 | 0.75000% | 10,500 |
| GULF HORIZON | 3,800,000 | 0.75000% | 28,500 |
| CANYON HORIZON | 4,800,000 | 0.75000% | 36,000 |
| LONE STAR HORIZON | 4,800,000 | 0.75000% | 36,000 |
| PEARL HORIZON | 1,600,000 | 0.75000% | 12,000 |
| STEPHANITURM | 3,800,000 | 0.75000% | - |
| HORIZON MB100 | 600,000 | 0.75000% | 4,500 |
| ATLANTIC HORIZON | 4,125,000 | 0.75000% | 30,938 |
| PACIFIC HORIZON | 6,000,000 | 0.75000% | 45,000 |
| PECOS HORIZON | 4,000,000 | 0.75000% | 30,000 |
| SEA HORIZON | 5,000,000 | 0.75000% | 37,500 |
| BRAZOS HORIZON | 2,000,000 | 0.75000% | 15,000 |
| | **47,025,000** | | **323,438** |

On long term charter -- to attach with effect from date to be agreed Leading Underwriters.





LE0280715

JLT

Sheet    of

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 1 – WAR/TERRORISM ETC. WORKSHEET

| Vessel | Agreed Value | War etc. Rate | | | |
|---|---|---|---|---|---|
| American Horizon | USD 10,000,000 | 0.05% | USD | 5,000 | Gulf of Mexico |
| Phoenix Horizon | USD 15,000,000 | 0.05% | USD | 7,500 | Gulf of Mexico |
| Cajun Horizon | USD 7,000,000 | 0.05% | USD | 3,500 | Gulf of Mexico |
| Gulf Horizon | USD 19,000,000 | 0.05% | USD | 9,500 | Ecuador |
| Canyon Horizon | USD 24,000,000 | 0.05% | USD | 12,000 | Gulf of Mexico |
| Lone Star Horizon | USD 24,000,000 | 0.05% | USD | 12,000 | Gulf of Mexico |
| Pearl Horizon | USD 8,000,000 | 0.05% | USD | 4,000 | Gulf of Mexico |
| Stephaniturm | USD 19,000,000 | 0.05% | NIL | | North Sea |
| Horizon MB 100 | USD 3,000,000 | 0.05% | USD | 1,500 | Gulf of Mexico |
| Atlantic Horizon | USD 21,125,000 | 0.05% | USD | 10,563 | Gulf of Mexico |
| Pacific Horizon | USD 30,000,000 | 0.05% | USD | 15,000 | Gulf of Mexico |
| Pecos Horizon | USD 20,000,000 | 0.05% | USD | 10,000 | Gulf of Mexico |
| Sea Horizon | USD 25,000,000 | 0.25% | USD | 62,500 | Indonesia |
| Brazos Horizon | USD 10,000,000 | 0.05% | USD | 5,000 | Gulf of Mexico |
| | | | USD158,063 | | |

* On long term charter



GXI



LE0280715

JLT

Sheet   of

## HORIZON OFFSHORE CONTRACTORS, INC.
### VESSEL SCHEDULE

|  | Total Value | | Year Built (Re) | GRT | SIZE | TYPE |
|---|---|---|---|---|---|---|
| **Horizon Offshore** | | | | | | |
| American Horizon | USD | 10,000,000 | 1960/64/86 | 1,762 | 180 x 85 | Lay/Bury Barge |
| Phoenix Horizon | USD | 15,000,000 | 1977/82/96 | 4,988 | 300 x 90 | Derrick/Lay Barge |
| Cajun Horizon | USD | 7,000,000 | 1980 | 514 | 140 x 46 | Lay Barge |
| Gulf Horizon | USD | 19,000,000 | 1968 | 3,859 | 350 x 72 | Lay Barge |
| Canyon Horizon | USD | 24,000,000 | 1966 | 5,686 | 330 x 90 | Bury Barge |
| Lone Star Horizon | USD | 24,000,000 | 1961/73 | 3,774 | 320 x 90 | Lay Barge |
| Pearl Horizon | USD | 8,000,000 | 1973 | 1,063 | 184 x 45 | Dive Support Vessel |
| Stephaniturm | USD | 19,000,000 | 1978 | 1,954 | 230 x 45 | Dive Support Vessel |
| Horizon MB100 | USD | 3,000,000 | 1982/83/96 | 5,950 | 328 x 100 | Cargo Barge |
| Atlantic Horizon | USD | 21,125,000 | 1982/98 | 6,103 | 420 x 98 | Derrick Barge |
| Pacific Horizon | USD | 30,000,000 | 1972/74/98 | 7,218 | 350 x 100 | Derrick Barge |
| Pecos Horizon | USD | 20,000,000 | 1970 | 2,688 | 256 x 72 | Pipe Bury Barge |
| Sea Horizon | USD | 25,000,000 | 1977 | 6,889 | 361 x 98 | Derrick/Lay Barge |
| Brazos Horizon | USD | 10,000,000 | | 2,225 | 210 x 70 | Derrick Barge |
| | **USD 235,125,000** | | | | | |





LE0280715

JLT

Sheet    of

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 2 - PROPERTY/EQUIPMENT
## To Be Confirmed/Agreed

Section A (Provisional)

2500 City West Boulevard, Houston, Texas                USD  20,000,000
Sabine Pass Facility, Texas
To be advised, Ciudad del Carmen, Mexico
Port Arthur Yard Facility, Port Arthur, Louisiana
24 Festival Road, Victoria Island, Lagos, Nigeria
Singapore/Jarkata, South East Asia


Section B (Provisional)
Miscellaneous Equipment                                 USD  10,000,000

                                                        ─────────────
**TOTAL**                                               **USD  30,000,000**


War /Terrorism Schedule
USD 27,000,000            0.05%              USD        13,500
USD  3,000,000 (Indonesia) 0.25%            USD         7,500
                                            USD        21,000





**LE0280715**

JLT

Sheet    of

## HORIZON OFFSHORE CONTRACTORS, INC.
### SECTION 3 –BUILDERS RISKS

Subject that all contracts with an Esimated Final Contract Value of greater than USD 2,000,000 are to be declared hereon.

PIPELINE PROJECTS

Not exceeding 18" pipe and 500'of water:

| | |
|---|---|
| Estimated Contract Value up to USD 5,000,000 | 2.25% on Final Contract Value. |
| Estimated Contract Value in excess of USD 5,000,000 | 3.00% on Final Contract Value. |

Not exceeding 24" pipe and 500'of water:

| | |
|---|---|
| Estimated Contract Value up to USD 5,000,000 | 2.70% on Final Contract Value. |
| Estimated Contract Value in excess of USD 5,000,000 | 3.60% on Final Contract Value. |

Excess of 24" pipe and/or 500'of water:          To Be Agreed.

NON PIPELINE PROJECTS          1.875% on Final Contract Value



DEDUCTIBLES (ACROSS ALL PRJECTS)

USD 2,500,000 any one accident or occurrence.



LE0280715

JLT

Sheet    of

# HORIZON OFFSHORE CONTRACTORS, INC.
## NAMED ASSUREDS

Horizon Offshore, Inc.

Horizon Offshore Contractors, Inc.

Horizon Vessels, Inc.

Horizon Offshore Contractors Ltd

Horizon Offshore International Ltd

Horizon Offshore (Nigeria) Ltd

Horizon Group LDC

Elliot Associates, LP or Affiliates

Westgate International, L.P. and Affiliates

Horizon/Cal Dive Joint Venture (to be agreed)

ECH Offshore S.A. de R.L. de C.V.

HOC Offshore S.A. de R.L. de C.V.

HorizEn L.L.C.

Tiburon S.A. de R.L. de C.V.

Horizon Vessels International Ltd.

PT Horizon Marine Construction Indonesia

Inactive or Former Entities:

Horizon Marine International, Inc.

Horizon Offshore L.L.C.

HLS Offshore L.L.C. doing business as HLS International Companies

Highwood Associates, Inc.

HLS Offshore Inc.

Horizon Subsea Services, Inc.

DSND Horizon L.L.C.



or as their interests may appear and their affiliated, subsidiary and interrelated companies, and/or co-venturers and/or operators as charterer as may now, heretofore or hereafter exist and having an interest hereunder at the time of happening of any loss, as their respective rights and interests do appear and/or any executive officer, employee, director or stockholder thereof while acting within the scope and/or course of their duties as such and/or as expiring and/or as may be agreed.



**LE0280715**

JLT

Sheet    of

CIT Group/Equipment Financing, Inc. as Mortgagees are named hereon as additional insureds and loss payees as their interests may appear, subject to Loss Payable Clause as expiring.

GMAC Business Credit, LLC its successors and/or assigns are added as loss payees hereon in respect of vessel "Sea Horizon".

General Electric Capital Corp. are added as loss payees hereon in respect of vessel "Pecos Horizon".

## HORIZON OFFSHORE CONTRACTORS, INC.
### CHEVRON INDEMNITY CLAUSE

It is hereby noted and agreed that in respect of Assured's operations with Chevron USA Inc. the deductible(s) are amended to USD 25,000 any one accident or occurrence subject Assured indemnifying Underwriters hereon at the time of settlement, for the difference between the above amount and the previously agreed deductibles hereon in the event of a claim.





| LE0280715 | JLT |
|---|---|
| | Sheet    of |

## HORIZON OFFSHORE CONTRACTORS, INC.

### Preferred Attorneys/Adjusting Companies –to be agreed Leading Underwriters

It is understood and agreed that, if required, at Assured's option, the Assured may choose from the following attorneys to represent them.

**LOUISIANA**

Lafayette

| | |
|---|---|
| Edwin Preis/Ralph Kraft | Preis, Kraft and Roy |

New Orleans

| | |
|---|---|
| George Gilly | Phelps Dunbar |
| George J Fowler III | Rice Fowler |
| Daniel Picou | Larzelere, Picou & Wells (Metairie) |
| | Westmoreland Hall |

**TEXAS**

Houston

| | |
|---|---|
| David Plavnicky | Plavnicky, Wheat Marshall, Goodson |
| Ron White | White, Macillop & Basham P.C. |
| George Caflish | Preis, Kraft & Roy |
| Chris Lorenzen | Crain, Caton & James |
| | Corpus Christi |
| Ralph Meyer | Royston, Rayzor, Vickery & Williams |
| | Westmoreland Hall |





| LE0280715 | 901 |
| --- | --- |
| | JLT |
| | Sheet    of |

## PREFERRED ADJUSTING COMPANIES

**LOUISIANA & TEXAS**
Bruce M Shuman                          Shuman Consulting Services, Inc.


**LOUISIANA**
Lafayette
Joe Sarkies                             Kenneth Livaudis Claims Service


New Orleans
Thomas J Halverson                      EJ Halverson & Associates
Rush Johnson or Bateman Chapman



 | **LE0280715** | JLT

Sheet    of

## HORIZON OFFSHORE CONTRACTORS, INC.
### Preferred Marine Surveyors – to be agreed Leading Underwriters.

Section 1

| | |
|---|---|
| Doug Devoy | Matthews Daniel Company, Houston |
| Greg Gant | Guy Matthews & Associates, Inc., Houston |
| (Bryan Johnson) | Rush Johnson & Associates, Houston |
| Captain M.A. Jacobs | Global Maritime, Houston |
| | Bachrach, Wood, Peter & Associates, Inc. * |
| | Noble Denton & Associates |

* but only in respect of "on hire" and "off hire" surveys.

Far East only                 Falconer, Bryan & Associates Pte Ltd

Matthews Daniel Company, Houston

Noble Denton & Associates


Section 3

| | |
|---|---|
| Doug Devoy | Matthews Daniel Company, Houston |
| Greg Gant | Guy Matthews & Associates, Inc., Houston |
| Bryan Johnson | Rush Johnson & Associates, Houston |
| Captain M.A. Jacobs | Global Maritime, Houston |
| Jim Moore | JF Moore, Houston |
| | Noble Denton & Associates |

Far East only                 Falconer, Bryan & Associates Pte Ltd

Matthews Daniel Company, Houston

Noble Denton & Associates





LE0280715

JLT

Sheet   of

## HORIZON OFFSHORE CONTRACTORS, INC.
## PACKAGE CLAIMS INFORMATION (USD) (excluding Builders Risks)
## (Including Fees)

### 1997 - 98 (doing business as Horizon Offshore)

| D.o.L. | Description | Type Status | Total Nett Claim | Paid |
|---|---|---|---|---|
| 11 Sep 97 | Vessel damage (M. Diver) | P.D. Closed | 504,377.10 | 504,377.10 |
| 24 Sep 97 | Transit damage (ODS Mariner) | P.D. Closed | 1,703,288.83 | 1,703,288.83 |
| 12 Jan 98 | Stinger damage (Lone Star) | P.D. Closed | 0.00 | 0.00 |
| 20 Jan 98 | Vessel damage (Pearl) | Coll. Closed | 0.00 | 0.00 |
| 10 Feb 98 | Vessel damage (H355/H356) | Coll. Closed | 0.00 | 0.00 |
| | | | 2,207,665.93 | 2,207,685.93 |

### 1998 - 99 (doing business as Horizon Offshore)

| D.o.L. | Description | Type Status | Total Nett Claim | Paid |
|---|---|---|---|---|
| 21 Aug 98 | Generator damage (Canyon) | P.D. Closed * | 681,413.18 | 681,413.18 |
| 21 Aug 98 | Generator damage (Atlantic) | P.D. Closed * | 0.00 | 0.00 |
| 21 Aug 98 | Tank buckled (Gulf) | P.D. Closed * | 0.00 | 0.00 |
| 04 Oct 98 | Boom failure (American) | P.D. Closed | 3,611.92 | 3,611.92 |
| 06 Nov 98 | Stinger damage (Gulf) | P.D. Closed | 284,421.95 | 284,421.95 |
| | | | 969,447.05 | 969,447.05 |

* one claim.





| LE0280715 | | JLT |
| --- | --- | --- |
| | | Sheet    of |

## 1999 - 2000 (doing business as Horizon Offshore)

| D.o.L. | Description | Type Status | Total Nett Claim | Paid | |
| --- | --- | --- | --- | --- | --- |
| 09 Apr 99 | Damage to Tidemar 253 | P.D. Closed | 1,023.75 | 1,023.75 | |
| 14 Apr 99 | H.W. damage (Lone Star) | P.D. Closed | 81,737.76 | 81,737.76 | |
| 05 May 99 | Damage to CMS 754 | Coll. Closed | 1,110.28 | 1,110.28 | |
| 06 May 99 | Damage to CMS 754 | P.D. Closed | 0.00 | 0.00 | |
| 01 Jul 99 | Vessel damage to (Canyon) | P.D. Closed | 305,307.20 | 305,307.20 | |
| 01 Jul 99 | Vessel damage (Canyon) | P.D. Closed | 422,872.62 | 422,872.62 | |
| 26 Aug 99 | Pearl struck submerged object | P.D. | 218,508.13 | 13,508.13 | Open |
| 05 Sep 99 | Crane damage (Atlantic) | P.D. Closed | 1,450.55 | 1,450.55 | |
| 29 Oct 99 | Crane damage (Pacific) | P.D. Closed | 0.00 | 0.00 | |
| 27 Jan 00 | H.W. damage (Brazos) | P.D. | 220,000.00 | 0.00 | Open |
| 21 Mar 00 | Vessel damage (Pacific) | Coll. Closed | 22,356.02 | 22,356.02 | |
| | | | 1,274,366.31 | 849,366.31 | |

## 2000 - 2001 (doing business as Horizon Offshore)

| 27 Apr 00 | Anchor damage (Brazos) | P.D. Closed | 5,289.11 | 5,289.11 |
| --- | --- | --- | --- | --- |
| 25 May 00 | Anchor damage (Pearl) | P.D. Closed | 0.00 | 0.00 |
| 25 May 00 | Stinger damage (Lone Star) | P.D. Closed | 12,097.90 | 12,097.90 |



**LE0280715**

JLT

Sheet    of

| Date | Description | Type | Amount | Paid | Status |
|---|---|---|---|---|---|
| 10 Jun 00 | Tank damage (American) | P.D. | 81,000.00 | 0.00 | Open |
| 01 Jul 00 | Engine damage (Pacific) | P.D. Closed | 3,243.00 | 3,243.00 | |
| 11 Aug 00 | Fire damage (Lone Star) | P.D. Closed | 1,636,668.06 | 1,636,668.06 | |
| 18 Oct 00 | Fire damage (Canyon) | P.D. Closed | 631,264.62 | 631,264.62 | |
| 03 Nov 00 | Vessel damage (Lone Star) | Coll. Closed | 5,047.37 | 5,047.37 | |
| | | | 2,374,610.06 | 2,293,610.06 | |

**2001 - 2002 (doing business as Horizon Offshore)**

| Date | Description | Type | Amount | Paid | Status |
|---|---|---|---|---|---|
| 09 Jun 01 | Equipment Allision | Eqpt. | 0.00 | 0.00 | Open |
| 09 Oct 01 | Platform Dropped (Pacific) | P.D. | 0.00 | 0.00 | Open |
| | | | 0.00 | 0.00 | |

Claims as per JLT Risk Solutions Ltd. figures 26 March, 2002.



| LE0280715 | | JLT |
|---|---|---|
| | | Sheet    of |

## HORIZON OFFSHORE CONTRACTORS, INC.
## PACKAGE CLAIMS INFORMATION (USD) (Builders Risks only)
## (Including Fees)

### 1998 - 99 (doing business as Horizon Offshore)

| D.o.L. | Description | Type | Total Nett Claim | Paid | Status |
|---|---|---|---|---|---|
| 30 Jun 98 | Contingent Builders | Builders | 0.00 | 0.00 | Open |
| 19 Jul 98 | Buckled Pipe MI622 | Builders | 3,419,038.13 | 3,419,038.13 | Closed |
| | | | 3,419,038.13 | 3,419,038.13 | |

### 1999 - 2000 (doing business as Horizon Offshore)

| D.o.L. | Description | Type | Total Nett Claim | Paid | Status |
|---|---|---|---|---|---|
| 09 Jun 99 | Pipeline Damage | Builders | 2,403,599.16 | 2,403,599.16 | Closed |
| 02 Oct 99 | Tripod Tilted | Builders | 948,851.35 | 948,851.35 | Closed |
| 29 Oct 99 | Jacket Installation | Builders | 537,197.88 | 537,197.88 | Closed |
| 30 Dec 99 | Pipeline Damage | Builders | 841,053.22 | 841,053.22 | Closed |
| | | | 4,730,701.61 | 4,730,701.61 | |

### 2000 - 2001 (doing business as Horizon Offshore)

| 27 Apr 00 | Pipeline Damage | Builders | 5,289.11 | 5,289.11 | Closed |
|---|---|---|---|---|---|
| 15 Jun 00 | Pipeline Damage | Builders | 721,057.40 | 21,057.40 | Open |
| 22 Jun 00 | Pipeline Severed | Builders | 24,490.52 | 24,490.52 | Open* |
| 17 Jul 00 | Pipeline Damage (ECH) | Builders | 464,038.50 | 14,038.50 | Open |
| 11 Aug 00 | Damage to L.S. Horizon | Builders | 718,770.34 | 718,770.34 | Closed |
| 05 Oct 00 | Pipe laid incorrectly | Builders | 0.00 | 0.00 | Open |
| | Pipeline Damage | Builders | 1,346,886.25 | 1,346,886.25 | Closed |
| 03 Nov 00 | Pipeline Damage | Builders | 708,595.80 | 708,595.80 | Closed |
| 24 Jan 01 | Bent Valve (ECH) | Builders | 0.00 | 0.00 | Closed |
| 14 Mar 01 | Pipeline Damage | Builders | 781,479.56 | 781,479.56 | Open * |
| 30 Mar 01 | Flange Damage | Builders | 3,358,347.00 | 8,347.00 | Open |
| | | | 8,128,954.48 | 3,628,954.48 | |

* Total Claim USD 505,372.84 but recovery made at mediation of USD 480,882.32





901
JLT

Sheet    of

LE0280715

**2001 - 2002 (doing business as Horizon Offshore)**

| 01 Jun 01 | Pipeline Damage (ECH) | Builders | 3,715,059.75 | 5,059.75 | Open |
| 09 Oct 01 | Platform Dropped | Builders | 10,850,000.00 | 0.00 | Open |
| 18 Oct 01 | Broken Sling | Builders | 0.00 | 0.00 | Closed |
| | | | 14,565,059.75 | 5,059.75 | |

Note: ECH = Horizon Joint Venture placed outside of Package.

Claims as per JLT Risk Solutions Ltd. figures 26 March, 2002.



LE0280715

JLT

Sheet    of

## HORIZON OFFSHORE
## PACKAGE –EXCLUDING BUILDERS RISKS
### AS IF 9 APRIL RENEWAL DATES
### AS IF CURRENT DEDUCTIBLE'S AND ANNUAL AGGREGATE DEDUCTIBLE

| YEAR | NET PREMIUMS | | CLAIMS | |
|------|------|------|------|------|
| 1997 | USD | 453,927.97 | USD | nil |
| 1998 | USD | 682,753.88 | USD | nil |
| 1999 | USD | 622,040.11 | USD | nil |
| 2000 | USD | 646,105.70 | USD | nil |
| 2001 | USD | 2,016,38.32 | USD | nil |
| | USD | 4,421,208.98 | | |

* No JLTRS involvement in 1998 placing, so premium figures are estimated.
JLTRS figures as at 26 March, 2002.





## JLT RISK SOLUTIONS
#### Limited

**ENDORSEMENT**    **JLT901**

| For account of: | Attached to and forming part of Policy No: |
|---|---|
| Horizon Offshore Contractors Inc | LE0280715 |

LD164825                         FILE NO/UCR=LD0280715004

01/05/02 to 01/05/03

Global Maritime invoices in respect of their operational reveiw of the
Assured.


As per Global Maritime's invoices in respect of th
eir operational review of the Assured.

| | | |
|---|---|---|
| Net 100% Fees | GBP | 26,001.80 |
| Order Hereon 52.5% | GBP | 13,650.95 |
| Hereto 71.429% | GBP | 9,750.74 |



M03|08|00598|1

TSN: 10137 # 5|8|2003

| | | | |
|---|---|---|---|
| Lloyds | Collection Ref: LD165836 | MLP | 23/07/2003 |

## JLT RISK SOLUTIONS
Limited

| LE0280715 | LE148465 | **901 JLT** |
|---|---|---|

Slip number  3 of    3 (LLOYDS UN)

Assured/Reassured:-

Horizon Offshore Contractors Inc

Period:-

From 00:01 01/05/2002 to 00:01 01/05/2003

For L.P.S.O. use:-  2171045M

   51123*15-07-2002    01
    51124*15-07-2002    02
     61522*15-07-2002    03
   51126*15-07-2002    04

For I.L.U. use:-

For L.I.R.M.A. use:-



CMA

# JLT RISK SOLUTIONS
### Limited

## 901
## JLT

| Policy No LE0280715 | Ref No. LE1495000200 |
|---|---|

| Unique Market Reference | Slip Registration |
|---|---|
| LE0280715 | Lloyd's | ILU | LIRMA |

| Binding Authority Registration No and Date | Risk Code (s) ET |
|---|---|

| D T I Code 3 | TOC Tribunal | Terms of Settlement |
|---|---|---|

| | | Sett Due Date 30/11/2002 | Def | Adj |
|---|---|---|---|---|

| Assured Account | | Adjust Scheme |
|---|---|---|
| Horizon Offshore Contractor | | XXX | NO |

| USB /MXS XIX | Country of Origin U.S.A. | VAT Z |
|---|---|---|

Overseas Broker (Name and Address)

| CURRENCY USD | SIGNED LINE % | GROSS PREMIUM | |
|---|---|---|---|
| | | IN ALL | WAR ONLY |
| TOTAL | 100.000 | 618,750.00 | |
| LLOYD'S | 83.333 | 515,622.94 | |
| ILU | 0.000 | 0.00 | |
| LIRMA | 0.000 | 0.00 | |
| OTHER COMPANIES | 0.000 | 0.00 | |

2500 City West Boulevard
Suite 2200
Houston
TX 77042

For Future Use

| C.P.A. YES | NO | Serial No. | Certificate Nos. |
|---|---|---|---|

| EC CCI | EC ESTABLISHMEN | EC RESERVES. | EC NA |
|---|---|---|---|
| Bureau Scheme No. | | Brokers Cover No. | |

| Written lines % rest of Order whole | Order 45.0000 | Closed for 100.00 |
|---|---|---|

Signing slip &/or endorsement to be agreed by Leading Underwriter only.

JLT  0901

LE0280715

CALCULATIONS

$25,000,000 @ 5.5% = $1,375,000

@ 45% Order = $618,750.00

2864739E

FOR BUREAU USE

51243*05-12-2002  01

L P S C
JRT

301 ref 002

JLT RISK SOLUTIONS
Limited

**901 JLT**

SHEET  1 of

SECTION 2A)

PROPERTY

| Policy No. | Ref No. |
|---|---|
| LE0280715 | LE14846505 |

| Unique Market Reference | Slip Registration | | |
|---|---|---|---|
| | Lloyd's | ILU | LIRMA |
| LE0280715 | | | |

| Binding Authority Registration No and Date | Risk Code (s) |
|---|---|
| | EF |

| D T I Code | TOC Tribunal | Terms of Settlement |
|---|---|---|
| 3 | | Sett Due Date           Def  Adj |
| | | 01/07/2002 |

| Assured Account | | Adjust Scheme |
|---|---|---|
| Horizon Offshore Contractor | AXXX | NO |

| USB | Country of Origin | VAT |
|---|---|---|
| XXXX XXX | U.S.A. | Z |

Overseas Broker (Name and Address)

| CURRENCY | SIGNED LINE % | GROSS PREMIUM | |
|---|---|---|---|
| USD | | IN ALL | WAR ONLY |
| TOTAL | 100.000 | 88,103.93 | |
| LLOYD'S | 71.429 | 62,931.76 | |
| ILU | 0.000 | 0.00 | |
| LIRMA | 0.000 | 0.00 | |
| OTHER COMPANIES | 0.000 | 0.00 | |

2500 City West Boulevard
Suite 2200
Houston
Texas

For Future Use

61522*15-07-2002   03

| C.P.A. | | Serial No. | Certificate Nos. |
|---|---|---|---|
| YES | NO | | |

| EC | EC | EC | EC |
|---|---|---|---|
| CCI | ESTABLISHMENT | RESERVES | NA |

| Bureau Scheme No. | Brokers Cover No. |
|---|---|

| Written lines | % | CXXr | Order | Closed for |
|---|---|---|---|---|
| | RX | of  whole | 52.50000 | 100.00 |

Signing slip &/or endorsement to be agreed by Leading Underwriter only.

It is hereby agreed between the Underwriters and the Assured that in the event of the Assured, or their Agents on whose instructions insurance may have been effected, failing to pay JLT RISK SOLUTIONS Limited the premium or any instalment thereof on the due date in full, this policy may be forthwith cancelled by JLT RISK SOLUTIONS Limited, advising Underwriters in writing, and the Underwriters will thereupon return, to JLT RISK SOLUTIONS Limited, pro rata premium from the date of notice or from such later date as cancellation may be required in the said notice. The foregoing is subject to JLT RISK SOLUTIONS Limited giving 10 calendar days notice in writing to the Assured, or their Agents on whose instructions insurance may have been effected, or in accordance with the terms and conditions of any letter of undertaking that may be issued by JLT RISK SOLUTIONS Limited in favour of any assignee or mortgagee of this insurance.

301 ref 005      JLT 901

JLT  0901

LE0280715

Section 2A) - Property   -  USD 172,120

@ 52.5% Order          =  USD  90,363

Less 2.5% PPD          =  USD  88,103.93
(if premium paid to Uwrs within
65 days of inception)

FOR BUREAU USE

301 ref 005

Signed line
%

JLT  0901

| LE0280715 |
|---|

Closing off slip incepting 01/05/02+
+ being the actual or agreed inception date

| 28.571 | 2020 WEL | D324370B0X | ~~ 4/7/02 |
| 14.286 | 510 KLN | R1100L02A25A | |
| 19.048 | 457 WIK | 422D243738XX | |
| 9.524 | 2791 MAP | M5002MG00272 | |

301 ref 005

LTS 137-4 (10/90)

**HORIZON OFFSHORE CONTRACTORS, INC**
**PACKAGE PREMIUM WORKSHEET – LE0280715**

**Section 1**
A) - Hulls                                    USD 2,863,267.00
B) - IV                                       USD    323,438.00
                                              USD 3,186,705.00

@ 52.5% Order Hereon =                        **USD 1,673,020.13**


**Section 1**
C) War/Terrorism                              USD    158,063.00

@ 40% Order Hereon =                          **USD      63,225.20**


**Section 2**

A) Property                                   USD    172,120.00

B) Equipment                                  USD     86,060.00
                                              USD    258,180.00

@ 52.5% Order Hereon =                        **USD   135,544.50**


**Section 2**
War/Terrorism                                 USD     21,000.00
@ 40% Order Hereon =                          **USD       8,400.00**


Total Premium =                               **USD 1,880,189.83**

**Less 2.5% Prompt payment discount if premium**
**paid to Underwriters within 65 days of inception =**   **USD 1,833,185.08**

HORIZON DEBIT NOTE.DOC.

## JLT RISK SOLUTIONS
Limited

**901 JLT**

SHEET   1 of

Section 3 B)

Builders Risks

| Policy No. | Ref No. |
|---|---|
| LE0280715 | LE14847602 |

Unique Market Reference
LE0280715

Slip Registration

| Lloyd's | ILU | URMA |
|---|---|---|

Binding Authority Registration No and Date

Risk Code (s)
ET

| D T I Code | TOC Tribunal | Terms of Settlement | | |
|---|---|---|---|---|
| 3 | | Settl Due Date | Def | Adj |
| | | A 01/07/2002 | | |

M 4/7/02

Assured Account

Horizon Offshore Contractor

Adjust Scheme    NO

| USB | Country of Origin | VAT |
|---|---|---|
| XXX XXX | U.S.A. | 2 |

Overseas Broker (Name and Address)

| CURRENCY USD | SIGNED LINE % | GROSS PREMIUM | |
|---|---|---|---|
| | | IN ALL | WAR ONLY |
| TOTAL | 100.000 | 1,575,000.00 | |
| LLOYD'S | 71.429 | 1,125,006.75 | |
| ILU | 0.000 | 0.00 | |
| URMA | 0.000 | 0.00 | |
| OTHER COMPANIES | 0.000 | 0.00 | |

2500 City West Boulevard
Suite 2200
Houston
Texas

HXX

For Future Use
51126*15-07-2002    04

| C.P.A. | | Serial No. | Certificate Nos. | |
|---|---|---|---|---|
| YES | NO | | | |

| EC CCI | EC ESTABLISHMENT | EC RESERVES | EC NA |
|---|---|---|---|
Bureau Scheme No.    Brokers Cover No.

| Written lines | % of whole | Order | Closed for |
|---|---|---|---|
| | | 52.50000 | 100.00 |

Signing slip &/or endorsement to be agreed by Leading Underwriter only.

It is hereby agreed between the Underwriters and the Assured that in the event of the Assured, or their Agents on whose instructions insurance may have been effected, failing to pay JLT RISK SOLUTIONS Limited the premium or any instalment thereof on the due date in full, this policy may be forthwith cancelled by JLT RISK SOLUTIONS Limited, advising Underwriters in writing, and the Underwriters will thereupon return to JLT RISK SOLUTIONS Limited, pro rata premium from the date of notice or from such later date as cancellation may be required in the said notice. The foregoing is subject to JLT RISK SOLUTIONS Limited giving 10 calendar days notice in writing to the Assured, or their Agents on whose instructions insurance may have been effected, or in accordance with the terms and conditions of any letter of undertaking that may be issued by JLT RISK SOLUTIONS Limited in favour of any assignee or mortgagee of this insurance.

301 ref 007    JLT 901

JLT  0901

LE0280715

## Section 3 – Builders Risks

B) Additional Premium in respect of the Builders Risk Section to be USD 3,000,000 net absolute payable quarterly, in lieu of an additional annual aggregate deductible.

Premium USD 3,000,000

@ 52.5 % order thereon = USD 1,575,000

Payable Quarterly :–

| | |
|---|---|
| 04 – JULY – 02 | USD 393,750 |
| 01 – OCT – 02 | USD 393,750 |
| 01 – JAN – 03 | USD 393,750 |
| 01 – APRIL – 03 | USD 393,750 |

FOR BUREAU USE

301 ref 007

signed line
%

JLT  0901

LE0280715

Closing off slip incepting 01/05/02+
+ being the actual or agreed inception date

| 28.571 | 2020 WEL | D324370B0X |
| 14.286 | 510 KLN | R1100L02A25A |
| 19.048 | 457 WIK | 415D243738XX |
| 9.524 | 2791 MAP | M5002LG00271 |

301 ref 007

LTS 137-4 (10/90)

Signed line

JLT   0901

LE0280715

Closing off slip incepting 01/05/02+
+ being the actual or agreed inception date

| | | | |
|---|---|---|---|
| 33.333 | 2020 WEL | D324370B0X | |
| 16.667 | 510 KLN | R1100L02A25A | |
| 22.222 | 457 WTK | 415D243738XX | |
| 11.111 | 2791 MAP | M5002LG00271 | |

301 ref 002

LTS 137-4 (10/90)

JLT RISK SOLUTIONS
Limited

**901**
**JLT**

| Policy No. | | Ref No. | |
|---|---|---|---|
| LE0280715 | | LE148465 | |

| Unique Market Reference | Slip Registration | | |
|---|---|---|---|
| LE0280715 | Lloyd's | ILU | LIRMA |

| Binding Authority Registration No and Date | Risk Code (s) |
|---|---|
| | SEE 301 ATTACHED |

| D T I Code | TOC Tribunal | Terms of Settlement | | |
|---|---|---|---|---|
| | | Sett Due Date | Def | Adj |
| | | 01/07/2002 | | |

| Assured Account | | Adjust Scheme | |
|---|---|---|---|
| Horizon Offshore Contractor | | XXXX | NO |

| USB XXXX XXX | Country of Origin | VAT |
|---|---|---|
| | U.S.A. | Z |

Overseas Broker (Name and Address)

| CURRENCY | SIGNED LINE % | GROSS PREMIUM | |
|---|---|---|---|
| USD | | IN ALL | WAR ONLY |
| TOTAL | | AS PER | |
| LLOYD'S | | LPO301 | |
| ILU | | ATTACHED | |
| LIRMA | | | |
| OTHER COMPANIES | | | |

Assured address:-
2500 City West Boulevard
Suite 2200
Houston
Texas

For Future Use

| C.P.A. | | Serial No. | Certificate Nos. | |
|---|---|---|---|---|
| YES | NO | | | |

| EC | EC | EC | EC | EC |
|---|---|---|---|---|
| CCL | ESTABLISHMENT | RESERVES | | NA |
| Bureau Scheme No. | | Brokers Cover No. | | |

| Written lines | % of | QXXr whole | Order | Closed for |
|---|---|---|---|---|
| | | | * | 100.00 |

Signing slip &/or endorsement to be agreed by Leading Underwriter only.

It is hereby agreed between the Underwriters and the Assured that in the event of the Assured, or their Agents on whose instructions insurance may have been effected, failing to pay JLT RISK SOLUTIONS Limited the premium or any instalment thereof on the due date in full, this policy may be forthwith cancelled by JLT RISK SOLUTIONS Limited, advising Underwriters in writing, and the Underwriters will thereupon return, to JLT RISK SOLUTIONS Limited, pro rata premium from the date of notice or from such later date as cancellation may be required in the said notice. The foregoing is subject to JLT RISK SOLUTIONS Limited giving 10 calendar days notice in writing to the Assured, or their Agents on whose instructions insurance may have been effected, or in accordance with the terms and conditions of any letter of undertaking that may be issued by JLT RISK SOLUTIONS Limited in favour of any assignee or mortgagee of this insurance.

JLT
901

CHA

JLT   0901

LE0280715

H

XI

CMA

LTS 137-4 (10/90)

JLT RISK SOLUTIONS
Limited

**901 JLT**

SHEET 1 of

ET
SECTIONS 1A) 1B)
& 2 B)

| Policy No. | Ref No. |
|---|---|
| LE0280715 | LE14846503 |

Unique Market Reference

LE0280715

| Slip Registration | | |
|---|---|---|
| Lloyd's | ILU | LIRMA |

Binding Authority Registration No and Date

Risk Code (s)

ET

| D T I Code | TOC Tribunal |
|---|---|
| 3 | |

Terms of Settlement
Sett Due Date | Def | Adj

01/07/2002          ↑ 4/7/02

Assured Account

Horizon Offshore Contractor

Adjust Scheme     NO

| USB | Country of Origin | VAT |
|---|---|---|
| | U.S.A. | Z |

Overseas Broker (Name and Address)

| CURRENCY USD | SIGNED LINE % | GROSS PREMIUM | |
|---|---|---|---|
| | | IN ALL | WAR ONLY |
| TOTAL | 100.000 | 1,675,246.58 | |
| LLOYD'S | 71.429 | 1,196,611.88 | |
| ILU | 0.000 | 0.00 | |
| LIRMA | 0.000 | 0.00 | |
| OTHER COMPANIES | 0.000 | 0.00 | |

2500 City West Boulevard
Suite 2200
Houston
Texas

For Future Use

51123*15-07-2002   01

| C.P.A. | Serial No. | Certificate Nos. |
|---|---|---|
| YES | NO | |

| EC | EC | EC | EC |
|---|---|---|---|
| CCI | ESTABLISHMENT | RESERVES | NA |

Bureau Scheme No.                    Brokers Cover No.

| Written lines % | Other | Order | Closed for |
|---|---|---|---|
| of whole | | 52.50000 | 100.00 |

Signing slip &/or endorsement to be agreed by Leading Underwriter only.

It is hereby agreed between the Underwriters and the Assured that in the event of the Assured, or their Agents on whose instructions insurance may have been effected, failing to pay JLT RISK SOLUTIONS Limited the premium or any instalment thereof on the due date in full, this policy may be forthwith cancelled by JLT RISK SOLUTIONS Limited, advising Underwriters in writing, and the Underwriters will thereupon return, to JLT RISK SOLUTIONS Limited, pro rata premium from the date of notice or from such later date as cancellation may be required in the said notice. The foregoing is subject to JLT RISK SOLUTIONS Limited giving 10 calendar days notice in writing to the Assured, or their Agents on whose instructions insurance may have been effected, or in accordance with the terms and conditions of any letter of undertaking that may be issued by JLT RISK SOLUTIONS Limited in favour of any assignee or mortgagee of this insurance.

301 ref 003        JLT 901

JLT  0901

LE0280715

" E.T. "

Section 1 A) - Hulls      = USD 2,863,267

— " —      1 B) - I.V.      = USD   323,438

— " —      2 B) - Equipment = USD    86,060

USD 3,272,765

@ 52.5 % Order Hereon = USD 1,718,201.63

Less 2.5 % PPD      · USD 1,675,246.59
(If premium paid to Uurs
within 65 days of inception)

FOR BUREAU USE

301 ref 003

Signed line
%

JLT  0901

LE0280715

Closing off slip incepting 01/05/02+
+ being the actual or agreed inception date

28.571   2020 WEL   D324370B0X

14.286   510 KLN   R1100L02A25A

19.048   457 WTK   423D243738XX

9.524   2791 MAP   M5002LG00271

301 ref 003

LTS 137-4 (10/90)

JLT RISK SOLUTIONS
Limited

**901 JLT**

SECTION 1 C)
WAR
&
SECTION 2 B)
WAR

| Policy No. | Ref No. |
|---|---|
| LE0280715 | LE14846504 |

| Unique Market Reference | Slip Registration | | |
|---|---|---|---|
| LE0280715 | Lloyd's | ILU | LIRMA |

| Binding Authority Registration No and Date | Risk Code (s) |
|---|---|
| | W |

| O T I Code | TOC Tribunal | Terms of Settlement | | |
|---|---|---|---|---|
| 3 | | Sett Due Date | Def | Adj |
| | | 01/07/2002 | | |

Assured Account

Horizon Offshore Contractor

| | Adjust Scheme |
|---|---|
| | NO |

| USB XXX | Country of Origin | VAT |
|---|---|---|
| | U.S.A. | Z |

Overseas Broker (Name and Address)

| CURRENCY USD | SIGNED LINE % | GROSS PREMIUM | |
|---|---|---|---|
| | | IN ALL | WAR ONLY |
| TOTAL | 100.000 | 69,834.57 | |
| LLOYD'S | 81.250 | 56,740.59 | |
| ILU | 0.000 | 0.00 | |
| LIRMA | 0.000 | 0.00 | |
| OTHER COMPANIES | 0.000 | 0.00 | |

2500 City West Boulevard
Suite 2200
Houston
Texas

For Future Use  51124*15-07-2002   02

| C.P.A. | | Serial No. | Certificate Nos. |
|---|---|---|---|
| YES | NO | | |

| EC | | EC | EC | EC |
|---|---|---|---|---|
| | CCI | ESTABLISHMENT | RESERVES | NA |
| Bureau Scheme No. | | | Brokers Cover No. | |

| Written lines | % of whole | Order | Closed for |
|---|---|---|---|
| | | 40.00000 | 100.00 |

Signing slip &/or endorsement to be agreed by Leading Underwriter only.

It is hereby agreed between the Underwriters and the Assured that in the event of the Assured, or their Agents on whose instructions insurance may have been effected, failing to pay JLT RISK SOLUTIONS Limited the premium or any instalment thereof on the due date in full, this policy may be forthwith cancelled by JLT RISK SOLUTIONS Limited advising Underwriters in writing, and the Underwriters will thereupon return, to JLT RISK SOLUTIONS Limited, pro rata premium from the said notice or from such later date as cancellation may be required in the said notice. The foregoing is subject to JLT RISK SOLUTIONS Limited giving 10 calendar days notice in writing to the Assured, or their Agents on whose instructions insurance may have been effected, or in accordance with the terms and conditions of any letter of undertaking that may be issued by JLT RISK SOLUTIONS Limited in favour of any assignee or mortgagee of this insurance.

301 ref 004     JLT 901

JLT  0901

LE0280715

Section 1 c)  War    = USD 158, 063

Section 2 B)  War    = USD  21.000

                        USD 179, 063

@ 40 % Order Hereon  = USD  71, 625. 20

Less 2.5 % PPD      = USD  69, 834. 57
(if premium paid to Uurs
  within 65 days of Inception)

FOR BUREAU USE

301 ref 004

signed line
%

JLT  0901

| LE0280715 |

Closing off slip incepting 01/05/02+
+ being the actual or agreed inception date

50.000  2020 WEL    W324370B0X

18.750   510 KLN    R1100L02A25A

12.500  2791 MAP    J2002PG00432

XH
H

301 ref 004

LTS 137-4 (10.90)



**JLT RISK SOLUTIONS**
Limited

**ENDORSEMENT**        **JLT901**

For account of:                                              Attached to and forming part of Policy No:

Horizon Offshore Contractors Inc                            LE0280715

LD169393                                    FILE NO/UCR=LD0280715001

20/09/02

Fire in engine room

CUIDAD DEL CARMEN

Matthews-Daniels Sixth Intrim Report with Fee Inv
No 24614

| | | | |
|---|---|---|---|
| Net 100% Fees | USD | 19,289.53 |
| Order Hereon 52.5% | USD | 10,127.00 |
| Hereto 71.429% | USD | 7,233.62 |

R 50177 * 07/10/04
R M0210000155

Lloyds                    Collection Ref: LD169395            EPB        24/05/2004



**JLT RISK SOLUTIONS**
Limited

**ENDORSEMENT**      **JLT901**

| For account of: | Attached to and forming part of Policy No: |
| --- | --- |
| Horizon Offshore Contractors Inc | LE0280715 |

LD168589                          FILE NO/UCR=LD0280715002

09/12/02

S1 & S2 Sheaves broke free from deck of Lonestar Horizon and the

anchor cable parted resulting in unplanned laying down of cable on the

seabed.


GULF OF MEXICO

ADJUSTER FEE


As per CTC Services (RJA) fee USD12,325.60

(inv. no. 12538) dated 31 December 2003.


Net 100% Fees           USD           12,325.60


Order Hereon 45%        USD            5,546.52

Pharitos sio
50166 * 11/03/2004
M03/01/01 2085

P
TO

| Lloyds | Collection Ref: LD168589 | Page 1 MCF | 09/03/2004 |



## JLT RISK SOLUTIONS
Limited

ENDORSEMENT     JLT901

| For account of: | Attached to and forming part of Policy No: |
|---|---|
| Horizon Offshore Contractors Inc | LE0280715 |

LD168595                          FILE NO/UCR=LD0280715002

09/12/02

S1 & S2 Sheaves broke free from deck of Lonestar Horizon and the
anchor cable parted resulting in unplanned laying down of cable on the
seabed.

GULF OF MEXICO

ADJUSTER FEE

As per CTC Services (RJA) fees USD5,396.30 (no.
12594) and USD5,652.20 (no. 12630 - agreed
reduced amount) grossed for full payment JLT 87.5%

Net 100% Fees          USD          12,626.85

Order Hereon 45%       USD           5,682.08

PTO FOR TOTAL.

| Lloyds | Collection Ref:  LD168589 | Page  2  MCF | 09/03/2004 |
|---|---|---|---|



**JLT RISK SOLUTIONS**
Limited

**ENDORSEMENT          JLT901**

| For account of: | Attached to and forming part of Policy No: |
|---|---|
| Horizon Offshore Contractors Inc | LE0280715 |

LD168599                         FILE NO/UCR=LD0280715002

09/12/02

S1 & S2 Sheaves broke free from deck of Lonestar Horizon and the
anchor cable parted resulting in unplanned laying down of cable on the
seabed.

GULF OF MEXICO
CLAIM PHYSICAL DAMAGE

Net Settlement USD715,203.98 as per Proof Of Loss
signed 24 February 2004.

| | | |
|---|---|---|
| Gross 100% Claim | USD | 1,715,203.98 |
| Less X/S | USD | 1,000,000.00 |
| | | |
| Net 100% Claim | USD | 715,203.98 |
| | | |
| Order Hereon 45% | USD | 321,841.79 |
| | | |
| Total Claims | USD | 333,070.39 |
| Hereto 83.333% | USD | 277,557.55 |

| Lloyds | Collection Ref: LD168589 | Page 3 MCF | 09/03/2004 |
|---|---|---|---|



**Exhibit "F"**

# American Institute Hull Clauses
### (June 2, 1977)

7

To be attached to and form a part of Policy No ......................................................................................................................

of the ..........................................................................................................................................................................

The terms and conditions of the following clauses are to be regarded as substituted for those of the policy form to which they are attached, the latter being hereby waived, except provisions required by law to be inserted in the Policy. All captions are inserted only for purposes of reference and shall not be used to interpret the clauses to which they apply.

## ASSURED

This Policy insures ...........................................................................................................................................  1

..........................................................................................................................................................................  2

.............................................................................................................. hereinafter referred to as the Assured.  3

If claim is made under this Policy by anyone other than the Owner of the Vessel, such person shall not be entitled to recover to a greater extent  4
than would the Owner, had claim been made by the Owner as an Assured named in this Policy.  5

Underwriters waive any right of subrogation against affiliated, subsidiary or interrelated companies of the Assured, provided that such waiver shall  6
not apply in the event of a collision between the Vessel and any vessel owned, demise chartered or otherwise controlled by any of the aforesaid com-  7
panies, or with respect to any loss, damage or expense against which such companies are insured.  8

## LOSS PAYEE

Loss, if any, payable to ....................................................................................................................................  9

..................................................................................................................................................... or order.  10

Provided, however, Underwriters shall pay claims to others as set forth in the Collision Liability clause and may make direct payment to persons  11
providing security for the release of the Vessel in Salvage cases.  12
  13

## VESSEL

The Subject Matter of this insurance is the Vessel called the ....................................................................  14
or by whatsoever name or names the said Vessel is or shall be called, which for purposes of this insurance shall consist of and be limited to her hull,  15
launches, lifeboats, rafts, furniture, bunkers, stores, supplies, tackle, fittings, equipment, apparatus, machinery, boilers, refrigerating machinery, insula-  16
tion, motor generators and other electrical machinery.  17

In the event any equipment or apparatus not owned by the Assured is installed for use on board the Vessel and the Assured has assumed respon-  18
sibility therefore, it shall also be considered part of the Subject Matter and the aggregate value thereof shall be included in the Agreed Value.  19

Notwithstanding the foregoing, cargo containers, barges and lighters shall not be considered a part of the Subject Matter of this insurance.  20

## DURATION OF RISK

From the .............................................. day of ................................. 19......, .................................. time  21
to the ................................................ day of ................................. 19....................................... time.  22

Should the Vessel at the expiration of this Policy be at sea, or in distress, or at a port of refuge or of call, she shall, provided previous notice be  23
given to the Underwriters, be held covered at a pro rata monthly premium to her port of destination.  24

In the event of payment by the Underwriters for Total Loss of the Vessel this Policy shall thereupon automatically terminate.  25

## AGREED VALUE

The Vessel, for so much as concerns the Assured, by agreement between the Assured and the Underwriters in this Policy, is and shall be valued at  26
..................................................................................................................................................... Dollars.  27

## AMOUNT INSURED HEREUNDER

........................................................................................................................................... Dollars.  28

## DEDUCTIBLE

Notwithstanding anything in this Policy to the contrary, there shall be deducted from the aggregate of all claims (including claims under the Sue  29
and Labor clause and claims under the Collision Liability clause) arising out of each separate accident, the sum of $ ............................ unless the  30
accident results in a Total Loss of the Vessel in which case this clause shall not apply. A recovery from other interests, however, shall not operate to  31
exclude claims under this Policy provided the aggregate of such claims arising out of one separate accident if unreduced by such recovery exceeds that  32
sum. For the purpose of this clause each accident shall be treated separately, but it is agreed that (a) a sequence of damages arising from the same acci-  33
dent shall be treated as due to that accident and (b) all heavy weather damage, or damage caused by contact with floating ice, which occurs during a  34
single sea passage between two successive ports shall be treated as though due to one accident.  35

## PREMIUM

The Underwriters to be paid in consideration of this insurance ...................................................................  36
...................................... Dollars being at the annual rate of ............................................ per cent, which premium shall be due on attachment. If the Vessel  37
is insured under this Policy for a period of less than one year at pro rata of the annual rate, full annual premium shall be considered earned and immedi-  38
ately due and payable in the event of Total Loss of the Vessel.  39

## RETURNS OF PREMIUM

Premium returnable as follows:

Pro rata daily net in the event of termination under the Change of Ownership clause;  40
Pro rata monthly net for each uncommenced month if it be mutually agreed to cancel this Policy;  41
For each period of 30 consecutive days the Vessel may be laid up in port for account of the Assured,  42
...................................... cents per cent. net not under repair, or  43
...................................... cents per cent. net under repair;  44
provided always that:  45
  46

(a)   a Total Loss of the Vessel has not occurred during the currency of this Policy;   47

(b)   in no case shall a return for lay-up be allowed when the Vessel is lying in exposed or unprotected waters or in any location not approved by   48
     the Underwriters;   49

(c)   in the event of any amendment of the annual rate, the above rates of return shall be adjusted accordingly;   50

(d)   in no case shall a return be allowed when the Vessel is used as a storage ship or for lighting purposes.   51

    If the Vessel is laid up for a period of 30 consecutive days, a part only of which attaches under this Policy, the Underwriters shall pay such pro-   52
portion of the return due in respect of a full period of 30 days as the number of days attaching hereto bears to 30. Should the lay-up period exceed 30   53
consecutive days, the Assured shall have the option to elect the period of 30 consecutive days for which a return is recoverable.   54

**NON-PAYMENT OF PREMIUM**

    In event of non-payment of premium 30 days after attachment, or of any additional premium when due, this Policy may be cancelled by the Under-   55
writers upon 10 days written or telegraphic notice sent to the Assured at his last known address or in care of the broker who negotiated this Policy.   56
Such proportion of the premium, however, as shall have been earned up to the time of cancellation shall be payable. In the event of Total Loss of the   57
Vessel occurring prior to any cancellation or termination of this Policy full annual premium shall be considered earned.   58

**ADVENTURE**

    Beginning the adventure upon the Vessel, as above, and so shall continue and endure during the period aforesaid, as employment may offer, in port or   59
at sea, in docks and graving docks, and on ways, gridirons and pontoons, at all times, in all places, and on all occasions, services and trades; with leave   60
to sail or navigate with or without pilots, to go on trial trips and to assist and tow vessels or craft in distress, but the Vessel may not be towed, except   61
as is customary or when in need of assistance, nor shall the Vessel render assistance or undertake towage or salvage services under contract previously   62
arranged by the Assured, the Owners, the Managers or the Charterers of the Vessel, nor shall the Vessel, in the course of trading operations, engage in   63
loading or discharging cargo at sea, from or into another vessel other than a barge, lighter or similar craft used principally in harbors or inland waters.   64
The phrase "engage in loading or discharging cargo at sea" shall include while approaching, leaving or alongside, or while another vessel is approaching,   65
leaving or alongside the Vessel.   66

    The Vessel is held covered in case of any breach of conditions as to cargo, trade, locality, towage or salvage activities, or date of sailing, or loading   67
or discharging cargo at sea, provided (a) notice is given to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b)   68
any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured.   69

**PERILS**

    Touching the Adventures and Perils which the Underwriters are contented to bear and take upon themselves, they are of the Seas, Men-of-War, Fire,   70
Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Re-   71
straints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all   72
other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof, excepting, how-   73
ever, such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by endorsement thereon.   74

**ADDITIONAL PERILS (INCHAMAREE)**

    Subject to the conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by the following:

        Accidents in loading, discharging or handling cargo, or in bunkering;   75

        Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;   76

        Explosions on shipboard or elsewhere;   77

        Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any   78
        latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);   79

        Breakdown of or accidents to nuclear installations or reactors not on board the insured Vessel;   80

        Contact with aircraft, rockets or similar missiles, or with any land conveyance;   81

        Negligence of Charterers and/or Repairers, provided such Charterers and/or Repairers are not an Assured hereunder;   82

        Negligence of Masters, Officers, Crew or Pilots;   83

provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them.   84
Masters, Officers, Crew or Pilots are not to be considered Owners within the meaning of this clause should they hold shares in the Vessel.   85
  86

**DELIBERATE DAMAGE (POLLUTION HAZARD)**

    Subject to the conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by governmental authorities   87
acting for the public welfare to prevent or mitigate a pollution hazard, or threat thereof, resulting directly from damage to the Vessel for which the   88
Underwriters are liable under this Policy, provided such act of governmental authorities has not resulted from want of due diligence by the Assured, the   89
Owners, or Managers of the Vessel or any of them to prevent or mitigate such hazard or threat. Masters, Officers, Crew or Pilots are not to be considered   90
Owners within the meaning of this clause should they hold shares in the Vessel.   91

**CLAIMS (GENERAL PROVISIONS)**

    In the event of any accident or occurrence which could give rise to a claim under this Policy, prompt notice thereof shall be given to the Under-   92
writers, and:   93

(a)   where practicable, the Underwriters shall be advised prior to survey, so that they may appoint their own surveyor, if they so desire;   94

(b)   the Underwriters shall be entitled to decide where the Vessel shall proceed for docking and/or repair (allowance to be made to the Assured for the   95
     actual additional expense of the voyage arising from compliance with the Underwriters' requirement);   96

(c)   the Underwriters shall have the right of veto in connection with any repair firm proposed;   97

(d)   the Underwriters may take tenders, or may require in writing that tenders be taken for the repair of the Vessel, in which event, upon acceptance   98
     of a tender with the approval of the Underwriters, an allowance shall be made at the rate of 30 per cent. per annum on the amount insured, for   99
     each day or pro rata for part of a day, for time lost between the issuance of invitations to tender and the acceptance of a tender, to the extent   100
     that such time is lost solely as the result of tenders having been taken and provided the tender is accepted without delay after receipt of the   101
     Underwriters' approval.   102

    Due credit shall be given against the allowances in (b) and (d) above for any amount recovered:   103

1.   in respect of fuel, stores, and wages and maintenance of the Master, Officers or Crew allowed in General or Particular Average;   104

2.   from third parties in respect of damages for detention and/or loss of profit and/or running expenses;   105

for the period covered by the allowances or any part thereof.   106

    No claim shall be allowed in Particular Average for wages and maintenance of the Master, Officers or Crew, except when incurred solely for the   107
necessary removal of the Vessel from one port to another for average repairs or for trial trips to test average repairs, in which cases wages and mainte-   108
nance will be allowed only while the Vessel is under way. This exclusion shall not apply to overtime or similar extraordinary payments to the Master,   109
Officers or Crew incurred in shifting the Vessel for tank cleaning or repairs or while specifically engaged in these activities, either in port or at sea.   110

    General and Particular Average shall be payable without deduction, new for old.   111

The expense of sighting the bottom after stranding shall be paid, if reasonably incurred especially for that purpose, even if no damage be found.    112

No claim in any case be allowed in respect of scraping or painting the Vessel's bottom.    113

In the event of loss or damage to equipment or apparatus not owned by the Assured but installed for use on board the Vessel and for which the    114
Assured has assumed contractually, claim shall not exceed (1) the amount the Underwriters would pay if the Assured were owner of such equipment or    115
apparatus, or (2) the contractual responsibility assumed by the Assured to the owners or lessors thereof, whichever shall be less.    116

No claim for unrepaired damages shall be allowed, except to the extent that the aggregate damage caused by perils insured against during the period    117
of the Policy and left unrepaired at the expiration of the Policy shall be demonstrated by the Assured to have diminished the actual market value of the    118
Vessel on that date if undamaged by such perils.    119

## GENERAL AVERAGE AND SALVAGE

General Average and Salvage shall be payable as provided in the contract of affreightment, or failing such provision or there be no contract of    120
affreightment, payable at the Assured's election either in accordance with York-Antwerp Rules 1950 or 1974 or with the Laws and Usages of the Port of    121
New York. Provided always that when an adjustment according to the laws and usages of the port of destination is properly demanded by the owners    122
of the cargo, General Average shall be paid accordingly.    123

In the event of salvage, towage or other assistance being rendered to the Vessel by any vessel belonging in part or in whole to the same Owners or    124
Charterers, the value of such services (without regard to the common ownership or control of the vessels) shall be ascertained by arbitration in the man-    125
ner provided for under the Collision Liability clause in this Policy, and the amount so awarded so far as applicable to the interest hereby insured shall    126
constitute a charge under this Policy.    127

When the contributory value of the Vessel is greater than the Agreed Value herein, the liability of the Underwriters for General Average contribution    128
(except in respect to amounts made good to the Vessel), or Salvage, shall not exceed that proportion of the total contribution due from the Vessel which    129
the amount insured hereunder bears to the contributory value, and if, because of damage for which the Underwriters are liable as Particular Average, the    130
value of the Vessel has been reduced for the purpose of contribution, the amount of such Particular Average damage recoverable under this Policy shall    131
first be deducted from the amount insured hereunder, and the Underwriters shall then be liable only for the proportion which such net amount bears    132
to the contributory value.    133

## TOTAL LOSS

In ascertaining whether the Vessel is a constructive Total Loss the Agreed Value shall be taken as the repaired value and nothing in respect of the    134
damaged or break-up value of the Vessel or wreck shall be taken into account.    135

There shall be no recovery for a constructive Total Loss hereunder unless the expense of recovering and repairing the Vessel would exceed the    136
Agreed Value. In making this determination, only expenses incurred or to be incurred by reason of a single accident or a sequence of damages arising    137
from the same accident shall be taken into account, but expenses incurred prior to tender of abandonment shall not be considered if such are to be    138
claimed separately under the Sue and Labor clause.    139

In the event of Total Loss (actual or constructive), no claim to be made by the Underwriters for freight, whether notice of abandonment has been    140
given or not.    141

In no case shall the Underwriters be liable for unrepaired damage in addition to a subsequent Total Loss sustained during the period covered by this    142
Policy.    143

## SUE AND LABOR

And in case of any Loss or Misfortune, it shall be lawful and necessary for the Assured, their Factors, Servants and Assigns, to sue, labor and travel    144
for, in and about the defense, safeguard and recovery of the Vessel, or any part thereof, without prejudice to this insurance, to the charges whereof    145
the Underwriters will contribute their proportion as provided below. And it is expressly declared and agreed that no acts of the Underwriters or Assured    146
in recovering, saving or preserving the Vessel shall be considered as a waiver or acceptance of abandonment.    147

In the event of expenditure under the Sue and Labor clause, the Underwriters shall pay the proportion of such expenses that the amount insured    148
hereunder bears to the Agreed Value, or that the amount insured hereunder (less loss and/or damage payable under this Policy) bears to the actual    149
value of the salved property, whichever proportion shall be less; provided always that their liability for such expenses shall not exceed their proportionate    150
part of the Agreed Value.    151

If claim for Total Loss is admitted under this Policy and sue and labor expenses have been reasonably incurred in excess of any proceeds realized    152
or value recovered, the amount payable under this Policy will be the proportion of such excess that the amount insured hereunder (without deduction    153
for loss or damage) bears to the Agreed Value or to the sound value of the Vessel at the time of the accident, whichever value was greater; provided    154
always that Underwriters' liability for such expenses shall not exceed their proportionate part of the Agreed Value. The foregoing shall also apply to    155
expenses reasonably incurred in salving or attempting to salve the Vessel and other property to the extent that such expenses shall be regarded as having    156
been incurred in respect of the Vessel.    157

## COLLISION LIABILITY

And it is further agreed that:    158

(a) if the Vessel shall come into collision with any other ship or vessel, and the Assured or the Surety in consequence of the Vessel being at fault    159
shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, the    160
Underwriters will pay the Assured or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as their respective sub-    161
scriptions hereto bear to the Agreed Value, provided always that their liability in respect to any one such collision shall not exceed their propor-    162
tionate part of the Agreed Value;    163

(b) in cases where, with the consent in writing of a majority (in amount) of Hull Underwriters, the liability of the Vessel has been contested, or pro-    164
ceedings have been taken to limit liability, the Underwriters will also pay a like proportion of the costs which the Assured shall thereby incur    165
or be compelled to pay.    166

When both vessels are to blame, then, unless the liability of the owners or charterers of one or both such vessels becomes limited by law, claims    167
under the Collision Liability clause shall be settled on the principle of Cross-Liabilities as if the owners or charterers of each vessel had been compelled    168
to pay to the owners or charterers of the other of such vessels such one-half or other proportion of the latter's damages as may have been properly allowed    169
in ascertaining the balance or sum payable by or to the Assured in consequence of such collision.    170

The principles involved in this clause shall apply to the case where both vessels are the property, in part or in whole, of the same owners or chart-    171
erers, all questions of responsibility and amount of liability as between the two vessels being left to the decision of a single Arbitrator, if the parties    172
can agree upon a single Arbitrator, or failing such agreement, to the decision of Arbitrators, one to be appointed by the Assured and one to be appointed    173
by the majority (in amount) of Hull Underwriters interested; the two Arbitrators chosen to choose a third Arbitrator before entering upon the reference,    174
and the decision of such single Arbitrator, or of any two of such three Arbitrators, appointed as above, to be final and binding.    175

Provided always that this clause shall in no case extend to any sum which the Assured or the Surety may become liable to pay or shall pay in cones-    176
quence of, or with respect to:    177

(a) removal or disposal of obstructions, wrecks or their cargoes under statutory powers or otherwise pursuant to law;    178

(b) injury to real or personal property of every description;    179

(c) the discharge, spillage, emission or leakage of oil, petroleum products, chemicals or other substances of any kind or description whatsoever;    180

(d) cargo or other property on or the engagements of the Vessel;    181

(e) loss of life, personal injury or illness.    182

Provided further that exclusions (b) and (c) above shall not apply to injury to other vessels or property thereon except to the extent that such injury    183
arises out of any action taken to avoid, minimize or remove any discharge, spillage, emission or leakage described in (c) above.    184

PILOTAGE AND TOWAGE

This insurance shall not be prejudiced by reason of any contract limiting in whole or in part the liability of pilots, tugs, towboats, or their owners when the Assured or the agent of the Assured accepts such contract in accordance with established local practice.

Where in accordance with such practice, pilotage or towage services are provided under contracts requiring the Assured or the agent of the Assured:

(a)    to assume liability for damage resulting from collision of the Vessel insured with any other ship or vessel, including the towing vessel, or

(b)    to indemnify those providing the pilotage or towage services against loss or liability for any such damages,

it is agreed that amounts paid by the Assured or Surety pursuant to such assumed obligations shall be deemed payments "by way of damages to any other person or persons" and to have been paid "in consequence of the Vessel being at fault" within the meaning of the Collision Liability clause in this Policy to the extent that such payments would have been covered if the Vessel had been legally responsible in the absence of any agreement. Provided always that in no event shall the aggregate amount of liability of the Underwriters under the Collision Liability clause, including this clause, be greater than the amount of any statutory limitation of liability to which owners are entitled or would be entitled if liability under any contractual obligation referred to in this clause were included among the liabilities subject to such statutory limitations.

CHANGE OF OWNERSHIP

In the event of any change, voluntary or otherwise, in the ownership or flag of the Vessel, or if the Vessel be placed under new management, or be chartered on a bareboat basis or requisitioned on that basis, or if the Classification Society of the Vessel or her class therein be changed, cancelled or withdrawn, then, unless the Underwriters agree thereto in writing, this Policy shall automatically terminate at the time of such change of ownership, flag, management, charter, requisition or classification; provided, however, that:

(a)    if the Vessel has cargo on board and has already sailed from her loading port, or is at sea in ballast, such automatic termination shall, if required, be deferred until arrival at final port of discharge if with cargo, or at port of destination if in ballast;

(b)    in the event of an involuntary temporary transfer by requisition or otherwise, without the prior execution of a written agreement by the Assured, such automatic termination shall occur fifteen days after such transfer.

This insurance shall not inure to the benefit of any transferee or charterer of the Vessel and, if a loss payable hereunder should occur between the time of change or transfer and any deferred automatic termination, the Underwriters shall be subrogated to all of the rights of the Assured against the transferee or charterer in respect of all or part of such loss as is recoverable from the transferee or charterer, and in the proportion which the amount insured hereunder bears to the Agreed Value.

The term "new management" as used above refers only to the transfer of the management of the Vessel from one firm or corporation to another, and it shall not apply to any internal changes within the offices of the Assured.

ADDITIONAL INSURANCES

It is a condition of this Policy that no additional insurance against the risk of Total Loss of the Vessel shall be effected to operate during the currency of this Policy by or for account of the Assured, Owners, Managers, Operators or Mortgagees except on the interests and up to the amounts enumerated in the following Sections (a) to (g), inclusive, and no such insurance shall be subject to P.P.I., F.I.A. or other like term on any interests whatever excepting those enumerated in Section (a); provided always and notwithstanding the limitation on recovery in the Assured clause a breach of this condition shall not afford the Underwriters any defense to a claim by a Mortgagee who has accepted this Policy without knowledge of such breach:

(a) DISBURSEMENTS, MANAGERS' COMMISSIONS, PROFITS OR EXCESS OR INCREASED VALUE OF HULL AND MACHINERY, AND/OR SIMILAR INTERESTS HOWEVER DESCRIBED, AND FREIGHT (INCLUDING CHARTERED FREIGHT OR ANTICIPATED FREIGHT) INSURED FOR TIME. An amount not exceeding in the aggregate 25% of the Agreed Value.

(b) FREIGHT OR HIRE, UNDER CONTRACTS FOR VOYAGE. An amount not exceeding the gross freight or hire for the current cargo passage and next succeeding cargo passage (such insurance to include, if required, a preliminary and an intermediate ballast passage) plus the charges of insurance. In the case of a voyage charter where payment is made on a time basis, the amount shall be calculated on the estimated duration of the voyage, subject to the limitation of two cargo passages as laid down herein. Any amount permitted under this Section shall be reduced, as the freight or hire is earned, by the gross amount so earned. Any freight or hire to be earned under the form of Charters described in (d) below shall not be permitted under this Section (b) if any part thereof is insured as permitted under said Section (d).

(c) ANTICIPATED FREIGHT IF THE VESSEL SAILS IN BALLAST AND NOT UNDER CHARTER. An amount not exceeding the anticipated gross freight on next cargo passage, such amount to be reasonably estimated on the basis of the current rate of freight at time of insurance, plus the charges of insurance. Provided, however, that no insurance shall be permitted by this Section if any insurance is effected as permitted under Section (b).

(d) TIME CHARTER HIRE OR CHARTER HIRE FOR SERIES OF VOYAGES. An amount not exceeding 50% of the gross hire which is to be earned under the charter in a period not exceeding 18 months. Any amount permitted under this Section shall be reduced as the hire is earned under the charter by 50% of the gross amount so earned but, where the charter is for a period exceeding 18 months, the amount insured need not be reduced while it does not exceed 50% of the gross hire still to be earned under the charter. An insurance permitted by this Section may begin on the signing of the charter.

(e) PREMIUMS. An amount not exceeding the actual premiums of all interest insured for a period not exceeding 12 months (excluding premiums insured as permitted under the foregoing Sections but including, if required, the premium or estimated calls on any Protection and Indemnity or War Risks and Strikes insurance) reducing pro rata monthly.

(f) RETURNS OF PREMIUM. An amount not exceeding the actual returns which are recoverable subject to "and arrival" or equivalent provision under any policy of insurance.

(g) INSURANCE IRRESPECTIVE OF AMOUNT AGAINST: Risks excluded by War, Strikes and Related Exclusions clause; risks enumerated in the American Institute War Risks and Strikes Clauses; and General Average and Salvage Disbursements.

WAR STRIKES AND RELATED EXCLUSIONS

The following conditions shall be paramount and shall supersede and nullify any contrary provisions of the Policy.

This Policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:

(a)    Capture, seizure, arrest, restraint or detainment, or any attempt thereat; or

(b)    Any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; or

(c)    Any mine, bomb or torpedo not carried as cargo on board the Vessel; or

(d)    Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter; or

(e)    Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy; or

(f)    Strikes, lockouts, political or labor disturbances, civil commotions, riots, martial law, military or usurped power; or

(g)    Malicious acts or vandalism, unless committed by the Master or Mariners and not excluded elsewhere under this War Strikes and Related Exclusions clause; or

(h)    Hostilities or warlike operations (whether there be a declaration of war or not) but this subparagraph (h) not to exclude collision or contact with aircraft, rockets or similar missiles, or with any fixed or floating object, or stranding, heavy weather, fire or explosion unless caused directly by a hostile act by or against a belligerent power which act is independent of the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other vessel involved therein, is performing. As used herein, "power" includes any authority maintaining, naval, military or air forces in association with a power.

If war risks or other risks excluded by this clause are hereafter insured by endorsement on this Policy, such endorsement shall supersede the above conditions only to the extent that the terms of such endorsement are inconsistent therewith and only while such endorsement remains in force.

**Exhibit "G"**

*American Institute*

**TUG FORM**
**(August 1, 1976)**

53R-1

To be attached to and form a part of Policy No. ......................................................................................................................................
of the ............................................................................................................................................................................................

The terms and conditions of the following clauses are to be regarded as substituted for those of the policy form to which they are attached, the latter being hereby waived, except provisions required by law to be inserted in the Policy. All captions are inserted only for purposes of reference, and shall not be used to interpret the clauses to which they apply.

**ASSURED**

This Policy insures ...................................................................................................................................................................   1
.......................................................................................................................... hereinafter referred to as the Assured.   2

If claim is made under this Policy by anyone other than the Owner of the Vessel, such person shall not be entitled to recover to a greater extent   3
than would the Owner, had claim been made by the Owner as an Assured named in this Policy.   4

Underwriters waive any right of subrogation against affiliated, subsidiary or interrelated companies of the Assured, provided that such waiver   5
shall not apply in the event of a collision between the Vessel and any vessel owned, demise chartered or otherwise controlled by any of the aforesaid   6
companies, or with respect to any loss, damage or expense against which such companies are insured.   7

**LOSS PAYEE**

Loss, if any, (excepting claims required to be paid to others under the Collision and Tower's Liability Clause), payable to ..........................   8
......................................................................................................................................................................................................   9
................................................................................................................................................................................ or order.   10

**VESSEL**

The Subject Matter of this insurance is the Vessel called the ......................................................................................................   11
or by whatsoever name or names the said Vessel is or shall be called, which for purposes of this insurance shall consist of and be limited to her hull,   12
launches, lifeboats, rafts, furniture, bunkers, stores, supplies, tackle, fittings, equipment, apparatus, machinery, boilers, refrigerating machinery, insulation,   13
motor generators and other electrical machinery.   14

In the event any equipment or apparatus not owned by the Assured is installed for use on board the Vessel and the Assured has assumed respon-   15
sibility therefor, it shall also be considered part of the Subject Matter and the aggregate value thereof shall be included in the Agreed Value.   16

In the event that more than one vessel is insured by this Policy, all of these clauses shall apply as though a separate policy had been issued   17
with respect to each vessel.   18

**TRADING WARRANTY**

Warranted that the Vessel shall be confined to ..........................................................................................................................   19
......................................................................................................................................................................................................   20

Any breach of the Trading Warranty specified in this Policy shall result in a suspension thereof, provided, however, that on the return of the   21
Vessel in a seaworthy condition to within the limit stated in the said Trading Warranty this Policy shall re-attach and continue in full force and effect   22
but in no event beyond the normal expiry thereof.   23

**DURATION OF RISK**

From the .................................................... day of .................................... 19.........., ........................................................ time   24
to the ...................................................... day of .................................... 19.........., ...................................................... time.   25

Should the Vessel at the expiration of this Policy be at sea, or in distress, or at a port of refuge or of call, she shall, provided previous notice   26
be given to the Underwriter, be held covered at a pro rata monthly premium to her port of destination.   27

In the event of payment by the Underwriters for Total Loss of the Vessel this Policy shall thereupon automatically terminate.   28

**AGREED VALUE**

The Vessel, for so much as concerns the Assured, by agreement between the Assured and Underwriters in this Policy, is and shall be valued at   29
......................................................................................................................................................................... Dollars.   30

**AMOUNT INSURED HEREUNDER**

......................................................................................................................................................................... Dollars.   31

**PREMIUM**

The Underwriters to be paid in consideration of this insurance ....................................................................................................   32
........................................................... Dollars being at the rate of ........................................................ per cent.,   33
which premium shall be due on attachment.   34

**DEDUCTIBLE**

Notwithstanding anything in this Policy to the contrary, there shall be deducted from the aggregate of all claims (including claims under the Sue   35
and Labor Clause and claims under the Collision and Tower's Liability Clause) arising out of each separate accident, the sum of $ ...............   36
..........................................................., unless the accident results in a Total Loss of the Vessel in which case this clause shall not apply to the claim   37
for the Total Loss of the Vessel and to claims under the Sue and Labor clause. A recovery from other interests, however, shall not operate to exclude   38
claims under this Policy provided the aggregate of such claims arising out of one separate accident if unreduced by such recovery exceeds that sum.   39
For the purpose of this clause each accident shall be treated separately, but it is agreed that (a) a sequence of damages arising from the same accident   40
shall be treated as due to that accident and (b) all heavy weather damage which occurs during a single sea passage between two successive ports   41
shall be treated as though due to one accident.   42

**RETURNS OF PREMIUM**

Premium returnable as follows:   43
pro rata daily in the event of termination under the Change of Ownership clause;   44
pro rata daily if this Policy be cancelled by the Underwriters;   45
short rate will be charged if this Policy be cancelled by the Assured;   46
............................ cents per cent., for each period of 30 consecutive days the Vessel may be laid up in port not under repair;   47

provided always that: 48
    (a)  from all return premiums the same percentage of deduction (if any) shall be made as was allowed by the Underwriters on receipt of the original 49
         premium; 50
    (b)  a Total Loss of the Vessel has not occurred during the currency of this Policy; 51
    (c)  in no case shall a return for lay-up be allowed when the Vessel is lying in exposed or unprotected waters or in any location not approved by 52
         the Underwriters; 53
    (d)  in the event of any amendment of the annual rate, the above rates of return shall be adjusted accordingly. 54

If the Vessel is laid up for a period of 30 consecutive days, a part only of which attaches under this Policy, the Underwriters shall pay such 55
proportion of the return due in respect of a full period of 30 days as the number of days attaching hereto bears to 30. Should the lay-up period exceed 56
30 consecutive days, the Assured shall have the option to elect the period of 30 consecutive days for which a return is recoverable. 57

## CANCELLATION

This Policy may be cancelled either by the Underwriters or by the Assured giving 15 days' written or telegraphic notice to the other. Underwriters' 58
notice may be sent to the Assureds last known address or in care of the Broker who negotiated this Policy. In the event of Total Loss of the Vessel 59
occurring prior to any cancellation or termination of this Policy, full annual premium shall be considered earned. 60

## ADVENTURE

Beginning the adventure upon the Vessel, as above, and so shall continue and endure during the period aforesaid, subject to all the terms, conditions 61
and warranties of this Policy, as employment may offer, in port or at sea, in docks and graving docks, and on ways, gridirons and pontoons, at all times, 62
in all places, and on all occasions. 63

## PERILS

Touching the Adventures and Perils which the Underwriters are contented to bear and take upon themselves, they are of the Waters named herein, 64
Fire, Lightning, Earthquake, Assailing Thieves, Jettisons, Barratry of the Master and Mariners and all other like Perils that shall come to the Hurt, De- 65
triment or Damage of the Vessel. 66

## ADDITIONAL PERILS (INCHMAREE)

Subject to the conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by the following: 67
    Accidents in loading, discharging or handling cargo, or in bunkering; 68
    Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons; 69
    Explosions on shipboard or elsewhere; 70
    Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any 71
    latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part); 72
    Breakdown of or accidents to nuclear installations or reactors not on board the insured Vessel; 73
    Contact with aircraft, rockets or similar missiles, or with any land conveyance; 74
    Negligence of Charterers and/or Repairers, provided such Charterers and/or Repairers are not an Assured hereunder; 75
    Negligence of Masters, Officers, Crew or Pilots; 76
provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. 77

## COLLISION AND TOWER'S LIABILITY

And it is further agreed that: *or contract* 78
    (a)  if the Vessel hereby insured shall come into collision with any other vessel, craft or structure, floating or otherwise (including her tow); or shall 79
        strand her tow or shall cause her tow to come into collision with any other vessel, craft or structure, floating or otherwise, or shall cause any 80
        other loss or damage to her tow or to the freight thereof or to the property on board, and the Assured, or the Surety, in consequence of the 81
        insured Vessel being at fault, shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums, 82
        we, the Underwriters, will pay the Assured or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as our 83
        subscriptions hereto bear to the value of the Vessel hereby insured, provided always that our liability in respect of any one such casualty shall not 84
        exceed our proportionate part of the value of the Vessel hereby insured; 85
    (b)  in cases where the liability of the Vessel has been contested or proceedings have been taken to limit liability with the consent in writing, of a 86
        majority (in amount) of the Underwriters on the hull and machinery, we will also pay a like proportion of the costs which the Assured shall 87
        thereby incur or be compeled to pay. 88

When both vessels are to blame, then, unless the liability of the Owners of one or both of such vessels becomes limited by law, claims under 89
the Collision and Tower's Liability clause shall be settled on the principle of Cross-Liabilities, as if the Owners of each vessel had been compelled to pay 90
to the Owners of the other of such vessels such one-half or other proportion of the latter's damages as may have been properly allowed in ascertaining 91
the balance or sum payable by or to the Assured in consequence of such casualty. 92

It is hereby further agreed that the principles involved in this clause shall apply to the case where two or more of the vessels involved are the 93
property, in part or in whole, of the same Assured, all questions of responsibility and amount of liability as between such Vessels being left to the 94
decision of a single Arbitrator, if the parties can agree upon a single Arbitrator, or failing such agreement, to the decision of Arbitrators, one to be 95
appointed by the Assured and one to be appointed by a majority (in amount) of the Underwriters on hull and machinery; the two Arbitrators so chosen 96
to choose a third Arbitrator before entering upon the reference, and the decision of such single Arbitrator, or of any two of such three Arbitrators, 97
appointed as above, to be final and binding. 98

Provided always that this Collision and Tower's Liability clause shall in no case extend to any sum which the Assured or the Surety may become 99
liable to pay, or shall pay: 100
    I.  for loss, damage or expense to vessel(s) in tow owned (other than vessel(s) bareboat chartered to others), bareboat chartered, managed or operated 101
      by the Assured and/or its affiliated and/or subsidiary companies and/or corporations, and to cargo, owned by the Assured and/or its affiliated and/or sub- 102
      sidiary companies and/or corporations, on board vessel(s) in tow of the Vessel hereby insured; or 103
    II.  in consequence of, with respect to, or arising out of: 104
        (a)  removal or disposal of obstructions, wrecks or their cargoes under statutory powers or otherwise pursuant to law; 105
        (b)  cargo, baggage or engagements of the insured Vessel 106
        (c)  loss of life, personal injury or illness; 107
        (d)  the discharge, spillage, emission or leakage of oil, petroleum products, chemicals or other substances of any kind or description whatsoever. 108

Provided, further that Exclusion II(d) shall not apply to actual physical loss of or damage to such substances (if liability therefore is otherwise 109
covered under the attached Policy) except to the extent that such loss or damage arises out of any action taken to avoid, minimize or remove any dis- 110
charge, spillage, emission or leakage described in Exclusion II(d). 111

GENERAL AVERAGE

General Average and Salvage shall be payable in accordance with the laws and usages of the port of New York, but excluding wages, provisions, fuel and engine stores during detention however caused.

And it is further agreed that in the event of salvage, towage or other assistance being rendered to the Vessel hereby insured by any vessel belonging in part or in whole to the same owners or charterers, the value of such services (without regard to the common ownership or control of the vessels) shall be ascertained by arbitration in the manner above provided for under the Collision and Tower's Liability clause, and the amount so awarded so far as applicable to the interest hereby insured shall constitute a charge under this Policy.

When the contributory value of the Vessel is greater than the Agreed Value herein, the liability of the Underwriters for General Average contribution (except in respect to amounts made good to the Vessel, or Salvage, shall not exceed that proportion of the total contribution due from the Vessel which the amount insured hereunder bears to the contributory value; and if, because of damage for which the Underwriters are liable as Particular Average, the value of the Vessel has been reduced for the purpose of contribution, the amount of such Particular Average damage recoverable under this Policy shall first be deducted from the amount insured hereunder, and the Underwriters shall then be liable only for the proportion which such net amount bears to the contributory value.

SUE AND LABOR

And in case of any loss or Misfortune, it shall be lawful and necessary for the Assured, their Factors, Servants and Assigns, to sue, labor and travel for, in, and about the defense, safeguard and recovery of the Vessel, or any part thereof, without prejudice to this insurance, to the charges whereof the Underwriters will contribute their proportion as provided below. And it is expressly declared and agreed that no acts of the Underwriters or Assured in recovering, saving or preserving the Vessel shall be considered as a waiver or acceptance of abandonment.

In the event of expenditure under the Sue and Labor clause, the Underwriters shall pay the proportion of such expenses that the amount insured hereunder bears to the Agreed Value, or that the amount insured hereunder (less loss and/or damage payable under this Policy) bears to the actual value of the salved property, whichever proportion shall be less; provided always that their liability for such expenses shall not exceed their proportionate part of the Agreed Value.

If claim for Total Loss is admitted under this Policy and sue and labor expenses have been reasonably incurred in excess of any proceeds realized or value recovered, the amount payable under this Policy will be the proportion of such excess that the amount insured hereunder (without deduction for loss or damage) bears to the Agreed Value or to the sound value of the Vessel at the time of the accident, whichever value was greater; provided always that Underwriters' liability for such expenses shall not exceed their proportionate part of the Agreed Value. The foregoing shall also apply to expenses reasonably incurred in salving or attempting to salve the Vessel and other property to the extent that such expenses shall be regarded as having been incurred in respect of the Vessel.

SEAWORTHINESS

The Underwriters shall not be liable for any loss, damage or expense arising out of the failure of the Assured to exercise due diligence to maintain the Vessel in a seaworthy condition after attachment of this Policy; the foregoing, however, not to be deemed a waiver of any warranty of seaworthiness implied at law.

WATCHMAN

It is agreed that when this Vessel is tied up or moored, it shall be at all times in charge of a watchman in the employ of the Assured, whose duty it shall be to make careful examination of the Vessel throughout at reasonable intervals, including inspection of the bilges.

CHANGE OF OWNERSHIP

In the event of any change, voluntary or otherwise, in the ownership or flag of the Vessel, or if the Vessel be placed under new management, or be chartered on a bareboat basis or requisitioned on that basis, or if the Classification Society of the Vessel or her class therein be changed, cancelled or withdrawn, then, unless the Underwriters agree thereto in writing, this Policy shall automatically terminate at the time of such change of ownership, flag, management, charter, requisition or classification; provided, however, that in the event of an involuntary temporary transfer by requisition or otherwise, without the prior execution of a written agreement by the Assured, such automatic termination shall occur fifteen days after such transfer. This insurance shall not inure to the benefit of any transferee or charterer of the Vessel and, if a loss payable hereunder should occur between the time of change or transfer and any deferred automatic termination, the Underwriters shall be subrogated to all of the rights of the Assured against the transferee or charterer in respect of all or part of such loss as is recoverable from the transferee or charterer, and in the proportion which the amount insured hereunder bears to the Agreed Value.

The term "new management" as used above refers only to the transfer of the management of the Vessel from one firm or corporation to another, and it shall not apply to any internal changes within the offices of the Assured.

ADDITIONAL SERVICES

It is a condition of this Policy that there shall be no other insurance against physical loss of or damage to the Vessel for or on account of the Assured except that the Assured may, without prejudice to this insurance, insure:

(a) War, Strikes and related risks not covered by this Policy;

(b) Risks identical to those covered by this Policy for the difference in amount, if any, between the "AMOUNT INSURED HEREUNDER" and the "AGREED VALUE";

provided that any breach of the above condition shall not afford the Underwriters any defense to a claim by a mortgagee who has accepted this Policy without knowledge of such breach.

CLAIMS (GENERAL PROVISIONS)

In the event of any accident or occurrence which could give rise to a claim under this Policy, prompt notice thereof shall be given to the Underwriters, and:

(a) where practicable, the Underwriters shall be advised prior to survey, so that they may appoint their own surveyor, if they so desire;

(b) the Underwriters shall be entitled to decide where the Vessel shall proceed for docking and/or repair (allowance to be made to the Assured for the actual additional expense of the voyage arising from compliance with the Underwriters' requirement);

(c) the Underwriters shall have the right of veto in connection with any repair firm proposed;

(d) the Underwriters may take tenders or may require tenders to be taken for the repair of the Vessel, in which event, upon acceptance of a tender with the approval of the Underwriters, an allowance shall be made at the rate of 30 per cent., per annum on the amount insured, for each day or pro rata for part of a day, for time lost between the issuance of invitations to tender and the acceptance of a tender, to the extent that such time is lost solely as the result of tenders having been taken and provided the tender is accepted without delay after receipt of the Underwriters' approval.

Due credit shall be given against the allowances in (b) and (d) above for any amount recovered:

(1) in respect of fuel, stores, and wages and maintenance of the Master, Officers and Crew members allowed in General or Particular Average;

(2) from third parties in respect of damages for detention and/or loss of profit and/or running expenses; for the period covered by the allowances or any parts thereof.

No claim shall be allowed in Particular Average for wages and maintenance of the Master, Officers and Crew, except when incurred solely for the necessary removal of the Vessel from one port to another for average repairs or for trial trips to test average repairs, in which cases wages and maintenance will be allowed only while the vessel is under way.

General and Particular Average shall be payable without deduction, new for old.

The expense of sighting the bottom after stranding shall be paid, if reasonably incurred especially for that purpose, even if no damage be found.

No claim shall in any case be allowed in respect of scraping or painting the Vessel's bottom.

In the event of loss or damage to equipment or apparatus not owned by the Assured but installed for use on board the Vessel and for which the 182
Assured has assumed responsibility, claim shall not exceed (1) the amount the Underwriters would pay if the Assured were owner of such equipment or 183
apparatus, or (2) the contractual responsibility assumed by the Assured to the owners or lessors thereof, whichever shall be less. 184

No claim for unrepaired damage shall be allowed, except to the extent that the aggregate damage caused by perils insured against during the period 185
of this Policy and left unrepaired at the expiration thereof shall be demonstrated by the Assured to have diminished the actual market value of the 186
Vessel on that date if undamaged by such perils. 187

## TOTAL LOSS

There shall be no recovery for a constructive Total Loss hereunder unless the expense of recovering and repairing the Vessel would exceed the Agreed 188
Value. In making this determination, only expenses incurred or to be incurred by reason of a single accident or a sequence of damages arising from the 189
same accident shall be taken into account, but expenses incurred prior to tender of abandonment shall not be considered if such are to be claimed separately 190
under the Sue and Labor clause. 191

In ascertaining whether the Vessel is a constructive Total Loss the Agreed Value shall be taken as the repaired value and nothing in respect of 192
the damaged or break-up value of the Vessel or wreck shall be taken into account. 193

In the event of Total Loss (actual or constructive), no claim to be made by the Underwriters for freight, whether notice of abandonment has been 194
given or not. 195

In no case shall the Underwriters be liable for unrepaired damage in addition to a subsequent Total Loss sustained during the period covered by this 196
Policy. 197

## SUBROGATION

Upon making any payment under this Policy the Underwriters shall be vested with all of the Assured's rights of recovery against any person, 198
corporation, vessel or interest, and the Assured shall execute and deliver such instruments and papers as the Underwriters shall require and do whatever 199
else is necessary to secure such rights at the time of payment or subsequent thereto. At the option of the Underwriters, such payment may be made 200
by means of a loan receipt repayable only out of any recovery made by the Underwriters as aforesaid. Such loan receipt shall be in the customary form 201
permitting Underwriters to bring suit in the name of the Assured or the Underwriters at the latters' own cost and expense. 202

Any agreement, contract or act, past or future, express or implied, by the Assured whereby any right of recovery of the Assured against any person, 203
corporation, vessel or interest is released, decreased, transferred or lost which would, on payment of claim by the Underwriters, belong to the Underwriters 204
but for such agreement, contract or act shall render this Policy null and void as to the amount of any such claim, but only to the extent and to the 205
amount that said agreement, contract or act releases, decreases, transfers, or causes the loss of any right or recovery of the Underwriters, but the Under- 206
writers' right to retain or recover the full premium shall not be affected. 207

## LITIGATION AND DEFENSE

The Underwriters shall have the option of naming the attorneys who shall represent the Assured in the prosecution or defense of any litigation 208
or negotiations between the Assured and third parties concerning any claim, loss or interest covered by this Policy, and the Underwriters shall have the 209
direction of such litigation or negotiations. If the Assured shall fail or refuse to settle any claim as authorized by the Underwriters, the liability of the 210
Underwriters to the Assured shall be limited to the amount for which settlement could have been made. 211

No suit, action or proceedings brought by the Assured against the Underwriters for the recovery of any claim under this Policy shall be sustainable 212
in any court of law or equity unless the same be commenced within twelve (12) months after the Underwriters have denied liability for payment of claim; 213
except that in the case of a claim arising under the Collision and Tower's Liability clause, no suit or action shall be sustainable unless brought within 214
twelve (12) months next after the Assured shall have discharged his liability. Provided, however, that if by the laws of the State within which this Policy 215
is issued such limitation is invalid, then any such claim shall be void unless such action, suit or proceeding be commenced within the shortest limit of 216
time permitted by the laws of such State. 217

## WAR, STRIKES AND RELATED EXCLUSIONS

The following conditions shall be paramount and shall supersede and nullify any contrary provisions of the Policy. 218

This Policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of: 219

(a)  Capture, seizure, arrest, restraint or detainment, or any attempt thereat; or 220

(b)  Any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; or 221

(c)  Any mine, bomb or torpedo not carried as cargo on board the Vessel; or 222

(d)  Any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force or matter; or 223

(e)  Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy; or 224

(f)  Strikes, lockouts, political or labor disturbances, civil commotions, riots, martial law, military or usurped power, malicious acts or vandalism; or 225

(g)  Hostilities or warlike operations (whether there be a declaration of war or not) but this subparagraph (g) not to exclude collision or contact with 226
aircraft, rockets or similar missiles, or with any fixed or floating object, or stranding, heavy weather, fire or explosion unless caused directly 227
by a hostile act by or against a belligerent power which act is independent of the nature of the voyage or service which the Vessel concerned 228
or, in the case of a collision, any other vessel involved therein, is performing. As used herein, "power" includes any authority maintaining naval, 229
military or air forces in association with a power. 230

If war risks or other risks excluded by this clause are hereafter insured by endorsement on this Policy, such endorsement shall supersede the 231
above conditions only to the extent that the terms of such endorsement are inconsistent therewith and only while such endorsement remains in force. 232

# rob

http://www.aimu.org/aimuforms/7.pdf
04-19-05  09:24



Exhibit "H"

Construction Contract No. 02-12
April 12, 2002
Iroquois Gas Transmission System, L.P.
by its agent
Iroquois Pipeline Operating Company
and
Horizon Offshore Contractors, Inc.

Marine Pipeline Crossing
Eastchester Extension Project

VOLUME I



IRO/AE 00001



EXHIBIT
12
8/3/05 WH

IROQ 0013031

CONFIDENTIAL

Construction Contract No. 02-12
April 12, 2002
Iroquois Gas Transmission System, L.P.
by its agent
Iroquois Pipeline Operating Company
and
Horizon Offshore Contractors, Inc.

Marine Pipeline Crossing
Eastchester Extension Project

VOLUME I

**IRO/AE 00002**

IROQ 0013032

**CONFIDENTIAL**

*Contracts*

IRO/AE 00003

IROQ 0013033

CONFIDENTIAL

# CONSTRUCTION CONTRACT
## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | **THE WORK** | 1 |
| 1.1 | The Work | 1 |
| 1.2 | The Contract | 1 |
| 1.3 | Start and Completion Dates | 3 |
| 1.4 | Executed Contract, Insurance and Bonds | 3 |
| 1.5 | Definitions | 3 |
| | 1.5.1 Change Order | 3 |
| | 1.5.2 Chief Engineer | 3 |
| | 1.5.3 Company | 3 |
| | 1.5.4 Company Representative | 3 |
| | 1.5.5 Contract | 3 |
| | 1.5.6 Contractor | 3 |
| | 1.5.7 Contract Price | 3 |
| | 1.5.8 Defective Work | 3 |
| | 1.5.9 Environment | 3 |
| | 1.5.10 Equipment | 3 |
| | 1.5.11 Field Manager | 3 |
| | 1.5.12 Final Completion | 3 |
| | 1.5.13 Force Majeure | 3 |
| | 1.5.14 Subcontractor | 3 |
| | 1.5.15 Substantial Completion | 3 |
| | 1.5.16 Warranty Period | 3 |
| | 1.5.17 Work | 3 |
| | 1.5.18 Work Authorization | 4 |
| | 1.5.19 Work Site | 4 |
| 1.6 | Work Site Use | 4 |
| 1.7 | Inspection | 4 |
| 1.8 | Defective Work | 4 |
| 1.9 | Other Contractors | 4 |
| 1.10 | Notification and Consultation | 4 |
| | | |
| 2 | **COMPENSATION** | 4 |
| 2.1 | Contract Price | 4 |
| 2.2 | Taxes, Fees and Charges | 4 |
| 2.3 | Billings | 5 |
| | 2.3.1 Billing, Payment and Retainage | 5 |
| | 2.3.2 Billing Requirements | 5 |
| 2.4 | Payment Withholding | 5 |
| 2.5 | Release of Retainage | 5 |
| 2.6 | Payment for Materials | 5 |
| 2.7 | Payments Not Acceptance of Work | 5 |
| | | |
| 3 | **CHANGES TO THE CONTRACT** | 5 |
| 3.1 | Change Orders | 5 |
| 3.2 | No Contractor Changes | 5 |
| 3.3 | Company Changes | 6 |
| 3.4 | Contractor's Duties for Changes | 6 |
| 3.5 | Change Order Compensation | 6 |
| 3.6 | Support Documents and Audits | 6 |
| 3.7 | Work Authorizations; Disputed Work | 6 |
| | 3.7.1 Undisputed Work | 6 |
| | 3.7.2 Disputed Work | 6 |
| | | |
| 4 | **DELAYS AND SHUTDOWNS** | 7 |
| 4.1 | Diligent Performance of the Work | 7 |

**IRO/AE 00004**

IROQ 0013034

**CONFIDENTIAL**

|       |       |                                                          |     |
|-------|-------|----------------------------------------------------------|-----|
| 4.2   |       | Weather Delays.                                           | 7   |
| 4.3   |       | Company Caused Delay or Shutdown.                        | 7   |
|       | 4.3.1 | Company Caused Delay.                                     | 7   |
|       | 4.3.2 | Company Directed Shutdown.                                | 7   |
|       | 4.3.3 | Notice of Affected Crews.                                 | 7   |
|       | 4.3.4 | Remedy.                                                   | 7   |
| 4.4   |       | Shutdown for Unsafe Conditions.                          | 7   |
| 4.5   |       | Shutdown for Environmental Disturbance.                  | 7   |
| **5** | **FORCE MAJEURE** |                                              | **7** |
| 5.1   |       | Definition.                                              | 7   |
| 5.2   |       | Notice.                                                  | 8   |
| 5.3   |       | Remedies.                                                | 8   |
| **6** | **TERMINATION FOR CAUSE** |                                      | **8** |
| 6.1   |       | Termination for Contractor's Insolvency, etc.           | 8   |
| 6.2   |       | Contractor's Default.                                    | 8   |
| 6.3   |       | Contractor's Failure to Remedy Default.                 | 8   |
| 6.4   |       | Company's Rights.                                        | 8   |
| 6.5   |       | Termination of Contractor's Rights.                     | 9   |
| 6.6   |       | Cost of Completing Work.                                 | 9   |
| 6.7   |       | General Obligations.                                     | 9   |
| **7** | **TERMINATION FOR CONVENIENCE** |                                | **9** |
| 7.1   |       | Termination at Company's Option.                        | 9   |
| 7.2   |       | Remedies for Such Termination.                          | 9   |
| **8** | **SAFETY** |                                                     | **10** |
| 8.1   |       | Safety.                                                  | 10  |
| 8.2   |       | Safety Meetings and Equipment.                          | 10  |
| 8.3   |       | First Aid Facilities.                                    | 10  |
| 8.4   |       | Emergencies.                                             | 10  |
| **9** | **ENVIRONMENTAL PROTECTION** |                                   | **10** |
| 9.1   |       | Environmental Conditions.                               | 10  |
| 9.2   |       | Definition of "Environment".                            | 10  |
| 9.3   |       | Contractor Compliance.                                   | 10  |
| 9.4   |       | Contractor Default.                                      | 10  |
| 9.5   |       | Notice of Environmental Disturbance.                    | 10  |
| 9.6   |       | Pollution Control.                                       | 10  |
| **10** | **SUBCONTRACTORS** |                                            | **11** |
| 10.1  |       | Prior Company Approval.                                  | 11  |
| 10.2  |       | Rejection of Subcontracts.                              | 11  |
| 10.3  |       | Subcontract Assignment to Company.                     | 11  |
| 10.4  |       | Contractor's Responsibility.                            | 11  |
| **11** | **INDEMNIFICATIONS** |                                          | **11** |
| 11.1  |       | General Indemnity.                                       | 11  |
| 11.2  |       | Consequential Damages.                                   | 12  |
| 11.3  |       | Settlement of Claims.                                    | 12  |
| 11.4  |       | Patent Indemnity.                                        | 12  |
| 11.5  |       | Law Compliance Indemnity.                               | 12  |
| 11.6  |       | Tax Indemnity (including Social Security).              | 13  |
| 11.7  |       | Lien Indemnity.                                          | 13  |
| **12** | **INSURANCE AND BONDING** |                                     | **13** |

IRO/AE 00005

IROQ 0013035

CONFIDENTIAL

| | 12.1 | Insurance | 13 |
| | 12.2 | Bonding | 13 |
| | | | |
| 13 | | WARRANTIES | 13 |
| | 13.1 | General Warranty | 13 |
| | 13.2 | Remedial Work | 13 |
| | 13.3 | Extended Warranties | 14 |
| | 13.4 | Limitation of Warranties | 14 |
| | 13.5 | Completion Guarantee; Liquidated Damages | 14 |
| | | | |
| 14 | | OTHER CONTRACTOR OBLIGATIONS | 14 |
| | 14.1 | Competent Supervision | 14 |
| | 14.2 | Qualified Workers | 14 |
| | 14.3 | Responsibility for Work, Security and Property | 14 |
| | | 14.3.1 Risk of Loss | 14 |
| | | 14.3.2 Security | 14 |
| | | 14.3.3 Title to Work | 14 |
| | | 14.3.4 People and Property | 14 |
| | 14.4 | Non-Discrimination | 15 |
| | 14.5 | Protection of Third Party Property | 15 |
| | | 14.5.1 Landowners and Tenants | 15 |
| | | 14.5.2 Other Facilities | 15 |
| | 14.6 | Reports | 15 |
| | 14.7 | Records | 15 |
| | 14.8 | Title to Drawings | 15 |
| | | | |
| 15 | | CONTRACTOR'S REPRESENTATIONS | 15 |
| | 15.1 | Contractor's Good Standing | 15 |
| | 15.2 | Independent Contractor | 15 |
| | 15.3 | Authority to do Business | 15 |
| | 15.4 | No Violation of Law; Litigation | 15 |
| | 15.5 | Contractor Acknowledgments | 15 |
| | 15.6 | Contractor Covenants | 16 |
| | | | |
| 16 | | MISCELLANEOUS | 16 |
| | 16.1 | Entire Agreement | 16 |
| | 16.2 | No Waiver | 16 |
| | 16.3 | Severability | 16 |
| | 16.4 | Applicable Law and Venue | 16 |
| | 16.5 | Assignability | 16 |
| | 16.6 | Accommodation of Company's Financing | 16 |
| | 16.7 | Non-Recourse Obligations | 17 |
| | 16.8 | Notices | 17 |
| | | 16.8.1 Company Address | 17 |
| | | 16.8.2 Contractor Address | 17 |
| | | 16.8.3 Delivery | 17 |
| | 16.9 | Conflicts | 17 |
| | 16.10 | Captions | 17 |
| | 16.11 | Time of the Essence | 17 |
| | 16.12 | Amendment | 17 |
| | 16.13 | Costs of Enforcement | 18 |

IRO/AE 00006

IROQ 0013036

CONFIDENTIAL

CONSTRUCTION CONTRACT NO. 02-12

THIS CONSTRUCTION CONTRACT made as of the 12th day of April, 2002

BETWEEN:

**Iroquois Gas Transmission System, L.P.,**
a Delaware limited partnership
by its agent
**Iroquois Pipeline Operating Company**
a Delaware corporation
**(the "Company")**

- and -

**Horizon Offshore Contractors, Inc.**
Incorporated under the laws of the State of Delaware
**(the "Contractor")**

WITNESSES as follows:

**1    THE WORK**

1.1    **The Work.** The Contractor shall provide all necessary labor, equipment, supervision to perform and shall perform the work of constructing a 24-inch diameter gas pipeline and appurtenant facilities to cross Long Island Sound between Northport, Long Island and Hunts Point (the Bronx) and as more particularly set out in Exhibit "A", Project Description.

1.2    **The Contract.** The Contractor shall perform the Work in accordance with the terms and conditions contained herein and in the following exhibits attached hereto and made part hereof:

<u>Volume I</u>

Contract

| | | |
|---|---|---|
| Exhibit "A" | - | Project Description |
| | - | Contractor Letter dated 4/8/02 |
| | - | Contractor Letter dated 4/6/02 |
| | - | Contractor Letter dated 4/5/02 |
| | - | Contractor Letter dated 4/1/02 |
| | - | Company Letter dated 3/28/02 |
| | - | Contractor Letter dated 3/22/02 |
| | - | Contractor E-mail dated 3/16/02 |
| | - | Contractor Letter dated 3/14/02 |
| | - | Technical & Commercial Clarifications, Rev. 2, dated 3/12/02 |
| | - | Company Letter dated 2/20/02 |
| | - | Contractor Letter dated 10/30/01 |
| | - | Contractor Letter dated 6/22/01 |
| | - | Company Inquiry dated 6/21/01 |
| | - | Contractor Letter dated 6/18/01 |
| Exhibit "B" | - | Target Price Contract |
| | - | Detailed Cost Estimates |
| | - | Schedule of Rates |
| | - | List of Equipment and Manpower |
| | - | List of Subcontractors |

**IRO/AE 00007**

**IROQ 0013037**

**CONFIDENTIAL**

|  | - | Work Schedule |
|  | - | Contractor Project Billing Schedule dated 4/12/02 |
|  | - | Contractor Letter dated 4/1/02 |
|  | - | Contractor Proposal , dated 3/12/02, Vol. I |
|  | - | International Union of Operating Engineers Union Letter dated 2/15/02 |
| Exhibit "C" | - | Forms of Affidavit & Release Upon Substantial Completion |
| Exhibit "D" | - | Forms of Affidavit & Release Upon Final Completion |
| Exhibit "E" | - | Form of Change Order |
| Exhibit "F" | - | Form of Work Authorization |
| Exhibit "G" | - | Insurance |

| Volume II – Exhibit "A" | - | Specifications & Appendices |
|  | - | Appendix I – Contractor Documentation Requirements |
|  | - | Appendix II - Not Used |
|  | - | Appendix III – Project Specifications |
|  | - | Appendix IV – Project Drawings |
|  | - | Appendix V – Additional Project Data |

Reference Documents:

- Project Addendum No. 1 issued 5/29/01
- Project Addendum No. 2 issued 6/13/01
- Project Addendum No. 3 issued 6/18/01
- Project Addendum No. 4 issued 6/18/01
- Project Addendum No. 5 issued 7/2/01
- Project Addendum No. 6 issued 7/10/01
- Project Addendum No. 7 issued 7/13/01
- Project Addendum No. 8 issued 7/18/01
- Project Addendum No. 9 issued 8/17/01
- Project Addendum No. 10 issued 8/30/01
- Project Addendum No. 11 issued 9/5/01
- Project Addendum No. 12 issued 2/28/02
- Instructions to Bidders
- Contractor Revised Bid 3/12/02, Vol. I
- Contractor Revised Bid 3/12/02, Vol. II-Trenching
- Contractor Revised Technical Proposal, Vol. III a
  Contractor Letter dated 11/13/01
- Contractor Operations HSE Plan, Vol. IIIb
- Contractor Revised Bid 8/24/01, Vol. 1A  Supplemental
- Contractor Bid 8/1/01, Vol. I – Commercial
- Contractor Bid  Vol. II Construction Procedures
- Company Letter  dated 3/26/02 re: Permit, Specification & Information
- Company Addendum – East River/Hunts Point dated 3/22/02
- Company Letter dated 2/28/02 re Insurance & Bonding

Under Separate Cover:
Drawings – As per Section 3.3.1, Exhibit "A",  Construction Drawings
Iroquois Environmental Procedure Manual
Iroquois Welding and Nondestructive Testing Manual
Eastchester Application; Docket No. CP00-232-000, dated April 26, 2000, Vols. I, II  III & V
Eastchester Amended Application; Docket No. CP00-232-001, dated December 15, 2000, Vols. I and II
Joint Application for Permit – Eastchester Extension Project, submitted to NYS DEC, March 16, 2001
Iroquois Engineering & Operations Drafting Standards Manual, November 1, 2000, Rev. 0
Iroquois Health & Safety Procedure Manual
Supplementary Geotechnical Data –as per Article 28 of the Instructions to Bidders
Additional Geophysical Survey Data-As per Article 28 of the Instructions to Bidders
Final Environmental Impact Statement
Geotechnical Investigation – Interim Report dated 12/24/01
Geophysical Survey – Vol. 1, East River Survey dated 1/25/02
NYS DEC Permit #0-0000-00062/00001, Section 401 Water Quality Certificate

**IRO/AE 00008**

**IROQ 0013038**

**CONFIDENTIAL**

Pre-Pipelay Dredging Specification, Rev. 2, 1/23/02
Dredging Act Ruling Request – U.S. Customs Service
Joint Application for Permit, February 2002 (Amended Application)
Eastchester Permitting Matrix, as provided 2/20/02
Iroquois Comments on DEIS, dated October 5, 2001
FERC Supplemental DEIS for the Millennium Project (Reference Only)
Pipe Mill Certificate
Pipe Data Book

(sometimes collectively, the "Contract").

1.3    **Start and Completion Dates.** Subject to compliance with Article 1.4, the Contractor shall commence the Work on or before September 3, 2002, and shall use due diligence to achieve Substantial Completion on or before March 1, 2003, and Final Completion on or before April 1, 2003. Contractor shall commence preparatory activities necessary to meet this schedule on or about April 12, 2002.

1.4    **Executed Contract, Insurance and Bonds.** Prior to commencing the Work, the Contractor shall furnish to the Company the following:
    .1   the Contract duly executed by the Contractor;
    .2   evidence of compliance with the insurance provisions set out in Article 12.1; and
    .3   performance bond as set out in Article 12.2

1.5    **Definitions.** The following terms, when capitalized, shall have the meanings set out below when used in the Contract:
  1.5.1    **Change Order.** – a written order to the Contractor pursuant to Article 3.
  1.5.2    **Chief Engineer.** – Mr. Ken Webb, Manager, New Projects, or such other person as may from time to time be designated in writing by the Company.
  1.5.3    **Company.** – Iroquois Gas Transmission System, L.P. by and including its agent Iroquois Pipeline Operating Company, and any other persons acting pursuant to the authorization of, or on behalf of, the Company.
  1.5.4    **Company Representative.** – the person or persons designated in writing by the Chief Engineer, which designation shall include Environmental Inspector, to the Contractor before the Work commences or such other person or persons as may from time to time be designated in writing during the progress of the Work. The written designation of the Chief Engineer shall state the name, title and authority of each Company Representative.
  1.5.5    **Contract.** – the Contract as set out in Paragraph 1.2.
  1.5.6    **Contractor.** – the Contractor named above.
  1.5.7    **Contract Price.** – the prices specified in Paragraph 2.1, including any adjustments thereto.
  1.5.8    **Defective Work.** –any part of the Work performed by the Contractor which, fails to comply with the provisions hereof excluding defective materials provided by the Company.
  1.5.9    **Environment.** – Environment as set out in Article 9.
  1.5.10    **Equipment.** – all materials, plants, tools, equipment, appliances machinery, supplies, property or other things of whatever nature required or provided in connection with the execution, completion, or maintenance of the Work, but not including things intended to form or forming part of the Work.
  1.5.11    **Field Manager.** – Mr. Robert Yetton, or such other person as may from time to time be designated in writing by the Company.
  1.5.12    **Final Completion.** – completion of all the Work in accordance with the Contract and certification thereof by the Chief Engineer.
  1.5.13    **Force Majeure.** – an event of Force Majeure as set out in Article 5.
  1.5.14    **Subcontractor.** – any party with whom the Contractor enters into an arrangement for the performance of the Work or for the supply of equipment, material, or services to the Contractor, including parties at any tier with whom any Subcontractor has further subcontracted any part of the Work, and the legal or personal representatives, successors, and assigns of such party.
  1.5.15    **Substantial Completion.** – completion of all of the Work in accordance with the Contract Documents or all work necessary to place the Work in service, whichever shall occur first.
  1.5.16    **Warranty Period.** – a period of one (1) year from the date of Final Completion and, for repair work performed during the Warranty Period, an additional period of one (1) year from the date of acceptance by the Company of such repair work.
  1.5.17    **Work.** – the Work as set out in Paragraph 1.1, including all activities to be performed by the Contractor under the Contract and all obligations, duties and responsibilities assigned to or undertaken by the Contractor pursuant to the Contract.

**IRO/AE 00009**

IROQ 0013039

**CONFIDENTIAL**

4

1.5.18    **Work Authorization.** - a written authorization to the Contractor to proceed with certain work pursuant to Article 3.

1.5.19    **Work Site.** – sites provided by the Company where the Work is to be performed including, without limitation, fee lands, easements for right-of-way, work room rights, storage or stockpile areas, and the right of ingress and egress.

1.6    **Work Site Use.** The Company shall provide the Contractor with any provisions, including restrictions and conditions, relating to the use of the Work Site. The Contractor shall observe and comply with all such provisions, including restrictions and conditions, respecting the use and enjoyment of the Work Site, shall confine its operations to the Work Site and shall be responsible for security measures at the Work Site and in connection with the performance of the Work.

1.7    **Inspection.** The Company contemplates and the Contractor hereby agrees to a thorough inspection by the Company and its designees of all the Work, materials and services furnished under the Contract. All Work performed by the Contractor and all materials and services furnished by it hereunder shall be subject to inspection by the Company and its designees at any time and the decision of the Chief Engineer shall be conclusive as to the compliance of the Work with the Contract provided however, Company's inspection shall be timely and not unreasonably interrupt or delay Contractor's schedule.

1.8    **Defective Work.** The Company shall give notice to the Contractor of any Defective Work and within five (5) days thereafter the Contractor shall commence to repair or replace the Defective Work regardless of the stage of its completion (if it is subsequently determined that there was no defect then the Company shall reimburse the Contractor for the cost of repairing or replacing the Work). No such inspection shall constitute an approval of any Work or Equipment, or relieve Contractor of any of its obligations hereunder.

1.9    **Other Contractors.** Additional construction not covered by the Contract may be carried on at the Work Site either by the Company or other contractors. The Contractor shall cooperate fully with the Company or with such other contractors and carefully fit the performance of the Work with such additional construction. The Contractor agrees that in all matters relating to employment and labor it will comply, if necessary, with the schedule of wages and working conditions generally accepted by the trade unions representing the various trades engaged at the Work Site or required by law. If, despite the exercises of due diligence to avoid incurring delays or extra expense, Contractor nevertheless incurs such delay or expense, Company shall issue a change order in accordance with the provisions of Article 4, Exhibit "B", Target Price Contract.

1.10    **Notification and Consultation.** Notwithstanding any other provisions of the Contract, and in accordance with provisions of Exhibit "B" Target Price Contract, should the Contractor observe or be advised of any condition or state of facts, or omission or error in the Contract, which may affect or delay the performance of the Work or give rise to extra costs, the Contractor shall immediately advise the Company Representative in writing. Notwithstanding any other provisions of the Contract and in accordance with the provisions of Exhibit "B", Target Price Contract, should the Contractor fail to notify the Company in writing within forty-eight (48) hours of commencing any additional resulting work or delay, the Company shall not be responsible for payment to the Contractor of additional compensation resulting from any such matter, condition or thing. The Contractor shall be obligated to consult with the Company concerning its handling of conditions or matters which may give rise to extra work. By this provision, the Company does not waive any other provision of the Contract.

2    **COMPENSATION**

2.1    **Contract Price.** For and in consideration of the performance of the Work, the Company shall pay the Contractor the Contract Price of ███████████████████ as described in Exhibit "B" which may be adjusted by Change Order pursuant to Article 3. The Contract Price includes, by way of illustration and not limitation, all supervision, labor, material (except material specified to be furnished by the Company), use of equipment furnished, taxes, consumables, utilities, overhead, profit, and all other costs and expenses incurred by the Contractor in the performance of the Work, whether of the same or of a different nature from those enumerated. Except as otherwise specifically provided in the Contract, all costs incurred by the Contractor in performing the Work shall be paid by the Contractor without reimbursement by the Company.

2.2    **Taxes, Fees and Charges.** The Contract Price shall cover and include the Contractor's entire compensation for payment of all taxes, fees and charges incurred or incident to the performance of the Work, exacted, levied or assessed by the Federal Government, any state, county, town or any political subdivision of any state. The Contractor shall secure and pay for all royalties, permits, and all license fees and taxes on the services, labor, materials and equipment, including the cost of all rental equipment, to be furnished by the Contractor in connection with the performance of the Work. In addition, the Contractor shall pay all worker's/workmen's compensation contributions, unemployment insurance contributions, and all other taxes and payroll contributions now or hereafter imposed by any lawful authority, and shall indemnify and save harmless the Company

**IRO/AE 00010**

**IROQ 0013040**

**CONFIDENTIAL**

5

from any and all claims, penalties, interest and costs against any of the same which may be made or assessed against the Company in respect thereof. The Company shall be liable for and pay only property or use tax levied on material to be furnished by the Company under the Contract, and the cost of any Federal, state, county or other governmental permits for right-of-way furnished by the Company.

**2.3    Billings.**

2.3.1    **Billing, Payment and Retainage.** The Contractor, during the performance of the Work, shall furnish to the Company Representative twice each month a billing in form satisfactory to the Company for Work completed to the end of the previous period. The Company shall pay to the Contractor within fifteen (15) days following approval by the Company Representative of the billing, the approved portion thereof, retaining therefrom retainage of a maximum of ten percent (10%), as more fully described in Exhibit "B". If the Contractor disputes any determination by the Company with regard to a billing, the Contractor nevertheless expeditiously shall continue to prosecute the Work.

2.3.2    **Billing Requirements.** The Contractor shall furnish the Company with such backup and support material as the Company may request.

**2.4    Payment Withholding.** From any payment by the Company to the Contractor the Company may withhold sums, without payment of interest, of any amounts that the Company reasonably believes should not be paid to the Contractor, arising from events including but not limited to the following:

.1    Defective Work not remedied by the Contractor; or
.2    the filing of a lien or liens, and the costs of removing same; or
.3    settlement of claims pursuant to Article 11.3; or
.4    the Contractor's failure to pay when due the liquidated damages provided for in Section 13.5; or
.5    default by the Contractor in the performance of any of its obligations hereunder.

If the Contractor, after receipt of notice from the Company, fails or refuses to remedy the cause for withholding within twenty (20) days thereafter, then the Company may remedy the same and deduct the costs thereof from the compensation payable to the Contractor or otherwise seek to recover such sums from the Contractor in the event there is insufficient compensation remaining due to the Contractor to satisfy those obligations.

When the cause for withholding any payment has been remedied by the Contractor and satisfactory evidence of such remedy has been furnished to the Company, the payment or payments so withheld shall be made to the Contractor within thirty (30) days thereafter.

**2.5    Release of Retainage.** Upon Contractor's achieving Substantial Completion and completion of all building finishings to the satisfaction of the Company, the Company shall pay to the Contractor one-half of the retainage following the Contractor's submission of Affidavits and Releases properly executed. Attached hereto as Exhibit "C" are the forms of the Company's Affidavits and Releases Upon Substantial Completion which the Contractor (and such Subcontractors as the Company may require) will be required to sign. Upon Final Completion and the Contractor's submission of Affidavits and Releases properly executed, the Company shall pay the balance of the retainage to the Contractor. Attached hereto as Exhibit "D" are the forms of the Company's Affidavit and Release Upon Final Completion which the Contractor (and such Subcontractors as the Company may require) will be required to sign.

**2.6    Payment for Materials.** Contractor shall be paid for materials and equipment to be incorporated into the Work which is supplied by the Contractor upon purchase of such materials and equipment. All such materials shall become the property of the Company upon such payment being made.

**2.7    Payments Not Acceptance of Work.** No payment made hereunder shall be considered approval or acceptance of any Work. All payments shall be subject to correction or adjustment in subsequent progress reviews and payments.

**3    CHANGES TO THE CONTRACT**

**3.1    Change Orders.** Any changes to the provisions hereof shall only be made by means of a Change Order or a Work Authorization given by the Company, signed on behalf of the Company, and delivered to the Contractor. An example Change Order is attached hereto as Exhibit "E" and an example Work Authorization is attached hereto as Exhibit "F" for reference. Oral changes shall not be binding on the Company.

**3.2    No Contractor Changes.** The Contractor shall not make additions, changes, alterations or omissions, perform extra work, or supply or use extra materials or equipment incorporated into the Work, of any kind, unless a Change Order or Work Authorization has first been signed, given and received.

IRO/AE 00011

IROQ 0013041

CONFIDENTIAL

6

3.3    **Company Changes.** The Company may at any time by a Change Order and without notice to the sureties, if any, issue additional instructions, make changes in the Work, omit certain work or require additional work to be performed by the Contractor. In each such event, the Company shall specify the amount and kind of work to be done or omitted, the materials to be used and the equipment to be furnished.

3.4    **Contractor's Duties for Changes.** If additional work is authorized by a Change Order, the Contractor shall make every effort to provide such additional personnel and equipment to complete the additional work within the time specified in the Contract. The time for completion of the Work, notwithstanding changes in the Work, shall not be extended unless approved in writing by the Company.

3.5    **Change Order Compensation.** If any addition, change, alteration or omission authorized by a Change Order either increases or decreases the cost of the Work to the Contractor, the compensation payable to the Contractor shall be correspondingly increased or decreased and in each instance the amount of such increase or decrease, as the case may be, shall be reasonable and shall be calculated and determined in accordance with either established unit rates, or agreed upon lump sums and as provided in Exhibit "B", Target Price Contract.

3.6    **Support Documents and Audits.** Charges made for the foregoing items shall be supported by reports (on forms to be furnished or approved by the Company), signed by the Contractor and the Company and shall be subject to audit by the Company.

3.7    **Work Authorizations; Disputed Work.**
        3.7.1    **Undisputed Work.** Extra work or alterations in the Work not in dispute may be authorized, in the first instance, by (a) the Field Manager pursuant to a Work Authorization if the amount of the adjustment to the Contract Price is reasonably estimated by the Contractor and Field Manager to be less than $25,000, and no extension of time is requested by the Contractor, or (b) the Chief Engineer or his designee in writing pursuant to a Work Authorization if the amount of the adjustment to the Contract Price is reasonably estimated by the Contractor and the Field Manager to be in excess of $25,000, and no extension of time is requested by the Contractor. Upon issuance of the Work Authorization, Contractor shall proceed promptly to execute the work. Such authorization shall be binding on the Company and payment thereon shall be made pursuant to a Change Order issued thereafter by the Company.

        3.7.2    **Disputed Work.** If the Company and the Contractor disagree about whether work ordered to be done as Contract Work is extra work, or about an extension of time or any adjustment to be made to the Contract Price for an alteration in the Work, the Company may, pursuant to a Work Authorization, direct the Contractor to proceed with the work on the basis of an adjustment (if any) to be determined at the earliest practicable date thereafter, and the Contractor shall promptly proceed to execute the work. Such Work Authorization may be issued by the Field Manager if the amount in dispute is less than $25,000 for each occurrence and no extension of time is requested by the Contractor. For amounts in dispute in excess of $25,000 or a request for an extension of time, a Work Authorization may be issued by the Chief Engineer or his designee in writing. No claims for extra work shall be reviewed by the Company unless a Work Authorization has been issued. Subject to the dispute resolution procedures available under this Agreement, the decision of the Company concerning disputed work shall be final.

**IRO/AE 00012**

IROQ 0013042

**CONFIDENTIAL**

**4.     DELAYS AND SHUTDOWNS**

4.1     **Diligent Performance of the Work.** After commencement, the Work shall be diligently performed by the Contractor until Final Completion. If the Contractor or any Subcontractor is responsible for a delay in the progress of the Work, the Contractor shall, work overtime, acquire necessary additional equipment, hire additional manpower or perform other acts as may be necessary to avoid delay in the completion of the Work. Where Contractor's actual costs differ from the Target Cost, Company shall be obligated to pay the Contractor's actual costs in accordance with Exhibit "B" Target Price Contract.

4.2     **Weather Delays.** As provided in this Article 4.2, Contractor's Target Price includes for compensation due to delays caused by adverse weather conditions, provided that any weather downtime shall be cause for an extension of time to the extent that such downtime affects the critical path of the project schedule. Downtime incurred as a result of weather disturbances which become named storms by the National Weather service or as a result of excessive ice shall be compensated in accordance with Article 4, Exhibit "B", Target Price Contract.

4.3     **Company Caused Delay or Shutdown.**
        4.3.1          **Company Caused Delay.** Should there be a shutdown or delay in the Work or any part thereof as a result of any act, error or omission of the Company, the Contractor shall give notice thereof to the Company. Such shut down or delay shall be held not to have begun earlier than 48 hours prior to receipt of such notice. Upon receipt of such notice the Chief Engineer shall ascertain the reasons for and the extent of such shut down or delay, if any.
        4.3.2          **Company Directed Shutdown.** The Company may, at any time, shut down the Work or any part thereof by giving three (3) days notice to the Contractor. The Contractor shall resume the Work within five (5) days after receipt of notice from the Company.
        4.3.3          **Notice of Affected Crews.** Immediately following the giving or receipt of the notices referred to in Articles 4.3.1 or 4.3.2, the Contractor shall advise the Company in writing of the number of crews and employees made idle by such shutdown or delay. The period of shutdown or delay pursuant to 4.3.2 shall continue as to such crews until receipt by the Contractor of the notice to resume the Work.
        4.3.4          **Remedy.** In the event of a Company caused delay Contractor shall be entitled to compensation for costs and/or delay in accordance with Contract rates, Exhibit "B", Target Price Contract. If delay extends beyond 12 hours, Company shall reserve the right to compensate Contractor at standby or non-operating rates as applicable.

4.4     **Shutdown for Unsafe Conditions.** Should the Contractor fail to comply with any safety rules or regulations, show disregard for recognized safety practices, or if the Company determines during the performance of the Work that there may be immediate danger to human life or property, or in the opinion of the Company a condition exists as caused by Contractor which may result in a violation of rules, regulations or laws, the Company Representative may order an immediate shutdown in the Work or any part thereof. The Company Representative shall not order the Work affected to be recommenced until such time as the unsafe condition or practice has been corrected by the Contractor to the satisfaction of the Company. Contractor shall be entitled to extra compensation and extra time shall be allowed for the completion of the Work as a result of such shutdown unless such shutdown results from the Contractor's failure to comply with any safety rules or regulations or the Contractor's disregard for recognized safety practices.

4.5     **Shutdown for Environmental Disturbance.** In the event a condition exists that may result in a violation of environmental permits, rules, regulations or laws, the Company Representative may order an immediate shutdown of the work causing or affecting the environmental disturbance. Contractor shall be entitled to extra compensation and extra time shall be allowed for the completion of the Work as a result of such shutdown unless such shutdown results from Contractor's violation of an environmental permit, rule, regulation or law. The Company representative shall not order the Work affected to be recommenced until such time as the environmental condition or practice has been corrected by the Contractor to the satisfaction of the Company.

**5     FORCE MAJEURE**

5.1     **Definition.** The term "Force Majeure" means any of the following: fires, floods, epidemics, lightning; earthquakes; quarantine; blockade; change in governmental laws, regulations, acts, orders, or injunctions subsequent to execution of the Contract; war; insurrection or civil strife; labor strike; sabotage; explosions; and any other similar events, but only to the extent that such events adversely affect the ability of the affected party to perform its obligations, do not result from the fault or negligence of the affected party or its agents and are beyond the control of the affected party and beyond such party's reasonable efforts to prevent, avoid, or mitigate such acts, events, or occurrences.

**IRO/AE 00013**

**IROQ 0013043**

**CONFIDENTIAL**

5.2 **Notice.** In the event that either party's performance of its obligations under the Contract is delayed by an event of Force Majeure, such party shall within two (2) days of the commencement of any such delay provide to the other party written notice thereof including a statement describing the event of Force Majeure in detail. Within five (5) days following delivery of such notice or such other period as may be agreed upon in writing by the parties, the affected party shall specify to the other party in writing the effect of the event of Force Majeure upon the performance of the Contract.

5.3 **Remedies.** The remedy for an event of Force Majeure shall be an extension of time within which to perform the affected obligation equal to the duration of the event of Force Majeure and reimbursement of Contractor's costs for all Contractor equipment and personnel made idle during such event of Force Majeure in accordance with Section 2.2 of Exhibit "B" and at such reduced or standby rates as are mutually agreed upon between the Company and the Contractor. This reimbursement shall be in addition to the Target Cost. Should the Force Majeure event persist in excess of seven (7) days, Contractor shall, if mutually agreeable between the Company and the Contractor, demobilize to other project obligations and remobilize at a mutually agreeable date.

# 6    TERMINATION FOR CAUSE

6.1 **Termination for Contractor's Insolvency, etc.** If the Contractor sells or transfers all or substantially all of its assets, or makes a general assignment for the benefit of its creditors, or institutes a proceeding in bankruptcy, or if a receiver is appointed on account of its insolvency, the Company may request of the Contractor or its successor in interest assurance satisfactory to the Company of the Contractor's future performance in accordance with the terms and conditions of the Contract. If the Contractor or its successor fails to provide such satisfactory assurances within seven (7) days of a request therefor, the Company may, without prejudice to any right or remedy and after giving Contractor seven (7) days notice thereof, terminate the employment of the Contractor.

6.2 **Contractor's Default.** If the Contractor commits a material violation of any provision of the Contract then the Company may give notice to the Contractor stating the event in which the Contractor is in default. By way of illustration but not limitation, a material violation of the Contract includes:

    .1    Contractor's failure to supply properly skilled workmen or materials and Equipment of the proper quality or quantity;

    .2    Contractor's failure in any respect to perform the Work or any portion thereof in an efficient, workmanlike, skilled, safe, and careful manner

    .3    Contractor's failure at any time after Contractor's work schedule shall show that Substantial Completion will be delayed more than thirty days beyond March 1, 2003, to commence such steps as shall be reasonably calculated to allow Substantial Completion to occur within thirty days of March 1, 2003. In such instance, Contractor must be capable of demonstrating that the steps taken will result in Substantial Completion within thirty days of March 1, 2003;

    .4    Contractor's failure to make prompt payment of undisputed invoices due to subcontractors for materials or labor;

    .5    Contractor's failure to perform its contractual obligations in good faith.

6.3 **Contractor's Failure to Remedy Default.** Should the Contractor fail to commence to remedy the default within five (5) days after receipt of such notice then the Company shall have the right to:

    .1    provide labor, Equipment and materials as may be required to remedy the default and to bill the Contractor and its sureties for expenses, costs and damages so incurred or to deduct such amount due or to become due to the Contractor; or

    .2    terminate the Contract and/or the right of the Contractor to proceed with the Work or any part thereof, regardless of its state of completion without prejudice to any right or remedy that the Company may have hereunder.

6.4 **Company's Rights.** In the event of termination pursuant to this Article 6, the Contractor shall provide the Company with the right to continue to use any and all patented and/or proprietary information that the Company deems necessary to complete the Work, provided that the Company agrees to maintain the confidentiality of such information. Furthermore, the Company may finish the Work by whatever method it may deem expedient, including the hiring of any other person, firm or corporation under such form of contract as the Company may deem desirable. The Company shall not be required to obtain the lowest bids for completing the Work but may make such expenditures as, in its sole judgment, will best accomplish the completion of the Work. The Company shall continue to possess all rights and remedies available to it at law and in equity associated with the Contract.

IRO/AE 00014

IROQ 0013044

CONFIDENTIAL

6.5  **Termination of Contractor's Rights.** In the event of termination pursuant to this Article 6, the Contractor shall not be entitled to receive any further payment under the Contract except for payments for Work satisfactorily performed prior to such termination and for costs incurred or committed prior to termination, which payments shall be due to the Contractor at the time of termination. Contractor shall continue to possess all rights and remedies available to it at law and in equity associated with the Contract, and Contractor shall continue to be bound by those provisions of the contract which survive the date of termination.

6.6  **Cost of Completing Work.** The cost to the Company of completing the Work, including reasonable charges for administering such completion and for legal fees associated with the termination, will be charged to the Contractor, and such costs may be deducted by the Company out of monies due, or that may at any time thereafter become due, to the Contractor. In the event that such costs exceed the sum that would have otherwise been payable under the Contract, then the Contractor and its sureties shall be liable for and shall pay to the Company the amount of such excess. Provided, however, that Contractor's responsibility for the excess cost of completion of the Work and/or all other damages which may be recoverable by Company from Contractor for Contractor's default shall be limited to an aggregate sum equal to twenty percent (20%) of the total contract price of the Work otherwise payable to Contractor under the terms of this Agreement; this limitation of Contractor's liability does not affect the Company's rights to recover such costs and/or all other damages from the Contractor's sureties to the extent of the amount of the bond in effect at the time of termination.

6.7  **General Obligations.** In the event of termination pursuant to this Article 6, the Contractor shall, at the Company's request and the Contractor's expense, perform the following services relative to the Work so affected:

    .1  Assist the Company in preparing an inventory of all Equipment and property of any and every kind provided by the Contractor in use or in storage at the Work Site.

    .2  Assign to the Company all subcontracts and other contractual agreements as may be designated by the Company; and

    .3  Remove from the Work Site such of the Equipment provided by the Contractor and rubbish as the Company may request.

## 7  TERMINATION FOR CONVENIENCE

7.1  **Termination at Company's Option.** The Company may, at any time, terminate the Work or any part thereof by giving notice to the Contractor, whether or not the Contractor is in default. Upon receipt of such notice the Contractor shall, unless the notice directs otherwise:

    .1  immediately discontinue the Work on the date and to the extent specified in the notice;

    .2  cease placing orders or subcontracts for materials, equipment or services and make every effort to cancel existing orders or subcontracts on terms satisfactory to the Company, except as may be necessary for completion of such portion of the Work not discontinued;

    .3  do only such portion of the Work as may be necessary to preserve and protect the portion of the Work installed prior to termination;

    .4  protect materials and equipment on or in transit to the Work Site; and

    .5  continue to be responsible for the portion of the Work performed prior to termination.

7.2  **Remedies for Such Termination.** Upon any such termination the Contractor agrees to waive any claims for damages, including loss of anticipated profits on account thereof, and agrees that the sole remedy for such termination shall be to receive the sum of the following:

    .1  All amounts due and not previously paid to the Contractor for that part of the Work completed prior to such notice and for that part of the Work thereafter completed as specified by the Company.

    .2  All other amounts incidental to or arising out of the termination of the Work which, shall be reasonable, including costs relating to,

        (i)  the termination of non-union labor or union labor contracts;

        (ii)  the termination of leases of rented premises and rented office equipment;

        (iii)  the termination of utility services in connection with the rented premises referred to in the immediately preceding subclause (ii);

        (iv)  the termination of equipment, machinery and automotive leases;

        (v)  unused materials, which shall then be delivered to the Company;

        (vi)  unabsorbed overhead costs prorated to the unfinished portion of the Work; and

        (vii)  reasonable amounts paid by Contractor in settlement or termination of claims of its subcontractors and suppliers;

**IRO/AE 00015**

**IROQ 0013045**

**CONFIDENTIAL**

10

(ix)    an amount, as liquidated damages, equal to 5% of the value of the uncompleted portion of the Work. The Parties agree that any sums which may be payable by Company under this Article 7.2 (ix) are in the nature of liquidated damages and not a penalty, and are fair and reasonable, and such payment represents a reasonable estimate of fair compensation for the losses that may reasonably be anticipated from Company's termination of the Agreement.

**8      SAFETY**

8.1    **Safety.** The Contractor shall execute the Work in a safe manner and conduct its operations in compliance with all applicable laws, regulations, and standards, including those governing safety. The Contractor shall designate a qualified safety representative to implement a safety program and direct its and its Subcontractors' employees to take all precautions necessary to protect against and prevent injury to the public, personnel and property. Contractor shall use reasonable care to properly maintain and operate the vessels under its control and to require its Subcontractors to properly maintain and operate the vessels under their control.

8.2    **Safety Meetings and Equipment.** The Contractor shall hold regularly scheduled meetings prior to and during the performance of the Work to instruct its and its Subcontractors' employees on safety practices and the requirements of its safety program. The Contractor shall furnish safety equipment and enforce the use of such equipment by its and its Subcontractors' personnel.

8.3    **First Aid Facilities.** The Contractor shall, at its expense, provide first aid facilities and equipment, including transportation, and make such facilities and equipment available for the treatment of persons who may be injured or become ill while engaged in the performance of the Work.

8.4    **Emergencies.** In the event of any emergency endangering life or property or the Environment, Contractor shall take such action as may be reasonable and necessary to prevent, avoid or mitigate injury, damage or loss and shall report any such incidents to the Company as soon as possible.

**9      ENVIRONMENTAL PROTECTION**

9.1    **Environmental Conditions.** The Contractor acknowledges that performance of the Work may involve a disturbance of the Environment and that the regulatory authority which authorized the Company to construct the Work requires the Company to do so with as little disturbance of the Environment as is reasonable and possible in the circumstances.

9.2    **Definition of "Environment".** For purposes of any contract, Environment includes physical environment (air, water, land) and biological environment (birds, fishes, reptiles, insects, mammals, man) and the Company and the Contractor accept that the physical and biological environment interrelate with man-made elements (cities, highways, railways, pipelines) to form independent "ecosystems" and that a change in one element of the system may result in subtle, moderate or massive alterations to other parts. Therefore, with respect to the performance of the Work the Contractor must ensure that its activities are conducted in a manner that conforms to acceptable environmental standards.

9.3    **Contractor Compliance.** The Contractor shall observe and comply with the environmental requirements forming part of the Contract. The Company may retain independent persons experienced in environmental matters to ensure that acceptable environmental standards are being maintained during construction.

9.4    **Contractor Default.** Failure by the Contractor to comply with the environmental requirements of the Contract shall constitute an event of default and upon the occurrence thereof the Company shall exercise any or all of the remedies available to it under the Contract.

9.5    **Notice of Environmental Disturbance.** The Contractor shall immediately give notice to the Company of any environmental disturbance, including but not limited to contamination of the environment, spills or leaks of pollutants, erosion, or archaeological finds. The Contractor shall, if so directed by the Company Representative, immediately stop the Work causing or affecting the environmental disturbance, and take such other actions as may be required by the Company.

9.6    **Pollution Control.** The Contractor shall assume all responsibility for, including control and removal of, and indemnify and hold harmless the Company against and from loss, cost or damage arising from pollution or contamination which originates from, (i) without limitation, and without limit, spills or leaks of fuels, lubricants, motor oils, pipe dope or coating, paints, solvents, ballasts, bilge garbage, sewerage, or other materials in the Contractor's or its Subcontractors' possession and (ii) for the first

**IRO/AE 00016**

**IROQ 0013046**

**CONFIDENTIAL**

$100,000 of any claims which arise or result from all other sudden and accidental spills, leaks, discharges from any other source, (but excluding disturbance of existing contaminated soils) resulting from operations of Contractor or its Subcontractors or from damage caused by Contractor's or its Subcontractor's vessels or other equipment or the anchors thereof, which are caused by the negligence or other fault of Contractor, or the unseaworthiness of any vessel.

Company shall assume all responsibility for, including control and removal of, and shall defend, indemnify and hold Contractor and its Subcontractors harmless from and against any and all loss, cost or damage arising from (iii) pollution or contamination which results from any source other than those enumerated in (i) above in excess of $100,000, and (iv), Contractor's disturbance of existing contaminated soils during performance of the Work, whether the presence of such contamination is known or unknown, and regardless of whether their disturbance is expected or intended to occur as a result of operations performed by Contractor or its Subcontractors under this Agreement, regardless of cause, even if caused by the negligence or other fault of Contractor or is Subcontractors or the unseaworthiness of any vessel, so long as the Contractor has not willfully or knowingly violated the requirements of any environmental permits. However, any pollution liability arising out of collision with another vessel during the operation or navigation of Contractor's vessel shall be the responsibility of the Contractor.

Company shall obtain and maintain during the performance of the Work a policy of Contractor's Pollution Liability Insurance at limits and deductibles to be determined by the Company based on need and market conditions. Contractor and its Subcontractors to any tier shall be named as additional assureds under the policy, and underwriters on the policy shall waive all rights of subrogation against such additional assureds. The policy shall be primary to any other insurance carried by the Contractor. If Contractor does not agree that the limits of the insurance purchased by Company pursuant to this Article 9.6 are sufficient to cover the exposure for pollution, then Contractor shall have the right to obtain higher limits of coverage, and the premium shall be shared equally by Company and Contractor.

**10    SUBCONTRACTORS**

10.1    **Prior Company Approval.** The Contractor shall obtain written approval of the Company before subcontracting any portion of the Work to other than those Subcontractors set out in the Contract. No Subcontractor shall subcontract any portion of its subcontract without the prior written approval of the Company. Such approvals shall not relieve the Contractor from any of its obligations under the Contract. The Contractor shall be and remain liable as if no such subcontract had been approved by the Company. The Contractor shall furnish reports and other information relative to any Subcontractor as the Company may request.

If requested by the Company, the Contractor shall furnish to the Company a breakdown of all bids from subcontractors prior to awarding any subcontract. Each contract between the Contractor and any Subcontractor (of any tier) shall include a provision to the effect that each Subcontractor shall be bound to the provisions, terms and conditions of this Contract to the same extent as the Contractor, except that subcontractors may utilize lump sum or unit price compensation methods in lieu of the Target Cost/Target Fee method described in Exhibit "B".

10.2    **Rejection of Subcontracts.** The Company reserves the right to reject any subcontract or to require the termination of any subcontract at any time, if, in the opinion of the Chief Engineer, the Subcontractor is not performing the Work in the manner specified, and such rejection shall not affect, increase or diminish the Company's or the Contractor's obligations or rights under this Contract.

10.3    **Subcontract Assignment to Company.** Any subcontract shall not bind or purport to bind the Company nor create any right in the Subcontractor against the Company but shall contain provisions permitting the assignment thereof by the Contractor to the Company without the consent of the Subcontractor, and shall provide that, if Contractor is terminated pursuant to Articles 6 or 7 hereof, the Subcontract shall be assigned without further action to the Company or any replacement contractor designated by the Company, except that the Company may, at its option, refuse to accept any such assignment.

10.4    **Contractor's Responsibility.** The Contractor shall be fully responsible for any act or omission of any of its Subcontractors and of persons either directly or indirectly employed by any of them.

**11    INDEMNIFICATIONS**

11.1.1.    **General Indemnity.** Contractor shall be liable in any case of illness, injury or death to employees and other personnel of Contractor or its Subcontractors of any tier or in any case of loss or loss of use or damage to its or their equipment other property. Contractor shall release, defend, protect, indemnify and hold harmless Company from and against any loss, cost, claim, liability, suit, judgement, award or damage, including reasonable attorney's fees and expenses including expert witness fees, on

IRO/AE 00017

IROQ 0013047

CONFIDENTIAL

12

account of such illness, injury, death, loss or damage regardless of whether caused or contributed to by the sole, joint, or concurrent negligence or other fault of Company or its other contractors, or the unseaworthiness of any vessel.

11.1.2   Company shall be liable in any case of illness, injury or death to employees and other personnel of Company or its contractors or subcontractors of any tier other than Contractor and its Subcontractors or in any case of loss or loss of use or damage to the Work or its or their equipment or other property. Company shall release, defend, protect, indemnify and hold harmless Contractor from and against any loss, cost, claim, liability, suit, judgment, award or damage, including reasonable attorney's fees and expenses including expert witness fees, on account of such illness, injury, death, loss or damage regardless of whether caused or contributed to by the sole, joint, or concurrent negligence or other fault of Contractor or its subcontractors of any tier, or the unseaworthiness of any vessel.

11.1.3   The Contractor shall indemnify, hold harmless and release the Company and its affiliates, and its and their officers, contractors, employees and agents from and against all liabilities or causes of action, demands, suits, damages, judgments, fees, fines, penalties, costs and expenses resulting from injury to or death of third parties and from any damage to property or any losses of any kind suffered by third parties, due to or caused by the breach of the Contractor of its obligations under this Agreement, or the willful misconduct or negligence of the Contractor or its Subcontractors in carrying out its responsibilities under this Agreement, except and to the extent such injury, death, damage or loss is caused by the negligence or willful misconduct of the Company or its affiliates, and its or their officers, employees, agents and contractors.

11.1.4   The Company shall indemnify, hold harmless and release the Contractor and its affiliates, and its and their officers, contractors, employees and agents from and against all liabilities or causes of action, demands, suits, damages, judgments, fees, fines, penalties, costs and expenses resulting from injury to or death of third parties from any damage to property or any losses of any kind suffered by third parties, due to or caused by the breach of the Company of its obligations hereunder, or the willful misconduct or negligence of the Company or its subcontractors in carrying out its responsibilities under this Agreement, except and to the extent such injury, death, damage or loss is caused by the negligence or willful misconduct of the Contractor or its affiliates, and its or their officers, employees, agents and contractors.

11.1.5   In the event that the claims, damages, losses, judgments, or settlements covered by the provisions set forth in Articles 11.1.3 and 11.1.4 are the result of the negligence of both parties, each party shall be liable to the extent or degree of their respective negligence, as determined by mutual agreement of both parties or in the absence thereof, as determined by adjudication of comparative negligence.

11.2   Consequential Damages.Notwithstanding any other provision in this Agreement, neither Party shall be liable to the other for loss of profit or revenue, loss of use of capital, loss of product or loss or delay of production, business interruptions, or losses resulting from failure to meet other contractual commitments or deadlines and downtime of facilities or equipment or any consequential damages or suffered in connection with or arising out of the performance of the Work regardless of whether any such loss or damage is caused or contributed to by the sole, joint, or concurrent negligence or other fault of either Party or the unseaworthiness of any vessel.

11.3   Settlement of Claims.  The Company shall have the right to settle any damage caused by the Contractor to any property in an amount not exceeding Three Thousand Dollars ($3,000) without prior reference to the Contractor. With respect to any claims in excess of Three Thousand Dollars ($3,000) or any claims arising out of the death of or injury to any person, the Company shall give notice thereof to the Contractor. Unless the Contractor advises the Company within twenty-one (21) days thereafter that it has settled or intends to dispute such claim, the Company shall have the right to settle such claim. The Company shall charge the amount of any settlement, including the costs of the Company, against the compensation payable to the Contractor hereunder. At the time of settlement, the Company shall obtain a release in favor of both the Company and the Contractor and shall deliver a copy of such release to the Contractor.

11.4   Patent Indemnity.  The Contractor agrees be responsible for and to protect indemnify, defend, and hold harmless the Company, its participants, its employees, the Company Representative, the Chief Engineer, entities related to the Company, and lenders to the Company (including their independent engineers) from and against any and all loss, cost, and damage (including attorney's fees, costs and expenses) of whatever kind or nature which the Company may hereafter suffer or pay out by reason of any infringement of a United States patent, copyright or trademark issued prior to the date of design, based upon the performance of the Work or materials and Equipment designed or used by the Contractor or its Subcontractors except for materials and equipment furnished or specified for use by the Company.

11.5   Law Compliance Indemnity.  The Contractor agrees to be responsible for and to protect, indemnify, defend, and hold harmless the Company, its participants, its employees, the Company Representative, the Chief Engineer, entities related to

IRO/AE 00018

IROQ 0013048

CONFIDENTIAL

the Company, and lenders to the Company (including their independent engineers) from any and all assessments, taxes, penalties, fines, interest, attorney's fees, costs and expenses, and claims in connection with any violation of or noncompliance with any law, rule, regulation, ordinance, code, schedule, or order of the Federal Government or any state or local government, including those with respect to environmental matters, or any price-fixing or price adjudication by governmental agencies or courts, arising out of the Work, the Contract Price, or the Contractor's performance or nonperformance of the Work unless such obligation has been expressly assumed by the Company in the Contract.

11.6    **Tax Indemnity (including Social Security).** The Contractor agrees to be responsible for and to protect, indemnify, defend, and hold harmless the Company, its participants, its employees, the Company Representative, the Chief Engineer, entities related to the Company, and lenders to the Company (including their independent engineers) from any and all assessments, taxes, penalties, fines, interest, attorney's fees, costs and expenses, and claims, which may be made  or assessed against the Company, arising out of the Contractor's failure to pay all assessments, taxes, fees, or contributions, which are the Contractor's responsibility under the Contract, including but not limited to, taxes or contributions for unemployment insurance, old age pensions, benefits or annuities now or hereafter imposed by the United States or any state, which are measured by wages, salaries, or other remuneration paid or due persons employed in the performance of the Work.

11.7    **Lien Indemnity.** The Contractor shall be responsible for, protect, indemnify, defend, and save harmless the Company, its participants, its employees, the Company Representative, the Chief Engineer, entities related to the Company, and lenders to the Company (including their independent engineers) from and against all claims, demands, causes of action, suits, damages, liabilities, interest, attorney's fees, costs and expenses of whatever nature arising out of the service, labor, equipment and materials or any of them furnished by the Contractor or any of its Subcontractors; from all statutory liens upon the Work or Work Site arising out of the services, labor, equipment and materials or any of them furnished by the Contractor or any of its Subcontractors and shall keep the Work and Work Site free and clear of all liens, claims and encumbrances arising from the performance of the Contract by the Contractor or any of its Subcontractors. By this provision the Contractor specifically waives any statutory lien rights associated with the foregoing which the Contractor may have, but only to the extent of payments actually made by the Company. The Contractor shall cause any lien asserted against property arising out of or related to the Work to be discharged within twenty (20) days of its assertion.

**12    INSURANCE  AND  BONDING**

12.1    **Insurance.** The Company and the Contractor shall maintain insurance in accordance with the terms and conditions set out in Exhibit "G".

12.2    **Bonding.** The Contractor shall provide performance bonds issued by a surety company approved by the Company, in form satisfactory to the Company. The cost of such bonds shall be paid at the rates set out in Exhibit "B" hereto and shall be supported by an invoice in reasonable detail from the Surety Company. The amount of bond shall be equal to the Contract Price from commencement of Work until completion of the pipe lay and burial scope of work of the Laybarge Gulf Horizon. Thereafter, the amount of the bond shall be equal to the greater of 125% of the outstanding Contract Price or 125% of the forecast to complete.

**13    WARRANTIES**

13.1    **General Warranty.** Notwithstanding any other provisions of the Contract, the Contractor represents and warrants that the Work, shall be new, of good quality and free of defects in construction and workmanship and shall conform to the final project plans and specifications and descriptions set forth herein, and all other requirements of this Contract and this Warranty shall remain in effect for the duration of the Warranty Period. Materials not manufactured by the Contractor are not warranted to any extent, but Contractor shall assign to Company, to the extent in each case that the same are assignable any warranties received by Contractor from the manufacturers thereof.

13.2    **Remedial Work.** Should any defect in the workmanship be discovered during the Warranty Period, the Company shall give notice thereof to the Contractor. Upon receipt of such notice or Contractor's otherwise obtaining knowledge of any breach of warranty the Contractor shall promptly remedy the failure or defect and perform such tests as the Company may require to verify that the remedial work complies with the requirements of the Contract. All costs incidental to the performance of any remedial work and tests, shall be borne by the Contractor. The warranty shall apply equally to any remedial work performed by the Contractor and the Warranty Period shall be extended for a period of one (1) year from the date of acceptance by the Company of the remedial work. Should the Contractor fail to commence steps to perform the remedial work within a

**IRO/AE 00019**

**IROQ 0013049**

**CONFIDENTIAL**

14

reasonable time specified by the Company, the Company shall have the right to have such remedial work performed and all costs incidental to the performance thereof shall be borne by the Contractor.

13.3   **Extended Warranties.** The Contractor shall transfer to the Company all warranties and/or guarantees relating to the Work that the Contractor receives from all and any Subcontractors. The Contractor shall assign to the Company, at no additional cost, the benefits of warranties to the Contractor from its Subcontractors. Contractor shall assist the Company in prosecuting any warranty claims.

13.4   **Limitation of Warranties.** CONTRACTOR EXCLUDES ALL OTHER REPRESENTATIONS, OBLIGATIONS, AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONFORMITY TO MODELS OR SAMPLES, COMPLIANCE WITH SPECIFICATIONS OR INDUSTRY STANDARDS, DESIGN OR PERFORMANCE, AND ALL OTHER LIABILITIES IN CONNECTION WITH THE WORK AS PERFORMED (AT COMMON LAW OR IN CONTRACT OR TORT OR OTHERWISE, INCLUDING WITHOUT LIMITATION, STRICT LIABILITY AND NEGLIGENCE OF CONTRACTOR).

13.5   **Completion Guarantee; Liquidated Damages.** The Contractor guarantees that lay barge mobilization and completion of all of the activities required prior to lay barge mobilization shall occur on or before October 1, 2002. If Contractor fails to cause mobilization completion of the lay barge by such date, the Contractor shall pay the Company liquidated damages in the amount ▓▓▓▓▓▓▓▓▓▓ for each day following October 1, 2002 until and including the date of mobilization completion, up to a maximum of fourteen days. All liquidated damages shall be payable to the Company weekly in arrears within five (5) days of the date the Company submits to the Contractor an invoice therefor and will not be added to retainage. The Contractor agrees that (i) any sums which may be payable by the Contractor under this Article 13.5 are in the nature of liquidated damages and not a penalty, and are fair and reasonable, and (ii) such payment represents a reasonable estimate of fair compensation for the losses that may reasonably be anticipated from the Contractor's failure to meet this completion guarantee. Notwithstanding the Contractor's payment of liquidated damages in accordance with this Article 13.5, the Contractor shall continue to prosecute the Work in accordance with the requirements of this Agreement.

14   **OTHER CONTRACTOR OBLIGATIONS**

14.1   **Competent Supervision.** The Contractor shall provide adequate and competent supervision, shall keep a competent Superintendent or a competent Foreman acceptable to the Company at each Work Site. Prior to commencing the Work, the Contractor shall notify the Company in writing of the name and qualifications of its Superintendent or Foreman, if someone other than the person(s) set out in the Contract.

14.2   **Qualified Workers.** The Contractor shall do the Work in a workmanlike manner by qualified, careful and efficient workers in strict conformity with the Contract. The Company shall have the right to require the removal from the Work Site of any employee of the Contractor, or of its Subcontractors, who, in the Company's opinion, may be incompetent, careless or not qualified to perform the Work assigned to him or who in the opinion of the Company may be otherwise insubordinate or guilty of improper conduct or who shows disregard for or is in violation of any safety or environmental rules and regulations.

14.3   **Responsibility for Work, Security and Property.**
14.3.1   **Risk of Loss.** The Company shall be responsible for and shall bear any and all risk of loss of or damage to Work in progress, and to all materials and equipment (other than Contractor equipment) in excess of the deductible of Builders Risk Policy until Substantial Completion or termination of this Contract, whichever shall first occur.
14.3.2   **Security.** The Contractor shall at all times conduct operations in a manner to avoid the risk of loss, theft, or damage by vandalism, sabotage, or any other means. Contractor shall continuously inspect all Work, materials and equipment to discover and determine any conditions that might involve such risks and shall be solely responsible for discovery, determination, and correction of such conditions.
The Contractor shall establish and implement a project security program and shall cooperate with the Company on all security matters.
14.3.3   **Title to Work.** Notwithstanding Sections 14.3.1 and 14.3.2, Contractor guarantees that legal title to and ownership of all Work and all materials at all times shall be in the Company.
14.3.4   **People and Property.** The Contractor shall use due care and diligence to protect the Work, the personnel and property of the Company and the person and property of others which may in any way be affected by the Work. The Contractor shall use due care and diligence to ensure that no person is injured and no property rights are infringed upon during the performance of the Work.

IRO/AE 00020


IROQ 0013050


CONFIDENTIAL

**14.4** **Non-Discrimination.** In performing the Work, the Contractor shall not discriminate against any employee or applicant for employment because of race, creed, color, religion, sex, national origin, age or handicap, and will comply with all provisions of Executive Order 11246 of September 24, 1965 and any successor order thereto, to the extent that such provisions are applicable. This Article 14.4 shall be applicable to any Subcontractors retained by the Contractor.

**14.5** **Protection of Third Party Property.**
    **14.5.1**    **Landowners and Tenants.** The Contractor shall give due consideration to the interests and property of landowners and tenants wherever involved and shall carry out and perform the Work in a manner which shall cause the minimum of inconvenience, injury or damage. The Contractor shall restore all damaged property to as good condition as before damage occurred.
    **14.5.2**    **Other Facilities.** The Contractor shall use due diligence in crossing pipelines, pole lines, sewers, water lines, cables or other facilities, to protect such facilities from damage during the performance of the Work.

**14.6** **Reports.** The Contractor, when requested in writing by the Company to do so, shall provide written reports setting forth in reasonable detail the information requested relating to the Work.

**14.7** **Records.** Contractor shall maintain during the term hereof and for a period of five years after Final Completion, in accordance with generally accepted accounting principles consistently applied, such financial records and books of account as the Company may require and as will allow the Company and its representatives to monitor and verify the accuracy of progress payments and adjustments to the Contract Price. The Company and its designees may inspect and audit such records and books of account during normal business hours and upon at least three (3) days' notice. Contractor shall have the right to exclude from disclosure records which reveal the make up of pre-agreed major equipment rates and any information which is confidential or proprietary to Contractor.

**14.8** **Title to Drawings.** All drawings and specifications are the property of the Company and the Contractor may not use the drawings and specifications for any purpose not relating to the project without the Company's prior written consent.

**15**    **CONTRACTOR'S REPRESENTATIONS**

**15.1** **Contractor's Good Standing.** The Contractor represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and that the execution, delivery, and performance of the Contract has been duly authorized by all requisite corporate action and will not violate any provision of any governmental rule, regulation, or ordinance, its charter or bylaws, of any indenture, agreement, or instrument to which it is a party, or by which it or its property may be bound or affected.

**15.2** **Independent Contractor.** The Contractor is an independent contractor (and not an agent for the Company) and shall supervise and direct the Work, using its best skill and attention and shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work, notwithstanding that the performance of the Work or any part thereof may be subject to direction from or inspection by the Company.

**15.3** **Authority to do Business.** The Contractor represents that it has lawful authority to carry on and has qualified to do business in the state(s) and location(s) in which the Work is to be performed.

**15.4** **No Violation of Law; Litigation.** The Contractor represents and warrants that it is not in violation of any law promulgated, or judgment entered, by any federal, state, local or governmental authority which would adversely affect Contractor or its performance of any obligations under this Contract. The Contractor represents that it is not a party to any legal, administrative, arbitral, investigatorial, or other proceeding or controversy pending, or, to the best of its knowledge or reasonable expectation, any such threatened proceeding, which would adversely affect its ability to perform under the Contract.

**15.5** **Contractor Acknowledgments.** The Contractor acknowledges and agrees that:
    .1   it represents that it is fully qualified and holds all required licenses, permits, or other governmental authorizations to do the Work in accordance with the terms of the Contract within the time specified;
    .2   it has had full opportunity to examine and has carefully examined the Contract;
    .3   it understands the information contained in the Contract;

**IRO/AE 00021**

**IROQ 0013051**

**CONFIDENTIAL**

16

.4 it shall provide all and pay for all services, labor, materials and equipment (other than Company supplied materials and equipment), tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for the proper execution and completion of the Work;

.5 it shall observe and comply with:

  .1 all of the Company's safety instructions, rules and regulations, and

  .2 all applicable laws, orders, regulations, ordinances and other rules of all lawful authorities acting within their powers;

.6 it has an understanding of the difficulties which may be encountered in the performance of the Work and

.7 it has acquainted itself with Company provided geotechnical and geophysical surveys and has assumed they are representative of the general topography, soil structure, subsurface conditions, obstructions, and other conditions pertaining to the performance of the Work and the Work site;

.8 materials and equipment of every kind and character furnished by the Contractor shall be subject to the inspection and approval of the Company Representative; and

.9 it shall be fully responsible for any act or omission of any person, directly or indirectly, employed or otherwise engaged by it.

15.6 **Contractor Covenants.** The Contractor covenants and agrees that:

  .1 it is not aware of the existence of any relationship, family, business, contractual or otherwise, between itself, its principals, officers or employees and the Company, its directors, officers or employees;

  .2 it will not perform any work for or enter into any contract with others that may conflict with its contractual, professional, equitable or other obligations to the Company without first obtaining the written approval of the Company; and

  .3 it will not use for the benefit of others, or reveal to others any information or knowledge, not otherwise in the public domain, about the business and operation of the Company without first obtaining the written approval of the Company.

# 16 MISCELLANEOUS

16.1 **Entire Agreement.** The Contract embodies the entire agreement between the Company and the Contractor with respect to the Work and no other understandings or agreements, verbal or otherwise, exist.

16.2 **No Waiver.** Any failure by either party at any time to enforce the performance of any of the provisions of the Contract shall not constitute a waiver of such provisions and shall not affect the right of such at any time to avail itself of such remedies as it may have for any breaches of such provisions.

16.3 **Severability.** If any provisions of the Contract are invalid under any applicable statute or rule of law, they are, to that extent, omitted, but the remainder of the Contract shall continue to be binding upon the parties hereto.

16.4 **Applicable Law and Venue.** The Contract shall be governed by and construed and enforced in accordance with, the substantive laws of the State of New York, exclusive of conflicts of law provisions. The Contractor and the Company agree that any action or proceeding arising from or in connection with this Contract shall be brought in a state or federal court of appropriate jurisdiction in New York State. In the event of any litigation with respect to this Contract or any instrument or document executed and delivered in connection herewith, each party waives the right to a trial by jury.

16.5 **Assignability.** The Contractor shall not assign its interest in the Contract nor any monies to become due hereunder without the prior consent of the Company. All covenants and agreements herein contained shall extend to and be binding upon the successors and assigns of the Contractor and the Company.

The Contractor acknowledges that the Company intends to make a collateral assignment of the Contract to financial institutions in connection with a financing agreement and agrees that if financial institutions with a security interest in the Contract succeed to the interest of the Company by foreclosure or otherwise, the Contractor shall accord such financial institution the same rights as the Company hereunder.

16.6 **Accommodation of Company's Financing.** The Contractor acknowledges that the Contract is an integral part of the Company's financing agreements and agrees to make all reasonable efforts to assist with such financing, including meeting with potential lenders and technical consultants, and consenting to the assignment of the Contract for the benefit of the lenders. In the event of an assignment to Company lender(s), Contractor's obligations shall be no greater than its obligations to Company, and Contractor will be compensated for any costs associated with satisfying lender requirements which are over and above Company's requirements.

**IRO/AE 00022**

IROQ 0013052

**CONFIDENTIAL**

16.7 **Non-Recourse Obligations.** The Contractor understands and agrees that:

.1 It shall have no recourse against any partners in the Company and its sole recourse shall be against the Company and the Company's assets, irrespective of any failure to comply with applicable law or any provision of the Contract;

.2 no claim shall be made against any partners in the Company in connection with the Contract, except that the partners may be joined as nominal parties for the purpose of enforcing the Contractor's rights hereunder;

.3 it shall have no right to any claim against the Company for any capital contributions from any partner in the Company; and

.4 this representation is made expressly for the benefit of the partners in the Company.

16.8 **Notices.** Any notice or other communication provided for in the Contract shall be in writing to:

16.8.1 **Company Address.** The Company at

Suite 600
One Corporate Drive
Shelton, CT 06484

Attention:    Mr. Dave Warman
              Vice President, Engineering & Operations
Telephone #   (203) 925-7200
Fax #         (203) 929-9501

and

16.8.2 **Contractor Address.** The Contractor at

2500 City West Boulevard
Suite 2200
Houston, Texas 77042-3097

Attention:    Mr. George G. Reuter
              Vice President, Business Development
Telephone #   (713) 361-2600
Fax #         (713) 361-2691

16.8.3 **Delivery.** Such notice shall be deemed to have been properly given:

.1 in the case of delivery, when delivered to the party to whom it is addressed; or

.2 when given by telegram, telecopy or other similar means, at 9:00 a.m. local time on the next business day.

Either the Company or the Contractor may change its address by notice to the other.

16.9 **Conflicts.** The several parts of the Contract shall be taken together to explain each other and to make the whole consistent. Subject thereto, if any conflict exists between any parts of the Contract then such conflict shall be resolved by the Chief Engineer in his absolute discretion.

16.10 **Captions.** The captions and subheadings contained in the Contract are for convenience and reference only, and shall not affect the meaning or interpretation of the Contract.

16.11 **Time of the Essence.** Time shall in all respects be of the essence of the Contract, provided, however, that Company's remedy for any failure of Contractor to comply with the provisions of this Article 16.11 shall be limited to those remedies expressly stated in this Agreement, and any other remedies are expressly excluded.

16.12 **Amendment.** No amendment to this Contract shall be effective unless it is in writing and signed by the parties hereto.

**IRO/AE 00023**

**IROQ 0013053**

**CONFIDENTIAL**

16.13    **Costs of Enforcement.** Contractor agrees to pay the Company's costs, including reasonable attorney's fees, costs and expenses, arising out of any action against the Contractor to enforce the Company's rights under this Contract.

IN WITNESS WHEREOF the Company and the Contractor have executed this Construction Contract as of the day and year first above written.

**Iroquois Gas Transmission System, L.P.**
by its agent
**Iroquois Pipeline Operating Company**

_____


_____

Contractor's Tax I.D. No.:    **Horizon Offshore Contractors, Inc.**
**76-0534878**

_____

IRO/AE 00024

IROQ 0013054

CONFIDENTIAL

Exhibit S

**IRO/AE 00025**

IROQ 0013301

**CONFIDENTIAL**

## SCHEDULE OF INSURANCE REQUIREMENTS

**1    INSURANCE**

1.2    **Insurance.** The Contractor and Company shall furnish and maintain insurance in accordance with this Schedule of Insurance Requirements.

1.3    **Definitions.** The following terms, when capitalized, shall have the meanings set out below when used in this Schedule of Insurance Requirements:
1.3.1    **Company's Insurance.** - the insurance set out in Section 3.

1.4    **Cooperation and Assistance to Insurance Inspectors and Loss Prevention Personnel.** The Contractor shall cooperate with and assist any and all insurance inspectors and technical personnel in their duties to investigate and establish loss prevention procedures and remedies at the Work Site.

1.5    **Accident Reports.** The Contractor shall immediately report orally all job related accidents to the Company's inspector and within five (5) days furnish the Company with a written accident report giving full details thereof.

**2    CONTRACTOR'S INSURANCE**

2.1    **Contractor's Insurance.** The Contractor shall prior to commencing the Work furnish and maintain, at its own expense the following insurance:
2.1.1    **Comprehensive Automobile Liability Insurance** with a combined single limit of not less than Ten Million Dollars ($10,000,000) each occurrence for bodily injury (including passenger hazard) and property damage. Such insurance shall cover all owned, non-owned and hired land motor vehicles, trailers or semi-trailers designed for travel on public roads, whether licensed or not (including any machinery or apparatus attached thereto) in accordance with the 1988 ISO definitions.
2.1.2    **Automobile Collision and Comprehensive Insurance** covering all owned, non-owned, and hired land motor vehicles, trailers or semi-trailers designed for travel on public roads, whether licensed or not (including any machinery or apparatus attached thereto) for physical damage to said units from collision and comprehensive perils. The Company may, at its sole discretion, waive the Contractor's obligation to maintain this insurance coverage, provided the Contractor shall waive all its rights of recovery against the Company in the event of loss or damage to the units in question.
2.1.3    **Contractor's Equipment Insurance** covering physical damage to all equipment (not otherwise insured, for example automobiles, trucks, marine hull and machinery, et cetera) to be used in the performance of the Work. Said insurance shall include loss to or damage of equipment below the surface of the water and transit, loading and unloading risks. The Company may, at its sole discretion, waive the Contractor's obligation to maintain this insurance coverage, provided the Contractor shall waive all its rights of recovery against the Company in the event of loss or damage to the Contractor's Equipment in question.

**IRO/AE 00026**

IROQ 0013302

**CONFIDENTIAL**

2.1.4 **Aircraft Liability Insurance**, if aircraft are involved, with a combined single limit of not less than Twenty Million Dollars ($20,000,000) per occurrence of bodily injury (including passenger hazard) and property damage. Such insurance shall cover all owned and non-owned aviation units used by or on behalf of the Contractor in connection with the Work.

2.1.5 **Aviation "Hull" Physical Damage Insurance**, if aircraft are involved, covering all owned and non-owned aviation units used by or on behalf of the Contractor, for physical damage to said units from "all risks" of loss or damage.

2.1.6 **All Risk Aviation Cargo Insurance**, if aircraft are involved, **covering** all property carried by any owned or non-owned aviation unit by or on behalf of the Contractor, including "slung" loads, in connection with the Work. Such insurance shall name the Company as Loss Payee.

2.1.7 **Marine Protection and Indemnity Insurance**, if watercraft are involved, in an amount at least equal to the full value of each vessel employed under the Contract, but not less than One Hundred Million Dollars ($100,000,000) on a "per project" basis. Such insurance shall include full coverage for all crew liabilities, Removal of Wreck and/or Debris, Collision Liability (if not covered in the Marine Hull policies described in Section 2.1.8, Excess Collision Liability, Excess Towers Liability, Pollution Liability, and Cargo Legal Liability insurance covering the Contractor's operations or operations of those for whom the Contractor is legally responsible. Such insurance shall also contain a cross liability clause protecting the Company from suits by its employees of the Contractor or its subcontractor(s).

2.1.8 **Marine Hull and Machinery Insurance**, if watercraft are involved, including collision liability, with sister ship clause unamended, and with limits of liability at least equal to the full value of each water craft used in connection with the performance of the Work required under this contract, and with navigational limitations adequate for the Contractor to perform or cause to perform the specified Work. Where vessels engage in towing operations, said insurance shall include full towers liability up to hull value with the sister ship clause unamended.

2.2 **Contractor's Additional Insurance.** The Contractor shall prior to commencing the Work furnish and maintain at its expense the following insurance:

2.2.1 **Workers' Compensation,** with coverage applicable in all states in which the Work is performed with limits in accordance with statutory requirements of each such state, and Coverage B - Employer's Liability Coverage including Occupational Disease with a limit not less than Two Million Dollars ($2,000,000) per accident. The insurance shall contain an All States Endorsement, and United States Longshoreman and Harbor Workers' Compensation Act coverage and Maritime Employers Liability coverage.

2.2.2 **General Liability,** covering Contractor's operations on a "per project" basis with limits no less than a combined single limit for bodily injury, personal injury, and property damage of One Hundred Million Dollars ($100,000,000) per occurrence and One Hundred Million Dollars ($100,000,000) annual aggregate, including coverage as follows:
  - Comprehensive Form;
  - Premises/Operations;
  - Explosion, Collapse and Underground Hazard;
  - Products/Completed Operations with an extension of coverage after completion of the Work for a period of not less than three (3) years;

**IRO/AE 00027**

**IROQ 0013303**

**CONFIDENTIAL**

- Blanket Contractual Liability Insurance specifically covering contracts between the Company and the Contractor;
- Independent Contractors (if any part of the Work is to be subcontracted);
- Broad Form Property Damage;
- Personal Injury;
- Sudden and Accidental Pollution Liability Coverage (blended form with no time reporting parameters for Named Perils and 90 day Discovery /180 day reporting clause for all other perils). No exclusion shall apply for petroleum products onto or into water.
- Severability of Interest and Cross Liability Clause;
- Endorsement stating that the insurance shall be primary and not excess or contributing with any insurance or self-insurance maintained by the Company; and
- Blanket Waiver of Subrogation in favor of the Company.

2.3  **Insurers.** All insurance policies provided by the Contractor and Subcontractors shall be arranged with insurers acceptable to the Company and shall contain such terms and conditions as are acceptable to the Company.

2.4  **Additional Terms.** All insurance policies provided by the Contractor and Subcontractors shall be endorsed to provide that:

.1  the Company and its parental, partner, divisional, affiliate, or subsidiary companies and all employees thereof shall be included as additional insured (as respects General Liability coverage, Company will be included as an additional insured pursuant to a CG 20 10 (11 85) endorsement to Contractor's and Subcontractors CGL policies) except Worker's Compensation insurance;

.2  Contractor will waive insurers rights of subrogation and the insurers will include blanket waivers of subrogation on all policies and the insurers will have no right of recovery or subrogation against the Company or its parental, partner, divisional, affiliate, or subsidiary companies, and all employees thereof it being the intention of the parties that the insurance so effected shall protect all parties, and the Contractor's carrier shall be primarily liable for any and all losses covered by the above described insurance for the risks assumed by Contractor herein; and

.3  in the event of one insured incurring liability to any other insured, the policy or policies shall cover the insured against whom claim is or may be made, in the same manner as if separate policies had been issued to each insured, except that the limits of insurance shall not be increased thereby.

.4  any requirement to name Company and its parent, partner, divisional, affiliate or subsidiary companies as an additional insured or waive subrogation on any of Contractor's policies or that contractor's policies shall be primary to those of company and its parent, partner, divisional, affiliate or subsidiary companies and that company's and its parent, partner, divisional, affiliate or subsidiary companies' policies shall be excess and non-contributing to any other policies of Contractor shall be limited to those risks covered by Contractor's insurances for which Contractor has agreed under the terms of the contract to assume responsibility or indemnify Company and it's parents, partner, divisional, affiliate or subsidiary companies.

**IRO/AE 00028**

**IROQ 0013304**

**CONFIDENTIAL**

2.5    **Deductibles.**  Any and all deductibles in the above described insurance policies shall be assumed by, for the account of, and at the sole risk of the Contractor and/or Subcontractors.

2.6    **Contractor's Certificates, and Policies.**  Before commencing the Work, the Contractor shall secure and deliver to Company one original and three (3) copies of each certificate evidencing that insurance coverages of the types and limits provided for in Paragraph 2.1 and, if required, 2.2 are in full force and effect and showing the provisions described in Paragraph 2.7 below.  If requested by the Company, Contractor shall furnish to Company copies of all such policies.

2.7    **No Cancellation or Reduction.**  All of the Contractor's insurance policies shall provide that if such insurance is canceled for any reason whatsoever (including, without limitation, nonpayment of premium) or any material change is made in the coverage that affects the interests of the Company, such cancellation or change shall not be effective as to the Company for sixty (60) days for nonpayment of premiums and otherwise for ninety (90) days, in both cases after receipt by the Company of written notice sent by registered mail from such insurer.

2.8    **Subcontractor's Insurance.**  Contractor shall require each and every Subcontractor to furnish and maintain insurance in accordance with this Section 2, and to furnish, or cause to be furnished to the Company, in the manner set out in Paragraph 2.6, certificates of insurance coverage for each Subcontractor in the same minimum amounts and on the same general terms as stated herein to cover the work of the particular Subcontractor.

2.9    **Other Insurance Provisions.**  Any "other insurance" provisions in a policy in which the Company is named as an additional insured shall not apply to the Company, its parental, partner, divisional, affiliated or subsidiary companies.  This provision must be in the form of the following "other insurance endorsement":

> "Underwriters acknowledge the existence of liability and property insurance carried by the Company, and it is understood and agreed that the provisions relating to other insurance in this policy, if any, shall not be applicable to said Company.  It is further understood that the insurance provided by this policy shall be primary as respects any insurance provided by or purchased by or on behalf of the Company, and shall not be called upon by these insurers for contributing, deficiency, concurrent or double insurance or otherwise for the risks assumed by Contractor herein."

> Any requirement to name Company and its parent, partner, divisional, affiliate or subsidiary companies as an additional insured or waive subrogation on any of Contractor's policies or that contractor's policies shall be primary to those of company and its parent, partner, divisional, affiliate or subsidiary companies and that company's and its parent, partner, divisional, affiliate or subsidiary companies' policies shall be excess and non-contributing to any other policies of Contractor shall be limited to those risks covered by Contractor's insurances for which Contractor has agreed under the terms of the contract to assume responsibility or indemnify Company and it's parents, partner, divisional, affiliate or subsidiary companies.

2.10    **Sue and Labor Provisions.**  Any "sue and labor" provision in the required policy in which the Company is named as an additional insured shall not apply to the Company.

**IRO/AE 00029**

**IROQ 0013305**

**CONFIDENTIAL**

2.11   **Premiums and Assessments.** The insurance companies shall have no recourse against the Company for payment of premiums or assessments under any mutual form of policies held by the Contractor or any Subcontractor.

2.12   **Obligations not Relieved and Insurance Indemnity.** Failure to secure insurance in accordance with the Contract, or the failure to secure such endorsements on the policies as may be necessary to carry out the terms and provisions of the Contract, insolvency, bankruptcy, or failure of any insurance company carrying insurance of the Contractor and/or Subcontractor, or failure of any insurance company to pay any claim accruing, shall in no way act to relieve the Contractor from its obligations under the Contract, anything in the Contract to the contrary notwithstanding. In the event that any liability for any loss or damage be denied by the underwriter or underwriters in whole or in part because of breach of said insurance by the Contractor or Subcontractor or for any other reason, or if the Contractor or Subcontractor fails to maintain any of the insurance herein required, the Contractor will hold harmless, defend, and indemnify the Company, its parental, partner, divisional, subsidiary, and affiliated companies, and all employees thereof against all losses, claims demands, and expenses, including attorneys' fees, which would otherwise be covered by said insurance. It is understood and agreed by Contractor that Contractor's duty to indemnify the Company remains separate and apart from the duty of Contractor to maintain insurance as provided in this contract.

2.13   **Additional Requested Insurance.** In the event the Company should require any additional insurance during the construction period, such insurance shall be provided by the Contractor with insurers approved by the Company and on such reasonable terms as are acceptable to the Company.

2.14   **Contractor's Nonrecourse to Company Controlled Excess Liability Insurance.** Any Excess Liability insurance purchased by or on behalf of the Company does not apply in addition to coverage to be provided by the Contractor or any Subcontractor herein.

**3     COMPANY'S   INSURANCE**

3.1   **Builders' "All Risk" Property insurance.** The Company shall furnish and maintain prior to the commencement of Work and until Final Acceptance at its expense Builders' "All Risk" Property insurance for the benefit of the Company and the Contractor and its subcontractors to any tier, who shall be named as additional insureds and the Program Participants as their respective interests may appear against direct physical loss or damage to the Work, and materials to be incorporated therein, on a replacement cost basis.

    3.1.1   **Deductible.** This policy is subject to a deductible of Fifty Thousand Dollars ($50,000) with respect to water crossings per occurrence, and for that amount the Contractor is fully responsible.

    3.1.2   **Exclusion.** Coverage does not apply to real or personal property which is owned by, leased to, or otherwise under the care, custody or control of the Program Participants and which is not a part of, or to be incorporated into the Work. The Company assumes no liability for loss or damage to such property. To the extent of the liability assumed by Contractor herein the Contractor shall cause the underwriters of any insurance maintained covering loss or damage to, or loss of use of such property, to waive their rights of subrogation against the Company. To the extent of the liability assumed by Contractor, the Contractor shall also require all Subcontractors to waive their rights of recovery, and their insurers will permit

**IRO/AE 00030**

IROQ 0013306

CONFIDENTIAL

Subcontractors to waive their rights of subrogation against the Company for loss or damage to such property. Insurers policies will contain waiver of subrogation provisions.

3.1.3 **Work Site.** For the purposes of this Builders "All-Risk" Property insurance only, the Work Site is extended to include any other sites where the Work is actually being performed. It also includes all property to be incorporated into the Work while in transit to and during storage on or away from the Work Site.

3.1.4 **Waivers.** For that amount of each loss or damage to the Work in excess of the deductible, the Company shall waive its rights of recovery against Contractor and its subcontractors to any tier and the Program Participants. The underwriters of the Builder's Risk policies covering such physical damage to the Work will permit Company to waive their rights of subrogation against Contractor and its subcontractors to any tier and the Program Participants to the same extent herein that the Company has waived its rights of recovery.

3.2 **Contractor's Insurance After Leaving the Work Site.** Contractors required to return to the Work Site after final acceptance of their Work shall provide the insurance set out in Paragraphs 2.1 and 2.2, at their sole cost and expense, and shall furnish evidence of coverage with limits and from insurers acceptable to the Company.

3.3 **Claims Administration.** The Contractor shall cooperate with and assist the Company or the Company's designate in the investigation and documentation of all circumstances surrounding any accident, occurrence or event. If required by the Company to do so, the Contractor shall cause its employees, agents (including Subcontractors and Subcontractors employees and agents) and servants to undergo interview and cross-examination and deposition relative to the defense of any action or claim against the Company.

34 **Policies.** Details of the coverages referred to above are set forth in full in the respective insurance policy forms. The descriptions herein are not intended to be complete nor are they intended to alter or amend any provisions of the actual policies. If the descriptions conflict with the policies, the provisions of the policies shall govern.

**IRO/AE 00031**

IROQ 0013307

**CONFIDENTIAL**

Exhibit "I"

June 28, 2002

ARS-3246

(CERTIFIED COPY)

*Aon Risk Services*

*Natural Resources*
*Group*

This insurance contract is with an insurer not licensed to transact insurance in this State and is issued and delivered as a surplus lines coverage pursuant to the Texas insurance statutes. The State Board of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage and this insurer is not a member of the property and casualty insurance guaranty association created under Article 21.28C, Insurance Code. Article 1.14-2, Insurance Code, requires payment of 4.85 percent tax on gross premium.



PLAINTIFF'S
EXHIBIT

7-20-05 /5

IRO/AE 00300

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

IMPORTANT NOTICE

To obtain information or make a complaint:

You may contact Aon Risk Services of Texas, Inc. at:

> 2000 Bering Drive, Suite 900
> Houston, Texas 77057-3790
> Phone:      1-713-430-6000
> Fax:        1-713-430-6590

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

> 1-800-252-3439

You may write the Texas Department of Insurance:

> P.O. Box 149104
> Austin, Texas 78714-9104
> FAX # (512) 475-1771

**PREMIUM OR CLAIM DISPUTES:**

Should you have a dispute concerning your premium or about a claim, you should contact Aon Risk Services of Texas, Inc. first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**

This notice is for information only and does not become a part or condition of the attached document.

\\HSTNWFS1\SYS\CLIENTS\AON\Horizon Offshore\Policies\ARS-3246 - Marine Package\ARS-3246 - COC.doc

**IRO/AE 00301**

June 28, 2002

**(CERTIFIED COPY)**

ARS-3246

**AON**

*Aon Risk Services*

*Natural Resources*
*Group*

# *Confirmation of Coverage*

Per your instructions and based on the information you provided, Aon Risk Services of Texas, Inc., 2000 Bering Dr., Suite 900, Houston, Texas 77057 has effected insurance as follows:

## INSURED'S NAME AND ADDRESS:

Horizon Offshore Contractors, Inc.
2500 CityWest Boulevard, Suite 2200
Houston, TX 77042

## PERIOD:

From:     1 May 2002, 12:01 a.m. Local Standard Time
To:        1 May 2003, 12:01 a.m. Local Standard Time

In respect of Section 3:

Open cover to accept risks as may be declared during the period above subject to terms/conditions as within.

## INTEREST/SUM INSURED:

### Section 1

A)    Hull, machinery, equipment, appurtenances, gear, stingers, bury gear, cranes, derricks, remotely operated vessels etc., and everything connected therewith whether on board or not on board.

B)    Disbursements and/or Increased Value. Policy Proof of Interest, Full Interest Admitted, Without Benefit of Salvage.

C)    War etc. Risks Insurance including War Risks Protection & Indemnity Clauses (including crew)

Agreed Values/Insured Amounts as per schedules attached.

### Section 2

A)    Onshore Real and/or Personal Property

B)    Miscellaneous Marine Equipment

Amounts as agreed at inception or as per wording (to be agreed) as per schedule attached.

Including Equipment and Property at risk to the Assured (whether rented, purchased, leased, hired or operated by the Assured and including property of others in the Care, Custody, Control of the Assured is responsible) subject to limit of liability of USD 2,000,000 any one item.

Subject to limit of liability USD 10,000,000 any one location per occurrence.

*Aon Risk Services of Texas, Inc.*
2000 Bering Drive, Suite 900 • Houston, Texas 77057-3790 • tel: (713) 430-6000 • fax: (713) 430-6590

\\HST\\NWFS1\\SYS\\CLIENTS\\AON\\Horizon Offshore\\Policies\\ARS-3246 - Marine Package\\ARS-3246 - COC.doc-1

IRO/AE 00302

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

<u>Section 3</u>

Builders Risks (open cover) covering - platforms and/or pipelines and/or risers and/or other marine construction work and/or salvage work including land fabrication and procurement. As may be declared and accepted by Leading Underwriters.

Limit: up to USD 20,000,000 (100% of Estimated Final Contract Value) any one declaration both sections separately, plus amounts as per policy wording any one accident or occurrence.

<u>TRADING:</u>

Worldwide subject to American Institute Trading Warranties Cl.210 (July 1, 1972) or held covered at rates to be agreed by Leading Underwriters only and War etc. risks world-wide subject to London Market War Risk Trading Warranties including any subsequent amendments thereto during the term of this policy.

Tows in excess 750 nautical miles or outside of Gulf of Mexico held covered at rate, terms and conditions to be agreed. Warranted Tug, Tow, Towage and Stowage arrangements approved by agreed surveyor hereunder and Warranted all recommendations complied with.

<u>INSURING CONDITIONS:</u>

As attached Slip No. LE0280715

<u>PREMIUM:</u>

<u>ORDER HEREON:</u>

Section I  - 100%
Section II - 100%
Section III - 63.5% of 100%

<u>SECURITY:</u>

See Attached

<u>SEVERAL LIABILITY NOTICE (LSW 1001):</u>

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

\\HSTNWFS1\SYS\CLIENTS\AON\Horizon Offshore\Policies\ARS-3246 - Marine Package\ARS-3246 - COC.doc-2

IRO/AE 00303

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

## CONTRACT OF INSURANCE TO BE ISSUED:

Insurance described herein has been effected, against which a Contract of Insurance will be issued and in the event of any inconsistency, the terms, conditions and provisions of the Contract of Insurance to be issued will prevail.  This Confirmation of Coverage will be terminated as of its effective date by the issuance of the Contract of Insurance and the premium and charges shown herein shall be credited thereto.

## STATEMENT OF CONNECTED INTERESTS

Aon Corporation has, through its subsidiaries made minority investments in certain Lloyds syndicates, which may be participants in this placement.  These investments are subject to strict Lloyds regulations prohibiting any influence upon the business conduct of such syndicates.

## CANCELLATION:

This Confirmation of Coverage may be cancelled by the Insured by surrender thereof to Underwriters and/or their representatives, or by mailing to Underwriters and/or their representatives, written notice stating when thereafter such cancellation shall be effective.  This Confirmation of Coverage may also be cancelled by the Insurer(s) or by Aon Risk Services of Texas, Inc. on their behalf by mailing to the Insured at the address shown herein or last known address, written notice stating when, in accordance with the number of days notice for cancellation to be provided in the contract of insurance to be issued, such cancellation shall be effective.  The mailing of notice as aforesaid shall be sufficient proof of notice.  The time of surrender or the effective date stated in the notice shall become the termination date of this Confirmation of Coverage.  Delivery of such written notice by the Insured, the Insurer(s) or Aon Risk Services of Texas, Inc. shall be equivalent to mailing.  Cancellation shall be in accordance with the terms and conditions of the Contract of Insurance to be issued.

## INSURER'S HEREUNDER:

It is expressly understood and agreed by the Insured by accepting this Confirmation of Coverage, that Aon Risk Services of Texas, Inc. is not an Insurer hereunder and that Aon Risk Services of Texas, Inc. shall not be in any way or to any extent liable for any loss or claim whatsoever, but that the Insurers hereunder are those individual Insurance Companies and/or Underwriters, whose names appear herein.

For And On Behalf Of:

AON RISK SERVICES OF TEXAS, INC.

By:_____
          Authorized Representative

IRO/AE 00304

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

SECURITY:

Section IA and IB:

| UNDERWRITER | PERCENTAGE WRITTEN |
|---|---|
| Underwriters at Lloyd's Syndicate No. 2020 | 15.0% |
| Underwriters at Lloyd's Syndicate No. 510 | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2791 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 457 | 10.0% |
| | |
| Zurich Specialties London Ltd. | 7.5% |
| Great Lakes Reinsurance (UK) Ltd. | 7.5% |
| | |
| Underwriters at Lloyd's Syndicate No. 2323 | 2.5% |
| Underwriters at Lloyd's Syndicate No. 2987 | 4.0% |
| | |
| International Company of Hannover | 4.5% |
| | |
| Underwriters at Lloyd's Syndicate No. 1183 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 382 | 1.5% |
| | |
| GE Specialty (UK) Ltd. via JLT Risk Solutions Limited | 20.0% |
| | |
| Continental Insurance Company via Marine Office of America/CNA | 5.0% |
| | |
| American Employer's Insurance Company | 1.5% |
| Fireman's Fund Insurance Company | 1.3% |
| Markel Insurance Company | 1.7% |
| Royal Insurance Company | 0.5% |
| via Gulf Coast Marine, Inc. | |
| | 100.0% |

IRO/AE 00305

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

SECURITY:

Section IC:

| UNDERWRITER | PERCENTAGE WRITTEN |
|---|---|
| Underwriters at Lloyd's Syndicate No. 2020 | 20.0% |
| Underwriters at Lloyd's Syndicate No. 510 | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2791 | 5.0% |
| via JLT Risk Solutions Limited | |
| | |
| Zurich Specialties London Ltd. | 7.5% |
| | |
| Underwriters at Lloyd's Syndicate No. 2323 | 2.5% |
| Underwriters at Lloyd's Syndicate No. 2987 | 4.0% |
| | |
| International Company of Hannover | 4.5% |
| | |
| Underwriters at Lloyd's Syndicate No. 1183 | 12.5% |
| Underwriters at Lloyd's Syndicate No. 382 | 6.5% |
| | |
| GE Specialty (UK) Ltd. | 20.0% |
| via JLT Risk Solutions Limited | |
| | 100.0% |
| | |
| Continental Insurance Company | 5.0% |
| via Marine Office of America/CNA | |
| | |
| | |
| American Employer's Insurance Company | 1.5% |
| Fireman's Fund Insurance Company | 1.3% |
| Markel Insurance Company | 1.7% |
| Royal Insurance Company | 0.5% |
| via Gulf Coast Marine, Inc. | |
| | 100.0% |

IRO/AE 00306

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

SECURITY:

Section IIA

| UNDERWRITER | PERCENTAGE WRITTEN |
|---|---|
| Underwriters at Lloyd's Syndicate No. 2020 | 15.0% |
| Underwriters at Lloyd's Syndicate No. 510 | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2791 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 457 | 10.0% |
| Zurich Specialties London Ltd. | 7.5% |
| Great Lakes Reinsurance (UK) Ltd. | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2323 | 2.5% |
| Underwriters at Lloyd's Syndicate No. 2987 | 4.0% |
| International Company of Hannover | 4.5% |
| Underwriters at Lloyd's Syndicate No. 1183 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 382 Via JLT Risk Solutions Limited | 1.5% |
| Continental Insurance Company via Marine Office of America/CNA (H1005468) | 5.0% |
| Birmingham Fire Insurance Company of PA via Starr Tech (ST2607266) | 25.0% |
| | 100.0% |

**IRO/AE 00307**

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

SECURITY:

Section IIB

| UNDERWRITER | PERCENTAGE WRITTEN |
|---|---|
| Underwriters at Lloyd's Syndicate No. 2020 | 15.0% |
| Underwriters at Lloyd's Syndicate No. 510 | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2791 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 457 | 10.0% |
| Zurich Specialties London Ltd. | 7.5% |
| Great Lakes Reinsurance (UK) Ltd. | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2323 | 2.5% |
| Underwriters at Lloyd's Syndicate No. 2987 | 4.0% |
| International Company of Hannover | 4.5% |
| Underwriters at Lloyd's Syndicate No. 1183 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 382 | 1.5% |
| GE Specialty (UK) Ltd. via JLT Risk Solutions Limited | 20.0% |
| Continental Insurance Company via Marine Office of America/Can | 5.0% |
| American Employer's Insurance Company | 1.5% |
| Fireman's Fund Insurance Company | 1.3% |
| Markel Insurance Company | 1.7% |
| Royal Insurance Company via Gulf Coast Marine, Inc. | 0.5% |
| | 100.0% |

**IRO/AE 00308**

June 28, 2002                                                                    ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

SECURITY:

Section III

| UNDERWRITER | PERCENTAGE WRITTEN |
|---|---|
| Underwriters at Lloyd's Syndicate No. 2020 | 15.0% |
| Underwriters at Lloyd's Syndicate No. 510 | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2791 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 457 | 10.0% |
| Zurich Specialties London Ltd. | 7.5% |
| Great Lakes Reinsurance (UK) Ltd. | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2323 | 2.5% |
| Underwriters at Lloyd's Syndicate No. 2987 | 4.0% |
| International Company of Hannover via JLT Risk Solutions Limited | 4.5% |
| | 63.5% |

June 28, 2002                                                                 ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

## LE0280715

Type:        Package Policy.

Form:        MAR91. (English Jurisdiction deleted).

Assured:     Horizon Offshore Contractors, Inc. and/or as per Named Assured Clause attached
             and/or as may be agreed.

             Address:    2500 City West Boulevard, Suite #2200, Houston, Texas
                         77042, U.S.A.

Vessels:     As per schedules attached.

             Including if required new and/or acquired and/or managed and/or chartered vessels,
             from time at risk to the Assured or declared hereto by the Assured, including increase
             in values/amounts, automatically held covered, subject to a maximum individual
             combined vessel value/amount not exceeding top value/sum insured hereon and
             further subject to terms, conditions and rates as comparable vessels insured or as
             may be agreed by Underwriters.

Period:      12 months at 00.01 a.m. 1 May, 2002 Local Standard Time and/or date to be agreed
             Leading Underwriters only.

             In respect of Section 3:-
             Open cover to accept construction and/or installation work as declared (whether
             directly exposed or not) for which the Assured is responsible and which commences
             during the period as above including all refurbishment, pre-fabrication, load out,
             transportation, installation and maintenance and until final completion and operational
             acceptance by Client and/or Customer and for a further discovery period not
             exceeding 12 months from such acceptance. However, in the event the Assured
             hereon does not renew beyond above dates for coverage under Sections 1, 2 and 3,
             notice of cancellation is deemed given by Underwriters in respect of all declarations
             (except for those for which construction is completed in which case maintenance or
             discovery period up to policy limit but not exceeding 60 days after expiry date)
             attaching to this section from the expiry of such notice.

Interest/Sums
Insured:     Section 1

             A)    Hull, machinery, equipment, appurtenances, gear, stingers, bury gear, cranes,
                   derricks, remotely operated vessels, and everything connected therewith
                   whether on board or not on board.

**IRO/AE 00310**

*Aon Risk Services*

*Natural Resources*
*Group*

B)   Disbursements and/or Increased Value. Policy Proof of Interest, Full Interest Admitted, Without Benefit of Salvage.

C)   War etc. Risks Insurance including War Risks Protection & Indemnity Clauses (including crew)

Agreed Values/Insured Amounts as per schedules attached.

Section 2

A) Onshore Real and/or Personal Property

B) Miscellaneous Marine Equipment.

Amounts/values as agreed at inception as per schedule attached.

Including Equipment and Property at risk to the Assured (whether rented, purchased, leased, hired or operated by the Assured and including property of others in the Care, Custody, Control of the Assured is responsible) subject to limit of liability of USD 2,000,000 any one item.

Subject to limit of liability USD 10,000,000 any one location per occurrence.

Section 3

Builders Risks (open cover) covering - platforms and/or pipelines and/or risers and/or other marine construction work and/or salvage work including land fabrication and procurement. As may be declared and accepted by Leading Underwriters.

Limit: up to USD 20,000,000 (100% of Estimated Final Contract Value) any one declaration both sections separately, plus amounts as per policy wording any one accident or occurrence.

**Trading:**   Worldwide subject to American Institute Trading Warranties Cl.210 (July 1, 1972) or held covered at rates to be agreed by Leading Underwriters only and War etc. risks world-wide subject to London Market War Risk Trading Warranties including any subsequent amendments thereto during the term of this policy.

Tows in excess 750 nautical miles or outside of Gulf of Mexico held covered at rate, terms and conditions to be agreed. Warranted Tug, Tow, Towage and Stowage arrangements approved by agreed surveyor hereunder and Warranted all recommendations complied with.

**Conditions:**   Section 1

A) Subject to American Institute Hull Clauses (June 2, 1977) Cl.A1B amended to all risks of physical loss or physical damage.

**IRO/AE 00311**



June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources Group*

Lines 23 and 24 deleted and replaced by:
Should the vessel at the expiration date of the policy be in distress, she shall, provided previous notice be given to Underwriters hereon, be held covered until arrival at safe port.

Line 63 words from "nor shall the vessel" through to word "waters" on line 64 and lines 158-184 are deleted.

Including Collision and Tower's Liability amended to include collision and/or contact with fixed and floating objects per lines 78-111 of the American Institute Tug Form (August 1, 1976) Cl.A230, with line 79 amended by adding words "or contact" after word "collision" for separate minimum limit of USD 1,000,000 each accident or occurrence or hull value whichever the greater.

In respect of Collision Liability arising from vessel's equipment (e.g. floating stingers), it is agreed that such equipment is deemed part of vessel to which it is currently or previously assigned.

Deductibles:
USD 500,000 each accident or occurrence including total loss.
Subject to Annual Aggregate deductible of USD 1,500,000 excluding total loss (Sections 1 & 2), to be reviewed by Leading Underwriters following a change in the fleet schedule hereon.

In respect of Assured's operations with Chevron USA deductibles to be shown as a maximum of USD 25,000 subject to Indemnity Clause as attached.

In consideration of the premium charged including cargo risks hereon on miscellaneous property including property separated from vessels, in transit, storage etc. subject to a separate limit of USD 5,000,000 any one accident or occurrence subject to Institute Cargo Clauses (A) 1/1/82 Cl.252, Institute Cargo Clauses (Air) 1/1/82 Cl.259 and Institute Strikes Clauses (Cargo) 1/1/82 Cl.256, with English Law and Practice deleted on all clauses.
Deductible USD 75,000 any one accident or occurrence.

Institute War Clauses (Cargo) 1/1/82 Cl.255 without deductible.


B) Increased Value Amount against Actual and/or Constructive and/or Compromised and/or Arranged Total Loss including General Average, Salvage, Salvage Charges, Sue & Labour and Running Down Clause subject to American Institute Increased Value and Excess Liabilities Clauses (November 3, 1977) Cl.A175 amended as Hull section hereon and to follow settlement thereof where applicable.


C) Including American Institute Hull War Risks and Strikes Clauses (December 1, 1977) Cl.A237, American Hull Insurance Syndicate Addendum to American Institute Hull War Risks and Strikes Clauses (December 1, 1977) (April 1, 1984) with waiting period in clause 3 amended to six (6) months and words "or deliberate act of person or persons" added after the word operations and further amended to include

**IRO/AE 00312**

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

Nationalization 100% without waiting period and Deprivation in respect of units/locations scheduled at inception, otherwise to be agreed.

Notice period in respect of war and terrorism amended to 48 hours.

Including Terrorist Risks Wording as LPO 437 (4/82), Old Mines Clause, Blocking and Trapping Risks Conditions as LPO 444.

Subject to Onus of Proof and Confidentiality wording in respect of Confiscation, Nationalization, Expropriation and Deprivation only.

War, Confiscation, Nationalization, Expropriation and Deprivation exposures to be agreed at additional premium to be agreed Leading Underwriters.

American Institute S.R. & C.C. Endorsement (Hulls) September 8, 1959 Cl.A503.

Including War etc. Risks Protection and Indemnity up to hull agreed value or USD 1,000,000 whichever the greater also applicable to vessels covered under Assured's Club entry.

Missing Vessels Clause.

General Section 1 Conditions

Agree in respect of bareboat chartered material barges deductible USD 100,000 excluding Total or Constructive Total Loss for vessels valued less than USD 1,000,000 but USD 250,000 excluding Total or Constructive Total Loss all other vessels. Full annual premium if lost.

if including Protection and Indemnity as SP 23 (excluding crew and employees of the Assured). Including amendments thereto as required by contract in respect of work for Chevron USA Inc., subject to separate minimum limit USD 1,000,000 each accident or occurrence and deductible USD 100,000 any one occurrence.

Including Removal of Wreck/Debris Clause (including legal and contractual) but always excluding clean up and containment of seeping and polluting substances, for separate limit USD 1,000,000 any one accident or occurrence, deductible USD 100,000 any one accident or occurrence.

Cancelling Returns Only, notwithstanding C.R.O. basis, for units projected to be idle for periods greater than 90 days or units undergoing upgrade modification or cold stacked units, liberty is granted to the Assured to declare such risks on port risks/limited navigation basis returning daily pro rata     not under repair or daily pro rata     if under repair.

Reactivation Clause to be agreed.

General Average, Salvage, Salvage Charges and Sue & Labour up to Agreed value and such limit in addition - final limit to be agreed by Leading Underwriters (combined single limit over all 3 sections).

Warranted existing class maintained. However, it is noted that, where and as applicable due to the non-operational status and/or type and/or geographical limits of operation and navigation of a scheduled vessel, a United States Coast Guard Certificate of Inspection or a United States Coast Guard Letter of Compliance or a

IRO/AE 00313

*Aon Risk Services*

*Natural Resources*
*Group*

Load Line Certificate shall satisfy the requirements of any Classification requirement herein. It is further noted that any such Classification requirement shall not apply to any vessels where size and/or type and/or navigational operation do not require inspection and/or load line certification from the appropriate regulatory agency.

Including Institute Clauses for Builders Risks Clauses 1/6/88 Cl.351 (English Law and Practice clause deleted) in respect of refitting, repair of vessel(s) as applicable, but not to the extent of restricting coverage afforded herein, with option to suspend coverage hereunder for period(s) as may be agreed, subject automatic reattachment upon completion to be agreed, returning pro rata status at inception premium, if above repair work etc. covered elsewhere. No new buildings attaching hereunder or to be agreed Leading Underwriters, excluding latent defect.

Provision to move equipment from vessel to vessel and/or as required.

Assignment and/or Mortgagees and/or Loss Payable Clause, as agreed Leading Underwriters.

Section 2

A) Against all risks of direct physical loss or physical damage including fire and extended all risks coverage, to the property from any external cause per wording to be agreed leading Underwriter.

B) Against all risks of direct physical loss or physical damage including fire and extended all risks coverage, to the equipment from any external cause per wording to be agreed leading Underwriter

The subject matter insured under this section is covered whilst in use or otherwise on land, in air or afloat.

Both A and B)

Replacement Cost Basis, New for Old.

Including Removal of Debris but always excluding clean up and containment of seeping and polluting substances and for an additional USD 1,000,000 limit, subject to a deductible of USD 100,000 any one accident or occurrence.

Deductible 5% of value subject minimum USD 50,000 each accident or occurrence. Subject to Annual Aggregate Deductible as Section 1.

Property and/or equipment insured hereunder whilst stored, in transit or otherwise, also subject Institute Cargo Clauses (A) 1/1/82 Cl.252, Institute Cargo Clauses (Air) 1/1/82 Cl.259 and Institute Strikes Clauses (Cargo) 1/1/82 Cl.256 to extent not restricting coverage otherwise afforded herein, with English law and practice deleted on all clauses. Deductible as above.

Institute War Clauses (Cargo) 1/1/82 Cl.255 without deductible.

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

Notice period in respect of war and terrorism amended to 48 hours.

Confiscation and Expropriation wording LPO 324 (8/71) including Nationalisation and Deprivation Clauses to be agreed.

Section 3

As per WELCAR2001 wording with following amendments:

Named Assured hereon covered Principal Assured.

Clause 9, Sue and Labour Clause (page 15): "25% of the scheduled value" amended to "25%" of the Full Contract Value.

Clause 11, Removal of Wreck, Wreckage and/or Debris (page 16): "25%" amended to USD 1,000,000 any one accident or occurrence.

Clause 12, Tests, Leak and/or Damage Search Costs (page 16): (Amount) amended to "10%" of the Full Contract Value or USD 1,000,000 whichever the greater.

Clause 13, Stand-by Charges (page 16): (Amount) amended to "10%" of the Full Contract Value or USD 1,000,000 whichever the greater.

Clause 17, Forwarding Charges (page 19): (Amount) amended to "10%" of the Full Contract Value or USD 1,000,000 whichever the greater.

Discovery 12 months.

Including Endorsement 1 - Defective Part Exclusion Buy-Back at rate as may be agreed each declaration.

Excluding faulty welds as per wording.

Agree provide Seepage and Pollution cover hereunder in respect of Assured's Builders Risks projects as required subject prompt advice to Underwriters and for limit up to USD 20,000,000 each occurrence per project as declared and agreed each declaration by leading Underwriters.

This section is to be primary to any other insurance purchased by the Assured in respect of projects as declared where full contract value is covered hereunder only.

Including Nationalisation and Deprivation and Terrorist Risk Wording LPO 437 (4/82) to be agreed subject to paragraph below .

In respect of War, Strikes & Political Risks – to be agreed.

Notwithstanding anything contained herein the coverages included above in respect of property insured hereunder is included in coverage hereunder until the completion and acceptance by the Assured's client of the project, including pipelines and associated equipment whilst being laid and work to/onboard any fixed or floating platform, other than in respect of property/equipment fixed onland, on a fixed structure

IRO/AE 00315

June 28, 2002                                                        ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

or on the sea-bed for which coverage is held covered subject to the attached War Direct Physical Damage Wording and subject to the attached War Direct Physical Damage Wording LSW667 (Modified) as attached subject to an aggregate limit in respect of any one country (being the Full Contract Value of the project but always subject to an overall aggregate limit of USD 10,000,000 any one country) subject to advice to Underwriters prior to project commencement and subject to Additional Premium at rate to be agreed leading Underwriters only.

Notice period in respect of war and terrorism amended to 48 hours.

General Conditions (in respect of All Sections) – all to be agreed

Paramount Deductible Clause (applicable to Sections 1 and 2 only).

Preferred Attorneys, Adjusters, Surveyors schedules to be agreed.

Cross Liability Clause as required by contract.

Deliberate Damage Clause.

Institute Radioactive Contamination Exclusion Clause 1/10/90 Cl.356 dated 1st October 1990 including USA Endorsement dated 13th March 1991.

Other than Owners Limitation Clause deleted where required by written contract.

It is understood and agreed that where required by contract, bid or work order, Additional Assured and/or Waivers of Rights of Subrogation are automatically included hereunder, subject further to Notice Clauses as may be required by written contract only and that coverage provided hereunder shall be primary in respect of any coverage carried by said additional assureds where required by written contract.

Conflicting Conditions Clause to be agreed Leading Underwriter.

LSW 1001 Several Liability Notice.

Institute Service of Suit Clause (USA) 1/11/92 Cl.355.

Additional Vessels Clause.

Privilege to Charter Clause.

Including in addition Salvage, Salvage Charges, Sue and Labour and General Average payable in full irrespective of contributory value.

Seaworthiness Admitted.

Liberty to tow or be towed.

Unintentional Errors and Omissions in Reporting Clause.

Port of Refuge Expenses Clause.

Assignment and/or Mortgagees and/or Loss Payable Clause, as agreed Leading Underwriter.

**IRO/AE 00316**

June 28, 2002                                                                ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

Permission for crew to effect repairs, with those costs directly related to insured losses to be included in any claim, subject to approval of underwriters adjuster/surveyor.

Including Protective Co-Insurance Clauses and Loss Payees as agreed Leading Underwriter.

Permission granted to engage in any legal trade including carriage of explosives which warranted carried in accordance with IMO Coastguard regulations.

Agree 2% allowance on Hull/Increased Value premiums in respect of survey fees on an actual incurred basis, subject invoices.

Direct or Reinsurance as agreed.

Oil Pollution Act Disclaimer Clause.

Subject U.S. Jurisdiction & Law and Practice.

Contracts (TP) Act clause to be agreed.

LSW 3000 (15 days)

Full wording to be agreed.


**Subject full operational review by Global Maritime, with scope of review to be agreed within 90 days of attachment, and subject all recommendations complied with.**


Premium:

**IRO/AE 00317**

June 28, 2002                                                              ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 1 - HULL AND MACHINERY WORKSHEET

| VESSEL | HULL USD | HULL RATE | HULL PREMIUM USD |
|--------|---------:|-----------|------------------|
| AMERICAN HORIZON | 8,000,000 | | |
| PHOENIX HORIZON | 12,000,000 | | |
| CAJUN HORIZON | 5,600,000 | | |
| GULF HORIZON | 15,200,000 | | |
| CANYON HORIZON | 19,200,000 | | |
| LONE STAR HORIZON | 19,200,000 | | |
| PEARL HORIZON | 6,400,000 | | |
| STEPHANITURM* | 15,200,000 | | |
| *HORIZON MB100 | 2,400,000 | | |
| ATLANTIC HORIZON | 17,000,000 | | |
| PACIFIC HORIZON | 24,000,000 | | |
| PECOS HORIZON | 16,000,000 | | |
| SEA HORIZON | 20,000,000 | | |
| BRAZOS HORIZON | 8,000,000 | | |
| | 188,100,000 | | |

* On long term charter – to attach with effect from date to be agreed Leading Underwriters.

**IRO/AE 00318**

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 1 - DISBURSEMENTS WORKSHEET

| VESSEL | INCREASED VALUE USD | IV RATE | IV PREMIUM USD |
|---|---|---|---|
| AMERICAN HORIZON | 2,000,000 | | |
| PHOENIX HORIZON | 3,000,000 | | |
| CAJUN HORIZON | 1,400,000 | | |
| GULF HORIZON | 3,800,000 | | |
| CANYON HORIZON | 4,800,000 | | |
| LONE STAR HORIZON | 4,800,000 | | |
| PEARL HORIZON | 1,600,000 | | |
| STEPHANITURM* | 3,800,000 | | |
| HORIZON MB100 | 600,000 | | |
| ATLANTIC HORIZON | 4,125,000 | | |
| PACIFIC HORIZON | 6,000,000 | | |
| PECOS HORIZON | 4,000,000 | | |
| SEA HORIZON | 5,000,000 | | |
| BRAZOS HORIZON | 2,000,000 | | |
| | **47,025,000** | | |

*On long term charter -- to attach with effect from date to be agreed Leading Underwriters.

IRO/AE 00319

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources
Group*

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 1 – WAR/TERRORISM ETC. WORKSHEET

| Vessel | Agreed Value | War etc. Rate | |
|---|---|---|---|
| American Horizon | USD 10,000,000 | | Gulf of Mexico |
| Phoenix Horizon | USD 15,000,000 | | Gulf of Mexico |
| Cajun Horizon | USD 7,000,000 | | Gulf of Mexico |
| Gulf Horizon | USD 19,000,000 | | Ecuador |
| Canyon Horizon | USD 24,000,000 | | Gulf of Mexico |
| Lone Star Horizon | USD 24,000,000 | | Gulf of Mexico |
| Pearl Horizon | USD 8,000,000 | | Gulf of Mexico |
| Stephaniturm* | USD 19,000,000 | | North Sea |
| Horizon MB 100 | USD 3,000,000 | | Gulf of Mexico |
| Atlantic Horizon | USD 21,125,000 | | Gulf of Mexico |
| Pacific Horizon | USD 30,000,000 | | Gulf of Mexico |
| Pecos Horizon | USD 20,000,000 | | Gulf of Mexico |
| Sea Horizon | USD 25,000,000 | | Indonesia |
| Brazos Horizon | USD 10,000,000 | | Gulf of Mexico |

* On long term charter

**IRO/AE 00320**

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

HORIZON OFFSHORE CONTRACTORS, INC.
VESSEL SCHEDULE

| | Total Value | Year Built (Re) | GRT | SIZE | TYPE |
|---|---|---|---|---|---|
| **Horizon Offshore** | | | | | |
| American Horizon | USD 10,000,000 | 1960/64/86 | 1,762 | 180 x 85 | Lay/Bury Barge |
| Phoenix Horizon | USD 15,000,000 | 1977/82/96 | 4,988 | 300 x 90 | Derrick/Lay Barge |
| Cajun Horizon | USD 7,000,000 | 1980 | 514 | 140 x 46 | Lay Barge |
| Gulf Horizon | USD 19,000,000 | 1968 | 3,859 | 350 x 72 | Lay Barge |
| Canyon Horizon | USD 24,000,000 | 1966 | 5,686 | 330 x 90 | Bury Barge |
| Lone Star Horizon | USD 24,000,000 | 1961/73 | 3,774 | 320 x 90 | Lay Barge |
| Pearl Horizon | USD 8,000,000 | 1973 | 1,063 | 184 x 45 | Dive Support Vessel |
| Stephaniturm | USD 19,000,000 | 1978 | 1,954 | 230 x 45 | Dive Support Vessel |
| Horizon MB100 | USD 3,000,000 | 1982/83/96 | 5,950 | 328 x 100 | Cargo Barge |
| Atlantic Horizon | USD 21,125,000 | 1982/98 | 6,103 | 420 x 98 | Derrick Barge |
| Pacific Horizon | USD 30,000,000 | 1972/74/98 | 7,218 | 350 x 100 | Derrick Barge |
| Pecos Horizon | USD 20,000,000 | 1970 | 2,688 | 256 x 72 | Pipe Bury Barge |
| Sea Horizon | USD 25,000,000 | 1977 | 6,889 | 361 x 98 | Derrick/Lay Barge |
| Brazos Horizon | USD 10,000,000 | | 2,225 | 210 x 70 | Derrick Barge |
| | USD 235,125,000 | | | | |

IRO/AE 00321

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 2 - PROPERTY/EQUIPMENT
### To Be Confirmed/Agreed

Section A (Provisional)

2500 City West Boulevard, Houston, Texas       USD 20,000,000
Sabine Pass Facility, Texas
To be advised, Ciudad del Carmen, Mexico
Port Arthur Yard Facility, Port Arthur, Louisiana
24 Festival Road, Victoria Island, Lagos, Nigeria
Singapore/Jarkata, South East Asia

Section B (Provisional)
Miscellaneous Equipment       USD 10,000,000

TOTAL       USD 30,000,000

War /Terrorism Schedule
USD 27,000,000
USD  3,000,000 (Indonesia)

**IRO/AE 00322**

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources Group*

## HORIZON OFFSHORE CONTRACTORS, INC.
## SECTION 3 – BUILDERS RISKS

Subject that all contracts with an Estimated Final Contract Value of greater than USD 2,000,000 are to be declared hereon.

PIPELINE PROJECTS

Not exceeding 18" pipe and 500' of water:

| | |
|---|---|
| Estimated Contract Value up to USD 5,000,000 | 2.25% on Final Contract Value. |
| Estimated Contract Value in excess of USD 5,000,000 | 3.00% on Final Contract Value. |

Not exceeding 24" pipe and 500' of water:

| | |
|---|---|
| Estimated Contract Value up to USD 5,000,000 | 2.70% on Final Contract Value. |
| Estimated Contract Value in excess of USD 5,000,000 | 3.60% on Final Contract Value. |

Excess of 24" pipe and/or 500' of water:          To Be Agreed.

NON PIPELINE PROJECTS          1.875% on Final Contract Value

DEDUCTIBLES (ACROSS ALL PROJECTS)

USD 2,500,000 any one accident or occurrence.

**IRO/AE 00323**

June 28, 2002

ARS-3246

*Aon Risk Services*

HORIZON OFFSHORE CONTRACTORS, INC.

*Natural Resources*
*Group*

NAMED ASSURES

Horizon Offshore, Inc.

Horizon Offshore Contractors, Inc.

Horizon Vessels, Inc.

Horizon Offshore Contractors Ltd

Horizon Offshore International Ltd

Horizon Offshore (Nigeria) Ltd

Horizon Group LDC

Elliot Associates, LP or Affiliates

Westgate International, L.P. and Affiliates

Horizon/Cal Dive Joint Venture (to be agreed)

ECH Offshore S.A. de R.L. de C.V.

HOC Offshore S.A. de R.L. de C.V.

HorizEn L.L.C.

Tiburon S.A. de R.L. de C.V.

Horizon Vessels International Ltd.

PT Horizon Marine Construction Indonesia


Inactive or Former Entities:

Horizon Marine International, Inc.

Horizon Offshore L.L.C.

HLS Offshore L.L.C. doing business as HLS International Companies

Highwood Associates, Inc.

HLS Offshore Inc.

Horizon Subsea Services, Inc.

DSND Horizon L.L.C.


or as their interests may appear and their affiliated, subsidiary and interrelated companies, and/or co-
venturers and/or operators as charterer as may now, heretofore or hereafter exist and having an
interest hereunder at the time of happening of any loss, as their respective rights and interests do
appear and/or any executive officer, employee, director or stockholder thereof while acting within the
scope and/or course of their duties as such and/or as expiring and/or as may be agreed.

**IRO/AE 00324**

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources
Group*

CIT Group/Equipment Financing, Inc. as Mortgagees are named hereon as additional insureds and loss payees as their interests may appear, subject to Loss Payable Clause as expiring.

GMAC Business Credit, LLC its successors and/or assigns are added as loss payees hereon in respect of vessel "Sea Horizon".

General Electric Capital Corp. are added as loss payees hereon in respect of vessel "Pecos Horizon".

## HORIZON OFFSHORE CONTRACTORS, INC.
### CHEVRON INDEMNITY CLAUSE

It is hereby noted and agreed that in respect of Assured's operations with Chevron USA Inc. the deductible(s) are amended to USD 25,000 any one accident or occurrence subject Assured indemnifying Underwriters hereon at the time of settlement, for the difference between the above amount and the previously agreed deductibles hereon in the event of a claim.

IRO/AE 00325

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources Group*

SECTION 3 – Scope of Work

As follows each declaration or as may be agreed by Leading Underwriters:

The scope of Marine Warranty Survey work will require the Warranty Surveyor to assess the following items for a pipeline installation or to be agreed:

1.  **Transportation of Pipe**
    **Review and approve and/or attend:**
    Barge and Tug suitability survey (sometime "waived", or nominally surveyed when the particular barge is known to the Warranty Surveyor)
    Barge stability and bollard pull requirement
    Barge ballast arrangement and longitudinal strength (waived when adequacy of barge strength is obvious).
    Sea-fastening design
    Pipe loading and uploading
    Pipe barge sailaway

2.  **Pipelaying procedures**
    **Review and approve:**
    Weather monitoring
    Pipe coat specification
    Mooring of barge
    Pipe tension versus water depth for a specific diameter of pipe
    Shut down based on limiting sea state

3.  **Pipe Laying**
    **Attendance:**
    Warranty Surveyor mariners may attend a few of the following operations (depending on size and scope of job):
    a)  Shore Pull
    b)  Normal pipe lay
    c)  Tie-in
    d)  Trenching
    e)  Pipeline crossing
    f)  Other critical operations

To be agreed James Miller (Zurich Specialties London Limited)

**IRO/AE 00326**

Exhibit "J"

20. SEP. 2 04  9.38    JLTRS LTD      BENNETT        NO. 9829   P. 1/1
Case 1:05-cv-02149-JSR   Document 44-11   Filed 08/30/2005   Page 2 of 3
Received 0../7/2004 09:06PM in 00:46 on line (3) for #02075583!. • Pg 1/1
MAY-17-2004  15:09  FROM AON RISK SERVICES HOUSTON    TO JLT        P.01/01

LD 0280715 005



**Aon Natural Resources Group**
1330 Post Oak Boulevard, Suite 900
Houston, Texas 77056
Telephone: (832) 476-6000;
Fax: (800)953-4542 in US / (847)953-4178 outside US

18 MAY 2004
CLAIMS UNIT

**REPORT OF LOSS ON:**   Marine Package/Hull & Machinery        **DATE:** May 17, 2004

To:     **SECURITY**                                          **POLICY NO.**
        Underwriters at Lloyd's and Insurance                  ARS-3246
           Companies                                           Section 1A
        c/o JLT Risk Solutions Limited
        Continental Insurance Company via Marine
           Office of America/CNA
        American Employers Insurance Company          2 5
        Fireman's Fund Insurance Company             EPS
        Markel Insurance Company
        Royal Insurance Company via Gulf Coast
           Marine Inc.

Please accept notice of the following casualty which may result in a claim for:     5

*Handwritten note (right margin): Aon's May 17, 2004 Report of Loss Sent to Lloyd's c/o JLT on behalf of Horizon the primary insured.*

Name of the Assured:     Horizon Offshore Contractors, Inc.

Policy Inception:   05/01/02    Date of Casualty:   02/27/03   Policy E

Insured Vessel:   GULF HORIZON                                  Insured

Excess of: $   N/A          Deductible: $   500,000            AAO: $

Place where casualty occurred:   Long Island Sound, NY

Nature of Casualty:   Whilst performing pipelaying operations (pipe burial) the insured vessel's anchor cable parted and allegedly

damaged a sub-sea power cable owned by the New York Power Authority.

Gross estimated amount of entire loss: $   Unknown            Net to Excess: $   N/A

Assured have         instructed:   Adams & Reese to defend claims.

Remarks:  Loss initially reported to P & I, C.G.L and Excess insurers. File material to follow. Assured has filed for Limitation of Liability

in Houston.

Aon Claim #:   03-M5058-A        Relationship Manager:   B.J.        Claims Made:   No

Client's Claim #:

by:  James I. Montano

*If you have any instructions to give, please advise us promptly.*

PLEASE ACKNOWLEDGE RECEIPT BY SIGNING AND RETURNING A COPY OF THIS NOTICE

Signature:

Claim Number:   LD 028D715.

X:\BUSINESS UNITS\ANR\Claims\Claims Shared\Horizon\Loss Notices\03-M5058-A.doc-1
The information contained in this fax is confidential and/or privileged...

TOTAL P.01


**PLAINTIFF'S EXHIBIT**
3
7-20-05



**_Aon Natural Resources Group_**
1330 Post Oak Boulevard, Suite 900
Houston, Texas 77056
Telephone: (832) 476-6000;
Fax: (800)953-4542 in US / (847)953-4178 outside US

REPORT OF LOSS ON:    Marine Package/Hull & Machinery          DATE:    May 17, 2004

| To: | SECURITY | POLICY NO. | INTEREST |
|---|---|---|---|
| | Underwriters at Lloyd's and Insurance Companies c/o JLT Risk Solutions Limited | ARS-3246 Section 1A | 90.0% |
| | Continental Insurance Company via Marine Office of America/CNA | | 5.0% |
| | American Employers Insurance Company | | 1.5% |
| | Fireman's Fund Insurance Company | | 1.3% |
| | Markel Insurance Company | | 1.7% |
| | Royal Insurance Company via Gulf Coast Marine Inc | | 0.5% |
| | | | 100.0% |

Please accept notice of the following casualty which may result in a claim for:    Collision Liability

Name of the Assured:    Horizon Offshore Contractors, Inc.

Policy Inception:    05/01/02    Date of Casualty:    02/27/03    Policy Expiration:    05/01/03    Form:    A.I.H.C. (6/2/77)

Insured Vessel:    GULF HORIZON                              Insured Value: $    15,200,000

Excess of: $    N/A          Deductible: $    500,000    AAD: $    1,500,000    Stop Loss: $    N/A

Place where casualty occurred:    Long Island Sound, NY

Nature of Casualty:    Whilst performing pipelaying operations (pipe burial) the insured vessel's anchor cable parted and allegedly

damaged a sub-sea power cable owned by the New York Power Authority.

Gross estimated amount of entire loss: $    Unknown                    Net to Excess: $    N/A

Assured have          Instructed:    Adams & Reese to defend claims.

Remarks:    Loss initially reported to P & I, C.G.L and Excess insurers. File material to follow. Assured has filed for Limitation of Liability

in Houston.

Aon Claim #:    03-M5058-A          Relationship Manager:    B.J.          Claims Made:    No

Client's Claim #:    _____

by: _____
James I. Montano

_If you have any instructions to give, please advise us promptly._

PLEASE ACKNOWLEDGE RECEIPT BY SIGNING AND RETURNING A COPY OF THIS NOTICE

Signature:    _____

Claim Number:    _____

X:\BUSINESS UNITS\ANR\Claims\Claims Shared\Horizon\Loss Notices\03-M5058-A.doc-1
The information contained in this fax is confidential and/or privileged. This fax is intended to be reviewed initially by only the individual named above. If the reader of this transmittal page is not the intended recipient or a representative of the intended recipient, you are hereby notified that any review, dissemination copying of this fax or the information contained herein is prohibited. If you have received this fax in error, please immediately notify the sender by telephone and return this fax to the sender at the address above



EXHIBIT
26
8/3/05  WH

**IRO/AE 00574**

Exhibit "K"

Assured: Horizon Offshore Inc.
"Iroquois Gas Transmission System L.P." vs "Horizon Offshore" And "Power Authority of the State of New York"
Power Authority
D.O.L: 27/02/03

This notification constitutes ZGE's first advice of the existence of this loss and the therefore reserve all rights with regard to coverage and additionally in regard to the late notification of hull insurers and any prejudice that may arise from that late notification. Such reservation of rights to include all brokers involved in the advising of underwriters.

Insurers would point out that the broker's file begins with the cross-claims of Limitation Defendants/Cross-Claimants, filed by the Power Authority of the State of New York. In order to properly consider this claim and the policy response insurers will require copies of ALL correspondence related to this loss.

Please advise on whose authority/behalf the original Limitation action was filed.

Please explain how Iroquois Gas Transmission System L.P are considered an additional assured under Horizon Offshore's Hull & Machinery policy.

Insurers require an explanation from the assured as to why they have failed to advise their hull insurers previously.

Please advise on whose authority James Montano of Aon Risk Services disclosed details of Horizon's insurance coverage to Iroquois Gas Transmission System L.P.

ZGE do not concur with the Lloyd's leader's instruction of Gerry Kimmitt of Legge Farrow & Kimmitt. ZGE will discuss with the leader and revert.

Exhibit "L"

PHUL BENNI 1

Bennett, Paul - GBR3742

From:        Jim_Montano@ars.aon.com
Sent:        15 November 2004 16:15
To:          Paul_Bennett@JLTGROUP.COM
Cc:          Edwin.Laizer@arlaw.com; colin.williams@simsl.com
Subject:     Gulf Horizon alleged damage to NYPA power cables - 27th February     2003  Our Ref:
             OR03/304718/FFO/CPW  [Virus Checked]


Paul,
Pls see below msg from Steamship's Colin Williams,  discuss with leading
H&M underwriters and revert to us with their comments.
Regards,
Jim
----- Forwarded by Jim Montano/TX/ARS/US/AON on 11/15/2004 10:09 AM -----

               "Williams, Colin"
               <colin.williams@s           To:        "'ed.laizer@arlaw.com'"
<ed.laizer@arlaw.com>,
               imsl.com>                    "'jim_montano@ars.aon.com'"
<jim_montano@ars.aon.com>
                                            cc:
               11/15/2004 05:37             Subject:  Gulf Horizon alleged damage
to NYPA power cables
               AM                           - 27th February     2003  Our Ref :
OR03/304718/FFO/CPW
                                            [Virus Checked]



Dear Ed/Jim,

We note that Healy and Baillie, acting for Iroquois, are demand defence and
indemnity iro these claims from Horizon's insurers and, in the absence of a
response, will be seeking a declaration from the Courts iro this matter.

You will recall that this case involves the alleged damage to a sub-sea
power cable by the Gulf Horizon's anchors and, as such, this would appear
to be a matter covered by the Member's hull underwriters rather than us.
We have raised this point on several occasions in the past and feel that it
should be resolved without further ado in order that the case can be dealt
with by the appropriate insurer.  Accordingly, please advise whether hull
underwriters accept that this is a matter for them rather than Aegis and,
if not, please advise why they do not feel that they are involved in this
matter, given the clear nature of the cover wording.

Regards.
Colin Williams

DDI : 0207 650 6497
Fax : 0207 377 2912

*****************************************************************
This message has been checked for all known viruses by the Cable &
Wireless Email protection service, powered by Message Labs.
*****************************************************************

1

Exhibit "M"







**ATHENS**
**Compressor Station**                                    close

**Unit:** 10,028 hp Solar Taurus 70

**In-Service Date:** November 1998

**Gas Cooler In-Service:**
February 2004



**ATHENS**
**Compressor Station**                                    close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

**Gas Cooler In-Service Date:** ???



**ATHENS**
**Compressor Station**                                    close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

**Gas Cooler In-Service Date:** ???



**ATHENS**
**Compressor Station**    close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date  ???



**ATHENS**
**Compressor Station**    close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date  ???



**ATHENS**
**Compressor Station**    close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date  ???



**ATHENS**
**Compressor Station**    close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date  ???

**ATHENS**
**Compressor Station**    close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date  ???



**ATHENS**
**Compressor Station**                                  close

**Unit:** 9 650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date ???



**ATHENS**
**Compressor Station**                                  close

**Unit:** 9 650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date ???



**ATHENS**
**Compressor Station**                                  close

**Unit:** 9 650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date ???



**ATHENS**
**Compressor Station**                                  close

**Unit:** 9 650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date ???



**DOVER**
**Compressor Station**                                  close

**Units** 18,371 hp Alstom Cyclone

**In-Service Date:** February 2004



## ATHENS
### Compressor Station

close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date ???



## WRIGHT
### Compressor Station

close



**Unit 1:** 7,152 hp Solar Taurus 60

**Unit 2:** 7,152 hp Solar Taurus 60

**In-Service Date:** November 1993

**In-Service Date:** November 1993

## ATHENS
### Compressor Station

close



**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date ???

## BOONVILLE
### Compressor Station

close



**Unit:** 18,371 hp Alstom Cyclone

**In-Service Date:** February 2004

**Gas Cooler In-Service**
February 2004



**ATHENS**
**Compressor Station**

close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date: ???



**ATHENS**
**Compressor Station**

close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date: ???



**CROGHAN**
**Compressor Station**

close

**Unit 1:** 7,152 hp Solar Taurus 60

**Unit 2:** 10,028 hp Solar Taurus 70

**In-Service Date:** December 1994

**In-Service Date:** November 1992

**ATHENS**
**Compressor Station**

close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date: ???



**ATHENS**
**Compressor Station**

close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date: ???

**ATHENS**
**Compressor Station**



close

**Unit:** 9,650 hp Solar Taurus 70

**In-Service Date:** November 1998

Gas Cooler In-Service Date ???

EXHIBIT "N"

4/7/03

## Crossing Agreement
## Long Island Sound

THIS AGREEMENT is made this 29th day of October, 2002 (this "Agreement"), by and between the POWER AUTHORITY OF THE STATE OF NEW YORK ("NYPA" or "Grantee"), a corporate municipal instrumentality and political subdivision of the State of New York, having an office at 123 Main Street, White Plains, New York, 10601; and IROQUOIS GAS TRANSMISSION SYSTEM, L.P. ("Iroquois Gas"), a Delaware Limited Partnership, having an office at One Corporate Drive, Shelton, Connecticut, 06484, by Iroquois Gas' agent, IROQUOIS PIPELINE OPERATING COMPANY ("Iroquois Pipeline") (NYPA and Iroquois Gas may be hereinafter referred to collectively as the "Parties", and individually as "Party", as the context requires).

### PREAMBLE:

WHEREAS, by Grant of Easement from the New York State Office of General Services ("OGS") dated June 28, 1996 and recorded in the records of the said OGS and in the Westchester County Clerk's office on August 14, 1997 in Book 11788 of Deeds at page 312 (the "NYS Easement"), the Grantee installed four parallel solid-dielectric 345 kV cables ("the Sound Cable Project" or "Y-49 Cable"), under Long Island Sound between transition stations in the City of New Rochelle, Westchester County and the Town of North Hempstead, Nassau County, New York; and

WHEREAS, the Grantee obtained the NYS Easement following receipt from the Public Service Commission of the State of New York ("PSC"), pursuant to Article VII of the Public Service Law of the State of New York ("PSL"), of an Opinion and Order Granting Certificates of Environmental Compatibility and Public Need for the Sound Cable Project with Conditions (Opinion No. 88-14 issued May 18, 1988 ("Art. VII Certificate") as the Sound Cable Project is more particularly described therein; and

WHEREAS, the Grantee also obtained the appropriate permits from the United States Army Corps of Engineers ("Corps") for construction of the Y-49 Cable; and

WHEREAS, the Y-49 Cable's electric capacity is primarily dedicated to Long Island Lighting Company d/b/a LIPA ("LIPA"); and

WHEREAS, Iroquois Gas has received authorization (the "FERC Authorization") from the Federal Energy Regulatory Commission ("FERC") to install a 24-inch steel, natural gas pipeline ("Pipeline") along a route which will require the Pipeline to cross the NYS Easement and the Y-49 Cable; and

IRO/AE 00755

FMIC 001725

WHEREAS, Iroquois Gas has received from the Corps, New York District, a Department of the Army Permit, pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. §403) and Section 404 of the Clean Water Act (33 U.S.C. §1344) ("Corps Permit") for the installation of the Pipeline beneath Long Island Sound and the East River; and

WHEREAS, the route of the Pipeline authorized in the Corps Permit crosses the Y-49 Cable installed within the NYS Easement at a designated location under Long Island Sound, which location, and the immediately surrounding area, is more particularly described in Exhibit "B" annexed hereto and made a part hereof (the "Crossing"); and

WHEREAS, Iroquois Gas has requested the Grantee to consent to the Crossing and the grant by OGS to Iroquois Gas of a certain easement under and across Long Island Sound to enable Iroquois Gas to construct, install, operate, maintain and repair the Pipeline (the "Iroquois Gas Easement"); and

WHEREAS, the Grantee is willing to provide such consent to Iroquois Gas to the extent permissible under the NYS Easement and subject to the terms thereof and the issuance of the Iroquois Gas Easement; and

WHEREAS, the Parties wish to set forth in this Agreement their respective rights and obligations with respect to the construction and installation of the Pipeline and the respective rights and obligations of the Parties with respect to the operation, maintenance, repair, and replacement of the Y-49 Cable and the Pipeline (the Y-49 Cable and the Pipeline are herein referred to collectively as the "Facilities").

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Terms not otherwise defined elsewhere in this Agreement shall be defined as follows:

A.    "Applicable Laws" means all laws (including Environmental Laws), treaties, ordinances, judgments, decrees, injunctions, writs, consent orders and orders of any court, arbitrator or Governmental Authority and rules, regulations, orders and interpretations of any federal, state, county, municipal, regional, environmental or other governmental body, instrumentality, agency, authority, court, or other body having jurisdiction over the NYS Easement, Iroquois Gas Easement, the Parties, Crossing, Pipeline or Y-49 Cable as is in effect from time to time.

-2-

IRO/AE 00756

FMIC 001726

B.    "Applicable Permits" means any Permit required to be obtained or maintained in connection with construction and installation of the Pipeline, and the operation, maintenance, repair, removal, reinforcement and replacement of the Pipeline or the Y-49 Cable, as the case may be, including, but not limited to, the Corps Permit, Art. VII Certificate for the Y-49 Cable, NYS Easement, Iroquois Gas Easement and the FERC Authorization.

C.    "Art. VII Certificate" shall have the meaning set forth in the Preamble.

D.    "Best Engineering Practices" means, with respect to the design, installation and construction of the Pipeline at the Crossing, those practices, methods and acts engaged in or approved by a significant portion of engineering experts in the field of gas transmission facilities, the fields of civil, mechanical and metallurgical engineering, and the field of high voltage electric cable and cathodic protection, which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, would have been expected to best to prevent accidents relating to and interference with the Y-49 Cable.

E.    "Corps Permit" has the meaning set forth in the Preamble.

F.    "Critical Day" means any day during which NYPA's System operator, LIPA's System operator, or NYISO determines, in the exercise of Prudent Utility Practice, that there is a material risk that the projected demand in any part of the Long Island electricity system may exceed available electric supply or when local or national events, or potential events, as reasonably determined by such system operators, place System Integrity, as hereinafter defined, at risk.

G.    "Crossing" shall have the meaning set forth in the Preamble.

H.    "Environmental Laws" means all applicable former, current and future federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), Environmental Permits (as such term is defined herein) and New York State Department of Environmental Conservation Technical Administrative Guidance Memoranda and other guidance documents issued or published by any Governmental Authority (as such term is defined herein), in each case, relating to pollution, protection of the environment, natural resources or human health and safety, including laws relating to the presence, Release (as such term is defined herein) of, or exposure to, Hazardous Substances (as such term is defined herein), or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or arrangement for such activities with respect to, Hazardous Substances.

-3-

IRO/AE 00757

FMIC 001727

I.     "Environmental Permits" means the Permits required under or pursuant to Environmental Laws.

J.     "Facilities" shall have the meaning set forth in the Preamble.

K.     "Good Engineering Practice" means any of the practices, methods and acts engaged in, or approved by a significant portion of the gas transmission industry or electric transmission industry (as the case may be) which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, would have been expected to accomplish the desired result in a manner consistent with reliability, safety, environmental protection, expedition, project economics and Applicable Laws for similar facilities; provided, however, that in the event and to the extent that a different standard is set forth in any Applicable Permit and validly governs the activity in question, then Good Engineering Practice shall mean such different standard, unless the standard set forth in such Applicable Permit is a lesser standard. Good Engineering Practice is not intended to be limited to consideration of any one practice, method or act, to the exclusion of all others, but rather, is intended to require the consideration of a spectrum of possible practices, methods or acts.

L.     "Governmental Authority" means any federal, state, local, domestic or foreign government or any court, administrative or regulatory agency, board, committee or commission or other governmental entity or instrumentality, domestic, foreign or supranational or any department thereof.

M.     "Hazardous Substances" means (i) any petroleum, petroleum products or byproducts and all other hydrocarbons, petrochemicals, crude oil or any fraction thereof, coal ash, radon gas, asbestos, asbestos-containing material, urea formaldehyde, polychlorinated biphenyls, chlorofluorocarbons and other ozone-depleting substances; and (ii) any chemical, material, substance or waste (including thermal discharges) that is prohibited, limited or regulated by or pursuant to any Environmental Law.

N.     "No-Objection Letter" means any letter provided by any Party to OGS pursuant to which such Party does not object to the grant or extension of an OGS easement.

O.     "NYISO" means the New York Independent System Operator or any successor organization thereto that administers the wholesale electricity markets in New York State substantially as a whole, including without limitation, any regional transmission organization authorized by FERC.

P.     "NYISO System Operation Procedures" means the applicable rules, procedures, practices, manuals, and tariffs of the NYISO.

-4-

IRO/AE 00758

FMIC 001728

Q.    "NYPA's System" means NYPA's electric transmission system.

R.    "NYS Easement" is defined in the Preamble.

S.    "OGS" is defined in the Preamble.

T.    "Permit" means any valid consent, ruling, judgment, decree, waiver, exemption, variance, franchise, certificate, permit, authorization, approval, consent, license or similar order, including any application submitted to obtain same, of or from any Governmental Authority.

U.    "Release" means any actual or threatened release, spill, emission, emptying, escape, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment or within any building, structure, facility or fixture.

V.    "System Emergency" means the existence of a physical or operational condition or the occurrence of an event which, at the time of such condition or occurrence: (i) impairs or will imminently impair the safety and/or reliability and/or operation of NYPA's System and/or LIPA's System, or of service to NYPA's customers and/or LIPA's customers; or (ii) is imminently likely to endanger life or property.

W.    "Pipeline Emergency" means the existence of a physical or operational condition or the occurrence of an event which, at the time of such condition or occurrence: (i) impairs or will imminently impair the safety and/or reliability and/or operation of the Pipeline, or of service to Iroquois Gas' customers; or (ii) is imminently likely to endanger life or property.

X.    "System Integrity" means the adequate and reliable state of operation of NYPA's System and LIPA's System.

Y.    "Pipeline Integrity" means the adequate and reliable state of operation of the Pipeline.

Z.    "System Pre-Emergency" means a condition that reasonably could be expected, if permitted to continue, to contribute to a System Emergency or to a degraded operating condition as defined in NYISO System Operation Procedure 0.3 ("Procedure 0.3"). Degraded operating conditions include the Alert, Warning, Major Emergency, and Restoration as defined in Procedure 0.3.

AA.    "Y-49 Cable" shall have the meaning set forth in the Preamble of this Agreement, and any addition, substitution or replacement thereof, in whole or in part.

-5-

IRO/AE 00759

FMIC 001729

BB.   "Prudent Utility Practice" means any of the practices, methods or acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods or acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Prudent Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to delineate acceptable practices, methods, or acts generally accepted in the region.

CC.   "LIPA's System" means LIPA's electric transmission and distribution system.

## ARTICLE II
## NO OBJECTION TO IROQUOIS GAS EASEMENT

The Grantee in exchange for the consideration and covenants set forth herein, does not object, to the extent permissible under the NYS Easement and subject to the terms thereof, this Agreement and Applicable Laws, to (1) the grant by OGS to Iroquois Gas of the Iroquois Gas Easement, (2) the Crossing, and (3) the construction, and installation, operation, maintenance, repair, and replacement of the Pipeline by Iroquois Gas. In the event that the Iroquois Gas Easement is not granted by OGS on or before the date which is one year from the date of this Agreement, then either Party may terminate this Agreement on twenty (20) days prior written notice to the other Party. Iroquois Gas shall provide a copy of the Iroquois Gas Easement to Grantee upon request.

## ARTICLE III
## PIPELINE INSTALLATION AND CONSTRUCTION
## PROCEDURES AT THE CROSSING

A.   Iroquois Gas shall perform and furnish or cause to be performed and furnished, and be responsible for all costs and expenses associated with, all work, materials, equipment and services in connection with the design, engineering, construction, installation, testing and operation of the Pipeline at the Crossing. Set forth in Exhibit A attached hereto (and made a part hereof) are the procedures, plans, specifications and technical requirements ("Scope of Work") which shall be followed by Iroquois Gas in performing the installation and construction of the Pipeline at the Crossing (the "Work"). For purposes of this Agreement, the Work shall be deemed complete on the day which is one hundred twenty (120) days after the date upon which the Pipeline commences

-6-

IRO/AE 00760

FMIC 001730

commercial operation. Iroquois Gas shall notify the Grantee of the date upon which the Pipeline commences commercial operation. The Scope of Work has been reviewed by the Grantee and Grantee acknowledges that it has no objection to Iroquois Gas proceeding with the Work in accordance with the Scope of Work. The Scope of Work may not be modified or changed unless such modification or change is agreed to by the Parties. The Scope of Work reflects the Best Engineering Practices in effect at the current time. Notwithstanding the foregoing, the Grantee acknowledges and agrees that the procedures set forth in the Scope of Work must be consistent with the terms and conditions of any Applicable Permits. In the event of any conflict or inconsistency between the Scope of Work and the Applicable Permit, the Parties shall mutually resolve the conflict or inconsistency.

B.     Iroquois Gas shall perform and furnish or cause to be performed and furnished, at its sole cost and expense, the Work in accordance with: (i) all Applicable Laws; (ii) the Scope of Work; and (iii) Applicable Permits. With respect to those items of Work described in the Scope of Work which involve the use of heavy structures or heavy equipment at the Crossing, Iroquois Gas shall provide the Grantee and LIPA with at least thirty (30) days prior written notice of the estimated date on which such Work is scheduled to commence. With respect to all other items of Work described in the Scope of Work, Iroquois Gas shall provide the Grantee and LIPA with at least twenty-one (21) days prior written notice of the estimated date on which such Work is scheduled to commence at the Crossing. Iroquois Gas shall provide the Grantee and LIPA with weekly updates as to any changes in the scheduling of the Work. Iroquois Gas shall permit the Grantee, LIPA or their representatives access to the Work at all times including, but not limited to, any and all marine and underwater operations performed by Iroquois Gas in connection with the Work.

C.     Prior to the commencement of the Work, Iroquois Gas shall meet with NYPA's System operator and LIPA's System operator to coordinate and schedule the Work in an effort to prevent the performance of the Work at the Crossing on a Critical Day. Either the Grantee or LIPA shall have the right to immediately stop the construction and installation of the Pipeline at the Crossing upon oral notice to Iroquois Gas, if, and only if, as determined by Grantee's system operator or LIPA's system operator, as the case may be, (1) a System Emergency or System Pre-Emergency or Critical Day has occurred, (2) the continuation of the construction and installation of the Pipeline jeopardizes the continued transmission and delivery of electrical energy through the Y-49 Cable, and (3) additional reserve capacity from other locations on the Grantee's system or LIPA's system, as the case may be, is not available to Grantee or LIPA, as the case may be, at comparable prices. Upon receipt of such notice from Grantee or LIPA, Iroquois Gas shall immediately stop the construction and installation of the Pipeline at the Crossing and shall immediately confirm such stoppage to Grantee and LIPA.

-7-

IRO/AE 00761

FMIC 001731

D.     Iroquois Gas shall defend, indemnify and hold harmless the Grantee from and against any and all costs and expenses incurred as a result of damage to the Y-49 Cable arising out of or connected with the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents and employees in connection with the Work.

E.     Iroquois Gas shall furnish, at its sole cost and expense, the Grantee, LIPA and OGS with any permits, surveys, maps and other documentation that may be required by OGS or any Governmental Authority, in connection with this Agreement.

F.     The approval by the Grantee of the Scope of Work shall not result in any liability to the Grantee, it being intended by the Parties that such approval indicates only that the Grantee has no objection to Iroquois Gas proceeding with the Work pursuant to the Scope of Work.

G.     In the event that the Y-49 Cable is damaged or rendered inoperable, during the Work, and such damage or inoperability arises out of the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees: (i) Iroquois Gas shall pay all costs and expenses to repair and restore the Y-49 Cable to the operational status as existed before the damage or rendering of inoperability; and (ii) the Grantee shall make arrangements for and provide, at Iroquois Gas' sole cost and expense, equivalent replacement electrical capacity during the period the Y-49 Cable is inoperable or out of service. Notwithstanding the foregoing, the Grantee agrees to use commercially reasonable efforts at all times to mitigate any damages for which Iroquois Gas may be responsible pursuant to this Section G.

H.     Iroquois Gas has caused the area near the Crossing to be surveyed and investigated. In connection with such survey and inspection, the following reports have been previously provided to the Grantee: (1) Iroquois Eastchester Pipeline Route Alignment Sheet Plan and Profile, Sheet 11 of 16, Drawing No. H-1183.04-20.1-DRW-04-011-3, dated June 21, 2002, (2) Eastchester Extension Project Diver Inspection of Cable Crossing Sites in Long Island Sound, dated January 2002, and (3) NYPA Cable Crossing Design Report - by INTEC Engineering - June 2002. Iroquois Gas accepts the matters set forth in such reports as representing the current conditions at the Crossing (except for the condition of the Y-49 Cable).

I.     In the event that, during the Work, either Party learns that the Facilities of the other Party is/are damaged or destroyed, such Party shall immediately notify the other Party orally, which notice shall be promptly confirmed in writing. The Parties agree to cooperate with each other in good faith to develop a plan to govern the procedures to be followed if any repairs are required. The procedures and protocols for performing the Work shall, to the maximum possible extent, apply to such repairs.

-8-

IRO/AE 00762

FMIC 001732

## ARTICLE IV
## OPERATION, MAINTENANCE AND REPAIRS AT CROSSING AFTER PIPELINE CONSTRUCTION

A.    As between the Parties hereto, Iroquois Gas shall perform and furnish or cause to be performed and furnished, and be responsible for all costs and expenses associated with, all work, services, materials and equipment in connection with the operation and maintenance of, repairs to, and relocation of, the Pipeline at the Crossing (collectively, "Iroquois Repair Work"). Except for payments and expenses for which Iroquois Gas is responsible under the Service Agreement (as herein defined), the Grantee shall perform and furnish, or cause to be performed and furnished, and be responsible for all costs and expenses associated with, all work, services, materials and equipment in connection with the operation and maintenance of, repairs to, and relocation of, the Y-49 Cable (collectively, "Grantee Repair Work" and together with Iroquois Repair Work, "Repair Work"); provided, however, that Iroquois Gas shall bear all costs and perform all work associated with the relocation and replacement of the Pipeline protective structures (e.g., concrete mats, rock, rip-rap, etc.) in the event Grantee requires access to the Y-49 Cable at the Crossing as set forth in Article IV Section B.

B.    Iroquois Gas shall pay any and all additional costs and expenses reasonably incurred by the Grantee due to the presence of the Pipeline over the Y-49 Cable which are incurred by the Grantee in connection with Grantee Repair Work. In the event Grantee intends to perform Grantee Repair Work on the Y-49 Cable at the Crossing or in the event of an emergency affecting the Y-49 Cable at the Crossing and, in either case, there is no practical way to perform such work other than by relocating, removing and replacing the Pipeline protective structures (e.g., concrete mats, rock, rip-rap, etc.), Iroquois Gas shall, at its sole cost and expense, make immediate arrangements for and provide to Grantee unobstructed access (except for the presence of the Pipeline) to the Y-49 Cable at the Crossing.

C.    As between the Parties hereto, Iroquois Gas shall perform Iroquois Repair Work in accordance with: (i) all Applicable Laws; (ii) Good Engineering Practice; and (iii) all Applicable Permits, and, except for payments and expenses for which Iroquois Gas is responsible under the Service Agreement, the Grantee shall perform Grantee Repair Work in accordance with: (i) all Applicable Laws; (ii) Good Engineering Practice; and (iii) all Applicable Permits.

D.    Neither Iroquois Gas, on the one hand, nor the Grantee, on the other hand, shall operate the Facilities or perform Repair Work, in any manner that: (i) results in or could be reasonably expected to result in any damage to the Facilities; (ii) otherwise results in or could be reasonably expected to result in (x) personal injury or loss of life, (y) physical damage or physical harm to property, NYPA's System, LIPA's System or

-9-

IRO/AE 00763

FMIC 001733

the Pipeline, or (z) damage or harm to System Integrity, Pipeline Integrity or public safety; (iii) has or is reasonably likely to have an adverse effect on the operation and quality of service provided by NYPA's System, LIPA's System or the Facilities; and/or (iv) creates or contributes, or could be reasonably expected to create or contribute to a System Emergency, System Pre-Emergency or Pipeline Emergency.

E.    The Grantee shall have access to the Y-49 Cable as necessary for the purpose of conducting all normal business incident to inspecting, operating, maintaining, repairing and replacing the Y-49 Cable. Iroquois Gas shall have access to the Pipeline as necessary for the purpose of conducting all normal business incident to inspecting, operating, maintaining, repairing and replacing the Pipeline.

F.    Whenever a Party intends to perform Repair Work at the Crossing, such Party shall give reasonable advance written notice to the other Party setting forth when and where such activities will be conducted and a description (in reasonable detail) of the nature of the Repair Work to be conducted. In addition, whenever a Party intends to perform work on any of its facilities (at any location) and such activities could reasonably be expected to have an adverse impact on the Facilities, such Party shall give reasonable advance written notice to the other Party setting forth when and where such activities will be conducted and a description (in reasonable detail) of the nature of the work to be conducted and a description of the potential adverse impact upon the Facilities. The aforementioned notification requirements shall apply in all cases, including emergencies, provided that in the case of an emergency, the notice shall be given as soon as is reasonably practicable under the circumstances.

G.    Except in cases of emergency affecting the Pipeline, either the Grantee or LIPA shall have the right to immediately stop the performance of Iroquois Repair Work at the Crossing upon oral notice to Iroquois Gas, if, and only if, as determined by the Grantee's system operator or LIPA's System operator, as the case may be, (1) a System Emergency or System Pre-Emergency or Critical Day has occurred, (2) the Iroquois Repair Work jeopardizes the continued transmission and delivery of electrical energy through the Y-49 Cable, and (3) additional reserve capacity from other locations on Grantee's system or LIPA's System, as the case may be, is not available to Grantee or LIPA, as the case may be, at comparable prices. Upon receipt of such notice from Grantee or LIPA, Iroquois Gas shall immediately stop the Iroquois Repair Work at the Crossing and shall immediately confirm such stoppage to Grantee and LIPA.

H.    Each Party and LIPA shall have the right to have a representative present to observe any Repair Work being conducted at or near the Crossing which reasonably could be expected to have an adverse impact on such Party's Facilities including, but not limited to, any and all marine and underwater operations.

I.    In the event that either Party learns that the Facilities of the other Party

-10-

IRO/AE 00764

FMIC 001734

is/are damaged or destroyed, such Party shall immediately notify the other Party orally, which notice shall be promptly confirmed in writing. The Parties agree to cooperate with each other in good faith to develop a plan to govern the procedures to be followed if any Repair Work is required. A sample repair plan is annexed hereto and made a part hereof as Exhibit C, which is hereby incorporated into and made a part of this Agreement.

J.    Subject to the terms and conditions of Article VI hereof, (1) Iroquois Gas agrees to provide to the Grantee copies of all maintenance and inspection reports relating to the area of the Pipeline at the Crossing, including, but not limited to, the results of any "smart pig" and cathodic testing, and (2) the Grantee agrees to provide to Iroquois Gas copies of all maintenance and inspection reports relating to the area of the Y-49 Cable at the Crossing.

K. :    In the event that the Y-49 Cable is damaged or rendered inoperable, during any Iroquois Repair Work, and such damage or inoperability arises out of the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees, then Iroquois Gas shall pay all costs and expenses to repair and restore the Y-49 Cable to the operational status as existed before the damage or rendering of inoperability. In the event that the Pipeline is damaged or rendered inoperable, during any Grantee Repair Work, and such damage or inoperability arises out of the negligence, acts, omissions or willful misconduct of the Grantee, its contractors, subcontractors, agents or employees, then Grantee shall pay all costs and expenses to repair and restore the Pipeline to the operational status as existed before the damage or rendering of inoperability. Notwithstanding the foregoing, the Party whose Facility has been damaged or rendered inoperable agrees to use commercially reasonable efforts at all times to mitigate any damages for which any other Party may be responsible pursuant to this Section K.

## ARTICLE V
## PAYMENT

A.    After the execution and delivery of this Agreement by the Parties, the Parties agree to promptly negotiate, execute and deliver an agreement ("Service Agreement") which will govern the rights and obligations of the Parties with respect to certain payments to be made by Iroquois Gas to the Grantee. The terms and conditions of the Service Agreement shall provide as follows. Iroquois Gas shall pay all costs reasonably incurred (1) by Grantee and LIPA in reviewing and preparing this Agreement as well as any and all plans, specifications and documents relating to the Scope of Work, (2) by Grantee and LIPA in retaining consultants reasonably necessary for oversight of the Work, and (3) by Grantee and LIPA for oversight of the Work by Grantee and LIPA. Set forth in Exhibit D attached hereto is a list of the costs already incurred by Grantee and

-11-

IRO/AE 00765

FMIC 001735

LIPA in connection with the foregoing as well as a reasonable estimate of said costs that will be incurred by Grantee and LIPA through the end of the Work. The Service Agreement shall also provide that after the completion of the Work, Iroquois Gas shall pay the Grantee and LIPA for the costs reasonably incurred by Grantee related to review and oversight of any Iroquois Repair Work; provided, however, before any costs shall be incurred by Grantee or LIPA relating to review and oversight of Iroquois Repair Work, Grantee and LIPA shall submit to Iroquois Gas for review an estimate of the costs expected to be incurred by Grantee and LIPA relating to review and oversight of Iroquois Repair Work. The remaining terms and conditions of the Service Agreement shall be mutually satisfactory to the Parties. Iroquois Gas shall make an advance payment of One Hundred Thousand and no/100 ($100,000.00) Dollars (the "Deposit") towards the costs expected to be billed to Iroquois Gas under the Service Agreement. In the event that the costs billed under the Service Agreement at the completion of the Work are less than the amount of the Deposit, then and in such event the Grantee shall promptly refund to Iroquois Gas the amount of the Deposit which remains unused.

B.    For any other amounts for which a Party is entitled to reimbursement under this Agreement, the Party incurring such costs and expenses shall invoice the Party responsible under this Agreement to pay such costs and expenses on a monthly basis for all such reimbursable costs and expenses incurred during the previous month. The Party responsible for paying such costs and expenses shall pay all invoiced amounts within thirty (30) days of receipt of such invoice. Any overdue amounts shall bear interest from the due date through the date of payment at a rate of 1.5% per month.

### ARTICLE VI
### CONFIDENTIALITY

A.    Each Party (the "Receiving Party") shall keep confidential and shall cause its trustees, directors, officers, affiliates, employees, contractors, agents and other representatives (including financial advisors, attorneys and accountants) (collectively, the "Representatives") to keep confidential (except to the extent disclosure may be compelled by a Governmental Authority or required pursuant to Applicable Laws, and then only after compliance with Section B of this Article VI) any and all documents and information that are designated "confidential" and that are (i) furnished or disclosed by another Party hereto (the "Disclosing Party") in connection with this Agreement or (ii) learned by the Receiving Party, during the course of performance of this Agreement (the "Confidential Information"); provided, however, that the obligation hereunder to maintain Confidential Information shall expire two (2) years after any such Confidential Information is first furnished, disclosed or learned. The term "Confidential Information" shall not include any such documents or information that (i) is or becomes generally available to the public other than as a result of a disclosure by the Disclosing Party or its Representative, (ii) is

-12-

IRO/AE 00766

FMIC 001736

developed by the Receiving Party or its Representative independently and without use of, and does not contain or reflect, information furnished by the Disclosing Party or its Representative, or (iii) is or becomes available to the Receiving Party on a non-confidential basis from a source (other than the Disclosing Party or its Representative) which, to the best of the Receiving Party's knowledge after due inquiry, is not prohibited from disclosing such information to the Receiving Party by a legal, contractual or fiduciary obligation to the Disclosing Party. The Receiving Party shall not without the prior written consent of the Disclosing Party, release or disclose Confidential Information to any person, other than to its Representative on a need to know basis and who have first been advised of the confidentiality provisions of this Article VI and have agreed to comply with such provisions.

B.    In the event that the Receiving Party or any of its Representatives receive a subpoena or are otherwise ordered by a Governmental Authority or by Applicable Law to disclose any of the Confidential Information, the Receiving Party shall notify the Disclosing Party promptly so that the Disclosing Party may seek a protective order or other appropriate remedy or, in the Disclosing Party's sole discretion, waive compliance with the terms of this Article VI.

1.    In the event that no such protective order or other remedy is obtained, or that the Disclosing Party does not waive compliance with the terms of this Article VI, the Receiving Party shall furnish only that portion of the Confidential Information which the Receiving Party is advised by counsel is legally required and, except where disclosure on a non-confidential basis is required such as under New York State Freedom of Information Law, shall exercise its reasonable best efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information so furnished.

2.    Notwithstanding anything in this Article VI to the contrary, if FERC or its staff, during the course of an investigation or otherwise, requests information from the Receiving Party that is otherwise required to be maintained in confidence pursuant to this Agreement, the Receiving Party shall provide the requested information to FERC or its staff within the time provided for in the request for information. In providing the information to FERC or its staff, the Receiving Party shall, consistent with 18 C.F.R. Section 388.112, request that the information be treated as confidential and non-public by FERC and its staff and that the information be withheld from public disclosure. The Receiving Party shall notify the Disclosing Party, when it is notified by FERC or its staff, that a request for disclosure of, or decision to disclose, Confidential Information has been received, at which time either of the parties may

-13-

IRO/AE 00767

FMIC 001737

respond before such information would be made public, pursuant to 18 C.F.R. Section 388.112.

C.    In the event of litigation relating to the confidentiality provisions of this Article VI, if a court of competent jurisdiction determines in a final, nonappealable order that this Article VI has been breached by a Party or its Representatives, then such breaching Party shall reimburse the other Party for the reasonable costs and expenses (including legal fees and expenses) incurred in connection with all such litigation.

D.    By providing Confidential Information, neither the Grantee nor Iroquois Gas makes any warranties or representation as to its accuracy or completeness.  In addition, by supplying Confidential Information, neither the Grantee nor Iroquois Gas obligates itself to provide any particular information or Confidential Information to the other Party nor to enter into any further agreements or proceed with any other relationship or joint venture.

E.    Each Party shall use at least the same standard of care to protect Confidential Information as it uses to protect its own confidential information from unauthorized disclosure, publication or dissemination.

F.    Upon termination of this Agreement for any reason, each Party shall, promptly upon receipt of a written request from the other Party, destroy, erase or delete or return to the other Party without retaining copies thereof, any and all written or tangible Confidential Information received from the other Party.

## ARTICLE VII
### INSURANCE

A.    During the period commencing with the start of installation of the Pipeline in the Long Island Sound and (except as set forth in Section A.5 below) continuing until the date which is one hundred twenty (120) days after the Pipeline has commenced commercial operation, Iroquois Gas, at its own cost and expense, shall procure and maintain, and/or cause its contractors and subcontractors to procure and maintain, the following minimum insurance:

1.    <u>Workers' Compensation Insurance</u> in accordance with statutory requirements and Employer's Liability insurance with a minimum liability limit of $1,000,000 per accident.  Maritime Employers Liability and/or Jones Act Coverage will be required of Iroquois Gas' contractors and subcontractors when applicable.

-14-

IRO/AE 00768

FMIC 001738

2.   <u>Commercial General Liability Insurance</u> with a minimum liability limit of $1,000,000 per occurrence, $2,000,000 general aggregate. Such policy shall include standard Contractual Liability coverage. NYPA shall be named as additional insured with respect to operations relating to this Agreement for incidents arising out of the negligence of Iroquois Gas, its contractors or subcontractors.

3.   <u>Commercial Automobile Liability Insurance</u> with a minimum liability limit of $1,000,000 per occurrence. This insurance shall apply to all owned, non-owned, and hired automobiles used by Iroquois Gas.

4.   <u>Umbrella Liability Insurance Policy</u> with coverage for Commercial General Liability, Automobile Liability, and Employer's Liability with a minimum liability limit of $30,000,000 per occurrence. Such policy shall contain sudden and accidental pollution coverage.

5.   Maritime Liability Insurance and/or Protection and Indemnity Insurance covering all owned, hired and non-owned marine craft with a combined single limit of not less than $5,000,000. Notwithstanding that the Work shall not be deemed complete until the date which is one hundred twenty (120) days after the Pipeline has commenced commercial operation, Iroquois Gas shall have no obligation to maintain the insurance set forth in this Section A.5 after the actual completion of the Work; provided, however, that in the event any Repair Work at the Crossing shall require Iroquois Gas to use marine vessels to perform such Repair Work, Iroquois Gas shall procure and maintain (or cause its contractors or subcontractors to procure and maintain) the insurance required by this Section A.5 during the performance of such Repair Work.

6.   Contractors Pollution Liability Policy in the amount of $10,000,000 per occurrence, $10,000,000 general aggregate will be in place during construction of Eastchester Extension with a five (5) year completed operations endorsement.

7.   Iroquois Gas shall deliver to the Grantee, prior to the start of construction, certificates of insurance showing that the insurance requirements set forth in this Article VII A are in full force and effect and that not less than thirty (30) days written notice will be given to the Grantee prior to cancellation, termination or material alteration of the insurance. The provision of such insurance, however, shall in no manner relieve or release Iroquois Gas, its

-15-

IRO/AE 00769

FMIC 001739

agents, contractors, subcontractors, and invitees from liability, or limit such liability as to any and all obligations herein assumed.

8.    In the event that any of the above insurance policies are available only on a claims-made basis, then the dates of coverage (including the retroactive dates) and the time period within which any claim can be filed will be so stated on the certificate of insurance and Iroquois Gas shall not permit any lapse in coverage to occur.

9.    Iroquois Gas shall notify the Grantee's Claims Departments, in writing, of all accidents arising out of its performance under this Agreement verbally within forty-eight (48) hours, to be confirmed in writing within five (5) days, after Iroquois Gas learns of such occurrence. Such notice by Iroquois Gas to the Grantee shall not relieve Iroquois Gas of any of its obligations under this Agreement nor be construed to be other than mere notification.

10.   In the event that Iroquois Gas causes or permits any of the required insurance to lapse or be cancelled and fails to promptly provide equivalent coverage, the Grantee may, at its option, purchase comparable insurance and charge back the costs of such insurance to Iroquois Gas, which charge shall be due and payable in full by Iroquois Gas on the Grantee's demand therefor.

11.   Iroquois Gas shall also be responsible for ensuring that all contractors and subcontractors performing work at the Crossing obtain reasonable limits of insurance in forms and with companies consistent with those set forth in this Article.

12.   Iroquois Gas and its contractors and subcontractors shall name NYPA as additional insured under all of Iroquois policies of insurance as set forth in this Article.

13    All policies of insurance required to be obtained by Iroquois Gas pursuant to the terms of this Article VII A shall be primary to any insurance policies held or obtained by Grantee.

B.    (1) The Parties agree to carry, at their own cost and expense and throughout the term of this Agreement, policies of insurance covering fire, liability, worker's compensation, property all-risk, comprehensive bodily injury, property damage liability and automobile liability, products, completed operations, explosion and collapse, contractual and personal injury liability and other forms of insurance relating to, in the case of Iroquois Gas, the Pipeline and, in the case of the Grantee, the Y-49 Cable. Such insurance shall be in such amounts, have such deductibles and retentions and be

-16-

IRO/AE 00770

FMIC 001740

underwritten by such companies as would be obtained by a reasonably prudent operator in the electric power business or gas transmission business, as applicable, and shall be primary and noncontributory with any insurance carried by the other Party and it shall not require that such other Party pay any premium thereunder. Notwithstanding the foregoing, either Party may self-insure against any of the liabilities set forth in the first sentence of this Article VII B (1) if such Party satisfies all applicable statutory and regulatory criteria with respect to the self-insurance of the relevant liability and provides notice to the other Party of such Party's intention to self-insure. Upon receipt of any notice of cancellation or expiration of any such insurance policy, the Party receiving such notice shall immediately give written notice to the other Party.

(2) The Parties agree to furnish each other with certificates of insurance evidencing the insurance coverage set forth in this Article VII B and, upon reasonable request, a copy of any insurance policy referred to therein.

(3) Except for worker's compensation insurance, each Party shall be named as an additional insured under the general liability insurance policies maintained by each Party pursuant to this Article VII B.

## ARTICLE VIII
## ENVIRONMENTAL MATTERS

A. The Parties agree to cooperate with each other concerning (i) any plans to prevent or respond to spills of Hazardous Substances at or near the Crossing, to the extent such plans are required by any Governmental Authority, (ii) the selection of a response measure or remedial action and any follow-up or other reports required under applicable Environmental Laws in connection with any Release described in paragraph B below, and (iii) obtaining any Permits required by any Governmental Authority as a result thereof.

B. Each Party shall upon discovery immediately notify the other Party orally, which notice shall be promptly confirmed in writing, of any Release of Hazardous Substances (i) at or near the Crossing or (ii) originating from, or relating to, any facilities, equipment or systems owned by the other Party that are located at the Crossing. In the event of any such Release, such notifying Party shall make all initial notifications to Governmental Authorities required under Applicable Laws.

C. Notwithstanding anything to the contrary in the foregoing, Iroquois Gas shall make all initial notifications to Governmental Authorities required under Applicable Laws and shall take all required initial response measures to contain and isolate any Release of Hazardous Substances, at its own expense, which is caused by Iroquois Gas during the Work.

IRO/AE 00771

FMIC 001741

## ARTICLE IX
## INDEMNIFICATION AND LIMITATION OF LIABILITY

A.    Iroquois Gas shall indemnify, save harmless, and defend the Grantee and its parent corporations, subsidiaries, affiliates, shareholders, officers, trustees, directors, employees, contractors, subcontractors and agents (the "Indemnified Parties") against all claims, demands, losses, damages, judgments, and associated costs and expenses for property damage, personal injury, bodily injury, and/or death suffered by third parties, including reasonable attorneys' fees and other costs of legal defense and of investigating any proceeding commenced or threatened, arising out of the negligence, acts, omissions or willful misconduct of Iroquois Gas or its contractors, subcontractors or agents. In accordance with the above, the Indemnified Parties shall have the right to demand that Iroquois Gas undertake to defend the Indemnified Parties with counsel reasonably approved by the Indemnified Parties, against all lawsuits for which Iroquois Gas has a duty to defend, indemnify and save harmless the Indemnified Parties.

B.    Iroquois Gas shall defend, indemnify and hold harmless the Indemnified Parties from any and all loss, damage, penalty or injury, including reasonable attorneys' fees, expenses and other costs of legal defense and of investigating any proceeding commenced or threatened, arising out of any violation of Applicable Laws and/or Applicable Permits by Iroquois Gas in the performance of the Work, its parent, subsidiaries, affiliates, shareholders, officers, directors, employees, contractors, subcontractors and agents. This indemnification and hold harmless obligations shall be separate from and independent of any other indemnification and hold harmless obligation set forth in this Agreement.

C.    Grantee shall indemnify, save harmless, and defend Iroquois Gas and its partners, subsidiaries, affiliates, officers, trustees, directors, employees, contractors, subcontractors and agents (the "Iroquois Indemnified Parties") against all claims, demands, losses, damages, judgments, and associated costs and expenses for property damage, personal injury, bodily injury, and/or death suffered by third parties, including reasonable attorneys' fees and other costs of legal defense and investigating any proceeding commenced or threatened, arising out of the negligence, acts, omissions or willful misconduct of the Grantee, or its respective contractors, subcontractors or agents. In accordance with the above, the Iroquois Indemnified Parties shall have the right to demand that the Grantee undertake to defend the Iroquois Indemnified Parties with counsel reasonably approved by the Iroquois Indemnified Parties, against all lawsuits for which the Grantee has a duty to defend, indemnify and save harmless the Iroquois Indemnified Parties.

D.    Neither the Grantee nor its parent corporations, subsidiaries, affiliates, shareholders, officers, trustees, directors, employees, contractors, subcontractors or agents shall be liable to Iroquois Gas or its parent corporation, subsidiaries, affiliates,

-18-

IRO/AE 00772

FMIC 001742

partners, shareholders, officers, directors, employees, contractors, subcontractors or agents for incidental, special, indirect or consequential damages of any nature based on any theory of action including, but not limited to, breach of warranty, breach of contract, strict liability or negligence, arising out of performance under this Agreement. Except as otherwise provided in Article III Section G of this Agreement, neither Iroquois Gas nor its partners, subsidiaries, affiliates, officers, directors, employees, contractors, subcontractors or agents shall be liable to the Grantee and its corporate parents, subsidiaries, affiliates, trustees, officers, directors, employees, contractors, subcontractors or agents for incidental, special, indirect or consequential damages of any nature based on any theory of action including, but not limited to, breach of warranty, breach of contract, strict liability or negligence, arising out of performance under this Agreement.

E.    The Grantee acknowledges and agree that (a) the obligations of Iroquois Gas under this Agreement are the obligations of the partnership; (b) the Grantee shall have no recourse against any Partner in Iroquois Gas and its sole recourse shall be against the partnership assets, irrespective of any failure to comply with Applicable Law or any provisions of the Agreement; and (c) the Grantee shall have no right of subrogation to any claim of Iroquois Gas for any capital contributions from any Partner to Iroquois Gas.

F.    The total liability of the Grantee to Iroquois Gas on all claims of any kind accruing, whether in contract, warranty, indemnity, tort (including, but not limited to, negligence), strict liability, or otherwise, arising out of this Agreement shall not exceed twenty-five million dollars ($25,000,000.00).

G.    The obligations to indemnify and hold harmless set forth shall survive the expiration or termination of this Agreement.

## ARTICLE X
## TERM, DEFAULT, TERMINATION AND REMEDIES

A.    This Agreement shall become effective as of the date written above upon receipt of the amount of the payment set forth in Article V.

B.    Iroquois Gas shall immediately pay the Grantee any and all amounts due and owing under this Agreement upon termination.

C.    Iroquois Gas may terminate this Agreement for convenience upon thirty (30) days written notice to the Grantee. If Iroquois Gas terminates this Agreement for convenience, Iroquois Gas shall, within a reasonable time after termination of the Agreement, provide for the removal of the Pipeline at the Crossing and restoration of the Crossing to substantially the condition existing prior to installation of the Pipeline, and

-19-

IRO/AE 00773

FMIC 001743

Iroquois Gas shall be responsible for all costs and expenses associated with such removal and disposal of the Pipeline and restoration of the Y-49 Cable.

D.    Events of Default. The occurrence of one or more of the following events so long as the same is continuing shall constitute an "Event of Default" under this Agreement:

(i)    The failure by either Party to pay any and all amounts due under this Agreement which continues for a period of ten (10) days after notice of such non-payment is delivered to the defaulting Party.

(ii)    The failure by either Party to substantially perform any material obligation under this Agreement and which failure continues for a period of thirty (30) days after notice thereof has been received by the defaulting Party .

(iii)    The revocation or loss of any license, Permit, or other governmental approval materially affecting Iroquois Gas' ability to operate the Pipeline, provided that Iroquois Gas has waived and/or exhausted any and all rights to appeal.

(iv)    The failure by Iroquois to substantially perform any of the Work and which failure continues for a period of ninety (90) days after notice thereof has been received by Iroquois Gas.

E.    Notice and Opportunity to Cure Event of Default. Upon actual discovery of an Event of Default, a Party claiming the occurrence of such Event of Default must promptly provide the alleged defaulting Party with written notice of the Event of Default and any remedy sought ("Notice of Default"). The defaulting Party shall either:

(i)    At its sole cost and expense cure the Event of Default within the time period designated in Sections D(i), D(ii), D(iii) or D(iv) above; or

(ii)    If an Event of Default under Section D(ii), D(iii) or D(iv) above reasonably requires additional time to cure then such defaulting Party will, at its cost and expense, from the date such Party receives written Notice of Default, have (a) a sixty (60) day cure period from the date of the Notice of Default, or (b) if the defaulting Party provides a commercially reasonable cure plan to the other Party that requires more time than provided in Section E(ii)(a) of this Article X, then the defaulting Party shall be

-20-

IRO/AE 00774

FMIC 001744

extended such additional time to cure the Event of Default and the other Party shall have no right to seek remedies for breach of this Agreement, provided that the defaulting Party diligently pursues such cure plan.

F.    Remedies. If an Event of Default shall have occurred and be continuing, the non-defaulting Party, subject to the terms and conditions of this Agreement, shall be entitled to such remedies and damages as are available at law and equity. The non-defaulting Party also has the right to commence an action to terminate this Agreement; and, in the event of a final, non-appealable ruling by a court of competent jurisdiction finding that the non-defaulting Party has grounds to terminate this Agreement, such non-defaulting Party shall have the right to terminate this Agreement and withdraw its No-Objection Letter to the rights described in Article II of this Agreement. The termination of this Agreement shall not discharge any of the Parties from any obligations which may have accrued under this Agreement prior to such termination.

G.    If either Party is required or otherwise deems it advisable to remove its Facilities from the area at the Crossing, such Party shall bear all costs and expenses associated with such removal, except that Iroquois Gas shall, at its sole cost and expense, make immediate arrangements for and provide to Grantee unobstructed access (except for the presence of the Pipeline) to the Y–49 Cable at the Crossing. If Iroquois Gas abandons the Pipeline, Iroquois Gas shall remove, subject to Applicable Laws, the Pipeline and all protective structures (e.g., concrete mats, rock, rip-rap, etc.) at the Crossing as necessary to provide Grantee unobstructed access to the Y–49 Cable.

# ARTICLE XI
## CREDIT ASSURANCE

If at any time, Iroquois Gas' creditworthiness is impaired (a material adverse change in rating below BBB by Standard & Poors and Baa2 by Moody's), Iroquois Gas shall deliver reasonable performance assurance in the form of cash or an irrevocable and unconditional letter of credit, naming the Grantee as beneficiary. The letter of credit shall be an irrevocable and unconditional letter of credit issued by a major U.S. bank (or foreign bank with a U.S. branch office) with a credit rating of at least "A" by Standard & Poors and "A2" by Moody's (the "Issuer") and shall be in a form reasonably acceptable to the Party in whose favor the letter of credit is issued. Each letter of credit shall be a Credit Support Document. The letter of credit shall be in an amount to be reasonably determined by the Grantee to provide adequate assurance for Iroquois Gas' obligations hereunder during the performance of the Work and Iroquois Gas Repair Work. The letter of credit shall be immediately effective and shall permit the Grantee to make demand(s) for and receive payment from the Issuer for any amounts due the Grantee under this

-21-

IRO/AE 00775

FMIC 001745

Agreement or the Service Agreement and shall require Issuer to honor on sight any written demand by the Grantee for payment under the letter of credit.

## ARTICLE XII
## FUTURE AGREEMENTS

A.    The Parties acknowledge that the Pipeline will also cross a power transmission line ("Y-50 Cable") owned by Consolidated Edison Company of New York, Inc. ("Con Edison") and LIPA, located under Long Island Sound. Therefore, Iroquois Gas will be entering into an agreement with Con Edison and LIPA pursuant to which *inter alia*, Con Edison and LIPA will consent to OGS issuing the Iroquois Gas Easement. Iroquois Gas covenants that the terms and conditions of its agreement with Con Edison and LIPA for the Y-50 crossing (whether such agreement be written or oral or embodied in one or more documents, letters, etc.) shall be substantially the same as the terms and conditions of this Agreement.

B.    The Parties also agree that in the event that after the date hereof either Party intends to construct facilities in the Long Island Sound which will cross the Facilities or any other facilities owned by the other Party, then and in such event (1) the terms and conditions of any agreement between the Parties with respect to such future crossing shall be substantially the same as the terms and conditions of this Agreement, and (2) the Parties which are not constructing said facilities shall provide (if requested) a No Objection Letter to OGS. Unless otherwise agreed to in writing by the affected Parties, the procedures, plans, specifications and technical requirements set forth in the Scope of Work shall apply to any such future crossing, subject to reasonable modifications and changes that may be necessitated by analysis of site-specific conditions.

C.    If requested by the Grantee, Iroquois Gas agrees to cooperate with the Grantee in obtaining an extension of the NYS Easement for a period expiring no sooner than the expiration of the Iroquois Gas Easement. If OGS requires Iroquois Gas to consent to such extension of the term of the NYS Easement or to provide a No Objection Letter in connection therewith, Iroquois Gas hereby agrees to provide such consent or No Objection Letter upon the same terms and conditions as such consent and No Objection Letter was provided herein by the Grantee to Iroquois Gas.

D.    Iroquois Gas represents that the Crossing is not located in a heavy shipping lane nor anchor high strike area (as designated by the United States Coast Guard). Iroquois Gas shall promptly notify the Grantee if either of the foregoing conditions change. Consistent with Good Engineering Practice, Iroquois Gas will install (at its own cost and expense) such additional equipment at the Crossing as is necessitated

IRO/AE 00776

FMIC 001746

by any increased risk of damage to the Y-49 Cable due to a change in the foregoing conditions.

## ARTICLE XIII
## MISCELLANEOUS

A.    Independent Contractor.  At all times during the term of this Agreement, neither Party shall be deemed to be an independent contractor nor an employee, partner, joint venture participant or agent of the other Party.  Neither Party shall represent that any such relationship exists.

B.    Governing Law.  This Agreement is made in, and shall be interpreted, construed, governed and enforced in accordance with the laws of the State of New York. Each of the Parties hereby agrees to submit to the nonexclusive jurisdiction of the United States District Court for the Eastern District of New York and/or any New York State Supreme Court sitting in Nassau or Suffolk Counties for the purposes of all legal proceedings arising out of or relating to this Agreement. Each of the Parties hereby irrevocably waives, to the fullest extent permitted by law, any objection to the selection of this venue and any claim that any proceeding brought in such a court has been brought in any inconvenient forum.

C.    Force Majeure.  Notwithstanding anything to the contrary contained herein, a Party shall not be liable for its failure to perform obligations, except for payment obligations, set forth in this Agreement if and to the extent such failure has been occasioned by the occurrence of a force majeure event. The term "force majeure event" as used herein shall include acts of God, fires, floods, storms, hurricanes, strikes, labor disputes, riots, insurrections, acts of war (whether declared or otherwise), unforeseeable acts of governmental or judicial bodies, the breakdown, malfunctioning or failure of all or any part of the subject facilities or necessary equipment caused by an event of force majeure, or any other unforeseeable causes beyond the reasonable control of and which do not involve the fault, negligence or willful misconduct of the Party claiming force majeure. The Parties understand and agree that a failure or inability by any of the Parties to obtain and/or maintain sufficient funds to perform their obligations shall not constitute a force majeure event.  If either Party, because of an event of force majeure, is rendered wholly or partly unable to perform its obligations hereunder, that Party shall be excused from whatever performance is prevented by the force majeure to the extent so prevented, provided that such suspension of performance shall be of no greater scope and of no longer duration than is required by the force majeure, and further provided that (i) the Party claiming force majeure gives the other Party written notice describing the particulars of the occurrence within three (3) days of its occurrence, and (ii) the Party claiming force majeure uses reasonable diligence to remedy its inability to perform.

-23-

IRO/AE 00777

FMIC 001747

D.    <u>Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either Party, including by operation of law, without the prior written consent of the other Party, which shall not be unreasonably withheld, delayed or conditioned, except (i) in the case of NYPA (A) to an affiliate of NYPA in connection with the transfer of the Y-49 Cable to such affiliate or (B) to a lending institution or trustee in connection with a pledge or granting of a security interest in the Y-49 Cable and this Agreement and (ii) in the case of Iroquois Gas (A) to an affiliate of Iroquois Gas or a third party in connection with the transfer of the Pipeline to such affiliate or third party or (B) to a lending institution or trustee in connection with a pledge or granting of a security interest in all or any part of the Pipeline and this Agreement; <u>provided</u>, <u>however</u>, that no assignment or transfer of rights or obligations by and Party shall relieve it from the full liabilities and the full financial responsibility, as provided for under this Agreement, unless and until the transferee or assignee shall agree in writing to assume such obligations and duties and the other Party have consented in writing to such assumption.

E.    <u>Severability</u>. If any article, phrase, provision, or portion of this Agreement is adjudged to be invalid, illegal or unenforceable by any court of competent jurisdiction, such article, phrase, provision, or portion so adjudged shall be deemed separate, distinct, and independent, and the remainder of this Agreement will be and remain in full force and effect and will not be invalidated or rendered illegal or unenforceable or otherwise affected by such adjudication.

F.    <u>Amendments</u>. All modifications to this Agreement shall be in writing and signed by duly authorized representatives of each Party.

G.    <u>Inurement.</u> This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

H.    <u>Counterparts.</u> This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

I.    <u>No Waiver</u>. No failure or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder. No waiver, termination, or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon any of the Parties unless it is in writing and is signed by an authorized representative of the Party to be charged therewith.

-24-

IRO/AE 00778

FMIC 001748

J.    Entire Agreement. This instrument constitutes the entire Agreement by and among the Parties hereto with respect to the matters addressed herein and supersedes any and all other agreements, understandings and negotiations or discussions, either oral or in writing, express or implied, by and among the Parties hereto.

K.    Section Headings. The section headings herein are inserted for convenience only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

L.    Corporate Authorization. The Parties hereto hereby represent and warrant that this Agreement is legally binding and that the respective officers executing this Agreement have been duly authorized to do so.

M.    Notices. Any notice, consent, authorization, determination, or other communication required or permitted to be given or made pursuant to this Agreement shall be in writing and shall be sufficiently given or made if:

1.    Mailed by U.S. certified or registered mail, postage prepaid, return-receipt requested; or

2.    Telecopied to the facsimile number set forth below and followed by a copy delivered in accordance with Section M.1 or M.3; or

3.    Delivered by nationally recognized express or overnight courier.

Notices shall be sent as follows:

If to NYPA:
Power Authority of the State of New York
123 Main Street
White Plains, New York  10601
Attention:  Charles Lipsky, Vice President and Chief Engineer
Tel. No.: (914) 681-6758
Facsimile No.: (914) 681-6534

Emergency Notification by Telephone
Available Three Hundred Sixty-five (365)
Days Per Year and Twenty-four (24)
Hours Per Day:
(315) 792-8228

If to Iroquois Gas:

-25-

IRO/AE 00779

FMIC 001749

Iroquois Pipeline Operating Company
One Corporate Drive, Suite 600
Shelton, Connecticut 06484
Attention: Vice President, Engineering & Operations
Tel. No.: (203) 925-7200
Facsimile No.: Facsimile No.: (203) 925-7213

Emergency Notification by Telephone
Available Three Hundred Sixty-five (365)
Days Per Year and Twenty (24)
Hours Per day:
1 (800) 888-3982

If to LIPA:
Long Island Lighting Company d/b/a LIPA
333 Earle Ovington Boulevard
Suite 403
Uniondale, New York 11553
Attention:  Office of General Counsel
Tel. No.: (516) 222-7700
Facsimile No.: (516) 222-9137

Emergency Notification by Telephone
Available Three Hundred Sixty-five (365)
Days Per Year and Twenty (24)
Hours Per day:
(516) 545-4007

Notices shall be deemed effective when received.  The Parties may designate a
different notice destination by written notice to the other Party given in accordance
herewith.


**Signature Page to Follow**

IRO/AE 00780

FMIC 001750

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be executed by their duly authorized agents and representatives as of the day and year first above written.

POWER AUTHORITY OF THE STATE OF NEW YORK

By: _____
               (Signature)

Name: __Charles I. Lipsky, P.E.__
                    (Print)
Title: __Vice President & Chief Engineer__

Date: ____October 30, 2002_____


IROQUOIS GAS TRANSMISSION SYSTEM, L.P.
By Its Agent,
IROQUOIS PIPELINE OPERATING COMPANY

By: _____
               (Signature)

Name: __Craig R. Frew__
           __PRESIDENT__
                    (Print)
Title: _____

Date: __10/17/02_____

IROQUOIS GAS TRANSMISSION SYSTEM, L.P.
By Its Agent,
IROQUOIS PIPELINE OPERATING COMPANY

By: _____
               (Signature)

Name: __Jeffrey A. Bruner__
     __Vice President, General Counsel & Secretary__
                    (Print)
Title: _____

Date: __10/17/02_____


-27-

IRO/AE 00781

FMIC 001751

-28-

IRO/AE 00782

FMIC 001752

EXHIBIT "A"

## GENERAL PIPELINE INSTALLATION PROCEDURE
## AT Y-49 CABLE CROSSING LOCATION

A.    Preliminary site investigation: IGTS has performed a preliminary site investigation that includes geophysical as well as bathymetric surveys. The surveys have located the cable crossing locations and these data and proposed crossing coordinates have been provided to NYPA.

B.    IGTS will diver-inspect the proposed crossing location to confirm the suitability of the seabed conditions. The diver will use a hand held magnetometer or equivalent device to confirm the location of the cables beneath the seabed in the Crossing. IGTS will also attempt to determine the depth of cover of soil over the cables using an electronic, hand-held cable locator tool. IGTS will fix the coordinates of the cable crossing and provide this information to NYPA.

C.    Prior to laying the Pipeline, the Pipeline contractor will independently (from IGTS) confirm the cable crossing locations. The contractor will use divers to locate the cables using hand-held electronic equipment. This requirement shall be included in the Pipeline construction contract specifications, a copy of which shall be provided to NYPA.

D.    The contractor will lay an articulated concrete mat (type to be determined) on the seabed over the cable crossing location. Details of the proposed mat will be provided to NYPA prior to installation of the mat. Divers and/or a camera equipped remote operated vehicle (ROV) will monitor this operation.

E.    As the Pipeline is being laid it will be pre-trenched using a plow or jetting tool. During the pipe laying operation the trenching tool will be stopped and raised clear of the seabed approximately 200-ft before the cable crossing location. No trenching will occur within 200-ft either side of the cables.

F.    The divers will confirm the appropriate placement of the mats with respect to the cable position prior to Pipeline installation. An as-built record will be made of the position of the mat relative to the cable orientation prior to installing the Pipeline.

G.    The Pipeline will be laid across the mats. Divers will confirm the correct placement of the Pipeline relative to the mats.

H.    Divers will place sand bags under the Pipeline in the trench at predetermined locations on both sides of the cable crossings to support the pipe prior to backfilling the

-29-

IRO/AE 00783

FMIC 001753

trench.

I.    Divers will place protective articulated concrete mats over the Pipeline. These will extend back approximately 100 feet from the cable on both sides of the Crossing.

J.    An as-built record will be made of the work progress and completed protective mat installation.

K.    Crushed stone will be placed over the exposed Pipeline in the trench on both sides of the cable crossings. No crushed stone will be placed over the protective concrete mats at the cable crossings.

L.    Under no circumstances shall the IGTS gas Pipeline be located closer than four feet in any dimension from the NYPA cable. The installation of the Pipeline shall be in accordance with the study performed by IGTS (NYPA Cable Crossing Design Report). The installation shall meet the criteria stated in said report. Should the Pipeline settle beyond the amount stated in that study it will become the responsibility of IGTS to correct the situation and return the separation to a minimum of five (5) feet.

M.    Burying the Pipeline in the Sound by plowing methods will be permitted to resume beyond a point which is at least 200 lineal feet from the Crossing Point. Burying the Pipeline by plowing is absolutely prohibited within a 200 foot radius of the Crossing Point.

N.    Iroquois Gas will utilize sacrificial anodes for cathodic protection. Additional cathodic protection anodes will be installed by Iroquois Gas within the Crossing.

O.    Iroquois Gas shall utilize fusion bond epoxy-coated line pipe with a three and three-quarter inch (3 _") thick reinforced concrete coating outer layer for buoyancy control, stability and mechanical protection.

P.    Iroquois Gas shall notify NYPA of the completion of construction within the Crossing and as soon as practicable thereafter, will cause a reproducible "as-built" survey of the Crossing installation by a licensed New York State surveyor to be delivered to NYPA.

Q.    Iroquois Gas shall mark the Crossing with buoys prior to construction or as otherwise directed by NYPA.

R.    Iroquois Gas shall require its lay barge contractor to prepare, develop and submit to Iroquois Gas an anchor plan for its approval prior to the commencement of the Work. Iroquois Gas shall make such anchor plan available to NYPA upon request.

IRO/AE 00784

FMIC 001754

S.      Iroquois Gas, its contractors and subcontractors shall not perform any Work at the Crossing which will require lifting and placing of the concrete mattresses during a heavy sea condition that in the reasonable judgment of the Grantee's representative will create a significant risk of damage to the Y-49 Cable. In addition, Iroquois Gas, its contractors and subcontractors shall not perform any Work at the Crossing during: (a) the presence of any named storm affecting the area of the Crossing which has the potential to produce wave heights greater than Sea State 4 (maximum wave heights of 2.4 meters); and/or (b) a severe weather condition affecting the area of the Crossing which has the potential to produce wave heights greater than Sea State 4 (maximum wave heights of 2.4 meters); (c) a mechanical malfunction on the lay barge and/or stand by vessel which impacts the anchor plan and/or positioning of the lay barge.

T.      Iroquois Gas has represented that the Crossing is located beyond heavy shipping lanes and high anchor strike areas. Iroquois Gas will notify NYPA as soon as practicable upon recognition of any change in these conditions and will promptly furnish and install, at its cost, any additional protection to the Y-49 Cable to reflect any increase in risk presented by such change or changes.

U.      Iroquois agrees to provide additional protection at the crossing in the form of either (in Iroquois Gas' sole discretion) (a) a Kevlar fabric wrap of the pipeline at each of the individual Y-49 cable crossings, or (b) a blanket of Kevlar material between the pipeline and the cables at each of the individual Y-49 cable crossings. If a Kevlar wrap is to be used, Iroquois agrees to provide four layers of Kevlar fabric, wrapped and fastened around the pipe where it crosses each of the Y-49 cables. For this method, Iroquois agrees to wrap an approximately 40 foot long section of the pipeline such that when layed over each of the Y-49 cables, the actual pipeline/cable crossing point will lie within the central twenty feet of the 40 foot length of Kevlar wrapped pipe. Each of the four layers will be of Kevlar fabric with an individual fabric layer thickness of 10 mils or greater. If a blanket is used, Iroquois agrees to provide four or more layers of Kevlar fabric within the blanket. The Kevlar material may be directly attached or adhered to the lightweight concrete mattresses for purposes of installation or may be placed separately as blankets. The total thickness of the Kevlar blankets (or layers as may be attached or adhered directly to the lightweight concrete mattresses) shall be 0.25 inches or greater, including the effects of bulking. Iroquois agrees not to significantly weight the Kevlar blankets with material having a specific gravity greater than that of sea water.

V.      The Grantee will conduct an acoustic (sonar) survey of the Crossing on an annual basis to verify the condition of the Crossing. This survey will be performed once each calendar year for the first five years following commercial operation of the Pipeline. At the end of such five year period, Iroquois Gas will consult with the Grantee with regards to the frequency of future surveys based on the conditions observed during previous years.

-31-

IRO/AE 00785

FMIC 001755

EXHIBIT "O"

## MASTER SERVICE AGREEMENT NO. 98-3083

THIS AGREEMENT, made and entered into this 8ᵗʰ day of January, 1999, by and between HORIZON OFFSHORE CONTRACTORS, INC., a Delaware corporation with offices at 2500 City West Blvd., Suite 2200, Houston, Texas 77042 ("Company") and RACAL NCS, INC., a Delaware corporation with offices at 3624 Westchase Drive, Houston, Texas 77042 ("Subcontractor"). THIS AGREEMENT CONTAINS INDEMNITY AND INSURANCE PROVISIONS BINDING ON SUBCONTRACTOR.

### W I T N E S S E T H:

WHEREAS, Company is engaged in the business of offshore installation and pipelay activities and/or other offshore related activities including production of oil and gas, on a contract basis for other companies or for its own account, and in the course of such operations regularly and customarily enters into contracts with independent subcontractors for the performance of services relating thereto or to the vessels and other equipment and property, real and personal, of Company and its customers; and

WHEREAS, Company desires, as a matter of company policy, to establish and maintain an approved list of subcontractors and to offer work or contracts only to those subcontractors who are included on such approved list; and

WHEREAS, Subcontractor represents that it has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and/or otherwise performing services for Company.

NOW, THEREFORE, IN CONSIDERATION of the mutual promises, covenants, conditions, and agreements herein contained, the sufficiency of which is hereby acknowledged, and the specifications and special provisions set forth in the exhibits attached hereto and made a part hereof, the parties hereto mutually agree as follows:

### 1.0   AGREEMENT AND TERM

1.1     Subcontractor agrees that Subcontractor shall provide adequate equipment in good working order and condition and fully trained personnel capable of efficiently operating such equipment and/or otherwise performing services for Company (collectively the "Work") at locations designated by Company from time to time. Upon execution of this Agreement and compliance with its terms, including without limitation the furnishing of certificates of insurance or copies of policies as required under Section 6.3 hereof, Company agrees that the name of Subcontractor shall be added to the Company's approved list of Subcontractors. This Agreement shall remain in force and effect until canceled by either party by giving the other party thirty (30) days advance notice in writing in the manner provided for in this Agreement. If Subcontractor's then current Work for Company extends beyond thirty (30) days in duration following the giving of notice of termination by Subcontractor, which notice must be given in the manner provided



herein, then cancellation shall not be effective until such current Work is completed or terminated earlier by Company.

1.2     This Agreement shall control and govern all Work performed by Subcontractor for Company, under subsequent verbal and/or written Work orders, and all other occasions when Subcontractor is on Company's vessels, premises, or other work sites, whether or not Subcontractor is then working for Company or another party. At such time as Company desires Subcontractor to perform Work, Company shall issue to Subcontractor a written or verbal Work order. The terms and conditions of this Agreement shall be deemed incorporated by reference in such written or verbal Work orders as though set out in full therein and made a part thereof. Any agreement or stipulations in any confirmation of such Work orders, delivery ticket, rate schedule, bids, proposals, purchase orders, or any other instrument used by Subcontractor containing provisions contrary or inconsistent or in addition to the terms and conditions of this Agreement or such Work orders are rejected and shall not be binding on Company or form a part of any agreement between Company and Subcontractor, even if signed, accepted, or approved by an agent, employee, or representative of Company.

## 2.0     LABOR, EQUIPMENT, MATERIALS, SUPPLIES AND SERVICES

2.1     When notified by Company, either verbally or by written Work order, of the Work desired, Subcontractor shall commence furnishing same at the designated time and location, with sufficient personnel, equipment, and materials, and continue such operations diligently and without delay to promptly complete the Work and by any designated completion date set forth in the Work order, in strict conformity with the specifications and requirements contained herein and such Work orders. Such Work orders shall specify the rates or other compensation payable to Subcontractor, the duration of the Work requested, the time and location of the Work to be performed, and other special clauses to cover the specific Work desired by Company.

2.2     Subcontractor shall not employ in any Work for Company any employee whose employment violates any labor, employment or other applicable laws. Subcontractor shall not employ in any Work for Company any employee who is a minor.

2.3     Subcontractor shall assign to each site where Work is being performed a superintendent, satisfactory to the Company, who shall be authorized to act on behalf of Subcontractor in all matters related to the execution of the Work. Subcontractor's superintendent will attend the Work during all normal working hours and be available at all times. Subcontractor's superintendent shall be fully authorized to represent Subcontractor in the performance of this Agreement and the Work order and the execution of the Work. Subcontractor shall inform Company in writing of the name and qualifications of such superintendent prior to assignment to the job, and Subcontractor shall not remove or replace such superintendent without prior written notice to and approval from Company.

2.4     Company shall appoint one or more representatives to coordinate with Subcontractor's superintendent Subcontractor's performance of the Work. Such Company representatives shall not have the authority to amend, modify, or waive the provisions of this Agreement or the Work order.

-2-

2.5    All Work performed by Subcontractor shall be done with due diligence, in a good and workmanlike manner, using skilled, competent and experienced workmen and supervisors, and in accordance with good construction practices and to the satisfaction of Company. Subcontractor shall be solely responsible for the Work under this Agreement and the Work order, including the techniques, sequences, procedures, and means, and for coordinating the Work with Company's activities and other subcontractors, whether connected with the Work or otherwise. All materials, equipment, supplies or manufactured articles furnished by Subcontractor shall be selected and used with good construction practice for their respective purposes, and shall be free from defects and conform fully to Company's specifications. All Work found defective, unsuitable, or non-conforming shall be removed, replaced or corrected by Subcontractor to Company's satisfaction without additional cost or risk to Company.

2.6    Subcontractor warrants that its Work shall be (i) free of defects in workmanship and materials, (ii) performed in a good and workmanlike manner consistent with applicable industry standards and practices and utilizing sound engineering and/or technical principals where applicable, (iii) performed with new, merchantable, and fit materials, and (iv) in full accordance with this Agreement, the Work order, and Company's specifications.  To the extent assignable, all rights and remedies available to Subcontractor or its subcontractors from their vendors, suppliers, and subcontractors shall be passed directly to Company.  Subcontractor's warranty shall apply for a period of one (1) year from the date of completion of Company's work on the project in question and acceptance thereof by Company's customer, if applicable, or such longer warranty period as Company may agree to in its present and future contracts with its customers . All warranty defects and deficiencies shall be promptly repaired, replaced, or otherwise corrected by Subcontractor to Company's satisfaction without additional cost or risk to Company.  Company shall also have all rights and remedies provided by the Uniform Commercial Code as adopted in the State of Texas.

2.7    Subcontractor's responsibilities under this Agreement and the Work order, including without limitation the obligations of Subcontractor to perform its work in full compliance with the terms and conditions of this Agreement and the Work order and Subcontractor's warranty obligations, shall apply regardless of any interim or final inspections, tests, acceptances, or approvals by Company or its customer or any failure to inspect, test, accept, or approve the Work. Nothing contained in this Agreement or the Work order shall be deemed to obligate Company to inspect all or party of the Work.  No interim or final payment shall relieve Subcontractor of its responsibilities under this Agreement or the Work order.

2.8    Subcontractor agrees to inspect all materials and equipment furnished by Company and employed in the course of operations conducted hereunder and shall notify Company of any apparent defects therein before using such materials and equipment. Should Subcontractor use such materials and equipment without notifying Company of any defect, Subcontractor shall be deemed to have assumed all risk and liability for any mishap that may occur in operations conducted hereunder by reason of failure or defects in such materials and equipment.

2.9    Delivery tickets covering any materials or supplies delivered to location by Subcontractor or furnished by vendors for which Company is obligated to reimburse Subcontractor

THALES          000003

shall be delivered to Company as received. The quantity, description, and condition of materials and supplies so furnished shall be verified and checked by Subcontractor, and the delivery shall be properly certified as to receipt by Subcontractor's representative. Upon receipt of the delivery tickets, a representative of Company shall review such tickets and, if the materials and supplies are of satisfactory quantity, description and condition, approve them; provided, however, that such approval shall in no way relieve or release Subcontractor from any performance, warranty, or other obligation hereunder with regard to such supplies and materials. If the quantity, description and condition of any materials or supplied covered by any delivery ticket are not satisfactory to such representative of Company, Subcontractor agrees to promptly substitute the same with materials and supplies acceptable to Company.

2.10    Subcontractor shall present Company's representative with daily time tickets. Approval of such daily time tickets shall in no way relieve or release Subcontractor of its obligations under this Agreement or the Work order and shall be without prejudice to Company's right to review whether Subcontractor's personnel were present, the Work performed, or the reasonableness of Subcontractor's charges.

2.11    Subcontractor shall fully inform Company's representative regarding plans to perform Work. No Work shall be performed by Subcontractor or any of its subcontractors without forty-eight (48) hours advance notice to Company's representative. Subcontractor shall furnish Company's representative with every reasonable facility for ascertaining whether the Work performed is in accordance with the requirements and intent of this Agreement and the Work order. Should any Work be performed without affording to Company's representative the opportunity to inspect such Work, Company's representative may require Subcontractor to uncover such Work for examination, in which case the cost of uncovering such Work shall be borne by Subcontractor, whether or not the Work is found acceptable. At the request of Company's representative, Subcontractor at any time before acceptance of the Work by Company shall remove or uncover such portions of the finished Work as may be directed. After examination, Subcontractor shall restore said portions of the Work to the standards required by this Agreement and the Work order. Should the Work thus exposed or examined prove to be in accordance with this Agreement and the Work order, the uncovering or removing, and the replacing of the covering or making good of the parts removed, shall be paid for as extra work, but should the Work so exposed or examined prove not to be in accordance with this Agreement and the Work order, the uncovering or removing, and the replacing of the covering or the making good of the parts removed, shall be at Subcontractor's expense.

2.12    Subcontractor agrees to maintain its equipment in good operating condition at all times and shall use all reasonable means to control and prevent accidents and pollution, protect Company's operations, and protect Company's equipment.

2.13    Subcontractor shall make a thorough inspection of the worksite and its surroundings before starting the Work to familiarize itself with all conditions relative to the Work. Subcontractor shall obtain all licenses and permits necessary for Subcontractor's performance of the Work.

-4-

2.14   Company shall have the right to reject and/or deny access to its property, facilities or other worksite to any employees or representatives of Subcontractor or any of its subcontractors whom Company considers unqualified or otherwise unsatisfactory for any reason and Subcontractor shall replace same with personnel acceptable to Company. Notwithstanding the above, Company and Subcontractor agree that Company shall have no right to terminate, discharge, discipline, or affect any other term or condition of employment of any employee or agent of Subcontractor. Any decision to terminate, discharge, discipline, or other wise affect any other term or condition of employment of any employee or agent of Subcontractor shall be the sole act of Subcontractor and Company shall have no liability therefore. Subcontractor agrees and covenants that should any current or former employee or agent of Subcontractor assert any cause of action, claims, damage, demand, liability, loss, or suit against Company arising out of Company's rejection or denial of access to such employee or agent or otherwise from performance of Work under this Agreement and the Work order, then Subcontractor shall release, protect, defend, indemnify and hold harmless Company therefrom.

2.15   Company may at any time and without notice to sureties change or issue additional instructions, specifications or drawings, or change, omit or require additional Work to be done by Subcontractor. In such event, Company shall have full authority to specify the amount and kind of Work to be done or omitted, the materials to be used, and the equipment to be furnished. Subcontractor shall make no additions, changes, alterations or omission, perform extra work or supply or use extra materials or equipment of any kind, except in accordance with a prior approved change order executed by Company.

2.16   If Subcontractor is required to provide engineering and design services for the Work, Subcontractor warrants those engineering and design services (the "Engineering/Design Services") rendered on the Work to be performed in accordance with the generally accepted standards and practices prevailing in the engineering industry by individuals qualified in specific technical areas.  If any of the Engineering/Design Services fail to comply with the foregoing warranty, Subcontractor shall re-perform, without additional charge, all or any portion of the Engineering/Design Services originally performed in a faulty manner.

3.0   PAYMENT

3.1   Company shall pay Subcontractor for the Work at the rates stipulated in the Work orders provided for herein, subject to and conditioned upon Subcontractor complying in full with its obligations, covenants, and agreements contained in this Agreement and the Work order and upon such Work being accepted by Company as fully complying with all the terms, conditions, specifications and requirements of this Agreement and the Work order and being invoiced not later than thirty (30) days after completion of the Work. Subcontractor shall invoice Company at the end of each month for work performed in such month with full supporting documentation including delivery tickets and daily time tickets signed by Company's duly authorized representative, and such other documentation and back up as Company shall require. Company shall pay to Subcontractor the undisputed portion of such invoices within sixty (60) days of receipt. Company shall have the right to withhold payment of amounts in dispute, without interest, and to setoff or deduct from payments due Subcontractor hereunder amounts claimed by Company from Subcontractor, whether or not under this Agreement or the Work order.

-5-

3.2    The prices charged by Subcontractor for goods, facilities, and service provided to the Company shall be the lowest of (a) the prices stated on Subcontractor's published price lists most recently provided to the Company at the time the Work is provided, (b) any prices negotiated between the Company and Subcontractor at the time the Work is provided, and (c) any prices submitted by Subcontractor in a bid to Company for the Work. Subcontractor represents that the prices charged to Company for the Work shall be the lowest prices charged by Subcontractor to any entity for services and/or materials substantially similar in quality and quantity to the Work. Prior to the parties agreeing on a particular price, the Company shall have the right at any time to request and negotiate for prices lower that Subcontractor's published prices or to request bids from Subcontractor and other contractors.

3.3    When a rate is on a daily basis, twenty-four (24) hours shall constitute a day unless the parties agree otherwise in writing. When less than a full day is worked, Subcontractor shall be paid only that proportionate part of the rate per day which the number of hours worked, computed to the nearest one-half hour bears to the number of hours agreed to constitute a day. When a day is agreed to mean a period of twenty-four hours, the day shall coincide with the calendar day. All time for which payment is due Subcontractor shall be the actual time worked on location computed to the nearest one-half hour. Actual days or hours worked under this Agreement and the Work order, as the case may be, shall be considered to commence each day only when actual work is commenced on location and to cease each day when work ceases on location, except that if rigging up of machinery is necessary, rigging up and dismantling time shall be included. If Company agrees in advance in writing to pay for travel time or for transportation of goods or services, Subcontractor shall identify such travel time and transportation charges on its invoices separately from other time and costs billed. Charges for transportation of goods or services to and from the work location shall be calculated from the nearest competitive point to the work location unless otherwise agreed upon.

3.4    All Work orders, delivery tickets, and invoices shall be accurate and shall describe the Work in reasonable detail, including equipment condition, item counts, applicable footage, weight, etc., and service and delivery dates. All Work orders, delivery tickets, and invoices shall bear Company's project name and number as well as any subcontractor number assigned by Company to Subcontractor.

3.5    The rates charged by Subcontractor as determined by the terms and conditions of this Agreement and the Work order shall cover and include all the considerations to be received by Subcontractor from Company for the performance of the Work, whether or not specifically enumerated, and shall cover and include all material, overhead, superintendence, labor, use of equipment furnished, engineering, sales, use, and similar taxes, and all other cost and expense incurred by Subcontractor in performance of said Work.

3.6    Company shall have the right to audit Subcontractor's books and records relating to all invoices issued pursuant to this Agreement and the Work order. Subcontractor agrees to maintain such books and records for a period of three (3) years from the date such costs were incurred and to make such books and records available to Company at any time or times within such three year period. Company shall be entitled to make copies of all such books and records.

-6-

3.7   Subcontractor shall be invoiced by Company at Company's current rate for communication costs incurred by Subcontractor or its contractors and subcontractors or their personnel, whether business related or personal, utilizing Company's communications equipment. Such invoices shall be payable on presentation.

## 4.0   REPORTS TO BE FURNISHED BY SUBCONTRACTOR

4.1   The quantity, description and condition of the materials and supplies and/or services furnished shall be verified and checked by Subcontractor, and all delivery tickets and daily service logs shall be properly certified as to receipt by Subcontractor's representative. Subcontractor must obtain approval of Company's representative on location for materials and supplies for which Subcontractor is to be reimbursed by Company.

4.2   Subcontractor shall orally report to Company, as soon as practicable, followed by an appropriate written report, all accidents or occurrences resulting in job related death, illness, or injuries to Subcontractor's employees or third parties, or damage to property of Company or third parties or the environment arising out of or during the course of Work to be performed hereunder. Subcontractor shall furnish Company with a copy of all reports of such accidents and occurrences made by Subcontractor to Subcontractor's insurer or governmental authorities and all correspondence or other communications to or from the same regarding such accidents and occurrences.

## 5.0   INDEPENDENT CONTRACTOR RELATIONSHIP

In the performance of any Work by Subcontractor for Company, Subcontractor shall be deemed to be an independent contractor, with the authority and right to direct and control all details of the Work, Company being interested only in the results obtained. However, all Work contemplated shall meet the approval of Company and shall be subjected to a general right of inspection. Company shall have no right or authority to supervise or give instructions to the employees, agents, or representative of Subcontractor, but such employees, agents or representatives at all times shall be under the direct and sole supervision and control of Subcontractor. Any suggestions or directions given by Company or its employees shall be given to the superintendent or other person in charge of Subcontractor's crew; provided however, that in the event any employee or representative of Company should give any order or instructions to the employees of Subcontractor (which employee or representative of Company shall not in any event be authorized to do) and such order is not countermanded by Subcontractor's superintendent or other person in charge of Subcontractor's employees or crew, it shall be deemed that such orders or instructions are the orders or instructions of Subcontractor. It is the understanding and intention of the parties hereto that no relationship of master and servant or principal and agent shall exist between Company and the employees, agents, or representatives of Subcontractor, whether by "borrowed servant" or any other legal theory, and that all Work covered hereby shall be performed at the sole risk of Subcontractor.

THALES          000007

## 6.0   INSURANCE

6.1   Without limiting the indemnity obligations or liabilities of Subcontractor or its insurer(s) under this Agreement, at any and all times during the term of this Agreement, Subcontractor shall at Subcontractor's expense maintain, with an insurance company or companies authorized to do business in the location where the Work is to be performed, insurance coverages of the kind and in the minimum amounts as set forth hereinbelow and in a form and with such underwriters as are acceptable to Company. The limits specified shall be minimum limits only and the additional assureds as provided herein shall be entitled to the full limits of all policies actually obtained. Failure to maintain any of such insurances shall constitute sufficient grounds for immediate termination of this Agreement or any work order without prior notice to Subcontractor.

(a)   Workers' Compensation Insurance and Employers' Liability Insurance complying with the applicable laws of the country and state where the Work is performed, with Employers Liability limits of $500,000.00, covering all Subcontractor's employees performing Work under this Agreement, and with endorsements for voluntary compensation and borrowed servant coverage.

(b)   Comprehensive General Liability Insurance with combined limits for Bodily Injury and Property Damage of $500,000.00 per occurrence, with broad form contractual liability coverage, products and completed operations, and deletion of any care, custody, or control exclusion, and with territorial limits extended to include all areas where the Work is to be performed.

(c)   Automobile Liability Insurance for owned, non-owned, and hired automobiles, with combined limits for Bodily Injury and Property Damage of $500,000.00 per occurrence.

(d)   Physical Damage Insurance and Equipment Floater on Subcontractor's property to the extent of its full fair market value.

(e)   Aviation Liability Insurance to cover aircraft, if any, whether owned, non-owned, chartered, or hired by the Subcontractor and used for or in connection with the performance of Work under this Agreement, with a combined Bodily Injury and Property Damage limit of not less than $500,000.00 per occurrence.

(f)   Excess Liability Insurance excess to the policies required in Subparagraphs 6.1 (a), (b), (c), and (e) with corresponding extensions of coverages, and with minimum limits of $5,000,000.

(g)   In the event operations are over or adjacent to water, Subcontractor shall obtain endorsements to the statutory Workers' Compensation and Employers' Liability Insurance policy required under Subparagraph 6.1 (a) for Longshoremen's and Harbor Workers' Compensation Act, Outer

-8-

Continental shelf Lands Act Extension, and Maritime Employers' Liability including wages, transportation, maintenance and cure. The Comprehensive General Liability Insurance policy specified in Subparagraph 6.1(b) shall be endorsed to delete any watercraft exclusion. All such policies shall be endorsed to provide that a claim "in rem" will be treated as a claim "in personam". The Excess Liability Insurance required in Subparagraph 6.1(f) shall be similarly extended. In lieu of deletion of the watercraft exclusion and "in rem" endorsements in the Comprehensive General Liability Insurance policy and Excess Liability Insurance, Subcontractor may provide equivalent coverage through other policies.

(h)   If Subcontractor rents or leases marine equipment and/or furnishes marine services hereunder, Subcontractor, in addition to all applicable insurance coverage provided in Paragraph 6.1 (a), (b), (c), (d), (e), and (f) above shall carry adequate Protection and Indemnity Insurance covering any vessel or vessels used and their equipment including Tower's Liability coverage if the vessel or vessels engage in towing operations. Subcontractor shall also carry Hull and Machinery insurance in such amounts and against such risks as Company may require. The Protection and Indemnity Insurance shall be endorsed to delete any "other   than as owner" capacity and limitation of liability provisions therein. The sistership clause in the Hull and Machinery policy shall be unamended. Subcontractor shall not use any vessel or marine equipment in the performance of work for Company at any time unless said vessel is adequately covered by insurance, as herein provided, and is operated within the navigation limits of the insurance polices.

6.2    Subcontractor hereby waives subrogation and prior to commencing work for Company shall obtain from its insurers a waiver of subrogation against Company, its subsidiaries, affiliates, and interrelated companies, and their respective officers, directors, servants, employees, and agents, and their customers and their joint venturers and co-lessees in all of the insurance policies set forth in this Section and all insurance carried by Subcontractor protecting against loss of or damage to its property and equipment employed in the performance of this Agreement whether the same be set forth in this Section or not. Further, Company, its subsidiaries, affiliates, and interrelated companies, and their respective officers, directors, employees, and agents, and their customers and their joint venturers and co-lessees shall be named as additional assureds in all their capacities in all policies carried by Subcontractor, whether or not required under this Section, other than the Workers' Compensation and Employers' Liability Insurances. All such policies shall insure for negligence of additional insureds regardless of negligence of Subcontractor. All such policies shall be endorsed to provide that they are primary to any coverages maintained or available to such additional assureds, regardless of any "excess" or "other insurance" clauses therein. All such policies shall be endorsed to provide that additional assureds shall not be liable for premiums, commissions, or calls, and that Company shall be given thirty (30) days prior written notice of any cancellation, alteration, nonrenewal, or material modifications of such policies. All deductibles or self-insured retentions shall be subject to Company's approval and shall be for the sole account of Subcontractor.

-9-

6.3    All insurances required under Section 6.1 shall be carried with underwriters acceptable to Company and shall be maintained in full force and effect at all times during the term of this Agreement. Subcontractor agrees to have its insurers furnish Company a certificate or certificates evidencing the insurance coverages required herein and upon request certified copies of such policies. Any failure by Company to protest an omissions or discrepancy in such certificates of insurance from the insurances required hereunder shall not be deemed a waiver by Company of any of the obligations of Subcontractor hereunder.

6.4    In the event Subcontractor seeks to be a self-insurer and Company has consented to Subcontractor being a self-insurer as to any one or more of the risks as to which coverage is herein required, evidence of such consent must be in writing and approved by a representative of Company authorized to enter into such consent agreement.

## 7.0    INDEMNITY

7.1    In order to allocate respective responsibilities of Company and Subcontractor for liabilities arising out of personal injury or property damage, it is agreed between Company and Subcontractor that certain responsibilities and liabilities for personal injuries and property damage arising out of the performance of this Agreement should be allocated between them in order to avoid protracted litigation between Company and Subcontractor along with the associated legal expenses and so that insurance or where permitted self-insurance may be arranged by each party as necessary to protect them against these exposures to loss. The following sets out the specifics of the agreements between Company and Subcontractor as to the allocation of the responsibilities and liabilities. Company and Subcontractor shall promptly notify the other of any claim, demand, or suit that may be presented to or served upon it which would give rise to an indemnifiable claim under this Agreement. Subcontractor and Company covenant and agree to support their respective indemnity agreements by available liability insurance coverage.

7.2    SUBCONTRACTOR SHALL BE LIABLE IN ANY CASE OF ILLNESS, INJURY OR DEATH TO EMPLOYEES AND OTHER PERSONNEL OF SUBCONTRACTOR OR ITS CONTRACTORS OR SUBCONTRACTORS ANY TIER OR IN ANY CASE OF LOSS OR LOSS OF USE OR DAMAGE TO ITS OR THEIR EQUIPMENT OR OTHER PROPERTY OR PROPERTY OF THIRD PARTIES. SUBCONTRACTOR SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS COMPANY FROM AND AGAINST ANY LOSS, COST, CLAIM, OBLIGATION TO INDEMNIFY ANOTHER, LIABILITY, SUIT, JUDGMENT, AWARD OR DAMAGE, INCLUDING REASONABLE ATTORNEY'S FEES AND EXPENSES, ON ACCOUNT OF SUCH ILLNESS, INJURY, DEATH, LOSS OR DAMAGE, OR FOR REMOVAL OF WRECK OR DEBRIS WHETHER OR NOT COMPULSORY BY LAW, OR FOR POLLUTION CAUSED BY SUBCONTRACTOR'S PERFORMANCE OF THE WORK OR EMANATING FROM SUBCONTRACTOR'S EQUIPMENT, WHICH ARE INCIDENT TO OR CONNECTED WITH THE PERFORMANCE OF THE WORK UNDER THIS AGREEMENT OR BREACH HEREOF OR THE PRESENCE OF EMPLOYEES, VESSELS, OR EQUIPMENT AT ANY WORKSITE OR LOCATION OR TRANSPORTATION THEREOF TO OR FROM ANY WORKSITE OR LOCATION, REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO BY NEGLIGENCE OR

-10-

OTHER FAULT (INCLUDING SOLE, JOINT, CONCURRENT OR GROSS NEGLIGENCE) ANY OF THE PARTIES INDEMNIFIED HEREIN OR THEIR CONTRACTORS OR SUBCONTRACTORS OF ANY TIER OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY, DEFECT IN PREMISES, MATERIALS, OR EQUIPMENT, "RUIN", OR THE UNSEAWORTHINESS OR OTHER FAULT OF ANY VESSEL, OR DEFECT IN ANY PREMISES, MATERIAL, OR EQUIPMENT, OR ANY OTHER ANTICIPATED OR UNANTICIPATED EVENT OR CONDITION, AND REGARDLESS OF WHETHER PRE-EXISTING THE EXECUTION OF THIS AGREEMENT. AS USED HEREIN, "COMPANY" SHALL MEAN COLLECTIVELY COMPANY, ITS SUBSIDIARIES, AFFILIATES, AND INTERRELATED COMPANIES, AND THEIR CUSTOMERS AND THEIR JOINT VENTURERS AND CO-LESSEES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND UNDERWRITERS, AND ANY AND ALL VESSELS OWNED, CHARTERED, MANAGED, OR OPERATED BY ANY OF THE FOREGOING. THE PARTIES INDEMNIFIED HEREIN SHALL HAVE THE RIGHT TO PARTICIPATE IN THE DEFENSE OF ANY INDEMNIFIED CLAIMS AT THEIR OWN EXPENSE.

7.3    COMPANY AGREES THAT IT SHALL BE LIABLE IN ANY CASE OF ILLNESS, INJURY OR DEATH TO EMPLOYEES AND OTHER PERSONNEL OF COMPANY. COMPANY    SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS SUBCONTRACTOR FROM AND AGAINST ANY LOSS, COST, CLAIM, OBLIGATION TO INDEMNIFY ANOTHER, LIABILITY, SUIT, JUDGMENT, AWARD OR DAMAGE, INCLUDING REASONABLE ATTORNEY'S FEES AND EXPENSES, ON ACCOUNT OF SUCH ILLNESS, INJURY, OR DEATH, WHICH ARE INCIDENT TO OR CONNECTED WITH THE PERFORMANCE OF THE WORK UNDER THIS AGREEMENT OR BREACH HEREOF OR THE PRESENCE OF EMPLOYEES, VESSELS, OR EQUIPMENT AT ANY WORKSITE OR LOCATION OR TRANSPORTATION THEREOF TO OR FROM ANY WORKSITE OR LOCATION, REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO BY NEGLIGENCE OR OTHER FAULT (INCLUDING SOLE, JOINT, CONCURRENT OR GROSS NEGLIGENCE) ANY OF THE PARTIES INDEMNIFIED HEREIN OR THEIR CONTRACTORS OR SUBCONTRACTORS OF ANY TIER OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY, DEFECT IN PREMISES, MATERIALS, OR EQUIPMENT, "RUIN", OR THE UNSEAWORTHINESS OR OTHER FAULT OF ANY VESSEL, OR DEFECT IN ANY PREMISES, MATERIAL, OR EQUIPMENT, OR ANY OTHER ANTICIPATED OR UNANTICIPATED EVENT OR CONDITION, AND REGARDLESS OF WHETHER PRE-EXISTING THE EXECUTION OF THIS AGREEMENT; PROVIDED, HOWEVER, THAT COMPANY'S OBLIGATIONS AND LIABILITIES UNDER THIS SECTION 7.3 SHALL APPLY ONLY IN THE EVENT THAT THE INDEMNITY PROVISIONS OF THIS AGREEMENT BECOME SUBJECT TO CHAPTER 127 OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE OR IN THE EVENT THAT SUBCONTRACTOR'S EMPLOYEES ARE ENTITLED TO RECEIVE BENEFITS UNDER THE UNITED STATES LONGSHOREMEN'S AND HARBOR WORKERS' COMPENSATION ACT BY VIRTUE OF SECTION 4 OF THE OUTER CONTINENTAL LANDS ACT. AS USED    HEREIN,    "SUBCONTRACTOR"    SHALL    MEAN    COLLECTIVELY SUBCONTRACTOR, ITS SUBSIDIARIES, AFFILIATES, AND INTERRELATED COMPANIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AND

-11-

AGENTS. THE PARTIES INDEMNIFIED HEREIN SHALL HAVE THE RIGHT TO PARTICIPATE IN THE DEFENSE OF ANY INDEMNIFIED CLAIMS AT THEIR OWN EXPENSE.

7.4    (A)    IN THE EVENT THAT AN OTHERWISE INDEMNIFIABLE CLAIM UNDER THIS AGREEMENT IS SUBJECT TO THE INDEMNITY LIMITATIONS IN LA. REV. STAT. ANN. SECTION 9:2780(G), AS AMENDED, AND FOR SO LONG AS THAT ACT IS IN FORCE, THEN IT IS AGREED THAT THE ABOVE OBLIGATIONS TO INDEMNIFY APPLICABLE TO SUCH INDEMNIFIABLE CLAIM ARE LIMITED TO THE EXTENT OF INDEMNITOR'S COMPARATIVE NEGLIGENCE OR STRICT LIABILITY. IN THE EVENT THAT AN OTHERWISE INDEMNIFIABLE CLAIM UNDER THIS AGREEMENT IS SUBJECT TO THE INDEMNITY LIMITATIONS IN CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE, AND SO LONG AS SUCH LIMITATIONS ARE IN FORCE, THEN TO THE EXTENT IN EACH CASE NECESSARY TO MAKE THE RECIPROCAL INDEMNITY OBLIGATIONS IN THIS AGREEMENT ENFORCEABLE IT IS AGREED THAT (I) SUCH INDEMNITY OBLIGATIONS SHALL INCLUDE AS INDEMNITEES THE RESPECTIVE CONTRACTORS OF THE INDEMNIFIED PARTIES AND (II) SUBCONTRACTOR AND COMPANY COVENANT AND AGREE TO SUPPORT THEIR RESPECTIVE INDEMNITY AGREEMENTS BY LIABILITY INSURANCE COVERAGE IN THE AMOUNTS AND WITH THE COVERAGES SET FORTH IN ARTICLE 6 HEREOF AND COMPANY AGREES IN ACCORDANCE WITH SUBSECTION 7.4(B) HEREINBELOW THAT IT SHALL CARRY AND MAINTAIN THE SAME TYPES OF COVERAGE AND WITH THE EQUAL LIMITS REQUIRED OF SUBCONTRACTOR THEREUNDER. EXCEPT AS REQUIRED BY CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE IN ORDER TO HAVE ENFORCEABLE RECIPROCAL INDEMNITIES, THE LIMITS OF SUCH POLICIES SHALL NOT LIMIT SUBCONTRACTOR'S OR COMPANY'S INDEMNITY AND RELEASE OBLIGATIONS UNDER THIS AGREEMENT. TO THE EXTENT THAT THE RECIPROCAL INDEMNITY AND RELEASE OBLIGATIONS UNDER THIS AGREEMENT ARE OTHERWISE NOT ENFORCEABLE UNDER CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE, IT IS AGREED THAT ANY SUCH INDEMNITY MAY BE ENFORCED BY THE INDEMNIFIED PARTY AS A UNILATERAL INDEMNITY.

(B)    TO THE EXTENT REQUIRED BY SUBSECTION 7.4(A) HEREINABOVE, COMPANY SHALL MAINTAIN INSURANCES AND COMPLY WITH ALL REQUIREMENTS OF ARTICLE 6 APPLICABLE TO SUBCONTRACTOR WITH RESPECT TO COVERAGES, LIMITS, CERTIFICATION, AND OTHERWISE FOR THE BENEFIT OF SUBCONTRACTOR AND IN CONNECTION THEREWITH ALL REFERENCES IN ARTICLE 6 TO "SUBCONTRACTOR" SHALL BE DEEMED TO MEAN "COMPANY" AND ALL REFERENCES TO "COMPANY" SHALL BE DEEMED TO MEAN "SUBCONTRACTOR". WITHOUT LIMITATION OF SUCH OBLIGATIONS OF COMPANY HEREUNDER, COMPANY SHALL CAUSE ITS POLICIES TO BE ENDORSED TO NAME SUBCONTRACTOR AS AN ADDITIONAL INSURED WITH FULL WAIVER OF SUBROGATION AND TO PROVIDE THAT COMPANY'S POLICIES SHALL BE PRIMARY AND EXCESS AND NON-CONTRIBUTING TO ANY OTHER POLICIES OF SUBCONTRACTOR, TO THE EXTENT OF THE RISKS FOR WHICH COMPANY HAS

-12-

AGREED TO ASSUME RESPONSIBILITY AND INDEMNIFY SUBCONTRACTOR UNDER THIS AGREEMENT. THE OBLIGATIONS OF COMPANY AND SUBCONTRACTOR TO SUPPLY THE INSURANCES REQUIRED UNDER THIS AGREEMENT SHALL BE SEPARATE AND INDEPENDENT COVENANTS FROM THE OTHER COVENANTS AND AGREEMENTS OF THE PARTIES UNDER THIS AGREEMENT. EACH PARTY SHALL, OR SHALL CAUSE ITS INSURERS TO, INVOICE THE OTHER PARTY AND THE OTHER PARTY SHALL PAY ALL COSTS OF SUCH ADDITIONAL INSURED AND WAIVER OF SUBROGATION ENDORSEMENTS, WHICH COSTS AS OF THE DATE HEREOF DO NOT EXCEED $1,000.00 PER YEAR.

(C)   IF IT IS JUDICIALLY DETERMINED THAT THE MONETARY LIMITS OR SCOPE OF COVERAGE OF THE INSURANCES REQUIRED UNDER THIS AGREEMENT OR OF THE INDEMNITIES VOLUNTARILY ASSUMED UNDER THIS SECTION EXCEED THE MAXIMUM MONETARY LIMITS OR SCOPE PERMITTED UNDER APPLICABLE LAW, IT IS AGREED THAT SAID INSURANCE REQUIREMENTS OR INDEMNITY SHALL AUTOMATICALLY BE AMENDED TO CONFORM TO THE MAXIMUM MONETARY LIMITS AND SCOPE PERMITTED UNDER SUCH LAW.

(D)   THE ALLOCATIONS OF RESPONSIBILITY, INDEMNITY OBLIGATIONS, AND EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH IN THIS AGREEMENT THAT APPLY TO AN EVENT OR CONDITION THAT OCCURS DURING THE PERFORMANCE OF THIS AGREEMENT SHALL SURVIVE AND NOT BE AFFECTED BY THE EXPIRATION OR TERMINATION OF ANY WORK ORDER OR THIS AGREEMENT. THE INDEMNITEES OR RELEASED PARTIES SHALL BE ENTITLED TO REASONABLE ATTORNEYS FEES AND COSTS INCURRED IN ASSERTING OR ENFORCING THE ALLOCATIONS OF RESPONSIBILITY, INDEMNITY OBLIGATIONS, AND EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH IN THIS AGREEMENT AGAINST THE OTHER PARTY.

**8.0   BONDS**

Company shall have the right to require Subcontractor to obtain and maintain performance and payment bonds naming Company and its customers as obligee, in such amounts, with such sureties, and on such forms as shall be satisfactory to Company. The premium cost for such bonds shall be subject to Company's prior written approval and shall be for Company's account and included in the Work order.

**9.0   TAXES AND CLAIMS**

9.1   Subcontractor agrees to pay all taxes, licenses, and fees levied or assessed on Subcontractor or the employees or other personnel of Subcontractor or its contractors or subcontractors of any tier in connection with or incident to the performance of this Agreement and the Work order by any governmental agency and all unemployment compensation insurance, old age benefits, social security, or any other taxes upon the wages of the agents, employees, and representatives of Subcontractor or its contractors or subcontractors of any tier. Subcontractor

THALES          000013

agrees to require the same agreements and be liable for any breach of such agreements by any of its contractors or subcontractors of any tier.

9.2    Subcontractor agrees to reimburse Company on demand for all such taxes or governmental charges, State or Federal, that Company may be required or deem it necessary to pay on account of Subcontractor or employees of Subcontractor or its contractors and subcontractors of any tier. Subcontractor agrees to furnish Company with information required to enable it to make the necessary reports and to pay such taxes or charges. At its election, Company is authorized to deduct all sums so paid for such taxes and governmental charges from such amounts as may be or become due to Subcontractor hereunder.

9.3    Subcontractor agrees to pay all claims for labor, materials, services, and supplies furnished by Subcontractor hereunder and agrees to allow no claim, lien or charge to be fixed upon the Work or any vessels or equipment, the lease, the well, the land on which the well is located, or other property of any member of the Company Group. Subcontractor shall discharge or cause to be discharged at once or bond or otherwise secure the property of Company and such other parties and the Work against all claims, charges, liens and/or attachments or similar legal process associated with claims for payment brought by subcontractors, workmen, laborers, mechanics, materialmen, repairers, vendors, suppliers, transporters, artisans, etc. which are filed or claimed in connection with the Work under this Agreement or the Work order and shall - indemnify, protect, defend, and hold Company and such other parties harmless from and against all such claims, charges, liens and/or attachments. If Subcontractor shall fail or refuse to pay any claims or indebtedness incurred by Subcontractor in connection with the services as provided hereunder, it is agreed that Company shall have the right to pay any such claims or indebtedness out of any money due or to become due to Subcontractor hereunder. Notwithstanding the foregoing, Company agrees that it will not pay any such claim or indebtedness as long as same is being actively contested by Subcontractor and Subcontractor has taken all actions necessary (including the posting of a bond when requested by Company) to protect the property interests of Company and such other parties affected by such claim or indebtedness.

9.4    Before interim or final payments are made by Company to Subcontractor, Company may require Subcontractor to furnish lien waivers and affidavits and/or other proof in form and substance satisfactory to Company as to the matters required herein and that there are no unsatisfied claims, suits, liens, or charges for injuries to persons or property or for the payment of any sums due or to become due or otherwise owing to Subcontractor by Company.

## 10.0    LAWS, RULES AND REGULATIONS

10.1    Subcontractor agrees to comply with all laws, rules, and regulations, which are now or may become applicable to the Work or operations covered by this Agreement or the Work order or arising out of the performance of such operations and shall protect, defend, indemnify, and hold harmless the Company Group from and against any liabilities, fine, or penalty asserted or assessed as a result of violation of or failure to so comply. If Company is required to pay any fine or penalty resulting from Subcontractor's failure to comply with such laws, rules, or regulations, Subcontractor shall immediately reimburse Company for any such payment.

-14-

10.2   In the event any provision of this Agreement or the Work order is determined to be void or contrary to any applicable law, rule, or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule, or regulation, and this Agreement and the Work order as so modified, shall remain in full force and effect.

## 11.0   PATENTS

In addition to all other indemnity provisions contained herein, Subcontractor represents and warrants that the use or construction of any and all tools, equipment, and materials furnished by Subcontractor and used in the Work provided for herein does not infringe on any license, copyright, trademark, or patent issued or applied for, and Subcontractor agrees to indemnify, defend, and hold the Company Group harmless from any and all claims, demands, losses, liabilities, and causes of action of every kind and character in favor of or made by a patentee, licensee, or claimant for infringement of such license, copyright, trademark, or patent that may result from or arise out of furnishing or use of any tool or equipment, or materials by Subcontractor in connection with the Work.

## 12.0   TERMINATION OF WORK

12.1   Company may, at any time, in its sole discretion and with or without cause, terminate or suspend all or any Work covered by any Work order, verbal or written, issued hereunder.  In the event of termination by Company, subject to Company's rights and remedies provided for in Section 12.2 hereof or otherwise available to Company by contract, at law, or in equity, including the right to withhold or offset amounts owing to Company, Subcontractor shall be paid the applicable rates stipulated in the Work order (or for worked performed on a lump sum basis a prorata portion based upon the percentage of the Work completed) for Work performed up to the date of such termination or suspension. In no event shall Subcontractor be entitled to be paid prospectively for work unperformed by reason of such termination or suspension, nor shall Subcontractor be entitled to any other compensation or damages for loss of anticipated profits or otherwise.  On notice of such termination, Subcontractor shall promptly remove its personnel, machinery, and equipment from the location and shall further cooperate with Company or its designee to ensure an orderly and expeditious transition and completion of the Work. If the Work is suspended by Company, Subcontractor shall promptly resume performance of the Work upon notice from Company.

12.2   If Subcontractor shall fail to fully and timely perform its obligations and undertakings under this Agreement or the Work order, or should Subcontractor otherwise breach any of its covenants or agreements to Company, or if Subcontractor shall become insolvent or make an assignment for the benefit of creditors or if a petition in bankruptcy shall be filed by or against Subcontractor or if a receiver shall be appointed for Subcontractor or its properties, Company shall be entitled to terminate this Agreement or any Work order without prior notice to Subcontractor.  In the event of such termination, Company shall be entitled to have the Work completed by others or by Company's own employees and Subcontractor shall be liable to Company for any increased costs of completion and delay caused to Company in the performance of its contracts with its customers.  Company may withhold all sums that would otherwise be due to Subcontractor under this Agreement and the Work order to cover amounts owing to Company

-15-

hereunder ( which may include a reasonable allowance for the overhead cost of Company) and if such withheld sums are insufficient to fully cover the amounts owing to Company Subcontractor shall pay to Company on demand such additional amounts as are necessary.

## 13.0  GIFTS AND GRATUITIES

It is deemed by Company to be a conflict with the Company's interests for its employees or any members of their immediate family to accept gifts, payments, extravagant entertainment, services, or loans in any form from anyone soliciting business, or who may already have established business relations with the Company. Gifts of nominal value and entertainment, meals, and social invitations that are customary and proper under the circumstances and do not place the recipient under any obligation are acceptable. If any employee of the Company should solicit a gift or gratuity from the Subcontractor, Subcontractor hereby agrees to notify an officer of the Company of such act. It is agreed that the Company will hold such notification in confidence. It is further understood that failure by the Subcontractor to comply with the Company's policies regarding gifts and gratuities may, at the Company's option, result in the termination of this Agreement and/or the Work order and may further preclude any future dealings between the parties.

## 14.0  ILLEGAL DRUGS, ALCOHOL, AND FIREARMS

14.1    To help ensure a safe, productive work environment, Company has established a program designed to prohibit the use, transportation and possession of firearms,  weapons, explosives, drugs, and/or controlled substances, drug paraphernalia and alcoholic beverages in any office, worksite, vehicle, vessel, or facility of Company or on helicopters, boats, offshore vessels and locations, or Company's other premises. Illegal drugs include marijuana, amphetamines, barbituates, opiates, cocaine, codeine, morphine, hallucinogenic substances (LSD), and phencyclidine  (PCP) and any similar drugs and/or chemical synthetics deemed hazardous by Company.

14.2    Such programs shall apply to the employees, agents, servants, and representatives of Subcontractor or its contractors or subcontractors of any tier.

14.3    Company specifically reserves the right to carry out reasonable searches of individuals, their personal effects, and vehicles when entering, on, and leaving Company's premises or locations. The searches will be initiated by Company without prior announcement. Individuals found in violation will be removed from Company's premises or locations immediately. Submission to such a search is strictly voluntary; however, refusal may be cause for not allowing that individual on the Company's premises or locations. It is Subcontractor's responsibility to notify its personnel of this prohibition and its enforcement.

14.4    Company has implemented the Research and Special Programs Administration (RSPA) and United States Coast Guard (USCG) Drug Testing Regulations as set forth in 49 Code of Federal Regulations (CFR) Part 199 and 46 CFR Part 16 and the Department of Transportation (DOT), Procedures for Transportation Workplace Drug Testing Programs as set forth in 49 CFR Part 40. The Plan applies to the Company's DOT covered employees and contractor personnel.

THALES          000016

The regulations set forth in 49 CFR Part 199 and 46 CFR Part 16 further define the employees covered by these regulations and provide for the manner by which covered employees are selected and tested for prohibited drugs. Urine samples shall be utilized for DOT drug testing.

14.5    Subcontractor shall further comply with any and all regulations and programs adopted or imposed by Company's customers from time to time and made applicable to Company and its subcontractors.

## 15.0    EXTENSION

As a part of the consideration for this Agreement, Subcontractor hereby agrees that the provisions of Article 6 (Insurance), Article 7 (Indemnity), Article 8 (Responsibility for Loss or Damage), Article 9 (Taxes and Claims), Article 10 (Laws, Rules, and Regulations), Article 11 (Patents), and Sections 20.2 and 20.3 (Miscellaneous) shall extend to and be enforceable by and for the benefit of the Company Group.

## 16.0    GOVERNMENT REGULATIONS

The following regulations, where required by law, are incorporated in the agreement by reference as if fully set out:

(1)    The Equal Opportunity Clause prescribed in 41 CFR 60-1.4;

(2)    The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era;

(3)    The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4;

(4)    The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20;

(5)    The Americans With Disabilities Act;

(6)    Research and Special Programs Administration (RSPA) and United States Coast Guard (USCG) Drug Testing Regulations as set forth in 49 CFR Part 199 and 46 CFR Part 16 and the Department of Transportation (DOT) Procedures for Transportation Workplace Drug Testing Programs as set forth in 49 CFR Part 40; and

(7)    Section 202 of Executive Order 11246 of September 24, 1965 (30 F.R. 12,319) and any future amendments or revisions thereto.

Subcontractor shall further comply with any and all regulations and programs adopted or imposed by Company's customers from time to time and made applicable to Company and its subcontractors.

THALES                    000017

## 17.0   EXHIBITS

The following Exhibits are attached hereto and made a part of this Agreement for all purposes:

Exhibit A - Subcontractor's Rate Schedule or Bid

In the event of conflict between such Exhibit and this Agreement or the Work order, the terms and conditions of this Agreement and the Work order shall control.

## 18.0   NOTICES

Any notices under this Agreement shall be in writing and shall be delivered by hand or sent by facsimile confirmed by mail to the following addresses.

If to Company:

Horizon Offshore Contractors, Inc.
2500 City West Blvd.
Suite 2200
Houston, Texas 77042
Attention:     James K. Cole
Fax No.:       (713) 361-2690

If to Subcontractor:

Racal NCS, Inc.
3624 Westchase Drive
Houston, Texas 77042
Attention:     Anthony J. Harrison
Fax No.:       (713) 784-8162

Notices shall be deemed effective on receipt.

## 19.0   HEALTH, SAFETY AND ENVIRONMENTAL (HSE)

19.1    Subcontractor must also meet Company's HSE pre-qualification standards. Those standards, as a minimum, are:

(a)    Documented evidence that Subcontractor has an established and effective HSE management system in place with the following minimum requirements being met:

-18-

(1) Possess established HSE policies, procedures, practices guidelines which comply with regulatory requirements and meet or exceed Company standards.

(2) Employ a full time HSE professional on staff.

(3) Demonstrate management commitment and involvement in the HSE process.

(4) Maintain an effective employee communication process.

(5) Maintain an effective HSE incentive plan.

(b) Subcontractor documentation of statistical safety performance for the past three (3) years which provides total company manhours worked, lost time illnesses/injuries, restricted workday cases, medical treatment cases and fatalities. A detailed explanation of any work related fatality should accompany the statistical information.

(c) Subcontractor documentation of regulatory citations received for health, safety or environmental violations for the past three (3) years.

19.2    In addition to the documented evidence of HSE compliance, it may necessary to perform an HSE audit of the Subcontractor prior to commencing activity.

19.3    Subcontractor shall further comply with any and all regulations and programs adopted or imposed by Company's customers from time to time and made applicable to Company and its subcontractors.

## 20.0  MISCELLANEOUS PROVISIONS

20.1    This Agreement is non-exclusive and Company reserves the right to employ at any time other contractors for the Work contemplated by this Agreement or any portion thereof.

20.2    In all cases in which Work is performed in the State of Louisiana or within Louisiana territorial waters or the waters of the Outer Continental Shelf offshore therefrom where Subcontractor's employees (including Subcontractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Workers' Compensation Act, La.R.S. 23:1021 et seq., the following shall apply:  Company and Subcontractor acknowledge and agree that the Work and services contracted for hereunder are an integral part of and essential to the ability of Company to generate its goods, products and services for purposes of La.R.S. 23:1061(A). Furthermore, at all times acknowledging that Subcontractor is an independent contractor and that Company is interested only in the results obtained, the parties agree and acknowledge that Company is a statutory employer of Subcontractor's employees under La.R.S. 23:1061(A), as the same may be amended from time to time, for purposes of Work performed pursuant to this Agreement and the Work order.  The parties further agree that Subcontractor will remain responsible for all

-19-

compensation benefits owed to its employees regardless of any status of those employees as either borrowed servants or statutory employees of Company either under the Jones Act, the Longshoremen's and Harbor Workers' Compensation Act, Louisiana Workers' Compensation Act, or similar laws. Further, Subcontractor agrees to DEFEND, INDEMNIFY and HOLD Company HARMLESS from any and all claims for compensation benefits by Subcontractor's employees against the Company, and hereby waives any right of Subcontractor or right of subrogation of Subcontractor's insurers to seek reimbursement of any compensation benefits owed or paid.

20.3    Subcontractor further represents that any products or services provided pursuant to this Agreement and the Work order will be Year 2000 Compliant. This representation shall survive any warranty period or termination of this Agreement and the Work order.  Year 2000 Compliant means:

(1)     Subcontractor's software will function without interruption or human intervention with four digit year and indication of century processing on all Date Data, including errors or interruptions from functions which may involve Date Data from more than one century or leap years, regardless of the date of processing or date of Date Data (The term "Date Data" shall mean any data, input, or output which includes an indication of date.);

(2)     Subcontractor's software will provide results from any operation accurately reflecting any Date Data used in the operation performed, with output in any form, except graphics, having four digit years and indication of century; and

(3)     Subcontractor's software will accept two digit year Date Data in a manner that resolves any ambiguities as to century in a defined manner.

20.4    Company may assign this Agreement or any Work order at any time.  Subcontractor shall not assign this Agreement or the Work order or any of its rights, duties, or obligations under this Agreement or the Work order , including without limitation any right to payment, without the prior written consent of Company. This Agreement and the Work order shall inure solely to the benefit of the parties hereto and their respective successors and permitted assigns.  Subcontractor shall not subcontract all or any portion of the Work without the prior written consent of Company.  Subcontractor shall be responsible for all acts and omissions of its contractors and subcontractors of any tier.

20.5    If any provision of this Agreement or the Work order shall be determined to be void or unenforceable, the scope of such void or unenforceable provision shall be deemed modified and diminished to the extent necessary to render such provision valid and enforceable. In any event, the validity of enforceability of any provision shall not effect any other provision of this Agreement or the Work order, and the Agreement and the Work order shall be construed and enforced as if such void or unenforceable provision had not been included.

20.6    It is specifically agreed that time is of the essence in this Agreement and the Work order. It is specifically agreed that the use of captions and subcaptions in this Agreement is merely for the convenience of the parties hereto, and they shall not be used in interpreting any part of this

-20-

Agreement or the Work order. The covenants and agreements of the parties under this Agreement or the Work order shall be separate and independent.

20.7 . THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THIS SUBJECT MATTER, AND SUPERSEDES ALL PRIOR AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS AND UNDERSTANDINGS, EXCEPT THOSE EXPRESSLY SET FORTH HEREIN. NO OTHER AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS OR UNDERSTANDINGS, EITHER EXPRESS OR IMPLIED, UNLESS EXPRESSLY SET FORTH HEREIN, ARE BINDING BETWEEN THE PARTIES.

20.8 Neither this Agreement nor the Work order shall be amended, modified, or waived except in writing signed by the parties. Failure by Company at any time or from time to time to enforce or require strict keeping and performance of any of the terms or conditions of this Agreement or the Work order shall not constitute a waiver of such terms or conditions nor affect or impair the right of Company at any time to avail itself of such remedies as it may have for any breach thereof.

20.9   Neither this Agreement nor the Work order shall be construed to confer any benefit on any third party not a party or otherwise referred to in this Agreement or the Work order nor shall it provide any rights to such third party to enforce its provisions. Subcontractor shall assume such other or greater obligations and liabilities to the Company Group as shall be the responsibility of Company in the present or future contracts with its customers, including without limitation when such customer contracts require Company's contracts with its subcontractors to contain terms and conditions which are the same or substantially similar to the terms and conditions of such customer contracts.

.... 20.10 . THE VALIDITY, CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT AND THE WORK ORDER SHALL BE GOVERNED BY THE GENERAL MARITIME LAW OF THE UNITED STATES , AND TO THE EXTENT MARITIME LAW IS NOT APPLICABLE THEN BY THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICTS OF LAWS PRINCIPLES WHICH WOULD DIRECT THE APPLICATION OF THE SUBSTANTIVE LAW OF ANOTHER JURISDICTION. THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN HOUSTON, TEXAS WITH RESPECT TO ANY LITIGATION ARISING OUT OF THIS AGREEMENT OR THE WORK ORDER OR PERFORMANCE HEREUNDER, AND HEREBY IRREVOCABLY DESIGNATE THE SECRETARY OF STATE OF THE STATE OF TEXAS AS THEIR AGENT FOR SERVICE OF PROCESS UNLESS ANOTHER AGENT HAS BEEN REGISTERED IN TEXAS AND AGREE THAT PROCESS MAY BE SERVED THEREON IN ANY MANNER PERMITTED BY TEXAS LAW.

20.11  All information obtained by Subcontractor in the performance of its duties under this Agreement and the Work order and all data, reports and records pertaining to performance under this Agreement and the Work order shall be the sole property of Company and shall be

THALES          000021

considered confidential and shall not be used or disclosed to any person or entity without the prior written consent of Company.

20.12 Subcontractor shall be responsible for prompt cleanup of the worksite and removal of wreck and debris of any equipment, vessels, materials and/or supplies of any nature utilized by Subcontractor in the performance of the Work or transported by or for Subcontractor to any worksite. Such cleanup and removal shall occur promptly.

20.13 This Agreement shall supercede, amend, and restate any prior Master Service Agreements between Company and Subcontractor.

20.14 This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument. Facsimile signatures of this Agreement by either or both of the parties shall have the effect of original signatures.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement upon the date first above shown.

HORIZON OFFSHORE CONTRACTORS, INC.
COMPANY

BY: _____

NAME: _JAMES K. COLE_____

TITLE: _SENIOR VICE PRESIDENT_____

RACAL NCS, INC.
SUBCONTRACTOR

BY: _____

NAME: _M. P. HUTCHISON_____

TITLE: _GENERAL MANAGER_____

n:\legal\kor\racalncs.msa v3.1-29-99

-22-

THALES          000022



THALES GEOSOLUTIONS, INC.
3524 Westchase Drive
Houston, Texas 77042
USA
Tel: 1 713 784 4482
Fax: 1 713 784 6158
www.thales-geosolutions.com

July 27, 2001

Horizon Offshore Contractors, Inc.
Attn: James K. Cole
2500 City West Blvd, Suite 2200
Houston, Texas 77042

Re:    Horizon Offshore Contractors, Inc.  Master Service Agreement

Dear Mr. Cole:

    Pursuant to section 20.4 of the above referenced Master Service Agreement dated January 8, 1999, you are hereby advised that on February 28th 2001, KC Offshore, LLC was merged into its affiliate Racal NCS, Inc..  As surviving entity, Racal NCS, Inc. changed its name to Thales GeoSolutions, Inc. on April 12th 2001.  This letter shall serve to amend the above referenced agreement (Agreement).  All references to KC Offshore, LLC and/or Racal NCS, Inc. shall be deleted in their entirety and replaced with Thales GeoSolutions, Inc..  All other terms and conditions of the existing Agreement shall remain in full force and effect.

Please acknowledge and consent to the foregoing change by signing this amendment to the Agreement in the space provided below and returning one fully executed copy of the same to us.

Sincerely,

THALES GEOSOLUTIONS

By: _____
    Angela Mejia
    General Counsel Americas

Accepted and Agreed to
~~This ___ day of ___ 2001~~
This 9th day of August, 2001

Horizon Offshore Contractors, Inc.

By: _____
Name: George I. Friedel
Title: Vice President
       Gulf of Mexico Operations

EXHIBIT
2

THALES                    000023

liabilities, costs or expenses against which the Member would be insured if the entered ship were fully insured under the hull policies on terms not less wide than those of the usual Lloyd's policy for the current market value with attached London Institute Time Clauses - Hulls 1/10/83 (including Clause 8) and were fully entered in Class II of the Club or other Club affording the same cover.

If the entered vessel be insured at Lloyd's or elsewhere on wider terms than the foregoing and the Club's liability under Rules **25 xxvi** or **25 xxvii** be thereby reduced, an appropriate reduction in calls shall be made for the excluded risks provided notice be given by the Member at the inception of the risk;

**Specialist b** **Operations** liabilities, costs or expenses incurred by a Member who contracts to perform specialist operations, including but not limited to dredging, blasting, pile driving, well stimulation, cable or pipe laying, maintenance or removal, core sampling, depositing of spoil, waste incineration or disposal operations, professional oil spill response or professional oil spill response training;

**Drilling c** **Operations** liabilities, costs or expenses incurred in respect of an entered ship (being a drilling ship or barge or any other ship or barge carrying out drilling exploration, construction or production operations including any accommodation unit moored on site as an integral part of such operations) and arising out of or during drilling or core sampling or production operations;

**Diving d** **Operations** liabilities, costs or expenses arising out of the operation by the Member of submarines, mini submarines or diving bells or the activities of professional or commercial divers;

**Salvage e** **Operations** liabilities, costs and expenses arising out of salvage operations conducted by an entered vessel, other than where the purpose of such operations is saving or attempting to save life at sea.

**18 Nuclear Risks** The Club shall not insure any Member to any extent whatever against any loss, damage, liability or expense directly or indirectly caused by, contributed to, or arising from:

**a** ionising radiation from, or the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear fuel or any nuclear waste or the combustion of nuclear fuel;

**b** ionising radiation from, or the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;

**c** any weapon of war employing atomic or nuclear fission and/or fusion and/or other like reaction or radioactive force or matt

*provided always that:*

this Rule does not exclude liabilities, costs and expens carriage of "excepted matter" (as defined in the Nuc 1965 of the United Kingdom or any regulations ma carried as cargo on an entered vessel.

*17 b*

IRO/AE 00084

ARS-3175

*Aon Risk Services*

*Natural Resources*
*Group*

4)   Notwithstanding the inclusion of risks otherwise excluded by Rule 17e (Salvage Operations), the cover afforded hereunder shall be limited to liabilities, costs and expenses associated with salvage operations incidental to activities associated with risks described under Rule 17b (Specialist Operations), Rule 17c (Drilling Operations) and Rule 17d (Diving Operations), and this insurance shall not cover liabilities, costs and expenses arising out of salvage operations as a professional salvor.

5)   Including coverage for Contractual Liabilities in respect of seamen for death, injury or illness and it is agreed to waive the requirement for approval of any crew agreements and other contracts of service or employment and contracts for services.

6)   Including coverage for liabilities assumed by the Insured not otherwise provided under Rule 25 xix (Towage) and its subparagraphs and it is agreed to waive the requirement for approval of the terms of any such contracts, but excluding amounts recoverable under Hull Risks insurance effected by the Insured.

7)   Including coverage for liabilities as provided under Rule 25 xx (Contract and Indemnities) and its subparagraphs and it is agreed to waive the requirement for approval of the terms of any such contracts.

8)   Including liabilities, costs and expenses in respect of wreck and debris removal whether liability be compulsory under law or assumed under contract, or whether voluntarily assumed where it is determined that the wreck or debris interferes with the operation of the Insured, but excluding amounts recoverable under Hull Risks insurance effected by the Insured.

9)   Including 4/4ths Collision Liability and damage to Fixed and Floating Objects, but excluding amounts recoverable under Hull Risks insurance effected by the Insured.

10)  Subject otherwise to the terms, conditions and risks covered, including liabilities, costs and expenses for death, injury or illness in respect of any person performing work in connection with any offshore or maritime operation of the Insured, whether such person is an employee of the Insured or is engaged by the Insured under contract of services or for services, whether or not such operations are performed from a entered ship.

11)  Subject otherwise to the terms, conditions and risks covered, including liabilities, costs and expenses incurred by the Insured in respect of the short term charter or hire of miscellaneous barges and tugs used in support of the operations of the entered Vessels/Units; including liabilities, costs and expenses for risks otherwise excluded by Rule 17(a) Hull Risks, subject such support craft are not bareboat chartered by the Insured and excepting craft rented or hired where the Insured has assumed a "first party" risk or the obligation to provide Hull Risks insurance.

**IRO/AE 00039**

EXHIBIT "P"

VIA FAX



*Aon Natural Resources*
1330 Post Oak Boulevard, Suite 900
Houston, Texas 77056
Telephone: (832) 476-6000; Telefax: (832) 476-6590

*Aon's Notices to Horizon's Insurers*

**REPORT OF LOSS ON:**   Protection & Indemnity            **DATE:**  March 4, 2003

To:   **COMPANY**                          **POLICY NO.**              **INTEREST**
Associated Electric & Gas Insurance
Services Limited (AEGIS), Hamilton,          ARS-3175                    100%
Bermuda per Origin Limited, London, U.K.
c/o JLT Risk Solutions Limited
   London, England, U.K.
Attn: Mr. Simon Dawes

Please accept notice of the following casualty which may result in a claim for:   Damage to Property

Name of the Assured:   Horizon Offshore, Inc. and Horizon Offshore Contractors, et al.

Policy Inception:  2/20/02    Date of Casualty:  2/27/03    Policy Expiration:  5/1/03

Insured Vessel:   GULF HORIZON                    Limit of Liability $   950,000 O. A. O.

Excess of: $   50,000    Deductible: $   N/A    AAD: $   N/A    Stop Loss: $   N/A

Place where casualty occurred:   Long Island Sound, NY

Nature of Casualty:   Whilst performing pipelaying operations (pipe burial) the insured vessel's anchor cable parted and allegedly

damaged a sub-sea power cable owned by the New York Power Authority.

Estimated amount of entire loss $   (unknown)                    Excess $   N/A

                          Instructed:

Remarks:   Details of casualty and developments will be reported in due course.

Claim #:   03-MS058    Producer:   BJ    Claims Made:   No

Client's Claim #: _____

                          by: _James I. Montano_

*If you have any instructions to give, please advise us promptly.*

**PLEASE ACKNOWLEDGE RECEIPT BY SIGNING AND RETURNING A COPY OF THIS NOTICE**

Signature: _____

\\uclutv\u2k\\share\\BUSINESS UNITS\\ANR\\Claims\\Claim Shared\\Horizon\03-MS058.doc-1
*The information contained in this fax is confidential and/or privileged. This fax is intended to be received initially by only the individual named above. If the reader of this transmittal page is not the intended recipient or a representative of the intended recipient, you are hereby notified that any review, dissemination copying of this fax or the information contained herein is prohibited. If you have received this fax in error, please immediately notify the sender by telephone and return this fax to the sender at the address above.*

VIA FAX



**Aon Natural Resources**
1330 Post Oak Boulevard, Suite 900
Houston, Texas 77056
Telephone: (832) 476-6000; Teletax: (832) 476-6582

REPORT OF LOSS ON:    Excess P & I    DATE:    April 18, 2003

| | | |
|---|---|---|
| To: **COMPANY** | **POLICY NO.** | **INTEREST** |
| The Steamship Mutual Underwriting Association (Bermuda) Ltd. c/o JLT Risk Solutions Limited Attn: Terry Cornick | ARS-3176 | 100.0% |

Please accept notice of the following casualty which may result in a claim for;    Damage to Property

Name of the Assured:   Horizon Offshore, Inc. and Horizon Offshore Contractors, et al.

Policy Inception:  02/20/02    Date of Casualty:  2/27/03    Policy Expiration:  5/1/03

Insured Vessel:   GULF HORIZON    Limit of Liability $    Per Rules

Excess of: $  1,000,000    Deductible: $   50,000    AAD: $   15,000,000   Stop Loss: $   N/A

Place where casualty occurred:   Long Island Sound, NY

Nature of Casualty:   Whilst performing pipelaying operations (pipe burial) the insured vessel's anchor cable parted and allegedly

damaged a sub-sea power cable owned by the New York Power Authority.

Estimated amount of entire loss   $  1,000,000    Excess  $  1,000,000

Assured have   Instructed   Lyons, Skoufalos, Proios & Flood, LLP to represent their interests.

Remarks:   Our email message of 16 April 2003 refers.

Claim #:   03-M5058-X    Producer:  BJ    Claims Made:   No

Client's Claim #: _____

by:  _____
James J. Montano

If you have any instructions to give, please advise us promptly.

PLEASE ACKNOWLEDGE RECEIPT BY SIGNING AND RETURNING A COPY OF THIS NOTICE

Signature:  _____

Claim Number:  _____

X:\BUSINESS UNIT\ANR\Claims\Claims Shared\Horizon\Loss Notices\Amended 03-M5058-X.doc-1
The information contained in this fax is confidential and/or privileged. This fax is intended to be received only by the individual named above. If the reader of this transmittal page is not the intended recipient or a representative of the intended recipient, you are hereby notified that any review, dissemination copying of this fax or the information contained herein is prohibited. If you have received this fax in error, please immediately notify the sender by telephone and return this fax to the sender at the address above.

IRO/AE 00605

VIA FAX



**Aon Natural Resources**
1330 Post Oak Boulevard, Suite 900
Houston, Texas 77056
Telephone: (832) 476-6000; Telefax: (832) 476-6582

REPORT OF LOSS ON: Excess Liabilities                DATE: May 21, 2003

To:     COMPANY                          POLICY NO.        INTEREST
        American Home Assurance Company
        via American International Marine Agency   ARS-3177      100.0%
        Attn: Jack Molkentin

Please accept notice of the following casualty which may result in a claim for:   Damage to Property

Name of the Assured:  Horizon Offshore, Inc. and Horizon Offshore Contractors, et al.

Policy Inception:  02/20/02    Date of Casualty:  2/27/03    Policy Expiration:  5/1/03

Insured Vessel:  GULF HORIZON              Limit of Liability $  10,000,000

Excess of: $  1,000,000  Deductible: $  N/A   AAD: $  N/A   Stop Loss: $  N/A

Place where casualty occurred:  Long Island Sound, NY

Nature of Casualty:  Whilst performing pipelaying operations (pipe burial) the insured vessel's anchor cable parted and allegedly damaged a sub-sea power cable owned by the New York Power Authority.

Estimated amount of entire loss $   (unknown)

Assured have    instructed    Lyons, Skoufalos, Proios & Flood, LLP to represent their interests.

Remarks:  Primary carrier AEGIS have posted policy limit reserve. Additional information to follow.

Claim #:  03-M5058-X        Producer:  BJ        Claims Made:  No

Client's Claim #: _____

by:  _____ James L Montano

If you have any instructions to give, please advise us promptly.

PLEASE ACKNOWLEDGE RECEIPT BY SIGNING AND RETURNING A COPY OF THIS NOTICE

Signature: _____

Claim Number: _____

Tbutsho...dkTashared BUSINESS UNIT/ANFRClaims/Claims Shared/Horizon/Loss Notices/03-M5058-X.doc-1
The information contained in this fax is confidential and/or privileged. This fax is intended to be reviewed initially by only the individual named above. If the reader of this transmittal page is not the intended recipient or a representative of the intended recipient you are hereby notified that any review, dissemination, copying of this fax or the information contained herein is prohibited. If you have received this fax in error, please immediately notify the sender by telephone and return this fax to the sender at the address above.



**Aon Natural Resources**
1330 Post Oak Boulevard, Suite 900
Houston, Texas 77056
Telephone: (832) 476-6000; Telefax: (832) 476-6582

## REPORT OF LOSS ON:    Excess Liabilities

DATE:    July 16, 2003

To:    **COMPANY**                                                  **POLICY NO.**              **INTEREST**
XL Specialty Insurance Company (PMEX857027)
  via Brockbank Insurance Services, Inc.                ARS-3215                        20.00%
Liberty Insurance Underwriters (NY039204002)                                          25.00%
American Home Assurance Company (C1789)                                              26.43%
  via American International Marine Agency, Inc.
Navigators Insurance Company (0ZL1799-01)                                            28.57%
  via Navigators Insurance Services of Texas, Inc.                                  _____
                                                                                     100.00%

Please accept notice of the following casualty which may result in a claim for:    Property Damage

Name of the Assured:  Horizon Offshore, Inc. and Horizon Offshore Contractors, et al.

Policy Inception:  04/09/02 ___  Date of Casualty:  2/27/03 ___    Policy Expiration:  5/1/03

Insured Vessel:  GULF HORIZON                              Limit of Liability $  140,000,000

Excess of: $  10,000,000   Deductible: $  N/A ___   AAD: $  N/A ___   Stop Loss: $  N/A

Place where casualty occurred:  Long Island Sound, NY

Nature of Casualty:  Whilst performing pipelaying operations (pipe burial) the insured vessel's anchor cable parted and allegedly

damaged a sub-sea power cable owned by the New York Power Authority.


Estimated amount of entire loss   $  (Unknown) ___                           Excess  $ ___

The Assured ___ instructed  attorneys Lyons, Skoufalos, Proios & Flood, to investigate. Additional information to follow.


Remarks: ___

Claim #:  03-M5068-XA ___        Producer:   BJ ___        Claims Made:   No ___

Client's Claim #: ___

                                       by:  [signature]
                                            James I. Montano

If you have any instructions to give, please advise us promptly.

### PLEASE ACKNOWLEDGE RECEIPT BY SIGNING AND RETURNING A COPY OF THIS NOTICE

Signature: ___

Claim Number: ___

H:\x\x\x\shares\BUSINESS UNITS\AN\IC\Claims\Claims Shared\Horizon\Loss Notices\Amanded 03-M5068-XA doc-1
The information contained in this fax is confidential and/or privileged. This fax is intended to be received exically by only the individual named above. If the reader of this transmittal page is not the intended recipient or a representative of the intended recipient, you are hereby entitled that any review, dissemination copying of this fax or the information contained herein is prohibited. If you have received this fax in error, please immediately notify the sender by telephone and return this fax to the sender at the address above.

EXHIBIT "Q"



**Iroquois**
GAS TRANSMISSION SYSTEM
IROQUOIS PIPELINE OPERATING COMPANY, OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 17, 2003

_Via Certified Mail_

AEGIS
10 Exchange Place
Jersey City, NJ  07302

RE:    Protection and Indemnity
       Policy Number ARS-3175

Your Insured:    Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged.  NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

_Michelle L. Wieler_

Michelle L. Wieler
Risk Management

cc:  Jeffrey Bruner - Iroquois Legal

EXHIBIT
11
8/3/05   WH
FENGAD 800-631-6989

recycled paper

IRO/AE 00584

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AEGIS
10 Exchage Place
Jersey City, NJ
    07302

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☒ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service)    7002 0460 0000 9136 0958

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

**O F F I C I A L   U S E**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  AEGIS
Street, Apt. No.; or PO Box No.  10 Exchange Place
City, State, ZIP+4  Jersey City NJ 07802

PS Form 3800, January 2001    See Reverse for Instructions

IRO/AE 00585

**Iroquois**
**GAS TRANSMISSION SYSTEM**
IROQUOIS PIPELINE OPERATING COMPANY,
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 18, 2003

<u>*Via Certified Mail*</u>

American Home Assurance Co.
70 Pine Street, 3rd Floor
New York, NY  10270

RE:   **Excess Liabilities**
      **Policy Number ARS-3215**

<u>Your Insured:</u>   Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged.  NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

Michelle L. Wieler
Risk Management

cc:  Jeffrey Bruner - Iroquois Legal

recycled paper

IRO/AE 00579

**Iroquois**

**GAS TRANSMISSION SYSTEM**

IROQUOIS PIPELINE OPERATING COMPANY
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 17, 2003

<u>*Via Certified Mail*</u>

American Home Assurance Co.
70 Pine Street, 3rd Floor
New York, NY 10270

RE:    **Excess Liabilities**
       **Policy Number ARS-3215**

<u>Your Insured:</u>    Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged.  NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

*Michelle L. Wieler*

Michelle L. Wieler
Risk Management

cc:  Jeffrey Bruner - Iroquois Legal

recycled paper

**Iroquois**
**GAS TRANSMISSION SYSTEM**
IROQUOIS PIPELINE OPERATING COMPANY
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 18, 2003

*Via Certified Mail*

American Home Assurance Company
c/o American International Marine Agency, Inc.
675 Bering Drive, Suite 600
Houston, TX 77057

RE:  **Excess Liabilities**
     **Policy Number C-1727**
     **(ARS-3177)**

Your Insured:    Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged. NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

Michelle L. Wieler
Risk Management

cc: Jeffrey Bruner - Iroquois Legal

recycled paper

IRO/AE 00588

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X _Joe Nino_  ☐ Agent  ☐ Addressee <br> B. Received by (Printed Name)  C. Date of Delivery  _5/14/03_ |
| 1. Article Addressed to: <br><br> American Home Assurance <br> 675 Bering Drive Suite 600 <br> Houston TX 77057 | D. Is delivery address different from item 1?  ☐ Yes <br> If YES, enter delivery address below:  ☐ No |
|  | 3. Service Type <br> ☒ Certified Mail  ☐ Express Mail <br> ☐ Registered  ☒ Return Receipt for Merchandise <br> ☐ Insured Mail  ☐ C.O.D. |
|  | 4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number <br> (Transfer from service) | 7002 0460 0000 9136 8934 |

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

# O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  American Home Assurance
Street, Apt. No.; or PO Box No.  675 Bering Drive
City, State, ZIP+4  Houston TX 77057

PS Form 3800, January 2001          See Reverse for Instructions

7002 0460 0000 9136 8934

IRO/AE 00589

# **Iroquois**
## GAS TRANSMISSION SYSTEM
IROQUOIS PIPELINE OPERATING COMPANY
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 18, 2003

*Via Certified Mail*

American Home Assurance Company
c/o American International Marine Agency, Inc.
675 Bering Drive, Suite 600
Houston, TX 77057

RE:   General Liabilities
      Policy Number C-1727
      (ARS-3177)

Your Insured:    Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged. NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

*Michelle L Wieler*

Michelle L. Wieler
Risk Management

cc:   Jeffrey Bruner - Iroquois Legal

recycled paper

**IRO/AE 00590**

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

American Home Assurance Co.
675 Bearing Drive
Suite 600
Houston, TX 77057

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Barrett_    ☐ Agent
                ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7002 2410 0001 2474 3016

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

IRO/AE 00591

# Iroquois
**GAS TRANSMISSION SYSTEM**
IROQUOIS PIPELINE OPERATING COMPANY,
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 18, 2003

*Via Certified Mail*

Navigators Insurance Company
via Navigators Insurance Services of Texas, Inc.
Sage Park 1
2121 Sage, Suite 145
Houston, TX 77056

RE:    **Excess Liabilities**
       **Policy Number ARS-3215**

Your Insured:      Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and
damaged. NYPA has informed us that the costs associated with the temporary as well
as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this
loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois'
potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

Michelle L. Wieler
Risk Management

cc: Jeffrey Bruner – Iroquois Legal



IRO/AE 00582



**Iroquois**

GAS TRANSMISSION SYSTEM
IROQUOIS PIPELINE OPERATING COMPANY,
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 17, 2003

<u>*Via Certified Mail*</u>

The Steamship Mutual Underwriting Associates (Bermuda) Ltd.
Steamship Insurance Management Services Ltd.
Aquatical House
39 Bell Lane
London, E17LU
United Kingdom

RE:   **Protection and Indemnity**
       **Policy Number ARS-3176**

<u>Your Insured:</u>   Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged. NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

Michelle L. Wieler
Risk Management

cc: Jeffrey Bruner – Iroquois Legal



| | | |
|---|---|---|
| **U.S. Postal Service** | | |
| **CERTIFIED MAIL RECEIPT** | | |
| *(Domestic Mail Only; No Insurance Coverage Provided)* | | |

O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To   Steamship Underwriting
Street, Apt. No.; or PO Box No.   39 Bell Lane
City, State, ZIP+4   London England E17LU

PS Form 3800, January 2001          See Reverse for Instructions

IRO/AE 00583

**Iroquois**

GAS TRANSMISSION SYSTEM
IROQUOIS PIPELINE OPERATING COMPANY,
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 17, 2003

_Via Certified Mail_

Liberty Insurance Underwriters
61 Broadway, 32nd Floor
New York, NY 10006

RE:   **Excess Liabilities**
      **Policy Number ARS-3215**

Your Insured:   Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged. NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

_Michelle L Wieler_

Michelle L. Wieler
Risk Management

cc: Jeffrey Bruner - Iroquois Legal

recycled paper

IRO/AE 00596

**SENDER: COMPLETE THIS SECTION**

- Complete Items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

| A. Signature | | |
|---|---|---|
| X | | ☐ Agent |
| | | ☐ Addressee |
| B. Received by ( Printed Name) | | C. Date of Delivery |
| Gym / Star | | 3-20 |

D. Is delivery address different from Item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Liberty Insurance underwitals
161 Broadway 32 Floa
New york, NY
10006

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered      ☑ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article
(Tra

PS Fo

102595-02-M-1640

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

**O F F I C I A L   U S E**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To
Liberty insurance underwiter
Street, Apt. No.; or PO Box No.   161 Broadway 32 Floor
City, State, ZIP+4   New york NY 10006

PS Form 3800, January 2001    See Reverse for Instructions

0472   9136   0000   0460   2002

IRO/AE 00597

**Iroquois**

**GAS TRANSMISSION SYSTEM**
IROQUOIS PIPELINE OPERATING COMPANY,
OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 17, 2003

<u>Via Certified Mail</u>

Navigators Insurance Co.
~~One Penn Plaza, 55th Floor~~    *2121 Sage Suite 145*
New York, NY 10119    *Houston, TX 77056*

RE:    **Excess Liability**
       **Policy Number ARS 3215**

<u>Your Insured:</u>    Horizon Offshore Contractors, Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged. NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

*Michelle L Wieler*

Michelle L. Wieler
Risk Management

cc: Jeffrey Bruner – Iroquois Legal

recycled paper

**IRO/AE 00600**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Navigates Insurance
One Penn Plaza
55th Floor
New york, NY
          10119

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                   ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
                                  2-20-03

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☒ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

2. Article
   (Tr
PS Fo                                          102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

# O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To
Navigices Insurance
Street, Apt. No.; or PO Box No.
One Penn Plaza
City, State, ZIP+4
New york NY 10119

PS Form 3800, January 2001          See Reverse for Instructions

IRO/AE 00601

**Iroquois**

GAS TRANSMISSION SYSTEM
IROQUOIS PIPELINE OPERATING COMPANY, OPERATOR

ONE CORPORATE DRIVE, SUITE 600
SHELTON, CT 06484-6211

TEL: (203) 925-7200
FAX: (203) 929-9501

March 17, 2003

<u>*Via Certified Mail*</u>

XL Specialty Insurance Co.
1540 E. American Lane, 20th Floor
Schaumberg, IL 60173

RE:    **Excess Liabilities**
       **Policy Number ARS-3215**

<u>Your Insured:</u>    Horizon Offshore Contractors Inc.

Dear Ladies and Gentlemen:

On February 27, 2003 the New York Power Authority's (NYPA) Y49 cable was struck and damaged. NYPA has informed us that the costs associated with the temporary as well as permanent repairs will be extensive.

Although one would assume that your named insured has notified you concerning this loss, we as additional insured are nonetheless alerting you of NYPA's loss and Iroquois' potential claim against the policy of insurance written by your company.

Kindly acknowledge receipt of same.

Very truly yours,

*Michelle L. Wieler*

Michelle L. Wieler
Risk Management

cc: Jeffrey Bruner - Iroquois Legal

recycled paper

IRO/AE 00602

ᵉsegmentCase 1:05-cv-02149-JSR    Document 44-18    Filed 08/30/2005    Page 17 of 18



IRO/AE 00603

<u>VIA FAX</u>



*Aon Natural Resources*
1330 Post Oak Boulevard, Suite 900
Houston, Texas 77056
Telephone: (832) 476-6000; Telefax: (832) 476-6590

**REPORT OF LOSS ON:**  Protection & Indemnity          **DATE:**  March 4, 2003

To:  <u>COMPANY</u>                            <u>POLICY NO.</u>                    <u>INTEREST</u>
Associated Electric & Gas Insurance
Services Limited (AEGIS), Hamilton,        ARS-3175                     100%
Bermuda per Origin Limited, London, U.K.
c/o JLT Risk Solutions Limited
London, England, U.K.
Attn: Mr. Simon Dawes

Please accept notice of the following casualty which may result in a claim for:   Damage to Property

Name of the Assured:   Horizon Offshore, Inc. and Horizon Offshore Contractors, et al.

Policy Inception:  2/20/02     Date of Casualty:  2/27/03      Policy Expiration:  5/1/03

Insured Vessel:   GULF HORIZON                        Limit of Liability $      950,000 O. A. O.

Excess of: $   50,000     Deductible: $   N/A     AAD: $   N/A      Stop Loss: $   N/A

Place where casualty occurred:   Long Island Sound, NY

Nature of Casualty:   Whilst performing pipelaying operations (pipe burial) the insured vessel's anchor cable parted and allegedly

damaged a sub-sea power cable owned by the New York Power Authority.


Estimated amount of entire loss $   (unknown)                              Excess $   N/A

               Instructed:


Remarks:   Details of casualty and developments will be reported in due course.



Claim #:   03-MS058              Producer:   BJ                  Claims Made:   No

Client's Claim #:

                                                    by:
                                                       James I. Montano

If you have any instructions to give, please advise us promptly.

PLEASE ACKNOWLEDGE RECEIPT BY SIGNING AND RETURNING A COPY OF THIS NOTICE

Signature:

\\uctdvau2k:\\share\\BUSINESS UNITS\\ANR\\Claims\\Claims Shared\\Horizon\\03-MS058.doc-1
The information contained in this fax is confidential and/or privileged. This fax is intended to be received initially by only the individual named above. If the reader of this transmitted page is not the
intended recipient or a representative of the intended recipient, you are hereby notified that any review, dissemination copying of this fax or the information contained herein is prohibited. If you have
received this fax in error, please immediately notify the sender by telephone and return this fax to the sender at the address above.

IRO/AE 00604

**EXHIBIT "R"**



HEALY & BAILLIE, LLP   JUDGE RAKOFF
Attorneys for Plaintiff
61 Broadway
New York, NY 10006
(212) 943-3980
Richard V. Singleton (RS-9489)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IROQUOIS GAS TRANSMISSION SYSTEM L.P.,

                                        Plaintiff,

          -against-

ASSOCIATED ELECTRIC & GAS INSURANCE
SERVICES LTD., Hamilton, Bermuda (AEGIS),

                                        Defendant.

**COMPLAINT IN ACTION
FOR DECLARATORY
JUDGMENT**

          Plaintiff, Iroquois Gas Transmission System L.P. (hereinafter "Iroquois"), by its

attorneys Healy & Baillie, LLP, complaining of Defendant, Associated Electric & Gas

Insurance Services Ltd., Hamilton, Bermuda (hereinafter "AEGIS"), alleges as follows:

          1.     This is an action for a judgment pursuant to 28 U.S.C. § 2201.

          2.     This Court has diversity jurisdiction over the claim asserted herein pursuant

to 28 U.S.C. §1332, on the grounds that the matter in controversy exceeds the sum of

$75,000, exclusive of interest and costs, and is between citizens of different states, and/or

of a foreign state.

          3.     Plaintiff is a limited liability partnership organized and existing under the

laws of the State of Delaware, with an office and place of business at 1 Corporate Drive,

Shelton, Connecticut 06484.

4.    Defendant AEGIS is a corporation organized and existing under the laws of the Commonwealth of Bermuda, with and office and place of business at 10 Exchange Place, Jersey City, New Jersey 07302.

5.    Defendant AEGIS is subject to jurisdiction in the State of New York and has appointed an agent for service of process in New York.

6.    Venue is proper in that defendant is a corporation subject to jurisdiction in New York.

## THE CONSTRUCTION CONTRACT

7.    On April 12, 2002, Iroquois, through its agent, Iroquois Pipeline Operating Company, entered into a contract with Horizon Offshore Contractors, Inc. (hereinafter "Horizon") for the construction of a 34-mile underwater natural gas pipeline from Northport, New York to Hunts Point, New York ("the Contract").

8.    Pursuant to § 12 of the Contract, Horizon was obligated to maintain various insurance policies in accordance with the terms and conditions of Exhibit G to the Contract.

9.    Section 2.4 of Exhibit G to the Contract obligated Horizon to name Iroquois as an additional assured on Horizon's variously enumerated insurance policies.

10.    Section Clause 2.4.2 of Exhibit G to the Contract provided that the coverage Horizon was contractually bound to provide Iroquois was deemed to be primary coverage in relation to other policies held directly by Iroquois.

11.    Pursuant to its contractual obligation, Horizon named Iroquois as an additional assured on various policies held by Horizon including the following:

     (a)    an AEGIS Policy providing the first layer of applicable insurance coverage extending to a limit of $1,000,000 (hereinafter the "AEGIS Policy");

     (b)    an American Home policy providing excess cover beyond the AEGIS Policy to a limit of $10,000,000; and

     (c)    an ARS policy providing excess cover beyond the American Home excess policy to a limit of $140,000,000.

12.    The American Home policy and the ARS policy are follow-on policies to the AEGIS Policy with some variations not here relevant.

## THE AEGIS POLICY

13.    The cover note to the AEGIS Policy issued in favor of Iroquois recites under "OTHER TERMS, CLAUSES AND CONDITIONS" that AEGIS agreed to such coverage as follows:

> 2.    ADDITIONAL INSURED CLAUSE AND OTHER PROVISIONS
>
> i.)    The insured has privilege to name others as an additional insured for their respective rights and interests and/or waive any rights of recovery, but only to the extent as may be required under contract or agreement.

14.    AEGIS, agreed to provide primary cover to Iroquois pursuant to the Contract, and the cover note to the Horizon AEGIS Policy further states the following with respect to primary coverage:

> iii.)    It is agreed that in respect of additional insured(s), the coverage provided hereunder shall be primary in respect of any coverage carried by said additional insured(s) but only to the extent as may be required by contract or agreement.

15.    The coverage Horizon was contractually bound to provide Iroquois included cover for the legal cost of defending actions brought against the assured(s), which includes Iroquois.

16.    The AEGIS Policy provided coverage for $950,000 excess of $50,000 per accident/occurrence pursuant to the "Declarations" of the policy.

17.    Clause 4 of the "Declarations" of the policy states:

**SUM(S) INSURED**

US$950,000 any one accident or occurrence, including legal and survey fees and expenses, subject to a general aggregate limit of liability of US$15,000,000 per period.

18.    Clause 5 of the "Deductions" of the policy states:

**EXCESS**

US$50,000 any one accident or occurrence, including legal and survey fees and expenses.

19.    The foregoing clauses set out the obligations of AEGIS to Iroquois, which include, *inter alia,* payment of legal fees incurred by Iroquois respecting covered risks.

**THE DISPUTE**

20.    On or about February 27, 2003, the anchor of the pipe-lay barge, the GULF HORIZON, belonging to Horizon, while performing work pursuant to the Contract, allegedly snagged and damaged an underwater electrical cable belonging to the Power Authority of the State of New York ("NYPA").

21.    Pursuant to the cover note of the AEGIS policy, the GULF HORIZON is named as an insured vessel under the AEGIS Policy.

22.    Shortly after the incident NYPA placed Iroquois on notice that it intended to hold Iroquois fully responsible for all damage resulting from the incident.

23.    On or about August 2003, Horizon commenced litigation in the United States District Court for the Southern District of Texas under the Shipowner's Limited Liability Act ("Act") seeking exoneration from or limitation of liability with respect to the cable damage.

24.    Iroquois and NYPA filed claims in that action as they were required to do under the Act. NYPA claimed for its damages, and Iroquois claimed for indemnity for any liability it may be found to have to NYPA.

25.    On or about July 21, 2004, NYPA filed cross-claims against Iroquois seeking to recover in full from Iroquois for the cost of repairs and other losses in connection with the incident.

26.    On or about October 13, 2004, NYPA filed a motion for summary judgment against Iroquois.

27.    Iroquois timely notified AEGIS of the commencement of Horizon's limitation action, the filing of NYPA's cross-claim against Iroquois, and of the filing of NYPA's motion for summary judgment.

28.    In response to the actions filed against it Iroquois has expended substantial sums in legal fees to defend itself against the claims of third parties and to assert indemnity claims against Horizon.

29.    As an additional insured under the AEGIS policies, AEGIS is obligated to defend Iroquois and reimburse Iroquois for its legal costs incurred in connection with the cable damage litigations.

30.    Despite due demand AEGIS has failed to reimburse Iroquois' legal costs which now exceed $600,000.

31.    As a result of AEGIS' failure to pay Iroquois' legal costs, Iroquois has had to fund its own legal costs and/or seek on account payments against secondary insurance policies which would otherwise take effect only in the event of non-payment by AEGIS.

32.    AEGIS has continued to fail to respond to Iroquois' requests to defend and for coverage for legal costs and expenses although there is no basis on which to do so.

33.    The continued failure of AEGIS to defend and to reimburse Iroquois' on-going legal costs in the pending litigations may at some point prejudice Iroquois' ability to defend the various claims asserted against it and to pursue recovery against those responsible for the incident.

WHEREFORE, Plaintiff prays for judgment:

1.    declaring AEGIS is bound to cover Iroquois' legal expenses to the limit of Iroquois' cover;

2.    awarding Plaintiff its costs and reasonable attorneys' fees expended to date in connection with the litigation and in defending NYPA's claims;

3.    awarding Plaintiff its costs and reasonable attorneys' fees in connection with this action; and

3.   awarding Plaintiff such other and further relief as this Honorable Court may find to be just.

Dated:  New York, New York
       February 14, 2005

                                        HEALY & BAILLIE, LLP

                              By    _____
                                        Richard V. Singleton (RS-9489)
                                        Attorneys for Plaintiffs
                                        61 Broadway, 32nd Floor
                                        New York, New York 10006-2701
                                        (212) 943-3980

273929.1                              - 7 -

EXHIBIT "S"

HEALY & BAILLIE, LLP
Attorneys for Plaintiff
61 Broadway
New York, NY 10006
(212) 943-3980
Richard V. Singleton (RS-9489)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| IROQUOIS GAS TRANSMISSION SYSTEM L.P.,<br><br>               Plaintiff,<br><br>     -against-<br><br>ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD., Hamilton, Bermuda (AEGIS), and CERTAIN UNDERWRITERS AT LLOYD'S,<br><br>               Defendants. | (ECF Case)<br><br>05 Civ. 2149 (JSR)<br><br>**AMENDED COMPLAINT IN ACTION FOR DECLARATORY JUDGMENT** |

Plaintiff, Iroquois Gas Transmission System L.P. (hereinafter "Iroquois"), by its attorneys Healy & Baillie, LLP, complaining of Defendants, Associated Electric & Gas Insurance Services Ltd., Hamilton, Bermuda (hereinafter "AEGIS") and of Certain Underwriters at Lloyd's (hereinafter "Lloyd's Underwriters"), alleges as follows:

1.      This is an action for a judgment pursuant to 28 U.S.C. § 2201.

2.      This Court has diversity jurisdiction over the claim asserted herein pursuant to 28 U.S.C. §1332, on the grounds that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states, and/or of a foreign state.

3.     Plaintiff is a limited liability partnership organized and existing under the laws of the State of Delaware, with an office and place of business at 1 Corporate Drive, Shelton, Connecticut 06484.

4.     Defendant AEGIS is a corporation organized and existing under the laws of the Commonwealth of Bermuda, with and office and place of business at 10 Exchange Place, Jersey City, New Jersey 07302.

5.     Defendant AEGIS is subject to jurisdiction in the State of New York and has appointed an agent for service of process in New York.

6.     Defendants Lloyd's Underwriters are insurers and underwriters obligated to provide coverage pursuant to an insurance policy issued through Aon Risk Services of Texas, Inc. for the period from May 1, 2002 through May 1, 2003, bearing the number ARS-3246 and subject to Insuring Conditions identified as LE0280715. A list of each of these insurers and/or underwriters and their relative shares of cover under this contract of insurance, as is relevant to coverage under Section 1A of said policy, is attached hereto as "A."

7.     Venue is proper in that defendants are corporations or other entities subject to jurisdiction within the Southern District of New York.

## THE CONSTRUCTION CONTRACT

8.     On April 12, 2002, Iroquois, through its agent, Iroquois Pipeline Operating Company, entered into a contract with Horizon Offshore Contractors, Inc. (hereinafter "Horizon") for the construction of a 34-mile underwater natural gas pipeline from Northport, New York to Hunts Point, New York ("the Contract").

9.    Pursuant to § 12 of the Contract, Horizon was obligated to maintain various insurance policies in accordance with the terms and conditions of Exhibit G to the Contract.

10.    Section 2.4 of Exhibit G to the Contract obligated Horizon to name Iroquois as an additional assured on Horizon's variously enumerated insurance policies.

11.    Section Clause 2.4.2 of Exhibit G to the Contract provided that the coverage Horizon was contractually bound to provide Iroquois was deemed to be primary coverage in relation to other policies held directly by Iroquois.

12.    Pursuant to its contractual obligation, Horizon named Iroquois as an additional assured on various policies held by Horizon including the following:

      (a)    an AEGIS Policy providing the first layer of applicable insurance coverage extending to a limit of $1,000,000 (hereinafter the "AEGIS Policy");

      (b)    an American Home policy providing excess cover beyond the AEGIS Policy to a limit of $10,000,000; and

      (c)    an ARS policy providing excess cover beyond the American Home excess policy to a limit of $140,000,000.

13.    The Steamship Policy, the American Home Policy, and the Conglomerate Excess Policy are follow-on policies to the AEGIS Policy with some variations not here relevant.

14.    Horizon also procured an additional policy of hull insurance underwritten (as is relevant here) by the Lloyd's Underwriters. The policy was issued by Aon Risk

276240.2

- 3 -

Services of Texas, Inc. for the period from May 1, 2002 through May 1, 2003 and bears the number ARS-3246. A list of the Lloyd's Underwriters, including each insurer's and/or underwriter's relative share of said cover, is attached hereto as "A." This policy is hereinafter referred to as the "Lloyd's Hull Policy."

## THE OCCURRENCE

15.    On or about February 27, 2003, the anchor of the pipe-lay barge, the GULF HORIZON, belonging to Horizon, while performing work pursuant to the Contract, allegedly snagged and damaged an underwater electrical cable belonging to the Power Authority of the State of New York ("NYPA").

16.    The GULF HORIZON is named as an insured vessel under the AEGIS Policy.

17.    The GULF HORIZON is named as an insured vessel under the Lloyd's Hull Policy.

18.    Shortly after the incident NYPA placed Iroquois on notice that it intended to hold Iroquois fully responsible for all damage resulting from the incident.

19.    On or about August 2003, Horizon commenced litigation in the United States District Court for the Southern District of Texas under the Shipowner's Limited Liability Act ("Act") seeking exoneration from or limitation of liability with respect to the cable damage.

20.    Iroquois and NYPA filed claims in that action as they were required to do under the Act. NYPA claimed for its damages, and Iroquois claimed for indemnity for any liability it may be found to have to NYPA.

276240.2                                    - 4 -

21.    On or about July 21, 2004, NYPA filed cross-claims against Iroquois seeking to recover in full from Iroquois for the cost of repairs and other losses in connection with the incident.

22.    On or about October 13, 2004, NYPA filed a motion for summary judgment against Iroquois.

## THE AEGIS POLICY

23.    The cover note to the AEGIS Policy issued in favor of Iroquois recites under "OTHER TERMS, CLAUSES AND CONDITIONS" that AEGIS agreed to such coverage as follows:

> 2.    ADDITIONAL INSURED CLAUSE AND OTHER PROVISIONS
>
> i.)    The insured has privilege to name others as an additional insured for their respective rights and interests and/or waive any rights of recovery, but only to the extent as may be required under contract or agreement.

24.    AEGIS, agreed to provide primary cover to Iroquois pursuant to the Contract, and the cover note to the Horizon AEGIS Policy further states the following with respect to primary coverage:

> iii.)    It is agreed that in respect of additional insured(s), the coverage provided hereunder shall be primary in respect of any coverage carried by said additional insured(s) but only to the extent as may be required by contract or agreement.

25.    The coverage Horizon was contractually bound to provide Iroquois included cover for the legal cost of defending actions brought against the assured(s), which includes Iroquois.

276240.2                                    - 5 -

26.    The AEGIS Policy provided coverage for $950,000 excess of $50,000 per accident/occurrence pursuant to the "Declarations" of the policy.

27.    Clause 4 of the "Declarations" of the policy states:

**SUM(S) INSURED**

US$950,000 any one accident or occurrence, including legal and survey fees and expenses, subject to a general aggregate limit of liability of US$15,000,000 per period.

28.    Clause 5 of the "Deductions" of the policy states:

**EXCESS**

US$50,000 any one accident or occurrence, including legal and survey fees and expenses.

29.    The foregoing clauses set out the obligations of AEGIS to Iroquois, which include, *inter alia*, payment of legal fees incurred by Iroquois respecting covered risks.

## THE LLOYD'S HULL POLICY

30.    The Lloyd's Hull Policy incorporates "Insuring Conditions" denominated as "LE0280715." Said Conditions provide in pertinent part as follows:

It is understood and agreed that where required by contract, bid or work order, Additional Assured and/or Waivers of Rights of Subrogation are automatically included hereunder, subject further to Notice Clauses as may be required by written contract only and that coverage provided hereunder shall be primary in respect of any coverage carried by said additional assureds where required by written contract.

31.    The Lloyd's Hull Policy grants coverage to other parties identified as Additional Assureds when required by contract, bid or work order.

- 6 -

32.   Iroquois is an Additional Assured within the meaning of the foregoing provision.

33.   Accordingly, the Lloyd's Hull Policy is obligated to provide coverage that is primary in respect any coverage carried by Iroquois.

34.   The obligation of Certain Underwriters at Lloyd's to provide cover to Iroquois additionally includes the obligation to pay legal fees and costs incurred by Iroquois in respect of covered risks.

## THE DISPUTE

35.   AEGIS was timely notified on or shortly after the incident which occurred in February of 2003.

36.   AEGIS was informed of the commencement of Horizon's limitation action, the filing of NYPA's cross-claim against Iroquois, and of the filing of NYPA's motion for summary judgment.

37.   Lloyd's Underwriters were also timely notified of the foregoing.

38.   In response to the actions filed against it Iroquois has expended substantial sums in legal fees to defend itself against the claims of third parties and to assert indemnity claims against Horizon.

39.   As an additional insured under the AEGIS Policy and under the Lloyd's Hull Policy, AEGIS and the Lloyd's Underwriters are obligated to defend and indemnify Iroquois and to reimburse Iroquois for its legal costs incurred in connection with the cable damage litigations.

276240.2                                    - 7 -

40.    Despite due demand AEGIS and the Hull Underwriters have failed to reimburse Iroquois' legal costs which now exceed $600,000.

41.    As a result of the failure of AEGIS and the Lloyd's Underwriters to pay Iroquois' legal costs, Iroquois has had to fund its own legal costs and/or seek on account payments against secondary insurance policies which would otherwise take effect only in the event of non-payment by AEGIS or the Lloyd's Underwriters.

42.    AEGIS and the Lloyd's Underwriters have continued to fail to respond to Iroquois' requests to defend and for coverage of legal costs and expenses although there is no basis on which to do so, and accordingly have waived their right to object to coverage and/or are now estopped from denying coverage.

43.    The continued failure of AEGIS and the Lloyd's Underwriters to defend and to reimburse Iroquois' on-going legal costs in the pending litigations may at some point prejudice Iroquois' ability to defend the various claims asserted against it and to pursue recovery against those responsible for the incident.

WHEREFORE, Plaintiff prays for judgment:

1.    declaring AEGIS is bound to cover Iroquois' legal expenses to the limit of Iroquois' cover;

2.    declaring Lloyd's Underwriters are bound to cover Iroquois legal expenses pursuant to the Lloyd's Hull Policy;

3.    awarding Plaintiff its costs and reasonable attorneys' fees expended to date in connection with the litigation and in defending NYPA's claims;

5.    awarding Plaintiff its costs and reasonable attorneys' fees in connection with this action; and

- 8 -

6.    awarding Plaintiff such other and further relief as this Honorable
Court may find to be just.

Dated:  New York, New York
        March 23, 2005

                                    HEALY & BAILLIE, LLP

                          By        _____
                                    Richard V. Singleton (RS-9489)
                                    Attorneys for Plaintiffs
                                    61 Broadway, 32nd Floor
                                    New York, New York 10006-2701
                                    (212) 943-3980


TO:  LaBOEUF, LAMB, GREENE, MACRAE, LLP.
     Agent for Service of Process for Defendant
       Associated Electric & Gas Insurance Services Ltd.
     125 West 55th Street
     New York, New York 10019

     MENDEZ & MOUNT, LLP
     Agent for Service of Process for Defendant
       Certain Underwriters at Lloyd's
     750 Seventh Avenue
     New York, New York 10019-6829

276240.2                            - 9 -

A

June 28, 2002                                                                 ARS-3248

*Aon Risk Services*

*Natural Resources*
*Group*

SECURITY:

Section IA and IB:

| UNDERWRITER | PERCENTAGE WRITTEN |
|---|---|
| Underwriters at Lloyd's Syndicate No. 2020 | 15.0% |
| Underwriters at Lloyd's Syndicate No. 510 | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2791 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 457 | 10.0% |
| Zurich Specialties London Ltd. | 7.5% |
| Great Lakes Reinsurance (UK) Ltd. | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2323 | 2.5% |
| Underwriters at Lloyd's Syndicate No. 2987 | 4.0% |
| International Company of Hannover | 4.5% |
| Underwriters at Lloyd's Syndicate No. 1183 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 382 | 1.5% |
| GE Specialty (UK) Ltd. via JLT Risk Solutions Limited | 20.0% |
| Continental Insurance Company via Marine Office of America/CNA | 5.0% |
| American Employer's Insurance Company | 1.5% |
| Fireman's Fund Insurance Company | 1.3% |
| Markel Insurance Company | 1.7% |
| Royal Insurance Company via Gulf Coast Marine, Inc. | 0.5% |
| | 100.0% |

EXHIBIT "T"

HEALY & BAILLIE, LLP
Attorneys for Plaintiff
61 Broadway
New York, NY 10006
(212) 943-3980
Richard V. Singleton (RS-9489)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IROQUOIS GAS TRANSMISSION SYSTEM L.P.,

                                        Plaintiff,

            -against-

ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD., Hamilton, Bermuda; CERTAIN UNDERWRITERS AT LLOYD'S; AON RISK SERVICES OF TEXAS, INC.; and AMERICAN HOME ASSURANCE CO.,

                                        Defendants.

**(ECF Case)**

05 Civ. 2149 (JSR)

**SECOND AMENDED COMPLAINT IN ACTION FOR DECLARATORY JUDGMENT**

---

Plaintiff, Iroquois Gas Transmission System L.P. (hereinafter "Iroquois"), by its attorneys Healy & Baillie, LLP, complaining of Defendants, Associated Electric & Gas Insurance Services Ltd., Hamilton, Bermuda (hereinafter "AEGIS"), Certain Underwriters at Lloyd's (hereinafter "Lloyd's Underwriters"), Aon Risk Services of Texas, Inc. (hereinafter "Aon"), and American Home Assurance Co. ("American Home"), alleges as follows:

1.      This is an action for money damages and for a declaratory judgment pursuant to 28 U.S.C. § 2201.

RECEIVED
JUN 3  2005
DONOVAN PARRY
McDERMOTT & RADZIK

2.    This Court has admiralty jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1333 because the instant matter concerns insurance primarily applying to vessels engaged in commerce upon the navigable waters of the United States.

3.    Additionally and alternatively, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in that any claims that are not within this Court's admiralty jurisdiction are so related to claims within such jurisdiction that they form a part of the same case or controversy within the meaning of Article III of the Constitution.

4.    Additionally and alternatively, this Court has diversity jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §1332, on the grounds that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states, and/or of a foreign state.

5.    Plaintiff is a limited liability partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Corporate Drive, Shelton, Connecticut 06484.

6.    Defendant AEGIS is a corporation organized and existing under the laws of the Commonwealth of Bermuda, with an office and place of business at 10 Exchange Place, Jersey City, New Jersey 07302.

7.    Defendant AEGIS is subject to jurisdiction in the State of New York and has appointed an agent for service of process in New York.

8.    Defendants Lloyd's Underwriters are insurers and underwriters obligated to provide coverage pursuant to an insurance policy issued through Aon Risk Services of Texas, Inc. for the period from May 1, 2002 through May 1, 2003, bearing the number

ARS-3246 and subject to Insuring Conditions identified as LE0280715. A list of each of these insurers and/or underwriters and their relative shares of cover under this contract of insurance, as is relevant to coverage under Section 1A of said policy, is attached hereto as "A."

9.    Defendant Lloyd's Underwriters are subject to jurisdiction in the State of New York and have appointed an agent for service of process in New York.

10.    Defendant Aon is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 200 East Randolph Street, Chicago, Illinois. Aon has numerous offices in the State of Texas and transacted business relevant to the instant action at its office in Houston, Texas.

11.    Defendant Aon is subject to jurisdiction in the State of New York and has appointed an agent for service of process in New York.

~~12.    Defendant~~ American Home is a corporation organized and existing under the laws of the State of New York with its principal place of business at 70 Pine Street, New York, New York.

13.    Defendant American Home is subject to jurisdiction in the New York, has appointed an agent for service in New York, and may be found in New York.

14.    Venue is proper in that defendants are corporations or other entities subject to jurisdiction within the Southern District of New York.

## THE CONSTRUCTION CONTRACT

15.    On April 12, 2002, Iroquois, through its agent, Iroquois Pipeline Operating Company, entered into a contract with Horizon Offshore Contractors, Inc. (hereinafter

"Horizon") for the construction of a 34-mile underwater natural gas pipeline from Northport, New York to Hunts Point, New York ("the Contract").

16.    Pursuant to § 12 of the Contract, Horizon was obligated to maintain various insurance policies in accordance with the terms and conditions of Exhibit G to the Contract.

17.    Section 2.4 of Exhibit G to the Contract obligated Horizon to name Iroquois as an additional assured on Horizon's variously enumerated insurance policies.

18.    Section Clause 2.4.2 of Exhibit G to the Contract provided that the coverage Horizon was contractually bound to provide Iroquois was deemed to be primary coverage in relation to other policies held directly by Iroquois.

19.    Pursuant to its contractual obligation, Horizon named Iroquois as an additional assured on various policies held by Horizon, including the following:

      (a)    an AEGIS Policy providing the first layer of applicable insurance coverage extending to a limit of $1,000,000 (hereinafter the "AEGIS Policy");

      (b)    an American Home policy providing excess cover beyond the AEGIS Policy to a limit of $10,000,000 (hereinafter the "American Home Policy"); and

      (c)    an excess liability insurance policy providing excess cover beyond the aforementioned American Home excess policy to a limit of $140,000,000, underwritten by Navigators Insurance Co., American Home

Assurance Co., Liberty Insurance Underwriters and

XL Specialty Insurance Co. (hereinafter the

"Conglomerate Excess Policy").

20.    The American Home Policy and the Conglomerate Excess Policy are follow-on policies to the AEGIS Policy with some variations not here relevant.

21.    Horizon also procured an additional policy of hull insurance underwritten (as is relevant here) by the Lloyd's Underwriters. The policy covers the period from May 1, 2002 through May 1, 2003 and bears the number ARS-3246. This policy is hereinafter referred to as the "Lloyd's Hull Policy."

22.    Aon issued the AEGIS Policy, the American Home Policy, the Conglomerate Excess Policy and the Lloyd's Hull Policy from its office in Houston, Texas.

23.    Horizon is the named insured under all of the foregoing policies, and all of the foregoing policies indicate that Horizon's address is in Houston, Texas.

24.    Horizon procured all of the foregoing policies from Aon within the State of Texas, and Aon delivered all of the foregoing policies within the State of Texas.

## THE OCCURRENCE

25.    On or about February 27, 2003, while performing plowing work to bury the pipeline in the bottom of Long Island Sound pursuant to the Contract, the anchor of the pipe-lay barge GULF HORIZON, belonging to Horizon, allegedly snagged and damaged an underwater electrical cable belonging to the Power Authority of the State of New York ("NYPA"). This incident is hereinafter referred to as the "Occurrence."

26.    The GULF HORIZON is named as an insured vessel under the AEGIS Policy.

27.    The GULF HORIZON is named as an insured vessel under the Lloyd's Hull Policy.

28.    Shortly after the Occurrence NYPA placed Iroquois on notice that it intended to hold Iroquois fully responsible for all damage resulting from the incident.

29.    On or about August 2003, Horizon commenced litigation in the United States District Court for the Southern District of Texas under the Shipowner's Limited Liability Act ("Act") seeking exoneration from or limitation of liability with respect to the cable damage.

30.    Iroquois and NYPA filed claims in that action as they were required to do under the Act. NYPA claimed for its damages, and Iroquois claimed for indemnity for any liability it may be found to have to NYPA.

31.    On or about July 21, 2004, NYPA filed cross-claims against Iroquois seeking to recover in full from Iroquois for the cost of repairs and other losses in connection with the Occurrence.

32.    On or about October 13, 2004, NYPA filed a motion for summary judgment against Iroquois.

## THE AEGIS POLICY

33.    The cover note to the AEGIS Policy issued in favor of Iroquois recites under "OTHER TERMS, CLAUSES AND CONDITIONS" that AEGIS agreed to such coverage as follows:

279519.3

- 6 -

2.    ADDITIONAL INSURED CLAUSE AND OTHER PROVISIONS

i.)    The insured has privilege to name others as an
additional insured for their respective rights and interests
and/or waive any rights of recovery, but only to the extent as
may be required under contract or agreement.

34.    AEGIS, agreed to provide primary cover to Iroquois pursuant to the

Contract, and the cover note to the Horizon AEGIS Policy further states the following

with respect to primary coverage:

iii.)    It is agreed that in respect of additional insured(s), the
coverage provided hereunder shall be primary in respect of
any coverage carried by said additional insured(s) but only to
the extent as may be required by contract or agreement.

35.    The coverage Horizon was contractually bound to provide Iroquois

included cover for the legal cost of defending actions brought against the assured(s),

which includes Iroquois.

36.    The AEGIS Policy provided coverage for $950,000 excess of $50,000 per

accident/occurrence pursuant to the "Declarations" of the policy.

37.    Clause 4 of the "Declarations" of the policy states:

**SUM(S) INSURED**

US$950,000 any one accident or occurrence, including legal
and survey fees and expenses, subject to a general aggregate
limit of liability of US$15,000,000 per period.

38.    Clause 5 of the "Declarations" of the policy states:

**EXCESS**

US$50,000 any one accident or occurrence, including legal
and survey fees and expenses.

39.     The foregoing clauses set out the obligations of AEGIS to Iroquois, which

include, *inter alia*, payment of legal fees incurred by Iroquois respecting covered risks.

## THE LLOYD'S HULL POLICY

40.     The Lloyd's Hull Policy incorporates "Insuring Conditions" denominated

as "LE0280715." Said Conditions provide in pertinent part as follows:

> It is understood and agreed that where required by contract,
> bid or work order, Additional Assured and/or Waivers of
> Rights of Subrogation are automatically included hereunder,
> subject further to Notice Clauses as may be required by
> written contract only and that coverage provided hereunder
> shall be primary in respect of any coverage carried by said
> additional assureds where required by written contract.

41.     The Lloyd's Hull Policy grants coverage to other parties identified as

Additional Assureds when required by contract, bid or work order.

42.     Iroquois is an Additional Assured within the meaning of the foregoing

provision.

43.     Accordingly, the Lloyd's Hull Policy is obligated to provide coverage that

is primary in respect any coverage carried by Iroquois.

44.     The obligation of Certain Underwriters at Lloyd's to provide cover to

Iroquois additionally includes the obligation to pay legal fees and costs incurred by

Iroquois in respect of covered risks.

## THE AMERICAN HOME POLICY

45.     The American Home Policy provides (in pertinent part) that "the

unqualified word Assured whenever used includes any person or organization that the

Named Insured is obligated to include as an additional Assured under this policy."

46.    Iroquois is accordingly an "Assured" entitled to coverage for claims arising out of the Occurrence such as and including the claims asserted against it in the Horizon Limitation Action.

47.    The American Home Policy follows the insuring conditions of the AEGIS Policy except as expressly modified by the terms of the American Home Policy.

48.    Thus, except as expressly modified by its own terms, the American Home Policy must provide coverage on the same terms as the AEGIS Policy.

49.    AEGIS contends that the AEGIS Policy has been exhausted by claims arising from the Occurrence, and pending claims against the AEGIS Policy exceed the policy's limit of coverage.

50.    Accordingly, American Home is obligated to indemnify Iroquois against the claims and liabilities asserted against it in the Horizon Limitation Action, as well as against its attorney's fees and other expenses incurred in that action.

## NOTIFICATION TO THE INSURERS

51.    Aon acted as an insurance agent or broker with respect to all of the aforesaid policies of insurance.

52.    Shortly after the Occurrence, Iroquois and Horizon notified Aon of the incident.

53.    Aon undertook to identify and notify all of the potentially applicable insurers of the policies it had issued to Horizon and Iroquois of the Occurrence.

54.    Aon thereafter notified the carriers of the AEGIS Policy, the Steamship Policy, the American Home Policy, and the Conglomerate Excess Policy of the

Occurrence. Aon did not notify the Lloyd's Underwriters of a potential claim against the Lloyd's Hull Policy.

55.     Aon then advised Iroquois that it had notified "all appropriate insurers" of the Occurrence.

56.     Aon had provided Iroquois with documents indicating that Iroquois was an additional insured under the Lloyd's Hull Policy, but neither Aon nor Horizon nor the Lloyd's Underwriters provided Iroquois with the terms and conditions the coverage provided by the Lloyd's Hull Policy.

57.     In respect of the instant controversy, the Lloyd's Hull Policy provided coverage that was coextensive to, and duplicative of, the coverage provided by the AEGIS Policy, the Steamship Policy, the American Home Policy, and the Conglomerate Excess Policy.

58.     Iroquois thus had no basis for knowing or determining that it was entitled to coverage under the Lloyd's Hull Policy.

59.     Like Aon, both Iroquois and Horizon also notified the carriers of the AEGIS Policy, the Steamship Policy, the American Home Policy, and the Conglomerate Excess Policy of the Occurrence.

60.     On or about May 17, 2004 Aon provided its first notice of the Occurrence to the Lloyd's Underwriters.

61.     Aon engaged in the aforesaid conduct from its office in Houston, Texas.

## *COUNT I*
## JUDGMENT AS TO AEGIS

62.     In response to the actions filed against it Iroquois has expended substantial sums in legal fees to defend itself against the claims of third parties and to assert indemnity claims against Horizon.

63.     AEGIS is obligated to defend and indemnify Iroquois as an additional insured under the AEGIS Policy and to reimburse Iroquois for its legal costs incurred in connection with the cable damage litigations.

64.     Despite due demand, AEGIS has failed to reimburse Iroquois' legal costs which now exceed $800,000.

65.     As a result of the failure of AEGIS to pay Iroquois' legal costs, Iroquois has had to fund its own legal costs and/or seek on account payments against secondary insurance policies which would otherwise take effect only in the event of non-payment by AEGIS and/or the other insurance policies affected by Horizon as stated above.

66.     AEGIS has continued to fail to respond to Iroquois' requests to defend and for coverage of legal costs and expenses although there is no basis on which to do so, and accordingly has waived its right to object to coverage and/or is now estopped from denying coverage.

67.     The continued failure of AEGIS to defend and to reimburse Iroquois' on-going legal costs in the pending litigations may at some point prejudice Iroquois' ability to defend the various claims asserted against it and to pursue recovery against those responsible for the incident.

68.    Moreover, AEGIS had and has an obligation to deal fairly and in good faith with Iroquois.

69.    AEGIS has encumbered its entire policy limit pursuant to a Letter of Undertaking issued in favor Horizon in the Horizon Limitation Action.

70.    By encumbering its entire policy limit in favor of Horizon, and leaving no remaining coverage for its insured Iroquois, AEGIS has violated its obligation to deal fairly and in good faith.

## COUNT II
### JUDGMENT AS TO THE
### LLOYD'S UNDERWRITERS

71.    In response to the actions filed against it Iroquois has expended substantial sums in legal fees to defend itself against the claims of third parties and to assert indemnity claims against Horizon.

72.    As an additional insured under the Lloyd's Hull Policy, the Lloyd's Underwriters are obligated to defend and indemnify Iroquois and to reimburse Iroquois for its legal costs incurred in connection with the cable damage litigations.

73.    Despite due demand, the Lloyd's Underwriters have failed to reimburse Iroquois' legal costs which now exceed $800,000.

74.    As a result of the failure of the Lloyd's Underwriters to pay Iroquois' legal costs, Iroquois has had to fund its own legal costs and/or seek on account payments against secondary insurance policies which would otherwise take effect only in the event of non-payment by the Lloyd's Underwriters and/or the other insurance policies affected by Horizon as stated above.

75.    The Lloyd's Underwriters have continued to fail to respond to Iroquois' requests to defend and for coverage of legal costs and expenses although there is no basis on which to do so, and accordingly have waived their right to object to coverage and/or are now estopped from denying coverage.

76.    The continued failure of the Lloyd's Underwriters to defend and to reimburse Iroquois' on-going legal costs in the pending litigations may at some point prejudice Iroquois' ability to defend the various claims asserted against it and to pursue recovery against those responsible for the incident.

## COUNT III
## JUDGMENT AS TO AMERICAN HOME

77.    In response to the actions filed against it Iroquois has expended substantial sums in legal fees to defend itself against the claims of third parties and to assert indemnity claims against Horizon.

78.    Iroquois is advised that the expenses of Horizon, in addition to Iroquois' expenses, and/or as a result of other claims on the AEGIS Policy, have exhausted the AEGIS Policy.

79.    American Home is obligated to defend and indemnify Iroquois and to reimburse Iroquois for its legal costs incurred in connection with the cable damage litigations.

80.    Despite due demand, American Home has failed to reimburse Iroquois' legal costs.

81.    As a result of the failure of American Home to pay Iroquois' legal costs,

Iroquois has had to fund its own legal costs and/or seek on account payments against secondary insurance policies which would otherwise take effect only in the event of non-payment by American Home and/or the other insurance policies affected by Horizon as stated above.

82.     American Home has failed to respond to Iroquois' requests to defend, for legal costs and expenses, and otherwise to indemnify Iroquois, and accordingly has waived its right to object to coverage and/or is now estopped from denying coverage.

83.     The continued failure of American Home to defend and to reimburse Iroquois' on-going legal costs in the pending litigations may at some point prejudice Iroquois' ability to defend the various claims asserted against it and to pursue recovery against those responsible for the incident.

*COUNT IV*
**JUDGMENT BASED ON NEGLIGENCE**
**AS TO AON**

84.     The Lloyd's Underwriters have asserted late notice as a defense to Irouqois' claim for cover. While Iroquois disputes the validity of such defense, if the defense is upheld, any resulting lack of cover will be due to the faults and/or defaults of Aon.

85.     Aon had a duty to exercise reasonable diligence in carrying out its undertaking of notifying the potentially applicable insurers of the Occurrence.

86.     Aon had a duty to exercise reasonable diligence in advising and representing to Horizon and Iroquois the insurers potentially applicable for this loss.

87.     If the defense of the Lloyd's Underwriters is upheld, any resulting loss of cover will have been caused by Aon having failed to exercise reasonable diligence by

279519.3                                    - 14 -

failing to timely notify the Lloyd's Underwriters of the Occurrence, by failing to timely notify the Lloyd's Underwriters of Iroquois' claim, by affirmatively representing to Horizon and Iroquois that the Lloyd's Hull Policy did not potentially apply to claims arising from the Occurrence, and by affirmatively misrepresenting that only insurance policies other than the Lloyd's Hull Policy potentially applied to the claims.

88.    To whatever extent Iroquois is unable to recover from the Lloyd's Underwriters, any such inability is the direct and proximate result of Aon's negligence as described herein.

## COUNT V
## JUDGMENT BASED ON
## BREACH OF CONTRACT
## AS TO AON

89.    An agreement arose between Aon and Iroquois and/or between Aon and Horizon for Aon to submit claims related to the Occurrence to the appropriate insurance carriers.

90.    This agreement arose from the course of dealing between the parties. Aon provides comprehensive insurance services for a number of policies inuring to the benefit of Iroquois and Horizon and received commissions therefrom and other good and valuable consideration.

91.    If Iroquois was not a party to this agreement, Iroquois was a third-party beneficiary of the agreement.

92.    To whatever extent Iroquois is unable to recover from the Lloyd's Underwriters, any such inability is the direct and proximately result of Aon's breach of

its contractual obligation to submit insurance claims.

## DEMAND

WHEREFORE, Plaintiff prays for judgment:

1.  declaring AEGIS is bound to cover Iroquois' legal expenses to the limit of Iroquois' cover;

2.  declaring Lloyd's Underwriters are bound to cover Iroquois legal expenses pursuant to the Lloyd's Hull Policy;

3.  alternatively, declaring that Aon is obligated to make good any loss to Iroquois if the Lloyd's Underwriters are excused from defending and indemnifying per the terms of the Lloyd's Hull Policy;

4.  declaring American Home is bound to cover Iroquois legal expenses pursuant to the American Home Policy;

5.  awarding Plaintiff its costs and reasonable attorneys' fees expended to date in connection with the litigation;

6.  awarding Plaintiff its costs and reasonable attorneys' fees in connection with this action; and

7.  awarding Plaintiff such other and further relief as this Honorable Court may find to be just.

Dated:  New York, New York
        March 23, 2005

                                    HEALY & BAILLIE, LLP

                        By _____

                                    Richard V. Singleton (RS-9489)
                                    Attorneys for Plaintiffs
                                    61 Broadway, 32nd Floor
                                    New York, New York 10006-2701
                                    (212) 943-3980


TO:    LaBOEUF, LAMB, GREENE, MACRAE, LLP.
       Agent for Service of Process for Defendant
         Associated Electric & Gas Insurance Services Ltd.
       125 West 55th Street
       New York, New York 10019

       MENDEZ & MOUNT, LLP
       Agent for Service of Process for Defendant
         Certain Underwriters at Lloyd's
       750 Seventh Avenue
       New York, New York 10019-6829

A

June 28, 2002

ARS-3246

*Aon Risk Services*

*Natural Resources*
*Group*

## SECURITY:

### Section IA and IB:

| UNDERWRITER | PERCENTAGE WRITTEN |
|---|---|
| Underwriters at Lloyd's Syndicate No. 2020 | 15.0% |
| Underwriters at Lloyd's Syndicate No. 510 | 7.5% |
| Underwriters at Lloyd's Syndicate No. 2791 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 457 | 10.0% |
| | |
| Zurich Specialties London Ltd. | 7.5% |
| Great Lakes Reinsurance (UK) Ltd. | 7.5% |
| | |
| Underwriters at Lloyd's Syndicate No. 2323 | 2.5% |
| Underwriters at Lloyd's Syndicate No. 2987 | 4.0% |
| | |
| International Company of Hannover | 4.5% |
| | |
| Underwriters at Lloyd's Syndicate No. 1183 | 5.0% |
| Underwriters at Lloyd's Syndicate No. 382 | 1.5% |
| | |
| GE Specialty (UK) Ltd. via JLT Risk Solutions Limited | 20.0% |
| | |
| Continental Insurance Company via Marine Office of America/CNA | 5.0% |
| | |
| American Employer's Insurance Company | 1.5% |
| Fireman's Fund Insurance Company | 1.3% |
| Markel Insurance Company | 1.7% |
| Royal Insurance Company | 0.5% |
| via Gulf Coast Marine, Inc. | |
| | 100.0% |

EXHIBIT "U"

HEALY & BAILLIE, LLP
Attorneys for Plaintiff
61 Broadway
New York, New York 10006-2834
(212) 943-3980
John C. Koster (JK-4086)
Richard V. Singleton (RS-9489)
David D. Jensen (DJ-2261)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IROQUOIS GAS TRANSMISSION SYSTEM L.P.,<br><br>                              Plaintiff,<br><br>          -against-<br><br>ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LTD., Hamilton, Bermuda (AEGIS), and CERTAIN UNDERWRITERS AT LLOYD'S,<br><br>                              Defendants. | **(ECF Case)**<br><br>05 Civ. 2149 (JSR)<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT CERTAIN UNDERWRITERS AT LLOYD'S REQUEST FOR ADMISSIONS** |

          **PLEASE TAKE NOTICE** that pursuant to Rule 36 of the Federal Rules of

Civil Procedure and the Local Rules of this Court, Plaintiff IROQUOIS GAS

TRANSMISSION SYSTEM L.P. ("Iroquois"), by its attorneys Healy & Baillie, LLP,

hereby responds to the Requests for Admissions of Defendant CERTAIN

UNDERWRITERS AT LLOYD'S ("Lloyd's") dated July 12, 2005, including Lloyd's

First Amendment to its Requests for Admissions dated July 25, 2005 as follows:

          Request No. 1: Iroquois is a limited liability partnership organized and existing under the laws of the State of Delaware, with its principle place of business in Connecticut.

          *Response: Denied, except admitted that Iroquois is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business in Connecticut.*

Request No. 2: Iroquois is the owner of a 377-mile natural gas pipeline extending from the United States/Canadian border at Waddington, New York to Northport, Long Island, New York ("the Pipeline").

*Response: Admit that Iroquois is the owner of the Pipeline, but deny that the Pipeline is 377 miles in length (it is 412 miles in length) and deny that the Pipeline terminates at Northport, Long Island, New York (it terminates at South Commack, New York with a main line extension from Northport to the Bronx).*

Request No. 3: The Pipeline is operated by Iroquois' agent, Iroquois Pipeline Operating Company ("IPOC"), headquartered in Shelton, Connecticut.

*Response: Admitted.*

Request No. 4: Iroquois and IPOC do business, operate the Pipeline, and maintain places of business in New York.

*Response: Admitted, with the qualification that Iroquois and IPOC are headquartered in Shelton, Connecticut.*

Request No. 5: The majority of the Pipeline is located in the state of New York with a small portion extending across the southwest corner of Connecticut.

*Response: Admitted that a "majority" of the literal length of the Pipeline is located in the state of New York and that a smaller portion of the literal length of the Pipeline is located in the state of Connecticut.*

Request No. 6: On April 12, 2002, Iroquois, through IPOC acting as agent for its disclosed principal, entered into a contract (the "Contract") with Horizon Offshore Contractors, Inc. ("Horizon") whereby Horizon undertook as general contractor to construct a 35-mile long underwater extension to Iroquois' existing Pipeline to cross the Long Island Sound between Northport, Long Island and Hunts Point, New York.

*Response: Admitted.*

Request No. 7: The construction project portion of the Iroquois Pipeline referred to in Request No. 6 is known as the "Eastchester Extension".

*Response: Admitted, with the proviso that the "Eastchester Extension" project also included construction of five compressor stations in upstate New York.*

Request No. 8: The Eastchester Extension is located solely within New York State.

*Response: Admitted.*

281511.3                                    2

Request No. 9: The Contract between Iroquois and Horizon covering the Eastchester Extension was negotiated in both Connecticut and Texas.

*Response: Admitted.*

Request No. 10: All the work to be performed by Horizon under the Contract was to take place in New York State.

*Response: Denied.*

Request No. 11: The Contract between Iroquois and Horizon contains a New York State choice of law clause and forum selection clause.

*Response: Admitted.*

Request No. 12: In negotiating the Contract, Horizon requested a clause calling for arbitration in Houston, Texas.

*Response: Admitted.*

Request No. 13: Iroquois refused to agree to Texas arbitration and insisted on a New York forum with New York law since the work would be performed in New York and the project would be heavily regulated by local New York governments and agencies.

*Response: Admitted that Iroquois refused to agree to Texas arbitration and requested dispute resolution in New York, and otherwise denied.*

Request No. 14: Horizon ultimately agreed to the New York choice of law and forum clause.

*Response: Admitted.*

Request No. 15: The contract between Iroquois and Horizon covering the Eastchester Extension expressly provides that:

The Contract shall be governed by and construed and enforced in accordance with, the substantive laws of the State of New York, exclusive of conflicts of law provisions. [Horizon] and [Iroquois] agree that any action or proceeding arising from or in connection with this Contract shall be brought in a state or federal court of appropriate jurisdiction in New York State. In the event of any litigation with respect to this Contract or any instrument or document executed and delivered in connection herewith, each party waives the right to a trial by jury.

*Response: Admitted.*

Request No. 16:  The Contract also required Horizon to maintain certain insurance policies covering the Eastchester Extension project.

*Response: Admitted with the proviso that the policies were not solely intended to "cover the Eastchester Extension project" itself.*

Request No. 17:  In particular, the Contract provided it [sic] its "Schedule of Insurance Requirements" that:

2.1   **Contractor's Insurance.** [Horizon] shall prior to commencing the Work furnish and maintain, at its own expense the following insurance:

. . .

2.1.8   **Marine Hull and Machinery insurance,** if watercraft are involved, including collision liability, with sister ship clause unamended, and with limits of liability at least equal to the full value of each water craft used in connection with the performance of the Work required under this contract, and with navigational limitations adequate for the Contractor to perform or cause to perform the specified Work. . . .

*Response: Admitted.*

Request No. 18:  The Contract further required that all insurance policies provided by Horizon be endorsed to provide that Iroquois is included as an additional insured.

*Response: Admitted.*

Request No. 19:  Horizon did maintain a Hull and Machinery policy with Lloyd's Underwriters, Policy No. LE0280715 ("the Lloyd's Policy"), which covered vessels engaged by Horizon in the Eastchester Extension Project.

*Response: Admitted that said policy covered some 14 vessels in Horizon's fleet working on projects worldwide, only one of which, the GULF HORIZON, was engaged in the Eastchester Extension Project.*

Request No. 20:  Horizon was the named assured on the Lloyd's Policy.

*Response: Admitted, with the provision that Horizon was not the only named assured on the Lloyd's Policy.*

Request No. 21:  Horizon's plowing and pipe-laying barge the GULF HORIZON was listed as an insured vessel under the Lloyd's Policy.

*Response: Admitted.*

Request No. 22: The GULF HORIZON was stationed in the Long Island Sound in New York during the Eastchester Extension Project and the crew worked and lived on the barge from November 2002 until April 2003.

*Response: Admitted, with the proviso that the barge was fitted for the job, equipped and mobilized in Texas and traveled to Long Island Sound to perform the work.*

Request No. 23: Iroquois is not specifically listed or identified as an assured on the Lloyd's Policy.

*Response: Admitted that Iroquois is not specifically listed or identified as a named assured, but denied that the Lloyd's Policy does not provide coverage for Iroquois as an assured.*

Request No. 24: The Lloyd's Policy is governed by United States law and is subject to United States jurisdiction.

*Response: Admitted.*

Request No. 25: The Lloyd's Policy "Institute Service of Suit Clause (U.S.A.)" appoints New York agents for service of process in New York.

*Response: Admitted.*

Request No. 26: Horizon retained AON Risk Services of Texas, Inc. ("AON") to obtain various insurance policies for Horizon, including Hull and Machinery, for the period of May 1, 2002 through May 1, 2003.

*Response: Objection: Iroquois lacks knowledge of the purpose or purposes for which Horizon retained AON and cannot determine this information by reasonable inquiry because Horizon is an adverse party in ongoing litigation with Iroquois. Without waiving the objection, it is admitted that Horizon procured the Lloyd's Policy and other policies of insurance through AON.*

Request No. 27: AON served as the broker for Horizon in procuring the Lloyd's Policy and all other policies covering Horizon during the same period.

*Response: Objection: Iroquois lacks knowledge to admit or deny that AON was Horizon's broker as to "all . . . policies covering Horizon during the same period" and cannot determine this information by reasonable inquiry because Horizon is an adverse party in ongoing litigation with Iroquois. Without waiving the objection, it is admitted that AON served as the broker for Horizon in procuring the Lloyd's Policy and in procuring other policies relevant to this litigation.*

Request No. 28: AON obtained the Lloyd's Policy, and some of the other policies it procured for Horizon, through JLT Risk Solutions Ltd. ("JLT") in London, England.

*Response: Objection: Iroquois lacks knowledge to admit or deny this contention and cannot yet determine this information by reasonable inquiry because neither AON nor JLT have been deposed.*

Request No. 29: JLT negotiated the terms of the Lloyd's Policy for Horizon with Lloyd's Underwriters in England.

*Response: See response to Request no. 28.*

Request No. 30: JLT also served as a broker for Horizon in procuring the Lloyd's Policy, and some of Horizon's other policies, covering the same period from May 1, 2002 through May 1, 2003.

*Response: See response to Request no. 28.*

Request No. 31: The Lloyd's Policy was issued by Lloyd's Underwriters in England to Horizon's broker JLT in England.

*Response: See response to Request no. 28.*

Request No. 32: The Lloyd's Policy was delivered to Horizon in Texas, by AON under a combined cover with other policies bearing the number ARS-3246.

*Response: Admitted, with the proviso that the number ARS-3246 did not apply to other policies.*

Request No. 33: The Policy declaration page states that:

It is understood and agreed that where required by contract, bid or work order, Additional Assured and/or Waivers of the Rights of Subrogation are automatically included hereunder, subject further to Notice Clauses as may be required by written contract only and that coverage provided hereunder shall be primary in respect of any coverage carried by said additional assured where required by written contract.

*Response: Admitted, with the proviso that "the" does not appear before "Rights of Subrogation."*

Request No. 34: Iroquois only claim for coverage under the Policy is for coverage arising out of its contractual relationship with Horizon in connection with the Eastchester Extension Project.

*Response: Denied, except admitted that all of Iroquois' claims for coverage arise out of the performance of the Eastchester Extension Project.*

Request No. 35: Iroquois does not claim coverage as a named assured under the Lloyd's Policy.

*Response: Admitted.*

Request No. 36: Horizon has not sought coverage under the Lloyd's Policy in connection with the GULF HORIZON Incident at issue in this action.

*Response: Denied. Iroquois lacks knowledge to admit or deny whether Horizon has itself sought coverage and cannot determine this information by reasonable inquiry because Horizon is an adverse party in ongoing litigation with Iroquois. However, Iroquois has knowledge that persons acting on behalf of Horizon -- e.g. Defendant Associated Electric & Gas Insurance Services Ltd. -- have demanded coverage on behalf of Horizon under the Lloyd's Policy.*

Request No. 37: Completion of the Eastchester Extension Project, required Horizon to cross over 345,000-volt, dielectric fluid filled electrical power cables ("Power Cables") owned by the New York Power Authority ("NYPA") and located at the bottom of the Long Island Sound in New York.

*Response: Admitted.*

Request No. 38: Iroquois and NYPA entered into an agreement of their respective rights and obligations, which, among other things, allowed the Eastchester Extension project to cross over the Power Cables.

*Response: Admitted.*

Request No. 39: This Contract has been referred to by NYPA and Iroquois as the "Crossing Agreement."

*Response: Admit that the agreement referenced in request no. 38 is referred to as the "Crossing Agreement," but deny that the term previously defined in Defendant's Requests as "Contract" was this agreement.*

Request No. 40: The Crossing Agreement is governed by the substantive laws of the State of New York.

*Response: Admitted that the Crossing Agreement so provides.*

Request No. 41: The incident, for which Iroquois is now claiming coverage under the Lloyd's Policy ("the Incident"), arose from claims brought against Iroquois by NYPA for an alleged violation of the Crossing Agreement resulting from damage to one of the Power Cables (Y-49) during the Eastchester Extension Project.

*Response: Denied. The incident for which Iroquois is claiming coverage is the damage to the NYPA Power Cables, which led to NYPA's statement of intent to claim against Iroquois for the damage, the filing by Horizon of the limitation action, and the filing by NYPA of cross-claims within that action. This incident has resulted in claims that sound in both tort and contract, but all these claims arise from -- and would not exist in the absence of -- the alleged damage to the NYPA Power Cables.*

Request No. 42: The incident, wherein NYPA alleges damage was caused to its Power Cable, occurred on February 27, 2003.

*Response: Admitted that the incident giving rise to the NYPA cross-claim is alleged to have occurred on February 27, 2003.*

Request No. 43: The damage resulted when one of the anchors, from Horizon's pipe-lay barge the GULF HORIZON, allegedly struck the Y-49 underwater power cable.

*Response: Admitted that this is the alleged factual predicate to NYPA's claims.*

Request No. 44: The Lloyd's Policy incorporated a provision (hereinafter "the Notice Provision") which required that "[i]n the event of any accident or occurrence which could give rise to a claim under this Policy, prompt notice thereof shall be given to the Underwriters."

*Response: Admitted.*

Request No. 45: The Notice Provision applied to any party claiming coverage under the policy.

*Response: Admitted insofar as a party seeks coverage as an insured/assured.*

Request No. 46: Pursuant to the terms and conditions of the Lloyd's Policy, the insured and anyone claiming to be an additional insured had an affirmative obligation to provide Lloyd's Underwriters with prompt notification of any potential claim or of events or circumstances which may give rise to a claim under the Policy.

*Response: Admitted.*

Request No. 47: Iroquois was obligated to give Lloyd's Underwriters prompt notice of any accident or occurrence, which could give rise to a claim of coverage under the Lloyd's Policy.

*Response: Admitted.*

Request No. 48: Iroquois had an obligation to give Lloyd's Underwriters notice of the Incident involving the GULF HORIZON on February 27, 2003.

*Response: Admitted that the policy requires notice, but denied that Iroquois must give the notice.*

Request No. 49: On or about March 13, 2003, NYPA and LIPA put Iroquois and/or Horizon on notice that they were holding Iroquois/Horizon responsible for all damages arising out of the repairs and loss of use of the damaged Power Cables then estimated to be in the amount of $21,000,000.

*Response: Admitted that NYPA (only) so noticed Iroquois on March 13, 2003.*

Request No. 50: Lloyd's was not timely, or "promptly," notified of the Incident by Iroquois, Horizon, or any of either of their agents.

*Response: Objection: Iroquois lacks knowledge to admit or deny this contention and cannot yet determine this information by reasonable inquiry because neither AON nor JLT have been deposed.*

~~Request No. 51: The first notice (hereinafter "First Notice") of the Incident that Lloyd's Underwriters received was on May 18, 2004, by letter from AON dated May 17, 2004.~~

Amended Request No. 51: Annexed to Lloyd's Underwriters [Supplemental] Requests for Admissions as Exhibit "A" is a true and accurate copy of a letter dated May 17, 2004, from AON to Lloyd's Underwriters c/o JLT, purporting to notify Lloyd Underwriters of the February 27, 2003 Incident and of the potential insurance coverage claim against Lloyd's (hereinafter "First Notice").

*Response: Admitted.*

~~Request No. 52: Annexed hereto as Exhibit "A" is a true and accurate copy of the "First Notice" dated May 17, 2004, from AON to Lloyd's Underwriters notifying Lloyd's of the February 27, 2003 Incident and of the potential insurance coverage claim against the Lloyd's.~~

Amended Request No. 52: Lloyd's Underwriters did not receive the copy of, or notice of, the "First Notice" from JLT, or any other party acting on behalf of Iroquois, until on or about December 1, 2004.

*Response: Denied. Evidence developed in the case, including but not limited to the email messages admitted as exhibit 9 in the deposition of John Hodgett, supports the conclusion that Lloyd's in fact received notice prior to this date.*

~~Request No. 53: The notice evidenced by Exhibit A was sent nearly 15 months after the Incident.~~

281511.3                                   9

Amended Request No. 53: Lloyd's Underwriters did not receive any other notification of the February 27, 2003 Incident until on or about December 1, 2004.

*Response: Denied. See response to Amended Request No. 52.*

Request No. 54: To the extent, if any, that Iroquois was covered under the Lloyd's Policy or any other Horizon policy, AON served as Iroquois' broker for the purpose of *inter alia* notification of potential claims or events potentially covered under Horizon's policies of insurance.

*Response: Objection: Iroquois lacks knowledge to admit or deny this contention and cannot yet determine this information by reasonable inquiry because AON has not been deposed. Without waiving the objection it is admitted that AON undertook to notify insurers of Horizon and/or Iroquois of claims and events potentially subject to coverage.*

Request No. 55: Following the Incident on February 27, 2003, AON undertook to notify all potentially applicable insurers of Horizon of the Incident involving the GULF HORIZON's alleged anchor drag.

*Response: Admitted.*

Request No. 56: AON, on behalf of Horizon and Iroquois, notified insurers under the AEGIS policy, the Steamship Mutual Policy, the American Home Assurance Co.'s Policy and the Conglomerate Excess Policy of the Incident.

*Response: Admitted.*

Request No. 57: In notifying said insurers of the Incident, AON was acting as an agent and broker for both Iroquois and Horizon.

*Response: See response to Request no. 54.*

Request No. 58: It was AON's responsibility, as an agent or broker for Horizon or anyone claiming to be an additional insured under Horizon's policies, to notify potentially liable underwriters of the Incident.

*Response: See response to Request no. 54.*

Request No. 59: AON did not timely notify Lloyd's Underwriters of a potential claim under the Lloyd's Policy.

*Response: See response to Request no. 50 and Request no. 54.*

Request No. 60:  On or about March 17, 2003, approximately two weeks after the Incident, Iroquois itself put Horizon's Protection and Indemnity ("P & I") Insurers on notice in writing of the February 27, 2003 Incident and of the potential claim against AEGIS, Horizon's P & I insurers.

*Response: Admitted.*

Request No. 61:  Annexed hereto as Exhibit "B" is a true and accurate copy of a letter dated March 17, 2003, from Iroquois to AEGIS, together with a copy of the completed certified mail receipt forms.

*Response: Admitted.*

Request No. 62:  Around the same time, Iroquois also undertook to place Horizon's other insurers on notice of the Incident.

*Response: Admitted, with the proviso that Iroquois did not make this undertaking with respect to every insurer of Horizon.*

Request No. 63:  Annexed hereto as Exhibit "C" is a true and accurate copy of a letter dated March 18, 2003, from Iroquois to American Home Assurance Co. notifying American Home of the February 27, 2003 Incident and of the potential claim against an Excess Liability policy issued to Horizon by American Home.

*Response: Admitted.*

Request No. 64:  Annexed hereto as Exhibit "D" is a true and accurate copy of a letter dated March 17, 2003, from Iroquois to American Home Assurance Co. notifying American Home of the February 27, 2003 Incident and of the potential claim against an Excess Liability policy issued to Horizon by American Home.

*Response: Admitted.*

Request No. 65:  Annexed hereto as Exhibit "E" is a true and accurate copy of a letter dated March 18, 2003, from Iroquois to American Home Assurance Co. c/o American International Marine Agency, Inc., together with the certified mail return receipt, notifying American Home of the February 27, 2003 Incident and of the potential claim against an Excess Liability policy issued to Horizon by American Home.

*Response: Admitted.*

Request No. 66: Annexed hereto as Exhibit "F" is a true and accurate copy of a letter dated March 18, 2003, from Iroquois to American Home Assurance Co. c/o American International Marine Agency, Inc., together with the certified mail return receipt, notifying American Home of the February 27, 2003 Incident and of the potential claim against a General Liabilities policy issued to Horizon by American Home.

*Response: Admitted.*

Request No. 67: Annexed hereto as Exhibit "G" is a true and accurate copy of a letter dated March 18, 2003, from Iroquois to Navigators Insurance Company via Navigators Insurance Services of Texas, Inc., together with the certified mail receipt, notifying Navigators of the February 27, 2003 Incident and of the potential claim against an Excess Liabilities policy issued to Horizon by Navigators.

*Response: Admitted.*

Request No. 68: Annexed hereto as Exhibit "H" is a true and accurate copy of a letter dated March 17, 2003, from Iroquois to the Steamship Mutual Underwriting Associates (Bermuda) Ltd. c/o Steamship Insurance Management Services Ltd., together with the certified mail receipt, notifying Steamship of the February 27, 2003 Incident and of the potential claim against a Protection and Indemnity policy issued to Horizon by Steamship.

*Response: Admitted.*

Request No. 69: Annexed hereto as Exhibit "I" is a true and accurate copy of a letter dated March 17, 2003, from Iroquois to Liberty Insurance Underwriters, together with the certified mail return receipt, notifying Liberty of the February 27, 2003 Incident and of the potential claim against an Excess Liabilities policy issued to Horizon by Liberty.

*Response: Admitted.*

Request No. 70: Annexed hereto as Exhibit "J" is a true and accurate copy of a letter dated March 17, 2003, from Iroquois to Navigators Insurance Co., together with the certified mail return receipt, notifying Navigators of the February 27, 2003 Incident and of the potential claim against an Excess Liability policy issued to Horizon by Navigators.

*Response: Admitted.*

Request No. 71: Annexed hereto as Exhibit "K" is a true and accurate copy of a letter dated March 17, 2003, from Iroquois to XL Specialty Insurance Co., together with the certified mail return receipt, notifying American Home of the February 27, 2003 Incident and of the potential claim against an Excess Liabilities policy issued to Horizon by XL Specialty.

*Response: Admitted, with the proviso that the letter notified XL Specialty and not American Home.*

Request No. 72: Annexed hereto as Exhibit "L" is a true and accurate copy of a "Report of Loss" dated March 4, 2003, from AON to AEGIS notifying AEGIS of the February 27, 2003 Incident and of the potential claim against the P & I Policy issued to Horizon by AEGIS.

*Response: Admitted.*

Request No. 73: Annexed hereto as Exhibit "M" is a true and accurate copy of a "Report of Loss" dated April 18, 2003, from AON to Steamship Mutual Underwriting Association (Bermuda) Ltd. (Steamship Mutual) notifying Steamship Mutual of the February 27, 2003 Incident and of the potential claim against the Excess P & I Policy issued to Horizon by Steamship Mutual.

*Response: Admitted.*

Request No. 74: Annexed hereto as "N" is a true and accurate copy of a "Report of Loss" dated May 21, 2003, from AON to American Home Assurance Company notifying American Home of the February 27, 2003 Incident and of the potential claim against the Excess Liabilities policy issued to Horizon by American Home.

*Response: Admitted.*

Request No. 75: Annexed hereto as "O" is a true and accurate copy of a "Report of Loss" dated July 16, 2003, from AON to XL Specialty Insurance Company and other insurance companies notifying them of the February 27, 2003 Incident and of the potential claim against the Excess Liabilities policy issued to Horizon by XL Specialty and the other insurance companies listed on Exhibit "O".

*Response: Admitted.*

Request No. 76: Iroquois has expended significant amounts of money in connection with the legal defense of the claims asserted against it by NYPA and LIPA, including but not limited to legal fees and expert consulting fees, without any notice to, consultation with, or prior approval from Lloyd's Underwriters.

*Response: Admitted that Iroquois incurred legal fees and expert consulting fees in defending the claims asserted by NYPA without expressly consulting Lloyd's and without obtaining Lloyd's express approval, and further admitted that the amounts so incurred were not insubstantial. Otherwise, denied.*

Request No. 77: Following the Incident, experts were retained to monitor the repair efforts in New York.

*Response: Admitted.*

Amended Request No. 78:  Iroquois has no evidence to dispute that there was no agency agreement between JLT and Lloyd's Underwriters with respect to the Lloyd's Policy.

*Response:  Denied.  Evidence, including but not limited to the parties' past dealings and the absence of any provision advising the insured of where to send loss notices, supports the inference that agent(s) and/or broker(s) were authorized to act on behalf of the Lloyd's Underwriters.*

Amended Request No. 79:  Iroquois has no evidence to dispute that the document annexed hereto as Exhibit "P," is a true and accurate copy of a reservation of rights signed, *inter alia*, by the lead underwriter and lead insurance company of the Lloyd's Policy, on or about December 4, 2005.

*Response:  Admitted that the document is a true and accurate copy and bears the aforesaid signatures.  Denied that this was a "reservation of rights" and/or that it was transmitted to Horizon or Iroquois or any other insured.*

Amended Request No. 80:  Iroquois has no evidence to dispute that the document annexed hereto as Exhibit "Q," is a true and accurate copy of a document containing the handwritten file notes of John Hodgett, claim adjuster for lead underwriters, which were entered on the original claim file presented to lead underwriters by JLT, on or about December 1, 2004.

*Response:  Admitted, with the reservation that the date Lloyd's itself received first notice has not been conclusively established as December 1, 2004.*

Dated: New York, New York
       August 3, 2005

                                  HEALY & BAILLIE, LLP


                                  By _____
                                  Richard V. Singleton (RS-9489)
                                  David D. Jensen (DJ-2261)
                                  Attorneys for Plaintiffs
                                  61 Broadway, 32nd Floor
                                  New York, New York 10006-2834
                                  (212) 943-3980

TO:   NOURSE & BOWLES, LLP
      Attorney for Defendant Associated Electric & Gas Insurance Services Ltd.
      55 Broadway
      New York, New York 10006-3030
      Attention:  John P. Vayda, Esq.

      DONOVAN, PARRY, McDERMOTT & RADZIK
      Attorney for Defendant Certain Underwriters at Lloyd's
      Wall Street Plaza, 88 Pine Street
      New York, New York 10005-1801
      Attention:  Edward C. Radzik, Esq.

      DECHERT, LLP
      Attorney for Defendant Aon Risk Services of Texas, Inc.
      30 Rockefeller Plaza
      New York, New York 10112-2200
      Attention:  Rodney M. Zerbe, Esq.

281511.3                          15

EXHIBIT "V"

United States Courts
Southern District of Texas
FILED

DEC 1 5 2003

Michael N. Milby, Clerk

MH

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| IN THE MATTER OF HORIZON VESSELS, INC., AS OWNER, and HORIZON OFFSHORE CONTRACTORS, INC., HORIZON OFFSHORE, INC., and TEXAS OFFSHORE CONTRACTORS CORP., AS OWNERS, OPERATORS, OWNERS PRO HAC VICE, OF THE L/B GULF HORIZON PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY REGARDING THE INCIDENT OF FEBRUARY 27, 2003 <br><br> Plaintiffs | C.A. NO. H-03-3280 <br> ADMIRALTY |

§
§
§
§
§
§
§
§
§
§
§

## MOTION TO TRANSFER VENUE OF
## IROQUOIS GAS TRANSMISSION SYSTEMS, L.P.

Michael B. Hughes
Attorney in Charge for Claimant
Iroquois Gas Transmission Systems, L.P.
Texas State Bar # 10227200
P.O. Box 629
Houston Texas
409-795-2018 (phone)
409-726-1155 (fax)

OF COUNSEL:

Richard V. Singleton
Healy & Baillie, LLP
61 Broadway, 32nd Floor
New York, NY 10006-2701
212-943-3980 (phone)
212-425-0131 (fax)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................i

I. PROCEEDINGS........................................................................1

II. THE FACTS............................................................................3

III. STATEMENT OF THE ISSUE AND STANDARD OF REVIEW........3

IV.  SUMMARY OF ARGUMENT.................................................3

V. ARGUMENT...........................................................................4

       A.     Where the Events in Issue Took Place ........................5

       B.     Existence of a Forum Selection Clause ........................8

       C.     Convenience of the Parties ............................................9

       D.     The Convenience of Material Non-Party Witnesses ..12

       E.     The Availability of Process .........................................14

       F.     The Cost of Obtaining the Presence of Witnesses......15

       G.     The Relative Ease of Access to Sources of Proof ......15

       H.     Calendar Congestion...................................................16

       I.     The Interests of Justice in General .............................17

       J.     Petitioner's Choice of Forum is Entitlted
              to No Weight............................................................21

    VI. CONCLUSION....................................................................22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aquatic Amusement Associates Ltd. v. Walt Disney World Co.*, 734 F. Supp. 54 (N.D.N.Y. 1990) ............................................................................................10, 12

*Barnett v. Kirby Inland Marine, Inc.*, 202 F. Supp. 2d 664 (S.D. Tex. 2002)....................4

*Bigham v. Environcare*, 123 F. Supp. 2d 1046 (S.D. Tex 2000)........................................5

*Boller v. National Mediation Board*, 647 F. Supp. 1060 (S.D. Tex., 1986)....................23

*Christian College v. Exxon Corp.*, 845 F.2d, 523 (5th Cir. 1988)............................10, 21

*Dicken v. United States*, 862 F. Supp. 91 (D. Md. 1994) ...........................................22, 23

*Falconwood Financial Corp. v. Griffin*, 838 F. Supp. 836 (S.D.N.Y. 1993) ...................17

*Foster v. Litton Industrial Inc.*, 431 F. Supp. 86 (S.D.N.Y. 1977)...................................18

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 91 L. Ed. 1055, 67 S. Ct. 839 (1947)...............19

*Gundle Lining Const. v. Fireman's Fund Insurance*, 844 F. Supp. 1163 (S.D. Tex. 1994) ..................................................................................................4,16, 19

*Humble Oil and Refinery Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53 (5th Cir. 1963) .................................................................................................................4

*Lake Tankers Corp. v. Henn*, 354 U.S. 147 (1957) ..........................................................9

*Mobil Corp. v. SEC*, 550 F. Supp. 67 (S.D.N.Y. 1982)..............................................17, 21

*In re Norfolk Dredging Co.*, 240 F. Supp. 2d 532 (E.D. Va. 2002).....................................5

*In re Norfolk Dredging Co., supra*, 240 F. Supp. 537-38....................................................23

*Robertson v. M/V Cape Hunter*, 979 F. Supp. 1105 (S.D. Tex. 1997) ...............................5

*Royal Insurance Co. of America v. United States*, 998 F. Supp. 351 (S.D.N.Y. 1998) ...........................................................................................................5, 12

*Speed v. Omega Protein*, 246 F. Supp. 2d 668 (S.D. Tex. 2003) ......................................9

*St. Cyr. v. Greyhound Line, Inc.*, 486 F. Supp. 724 (E.D.N.Y. 1980) ...............................4

*Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988) ....................................................................................4, 8, 9

*In re TLC Marine Services, Inc.*, 900 F. Supp. 54 (E.D. Tex. 1995)...................................4

*The Bremen, supra,* [407 U.S.] at 10 ................................................................................9

*United States Fidelity and Guaranty Co. v. Republic Drug Co.*, 800 F. Supp. 1076
   (E.D.N.Y. 1992) ................................................................................5, 23

## FEDERAL STATUTES

Federal Transfer Statute, 28 U.S.C. § 1404(a) ........................................................4

Shipowner's Limitation of Liability Act, 46 U.S.C. 181 *et. seq* .........................................2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF HORIZON VESSELS, | § | |
| INC., AS OWNER, and HORIZON | § | |
| OFFSHORE CONTRACTORS, INC., | § | |
| HORIZON OFFSHORE, INC., and TEXAS | § | C.A. NO. H-03-3280 |
| OFFSHORE CONTRACTORS CORP., AS | § | ADMIRALTY |
| OWNERS, OPERATORS, OWNERS PRO | § | |
| HAC VICE, OF THE L/B GULF HORIZON | § | |
| PRAYING FOR EXONERATION FROM | § | |
| OR LIMITATION OF LIABILITY | § | |
| REGARDING THE INCIDENT OF | § | |
| FEBRUARY 27, 2003 | § | |
| Plaintiffs | | |

**MOTION TO TRANSFER VENUE OF**
**IROQUOIS GAS TRANSMISSION SYSTEMS, L.P.**

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, Limitation Defendant/Claimant Iroquois Gas Transmission Systems LP ("IGTS"), pursuant to Rule F(9) of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure (hereinafter cited as "Rule F"), respectfully moving to transfer this cause to the United States District Court for the Eastern District of New York for the following reasons:

**I.**

**PROCEEDINGS**

On August 13, 2003 Limitation Petitioners Horizon Vessels Inc., Horizon Offshore Contractors, Inc., Horizon Offshore, Inc., and Texas Offshore Contractors Corp. (collectively "Petitioners") filed in this Court a Verified Complaint for exoneration from or

limitation of liability pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. 181 *et. seq.* (the "Limitation Act"). Petitioners amended their Complaint on September 16, 2003.

The allegations in the Amended Complaint arise out of the performance by Horizon Offshore Contractors, Inc. ("Horizon"), as general contractors, of a contract dated April 12, 2002 with Iroquois Pipeline Operating Company ("IPOC")[1], as agent for its disclosed principal IGTS, to construct a natural gas pipeline from Huntington, Long Island to Hunts Point, Bronx County, in New York. Most of the pipeline was laid under water in Long Island Sound and the East River. All construction occurred in the State of New York. (See Webb Aff ¶¶ 3-5, 15-24, 30-51 and Exhibit B thereto). The Amended Complaint alleges that on February 27, 2003, while performing work under the Iroquois-Horizon contract, an anchor of Petitioner's lay barge the L/B GULF HORIZON snagged and damaged an underwater electrical cable owned by the Power Authority of the State of New York ("NYPA") in the East River and/or Long Island Sound in New York.[2]

On August 18, 2003, this Court issued an Order under the Limitation Act requiring all persons asserting claims against Petitioners arising out of the NYPA Incident to file and serve written answers and claims by November 12, 2003. Iroquois filed its Answer and Claim on that day as did the NYPA and Long Island Lighting Company d/b/a LIPA, operator of the damaged electrical cable, and the cable's underwriters, Factory Mutual Insurance Company (FM Global) (hereinafter "LIPA" and "FMIC", respectively). Thales GeoSolutions, Inc. ("Thales"), a subcontractor for Iroquois (Webb Aff, ¶¶ 8-9), also filed its Claim and Answer that same day.

---

[1] Unless otherwise indicated IPOC and IGTS are collectively referred to herein as "Iroquois". Both IGTS and IPOC have their headquarters and principal place of business in Shelton, Connecticut.

[2] This cable strike incident hereinafter is referred to as the "NYPA Incident".

## II.

## THE FACTS

The relevant facts are detailed in the accompanying affidavits of Kenneth Webb sworn to on December 10, 2003 and Richard V. Singleton sworn to on December 9, 2003 and the Exhibits annexed thereto. For purposes of this motion only, Iroquois also adopts the Affidavits of Michael J. Mitchell of NYPA dated October 23, 2003, Gerald C. Goldstein, Esq. of NYPA dated October 23, 2003, Michael Hervey of LIPA dated October 27, 2003, and Vincent Esposito of Key Span Electric Services, LLC dated October 27, 2003, all submitted in support of NYPA's and LIPA's earlier filed motion to transfer venue to the United States District Court for the Eastern District of New York. These several Affidavits are referenced as necessary in the following argument.

## III.

## STATEMENT OF THE ISSUE AND STANDARD OF REVIEW

The issue presented is whether this action should be transferred to the United States District Court for the Eastern District of New York pursuant to Rule F(9) of the Supplement Admiralty Rules. The decision to transfer the venue of a case rests in the sound discretion of the district court. *See Humble Oil and Refinery Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963); *Barnett v. Kirby Inland Marine, Inc.*, 202 F. Supp. 2d 664, 666 (S.D. Tex. 2002). Transfer decisions are reviewed under an abuse of discretion standard. *Jarvis Christian College v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1988).

## IV.

## SUMMARY OF ARGUMENT

Rule F (9) of the Supplement Admiralty Rules expressly provides that a limitation action may be transferred to another district for the convenience of parties and witnesses and in

the interest of justice.  The factors to be considered in deciding a Rule F(9) transfer are the same as for deciding transfers under the Federal Change of Venue statute, 28 U.S.C. § 1404(a).

Consideration of all relevant factors leaves no doubt that this action should be transferred to the Eastern District of New York.  All material events giving rise to this Limitation Action occurred in New York, the Iroquois-Horizon contract contains a forum selection clause requiring all disputes to be litigated in New York, the overwhelming majority of party witnesses and almost all non-party witnesses reside in or near the Eastern District of New York, and most of the relevant evidence is located in New York. Moreover, another case, the LIPA action, which arises out of another cable strike in New York during performance of Iroquois-Horizon contract and which involves most of the same parties and counsel, is presently being litigated in the Eastern District of New York.  The interests of justice would be best and most expeditiously served if litigation of these cases were to proceed in the same District.  Iroquois' motion to transfer therefore should be granted.

V.

**ARGUMENT**

An action filed under the Limitation Act may be transferred to another venue pursuant Rule F(9), which provides in pertinent part:

> For the convenience of parties and witnesses, in the interest of justice, the court may transfer the action to any district; if venue is wrongly laid the court shall dismiss or, if it be in the interest of justice, transfer the action to any district in which it could have been brought.

The factors for determining the propriety of transfers under Rule F(9) are the same as those under the Federal change of venue statute, 28 U.S.C. § 1404(a). *In re TLC Marine Services, Inc.*, 900 F. Supp. 54, 56 (E.D. Tex. 1995) (factors considered by this court to

determine whether a transfer is appropriate under Rule F(9) are the same as those under 28 U.S.C. § 1404(a)).

The criteria to be weighed by a court deciding a motion for transfer of venue under § 1404(a) include: (1) convenience of the parties; (2) convenience of material witnesses; (3) availability of process to compel the presence of witnesses; (4) cost of obtaining the presence of witnesses; (5) relative ease of access to sources of proof; (6) calendar congestion; (7) where the events in issue took place; (8) interests of justice in general; and (9) existence of a forum selection clause. *Id. See also Gundle Lining Const. v. Fireman's Fund Ins.*, 844 F. Supp. 1163, 1165 (S.D. Tex. 1994) (citing *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d. 22 (1988) and *St. Cyr. v. Greyhound Line, Inc.*, 486 F. Supp. 724, 727 (E.D.N.Y. 1980)). Each of these factors is addressed below in the order best reflecting the circumstances of this case. These factors, whether considered individually or collectively, compel the conclusion that Iroquois' motion must be granted.

A. <u>**Where the Events in Issue Took Place**</u>

This factor is often considered one of the most important in evaluating a motion to transfer venue. *Bigham v. Environcare*, 123 F. Supp. 2d 1046, 1051 (S.D. Tex 2000); *Robertson v. M/V Cape Hunter*, 979 F. Supp. 1105, 1108 (S.D. Tex. 1997) (noting that the "place of the alleged wrong is perhaps the most important factor in venue determination.") *See also In re Norfolk Dredging Co.*, 240 F. Supp. 2d 532, 537 (E.D. Va. 2002) (noting that the location of the collision was "of primary significance.") As the Norfolk Dredging Court explained:

> The district court in Maryland has a specific interest in overseeing matters that occurred within its jurisdiction specifically because issue [sic] of liability emerged from events that took place within the District of Maryland.

*Id.* at 537.  *Accord Royal Ins. Co, supra,* 998 F. Supp. at 353; *United States Fidelity and Guaranty Co. v. Republic Drug Co.,* 800 F. Supp. 1076, 1081 (E.D.N.Y. 1992).

As the Webb, Singleton, Mitchell, Hervey, and Esposito Affidavits make clear, **all** the operative events for which Horizon seeks to limit its liability occurred in New York.  **None** occurred in Texas.  The pipeline under construction was owned by IGTS, a corporation with its offices and principal place of business in Shelton, Connecticut.  Horizon contracted to perform pipe laying work in New York and sent employees, materials and equipment to New York to work on the pipeline project.  All pipeline construction performed by Horizon occurred in New York.  (Webb Aff, ¶¶ 2-5, 20-22, 29-30).  The GULF HORIZON's anchor dragged and struck one of NYPA's Y-49 cables located in New York.  Immediately afterwards an emergency team from New York was dispatched to Long Island Sound and technical surveys were performed— all in New York by surveyors located in the New York area.  (Webb Aff, ¶¶ 34-38; Mitchell Aff, ¶¶ 9-11).  Sometime thereafter, initial testing of the Y-49 cables was conducted, and temporary repairs and later permanent repairs were effected, again all in New York by contractors located and/or having offices in the New York area.  (Webb Aff, ¶ 39, 46; Mitchell Aff, ¶ 12; Esposito Aff, ¶¶ 4, 6.)  Finally, the damages in this litigation were suffered by NYPA and LIPA, New York State political subdivisions.  (Goldstein Aff, ¶¶ 4-6; Hervey Aff, ¶ 2).

The location factor is of even greater significance in this case.  The typical limitation of liability case involves a singular, fortuitous event, such as a vessel sinking, collision, or personal injury or death of seaman, that occurs while a vessel is passing through the waters of a particular jurisdiction.  Petitioners and the GULF HORIZON's presence in New York, however, was not singular, fortuitous or transitory.  Horizon established and maintained a significant and continuous presence in Connecticut and in New York for the purpose of

performing the Iroquois-Horizon contract from August 2002 through the termination of Horizon's services on November 25, 2003.  Horizon participated in the planning and had representatives on scene in New York and at Iroquois headquarters in Connecticut.  Horizon assisted with the drafting of numerous procedures and protocols specifically for the Iroquois-Horizon contract and for the local characteristics, topography, and requirements particular to the East River and Long Island Sound in New York.  The GULF HORIZON continuously operated in New York waters from commencement of its pipe-laying operations in November 2002 through April 29, 2003.  (Webb Aff, ¶¶ 23-25, 30-32).  The cable strike which is the subject of this action occurred in New York during the course of Horizon's performance under the Iroquois-Horizon Contract.

In addition, Iroquois has asserted several breach of contract claims against Horizon, which are not even colorably subject to limitation of liability.  These claims also arise out of Horizon's performance of the Iroquois-Horizon contract in New York and involve the same contract procedures and protocols, and many of the same witnesses, as the NYPA Incident.  All of the operative events giving rise to these claims occurred in New York.  As detailed in Iroquois' Claim and in paragraphs 52 through 54 of the Webb Affidavit, those other contract claims total some $44 million dollars, representing damages even more substantial than those damages for the NYPA Incident.  Some of those claims relate to potential damage to underwater cultural resource sites protected by the State of New York.  (Webb Aff, ¶¶ 52A-52D).  Such claims give the court in New York an even more compelling interest in this litigation.

The Eastern District of New York has very specific interests, not only in the NYPA Incident, but in all related claims.  The fact that all operative events relating to Iroquois' claims and Horizon's limitation actions occurred in New York and that Horizon's presence in

New York to perform the Iroquois-Horizon contract was intentional, systematic and continuous for more than 9 months, strongly favors transferring this action to New York.

### B.    Existence of a Forum Selection Clause

This case involves a forum selection clause specifically applicable to the NYPA Incident as well as to all other claims arising out of the Iroquois-Horizon Contract. Section 16.4 of the Iroquois-Horizon Contract provides that "any actions or proceeding arising from or in connection with this Contract **shall** be brought in a state or federal jurisdiction in New York State." (Webb Aff, ¶ 18).[3] This forum selection clause was specifically negotiated by Horizon and Iroquois, and Horizon's attempts to insert a provision calling for Houston arbitration were ultimately rejected during contract negotiations.    (Webb Aff, ¶ 18).    The Iroquois-NYPA Crossing Agreement, which obliges Iroquois "to hold NYPA harmless and to indemnify NYPA for any damage to the Y-49 cables arising out of the crossing by the pipeline", likewise contains a forum selection clause requiring all litigations arising under the Contract to be brought in the Eastern District of New York. (Webb Aff, ¶ 12).

In *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988), the Supreme Court addressed the question of the proper weight to be given a forum selection clause in the context of a §1404(a) transfer of venue motion.  The Court concluded:

> The presence of a forum selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's calculus.

Justice Kennedy, with whom Justice O'Connor joined, concurred, as follows:

---

[3] In a Limitation of Liability action, the appropriate court would be the United States District Court for the Eastern District of New York.

> The federal judicial system has a strong interest in the correct resolution of these questions, not only to spare litigants unnecessary costs but also to relieve courts of time consuming pretrial motions. Courts should announce and encourage rules that support private parties who negotiate such clauses. Though state policies should be weighed in the balance, the authority and prerogative of the federal courts to determine the issue, as Congress has directed by § 1404(a), should be exercised so that a valid forum-selection clause is given controlling weight in all but the most exceptional cases. See *The Bremen, supra,* [407 U.S.] at 10.

*Id.,* 487 U.S. at 34.  And as recently recognized by this Court, when a forum selection clause specifies a choice of venue, "the Court must address the convenience of the chosen forum given both parties' expressed preference for that venue." *Speed v. Omega Protein,* 246 F. Supp. 2d 668, 672 (S.D. Tex. 2003) (citing *Stewart, supra*).

Horizon, Iroquois and NYPA have all agreed (albeit in separate contracts) to litigate their disputes in New York.  Having agreed to litigate with Iroquois in New York, Horizon cannot now argue that it is inconvenient for it to do so—whether or not the litigation involves other New York parties such as NYPA and LIPA who are not parties to the contract. Likewise, Horizon should not be permitted to use the Limitation Act as a means to defeat Iroquois' contractual right to have its claims decided by a New York Court as expressly agreed by Horizon.  The Supreme Court has long cautioned that the Limitation Act is a shield, but is not to be used as an "offensive weapon" to defeat rights a claimant may otherwise have. *Lake Tankers Corp. v. Henn,* 354 U.S. 147, 152 (1957).  The contractually agreed forum selection clauses therefore should be given effect and this case should be transferred to New York.

### C.    Convenience of the Parties

The Eastern District of New York is certainly the most convenient district for Iroquois.  Both IGTS and IPOC are headquartered in Shelton, Connecticut.  (Webb Aff, ¶ 2). Some 30 to 40 Iroquois employees were involved in various aspects of the pipeline project, all of

whom could be potential witnesses in the case. (Webb Aff. ¶ 59). The Webb Affidavit at paragraphs 59, 60 and 67 identifies and describes the areas of anticipated testimony of the following Iroquois employees who are likely to be key witnesses: **Ben Gross, Susan Deleon, David Fontaine, Michele Wieler, Tony Fox, Cathy Proctor, Dave Warman, Tim Barnes, Brian Wolf, Don Moore, John Trowbridge, Alan Downes and James Dugan.** All of these employees reside in Connecticut or New York. While having to litigate 203 miles from Houston may be a minor inconvenience, *Christian College v. Exxon Corp.*, 845 F.2d, 523, 528 (5th Cir. 1988), requiring Iroquois to litigate its claim over 1700 miles away from its corporate headquarters in Connecticut and the residences of its employees, when the incident at issue occurred in the shadow of their offices, would be more than a gross inconvenience—it would be a severe hardship.

It also would adversely affect Iroquois' business. The key witnesses in the litigation are also are the key people involved in Iroquois' day to day business and with the pipeline construction project. The time required for such employees to travel to Houston to attend a trial, and the corresponding loss of productivity during their absence, will adversely affect Iroquois' business. (Webb Aff, ¶¶ 68-69) *See Aquatic Amusement Associates Ltd. v. Walt Disney World Co.*, 734 F. Supp. 54, 58 (N.D.N.Y. 1990)(crediting the adverse effect on plaintiff's business by the absence of six of its executives to testify at a lengthy trial in transferee district away from corporate offices).

The Eastern District of New York is also the most convenient district for claimants, NYPA and LIPA, the two New York State public utilities whose electrical cable Horizon damaged and who are the ultimate plaintiffs in this action. (*See generally* Mitchell, Goldstein, Hervey, and Esposito Affidavits). The issues concerning NYPA's and LIPA's

257522.1                                          10

provable damages for repair of NYPA's cable and for the costs of substitute electrical power produced by LIPA, which are being claimed in the total amount of $21,000,000, will be vigorously litigated. Given the nature of they way electrical utilities conduct their business, the number of departments involved in the repairs, and their methods for damage accounting, Iroquois expects that numerous NYPA and LIPA witnesses will be required on various issues concerning provable damages. (*See* Mitchell Aff, ¶¶ 18, 19; Goldstein Aff, ¶¶ 7, 8; Hervey Aff, ¶13; and Esposito Aff, ¶¶ 5-7.) Since NYPA and LIPA are New York entities whose employees live in the New York area, requiring them to travel to Houston for the trial of this matter would be an extreme hardship.

The severe hardship to Iroquois, NYPA and LIPA of having to travel to Houston to litigate their claims far outweighs any minimal inconvenience that may be claimed by Horizon for having to litigate in New York. Horizon **chose** to bid on a project that required it to commit personnel, equipment and other resources in New York for an extended period time. Horizon's shoreside employees chose to travel to Connecticut and New York where they resided and worked for six months or more during performance of the Contract. And Horizon's pleadings reflect that personnel it assigned to the L/B GULF HORIZON are mobile, work wherever the Barge operates, and frequently are away from home for long periods of time. (*See* Singleton Aff, ¶¶ 24-25.) These persons are not necessarily more accessible to this Court than to any other. Moreover, given the magnitude of the project, Horizon must have known that claims in New York arising out of its performance of the Iroquois-Horizon contract were probable. Accordingly, having agreed to a substantial contract in New York, having freely traveled there to perform the Iroquois-Horizon Contract, and having reaped the financial benefits of doing so,

Horizon can hardly claim now that it is inconvenient for it to travel to New York to litigate claims arising out of its performance of the Contract.

**D.    The Convenience of Material Non-Party Witnesses**

While courts have considered that "the convenience of non-party witnesses rather than that of employee witnesses ... is the more important factor and is accorded greater weight," (*Gundle, supra,* 844 F. Supp. At 1166 citing *Aquatic, supra,* 734 F. Supp. 54, 57; *Accord, Royal Insurance Co. of America v. United States,* 998 F. Supp. 351, 354 (S.D.N.Y 1998), in this case the convenience of **party** witnesses is more important because of the great number of Iroquois, NYPA, and LIPA witnesses involved.

In any event, most of the material non-party witnesses to the planning and performance of the Iroquois-Horizon contract, the cable strike, the extent of the damage to the cable, and the subsequent investigations and repairs are located nearer to the Eastern District of New York than to the Southern District of Texas. Paragraphs 34 through 38 and 61 through 65 of the Webb Affidavit, and Exhibit H to the Singleton Affidavit (attached hereto as Appendix I), list numerous non-parties who are potential witnesses, including:

- Employees of Ocean Surveys Inc., Key Span Electric Services, LLC and Miller Environmental Group, all of whom are located in the New York metropolitan area and who are involved with the post-casualty investigation and repairs to the cable. Many employees from each of these companies was involved and likely are material witnesses.

- Employees of various governmental agencies, including: the Federal Energy Regulatory Commission in Washington, D.C., (**Richard Hoffman, Lonnie Lister** and **Eric Tomasi**); The United States Army Corps. of Engineers in New York (**Richard Tomer** and **Frank Tangora**); the New York State Department of Environmental Conversation (**Kent Sanders**); and the New York Office of General Services (**Alan Bauder**). These agencies were involved in the permitting and oversight of the Pipeline project Extension Project and, after the NYPA Incident, their approval or "non objection" to proceeding were required before work on the marine portion of the pipeline project was permitted to continue. (Webb Aff, ¶63-64).

- Horizon filed a Report of Marine Accident and the United States Coast Guard of New York has commenced an investigation concerning the NYPA Incident. The investigation officers involved are based in Staten Island, New York. (Webb Aff, ¶44).

- Iroquois outside consultants including **Walter Gorman** of New York (permitting consultant), **Mark Robinson** who is currently residing in Connecticut (Iroquois Project Cost Consultant and knowledgeable concerning Iroquois' damages arising out of the NYPA incident and subsequent delays), and **R. Christopher Godwin & Associates** of Maryland (consultant for identifying potential underwater cultural resource sites in the construction corridor).

- The cable experts retained by Horizon, Thales, Iroquois and NYPA/LIPA, who are witnesses to the investigation of the cause of the damage and repairs, are **all** located in the New York area. (Singleton Aff, Ex. H).

- The crews of the tugs POWHATAN and the SHELBY, whose owners are located in New Jersey and whose key officers, engineers and mates reside in New York, New Hampshire, Maine, Maryland and other cities in the northeast United States.

Other non-parties located in Texas, such as Pegasus International, Inc. and INTEC Engineering, Inc., are Iroquois contractors whose key personnel worked and resided in New York and Connecticut while the pipeline project was ongoing and therefore are neutral in the transfer analysis. (Webb Aff, ¶¶ 6-9.) In any event, the key Pegasus consultant involved in the pipeline project Extension project was **Robert Yetton**, who was Pegasus' Marine Construction Manager. Mr. Yetton is not a resident of Texas. He is a resident of Scotland, who resided in Connecticut and worked out of Iroquois' offices in Connecticut while employed on the pipeline project. Moreover, all of his work product is Iroquois property and remains in Connecticut. (Webb Aff, ¶ 7.) Although 2 or 3 other Pegasus employees may be relevant witnesses, their presence in Texas is vastly outweighed by the abundant non-party witnesses present in the New York area and northeast United States.

Like Pegasus, INTEC's key personnel resided in Connecticut when assisting Iroquois. Moreover, with the exception of an investigation after the NYPA Incident, all work

done by INTEC related to completing the pipeline's design and specifications, and performing the pipeline's final alignment along the bottom of Long Island Sound. (Webb Aff ¶ 9). This work is not related to any anticipated issues in the case. Accordingly, no more than one INTEC employee is likely to be a material witness for this litigation.

The location of the crews of the two remaining support tugs, the KRISTINA A and MISS JESSICA, some of whom may be potential witnesses, is unknown to Iroquois. But they are believed to reside in Louisiana and other states in the Southeastern United States. Like the crew on the GULF HORIZON, they make their living traveling to wherever their next job is located and presumably would not be inconvenienced by having to travel to New York. In any event, unless Horizon can demonstrate that they are within this District or within 100 miles of Houston, their testimony will have to be taken by subpoenaed depositions no matter where this action proceeds.

In summary, only a few non-party witnesses, most of whom are Iroquois' contractors, are located in Texas. A few others may be located in states other than in the Northeast. Given the substantial number of material non-party witnesses located in New York and Connecticut in particular, and in the Northeast generally, litigation of this matter in New York would be far more convenient for the great majority of the non-party witnesses.

E.     **The Availability of Process**

In light of the fact that the majority of material non-party witnesses are within the greater New York City metropolitan area, they would not be subject to the compulsory process of this Court. The amenability of significant non-party witnesses to subpoena at the respective forums is an important factor to consider. Under Rule 45(e) of the Fed.R.Civ.P., a subpoena requiring the attendance of a witness at a hearing or trial may be served at any place within the district in which the hearing or trial is being held, or at any place within 100 miles of such

district. In *Gundle, supra,* 844 F. Supp. at 1166, the District court granted a transfer from Texas to New Jersey where most non-party witnesses resided. Like the circumstances of that case, the availability of process from the Eastern District of New York weighs strongly in favor of venue in that Court.

F.    **The Cost of Obtaining the Presence of Witnesses**

The cost of obtaining witnesses' attendance will be significantly greater in Texas than in New York. Even if some witnesses were willing to testify, the Court must determine whether "the cost of transportation to obtain their presence at trial in Texas would be substantial." *Gundle, supra,* 844 F. Supp. at 1166. As most of the witnesses—both party and non-party—reside in or near the Eastern District of New York, the cost of obtaining their presence for discovery and trial is a factor that weighs heavily in favor of transfer.

G.    **The Relative Ease of Access to Sources of Proof**

The location of documents and of physical evidence is an additional consideration in favor of transferring this matter to the Eastern District of New York. All of the physical evidence relating to the Y-49 cable system is located in New York. (Mitchell Aff, ¶ 23; Esposito Aff, ¶ 10). Further inspections of the cable by the parties and their experts and the trial court can only take place in New York.

Not only is the damaged cable located in New York, but many tens of thousands of documents relevant to the incident are located in New York. The documents maintained by Iroquois alone if packed together, **would exceed 135 five-drawer filing cabinets**. (Webb Aff, ¶ 56.) NYPA and LIPA's documents are likely equally as voluminous. (Webb Aff, ¶ 57; Mitchell Aff, ¶ 21; Hervey Aff, ¶ 13; Esposito Aff, ¶ 7.) In addition, at least 35,000 documents relating to the construction project and to the Iroquois-Horizon contract are already in the hands of New York counsel for NYPA/LIPA, Iroquois, Thales, and Horizon and more are expected to be

exchanged. Access to such volumes of documents is a factor weighing in favor of transfer. *See, Mobil Corp. v. SEC*, 550 F. Supp. 67, 70 (S.D.N.Y. 1982) (7,000 documents located in the District of Columbia weighed in favor of transfer of action to the Federal Court there).

Finally, potentially relevant documents in the possession of many non-party witnesses discussed above are beyond the reach of this Court's subpoena authority. These include documents of consultants, other contractors and sub-contractors, and experts. They also include the records of involved government agencies, such as the Federal Energy Regulatory Commission, the United States Corps of Engineers, the New York Department of Environmental Conservation, the New York Department of State, and the New York Office of General Services, all of whom were involved with the permitting, approvals and oversight of various aspects of the construction project. Some also were involved with suspending construction after the NYPA Incident and approving the conditions under which construction was permitted to resume. These records, which are extensive, are maintained in New York and Washington, D.C. (Webb Aff, ¶¶ 40, 57). The location of relevant evidence in or near the Eastern District of New York strongly favors transfer of this action to that Court. *See Falconwood Financial Corp. v. Griffin*, 838 F. Supp. 836, 841 (S.D.N.Y. 1993) (transfer of venue was necessary because defendants could not compel the testimony of the author of documents and, under discovery rules, a non-party could avoid document production if significant expense were involved).

**H.    Calendar Congestion**

Docket conditions "are merely accorded some weight and are not decisive in the determination of a transfer motion." *Foster v. Litton Indus. Inc.*, 431 F. Supp. 86, 88 (S.D.N.Y. 1977). On balance, however, comparative docket congestion weighs in favor of a transfer of this limitation action to New York.

For the twelve-month period ending September 30, 2002, the Southern District of Texas averaged 55 more filings of new actions per judge than the Eastern District of New York. [4] Although 2002 statistics state that the length of time between commencement of an action and filing to trial is 18.9 months in Texas and 30.4 months in New York, from 2001 to 2002 the number of cases filed in the Southern District of Texas increased from 10,919 to 12,762. This recent rise in filings will affect future levels of congestion in this Court. Moreover, during the same period, those statistics reflect a significantly greater number of criminal action filings per judge in this Court (220) than in the Eastern District of New York (89), while almost three times as many criminal filings occurred here (4,167) than in the proposed forum (1,330). Because of the speedy trial limitations applicable to such cases, and the priority given to criminal matters over civil matter on a court's trial calander, greater delays in handling this action are expectable here than in the Eastern District of New York. *See Grundle, supra,* 844 F. Supp. at 1166-67.

I.     **The Interests of Justice in General**

1.     Public Interest

Courts must consider factors of public interest in determining whether a case should be transferred to another district. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 91 L.Ed. 1055, 67 S.Ct. 839 (1947). Both NYPA and LIPA are public utilities performing vital governmental functions for the people of New York. (Goldstein Aff, ¶¶ 4-6; Hervey Aff, ¶ 2.) The present action involves an incident occurring in New York which seriously affected NYPA and LIPA's ability to serve the public there.

The notorious blackout in the northeastern United States and Canada last summer is a dramatic reminder of the local effects of the services—and of the interruption of services—

---

[4] The Southern District of Texas averaged 672 filings per judge while the Eastern District of New York averaged 617. 2002 Federal Court Management Statistics, http://www.uscourts.gov/cgi-bin/cmsd2002.pl.

supplied by public utilities. The Pipeline project and the NYPA Y-49 Cables (as well as the LIPA Cables involved in the LIPA Incident) are of significant importance to New York utilities in their supply of energy to the New York public. Indeed, the outcome of all of litigations concerning the pipeline project no doubt will have an impact on the New York public who ultimately bear the costs for the energy the New York utilities' supply there. The public interests of New York therefore support adjudication of the NYPA Incident and all other claims arising out of the pipeline project in the Eastern District of New York.

        2.    <u>Similar Action Pending</u>

In December 2002, Petitioners' subcontractor, Cal Dive International, while performing work under the Iroquois-Horizon contract, struck and damaged another underwater electrical cable system located in Long Island Sound jointly owned by LIPA and Connecticut Light and Power, a Connecticut utility. In response to claims made as a result of that cable strike, Cal Dive filed a petition for exoneration from or limitation of liability, similar to the one filed herein by Horizon, in the Eastern District of New York (hereafter the "LIPA Action"). (Webb Aff, ¶¶ 25-19; Singleton Aff, ¶¶ 5-15). The LIPA Action currently is pending and the parties are presently involved in discovery. (Singleton Aff, 11, 14-15).

The LIPA Action has many similarities with this action, including:

- The LIPA Action concerns the same construction project, arises out of the same Iroquois-Horizon contract, implicates similar issues, and involves many of the same parties, <u>i.e.</u> Iroquois, Horizon, LIPA and Thales, as this proceeding.

- The same New York counsel representing LIPA, Thales and Iroquois in the LIPA Action also initially acted on behalf of those parties with respect to the NYPA Incident. Significantly, Horizon's New York counsel in the LIPA matter also began acting for Horizon in the NYPA Incident and, among other things, organized an inspection of the GULF HORION by counsel and experts for all parties, which proceeded in Massachusetts in August 2003. Horizon's

New York counsel in the LIPA Action remained involved in both matters until Horizon filed its present action in this Court.[5]

- Horizon, Thales and NYPA/LIPA have retained the same experts with respect to the cable damage and repairs in the LIPA Action as they have in connection with this matter, so the same experts are acting in both cases.

A scheduling order has been issued in the LIPA Action bifurcating discovery into liability and damages and requiring that all discovery on liability be completed by March 30, 2004. The parties are currently proceeding with discovery on liability. They have produced over 35,000 documents relating to the performance of the Pipeline project, and the production of substantial volumes of additional documents is anticipated. Moreover, the parties have commenced depositions and expect them to continue during the week of December 15, 2003 and into January, 2004.

In addition, Iroquois is claiming in excess of $44 million from Horizon for other breach of contract claims arising under the Iroquois-Horizon Contract, and Horizon has stated in a recent motion in this Court that it intends to file a $20,000,000 claim against Iroquois for breach of the contract as well. (Webb Aff, ¶ 52-54). These claims, while having nothing to do with the NYPA Incident, implicate many of the same documents and witnesses as the claims involving the NYPA Incident. The litigation of these breach of contract claims should proceed in New York pursuant to the forum selection clause in the Iroquois-Horizon contract.

All the above militates in favor of transfer. (Webb Aff, ¶¶ 52-54; Singleton Aff, ¶¶ 8-15). "[T]he interests of justice would be best and most expeditiously served by the consolidation of this conglomeration of litigation." *Jarvis, supra,* 845 F.2d at 524. Moreover, as discussed in *Mobil Corp. v. SEC, supra,* 550 F. Supp. at 71, the public's interest in judicial

---

[5] Horizon's New York counsel is still acting on behalf of Horizon in the LIPA Action, but their further involvement in the NYPA case is unclear.

economy weighs heavily in joining all claims arising out of the pipeline project in one forum before the same judge as related, and possibly consolidated, actions.

### 3. Application of New York Law

The Iroquois-Horizon Contract calls for application of New York law. (Webb Aff, ¶ 18). The Iroquois-NYPA Crossing Agreement also requires the application of New York law. (Webb Aff, ¶12). And while Horizon is not a party to the Iroquois-NYPA Contract, and therefore not bound by the forum selection clause, a traditional choice of law analysis would mandate the application of New York law to NYPA's tort claims against Horizon. The tort occurred in New York and New York is the jurisdiction with the most significant contacts to the dispute.[6]

The application of New York law further favors transfer. In *Gundle, supra,* the relevant construction contract incorporated New Jersey law. In transferring the case from Texas to New Jersey the court stated:

> Clearly, a New Jersey court would be more familiar with and better able to apply New Jersey law than would a Texas Court.

*Id.* at 1166. *See also, Dicken v. United States*, 862 F. Supp. 91, 94 (D. Md. 1994) ("while federal judges in Kansas are not necessarily better qualified than this Court to apply Kansas law, they are undoubtedly more familiar with it, a further consideration justifying transfer.")

In addition to the events giving rise to the instant litigation, numerous disputes have arisen between Iroquois and Horizon under their Contract which will themselves be subject to New York law pursuant to the contract. (Webb Aff, ¶¶ 52-54; Singleton Aff, ¶ 32-33). It is highly foreseeable that these disputes will involve complex questions of New York law as well.

---

[6] The same law should be applied to all claims. To apply Texas law to NYPA's claim but New York law to Iroquois' claims would create a risk of inconsistent results.

The likely application of New York law to the claims involving the NYPA Incident and to Iroquois' other breach of contract claims weighs heavily in favor of transfer.

**J.    Petitioner's Choice of Forum is Entitled to No Weight**

At most, a plaintiff's choice of forum is only "one of the many factors for a court to consider." *Gundle, supra,* 844 F. Supp. At 1165 (citing *Harris Trust & Sav. Bank v. SLT Warehouse,* 605 F. Supp. 225, 227 (N.D. Ill. 1985)). And where, as here, all of the operative events occurred in New York, plaintiff's choice of forum is entitled to little weight. *Dicken v. United States,* 862 F. Supp. 91, 93 (D. Md. 1984)(plaintiff's choice of forum is given little weight when none of the conduct complained of occurred in the forum selected by plaintiff); *U.S. Fidelity and Guar. Co, supra,* 800 F. Supp. 1076, 1081 (E.D.N.Y. 1992) (where the facts giving rise to the action have no material relation or significant connection to the plaintiff's chosen forum, then the plaintiff's choice is not accorded the same great weight and, in fact, is given reduced significance). *Accord, In re Norfolk Dredging Co., supra,* 240 F. Supp. 537-38; *Boller v. National Mediation Board,* 647 F. Supp. 1060 (S.D. Tex., 1986).

Petitioner's choice of forum in this limitation action is entitled to even less weight than otherwise accorded to a plaintiff. As a threshold matter, Petitioners should not be permitted to circumvent the forum selection clause in the Iroquois-Horizon contract by filing a limitation action in Texas. But equally important, Petitioners are, in actuality, the defendants in this action. All claimants are seeking damages or indemnity from Petitioners and Petitioners will be **defending** those claims in this action as well as seeking to establish their right to limitation. Since Claimants, not Petitioners, are the true "plaintiffs" in this action, Petitioner's choice of venue for commencement of this Limitation of Liability action should merit little or no consideration in weighing the factors for transfer of venue.

# VI.    CONCLUSION

For the foregoing reasons, Iroquois respectfully submits that its motion to transfer this case to the United States District Court for the Eastern District of New York be granted and that Iroquois should be granted such further and other relief as the Court deems just and equitable.

Dated:    Houston, Texas
          December 15, 2003

                                        By:    _Michell B Hughes_

                                               Michael B. Hughes
                                               Attorney in Charge for Claimant
                                               Iroquois Gas Transmission
                                                       Systems, L.P.
                                               Texas State Bar # 10227200
                                               P.O. Box 629
                                               Houston Texas
                                               409-795-2018 (phone)
                                               409-726-1155 (fax)

Of Counsel,

Richard V. Singleton
Healy & Baillie, LLP
61 Broadway, 32nd Floor
New York, NY 10006-2701
212-943-3980 (phone)
212-425-0131 (fax)

257522.1

22

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon

counsel of record listed below via certified mail, return receipt requested, on this the 15 [th] day of

December, 2003:

Mr. Richard L. Gorman                    **CM-RRR # 7001 2510 0001 8345 0498**
Cohen, Gorman & Putnam, L.L.P.
The Niels Esperson Building
808 Travis Street, Suite 808
Houston, Texas 77002-5710

Mr. Edwin C. Laizer, APLC                **CM-RRR # 7001 2510 0001 8345 0511**
Adams and Reese, LLP
4500 One Shell Square
New Orleans, Louisiana 70139

Mr. Michael A. Hawash                    **CM-RRR # 7001 2510 0001 8345 0504**
Adams and Reese, LLP
4400 One Houston Center
1221 McKinney
Houston, Texas 77010

Mr. John Woods                           **CM-RRR # 7001 2510 0001 8345 0528**
Thacher Proffitt & Wood
Two Would Financial Center
New York, New York 10281

Mr. James H. Hohenstein                  **CM-RRR # 7001 2510 0001 8345 0535**
Law Offices of Holland & Knight, LLP
95 Broadway
New York, New York 10007-3189

_Michael B. Hughes_
Michael B. Hughes

23

EXHIBIT "W"





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

DEC 1 6 2003

Michael N. Milby, Clerk

| | |
|---|---|
| IN THE MATTER OF HORIZON VESSELS, INC., AS OWNER, and HORIZON OFFSHORE CONTRACTORS, INC., HORIZON OFFSHORE, INC., and TEXAS OFFSHORE CONTRACTORS CORP., AS OWNERS, OPERATORS, OWNERS PRO HAC VICE, OF THE L/B GULF HORIZON PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY REGARDING THE INCIDENT OF FEBRUARY 27, 2003<br><br>Plaintiffs | CIVIL ACTION<br>NO. H-03-3280<br><br>**AFFIDAVIT OF KEN WEBB IN SUPPORT OF MOTION TO TRANSFER VENUE**<br><br>(ADMIRALTY)<br>Rule 9(h) |

STATE OF CONNECTICUT    )
                             ) ss.:
COUNTY OF FAIRFIELD      )

Ken Webb, being duly sworn, deposes and says:

1.    I have been employed by Iroquois Pipeline Operating Company since 1994, most recently as Director of New Projects. I was the project manager for the planning and construction of the pipeline project that is the subject of this action. As such I am fully familiar with the facts and the events giving rise to Plaintiff's Complaint in Limitation and the claims of Iroquois Gas Transmission System, L.P. ("IGTS") herein. I make this Affidavit in support of IGTS' Motion pursuant to Supplementary Admiralty

1



EXHIBIT
13
8/3/05   NH

81
U3

Rule F(9) to transfer the venue of this action to the United States District Court for the Eastern District of New York.

2.     IGTS is a Delaware limited partnership having its office and principal place of business in Shelton, Connecticut.   Iroquois is the owner of a 377 mile natural gas pipeline extending from the Canadian border through New York State and across western Connecticut and Long Island Sound to Huntington, Long Island, New York.   Iroquois Pipeline Operating Company ("IPOC"), a corporation also headquartered in Shelton, Connecticut, is Iroquois' agent and the operator of Iroquois' pipeline.   (IGTS and IPOC are collectively referred to herein as "Iroquois").

3.     On or about April 1999 Iroquois began planning for the construction of a 35 mile extension to its pipeline, 34 miles of which were to be laid in the bottom of Long Island Sound and the East River in New York waters.   The extension, known as the "Eastchester Extension", is to extend Iroquois' existing pipeline from Huntington to Hunts Point in Bronx County in the City of New York.   The entire extension is located in New York State.

4.     The purpose of the extension is to provide natural gas for use in electrical power generation in New York and to provide natural gas to residential, industrial and commercial customers in New York.   Some of the users of the Eastchester Extension will be KeySpan Ravenswood, Inc.; Consolidated Edison Energy, Inc.; Reliant Energy Services, Inc.; and Virginia Power Energy Marketing, Inc.

5.     When completed, the Eastchester Extension will include the following facilities: 35 miles of 24 inch diameter pipe located in Nassau, Westchester, Suffolk and

2

264400.1

other counties in the State of New York on and in underwater lands owned by the State of New York, pursuant to an easement granted by the New York State Office of General Services ("OGS"); pipeline and pipeline maintenance facilities constructed on land in Huntington, New York and Bronx County in New York City; one main line valve at Hunts Point, New York; a gas meter, regulator, heater, and main line valve at the project terminus in Bronx County on Consolidated Edison's property; two new compressor stations along the existing pipeline in upstate New York; and additions and modifications to three existing compressor stations in upstate New York.

6.     Iroquois employed Pegasus International, Inc. ("Pegasus"), a Houston based construction management company, to assist in the pre-construction planning of the project and in managing the construction contract. Pegasus assigned John Wilson to the project. Mr. Wilson traveled to Connecticut in August 2001. He temporarily resided in Connecticut and worked out of Iroquois' offices in Shelton, during which time he assisted Iroquois on various aspects of the project. He returned to Houston in late September 2001.

7.     Mr. Wilson was replaced by Mr. Robert Yetton, a Pegasus consultant who resides in Scotland. Like Mr. Wilson, Mr. Yetton temporarily resided in Connecticut from October 20, 2002 to September 2003 when he returned to Scotland where he resides. Mr. Yetton assisted in pre-construction planning and afterwards served as construction manager for the project. He was given an office at Iroquois' offices in Connecticut, was loaned a computer for use in connection with the project and provided with secretarial and other office support services. By agreement, the computer, all data

3

254490.1

on the computer, and all paper files generated by or provided to him or any other Pegasus' employees who worked out of Iroquois' offices were Iroquois' property and remain in Connecticut.

8.     In connection with planning for the Eastchester Extension, underwater surveys of the route to verify the bottom topography and to identify and map various underwater obstructions and cultural resource sites were conducted and completed. Iroquois' consultant for identifying the potential cultural resource sites in the construction corridor was R. Christopher Godwin & Associates of Frederick, Maryland. The underwater surveys were conducted by Thales Geo Solutions ("Thales"), a Dutch company with offices in Houston and California. Thales transported its vessel, men and equipment to New York for this purpose and they remained in New York throughout the project.

9.     Thales was engaged by INTEC Engineering, Inc. ("Intec") another Iroquois contractor assisting with the planning of the Eastchester Extension project. Intec was retained by Iroquois to complete the pipeline's design and specifications, and perform the pipeline's final alignment (route selection) along the bottom of Long Island Sound. Intec, which is based in Houston, sent its personnel to Connecticut to assist with the above aspects of the project and they temporarily resided in Connecticut for this purpose. Intec's contract with Iroquois provides that the governing law is the law of New York.

10.     To obtain the necessary approvals for the construction, Iroquois filed applications with the Federal Energy Regulatory Commission ("FERC") in Washington, D.C., the New York offices of the United States Army Corps of Engineers ("USACE"),

4

the New York State Department of Environmental Conservation ("NYSDEC"), the New York Department of State ("NYDOS"), and the New York State Office of General Services ("NYOGS"). Permits were issued by all of these agencies who remained involved to exercise oversight of various aspects of the project.

11. The Long Island Sound portion of the pipeline was designed to cross several existing pipelines and electrical cables. One of the cable systems, the Y-49 crossing, consists of four cables owned by The Power Authority of the State of New York ("NYPA"). To construct their natural gas pipeline in Long Island Sound, including over the Y-49 cables, Iroquois was required to apply to NYOGS to obtain an easement. Iroquois' application was filed, and NYOGS granted the easement.

12. Prior to NYOGS' grant of the easement, and as a condition to granting the easement, Iroquois was required to obtain NYPA's written "non-objection" to the pipeline crossing NYPA's cables. Accordingly, Iroquois and NYPA negotiated a Crossing Agreement dated October 30, 2002 whereby NYPA agreed to the crossing in consideration of Iroquois' agreement, among other things, to hold NYPA harmless and to indemnify NYPA for any damage to the Y-49 cables arising out of the crossing by the pipeline. Article III(D) of the Crossing Agreement provides:

> D. Iroquois Gas shall defend, indemnify and hold harmless the Grantee [NYPA] from and against any and all costs and expenses incurred as a result of damage to the Y-49 Cable arising out of or connected with the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents and employees in connection with the Work. (Exhibit A).

Article III(G) of the Crossing Agreement provides:

5

254400 1

G.  In the event that the Y-49 Cable is damaged or rendered inoperable, during the Work, and such damage or inoperability arises out of the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees:  (i) Iroquois Gas shall pay all costs and expenses to repair and restore the Y-49 Cable to the operational status as existed before the damage or rendering of inoperability; and (ii) the Grantee shall make arrangements for and provide, at Iroquois Gas' sole cost and expense, equivalent replacement electrical capacity during the period the Y-49 Cable is inoperable or out of service. Notwithstanding the foregoing, the Grantee agrees to use commercially reasonable efforts at all times to mitigate any damages for which Iroquois Gas may be responsible pursuant to this Section. (Exhibit A).

Article XIII of the Crossing Agreement provides:

B.  Governing Law.  This Agreement is made in, and shall be interpreted, construed, governed and enforced in accordance with the **laws of the State of New York**.  Each of the Parties hereby agrees to submit to the nonexclusive jurisdiction of the **United States District Court for the Eastern District of New York** and/or any New York State Supreme Court sitting in Nassau or Suffolk Counties for the purposes of all legal proceedings arising out of or relating to this Agreement. **Each of the parties hereby irrevocably waives, to the fullest extent permitted by law, any objection to the selection of this venue and any claim that any proceeding brought in such a court has been brought in any inconvenient forum**. (Exhibit A). (emphasis supplied).

13.    Iroquois' pipeline also was designed to cross over power cables owned by Consolidated Edison and the Long Island Lighting Company d/b/a LIPA, a wholly owned subsidiary of the Long Island Power Authority, a New York Public Authority ("LIPA"), so a similar Crossing Agreement was executed as to their facilities.

6

254400 1

14. On or about May 17, 2001 Iroquois solicited bids for performance of the Eastchester Extension project. Several companies submitted bids, including Horizon Offshore Contractors, Inc. ("Horizon").

15. Horizon among others, responded to the invitation to bid by sending a proposal to Iroquois in Connecticut. Discussions thereafter were conducted on various aspects of Horizon's proposal, the contract and specifications. Some of these discussions occurred in Shelton, Connecticut and some occurred in Houston.

16. Horizon ultimately was engaged as the general contractor pursuant to a contract dated April 12, 2002 (the "Contract"). Under the Contract, Horizon was to provide all necessary labor, equipment, and supervision to perform the marine portion and some of the land portion of the Eastchester Extension project.

17. Section 11.1.3 of the Contract requires Horizon to indemnify Iroquois for any losses of any kind suffered by third parties. That section provides:

> 11.1.3  The Contractor shall indemnify, hold harmless and release the Company and its affiliates, and its and their officers, contractors, employees and agents from and against all liabilities or causes of action, demands, suits, damages, judgments, fees, fines, penalties, costs and expenses resulting from injury to or death of third parties and from any damage to property or any losses of any kind suffered by third parties, due to or caused by the breach of the Contract of its obligations hereunder, or the willful misconduct or negligence of the Contractor or its subcontractors in carrying out its responsibilities under this Agreement, except and to the extend such injury, death, damage or loss is caused by the negligence or willful misconduct of the Company or its affiliates, and its or their officers, employees, agents and contractors. (Exhibit B).

7

18.    The parties also negotiated a forum selection clause in the construction contract. Horizon initially proposed a provision calling for arbitration in Houston, Texas. (Exhibit C). Iroquois refused, insisting on a New York forum with New York law since the work would be performed in New York and the project would be heavily regulated by local New York governments and agencies. Horizon ultimately agreed and the Contract provides that any claims must be brought in the Court of the appropriate jurisdiction in New York and will be governed by the laws of the State of New York. Specifically, section 16.4 provides:

> Applicable Law and Venue
>
> "The Contract shall be governed by and construed and enforced in accordance with, **the substantive laws of the State of New York...** The Contractor and the Company agree that **any actions or proceeding arising from or in connection with this Contract shall be brought in a state or federal court of appropriate jurisdiction in New York State.**" (emphasis supplied) (Exhibit B).

19.    The Contract also contains the following pertinent provisions:

* Paragraph 11.1.3 provides that Horizon will indemnify and hold Iroquois harmless from all liabilities or damages for "any damage to property or any losses of any kind suffered by third parties" which are caused by the breach of Horizon's obligations under the Contract or "the negligence of [Horizon] or its Subcontractors in carrying out its responsibilities under this agreement".

* Paragraph 4.1 of the Contract requires Horizon to diligently perform the work after commencement and to acquire the necessary additional equipment, hire additional manpower and perform other acts necessary to avoid delay in the completion of the pipeline.

* Paragraph 13.1 is a warranty by Horizon that its work shall be "new, free of defects in construction and workmanship and shall conform to the Final

8

254400.1

project plans and specifications and descriptions set forth herein and all other requirements of this Contract".

- Paragraph 14.2 requires Horizon to "do the work in a workmanlike manner by qualified, careful and efficient workers in strict conformity with the contract."

- Paragraph 8.1 requires Horizon to exercise "reasonable care to properly maintain and operate the vessels under its control".

- Paragraph 10.4 provides that Horizon shall be fully responsible for any act or omission of its subcontractors.

- Paragraph 11.5 provides that Horizon shall indemnify and hold Iroquois harmless for any penalties, fines or claims in connection with any violation of or non-compliance with any rules, regulations, ordinances or codes arising out of the work or Horizon's performance.

- Paragraph 14.5 provides that Horizon shall give due consideration to the interests and property of third parties and shall perform its work in a manner which will cause a minimum of injury or damage.  It further provides that Horizon "will restore all damaged property to as good a condition as before damage occurred."

20.    Horizon's work under the land portion of the Contract required pipe to be installed underground in horizontally directionally drilled holes ("HDD") in two locations, Hunts Point and Huntington.  Easements were required and obtained from New York City and the Town of Huntington for such HDD work.

21.    Horizon's marine work under the Contract was to proceed in multiple stages.  After equipment preparation and mobilization, the pipe segments would be welded together on the deck of a barge, which would serve as a floating assembly line work platform.  The welded continuous pipe then would be laid (concurrent with ongoing welding, inspection and coating activities) in the bottom of Long Island Sound along the intended route.  Concrete mattresses were to be placed over NYPA's cables where the

254400.1

pipeline crossed them. Dependent upon the location, the seabottom would either be pre-dredged or the pipe would be plowed/lowered into a trench on the seabottom. In some locations the pipe was backfilled using either conventional clamshell equipment or a plow. The pipe was lowered and/or buried to depths of up to 8 feet. Additional concrete mattresses were to be placed over the pipeline where it crossed NYPA's cables and rock placed on the pipeline in between NYPA's cables for stability purposes and to provide protective cover.

22.    In the fall of 2002 Horizon sent employees, materials and equipment, including its pipe lay barge, the GULF HORIZON to New York to perform the first stages of the Contract. Horizon selected the GULF HORIZON from its fleet of vessels to perform the job. Iroquois neither designated this vessel nor selected it, but did agree to pay for modifications to the barge proposed by the contractor as necessary to perform the work contemplated under the Contract.

23.    The GULF HORIZON has no motive power of its own. During pipe laying operations, the barge advances by using its mooring winches and anchors and with the help of assist tugs. The assist tugs used while the barge was in Long Island Sound were the tugs POWHATAN, SHELBY, KRISTINA A and MISS JESSICA  Horizon contracted for the services of these tugs.

## The LIPA Incident

24.    Horizon engaged several sub-contractors to assist with the construction and contracted for the use of other vessels. On October 14, 2002 Horizon contracted with one

354409.1

such subcontractor, Cal Dive International, to provide a dive support vessel to be used in connection with various underwater divers' jobs that were required on the project.

25.    In early November 2002, Horizon commenced the welding and laying of the pipeline on the sea bottom at Northport and proceeded towards Hunts Point.

26.    On November 16, 2002, Cal Dive was working near Huntington in an area where the pipeline had already been welded and laid on the bottom to prepare the pipe for hydro testing.  During this work, Cal Dive's vessel, the DSV MR SONNY, dragged an anchor into several power cables jointly owned by LIPA and Connecticut Light and Power, a Connecticut utility ("CL&P"), causing damage to four of the seven cables in that system (the "LIPA Incident").

27.    As a result of that incident, Cal Dive commenced litigation on December 2, 2002 in the United States District Court for the Eastern District of New York seeking to limit its liability for the incident under the Shipowner's Limitation of Liability Act.  The case is presently pending before the Honorable Leonard Wexler.  Iroquois, Horizon, LIPA, CL&P and Thales have all filed claims in that action and have filed cross-claims against each other seeking indemnity and other relief.

28.    LIPA's cables were filled with a coolant oil known as dielectric fluid.  The damage to the cable caused a release of this fluid into the Long Island Sound.  The Town of Huntington, New York has threatened to initiate enforcement proceedings in New York alleging violations of certain municipal ordinances prohibiting the release of pollutants into Long Island Sound.

254400.1

## The NYPA Incident

29.    The welding and pipe laying portion of the Eastchester Extension project was completed by Horizon early in January 2003 at which time the GULF HORIZON proceeded to Port Newark, New Jersey to be equipped with a "plow" required to trench the seabed and bury the pipeline.    This plow was a critical piece of the barge's machinery.    It was designed by Engineering Business Limited of Northumberland, England.  The plow arrived in New Jersey in November 2002.  Work continued on the plow at Port Newark, New Jersey for several months to ready it for the job.

30.    The plow was installed on the GULF HORIZON at Port Newark in January 2003.  The barge thereafter returned to the Northport area to begin the trenching and backfilling portion of the Contract.

31.    On the evening of February 27, 2003, the GULF HORIZON was performing plowing and backfilling operations in the vicinity of NYPA's Y-49 cable crossing.  The tugs POWHATAN, SHELBY, KRISTINA A and MISS JESSICA were assisting.

32.    At approximately 11:58 p.m. on February 27, 2003, a NYPA representative onboard the GULF HORIZON received a call from NYPA's Electric System Operator stating that NYPA's Y-49 cable system had tripped off line and that the Y-49 cable system was de-energized.  The next day all work on the marine part of the pipeline was suspended.

33.    Subsequent investigations revealed that an anchor of the GULF HORIZON struck and damaged one of NYPA's Y-49 cables (the "NYPA Incident").

12

254400.1

34.    Immediately following the NYPA Incident, NYPA activated its emergency response and maintenance subcontractor, Keyspan Electric Services, LLC ("Keyspan"), to locate the source and extent of the damage, minimize the escape of the liquid coolant in the cable, and effectuate the temporary repairs of the Y-49 cable system. All of the temporary repairs took place in New York.

35.    Miller Environmental Group, Inc. of Calverton, New York was retained to provide divers and support personnel throughout the repair process.

36.    By letter dated March 25, 2003 NYPA and LIPA made written demand upon Horizon for damages with respect to the aforesaid alleged incident. (Exhibit D).

37.    Shortly after the NYPA Incident, Iroquois commenced an investigation into the cause of the damage. Cathy Proctor, an employee of TransCanada Pipelines Ltd., who was seconded to Iroquois for the Eastchester Extension project, was assigned responsibility for conducting such investigation.

38.    Iroquois also retained the services of Ocean Surveys, Inc. of Old Saybrook, Connecticut to conduct underwater surveys of the bottom in the area of NYPA's cables and to determine the underwater "track" of any dragged anchors from the GULF HORIZON by use of side scan sonar and multi-beam hydrographic surveys. Mr. George Reynolds, Vice President, and a surveyor, Mr. Stephen Gadowski, organized and participated in those surveys. I understand both are Connecticut residents.

39.    Subsequent to the NYPA incident, a high potential test was conducted at a Consolidated Edison substation located in Westchester, New York. The test was required to ascertain whether three of the four cables of the Y-49 cable system could be re-

energized. After testing and inspection, three cables were returned to service on March 8, 2003.

40.    As a result of the NYPA incident, the FERC refused to permit the work to re-commence until FERC could be assured that no further damage to NYPA's cable or other cable crossings would occur. Work by the L/B GULF HORIZON remained suspended until April 15, 2003 when FERC gave the approval to recommence work.

41.    In addition, as a result of the cable strike, the cable companies (NYPA, LIPA, and Con Ed), acting collectively, were unwilling to permit Iroquois to perform any further work in the area of their cables unless Iroquois agreed to use anchorless vessels. These vessels, which are constructed with a sophisticated propeller and thruster system that permits them to remain stationary while working, are rare in the northeastern United States and are substantially more expensive then other pipe lay barges that use conventional anchors.

42.    As Horizon does not have an anchorless vessel in its fleet, Horizon was required to charter in such vessel, the INTREPID, at great expense to Iroquois, so Horizon could finish its obligations under the Contract for the work in the area of NYPA's cables. The INTREPID began work in the area of NYPA's cables on or about September 1, 2003 and finished on or about October 8, 2003.

43.    Iroquois also was required to obtain additional approvals from USACE, NYSDEC and the FERC.

44.    In accordance with United States Coast Guard ("USCG") regulations, Horizon filed a Report of Marine Accident with the local USCG office at Activities New

14

254400.1

York, (Exhibit E) and the USCG commenced an investigation concerning the alleged striking. That investigation is currently pending, and all of the USCG records involved in that investigation are located in Staten Island, New York.

45.    The GULF HORIZON finished its work on the Eastchester Extension and left Long Island Sound on April 29, 2003. The GULF HORIZON proceeded directly to Massachusetts Bay to work on another marine pipeline project where she remained until August 2003. Horizon previously has stated that it is looking forward to securing more projects in the northeast region. (Exhibit F).

46.    Permanent repairs to NYPA's cable commenced in August and were completed on September 12. The repairs were made by the cable's manufacturer Pirelli in New York waters of Long Island Sound on a barge owned by Pirelli. Pirelli is an Italian Company that has offices in New Jersey at 5 Hollywood Court, So. Plainfield, New Jersey.

47.    On September 5, 2003, the repaired cable successfully passed a high potential test and was returned to service. All of the testing and repairs took place in New York.

## NYPA Incident Claims

48.    NYPA has placed Iroquois on notice by letter dated March 13, 2003 that it intends to claim against Iroquois pursuant to the Crossing Agreement for all damages in connection with loss of use and repairs to its cable. LIPA, who claims to be a primary user of the damaged cable's electrical transmissions capability, stated in the same letter that it intends to claim against Iroquois for its losses arising out of the loss of use of the

15

Y-49 cable.  NYPA's and LIPA's claims presently total $21,000,000, based on their claims filed in this litigation.

49.    Since the damage to the cables was caused solely by the fault of Horizon and/or M/V GULF HORIZON, Iroquois is entitled to indemnity from Horizon for all liability that Iroquois may be found to have to NYPA or to LIPA in connection with the NYPA Incident.

50.    Iroquois also intends to claim against Horizon for all delays resulting from the NYPA incident and for the expenses incurred by Iroquois in connection with Horizon's chartering the INTREPID to finish performance of the work in the area of NYPA's cables.

51.    Iroquois by letter dated March 06, 2003 has demanded that Horizon defend and indemnify Iroquois with respect to the NYPA incident.  (Exhibit G).

## Other Contract Claims Against Horizon

52.    Iroquois has several claims against Horizon, apart from those relating to the two cable incidents mentioned above, that have arisen out of Horizon's breaches and deficient performance under the Contract.  These disputes, as well as the LIPA and NYPA Incidents, require application of New York law as provided in the Contract. These other contract claims include the following:

### Potential Violations Of Exclusionary Zones

A.    The route for the pipeline in New York State waters was carefully mapped with a permitted construction corridor.  Underwater archeological sites within the corridor were identified and restricted zones were placed around them.  These sites are

16

protected, and oversight of that protection is vested in New York State Historic Preservation Office (NYSHPO).

B.    The Contract provided that areas outside the construction corridor and areas within the restricted zones (hereinafter collectively "exclusionary zones") were not to be violated, and Horizon was provided with the exact location of the exclusionary zones and was instructed to avoid dropping its anchors in or dragging its anchors through such exclusionary zones.

C.    Notwithstanding these instructions, preliminary indications are that Horizon and/or the GULF HORIZON may have violated exclusionary zones by dropping anchors on or dragging anchors through them. Iroquois has notified NYSHPO of this possibility and investigation is continuing to determine whether any damage to the archeological sites within those zones was in fact sustained.

D.    In the event that any damage is found to have occurred to any archeological sites in Long Island Sound or the East River and any party is found entitled to recover from Iroquois for such damage, then Iroquois intends to claim against Horizon for indemnification and/or contribution with respect to such liability.

<u>Misrepresentation, Deficient Performance And Delay</u>

E.    Horizon bid the job and was awarded the Contract based on its representation that it would perform about 225 welds per day. In actuality, Horizon only performed an average of 110 welds per day from commencement of work in November 2002 through completion of the welding in January 2003. Due to Horizon's

17

misrepresentation and/or failure to meets its represented work performance, the production effort took twice as long as forecast.

F.    Horizon's overall preparation, maintenance and operation of the GULF HORIZON for the project and its production with respect to the welding and laying of the pipe were grossly deficient, causing extensive barge downtime and additional expense to Iroquois. These deficiencies included, among others, the failure to properly winterize the barge and prepare the pipe for welding, and the employment of inexperienced welders whose employment was later terminated.

G.    As a result of the foregoing, Iroquois has suffered damages in the amount of $4,836,250, as closely as can be estimated at this time.

<u>Damage To Pipeline And Liability For Corrective Actions</u>

H.    The Contract required Horizon to cover the NYPA Y-49 cables with concrete mattresses before laying Iroquois' pipe over the cables. This appears either to not have been done at all or not to have been done correctly.

I.    The Contract further required that, after Iroquois' pipe was laid over NYPA's cables, the pipe would be covered with concrete mattresses. In addition, the pipeline in the areas between NYPA's cables would be covered with rock as a protective measure.

J.    During February 2003, Horizon's subcontractor Weeks, acting under Horizon's supervision, through gross exceedence of the parameters specified in the approved procedures and lack of due care, placed 4,500 tons of rock on Iroquois' pipeline within an approximately 80 foot section of pipe between NYPA's No. 1 and No. 2 cables,

18

354400.1

when the Contract estimate of the rock to be used in that area was approximately 700 cubic yards (1,000 tons), as referenced by the procedures for rock placement in this area.

K.    As a result of the above actions, the Iroquois pipe has been damaged and needs repairs. In addition, the Iroquois pipeline and/or the concrete mattresses have been pushed down and closer to the NYPA cables than permitted under the Crossing Agreement, and NYPA has demanded that Iroquois take corrective action to rectify the situation to avoid damage to its cables.

L.    The expense required for the corrective action required by NYPA and to repair to Iroquois' pipeline is estimated to be approximately $30,000,000.

M.    Additional permits and approvals for this corrective work were required and were obtained from FERC, NYDEC and the USACE. Other agencies, such as the National Marine Fisheries Service, provided comments and non-objections. The work has commenced and is continuing under the oversight of federal and state agencies.

### Subcontractor Issues

N.    On or about December 9, 2002, while Horizon's subcontractor Tom Allen was pulling the pipe from the Hunts Points Horizontal Directional Drill Hole on land in Bronx County, due to the subcontractor's lack of due care and insufficient equipment and/or procedures, the pipe became stuck and the drill string parted. This made it necessary to extract the pipe and drill a new hole. In addition, the GULF HORIZON was required to delay its pipeline tie-in work to assist with the extraction of the stuck pipe.

O.    Horizon is responsible for the actions of its subcontractors and thus is liable to Iroquois for the costs of extracting the pipe and drilling a new hole, as well as for

19

256400.1

delays to the pipe laying operations caused by the temporary redeployment of the GULF HORIZON, the costs of which, as closely as can be presently determined, total $15,279,043.

53.    The events and damages described in paragraphs 52A through 52O above were directly caused by Horizon's breach of its obligations under the Contract, including but not limited to the following warranties/obligations: (i) Horizon's failure to diligently perform the work after commencement of the job and Horizon's failure to avoid delay in the completion of the pipeline as required by the Contract; (ii) Horizon's breach of its contractual warranty that its work should be of good quality and free of defects in construction and workmanship and its obligations to do work in a workmanlike manner by "qualified careful and efficient workers;" (iii) Horizon's breach of its contractual obligations  to use reasonable care to properly maintain and operate the vessels under its control; (iv) Horizon's breach of its contractual undertaking to be fully liable for any acts or omissions of its subcontractors; and (v) Horizon's breach of its contractual obligations to protect third-party property and indemnify Iroquois for any damage thereto.

54.    As a result of the above said breaches of contract and/or negligent acts of Horizon, Iroquois has suffered damages, as closely as can be presently approximated, in the total amount of $44,115,293 as well as exposure to liability from third parties which has not yet been quantified.

55.    The Eastchester Extension project is still underway and Iroquois employees are working to complete it as quickly as possible.  Horizon's services, however, were

terminated on November 25, 2003, and Iroquois has employed another contractor to finish the project.

## Documents and Witnesses

56.    All of Iroquois' records and documents relating to the Eastchester Project, the cable strikings, and Iroquois' breach of contract claims against Horizon are located in Shelton, Connecticut. Iroquois has approximately 3,000 cubic feet (equivalent to 135 three-foot wide by five-drawer high filing cabinets) of documents relating to the Eastchester Extension, which documents are contained on two floors of Iroquois' corporate offices in Shelton. This volume of documents is not easily transported and it would be burdensome and very expensive for Iroquois to have to ship these documents to Texas.

57.    FERC, USACE, NYSDEC and NYOGS all maintain thousands of pages of relevant documents relating to the Eastchester Extension Project and the Y-49 cable strike. Those records are located in New York and Washington, D.C.

58.    While some Pegasus employees who were present in New York for the project reside in Texas, their computers, computer records, and most if not all of the documents generated by those Pegasus employees are located in Iroquois' offices in Shelton, Connecticut.

59.    Some 30 to 40 Iroquois employees were involved in various aspects of the Eastchester Extension project, the aftermath of the Y-49 cable strike, and the remedial measures required due to Horizon's breaches of the contract and deficient performance. All of those employees live in or near the vicinity of Shelton, Connecticut. Apart from

21

254490.1

me, the most significant are **Ben Gross** of Shelton Connecticut, Iroquois' Manager of Technical Services and knowledgeable concerning the overall Eastchester Project quality controls and pipelay and welding operations; **Susan Deleon**, who was heavily involved in the contract negotiations with Horizon; **David Fontaine**, who is Iroquois' Environmental Health and Safety monitor and made numerous trips to the GULF HORIZON; **Michele Wieler**, who is involved in the contract negotiations with Horizon, especially with regard to the insurance aspects of the contracts; and **Tony Fox**, who made numerous trips to the GULF HORIZON for the purposes of setting up the computers and communication systems.

60.    Other former employees and key people associated with the Eastchester project who are knowledgeable on the issues include: **Cathy Proctor,** a TransCanada employee residing in Shelton, Connecticut who is knowledgeable concerning the liaison with the utilities, the fitting of the GULF HORIZON with the plow, mobilization and operations of the dynamically positioned vessel Intrepid, and post casualty investigation; **Dave Warman,** a former employee also located in the Connecticut area, who is knowledgeable concerning pipeline design and route selection, bidding of the project, and selection of Horizon as contractor, and the pipelay, planning and rock dumping construction operations.

61.    Iroquois employed several outside consultants/experts to assist with the project and with post casualty matters, including monitoring the repairs to NYPA's cable. All of these consultants are in the New York/Connecticut area. These include **Joe Zimnock** of Suffern, New York (Iroquois cable expert and knowledgeable concerning

22

754400 1

the damage, testing and repairs to the NYPA cable); **Walter Gorman** of Rockaway Park, New York (Iroquois local permitting consultant in New York City; **Mark Robinson** of Monroe, Louisiana, currently located in of Shelton, Connecticut (Iroquois project cost consultant and knowledgeable concerning Iroquois' damages arising out of the alleged incident and subsequent delays).

62.    Iroquois also retained the services of R. Christopher Goodwin & Associates, who are consultants located in the Maryland area, with respect to identification and protection of the underwater cultural resource areas and ENSR Corp. of Willington, Connecticut, an environmental consultant with respect to the route and procedure for laying the pipeline in the bottom of Long Island Sound.

63.    Except for the FERC, all relevant individuals with the agencies who were involved with the project reside in the New York area. The most knowledgeable at the NYSDEC concerning the permitting requirements, route selection, construction approval, and post accident activities is **Kent P. Sanders** of Greenwich, New York. The most knowledgeable person at NYOGS concerning NYOGS' grant of an easement on the submerged lands of New York State is **Alan B. Bauder**. Two persons involved in this project at the Army Corps of Engineers and have knowledge concerning the routing and post accident approvals for continuing work are **Richard Tomer** and **Frank Tangora** of New York, New York.

64.    The FERC representatives involved in the permitting requirements route selection construction approval and post accident activities are, **Richard Hoffman**,

**Lonnie Lister**, **Eric Tomasi** all of whom reside in the Washington D.C. area which is a three hour train ride or thirty minute airplane flight (regular shuttles) from New York.

65.    The engineer for the Town of Huntington who was involved with the project and the threatened action by the town for the claimed violation of Huntington's pollution ordinances is **Peter Wolpensinger**.  He lives in the Huntington, New York area.

66.    I also believe that numerous NYPA, Keyspan and LIPA employees who are knowledgeable concerning the damage to NYPA's cables, the repairs, and the losses which NYPA and LIPA are claiming reside in the New York area.

67.    In addition, there are numerous additional Iroquois employees who have knowledge concerning the various breach of contract and other claims arising out of the Eastchester Project which are unrelated to the Y-49 cable strike that Iroquois will be asserting against Horizon.  All of these employees reside in the New York/Connecticut area.  They include **Tim Barnes**, Iroquois' manager of Environmental Health & Safety, who would be knowledgeable concerning the activities surrounding the protection of the cultural resources sites and potential invasions of the exclusionary zones; **Brian Wolf**, and **Don Moore**, in Iroquois' Technical Service Department, who are knowledgeable concerning the excessive rock dumping; **John Trowbridge**, in the engineering department who visited the GULF HORIZON and was responsible for the on shore sections of the project which interfaced with the horizontal directional drilling; and **Allan Downes** and **Jim Dugan** who are knowledgeable about the accounting aspects of the Contract.

24

254400.1

68.    For all the above reasons, it would be particularly inconvenient and burdensome for Iroquois to have to pursue its rights in connection with the Y-49 cable strike, and its rights with respect to its contract claims against Horizon unrelated to the cable strike, some 1,500 miles away in Houston, Texas, notwithstanding that the performance of the contract and the events giving rise to Iroquois claims all occurred in the vicinity of Iroquois' offices.

69.    Moreover, requiring Iroquois to litigate its claims against Horizon in Texas, notwithstanding Horizon's written contractual agreement to litigate all disputes in New York, would also adversely affect Iroquois business. The Eastchester project is ongoing and due to the construction windows and NYPA's concerns, mentioned above, is time sensitive.    The witnesses who will be required to travel to Texas are the most knowledgeable employees concerning the project and thus are the very ones required in New York to see the project expeditiously through to completion. Their absence likely will adversely affect Iroquois ability to timely complete the work and cause a considerable hardship on Iroquois.

WHEREAS, your deponent requests that the motion to transfer this case to New York be granted.

_____
KEN WEBB

Sworn to before me this _10th_ day
of December 2003.

_____
Notary Public - Connecticut
My Commission Expires: 2/20/2004

25

254400.1

EXHIBIT "X"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

FEB 2 7 2004

Michael N. Milby, Clerk of Court

IN THE MATTER OF HORIZON §
VESSELS, INC., AS OWNER, and §
HORIZON OFFSHORE CONTRACTORS, §
INC., HORIZON OFFSHORE, INC., §
and TEXAS OFFSHORE CONTRACTORS §
CORP., AS OWNERS, OPERATORS, §        CIVIL NO. H-03-3280
OWNERS PRO HAC VICE, OF THE §
L/B GULF HORIZON, PRAYING FOR §
EXONERATION FROM OR LIMITATION §
OF LIABILITY REGARDING THE §
INCIDENT OF FEBRUARY 27, 2003 §

## ORDER

On August 15, 2003, Horizon Vessels, Inc., Horizon Offshore
Contractors, Inc., Horizon Offshore, Inc., and Texas Offshore
Contractors Corp. ("Plaintiffs"), owners and operators of the lay
barge GULF HORIZON, filed suit in this court, seeking exoneration
from or limitation of liability for a maritime accident that
occurred on February 27, 2003.

Presently pending before the court[1] is a Motion to Transfer
Venue filed by the Power Authority of the State of New York
("NYPA"), Long Island Lighting Company d/b/a LIPA ("LIPA"), and
Factory Mutual Insurance Company ("FMIC") (Docket Entry No. 30),
and a Motion to Transfer Venue filed by Iroquois Gas Transmission
Systems, L.P. (Docket Entry No. 42). The court, sitting in
admiralty, has considered both motions, the responses thereto, and

_____

[1]     This case was referred to the undersigned magistrate judge pursuant
to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the
Civil Justice Reform Act, and FED. R. CIV. P. 72. Docket Entry No. 16.

the applicable law.  For the reasons set forth below, the court **DENIES** the Motion to Transfer Venue filed by NYPA, LIPA, and FMIC, and **DENIES** the Motion to Transfer Venue filed by Iroquois Gas Transmission Systems, L.P.  In addition, the court lifts the stay imposed on August 18, 2003, only as to Iroquois, to permit Iroquois to prosecute its contract claims in an appropriate forum.

## I.  Case Background

On April 2, 2002, Iroquois Gas Transmission System, L.P., by its agent Iroquois Pipeline Operating Company (collectively "Iroquois"), entered into a written agreement (the "Construction Contract") with Horizon Offshore Contractors, Inc. ("Horizon"), in which Horizon was to serve as general contractor on construction of a 35-mile extension to an existing natural gas pipeline owned by Iroquois (the "Pipeline").[2]  The undertaking was referred to as the Eastchester Expansion Project (the "Project") and had as its goal extension of the Pipeline from Huntington, Long Island, New York to Hunt's Point in Bronx County, New York.[3]  The purpose of the Project was to provide natural gas for use in electrical power generation units in New York and to provide additional natural gas supply to residential, industrial, and commercial users in the

---

[2]    Docket Entry No. 43, Exhibit B ("Construction Contract").  Iroquois's Pipeline stretched for 377 miles, from the Canadian border through New York state and across western Connecticut and Long Island Sound to Huntington, Long Island, New York.  Affidavit of Ken Webb, Docket Entry No. 43 ("Webb Aff.") ¶ 2.

[3]    Webb Aff. ¶ 3.

2

state.[4]  Under the Construction Contract, Horizon was required to

provide all necessary labor, equipment, and supervision to perform

the marine portion and some of the land portion of the Project.[5]

A large portion of the Pipeline extension was to be submerged

under Long Island Sound and, out of necessity, was to cross over

several pipelines and electrical cable facilities that were already

buried beneath the seabed.[6]  One of these cable facilities, known

as the Y-49 Cable, consisted of four parallel, fluid-filled, 345 kV

cables.[7]  The submerged portion of the Y-49 Cable was owned by

NYPA, although the cable's primary user was LIPA.[8]  LIPA also was

responsible for the cable's operation, maintenance, and repair.[9]

In order to construct the extension of its Pipeline in Long

Island Sound, Iroquois obtained an easement from the New York

Office of General Services ("NYOGS").[10]  Prior to doing so, and as

---

[4]    Id. ¶ 4.

[5]    Id. ¶ 16.

[6]    Id. ¶ 11.

[7]    Affidavit of Michael J. Mitchell, Docket Entry No. 31, Exhibit C ("Mitchell Aff.) ¶ 4.

[8]    Affidavit of Lynda Nicolino, Docket Entry No. 31, Exhibit F ("Nicolino Aff.") ¶ 6; Affidavit of Michael Hervey, Docket Entry No. 31, Exhibit E (Hervey Aff.") ¶ 7.

[9]    Hervey Aff. ¶ 7.  LIPA makes monthly payments to NYPA that cover the cost of operation and maintenance expenses incurred by NYPA in connection with the cable facilities.  See Docket Entry No. 31, Exhibit F, Exhibit 1 attached thereto.

[10]    Webb Aff. ¶ 11.

3

a condition to receiving the easement, Iroquois had to secure
NYPA's written permission for the Pipeline to cross over its
submerged cables.[11]  To this end, Iroquois and NYPA entered into a
"Crossing Agreement" on October 30, 2002, which delineated both
parties' respective rights and duties as to the construction,
installation, and repair of the portion of the Pipeline that would
cross over the Y-49 Cable.[12]

In the fall of 2002, Horizon mobilized and sent its employees,
materials, and equipment, including its pipe lay barge, the GULF
HORIZON, to Long Island Sound to perform work on the Project.[13]  The
initial stages of the Project required Horizon to weld together
pipe segments, lay the welded pipe on the bottom of Long Island
Sound alongside the intended route, and place concrete mattresses
over NYPA's cables at points where the Pipeline would cross them.[14]
Horizon completed the welding and pipe-laying phases of the Project
in early January 2003, after which the barge proceeded to Port
Newark, New Jersey, to be equipped with a plow that would enable it
to trench the seabed and bury the pipeline.[15]  After the plow was
installed, the barge returned to New York to begin the trenching

---

[11]    Id. ¶ 12.

[12]    Docket Entry No. 43, Exhibit A ("Crossing Agreement").

[13]    Webb Aff. ¶ 22.

[14]    Id. ¶ 21.

[15]    Id. ¶ 29.

4

and backfilling phases of the Project.[16]   Because the L/B GULF
HORIZON lacked motive power of its own, it was able to advance
forward during the pipe laying operations only by the use of its
mooring winches and anchors and with the assistance of four tugs,
the POWHATAN, SHELBY, KRISTINA A, and MISS JESSICA.[17]

On February 27, 2003, Horizon was still completing this phase
of the Project when, at approximately 9:41 p.m. Eastern Standard
Time, the Y-49 Cable feeder tripped off line.[18]  Initial indications
were that one of the individual cables of the Y-49 Cable had been
damaged by an external force and was leaking dielectric fluid into
the Sound.[19]  After NYPA became aware of the incident, it instructed
Iroquois to immediately suspend work on the Project.[20]    NYPA
summoned its emergency response and maintenance subcontractor,
KeySpan Electric Services, L.L.C. ("KeySpan"), to locate the source
and extent of the damage, minimize the escape of the cable's liquid
coolant, and provide temporary repair efforts on the damaged
cable.[21]  In its investigation, the response team concluded that an
anchor deployed by the L/B GULF HORIZON had dragged against and

---

[16]    Id. ¶ 30.

[17]    Id. ¶ 23.

[18]    Mitchell Aff. ¶ 6.

[19]    Id.

[20]    Id. ¶ 7.

[21]    Webb Aff. ¶ 34; Hervey Aff. ¶¶ 9-10.

ruptured Cable No. 4 of the Y-49 Cable.[22]  As a result of the incident, NYPA was forced to temporarily remove from service all four individual cables of the Y-49 Cable system.[23]

Subsequent to the date of the accident, NYPA, LIPA, KeySpan, and Iroquois each engaged Ocean Surveys, Inc., to conduct underwater surveys of the seabed in the area of NYPA's cables and to determine the precise "track" of any anchors from the L/B GULF HORIZON that were dragged in the vicinity.[24]  Pirelli Construction Services, Inc., the manufacturer of the Y-49 Cable, was awarded an emergency contract to recover and temporarily cap the damaged submarine cable.[25]  Pirelli later effected permanent repairs to the cable pursuant to a separate contract with NYPA.[26]

As a result of the incident, the Federal Energy Regulatory Commission refused to permit work to recommence until it could be assured that no further damage to the Y-49 Cable or other underwater cable crossings would occur.[27]  NYPA and LIPA also were unwilling to permit Iroquois to perform any further work unless

---

[22]     Mitchell Aff. ¶ 8.

[23]     Id.  The Y-49 Cable was out of service from the evening of February 27, 2003, until March 8, 2003.  Affidavit of James Parmalee, Docket Entry No. 60, ¶ 4.

[24]     Webb Aff. ¶ 38; Mitchell Aff. ¶ 10.

[25]     Mitchell Aff. ¶ 11.

[26]     Id. ¶ 12.

[27]     Webb Aff. ¶ 40.

6

Iroquois agreed to utilize an anchorless vessel.[28]  Because Horizon did not possess such a vessel in its fleet, it had to charter a new vessel, the INTREPID, at Iroquois's expense.[29]  The INTREPID began its work in the area of NYPA's cables on approximately September 1, 2003, and finished around October 8, 2003.[30]  The L/B GULF HORIZON ultimately finished its work on the Project in other areas of Long Island Sound on April 29, 2003.[31]

On August 15, 2003, Plaintiffs filed a verified complaint in this court under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. §§ 181 et seq. (the "Limitation Act"), seeking either exoneration from or limitation of liability for the incident.[32]  On August 18, 2003, pursuant to the Limitation Act's stated procedure, this court signed a monition order that: (1) approved Plaintiff's Declaration of Value of the L/B GULF HORIZON and its pending freight, (2) approved Plaintiff's Letter of Undertaking as

---

[28]     Id. ¶ 41.

[29]     Id. ¶ 42.

[30]     Id.

[31]     Id. ¶ 45.

[32]     Plaintiffs' Verified Complaint for Exoneration From or Limitation of Liability, Docket Entry No. 1 ("Plaintiffs' Complaint"). In the event Plaintiffs are not exonerated from liability for damage caused to the Y-49 Cable, they seek to limit their liability to the sum of $19,320,000, the value of their interest in the L/B GULF HORIZON together with her pending freight. Id. On September 16, 2003, Plaintiffs amended their original verified complaint. See Plaintiffs' Verified Amended Complaint for Exoneration From or Limitation of Liability, Docket Entry No. 10.

security, (3) directed notice be issued stating that any claims and answers to the complaint were to be filed by November 12, 2003, or be barred, and (4) restrained any further prosecution of claims against the Plaintiffs arising out of the incident.[33]

On October 31, 2003, NYPA and LIPA filed a motion to transfer the action to the United States District for the Eastern District of New York.[34]  However, because NYPA and LIPA had failed to file written claims as required by the monition order, this court found both entities lacked standing to file the motion and accordingly ordered the motion be stricken.[35]  On November 12, 2003, the claim submission deadline, NYPA, LIPA, and Iroquois filed timely claims, as did FMIC, the damaged cable's insurance underwriter, and Thales GeoSolutions, Inc. ("Thales"), a subcontractor hired by Iroquois for pre-construction work.[36]  On November 14, 2003, NYPA, LIPA, and FMIC filed a new motion seeking transfer of the case to the United

---

[33]    Order Approving Plaintiffs' Declaration of Value Pursuant to 28 U.S.C. § 1746, and Letter of Undertaking, Directing Issuance of Notice and Restraining Prosecution of Claims, Docket Entry No. 3.

[34]    Motion to Transfer Venue of the Power Authority of the State of New York and the Long Island Lighting Company d/b/a LIPA, Docket Entry No. 12.

[35]    Order, Docket Entry No. 20.

[36]    Claim of Iroquois Gas Transmission Systems, L.P., Docket Entry No. 22; Answer and Claim of the Power Authority of the State of New York, the Long Island Lighting Company d/b/a LIPA, and Factory Mutual Insurance Company (FM Global) Subject to Certain Rule 12(b) Defenses, Docket Entry No. 23; Claim of Thales GeoSolutions, Inc., Docket Entry No. 26.

States District Court for the Eastern District of New York.[37]
Thales subsequently joined in this motion.[38]  On December 15, 2003,
Iroquois filed its own motion to transfer venue to the Eastern
District of New York.[39]  These two motions to transfer venue are now
pending before this court.

## II.  Analysis

### A.  Improper Venue

Thales contends the Southern District of Texas is not a proper
venue in which to litigate this exoneration/limitation action.[40]
As authority for this proposition, Thales cites to Rule F(9) of the
Supplemental Rules of Federal Civil Procedure for Certain Admiralty
and Maritime Claims ("Supplemental Rules").[41]  Supplemental Rule
F(9) specifies where venue is proper in a limitation action:

> The complaint shall be filed in any district in which the
> vessel has been attached or arrested ... or, if the
> vessel has not been attached or arrested, then in any
> district in which the owner has been sued with respect to

---

[37]    Motion to Transfer Venue of the Power Authority of the State of New
York, the Long Island Lighting Company d/b/a LIPA, and Factory Mutual Insurance
Company (FM Global), Docket Entry No. 30 ("NYPA Group's Motion to Transfer
Venue").

[38]    Brief of Thales GeoSolutions, Inc. in Support of the Motion by LIPA
and NYPA to Transfer Venue, Docket Entry No. 41 ("Thales's Brief in Support of
Transfer").

[39]    Motion to Transfer Venue of Iroquois Gas Transmission Systems, L.P.,
Docket Entry No. 42 ("Iroquois's Motion to Transfer").

[40]    Thales's Brief in Support of Transfer.  None of the remaining movants
have advanced this argument.

[41]    Id.

9

> any such claim.  When the vessel has not been attached or
> arrested to answer the matters aforesaid, and suit has
> not been commenced against the owner, the proceedings may
> be had in the district in which the vessel may be, but if
> the vessel is not within any district and no suit has
> been commenced in any district, then the complaint may be
> filed in any district.

Supplemental Rule F(9) further provides that "if venue is wrongly

laid the court shall dismiss ... or transfer the action to any

district in which it could have been brought."

It is undisputed that, at the time Plaintiffs filed their

verified complaint on August 15, 2003, the L/B GULF HORIZON had not

been attached or arrested to answer for any claim to which the

Plaintiffs seek to limit liability, and also that Plaintiffs had

not been sued in any state or federal court over such claim.[42]

Plaintiffs maintain that the L/B GULF HORIZON was at sea on a

voyage, and thus "not within any district" at the precise time the

complaint was filed, 4:47 p.m. Central Standard Time on August 15,

2003.[43]  As a result, Plaintiffs contend, Supplemental Rule F(9)

permitted them to file the complaint in any judicial district,

including the Southern District of Texas.[44]  Thales disputes this

point and argues instead that when the complaint was filed, the L/B

GULF HORIZON was located off the coast of South Carolina, within

---

[42]    Id.

[43]    Reply of Exoneration/Limitation Plaintiffs to Brief of Thales
GeoSolutions, Inc. Regarding Motion to Transfer Venue, Docket Entry No. 59
("Horizon's Response to Thales").

[44]    Id.

the geographical limits of the United States District Court for the District of South Carolina.[45]  Thales therefore asserts that, under Supplemental Rule F(9), the only proper venue for this action is the District of South Carolina.[46]

The court has little hesitation in finding that venue is legally proper in the Southern District of Texas.  The United States may exercise sovereignty and jurisdiction over its "territorial sea."  The territorial sea has consistently been defined as a maritime zone that extends only twelve nautical miles from the coastal baseline. <u>See</u> Presidential Proclamation No. 5928, 54 Fed. Reg. 777 (December 27, 1988) ("The territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law."); <u>United States v. Alaska</u>, 521 U.S. 1, 8 (1997) (same); <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 488 U.S. 428, 441 n.8 (1989) (same).  Thus, to be "within" the federal District of South Carolina, for purposes of Supplemental Rule F(9), the L/B GULF HORIZON had to be within twelve nautical miles of the South Carolina coastal baseline.

Thales argues that the territorial sea of the United States was extended from twelve to twenty-four nautical miles under

---

[45]    <u>Id.</u>

[46]    <u>Id.</u>

11

Presidential Proclamation No. 7219, issued in 1999.  Contrary to Thales's contention, however, Presidential Proclamation No. 7219 did not undertake to expand the territorial sea of the United States.  Instead, it authorized coastal nations, such as the United States, to establish zones "contiguous to their territorial seas."  Presidential Proclamation No. 7219, 64 Fed. Reg. 48,701 (August 2, 1999).  Under this Proclamation, a "contiguous zone" is construed as the area between twelve and twenty-four nautical miles from the coastal baseline.  Id.  The United States has limited powers to act in a "contiguous zone"; specifically it may only "exercise the control necessary to prevent infringement of its customs, fiscal, immigration, or sanitary laws and regulations within its territory or territorial sea, and to punish infringement of the above laws and regulations committed within its territory or territorial sea."  Id.

Thales has failed to show the court how any of these limited categories of power vested in the United States pertain to this exoneration/limitation action.  No claimant has alleged that Plaintiffs violated a federal customs, fiscal, immigration, or sanitary law.  Thus, even though the District of South Carolina's jurisdictional reach does extend to the twenty-four nautical mile point for certain restricted enforcement purposes, none of those purposes are applicable here.

Plaintiffs have provided ample evidence demonstrating that, at

12

the precise time the verified complaint was filed, the L/B GULF HORIZON was outside the twelve-mile range of territorial sea, and therefore not within the District of South Carolina.[47]  Thales contends that, instead of looking to the exact time the complaint was filed, this court should fashion a "totality of circumstances" test to determine whether the vessel was within twelve miles of the coastal baseline at any point during the day on which the complaint was filed.[48]  The court declines to do so, as nothing in the language of Supplemental Rule F(9) suggests that such an open-ended approach is warranted.[49]

In conclusion, the court finds that the L/B GULF HORIZON was not within the territorial sea, and accordingly not within the District of South Carolina, at the time the complaint for this action was filed.  Therefore, under Supplemental Rule F(9), Plaintiffs were legally entitled to file their complaint in the

---

[47]    See id., Exhibits 2-4.

[48]    Reply Brief of Claimant Thales GeoSolutions, Inc. in Further Support of Motion to Transfer Venue, Docket Entry No. 67, at 6.  Thales maintains that an "exact minute of filing" standard would facilitate an uncertain, game-like jurisprudence, in which a vessel could be brought outside the territorial sea before the vessel owner filed a limitation action in a favored forum, and then be brought back into harbor once filing was complete.  Id.  The court understands Thales's concern.  However, this issue is not before the court, as Thales has not presented any evidence that Horizon manipulated or intended to manipulate venue.

[49]    Thales requests a period to conduct expedited discovery in order to determine whether the L/B GULF HORIZON anchored inside or outside the Charleston sea buoy, which was located near the twelve-mile territorial sea boundary, at 11:05 p.m. Eastern Standard Time.  Because the barge anchored at this point more than six hours after the complaint was filed, and the court has declined to utilize a "totality of circumstances" standard, the issue is irrelevant.  Accordingly, the court denies Thales's request.

the precise time the verified complaint was filed, the L/B GULF HORIZON was outside the twelve-mile range of territorial sea, and therefore not within the District of South Carolina.[47]   Thales contends that, instead of looking to the exact time the complaint was filed, this court should fashion a "totality of circumstances" test to determine whether the vessel was within twelve miles of the coastal baseline at any point during the day on which the complaint was filed.[48]   The court declines to do so, as nothing in the language of Supplemental Rule F(9) suggests that such an open-ended approach is warranted.[49]

In conclusion, the court finds that the L/B GULF HORIZON was not within the territorial sea, and accordingly not within the District of South Carolina, at the time the complaint for this action was filed.   Therefore, under Supplemental Rule F(9), Plaintiffs were legally entitled to file their complaint in the

---

[47]     See id., Exhibits 2-4.

[48]     Reply Brief of Claimant Thales GeoSolutions, Inc. in Further Support of Motion to Transfer Venue, Docket Entry No. 67, at 6.   Thales maintains that an "exact minute of filing" standard would facilitate an uncertain, game-like jurisprudence, in which a vessel could be brought outside the territorial sea before the vessel owner filed a limitation action in a favored forum, and then be brought back into harbor once filing was complete.   Id.   The court understands Thales's concern.   However, this issue is not before the court, as Thales has not presented any evidence that Horizon manipulated or intended to manipulate venue.

[49]     Thales requests a period to conduct expedited discovery in order to determine whether the L/B GULF HORIZON anchored inside or outside the Charleston sea buoy, which was located near the twelve-mile territorial sea boundary, at 11:05 p.m. Eastern Standard Time.   Because the barge anchored at this point more than six hours after the complaint was filed, and the court has declined to utilize a "totality of circumstances" standard, the issue is irrelevant. Accordingly, the court denies Thales's request.

13

Southern District of Texas.  Thales's argument in this regard is without merit.

## B.  Iroquois is Not a Proper Party to this Action

Iroquois asserts four claims against Horizon in this action, all of which arise out of the Construction Contract between the two parties.  However, only two of the claims--for indemnification and breach of contract damages--are directly related to the cable incident at issue.[50]  Iroquois has consistently taken the position that none of its claims are subject to limitation in this action because the claims arise out of Plaintiffs' personal contractual obligation.[51]  Plaintiffs do not contest Iroquois's stance on this point.  For the following reasons, the court agrees with Iroquois that its claims are not within the scope of this proceeding.

Personal contracts entered into by the owner of a vessel are not subject to being limited under the Act.  American Car & Foundry Co. v. Brassert, 289 U.S. 261, 264 (1933) (shipowners are entitled to limit their liability for acts of master and crew done without

_____

[50]    The remaining two claims are based on alleged acts or omissions unrelated to the cable incident at issue, and are therefore outside the scope of this action.

[51]    See Claim of Iroquois Gas Transmission Systems, L.P., Docket Entry No. 22, ¶ 16 ("Iroquois is not subject to Horizon's limitation proceeding with respect to this [indemnity] claim because Iroquois' claim is based on Horizon's personal contractual undertakings in the Contract.... Iroquois therefore is free to pursue this claim outside of the limitation proceeding and will be making an appropriate motion to permit it to do so in due course."); id. ¶ 24 (same language used in claim for breach of contract damages); Reply of Iroquois Gas Transmission Systems, L.P. in Support of Motion to Transfer Venue, Docket Entry No. 62 ("Iroquois's Reply to Horizon"), at 3, 11-12.

14

their privity or knowledge, but remain liable for their own fault, neglect, and contracts); Mediterranean Shipping S.A. Geneva v. POL-Atlantic, 229 F.3d 397, 403 (2nd Cir. 2000) ("Personal contracts entered into by a vessel owner ... are not subject to limitation under the Act."); Great Lakes Dredge & Dock Co. v. City of Chicago, 3 F.3d 225, 232 (7th Cir. 1993) ("[C]ontracts entered into by a shipowner 'personally,' rather than through the master employed for the ship, are beyond the reach of the Limitation Act.").

The personal contract doctrine "deprives a shipowner of the benefits of limitation under the Act and exposes him to the full burden of liability" to which the shipowner contracted to bear. Signal Oil & Gas Co. v. Barge W-701, 654 F.2d 1164, 1168 (5th Cir. 1981). "In application, this is an equitable doctrine based on the proposition that a shipowner should not be able to promise an undertaking or performance that was within his personal control and then turn around and limit liability when his performance was faulty." 2 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 15-8, at 318 (4th ed.); see also Richardson v. Harmon, 222 U.S. 96, 106 (1911).

The court finds that Plaintiffs entered into the Construction Contract, and incurred the various obligations arising therefrom, in a personal capacity as owners of the L/B GULF HORIZON. Thus, under the personal contract doctrine, Plaintiffs are not entitled to limit any claims asserted against them that arise out of the

15

Construction Contract. Iroquois's claim for indemnification and/or contribution clearly arises out of the Construction Contract.[52] This claim therefore comes within the purview of the personal contract exception and is excluded from this exoneration/limitation action. See Mediterranean Shipping, 229 F.3d at 403-06 (holding that shipowner's contract to indemnify or contribute is personal to the owner, and is therefore not subject to limitation). In addition, Iroquois's claim for breach of contract damages is also outside the scope of this proceeding, as it too arises from the Construction Contract.

Because it has not asserted any additional claims that are properly before the court, Iroquois cannot be considered a proper party to this action.[53] The court lifts the stay imposed on August

---

[52]    Section 11.1.3 of the Construction Contract, the pertinent indemnity provision, reads:
> The Contractor [Horizon] shall indemnify, hold harmless and release the Company [Iroquois] and its affiliates, and its and their officers, contractors, employees and agents from and against all liabilities or causes of action, demands, suits, damages, judgments, fees, fines, penalties, costs and expenses resulting from ... any damage to property or any losses of any kind suffered by third parties, due to or caused by the breach of the Contractor of its obligations hereunder, or the willful misconduct or negligence of the Contractor or its Subcontractors in carrying out its responsibilities under this Agreement...."

[53]    At the hearing conducted on February 17, 2004, counsel for Iroquois argued that Iroquois should be retained as a party in this action due to the potential of asserting a tort cause of action, more specifically a "tort indemnity claim," against Plaintiffs. The court finds such reasoning to be without merit. The various indemnity clauses contained in the Construction Contract encompass any claims Iroquois may have for indemnification that arise either in tort or contract. In short, Iroquois has not shown it possesses a tort claim that is independent of the contract claims which the court finds to be outside the scope of this action. Indeed, Iroquois itself previously asserted,

16

18, 2003, only as to Iroquois, to permit Iroquois to prosecute its contract claims against Plaintiffs in a proper forum. Further, because Iroquois's contract claims arising out of the Construction Contract are not properly filed in this action, the court will not consider Iroquois's argument that the forum-selection clause of the Construction Contract requires transfer of this limitation of liability action to the Eastern District of New York.[54]

## C.    Discretionary Transfer of Venue

The remaining movants, NYPA, LIPA, FMIC, and Thales, seek a discretionary transfer of this case to the United States District Court for the Eastern District of New York based on Supplemental Rule F(9), which provides: "For the convenience of parties and witnesses, in the interest of justice, the court may transfer the action to any district." Although Supplemental Rule F(9) specifically governs transfer of venue in maritime limitation of liability actions, the court is guided by the jurisprudence of the general transfer statute, 28 U.S.C. § 1404(a), which also authorizes a district court to transfer an action "[f]or the convenience of parties and witnesses, in the interest of justice."

---

"The Iroquois-Horizon Contract remains the basic source of any and all duties owed by Horizon to Iroquois." Iroquois's Reply to Horizon, at 13 n.22.

[54]    Section 16.4 of the Construction Contract, the forum-selection clause, provides that "any action or proceeding arising from or in connection with this Contract shall be brought in a state or federal court of appropriate jurisdiction in New York State."

17

Elliott v. Carnival Cruise Lines, 231 F. Supp. 2d 555, 558-59 (S.D. Tex. 2002); In re TLC Marine Servs., Inc., 900 F. Supp. 54, 56 (E.D. Tex. 1995).

The purpose of a discretionary transfer of venue is to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense. Van Dusen v. Barrack, 376 U.S. 612, 616 (1964); Gundle Lining Const. Corp. v. Fireman's Fund Ins. Co., 844 F. Supp. 1163, 1165 (S.D. Tex. 1994). Under 28 U.S.C. § 1404(a), the movant bears the burden of demonstrating that good cause exists to transfer venue to another district. Peteet v. Dow Chem. Co., 868 F.2d 1428, 1436 (5th Cir. 1989); Humble Oil & Ref. Co. v. Bell Marine Serv., Inc., 321 F.2d 53, 56 (5th Cir. 1963).

The decision whether to transfer rests within the discretion of the district court. Casarez v. Burlington N./Santa Fe Co., 193 F.3d 334, 339 (5th Cir. 1999); Peteet, 868 F.2d at 1436. In deciding whether a transfer is warranted, the court considers an array of relevant factors, which include: (1) convenience of the parties; (2) convenience of key non-party witnesses; (3) place of the alleged wrong; (4) cost of obtaining the attendance of witnesses; (5) availability of process to compel the presence of witnesses; (6) relative ease of access to sources of proof; (7) the plaintiff's choice of forum; and (8) the interests of justice in general. Holmes v. Energy Catering Servs., LLC, 270 F. Supp. 2d

18

882, 886 (S.D. Tex. 2003); <u>Lajaunie v. L & M Bo-Truc Rental, Inc.</u>, 261 F. Supp. 2d 751, 753 (S.D. Tex. 2003).[55]

### 1.   Convenience of the Parties

NYPA and LIPA maintain their principal place of business in New York, while FMIC is located in Rhode Island.  Plaintiffs are located in Texas, as is Thales.

Movants argue that forcing their employees to testify in Houston would result in severe inconvenience and hardship because most of the employees reside in or around New York.[56]  Although the convenience of key witnesses is the most important factor in a motion to transfer venue, <u>Speed</u>, 246 F. Supp. 2d at 674, the convenience of witnesses who are employees of the defendant "is entitled to less weight because [the defendant] will be able to compel their testimony at trial."  <u>Continental Airlines, Inc. v. American Airlines, Inc.</u>, 805 F. Supp. 1392, 1397 (S.D. Tex. 1992).  Accordingly, the court does not afford much weight to the convenience of the twelve employee-witnesses identified by NYPA and LIPA.[57]

While the Eastern District of New York is certainly a more

---

[55]    The factors for determining the propriety of discretionary transfers under Supplemental Rule F(9) are the same as those considered under 28 U.S.C. § 1404(a).  <u>In re TLC Marine Servs.</u>, 900 F. Supp. at 56.

[56]    NYPA Group's Motion to Transfer Venue, at 10-11.

[57]    <u>See</u> Mitchell Aff. ¶¶ 14-20; Hervey Aff. ¶ 13.

19

convenient forum for Movants' employees, it is undoubtedly inconvenient for the many individuals employed by Plaintiffs who could be expected to provide pertinent testimony.[58] The court finds that requiring Plaintiffs' employees to travel to and testify in New York would entail, at a minimum, an equal amount of hardship as requiring Movants' employees to do likewise in this court. It is well-established that venue will not be transferred if the end result is simply to shift inconvenience to another party. Dupre v. Spanier Marine Corp., 810 F. Supp. 823, 826 (S.D. Tex. 1993). Because transfer in this case would merely shift inconvenience from one set of employees to another, the court concludes that this factor does not favor transfer.

### 2. Convenience of the Key Non-Party Witnesses

The convenience of a particular venue for non-party witnesses expected to provide relevant testimony is the most important factor in the transfer analysis. Speed, 246 F. Supp. 2d at 674; Gundle, 844 F. Supp. at 1166.

Movants contend that all non-party witnesses who were involved

---

[58]    Movants argue that this court is not necessarily more convenient for the crew members of the L/B GULF HORIZON because the barge travels from district to district. NYPA Group's Motion to Transfer Venue, at 10. The court is unpersuaded by this argument. The record evidence indicates that all thirty-five members of the crew with the exception of one reside either in Texas, Louisiana, or Arkansas. Affidavit of David A. Kyle, Docket Entry No. 44, Exhibit 2 ("Kyle Aff."). Clearly, the crew members would find it more convenient to testify in Texas rather than New York. In addition, simply because the crew members work on a mobile barge does not necessarily mean they are more accessible to a New York forum.

in the emergency response and temporary and permanent cable repairs are located in or near New York.[59]  In support thereof, they have identified twenty-five individuals employed by the contractor and sub-contractors that performed this work.[60]  These individuals' testimony is expected to focus almost solely on inquiries relevant to a determination of damages incurred by Movants as a result of the cable incident.  Movants point out that all of these individuals live or work in or near the New York metropolitan area and are not free to travel far because they must be able to respond quickly to utility emergencies.[61]

Plaintiffs, on the other hand, have identified several non-parties whose employees could testify on issues other than damages which are or could be relevant to this case, including negligence, causation, seaworthiness of the vessel, and privity and knowledge.[62]  These identified non-parties are companies located in Texas and

---

[59]    NYPA Group's Motion to Transfer Venue, at 11.

[60]    Affidavit of Vincent Esposito, Docket Entry No. 31, Exhibit G ("Esposito Aff."), ¶¶ 5-6, 9.  Twenty-one of the identified individuals are employees of KeySpan, the company responsible for the operation, maintenance, and repair of the Y-49 Cable.  See id. ¶¶ 5, 9. The KeySpan employees are expected to testify about their role in both the emergency response to the incident and the subsequent repair of the Y-49 Cable.  Id.  The remaining non-party witnesses are employees of four sub-contractors that aided KeySpan with the emergency repair work.  Id. ¶ 6.

[61]    NYPA Group's Motion to Transfer Venue, at 11.

[62]    See Affidavit of Michael I. Ballard, Docket Entry No. 44, Exhibit 1; Kyle Aff.; Affidavit of Robert Stonecipher, Docket Entry No. 44, Exhibit 3; Affidavit of Edward J. Ruckstuhl, Docket Entry No. 52, Exhibit 1 ("Ruckstuhl Aff.").

Louisiana that, among other things, supplied, refurbished, and installed the L/B GULF HORIZON's mooring winches and winch engines; supplied the barge's anchors, tension meters, and wire rope; and performed inspections, surveys, maintenance, and repairs on the barge before it left for Long Island Sound.[63] Employees of these companies can provide testimony on certain relevant inquiries, including the pre-voyage design of the Project, outfitting and inspections of the L/B GULF HORIZON to determine its seaworthiness, the barge's equipment and its condition at the time of the incident, and specific anchor-handling procedures utilized during the Project. In addition, every crew member of two of the tugs that accompanied the L/B GULF HORIZON to New York reside in Louisiana.[64] These individuals can testify about anchor-handling procedures, the deployment and retrieval of the L/B GULF HORIZON's anchors on the date of the incident, navigation charts, watch schedule and procedures, and the tugs' daily activities and logs while in Long Island Sound.[65]

Movants have conceded that their key non-party witnesses will

---

[63]     For its work on the Project, the L/B GULF HORIZON was outfitted with a total of ten anchors. Reply of Exoneration/Limitation Plaintiffs in Opposition to the Motion to Transfer Venue, Docket Entry No. 44 ("Horizon's Response to NYPA's Group's Motion to Transfer"), ¶ 34. Each anchor was connected to the barge by means of an anchor wire attached to one of the ten winches on board. Id. The incident at issue was allegedly caused by one of these anchors, the CP-1 anchor, during the pipe-laying phase of the Project. Id. ¶ 36.

[64]     Kyle Aff. ¶ 5.

[65]     Id.

testify almost exclusively on the issue of damages incurred as a result of the incident.  However, while a determination of damages will certainly be necessary in this action, there are a number of other pertinent issues that also may be addressed, including negligence, causation, seaworthiness of the vessel, and privity/knowledge.  Plaintiffs have shown they are prepared to present a multitude of non-party witnesses on these issues, while Movants have failed to do so.  As a result, Movants have not satisfied their burden of demonstrating it would be more convenient for the key non-party witnesses, on the whole, to have this action litigated in New York rather than Texas.

### 3.    Place of the Alleged Wrong

The location of the alleged wrong is a very important factor in the court's evaluation of a motion to transfer venue.  Bigham v. Environcare, 123 F. Supp. 2d 1046, 1051 (S.D. Tex. 2000); Robertson v. M/V Cape Hunter, 979 F. Supp. 1105, 1108 (S.D. Tex. 1997).  However, "this factor, like the other factors, is only part of the equation."  Barnett v. Kirby Inland Marine, Inc., 202 F. Supp. 2d 664, 670 (S.D. Tex. 2002) (quoting Dupre v. Spanier Marine Corp., 810 F. Supp. 823, 827 (S.D. Tex. 1991)).

It is undisputed that the central operative event for which Plaintiffs seek to limit their liability--an anchor on the L/B GULF HORIZON allegedly dragging against and rupturing the Y-49 Cable--

23

occurred in waters located within the state of New York.[66]
Plaintiffs argue, however, that if the questions of negligence
focus on office personnel, the place of the alleged wrong could be
in Houston.[67] The court finds Plaintiffs' argument unconvincing.
In the court's view, this transfer factor does not focus on the
location of events which may eventually have a bearing on whether
Plaintiffs can limit their liability once they are found liable.
Instead, it looks at the place where the wrong that actually gave
rise to liability occurred. In this instance, if liability is
established, that place would be New York. Therefore, this factor
weighs in favor of transfer.

### 4.    Cost of Obtaining the Attendance of Witnesses

Movants contend that most of the key non-party witnesses
reside in New York, and that transfer to the Eastern District of
New York would therefore reduce the "unavoidable costs of discovery
and trial attendant to this litigation."[68] As articulated above,
however, Movants have not shown that a majority of key non-party
witnesses, taken as a whole, reside in New York. Plaintiffs have
identified a large number of potential key non-party witnesses who
work for companies located in or near Houston, Texas. Based simply

---

[66]    See Affidavit of Gerald Goldstein, Docket Entry No. 31, Exhibit D
("Goldstein Aff."), ¶ 6.

[67]    Horizon's Response to NYPA's Group's Motion to Transfer, ¶ 59.

[68]    NYPA Group's Motion to Transfer Venue, at 13.

on numbers, the court is unconvinced that the cost associated with obtaining the presence of non-party witnesses will be significantly greater for either Movants or Plaintiffs. Movants have not shown that the balance tips in their favor on this factor.

### 5. Availability of Process

This factor once again hinges upon the fact that Movants and Plaintiffs have identified, at a minimum, an equivalent number of key non-party witnesses. As a practical matter, the court notes that in either forum there will be a number of witnesses who reside outside the court's subpoena power that cannot be compelled to testify in person. Therefore, this factor does not favor either party in the transfer analysis.

### 6. Relative Ease of Access to Sources of Proof

Movants argue that sources of proof relevant to this case are, on the whole, more easily accessible in New York than in Texas.[69] They point out that key witnesses, physical evidence of the damaged cable and its repair, and thousands of pertinent documents are all located in New York.[70] Plaintiffs contend that all of the other relevant evidence is located in Texas. This includes the L/B GULF HORIZON itself and its winches and anchors, Thales's equipment, the

---

[69]    Id., at 13-14.

[70]    Id.

tugs, and Plaintiffs' multitude of witnesses.[71]  Plaintiffs have also shown that a voluminous amount of documents concerning the Project is located in Texas.[72]  After reviewing the record, the court is satisfied that enough significant evidence is located in Texas so as to disfavor transfer.

### 7.    Plaintiffs' Choice of Forum

Plaintiffs' choice to pursue this action in the United Stated District Court for the Southern District of Texas is entitled to great deference.  Speed, 246 F. Supp. 2d at 675; Continental Airlines, 805 F. Supp. at 1395.[73]  The amount of deference this court gives to Plaintiffs' choice is not lessened by the existence of the forum-selection clause in the Construction Contract.  As previously explained, that provision is not applicable in this exoneration/limitation action.  Accordingly, the court finds that this factor weighs heavily in favor of retaining the action.

### 8.    Interests of Justice

Movants set forth two reasons why the interests of justice would best be served by resolving this matter in New York.  First,

---

[71]    Horizon's Response to NYPA's Group's Motion to Transfer, ¶ 57.

[72]    Ruckstuhl Aff. ¶ 2.  Specifically, Plaintiffs aver they are in possession of documents connected with the Project that fill up approximately fifty-four file cabinet drawers.

[73]    The court briefly notes that Movants are correct in asserting that no presumption exists in favor of a plaintiff's choice of forum. See Humble Oil, 321 F.2d at 56.  However, Movants are plainly in error when they contend that a plaintiff's choice of forum is not entitled to any deference.

26

they contend that the citizens of New York have a special interest in the disposition of this case because NYPA and LIPA are public authorities supplying vital governmental services.[74]  Second, they assert that forum-selection clauses contained in the Construction Contract and the Crossing Agreement mandate that this case should be litigated in a New York court.[75]

The court finds these reasons to be unpersuasive.  As to Movants' first point, the court understands that the citizens of New York have an interest in ensuring the integrity of NYPA and LIPA because these two entities provide them with essential services.  However, the court fails to comprehend how disposition of this matter in the present forum affects or undermines in any way that interest.  Second, neither of the forum-selection clauses has any bearing on this transfer analysis.  As explained, the forum-selection clause contained in the Construction Contract is not pertinent to this transfer analysis.  Further, the forum-selection clause in the Crossing Agreement is irrelevant because it applies only to the two contracting parties, NYPA and Iroquois, and not to Plaintiffs.[76]

---

[74]    NYPA Group's Motion to Transfer Venue, at 16-17.

[75]    Id., at 17, 18.

[76]    The court notes that, even if the forum-selection clause in the Crossing Agreement somehow applied to Plaintiffs, it would receive little weight in the transfer analysis.  The clause reads: "Each of the Parties hereby agrees to submit to the nonexclusive jurisdiction of the United States District Court for the Eastern District of New York ... for the purposes of all legal

27

### III.   Conclusion

After assessing all the relevant factors, the court concludes that Movants have not shown good cause to transfer this exoneration/limitation action to the United States District Court for the Eastern District of New York.  Specifically, Movants have not met their burden of proving it would be more convenient for the parties and key non-party witnesses and in the interests of justice to transfer the case to that forum.  The court therefore **DENIES** the Motion to Transfer Venue filed by NYPA, LIPA, and FMIC, and **DENIES** the Motion to Transfer Venue filed by Iroquois.  In addition, the court lifts the stay imposed on August 18, 2003, only as to Iroquois, to permit Iroquois to prosecute its contract claims in an appropriate forum.

SIGNED in Houston, Texas, this 25ᵗʰ day of February, 2004.

NANCY K. JOHNSON
UNITED STATES MAGISTRATE JUDGE

---

proceedings arising out of or relating to this argument." Crossing Agreement, Article XIII, Section B.  Because nothing in the language used in this clause prohibits the parties from initiating litigation in forums other than in New York, the clause is permissive rather than mandatory, and is therefore not afforded significant weight. See Von Graffenreid v. Craig, 246 F. Supp. 2d 553, 560-61, 564 (N.D. Tex. 2003).

EXHIBIT "Y"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF HORIZON VESSELS, INC., AS OWNER, and HORIZON OFFSHORE CONTRACTORS, INC., HORIZON OFFSHORE, INC., and TEXAS OFFSHORE CONTRACTORS CORP., AS OWNERS, OPERATORS, OWNERS PRO HAC VICE, OF THE L/B GULF HORIZON PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY REGARDING THE INCIDENT OF FEBRUARY 27, 2003 | § § § § § § § § § § | C.A. NO. H-03-3280 ADMIRALTY |
| Plaintiffs | | |

## IROQUOIS GAS TRANSMISSION SYSTEM, L.P.'S MOTION FOR LEAVE TO FILE AN AMENDED CLAIM AND CROSS-CLAIMS

COMES NOW, Limitation Defendant/Claimant Iroquois Gas Transmission System LP ("Iroquois"), and respectfully moves this Honorable Court for leave to file the attached Amended Claim and Cross-Claims pursuant to Federal Rule of Civil Procedure ("FRCP") 15(a) and in accordance with this Court's Amended Docket Control Order dated June 27, 2005. Iroquois seeks amend its claim to add additional claims against Petitioners/Limitation Plaintiffs Horizon Vessels, Inc., Horizon Offshore Contractors, Inc., Horizon Offshore, Inc., and Texas Offshore Contractors Corp. (collectively "Horizon") and to add cross-claims against Limitation Defendant/Claimant Thales Geosolutions, Inc. ("Thales").

#282116

# I.

## NATURE AND STAGE OF THE PROCEEDINGS

On June 27, 2005, this Court entered an Amended Docket Control Order which, *inter alia*, set a deadline of August 1, 2005 for parties to move to amend their pleadings. (Docket Entry # 139). In compliance with the deadline set in the Amended Docket Control Order, Iroquois now seeks to amend its claim to assert additional claims against Petitioner and to add cross-claims against Thales. A copy of Iroquois' Amended Claim and Cross-Claims is attached hereto.

# II.

## SCOPE OF REVIEW

Motions for leave to file an amended pleading are reviewed for abuse of discretion. *Mayeaux v. Louisiana Health Service and Indemnity Company*, 376 F.3d 420, 425 (5th Cir. 2004)

# III.

## LEGAL ARGUMENT

FRCP 15 provides that leave to amend pleadings "shall be freely given when justice so requires." FRCP 15(a). Whether or not to grant a motion to amend is left to the "discretion" of the trial court. However, the term "discretion" when used in the context of motion to amend pleadings "may be misleading, because FRCP 15(a) 'evinces a bias in favor of granting leave to amend." *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of America Company*, 195 F.3d 765, 770 (5th Cir. 1999); quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981). Absent a "substantial reason ... the discretion of court is not broad enough to permit denial." *Martin's Herend Imports, Inc.*, 195 F.3d at 765; citing *Lone Star Motor Import v. Citroen Cars*, 288 F.2d 69, 75 (5th Cir. 1961). Stated

2

differently, "district courts <u>must</u> entertain a presumption in favor of granting parties leave to amend." *Mayeaux*, 376 F.3d at 425 (5th Cir. 2004) (emphasis added).

The presumption in favor of freely allowing amendments is so weighty that the Court should only consider denying a motion to amend if one or more of the following "substantial reasons" are present: (1) undue delay (2) bad faith (3) dilatory motive on the part of the movant (4) repeated failure to cure deficiencies by any previously allowed amendment (5) undue prejudice to the opposing party and (6) futility of amendment in determining whether to deny a motion to amend a pleading. *Ellis v. Liberty Life Assurance Company of Boston*, 394 F.3d 262, 268 (5th Cir. 2004); *Cornish v. Lancaster Independent School District*, 2005 U.S. Dist. LEXIS 15135 at * 4-5 (N.D. Tex. July 22, 2005).

Iroquois' Motion for Leave to file an Amended Claim and Cross-Claims unquestionably should be granted. The motion is made within the time set by the Court in the Second Agreed Amended Docket Control Order for the filing of motions to amend. The Amended Claims and Cross-Claims are based on information learned during discovery since the initial Claim was filed. The amended claims against Horizon are both for indemnity and arise out of Horizon's breach of its obligations under the Horizon/Iroquois Contract to procure and maintain insurance on behalf of Iroquois and to require its subcontractor Thales to name Iroquois as an additional insured on Thales' policies of insurance. These additional claims against Horizon for the most part fall within the general allegations in Iroquois original claim for indemnity based on breach of contract, but are set forth separately and in greater detail in the amended claim. Only the relief sought is somewhat broader than in the original Contract. As such, the addition of these claims will have no measurable impact on discovery, which is not scheduled to close until February 10, 2006, and will not affect the current Docket Control Order.

3

The cross-claims to be added against Thales similarly will have no impact on discovery and will not delay the trial of this action. These cross-claims seek indemnity for any liability Iroquois may be found to have to any entity as a result of the NYPA cable strike as well as indemnity for costs and legal fees incurred in connection with this action. The Cross-Claims are based on tort principles and Thales' breach of its obligations under the Thales/Horizon contract to provide indemnity to Iroquois and name Iroquois as an additional insured under Thales' policy of insurance. NYPA has already stated cross-claims against Thales so the issue of Thales' liability is already an issue in this litigation and discovery has been conducted on that basis. Moreover, allowing Iroquois to state cross-claims against Thales in these proceedings would eliminate the unnecessary and wasteful act of Iroquois having to commence a separate indemnity action against Thales. In sum, the more efficient and cost effective manner of proceeding both for the parties and the Court is to permit Iroquois to amend its Claim to state cross-claims against Thales.

None of the factors which previous Courts have indicated as factors to consider in determining whether to deny a motion for leave is present here:

**1.    Undue Delay**

As noted above, Iroquois is making this motion within the timeframe contemplated in the Amended Docket Control Order which was presented to the Court on consent of all parties. Moreover, as discussed above, the amendment will not extend discovery or delay the existing case management schedule. There has been no undue delay.

4

### 2.     Bad Faith

Iroquois seeks to amend its claim in good faith based on information learned over the course of discovery in this matter which was not available to it when it filed its original claim.

### 3.     Dilatory Motive

By seeking to amend its claim, Iroquois is not seeking to delay or postpone all or any part of this action.  Iroquois' motive only is to assert the entirety of its legally enforceable rights against Horizon and Thales.  In fact, for the reasons given above, granting Iroquois' motion will not delay discovery or the trial of this matter.

### 4.     Repeated Failure to Cure Deficiencies by any Previously Allowed Amendment

This factor is not applicable to Iroquois as Iroquois has not previously sought to amend its claim.

### 5.     Undue Prejudice to the Opposing Parties

Neither Horizon nor Thales would be unduly prejudiced if Iroquois is permitted to file the attached Amended Claim and Cross-Claims.  The Amended Claim and Cross-Claims are based on information discovered over the course of this action.  Both Horizon and Thales have fully participated in this action from its inception, and the facts and circumstances upon which the Amended Claim and Cross-Claims are based are known to all parties.

### 6.     Futility of Amendment

As already noted, Iroquois seeks to assert the attached Amended Claim and Cross-Claims in good faith and believes there is a high likelihood of success on the merits of same.

In sum, <u>all</u> factors and the interest of justice would be served by allowing the proposed Amended Claim and Cross-Claims and <u>none</u> of the factors counsel against it. Accordingly the motion should be granted.

**IV.**

**CONCLUSION**

Based on the foregoing, Iroquois respectfully requests leave of this Honorable Court to file the attached Amended Claim and Cross-Claims into the record of this matter.

Dated:   Houston, Texas
         August 1, 2005

                                          By:   *Michael B. Hughes*
                                                Michael B. Hughes
                                                Attorney in Charge for Claimant
                                                Iroquois Gas Transmission
                                                  Systems, L.P.
                                                Texas State Bar # 10227200
                                                P.O. Box 629
                                                Houston, Texas
                                                409-795-2018 (phone)
                                                409-762-1155 (fax)


                                                Richard V. Singleton
                                                (admitted *pro hac vice*)
                                                Thomas H. Belknap
                                                Healy & Baillie, LLP
                                                61 Broadway, 32nd Floor
                                                New York, NY 10006-2701
                                                212-943-3980 (phone)
                                                212-425-0131 (fax)

6

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served upon all counsel of record via certified mail, return receipt requested on this the 1st day of August, 2005.

Michael B. Hughes

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN THE MATTER OF HORIZON VESSELS,
INC., AS OWNER, and HORIZON
OFFSHORE CONTRACTORS, INC.,
HORIZON OFFSHORE, INC., and TEXAS
OFFSHORE CONTRACTORS CORP., AS
OWNERS, OPERATORS, OWNERS PRO
HAC FICE, OF THE L/B GULF HORIZON,
PRAYING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY REGARDING
THE INCIDENT OF FEBRUARY 27, 2003

CIVIL ACTION NO. H-03-3280


ADMIRALTY RULE 9(h)

Plaintiffs.

AMENDED CLAIM AGAINST PETITIONERS
AND CROSS-CLAIMS AGAINST THALES GEO SOLUTIONS, INC.

Claimant IROQUOIS GAS TRANSMISSION SYSTEM, L.P. by its attorneys McLeod Powell Alexander & Apfell, hereby claims against petitioners in limitation Horizon Vessels, Inc., Horizon Offshore Contractors, Inc., Horizon Offshore, Inc., and Texas Offshore Contractors Corp. (hereafter collectively the "Horizon Group" or "Petitioners") as follows:

1.      This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.     Claimant Iroquois Gas Transmissions System, L.P. ("Iroquois") is a
Delaware Limited Partnership with its principal place of business at Shelton,
Connecticut.

3.     On information and belief, at all relevant times the Horizon Group were
and still are corporations organized and existing under the laws of the state of Delaware,
having a place of business in Houston, Texas.

4.     On information and belief, at all relevant times one or more companies in
the Horizon Group, including Horizon Offshore Contractors, Inc. ("Horizon"), were and
still are the owners and operators of the vessel L/B GULF HORIZON.

5.     Iroquois is the owner of a 377-mile natural gas pipeline extending from the
United States-Canadian border to Northport, Long Island, New York.  The pipeline is
operated by Iroquois' agent, Iroquois Pipeline Operating Company ("IPOC"), also
headquartered in Shelton, Connecticut.

6.     On April 12, 2002, Iroquois, through IPOC acting as agent for a disclosed
principal, entered into a contract with Horizon whereby Horizon undertook as general
contractor to construct a 35-mile long underwater extension to Iroquois' existing pipeline
to cross Long Island Sound between Northport, Long Island and Hunts Point in the
Bronx, New York (the "Contract").  The construction project is known as the Eastchester
Extension.

7.    The Contract obligated Horizon, among other things, to provide all labor, supervision, equipment and vessels necessary to construct the pipeline, and contained the following relevant provisions:

- Paragraph 11.1.3 provides that Horizon will indemnify and hold Iroquois harmless from all liabilities or damages for "any damage to property or any losses of any kind suffered by third parties" which are caused by the breach of Horizon's obligations under the Contract or "the negligence of [Horizon] or its Subcontractors in carrying out its responsibilities under this agreement".

- Paragraph 4.1 of the Contract requires Horizon to diligently perform the work after commencement and to acquire the necessary additional equipment, hire additional manpower and perform other acts necessary to avoid delay in the completion of the pipeline.

- Paragraph 13.1 "warrants" that Horizon's work shall be "new, free of defects in construction and workmanship and shall conform to the Final project plans and specifications and descriptions set forth herein and all other requirements of this Contract".

- Paragraph 14.2 requires Horizon to "do the work in a workmanlike manner by qualified, careful and efficient workers in strict conformity with the contract."

- Paragraph 8.1 requires Horizon to use "reasonable care to properly maintain and operate the vessels under its control".

- Paragraph 10.4 provides that Horizon shall be fully responsible for any act or omission of its subcontractors.

- Paragraph 16.4 of the Contract provides that "the Contract shall be governed by and construed and enforced in accordance with the substantive laws of the State of New York, exclusive of conflicts of laws provisions" and further provides that any action or proceeding arising from or in connection with the Contract "shall be brought in a state or federal court of appropriate jurisdiction in New York State".

8.     Horizon was to perform the contract in three stages. The first stage required Horizon to weld the sections of pipe together to form a continuous pipeline and lower that pipeline to the bottom of Long Island Sound along the specified route. The second stage of the Contract required Horizon, after all 35 miles of the pipeline was welded and resting on the seabed, to trench the sea bottom, place the pipe in the trench and then backfill the trench so that the pipe was buried below the sea bottom up to depths of 10 feet. The third stage required Horizon, among other things, to place concrete mattresses over the pipe where it crossed NYPA's cables and cover the pipeline between NYPA's cables with rock as protection.

9.     Horizon commenced work under the Contract on or about November 6, 2002. To fulfill its obligations under the Contract, Horizon utilized the L/B GULF HORIZON, one of the vessels in its fleet. Horizon also subcontracted for the use of other vessels, including contracting with Don Jon Marine Co., Inc. and Weeks Marine, Inc. for the use of tugs to assist in the pipe-laying operations.

10.     Horizon subcontracted with Thales Geo Solutions, Inc. to provide surveying and positioning services for Horizon during the construction. To perform its obligations under its subcontract with Horizon, Thales placed positioning equipment on board the L/B GULF HORIZON and on board the anchor-handling tugs that were assisting the Gulf Horizon in the pipe laying operations. Thales also provided surveyors who lived and worked on board the L/B GULF HORIZON during the pipeline project to operate and monitor Thales' positioning equipment.

282113.1

44.    Horizon's hull insurers have advised that Horizon agrees with their position.

45.    Had Horizon's hull insurers provided coverage, they promptly would have indemnified Iroquois for any liability Iroquois would be found to have to NYPA, FMIC, LIPA or any other entity as a result of the alleged NYPA cable strike, and would have indemnified Iroquois for the costs and attorneys' fees incurred in the investigation and defense of this action, up to the policy limits and in excess of the deductible.

46.    Horizon's alleged failure to provide timely notice to its hull insurers is a breach of Horizon's aforesaid contractual obligations to Iroquois to maintain the hull insurance and a breach of said insurance, which has caused Iroquois damages and may cause Iroquois to suffer further damages up to $17 million dollars (in excess of $500,000), representing the insurance coverage that is unavailable to Iroquois.

47.    Horizon also procured a policy of insurance through AEGIS, on which policy Iroquois was named as an additional insured. That policy provided $1 million of coverage in excess of $50,000. AEGIS has also refused to provide coverage to Iroquois.

48.    Horizon has failed to indemnify Iroquois in accordance with its contractual obligations, notwithstanding demands from Iroquois that it do so.

49.    Accordingly, in the event Iroquois is found liable to NYPA, LIPA, FMIC or any other entity for the alleged damage to NYPA's cable, then Iroquois is entitled to

indemnification by Petitioners for all such liability up to $17.5 million and judgment should be entered in favor of Iroquois for that amount.

50.    Regardless of whether Iroquois is found liable to NYPA, LIPA, FMIC or any other entity, Iroquois is entitled to indemnity for all costs and attorneys' fees incurred in investigating and defending this action and in pursuing this claim against Horizon, as Iroquois would not have suffered such losses but for Horizon's breach. Iroquois also is entitled to indemnity for all attorneys' fees and costs incurred in pursuing coverage from Horizon's insurers.

## SIXTH CLAIM AGAINST PETITIONERS--INDEMNITY AND BREACH OF CONTRACT

51.    The Contract required Horizon to require Horizon's subcontractors to name Iroquois as an additional insured on all of Horizon's subcontractors' insurance policies.

52.    Thales, one of Horizon's subcontractors, failed to name Iroquois as an additional insured on its policies.

53.    Horizon therefore is in breach of its obligations to Iroquois under the contract and is liable to Iroquois for all consequences thereof.

54.    Had Thales named Iroquois as an additional insured on its policies, Thales' insurers would have indemnified Iroquois for any liability Iroquois is found to have to NYPA, FMIC, LIPA or any other entity as a result of the alleged NYPA cable strike, and would have provided Iroquois with coverage for the costs and attorneys' fees incurred

282113.1

during the investigation and defense of this action that would have been primary to Iroquois' insurance.

55.    Accordingly, if Iroquois is determined to have any liability to NYPA, FMIC, LIPA or any other entity as a result of the alleged cable strike, then Iroquois is entitled to indemnify from Horizon for all such liability.

56.    In addition, whether or not Iroquois is determined to have any liability, Iroquois is entitled to indemnity for all costs and attorneys' fees incurred to investigate and defend this action, as well as the costs and attorneys' fees incurred to pursue this indemnity claim, as such losses were directly caused by Horizon's aforesaid breach.

## GENERAL ALLEGATIONS AGAINST
## PETITIONERS AND RESERVATION OF RIGHTS

57.    Neither Horizon nor the Horizon Group is entitled to the benefits or protections of the Shipowner's Limitation of Liability Act, 46 U.S.C. § 181 et seq. (the "Limitation Act") and Iroquois is not subject to Petitioners' limitation proceeding with respect to this claim because Iroquois' claim is based on Horizon's personal contractual undertakings in the Contract, including Horizon's personal contractual undertaking to indemnify and hold Iroquois harmless from all such liability.  Iroquois therefore is free to pursue any or all of its claims outside of the limitation proceeding.

282113.1

58.    In the alternative, neither Horizon nor the Horizon Group is entitled to the benefits or protections of the Limitation Act because the casualty resulted from a cause that was within the privity and knowledge of Horizon and/or the Horizon Group.

59.    Petitioners' Complaint is vague, indefinite and does not define the voyage for which Petitioners seek exoneration or limitation. Iroquois therefore reserves the right to supplement this claim as events and additional facts may warrant, including the right to modify or withdrawal any of the claims asserted herein and/or to add new claims by Iroquois and/or IPOC.

## FIRST CROSS-CLAIM AGAINST THALES

60.    Iroquois repeats and realleges the allegations contained in paragraphs 1 through 59 as if set forth in full herein.

61.    If any damage was caused to NYPA's cables, then such damage was caused in whole or in part by Thales' negligence, gross negligence, recklessness, fault or lack of due care in the performance of Thales' surveying and positioning duties in connection with the Iroquois pipeline project, and not by any act or omission on the part of Iroquois.

62.    Accordingly, should Iroquois be found liable to NYPA, FMIC, LIPA, or any other entity for damage to NYPA's cable, then Iroquois is entitled to indemnification or contribution for any and all such liability, as well as for all costs and attorneys' fees incurred in investigating and defending this action.

## SECOND CROSS-CLAIM AGAINST THALES

63.    Iroquois repeats and realleges the allegations contained in paragraphs 1 through 62 as if set forth herein in full.

64.    The contract between Horizon and Thales required Thales to indemnify and defend Horizon and Horizon's "customers" for any liability "incident to or connected with the performance of work under this Agreement or breach thereof."

65.    The alleged damage to NYPA's cable occurred during and was incident to and connected with Thales' provision of surveying and positioning services to Horizon under the Horizon/Thales Contract, and Thales' acts or omissions and/or breach of the Horizon/Thales contract caused or contributed to the alleged incident.

66.    Iroquois was Horizon's "customer" as contemplated in the Horizon/Thales contract, Thales and Horizon intended for Iroquois to be covered by and to benefit from said provision of the Horizon/Thales Contract, and Iroquois therefore is a third-party beneficiary of such contract.

67.    Thales has failed to indemnify Iroquois pursuant to said contractual provisions, notwithstanding demands that Thales do so.

68.    Accordingly, if Iroquois is determined to have any liability to NYPA, LIPA, FMIC or any other entity as a result of the incident, then Iroquois is entitled to indemnity from Thales for such liability and judgment should be entered accordingly.

69.    In addition, whether or not Iroquois is determined to have any liability, Iroquois is entitled to indemnification for all costs and attorneys' fees incurred to investigate and defend this action, as well as the costs and attorneys' fees incurred to pursue this indemnity claim, as such losses were directly caused by Thales' breach of its contractual indemnity obligations.

## THIRD CROSS-CLAIM AGAINST THALES

70.    Iroquois repeats and realleges the allegations set forth in paragraphs 1 through 69 as if set forth in full herein.

71.    The Horizon/Thales contract provided that Thales would procure certain insurance sufficient to cover the maximum liability for the claims alleged in this action.

72.    The Iroquois/Horizon Contract required Horizon to require its subcontractors to name Iroquois as an additional insured under Horizon's insurance policies and the Horizon/Thales contract required Thales to name Iroquois as an additional insured under Thales' insurance policies.

73.    This insurance was to be primary to any other insurance of Horizon or Iroquois.

282113.1

74.     Horizon and Thales intended that Iroquois be covered by and benefit from said provision of the Horizon/Thales Contract and Iroquois therefore is a third-party beneficiary of such contract.

75.     Thales procured the required policies of insurance but, in breach of its contract with Horizon and in breach of its contractual obligations to Iroquois, failed to name Iroquois or Horizon as an additional insured in its insurance policies.

76.     Thales' policies, had they named Iroquois as an additional insured, would have indemnified Iroquois for any liability Iroquois may be found to have to NYPA, FMIC, LIPA or any other entity as a result of the alleged cable strike and would have provided Iroquois with coverage for the costs of investigation and defense of this action.

77.     Accordingly, should Iroquois be found liable to NYPA, LIPA, FMIC or any other entity in whole or in part for the damage claimed by those entities, then Iroquois is entitled to indemnity from Thales for Thales' breach of its obligation to name Iroquois as an additional insured on Thales' insurance policies.

78.     In addition, whether or not Iroquois is determined to have any liability, Iroquois is entitled to indemnification for all costs and attorneys' fees incurred to investigate and defend this action, as well as the costs and attorneys' fees incurred to pursue this indemnity claim, as such losses were directly caused by Thales' aforesaid breach of contract and would not have been incurred if Thales were not in breach.

WHEREFORE, claimant Iroquois prays as follows:

a. That Petitioner's Complaint for Exoneration from or Limitation of Liability be dismissed in its entirety as to Iroquois based on the "personal contract doctrine" and/or that the limitation injunction be lifted to permit Iroquois to pursue its personal contract claims in the forum of its choice; or

b. In the alternative, that Petitioners' Complaint for Exoneration From or Limitation of Liability be denied in full and that Iroquois' claims against Petitioners for indemnity and breach of contract be granted in full;

c. That if Iroquois is determined to have any liability to NYPA, LIPA, FMIC or another entity as a result of the cable strike, Iroquois be granted judgment on its Cross-Claims against Thales for full indemnity or contribution as more fully specified in the Cross-Claims, for any such liability and, even if Iroquois is not found liable, that it be granted judgment against Thales for all costs and attorneys' fees incurred in connection with investigating and defending this action and pursuing its cross-claims;

d. That Iroquois be awarded its costs and attorneys' fees incurred in connection with this action; and

282113.1

e.  That Iroquois be granted such other and further relief as may be just and

appropriate.

Dated:        Houston, Texas
              August 1, 2005

                                      By:  _Michael B Hughes_

                                           Michael B. Hughes
                                           Attorney in Charge for Claimant
                                             Iroquois Gas Transmission Systems,
                                             L.P.
                                           Texas State Bar # 10227200
                                           P.O. Box 629
                                           Houston, Texas
                                           409-795-2018 (phone)
                                           409-726-1155 (fax)

\

                                           Richard V. Singleton
                                           (admitted *pro hac vice* )
                                           Healy & Baillie, LLP
                                           29 Broadway
                                           New York, NY  10006
                                           (212) 943-3980

282113.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN THE MATTER OF HORIZON VESSELS,        §
INC., AS OWNER, and HORIZON OFFSHORE     §
CONTRACTORS, INC., HORIZON OFFSHORE,     §
INC., and TEXAS OFFSHORE CONTRACTORS     §
CORP., AS OWNERS, OPERATORS, OWNERS      §        C. A. No. H-03-3280
PRO HACE VICE, OF THE L/B GULF           §
HORIZON PRAYING FOR EXONERATION          §        ADMIRALTY
FROM OR LIMITATION OF LIABILITY          §
REGARDING THE INCIDENT OF                §
FEBRUARY 27, 2003                        §
                        Plaintiffs        §

## ORDER GRANTING IROQUIOS GAS TRANSMISSION SYSTEMS, L.P.'S, MOTION FOR LEAVE TO FILE AMENDED CLAIMS AND CROSS CLAIMS AGAINST THALES GEOSOLUTIONS, INC.

On this day came on to be considered the Motion of Iroquios Gas Transmissions Systems, L.P.'s (Iroquios) requesting leave to file an Amended Claim and Cross-Claim against Thales Geosolutions, Inc., and the court, having reviewed said Motion, and it being represented that there was opposition thereto, is of the opinion that it should granted.

Iroquios is hereby given leave to file its Amended Claims and Cross-Claims against Thales Geosolutions, Inc.

Done at Houston, Texas this _____ day of August, 2005.

EXHIBIT "Z"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF HORIZON | § | |
| VESSELS, INC., AS OWNER, and | § | |
| HORIZON OFFSHORE CONTRACTORS, | § | |
| INC., HORIZON OFFSHORE, INC., | § | |
| and TEXAS OFFSHORE CONTRACTORS | § | |
| CORP., AS OWNERS, OPERATORS, | § | CIVIL NO. H-03-3280 |
| OWNERS PRO HAC VICE, of the | § | |
| L/B GULF HORIZON, PRAYING FOR | § | |
| EXONERATION FROM OR LIMITATION | § | |
| OF LIABILITY REGARDING THE | § | |
| INCIDENT OF FEBRUARY 27, 2003 | § | |

## MEMORANDUM AND RECOMMENDATION

Presently pending before the court[1] is the motion of the Power Authority of the State of New York ("NYPA") and Factory Mutual Insurance Company ("FMIC") for partial summary judgment (liability) against Iroquois Gas Transmission System, L.P. ("Iroquois") (Docket Entry No. 107). The court has reviewed the motion, all relevant filings by the parties, and the applicable law. After doing so, the court **RECOMMENDS** that the motion for partial summary judgment be **DENIED**.

### I.  Case Background

The court previously set out the factual backdrop of this case in its Order denying two motions to transfer venue.[2] Nevertheless, a brief summary is warranted here for the sake of clarity.

In April 2002, Iroquois hired Horizon Offshore Contractors,

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Fed. R. Civ. P. 72. See Docket Entry No. 16.

[2]    See Docket Entry No. 77.

Inc. ("Horizon"), as its general contractor on construction of a 35-mile extension to an existing natural gas pipeline owned by Iroquois and located in parts of New York and Connecticut. The undertaking was referred to as the Eastchester Expansion Project or the Iroquois Pipeline Project. Iroquois and Horizon entered into a construction contract, under which Horizon had an obligation to provide all labor, equipment, and supervision necessary to complete the marine segment of the pipeline extension, as well a portion of the land segment.

The construction design called for part of the new pipeline to be submerged under Long Island Sound in the State of New York. Out of necessity, the extension was to cross over several pipelines and electrical cable facilities already buried beneath the seabed. One of these cable facilities, known as the "Y-49 Cable," consisted of four parallel, fluid-filled, high-voltage cables. The subterranean portion of the Y-49 Cable was owned by NYPA but, pursuant to an arrangement with NYPA, the Long Island Lighting Company d/b/a LIPA, ("LIPA"), was responsible for its primary operation, maintenance, and repair. At all times relevant to this lawsuit, FMIC supplied physical damage insurance on the Y-49 Cable.

Before commencing work, Iroquois was required to obtain NYPA's permission to have the new pipeline cross over NYPA's underwater cable facilities, including the Y-49 Cable. To this end, Iroquois and NYPA entered into a "Crossing Agreement" in October 2002, which specified each party's respective rights and duties with regard to

2

the construction, installation, and repair of the pipeline segment
that would cross over the Y-49 Cable.

In the fall of 2002, Horizon mobilized and sent its employees,
materials, and equipment, including its pipe lay barge, the GULF
HORIZON, to Long Island Sound.  In early January 2003, the GULF
HORIZON completed the initial pipe-welding and pipe-laying phases
of the project and proceeded to Port Newark, New Jersey, where it
was equipped with a plow enabling it to trench the seabed and bury
the pipeline.  After the plow was installed, the barge returned to
New York to proceed with the trenching and backfilling phases of
the project.

On the evening of February 27, 2003, the GULF HORIZON was in
Long Island Sound performing these operations.  At approximately
11:58 p.m. Eastern Standard Time, a NYPA representative aboard the
GULF HORIZON received a call from the NYPA electric system operator
stating that the Y-49 Cable had tripped off-line and that the Y-49
Cable system was de-energized.  The next day, NYPA ordered Iroquois
to suspend all work on the project.

Directly following the incident, NYPA summoned its emergency
response and maintenance subcontractor, KeySpan Electric Services,
L.L.C., to locate the source and extent of the damage, minimize the
escape of the cable's liquid coolant, and provide temporary repairs
to the damaged cable.  As a result of the incident, NYPA was forced
to temporarily remove from service all four individual cables of
the Y-49 Cable system.  After testing and inspection, three of the

3

individual cables were returned to service on March 8, 2003.

As a result of the cable strike, the Federal Energy Regulatory Commission refused to permit Iroquois to recommence construction until it could be assured no further damage would occur to NYPA's cables or any other cable crossings. Work was thereby suspended until April 15, 2003. In addition, NYPA, LIPA, and a third utility company refused to allow Iroquois to perform further work unless it agreed to utilize an anchorless vessel. Because Horizon did not possess such a vessel in its fleet, Iroquois had to charter a new vessel, the INTREPID. The INTREPID began its work in the area of NYPA's cables in September 2003, and finished in October 2003. The GULF HORIZON had completed its work in other areas of Long Island Sound on April 29, 2003. In August 2003, Pirelli Construction Services, Inc., the manufacturer of the Y-49 Cable, effectuated permanent repairs to the damaged cable. In September 2003, the cable successfully passed a high potential test and was returned to service.

On August 15, 2003, the Plaintiffs filed a verified complaint in this court under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. §§ 181 et seq., seeking exoneration from or limitation of liability for the incident. Subsequently, timely claims for relief were filed by NYPA, LIPA, FMIC, Iroquois, and Thales GeoSolutions, Inc. ("Thales"), an Iroquois subcontractor.

On July 21, 2004, NYPA, LIPA, and FMIC asserted cross-claims

4

against Iroquois for indemnification and negligence.[3]  On October 13, 2004, NYPA and FMIC moved for partial summary judgment on the indemnification cross-claim.  That motion is currently pending and will now be addressed.

## II.  Summary Judgment Standard

A grant of summary judgment under the federal rules is proper only when the evidence before the court fails to raise any genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); TIG Ins. Co. v. Sedgwick James of Washington, 276 F.3d 754, 759 (5th Cir. 2002).

The movant bears the initial burden of informing the court of the basis for a grant of summary judgment by identifying relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, and affidavits on file that demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  Upon a showing that there is an absence of evidence to support an essential element of the non-movant's cause, the burden

---

[3]    Cross-Claims of Limitation Defendants/Cross-Claimants, the Power Authority of the State of New York, the Long Island Lighting Company d/b/a LIPA, and Factory Mutual Insurance Company, Docket Entry No. 92.

shifts to the non-movant to produce evidence demonstrating that a genuine issue of material fact does exist which must be resolved by a trier of fact.  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. To satisfy this burden, the non-movant's evidence must raise more than mere "metaphysical doubt" about the material facts.  Thomas v. Great Atl. and Pac. Tea Co., 233 F.3d 326, 331 (5th Cir. 2000). Therefore, the non-movant's conclusory allegations, unsubstantiated assertions, improbable inferences, and speculation are insufficient to raise a fact issue for trial.  Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003).  When determining whether the evidence in the record creates a fact issue, the court resolves all doubts and views all reasonable inferences drawn from the evidence in favor of the non-movant.  Liberty Lobby, 477 U.S. at 255; Boston Old Colony Ins. Co. v. Tiner Assocs., Inc., 288 F.3d 222, 227 (5th Cir. 2002).

### III.  Analysis

NYPA and FMIC argue that they are entitled to summary judgment on their claim for indemnification against Iroquois.  They contend that broad and unambiguous indemnification clauses in the Crossing Agreement require Iroquois to reimburse them for all costs incurred as a result of the damage to the Y-49 Cable.  According to NYPA and FMIC, this includes monies spent for the emergency response and the temporary and permanent repairs to the Y-49 Cable.  In response, Iroquois contends NYPA and FMIC have failed to meet their initial

6

summary judgment burden because they have not demonstrated by way

of competent summary judgment evidence an absence of a fact issue

regarding the cause of the damage to the Y-49 Cable.

Iroquois' indemnity obligations are set forth in Article III

of the NYPA-Iroquois Crossing Agreement:

> D.    Iroquois Gas shall defend, indemnify and hold
> harmless the Grantee [NYPA] from and against any and all
> costs and expenses incurred as a result of damage to the
> Y-49 Cable arising out of or connected with the
> negligence, acts, omissions or willful misconduct of
> Iroquois Gas, its contractors, subcontractors, agents and
> employees in connection with the Work.
>
> . . .
>
> G.    In the event that the Y-49 Cable is damaged or
> rendered inoperable, during the Work, and such damage or
> inoperability arises out of the negligence, acts,
> omissions or willful misconduct of Iroquois Gas, its
> contractors, subcontractors, agents or employees: (i)
> Iroquois Gas shall pay all costs and expenses to repair
> and restore the Y-49 Cable to the operational status as
> existed before the damage or rendering of inoperability;
> and (ii) the Grantee [NYPA] shall make arrangements for
> and provide, at Iroquois Gas' sole cost and expense,
> equivalent replacement electrical capacity during the
> period the Y-49 Cable is inoperable....[4]

These two clauses unambiguously require Iroquois to indemnify NYPA

for all costs and expenses NYPA incurred as a result of damage to

the Y-49 Cable during work on the project only if such damage was

caused by the negligence, act, or omission of Iroquois, its

contractors, or subcontractors. Thus, to show they are entitled to

summary judgment, NYPA and FMIC must provide sufficient evidence to

---

[4]    "Crossing Agreement Long Island Sound," Docket Entry No. 119, Exhibit A ("Crossing Agreement") at 8.

demonstrate there is no genuine issue that Iroquois or one of the
contractors or subcontractors it used on the project caused the
cable damage.

    To this end, NYPA alleges that Iroquois' general contractor,
Horizon, caused the cable damage because its pipe lay barge, the
GULF HORIZON, dragged one of its anchors against and ruptured the
Y-49 Cable.  To show there is no genuine issue on this point, NYPA
submits as evidence Iroquois' interrogatory responses, an incident
report prepared by two Iroquois representatives, the affidavit of
the Iroquois project manager, and a letter written from Iroquois'
counsel to Horizon after the incident.

    NYPA first points to excerpts of Iroquois' certified responses
to interrogatories propounded by Horizon and NYPA, contending that
Iroquois admitted in two of those responses that Horizon caused the
damage to the Y-49 Cable.[5]  A closer inspection, however, reveals
that Iroquois made no such admission.  The responses pointed to by
NYPA are merely Iroquois' answers to "contention" interrogatories.
Thus, the responses only provided Iroquois' contentions or opinions
that Horizon was the responsible entity.[6]

--------

    [5]    Reply Memorandum of the Power Authority of the State of New York and
Factory Mutual Insurance Company in Support of their Motion for Partial Summary
Judgment (Liability) against Iroquois Gas Transmission System, L.P., Docket Entry
No. 119 at 6-9 (repeatedly referring to Iroquois' contentions as admissions of
a party-opponent).

    [6]    Contention interrogatories are permitted under Federal Rule of Civil
Procedure 33(c) and "seek information regarding a party's opinions or contentions
that relate to facts or the application of law to facts."  Capacchione v.
Charlotte-Mecklenburg Sch., 182 F.R.D. 486, 489 (W.D.N.C. 1998); see also
Starcher v. Correctional Med. Sys., Inc., 144 F.3d 418, 421 n.2 (6th Cir. 1998).

NYPA first references a contention interrogatory it propounded to Iroquois: "If you _contend_ that any other party was negligent or otherwise responsible, in whole or in part, for the damage to the Y-49 Cable, identify the third party and set forth the factual basis of your claim."[7]  Iroquois responded that it "contends that Limitation Petitioners [the Horizon entities] herein were negligent and otherwise responsible in whole for the damage to the Y-49 Cable."[8]  Iroquois explained that it took this position for several reasons:  Horizon had sole responsibility for maintaining the GULF HORIZON and her equipment; Horizon's crew was responsible for the GULF HORIZON's navigation and handling; the crew was in sole control of the barge and her anchors at the time the cable was struck; and there were no other vessels in the vicinity of the Y-49 Cable when the cable was struck other than the tugboats assisting the GULF HORIZON on the project.[9]

A second contention interrogatory referenced by NYPA, this one propounded by Horizon, stated:  "If you _contend_ that the event was caused by the negligence of any of the petitioners, please describe in specific detail each and every act or omission that you contend constituted negligence and state the specific facts upon which you

---

[7]     Utility Claimants' Interrogatory No. 12, Docket Entry No. 107, Exhibit 1-D at 11 (emphasis added).

[8]     Iroquois' Response to Utility Claimants' Interrogatory No. 12, Docket Entry No. 107, Exhibit 1-D at 11.

[9]     Id.

9

base your contention."[10]  In its response, Iroquois "contended" that Horizon was negligent.[11]

NYPA's assertion that these responses constitute "admissions" is incorrect.  Instead, the responses merely illuminate Iroquois' theory that Horizon had damaged the Y-49 Cable; they do not provide concrete evidence of such.[12]  This point is critical because while admissions from a party are competent summary judgment evidence, a party's subjective beliefs and unsubstantiated assertions are not.  See Brown, 337 F.3d at 541; Grimes v. Tex. Dep't of Mental Health and Mental Retardation, 102 F.3d 137, 139-40 (5th Cir. 1996).

Iroquois next submits as evidence a written report prepared by Tom Rybarski ("Rybarski") and Glen Chaffey ("Chaffey"), Iroquois representatives who investigated the cause of the damage aboard the GULF HORIZON after the cable had been struck.[13]  The report first set forth a "chronology of events" that detailed the GULF HORIZON's

---

[10]     Horizon's Interrogatory No. 1, Docket Entry No. 107, Exhibit 1-C at 4 (emphasis added).

[11]     Iroquois' Response to Horizon's Interrogatory No. 1, Docket Entry No. 107, Exhibit 1-C at 4.

[12]     In their reply memorandum, NYPA and FMIC also cite Jayne H. Lee, Inc. v. Flagstaff Industries Corp., 173 F.R.D. 651 (D.Md. 1997), for the proposition that a party's responses to contention interrogatories can provide a factual basis to support or oppose a motion for summary judgment.  Their reading of the case is incorrect.  The court in Jayne H. Lee simply made the statement, in the context of describing interrogatories in general, that interrogatory answers can provide competent summary judgment evidence; it was not referring to responses to contention interrogatories.  NYPA and FMIC wrongfully infuse a meaning into this statement that was not intended by the court.

[13]     "Incident Report on NYPA 4 Cable by the Lay Barge Gulf Horizon," Docket Entry No. 119, Exhibit 1 ("Incident Report").  Rybarski and Chaffey were employees of Pegasus International, Inc., a construction management company based in Houston, Texas, that Iroquois hired after the cable strike to investigate the cause of the incident.

activities on the day of the incident, including the precise times and locations it had dropped its anchors. The report also included summaries of interviews held with pertinent crewmembers of the GULF HORIZON, the GULF HORIZON's anchor pattern reports, and a catalogue of times and coordinates the GULF HORIZON dropped and picked up its anchors. Finally, the report included a "summary" that set out the investigation's relevant findings and conclusions.

In the "summary" section of the report, Rybarski and Chaffey noted that the GULF HORIZON's CP1 anchor was recovered on February 27, 2003, at 9:52 p.m. EST, only 101 feet from the damaged cable.[14] They pointed out that the NYPA electric system operator had called the GULF HORIZON eleven minutes earlier to state that the damaged cable had tripped off-line.[15] Rybarski and Chaffey also noted that the GULF HORIZON's two anchor winch operators on duty at the time of the cable strike admitted the barge's tensionometers were not functioning properly and that this prevented them from noticing if any of the anchors were dragging along the seabed.[16] On the basis of their findings, Rybarski and Chaffey concluded "[t]he reason for the trip was the CP1 anchor dragging into the NYPA 4 cable...."[17]

In addition to Iroquois' various interrogatory responses and

---

[14]    Id. at 9.

[15]    Id.

[16]    Id.

[17]    Id.

11

the incident report prepared by Rybarski and Chaffey, NYPA and FMIC rely on the sworn affidavit of Ken Webb ("Webb"), Iroquois' project manager who was responsible for the planning and construction of the pipeline extension.[18] In his affidavit, Webb offered a detailed chronology of events leading up to and subsequent to the cable strike.  Relevant to this motion, Webb testified that post-incident investigations revealed that an anchor of the GULF HORIZON struck and damaged the Y-49 Cable.[19]

Federal Rule of Civil Procedure 56(e) requires that affidavits filed in support of summary judgment be made on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters therein.  Fed. R. Civ. P. 56(e).  Iroquois contends Webb did not possess personal knowledge about the results of the post-incident investigations and that his testimony regarding such is therefore inadmissible.  This contention is devoid of merit.  Iroquois previously averred that Webb was one of only two Iroquois employees who were involved with the evaluation and planning of the temporary and permanent repairs to the Y-49 Cable following the incident.[20]  Moreover, Iroquois identified Webb as one of the individuals who assisted or provided

---

[18]    Affidavit of Ken Webb in Support of Motion to Transfer Venue, Docket Entry No. 119, Exhibit 2 ¶ 1.

[19]    Id. ¶ 33.

[20]    Iroquois' Response to Horizon's Interrogatory No. 21, Docket Entry No. 107, Exhibit 1-C at 17.

information in the preparation of its interrogatory responses.[21] Because it is undisputed Webb was heavily involved in overseeing the post-incident cable repairs, the court is satisfied that he has personal knowledge of the post-incident investigations and their results and was, therefore, competent to testify about such in his affidavit. Further, it bears mentioning that Iroquois previously submitted this same affidavit from Webb in support of its motion to transfer venue. Presumably, Iroquois held a good faith belief at that time that Webb was competent to testify to all matters stated therein. Thus, the position currently taken by Iroquois is tenuous at best.

Finally, NYPA submits as evidence a letter written roughly one week after the cable strike from Iroquois' counsel to Horizon, in which Iroquois' counsel took the position that the latter caused the cable damage: "As a result of our preliminary investigation, we have determined that the damage to NYPA's electrical cable was caused by the negligence of Horizon and/or its subcontractors."[22] The statement in this letter is admissible under Federal Rule of Civil Procedure 801(d)(2) as an admission by Iroquois.

The only evidence Iroquois has provided in opposition to the motion for summary judgment on this issue is Horizon's responses to

---

[21]     Iroquois' Response to Utility Claimants' Interrogatory No. 25, Docket Entry No. 107, Exhibit 1-D at 17.

[22]     Letter dated March 3, 2003, Docket Entry No. 119, Exhibit G.

13

interrogatories[23] and a letter from Horizon to Webb dated March 3, 2003.[24]  In both the interrogatory responses and the letter, Horizon stated that it "could not confirm" whether an anchor from the GULF HORIZON had ever come into contact with the Y-49 Cable.  With this evidence, Iroquois attempts to demonstrate that a fact issue exists with respect to whether Horizon caused the damage.

In sum, Iroquois does not dispute that the only vessels near the Y-49 Cable at the time it was struck were the GULF HORIZON and the four tugboats assisting it in its plowing operations, or that Horizon owned and operated the GULF HORIZON and contracted for use of the tugboats.  Iroquois has failed to controvert the evidence submitted by NYPA and FMIC showing that the tensionometer on the GULF HORIZON was not functioning at the time of the incident.  As stated in the incident report, this equipment malfunction prevented the winch operators from knowing whether the vessel's anchors were dragging along the seabed when the vessel was trenching the seabed near the Y-49 Cable.  Further, Iroquois has neither challenged nor offered any competent summary judgment evidence to controvert the findings made by Rybarski and Chaffey, the representatives it hired to assess the cause of the cable strike.  As stated above, Rybarski and Chaffey concluded on the basis of their fact-finding that the

---

[23]     Horizon's Response to Iroquois' Interrogatory No. 11, Docket Entry No. 113, Exhibit A at 11; Horizon's Response to Thales' Interrogatories Nos. 8 and 11, Docket Entry No. 113, Exhibit B at 7, 9-10; Horizon's Response to Utility Claimants' Interrogatories Nos. 8 and 12, Docket Entry No. 113, Exhibit C at 10-11, 13.

[24]     Letter dated March 5, 2003, Docket Entry No. 113, Exhibit D.

GULF HORIZON's CP1 anchor had struck the cable and that this was the cause of the cable tripping off-line.

However, even though the current state of the summary judgment record would normally require the court to grant the instant motion because of Iroquois' failure to raise a <u>genuine</u> issue of fact, <u>the court simply cannot overlook the fact that Horizon contests its liability for the cable damage and has not been given the chance to come forward with any evidence in support of its position.</u>

There is no question Iroquois would fall within the express language of the indemnification clauses <u>if</u> the act or omission of its contractor, Horizon, caused the damage to the Y-49 Cable.  It is also clear that if such was indeed the case, Iroquois would be contractually liable to NYPA and/or FMIC for all restoration and replacement costs incurred as a result of the damage.[25]  However, due process concerns prevent the court from adjudicating Horizon's fault in a motion for summary judgment between two other litigants based solely on one's failure to raise a genuine issue of fact on this point.  Simply put, NYPA and FMIC have put the cart before the horse on the matter of indemnification.[26]

---

[25] The parties have agreed that Iroquois' liability would be limited to any monies expended during the emergency response and the temporary and permanent repairs to the cable. Article IX, Section D of the Crossing Agreement explicitly provides that Iroquois is <u>not</u> liable for any incidental, special, indirect, or consequential damages NYPA may have sustained as a result of the cable damage. <u>See</u> Crossing Agreement at 19.

[26] Iroquois also argues that pursuant to Federal Rule of Civil Procedure 56(f), the court should defer consideration of the motion under until discovery is fully completed. For the sake of completeness, the court will briefly address this argument. In the Fifth Circuit, a party who opposes summary judgment under

## IV.  Conclusion

For the reasons discussed above, the court **RECOMMENDS** that the motion for partial summary judgment be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties, who have ten days from the receipt thereof to file written objections thereto pursuant to General Order 2002-13.  Failure to file written objections within this time period shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Court Clerk, P.O. Box 61010, Houston, Texas, 77208.  Copies of any such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk Avenue, Suite 7019, Houston, Texas, 77002.

---

Rule 56(f) must demonstrate two things:  (1) why additional discovery is needed, and (2) how the additional discovery will likely create a genuine issue of material fact.  <u>Brown v. Miss. Valley State Univ.</u>, 311 F.3d 328, 333 n.5 (5th Cir. 2002) (citing <u>Stearns Airport Equip. Co. v. FMC Corp.</u>, 170 F.3d 518, 534-35 (5th Cir. 1999)).  To satisfy this standard, the party must present "specific facts" and cannot rely on "vague assertions that discovery will produce needed, but unspecified facts."  <u>Washington v. Allstate Ins. Co.</u>, 901 F.2d 1281, 1285 (5th Cir. 1990).

In its motion, Iroquois states that the court should decline to entertain the motion because of "the current undeveloped state of discovery."  However, instead of explaining with specific facts why additional discovery is needed or how additional discovery will likely create a fact issue regarding the cause of the cable damage, Iroquois merely makes global statements about the current state of discovery:  "The parties are still responding to document requests.  No depositions have been taken.  The cause of the damage to the Y-49 Cable is unresolved."  This bare explanation does not suffice under the existing Fifth Circuit standard and, thus, Iroquois' argument is without merit.

**SIGNED** at Houston, Texas, this 12th day of May, 2005.

Nancy K. Johnson
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF HORIZON | § | |
| VESSELS, INC., AS OWNER, and | § | |
| HORIZON OFFSHORE CONTRACTORS, | § | |
| INC., HORIZON OFFSHORE, INC., | § | |
| and TEXAS OFFSHORE CONTRACTORS | § | |
| CORP., AS OWNERS, OPERATORS, | § | CIVIL NO. H-03-3280 |
| OWNERS PRO HAC VICE, of the | § | |
| L/B GULF HORIZON, PRAYING FOR | § | |
| EXONERATION FROM OR LIMITATION | § | |
| OF LIABILITY REGARDING THE | § | |
| INCIDENT OF FEBRUARY 27, 2003 | § | |

## ORDER

Presently pending before the court[1] is the Motion of the Power Authority of the State of New York and Factory Mutual Insurance Company (collectively "NYPA") for Reconsideration of their Motion for Partial Summary Judgment (Docket Entry No. 126). The court has reviewed the motion, the response thereto, and the applicable law. After doing so, the court **DENIES** the motion.

In its Memorandum and Recommendation issued May 12, 2005, the court determined that NYPA was not entitled to a grant of summary judgment on its cross-claim for indemnification against Iroquois Gas Transmission System, L.P. ("Iroquois"). The court found that summary judgment was improper because NYPA's argument was premised upon Horizon having caused the damage to the cable and Horizon was not given an opportunity to meaningfully rebut this charge.

NYPA now requests that the court reconsider this determination

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Fed. R. Civ. P. 72. See Docket Entry No. 16.

on the ground that there is "newly discovered evidence" material to the outcome of its summary judgment motion, namely, the deposition testimony of three Horizon representatives. NYPA asserts that this testimony "unequivocally confirms that the CP1 anchor from the GULF HORIZON dragged over 1,200 feet into the NYPA #4 Cable, causing significant damage on the date in question."

NYPA brings its motion for reconsideration under Federal Rule of Civil Procedure 60(b), which provides, in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)....

Fed. R. Civ. P. 60(b). Iroquois correctly points out that there is no "final judgment, order, or proceeding" from which NYPA can seek relief. The undersigned's Memorandum and Recommendation was just that: a recommendation of factual findings and legal conclusions submitted to the district court. It was neither a "final judgment" nor an "order." As the Fifth Circuit has explained, "[o]rdinarily, 'the recommendation of a magistrate judge is not a final decision and does not in any way "dispose of" a party's claims.'" Donaldson v. Ducote, 373 F.3d 622, 624 (5th Cir. 2004)(citation omitted). "A party dissatisfied with a magistrate judge's decision may instead obtain relief by objecting to the magistrate judge's findings and recommendations, thereby compelling the district court to review his objections de novo." Id. Thus, this motion is procedurally

2

improper.

Even assuming, arguendo, that NYPA properly filed its motion, the motion fails to remedy or even address the due process concerns mentioned in the Memorandum and Recommendation. Horizon still has not had a meaningful opportunity to defend itself vis-á-vis NYPA's charge that its vessel's anchor caused the cable damage. Selected excerpts from the depositions of three Horizon employees and an e-mail from a Horizon representative do not alleviate the problem because Horizon still has not had the chance to affirmatively come forward with evidence in defense of its actions. Thus, until the underlying issue of responsibility is fully and fairly resolved by other motions or by trial, disposition of NYPA's indemnification claim is premature.

Even if the court was satisfied that the due process concerns were resolved, a review of NYPA's "newly discovered" evidence does not clearly demonstrate an absence of genuine issue as to Horizon's culpability. George Reuter and Michael Ballard, Horizon's 30(b)(6) designated corporate representatives, both made clear that they did not know whether the GULF HORIZON's CP1 anchor dragged against the NYPA #4 Cable, thus causing the break. Larry Blalock, the vessel's superintendent, speculated that this may have been the case, but did not explain how he reached his conclusion. Finally, the court cannot determine whether statements made by Donald Schultz in his post-incident e-mail are "admissions" against Horizon because it is unclear whether he had the authority to speak on Horizon's behalf.

3

Both Reuter and Ballard referred to Schultz only as Horizon's "representative" and Reuter also testified that he did not believe Schultz "was actually an employee." NYPA has not filed any other evidence illuminating who Schultz is or the capacity in which he was working for Horizon at the time.

In conclusion, because NYPA's motion for reconsideration is procedurally improper and substantively meritless, the motion is **DENIED**.

**SIGNED** at Houston, Texas, this 21ˢᵗ day of June, 2005.

Nancy K. Johnson
United States Magistrate Judge

4

EXHIBIT "AA"

2

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   05 Civ. 2149 (JSR)
                                        ----x
 5
 6   IROQUOIS GAS TRANSMISSION SYSTEM L.P.,

                              Plaintiff,
 7
     - against -
 8
     ASSOCIATED ELECTRIC & GAS INSURANCE
 9   SERVICES LTD., Hamilton, Bermuda (AEGIS),
     and CERTAIN UNDERWRITERS AT LLOYD'S,
10
                              Defendants.
11   -------------------------------------x
                              July 20, 2005
12                            10:22 a.m.
13         DEPOSITION of the Defendant
     CERTAIN UNDERWRITERS AT LLOYD'S, by JOHN
14   HODGETT, pursuant to Notice, held at the
15   offices of Donovan, Parry, McDermott &
16   Rodzik, Esqs., Wall Street Plaza, 88 Pine
17   Street, New York, New York, before Abner
18   D. Berzon, a Registered Professional
19   Reporter, Certified Realtime Reporter and
20   Notary Public of the State of New York.
21
22
23
24
25
```

2

```
 1
 2   A P P E A R A N C E S :
 3
 4   HEALY & BAILLIE, LLP
 5   61 Broadway
     New York, New York 10006-2834
 6       Attorneys for Plaintiff
 7   BY: JOHN C. KOSTER, ESQ.
         DAVID D. JENSEN, ESQ.
 8
 9
10   NOURSE & BOWLES, LLP
     One Exchange Plaza
11   55 Broadway
     New York, New York 10006-3030
12       Attorneys for Defendant
         AEGIS
13
     BY: JOHN P. VAYDA, ESQ.
14
15
16   DONOVAN PARRY
     McDERMOTT & RADZIK, ESQS.
17   Wall Street Plaza
     88 Pine Street
18   New York, New York 10005-1801
         Attorneys for Defendant
19       Certain Underwriters at Lloyd's
20   BY: EDWARD RADZIK, ESQ.
         CAROLYN ELIZABETH MEERS, ESQ.
21
22
23
24
25
```

3

```
 1
 2   A P P E A R A N C E S  (Continued):
 3
 4   DECHERT, LLP
     30 Rockefeller Plaza
 5   New York, New York 11102
         Attorneys for Defendant
 6       AON Risk Services of Texas, Inc.
     BY: RODNEY ZERBE, ESQ.
 7
 8
 9   KENNEDY, LILLIS, SCHMIDT & ENGLISH, ESQS.
     75 Maiden Lane - Suite 402
10   New York, New York 10038-4816
11       Attorneys for Defendant
         American Home Assurance Company
12
     BY: CHARLES E. SCHMIDT, ESQ.
13
14
15           *       *       *
16
17
18
19
20
21
22
23
24
25
```

4

```
 1
 2         MR. VAYDA:  Before we get
 3   started.  I would like to make a short
 4   statement here on the record.  I'd like
 5   the record to reflect that AEGIS is
 6   attending this deposition without
 7   prejudice, but, instead, with full
 8   reservation and preservation of its rights
 9   to arbitrate with plaintiff any disputes
10   between the plaintiff and AEGIS in
11   London.  Thank you.
12
13   J O H N    H O D G E T T , having first
14   been duly sworn by Abner D. Berzon, a
15   Notary Public of the State of New York,
16   was examined and testified as follows:
17   EXAMINATION BY MR. KOSTER:
18       Q.   Mr. Hodgett, my name is John
19   Koster.  I'm with the firm of
20   Healy & Baillie and we represent the
21   plaintiff, Iroquois, and I'm here to ask
22   you some questions about the subject
23   matter of the litigation.  If you have any
24   trouble understanding my questions, please
25   let me know.
```

HODGETT

5

1
2          Let me ask you, first off, when
3   did you arrive in New York for this
4   deposition?
5      A.    I arrived on Monday night.
6      Q.    And have you testified at
7   depositions before --
8      A.    Yes.
9      Q.    -- either in this country or in
10  any other country?
11     A.    Yes.
12     Q.    In this country?
13     A.    Yes.
14     Q.    On how many occasions?
15     A.    In this country, twice.
16     Q.    And did they involve coverage
17  disputes?
18     A.    No.
19     Q.    Would you tell me what they did
20  involve generally.
21     A.    One of them was a dispute
22  between two lawyers that got personal.
23  And the other one was the -- was regarding
24  Quantum, of a loss of hire claim.
25     Q.    In those actions, did you

HODGETT

6

1
2   testify here in New York?  Were the suits
3   pending in the Southern District?
4      A.    Not the lawyer dispute, but the
5   loss of hire claim was here.
6      Q.    Do you recall the name of that
7   suit?
8      A.    Not precisely, no.
9      Q.    Do you recall how long ago it
10  was?
11     A.    1995, I believe.
12     Q.    And do you recall the attorneys
13  who were representing your company?
14     A.    My company wasn't represented.
15     Q.    Do you recall any of the
16  attorneys involved?
17     A.    I recall the that Hill, Benson,
18  Nash were involved.
19     Q.    And the other action you
20  referred to, in what jurisdiction did that
21  take place?
22     A.    Whichever jurisdiction covers
23  San Francisco.
24     Q.    Was it in federal court, do you
25  recall?

HODGETT

7

1
2      A.    I don't.
3      Q.    Do you recall the name any of
4   the parties in that action?
5      A.    Yes.
6      Q.    Could you give me those names.
7      A.    Well, the lawyers who were
8   antagonist, protagonist, whatever, were
9   James Boughey and Richard Lesser.
10     Q.    Is that B-o-u-g-h-e-y?
11     A.    B-o-u-g-h-e-y.
12     Q.    And Lesser, L-e-s-s-e-r-?
13     A.    Yes.
14     Q.    By whom were you employed?
15     A.    Wellington Underwriting.
16     Q.    And can you describe the
17  business of Wellington Underwriting.
18     A.    They are insurers.
19     Q.    Are they members of Lloyd's?
20     A.    Part of Wellington Underwriting
21  is at Lloyd's, through Syndicate 2020.
22     Q.    Does Wellington manage Syndicate
23  2020?
24     A.    Yes.
25     Q.    Are the equity interests in

HODGETT

8

1
2   Syndicate 2020 the same as the equity
3   interests in Wellington Underwriting, or
4   do you know?
5      A.    I don't know.
6      Q.    Do you know who would have that
7   information?
8      A.    The information is public
9   record.
10     Q.    And where would those public
11  records be?
12     A.    At the company's house in
13  London.
14     Q.    And would that be as to
15  Wellington or as to Syndicate 2020 or as
16  to both?
17     A.    They are all subsidiaries of
18  Wellington Underwriting, PLC.
19     Q.    Including Syndicate 2020?
20     A.    Yes.
21     Q.    So Syndicate 2020 isn't an
22  entirely owned subsidiary of Wellington
23  Underwriting, PLC?
24     A.    No.
25     Q.    No?  What's the difference?

9

HODGETT

A.    Syndicate 2020 has outside
capital providers, which are called at
Lloyd's names.

Q.    Do you know if AON or any of its
subsidiaries or Ralph Yates are part of
that Syndicate 2020?

A.    No.

Q.    You don't know?

A.    I don't know.

Q.    Do you know if JLT Risk or any
of its affiliates or subsidiaries are part
of Syndicate 2020?

A.    I don't know.

Q.    Do you know if AON or any of its
subsidiaries or affiliates are part of any
other members of Lloyd's who are on the
risk --

A.    No.

Q.    You don't know?

A.    I don't know.

Q.    And do you know if JLT or any of
its subsidiaries or affiliates are members
of any of the other syndicates or --

A.    I don't.

10

HODGETT

Q.    -- parties that are part of the
risk?

A.    I don't know.

Q.    How long, Mr. Hodgett, have you
been with Wellington Underwriting?

A.    Since April of 2001.

Q.    And what title do you hold with
them?

A.    Claims adjustor.

Q.    And as a claims adjustor for
Wellington Underwriting, what is it that
you do, in general?

A.    I handle energy claims for
Syndicate 2020.

Q.    And where do you physically
reside when you handle those claims?

A.    88 Leadenhall Street in London.

Q.    And what is your educational
background?

A.    Well, through the British school
system to, I don't know, general
certificate of education standard.

Q.    Is that the equivalent of high
school or college?

11

HODGETT

A.    I don't know.

Q.    Do you hold a degree from a
university in --

A.    No.

Q.    And when did you start working?

A.    In August 1965.

Q.    And who did you work for at that
point?

A.    Price Forbes.

Q.    And what was the business of
Price Forbes?

A.    They were insurers' brokers.

Q.    And what did you do for Price
Forbes?

A.    Menial tasks.

Q.    How long did you do menial tasks
for Price Forbes?

A.    Two years.

Q.    And then what did you do?

A.    I moved to another Lloyd's
broker, called Bevington, Vaizey & Foster.

Q.    So you were with them in the
late 60's?

A.    Yes.

12

HODGETT

Q.    How long did you stay with them?

A.    I don't remember exactly.

Q.    Five years, ten years, two
years, one year?

A.    Two or three years, I would say.

Q.    And what task did you perform
there?

A.    I handled North American
nonmarine claims.

Q.    And when you left that position,
where then did you go?

A.    I then went to another Lloyd's
broker called S.D. Hayman.

Q.    And how long were you with the
Hayman, H.D. Hayman firm?

A.    Including its takeover by
another broker, about three years.

Q.    And would that be in the mid
70's?

A.    At the end it was the mid 70's.
My employment there began in the earlier
70's.

Q.    Were there gaps in your
employment between any of these

13

HODGETT

1
2   organizations?
3       A.    There was one small gap where I
4   repaired televisions for a while.
5       Q.    How long was this small gap?
6       A.    From memory, about nine months.
7       Q.    Now, when you left H.D. Hayman,
8   where did you go?
9       A.    From H.D. Hayman, I went to
10  Lionel Sage.
11      Q.    And what is the business of
12  Lionel Sage?
13      A.    They're insurance brokers.
14      Q.    And what did you do at Lionel
15  Sage?
16      A.    I handled their marine claims.
17      Q.    And what were your years of
18  service there?
19      A.    1975 to 1978.
20      Q.    Was that your first experience
21  with marine claims?
22      A.    No.  I handled marine claims at
23  E.D. Hayman.
24      Q.    And when you left Lionel Sage,
25  where did you go?

14

HODGETT

1
2       A.    A company called Hinton Hill.
3       Q.    How long were you with Hinton
4   Hill?
5       A.    Twelve and a half years.
6       Q.    And what claims did you handle
7   there?
8       A.    Marine and energy claims.
9       Q.    And when you left Hinton Hill,
10  where did you go?
11      A.    Ropner.
12      Q.    Sorry?
13      A.    R-o-p-n-e-r Insurance Services.
14      Q.    And what was the business of
15  Ropner?
16      A.    They were insurance brokers.
17      Q.    And what did you do there?
18      A.    I handled marine claims.
19      Q.    How long were you with Ropner?
20      A.    Between five and six years.
21      Q.    And when you left Ropner, where
22  did you go?
23      A.    When I left Ropner, I became an
24  independent consultant.
25      Q.    And how long were you an

15

HODGETT

1
2   independent consultant?
3       A.    Five years.
4       Q.    Is that a successful line of
5   work for you?
6       A.    To begin with.
7       Q.    And where did you go after you
8   concluded your independent consultancy?
9       A.    Wellington.
10      Q.    And that was in 2001?
11      A.    Yes.
12      Q.    Does Wellington Underwriting, as
13  manager of syndicate 2020 -- by the way,
14  who was the lead underwriter on this
15  risk?  Do you know?
16      A.    Wellington 2020.
17      Q.    And did you handle this risk
18  from beginning to end?
19          MR. ZERBE:  Objection to form.
20      A.    Sorry, I don't understand the
21  question.  What do you mean by "handle
22  this risk"?
23      Q.    When did you start to handle
24  this risk?
25      A.    Beside the word "risk," I don't

16

HODGETT

1
2   understand.
3       Q.    The coverage for Iroquois or for
4   Horizon.
5       A.    I handle claims, not coverage.
6       Q.    I see.  And had you handled
7   other claims for the risk of -- on Horizon
8   prior to the one that's the subject matter
9   to this suit?
10      A.    I don't remember.
11      Q.    Would your records reflect that?
12      A.    I don't know.
13      Q.    Why would you not know?
14      A.    Our records don't specify who
15  saw any file at any given time.
16      Q.    Now, can you tell me what JLT
17  Risk Solutions is?
18      A.    It is an insurance broker.
19      Q.    And what services does JLT Risk
20  Solutions provide?
21      A.    It provides whatever insurance
22  broking services its clients want it to.
23      Q.    And what is the nature of your
24  interaction with JLT Risk Solutions?
25      A.    They present their clients'

17

HODGETT

1
2  claims to me, those that we lead.
3      Q.    Do you know if JLT Risk
4  Solutions or any of its subsidiaries or
5  affiliates retained any part of this risk
6  as an underwriter?
7      A.    JLT are insurance brokers, to my
8  knowledge. They aren't authorized to
9  accept risks.
10     Q.    So you just don't know?
11     A.    I don't know.
12     Q.    Now, what can you tell me about
13  the issuance of the Lloyd's policy? How
14  does that occur? Can you describe that in
15  general terms.
16     A.    From which point?
17     Q.    From the broker circulating a
18  risk at Lloyd and seeking cover.
19     A.    A broker would normally obtain
20  instructions from his client as to what
21  coverages he wished to purchase.
22         The broker would then approach
23  who he considered to be the best
24  underwriters to provide the coverage that
25  he needed, presumably at the price he

18

HODGETT

1
2  needed. The underwriter would provide
3  them with a quote, which they would then
4  take back to their client. Their client
5  would say yes or no.
6         And if the answer was yes, the
7  broker would then come back to the
8  underwriter, say, "You know, my client
9  would like to buy the coverage," and the
10  lead, the underwriter, would put their
11  line down, the broker would then approach
12  other underwriters to secure a hundred
13  percent of the placement.
14         The broker would then issue the
15  cover note, obtain the premium from the
16  client, and bring what's called a signing
17  slip to the leading underwriter. We would
18  then sign that and it would go to the
19  Lloyd's policy signing office and the
20  Lloyd policy signing office would do the
21  rest, including accepting premium,
22  distributing it to the syndicates that
23  were on the risk.
24     Q.    The representative of Wellington
25  in this process, does he sit in a box at

19

HODGETT

1
2  Lloyd's?
3      A.    Yes.
4      Q.    And do you know who that
5  individual is with respect to Wellington
6  at any given time?
7      A.    No.
8      Q.    Are there a number of people it
9  could be, or is it just one person?
10     A.    No, there's a number of people
11  that it could be.
12     Q.    And is there a number of people
13  it could be on marine and energy risks or
14  is there just one person?
15     A.    Of Wellington?
16     Q.    Yes.
17     A.    There's a number of people for
18  marine and energy risks.
19     Q.    And in the last three or four
20  years, how many people would that be?
21     A.    About eight.
22     Q.    And can you give me the name of
23  any of them.
24     A.    It could be Tim Burrows,
25  B-u-r-r-o-w-s, Matthew Yaldham,

20

HODGETT

1
2  Y-a-l-d-h-a-m, Michael Allen, A-l-l-e-n,
3  Chris Wildee, W-i-l-d-e-e. There's four
4  or five others.
5         MR. KOSTER:  Off the record.
6         (Discussion held off the
7  record.)
8      Q.    Mr. Hodgett, are there any
9  written policies that govern the conduct
10  of a broker such as JLT in relation to
11  Lloyd's?
12     A.    I don't know.
13     Q.    Do you know if JLT has any
14  authority with respect to Wellington or
15  Lloyd's in general? I'm going to use
16  Wellington to represent Lloyd's. Lloyd's
17  is the party in the action here. Is that
18  understood? Or do you want me to
19  specify?
20         MR. RADZIK:  I think it would be
21  better if you specify.
22     A.    I can only speak for
23  Wellington. I can't speak for Lloyd's.
24     Q.    Do you know if Lloyd's has any
25  such regulations, as an institution?

21

HODGETT

1
2     A.     Could you clarify that, please.
3     Q.     With regard to brokers who bring
4  their business to Lloyd's, does Lloyd's
5  have any regulations regarding their
6  conduct or their procedures?
7     A.     Yes.
8     Q.     And could you tell me what those
9  are or where I might find them.
10    A.     I don't.  I'd say I don't
11 know what they are.  A broker would be
12 able to give them to you.
13    Q.     Now I'm going to refer to
14 Wellington.  Does a broker have any
15 authority to bind coverage on behalf of
16 Wellington?
17    A.     No.
18    Q.     Does that apply to, say, open
19 cargo policies?
20    A.     I don't know.
21    Q.     Do you deal with open cargo
22 policies?
23    A.     No.
24    Q.     Do you deal with pollution
25 policies?

22

HODGETT

1
2     A.     No.
3     Q.     Do you know if a broker has any
4  authority to set premiums?
5     A.     I don't.
6     Q.     You don't know?
7     A.     I don't know.
8     Q.     Do you know who sets the
9  premiums?
10    A.     Wellington would set the premium
11 for Wellington's business.
12    Q.     Now, let's talk about the policy
13 that's in question here.  You have some
14 familiarity with that policy?
15    A.     Yes.
16    Q.     Can you explain in general terms
17 what coverage is provided by the policy?
18    A.     Policy provides Horizon with
19 hull and machinery coverage for the
20 specified vessels.
21    Q.     Was the Gulf Horizon one of
22 those specified vessels?
23    A.     Yes.
24    Q.     And were there co-assureds on
25 that policy?

23

HODGETT

1
2     A.     There was a provision for there
3  to be additional assureds where required
4  by the contracts.
5     Q.     And do you acknowledge that
6  Iroquois was a co-assured under that
7  policy?
8     A.     No.
9     Q.     Why not?
10    A.     I don't know.
11    Q.     You don't know why not?
12    A.     I don't know whether they are or
13 not.
14    Q.     As we sit here today, you do not
15 know whether Iroquois is or is not a
16 co-assured on that policy?  Is that your
17 testimony?
18    A.     Correct.
19    Q.     Have you checked any documents
20 to determine whether Iroquois is a
21 co-assured?
22    A.     What do you mean by that?  Have
23 I checked any documents?  What documents?
24    Q.     We've just seen some
25 correspondence this morning that was

24

HODGETT

1
2  produced by your counsel.  Have you
3  reviewed a file on this matter before
4  coming here?
5     A.     I have reviewed the files given
6  to me by Price Forbes that claim to be the
7  JLT files.
8     Q.     Who is Price Forbes?
9     A.     They are Horizon's current
10 broker.
11    Q.     And they replaced JLT Risk?
12    A.     Yes.
13    Q.     Do you know why they replaced
14 JLT Risks?
15    A.     No.
16    Q.     Have you ever dealt with JLT
17 Risk --
18    A.     Yes.
19    Q.     -- on this claim?
20    A.     Yes.
21    Q.     When did you first deal with JLT
22 Risk on this claim?
23    A.     In December of last year.
24    Q.     And who did you deal with there?
25    A.     Bryn Thomas.

**25**

HODGETT

Q.    Let me clarify.  By last year, you mean 2004?

A.    2004.

Q.    And could you give me that again?

A.    B-r-y-n Thomas.

Q.    And what was the nature of your dealings with Bryn Thomas?

A.    He came to my office and informed me about the loss, of the existence of the loss.

Q.    And what then did you do?

A.    I wrote -- I'm sorry, backtrack there.  I kept the file, I phoned Gerry Kimmitt, and then I wrote the comments which I believe you have a copy on the file on the 1st of December.

Q.    And Gerry Kimmitt is a lawyer in Texas?

A.    Gerry Kimmitt is a lawyer in Texas.

Q.    And you sought his advice on Texas law?

A.    No, I sought his advice

**26**

HODGETT

regarding coverage and the late notice of that claim.

Q.    Did you have any knowledge of prior notice to December of 2004?

A.    No.

Q.    Do you know if Wellington Underwriting, PLC had such notice?

A.    I don't know.

Q.    How long did you continue to deal with Bryn Thomas at JLT?

A.    Bryn Thomas was the broker who brought the file in to me physically.

Q.    Could you define "file" for me.  Does that mean a claim?

A.    It's a folder with paper in it, like that (indicating).

Q.    A manila folder, indicating.

A.    It was pink.

Q.    It was a pink manila folder, okay.

       And what did the file contain?

A.    I don't remember.

Q.    But you retained it?

A.    I retained it, talked to Gerry,

**27**

HODGETT

wrote my comments on it, gave it back.

Q.    Gave it back to --

A.    To JLT.

Q.    Is that the usual procedure?

A.    Yes.

Q.    Now, did you have other dealings with Bryn Thomas?

A.    Very few.  Subsequently, the majority of my dealings were with Paul Bennett.

Q.    And Paul Bennett is with Price Forbes?

A.    No, he's with JLT.

Q.    He's with JLT?

A.    Yes.

Q.    All right.  And what was the nature of your exchanges with Paul Bennett?

A.    I believe you've been given copies of them.

Q.    We'll get to that.  But as your recollection, did you have phone calls with him in addition to the e-mails and correspondence?

**28**

HODGETT

A.    Yes.

Q.    And have you produced all the e-mails relevant to this claim?

A.    I have produced all the e-mails relevant to this claim to my lawyers.

Q.    And of all the documents that have been recently produced, are there other documents that have not been produced to us?

A.    I don't know.

MR. KOSTER:  Well, I'm going to ask for a privilege log or some sort of explanation, if documents have not been produced.

MR. RADZIK:  We've produced all documents that have been tendered to us by Wellington, with the exception, of course, of privileged communications.  I will provide a privileged log listing those.

Q.    Now, does Wellington's file contain documents, e-mails, correspondence, phone notes, or anything else that you have not produced to your lawyers?

29

HODGETT

1
2    A.    No, it does not.  Everything in
3  Wellington's file has been produced to our
4  lawyers.
5    Q.    And does that include
6  communications with other parties on the
7  risk?
8    A.    All communications with that
9  other parties on the risk have been copied
10  to our lawyers.
11    Q.    And how often did you
12  communicate with other parties on the
13  risk?
14    A.    I don't remember.
15    Q.    Can you give me an estimate of
16  the frequency of your communications?
17    A.    No.
18    Q.    When did you cease dealing with
19  either Bryn Thomas and Paul Bennett at JLT
20  and begin dealing with Price Forbes?
21    A.    My recollection is around March
22  of 2005.
23    Q.    And who did you deal with at
24  Price Forbes?
25    A.    Tim Friday.

30

HODGETT

1
2    MR. VAYDA:  What was the last
3  name?
4    THE WITNESS:  Friday.
5    MR. VAYDA:  Thank you.
6    Q.    Let me ask you about the
7  policy.
8    MR. KOSTER:  First let me ask --
9  this is a document that was produced as
10  the -- let's mark it for identification as
11  Exhibit 1.
12    (Plaintiff's Exhibit 1, IRO/AE
13  00300 through IRO/AE 00326, marked for
14  identification, this date.)
15    Q.    Mr. Hodgett, the document that's
16  now been marked Exhibit 1, do you know
17  what documents were provided to the
18  assured in this case?
19    A.    No.
20    Q.    Well, I represent to you that
21  Plaintiff's Exhibit 1 are the documents
22  that were produced to my client and
23  represented to be the documents that were
24  produced to the assured.
25    What I'm calling the provided

31

HODGETT

1
2  documents, is this equivalent of a slip?
3    A.    No.
4    Q.    Could you define the
5  difference.
6    A.    A slip is something that the
7  London broker would have produced to the
8  London underwriters and would have the
9  London underwriters' signatures on it.
10    Q.    Okay.  Now we recently were
11  provided with what purports to be the
12  policy by your counsel, and let's identify
13  that.
14    MR. KOSTER:  So let's mark this
15  as Exhibit 2.
16    (Plaintiff's Exhibit 2,
17  insurance policy involved in this
18  litigation, marked for identification,
19  this date.)
20    Q.    Now, I'm going to show you
21  Exhibit 2, and that purports to be the
22  policy involved in this litigation.  Do
23  you have familiarity with that?
24    A.    Page 1 seems to be missing.
25  That's the first comment.

32

HODGETT

1
2    MR. JENSEN:  Here you go.
3    MR. ZERBE:  This exhibit is
4  pages 1 through 234.
5    MR. KOSTER:  And it's Exhibit 1
6  attached to the production of the Lloyd's
7  Underwriters, dated July 12, 2005.
8    Q.    Do you know when this document
9  was generated?
10    A.    No.
11    Q.    Do you know if it was generated
12  at the time the cover was written?
13    A.    No.
14    Q.    You don't know or --
15    A.    I don't know.
16    Q.    Who would know the answer to
17  questions such as that?
18    A.    This document was probably
19  generated by AON in Texas.
20    Q.    Do you know that as a matter of
21  fact, or are you speculating?
22    A.    I'm speculating.  It's an
23  educated guess.
24    Q.    Do you know the party or parties
25  at Wellington who would know the answer to

33

HODGETT

1
2  that question, of their own knowledge?
3      A.    No one at Wellington would know
4  that, of their own knowledge.
5      Q.    Well, when somebody at
6  Wellington writes a risk, do they ever
7  produce a full copy of the policy?
8      A.    This would not have been
9  produced by Wellington.
10     Q.    Would Wellington have produced a
11 copy for use within Wellington?
12     A.    No.
13     Q.    What documents would Wellington
14 deal with?
15     A.    Wellington would deal with the
16 slip and the Lloyd's policy or the Lloyd's
17 slip policy.
18     Q.    Explain to me if there's a
19 difference between the slip and the slip
20 policy?
21     A.    The slip is the original
22 document on which underwriters put their
23 lines, and they sign their stamp, and it
24 has their physical signatures on it and
25 they agree to accept whatever percentage

34

HODGETT

1
2  of the risk they're comfortable with.  The
3  slip policy is the version of that slip
4  that goes to the Lloyd's policy signing
5  office and has the Lloyd's seal on it,
6  which is a typed document with the lines
7  underwriters have written on the original
8  slip reduced to a line of type.
9      Q.    And what sort of document would
10 be in the Lloyd's policy signing office?
11     A.    The slip policy.
12     Q.    The slip policy?  And can you
13 give me some indication of what the slip
14 policy looks like.  Is it the equivalent
15 of Exhibit 2, of Exhibit 1, or of nothing
16 we've got here today?
17     MR. RADZIK:  I think to speed
18 things up --
19     A.    It would be closer to 2.  Sorry,
20 to this one.
21     MR. KOSTER:  Number 1.
22     MR. RADZIK:  We produced
23 Exhibits A and B on our first initial
24 response to production of documents.  A
25 and B, I think, are what constitutes the

35

HODGETT

1
2  slip policy, is my understanding.
3      MR. KOSTER:  Okay.
4      Q.    Do you know of your own
5  knowledge what documents get provided to
6  the assured in relation to the policy?
7      A.    No.
8      Q.    You don't know?
9      A.    No.
10     Q.    Now, when this loss was reported
11 to you, at whatever point, did you check
12 the policy to determine when it was the
13 subject of cover?
14     A.    I looked at the policy.
15     Q.    And when you say you looked at
16 the policy, what type of document did you
17 look at?
18     A.    A copy of the slip.
19     Q.    And did you determine anything
20 with respect to the existence of cover for
21 this risk?
22     A.    No.
23     Q.    Why not?
24     A.    I instantly -- I referred it to
25 my lawyers and provided them with what I

36

HODGETT

1
2  then knew for their advice.
3      Q.    And did you ask for their advice
4  with respect to coverage or with respect
5  to a late notice defense?
6      A.    Both.
7      Q.    Did you form an independent
8  judgment as to the extent of cover under
9  the policy?
10     A.    No.
11     Q.    So anything you testify to here
12 today is based upon the opinion of your
13 lawyers?
14     A.    Yes.
15     Q.    What type of cover did you
16 believe to be implicated by the incident
17 which is the subject of this dispute?
18     A.    I passed it to my lawyers
19 regarding advice regarding coverage.
20     Q.    And you formed no opinion before
21 sending it to them and you have no opinion
22 now?
23     A.    Correct.
24     Q.    Is that within the scope of your
25 duties as a claims agent to determine

37

```
1               HODGETT
2  whether a risk is covered?
3      A.    I have the authority to do that,
4  if I decide that is what is best for
5  Wellington.
6      Q.    Well, who has the ultimate
7  authority at Wellington to accept a risk
8  or to decline a risk?
9      A.    I'm sorry.  Are we back to risk
10 or are we on claims still?
11     Q.    Claims.
12     A.    Who has the ultimate authority?
13     Q.    Yes.
14     A.    The ultimate authority is the
15 group head of claims.
16     Q.    In this particular case, did you
17 refer to the group head of claims?
18     A.    No.
19     Q.    Do you know if Wellington has
20 ever declined cover of this claim?
21     A.    No.
22     Q.    It has not?
23     A.    Wellington has never declined
24 cover on this claim.
25     Q.    Do you know who Terry Cornick of
```

38

```
1               HODGETT
2  JLT Risk Solutions is?
3      A.    No.
4      Q.    Were you, as a claims agent,
5  aware that Horizon was engaged in pipe
6  laying operations?
7      A.    At what point?
8      Q.    That that was part of its
9  general business?
10     A.    At some point I became aware
11 that was part of their general business.
12     Q.    Had you dealt with Horizon
13 before?
14     A.    Before this claim?
15     Q.    Yes.
16     A.    It's a name that I knew, but I
17 can't recall precisely why.
18     Q.    Was Wellington as an
19 organisation aware of Horizon's business?
20     A.    Yes.
21     Q.    And do you know what particulars
22 Wellington had with respect to that
23 business?
24     A.    What do you mean by
25 "particulars"?
```

39

```
1               HODGETT
2      Q.    Do you know if any information
3  was provided when the risk was placed?
4      A.    I have no specific knowledge of
5  that.
6      Q.    Would the underwriter who
7  covered the risk know that, the --
8      A.    Yes.
9      Q.    -- the person...
10            And do you know whether
11 Wellington was aware of the Iroquois
12 construction contract when it placed the
13 risk?
14     A.    I don't know.
15     Q.    And do you know who within the
16 Wellington organisation would know that?
17     A.    The underwriter who wrote the
18 risk.
19            MR. KOSTER:  I am going to
20 certainly reserve my rights to supplement
21 the 30 (b) (6) request for a witness with
22 knowledge of these questions.
23            MR. RADZIK:  I'll take that
24 under advisement, but I don't think
25 there's any dispute here about the
```

40

```
1               HODGETT
2  policy.  The policy is here.  We have the
3  policies in black and white, and I don't
4  think there's --
5            MR. KOSTER:  I'm interested in
6  what Wellington knew about Horizon and
7  Horizon's contracts when the risk was
8  placed.
9      Q.    Do you know if Wellington ever
10 requested a copy of any of the contracts?
11     A.    No.
12     Q.    You don't know?
13     A.    No.
14     Q.    Do you know whether Wellington
15 was aware that Horizon was engaged in pipe
16 laying operations with other contractual
17 parties?
18     A.    Can I say?  We aren't
19 disputing.  The policy says what it says.
20     Q.    You really should respond to my
21 question.  I have to ask these questions
22 to find out whether you have any knowledge
23 of the answers.  If you don't, then I know
24 I have to go someplace else.  It may seem
25 repetitive to you, but I need to know
```

41

HODGETT

1 whether you know it or not, because you
2
3 might.
4          Do you know whether knowledge of
5 an assured's business is taken into
6 consideration in setting the premiums?
7     A.   No.
8     Q.   You don't know?
9     A.   Well, not from personal
10 knowledge.
11    Q.   Let me ask, Mr. Hodgett, what is
12 Lloyd's's procedure when it receives a
13 notice that a loss has occurred? I'm
14 talking about a normal procedure now.
15    A.   A normal procedure is that it
16 will check the circumstances of the loss
17 against the policy and check that it's
18 covered, check that the leading
19 underwriter has put appropriate wheels in
20 motion and entry on the system and
21 distributed details of that to all other
22 subscribing underwriters, all other
23 subscribing Lloyd's underwriters.
24    Q.   When you say the leading
25 underwriter, if that's Wellington, is that

42

HODGETT

1 something you would do as the claims
2
3 agent?
4     A.   Is what something I would do?
5     Q.   What you just described, you
6 would open a file, you would notify
7 people, you would determine coverage, that
8 sort of thing.
9     A.   I would look at the risk, look
10 at the incident, and decide what action
11 was appropriate on behalf of Wellington,
12 which may involve appointing surveyors,
13 adjustors, experts, lawyers, or any
14 combination of those.
15    Q.   And, in other words, you would
16 investigate the claim?
17    A.   Yes.
18    Q.   Did you investigate the claim in
19 this instance?
20    A.   No.
21    Q.   Did you seek any additional
22 information regarding the loss?
23    A.   No.
24    Q.   When you open a claim, or you're
25 given a claim, do you assign it a file

43

HODGETT

1
2 number?
3     A.   No.
4     Q.   No in this instance, or no in
5 all?
6     A.   No, Wellington don't assign the
7 file number. Lloyd's does.
8     Q.   And does that happen at
9 Wellington's request?
10    A.   Part of what Lloyd's does, it's
11 part of the service they provide to us.
12    Q.   But, as the leading underwriter
13 in this case, Wellington receives a
14 claim  --
15    A.   Yes.
16    Q.   -- and you ask Lloyd's to
17 register the claim, or whatever
18 terminology is appropriate?
19    A.   Yes.
20    Q.   And did you do that in this
21 instance?
22    A.   Yes.
23    Q.   And did it receive a claim
24 number?
25    A.   Yes.

44

HODGETT

1
2     Q.   And is that claim number
3 reflected in the correspondence you've
4 supplied?
5     A.   No.
6     Q.   Why not?
7     A.   It's not a point of reference
8 that we use externally.
9     Q.   And what's the function of
10 registering the claim with Lloyd's and
11 having it assigned a number and so on?
12 What happens within Lloyd's?
13    A.   It's just on the electronic
14 system.  Then so that the whole
15 subscribing market -- or, sorry, the whole
16 subscribing Lloyd's market can look at
17 that electronic entry whenever they like.
18    Q.   Do you cover the casualty
19 reports from Lloyd's list?
20    A.   Personally, no.
21    Q.   Does your organization do that?
22 Does Wellington do that?
23    A.   I'm assuming by "cover" you mean
24 read?
25    Q.   Either read or have an

45

HODGETT

1
2  electronic comparison with vessels that
3  they cover.
4        A.    Not to my knowledge.
5        Q.    Who would have such knowledge?
6        A.    I don't know.
7        Q.    Do you cover losses in Lloyd's's
8  list?
9        A.    No.
10       Q.    Referring then to Exhibit 2 on
11 page 26, Claims lines 92-93 say, "In the
12 event of any accident or occurrence which
13 could give rise to a claim under this
14 policy, prompt notice thereof shall be
15 given to the underwriter."  Do you see
16 that?
17       A.    Yes.
18       Q.    Who should be given notice?
19       A.    The underwriters.
20       Q.    And does that include all the
21 underwriters?
22       A.    Yes.
23       Q.    Is it the function of the lead
24 underwriter to advise the other
25 underwriters if the lead has been advised?

46

HODGETT

1
2        A.    No.  It's the function of the
3  broker to inform the underwriters which he
4  needs to inform, and it is the function
5  then of Lloyd's for the Lloyd's
6  underwriters and LIRMA for the company
7  underwriters for the following -- to
8  inform the following market.
9        Q.    If there is an assured on a
10 policy or a co-assured not working through
11 a broker, is there anything in this policy
12 that tells him who to notify specifically?
13       A.    I don't know.
14       Q.    Have you examined this policy?
15       A.    I don't know what any additional
16 assured would receive.
17       Q.    Well, if he had the policy, just
18 the policy, is there anything in the
19 policy that tells him who specifically
20 he's to notify his claim to?
21       A.    It tells him to specifically
22 give notice to underwriters.
23       Q.    And does it specify in the
24 policy who that would be and how they're
25 to be contacted?

47

HODGETT

1
2        A.    I don't know.  I haven't read it
3  all.
4        MR. KOSTER:  Let's mark this
5  document as Exhibit 3.
6        (Plaintiff's Exhibit 3, document
7  on the stationery of AON Natural Resources
8  Group, dated May 17, 2004, marked for
9  identification, this date.)
10       Q.    I'm going to place before you,
11 Mr. Hodgett, a document on the stationery
12 of AON Natural Resources Group, dated May
13 17, 2004.  In the upper left-hand corner,
14 it says "To: Underwriters at Lloyd's and
15 Insurance Companies, c/o JLT Risk
16 Solutions," and a number of other
17 insurance companies.
18       Did there come a time that that
19 notice was presented to the underwriters?
20       A.    Yes.
21       Q.    And when was that presented to
22 the underwriters?
23       A.    The 1st of December 2004.
24       Q.    Is it your testimony you were
25 not aware of any claim on this issue

48

HODGETT

1
2  that's in litigation before December of
3  2004?
4        A.    Yes.
5        Q.    Do you recognize any of the
6  parties either stamped or handwritten at
7  the top, "Bennett, LD 0280715," for
8  example?
9        A.    I assume Bennett is Paul
10 Bennett.
11       Q.    Are you able to identify any
12 other stamps on there?
13       A.    No.
14       Q.    Am I mistaken that it's
15 previously been admitted by underwriters
16 that they knew of this claim as of May of
17 2004?
18       MR. RADZIK:  That was a mistake
19 on my part in the -- I was just informed
20 that -- I produced the documents
21 indicating that it was December when
22 underwriters were actually informed.  So
23 my prior statements to -- as to the May
24 17th are a mistake.
25       MR. KOSTER:  As I recall, the

49

```
1                    HODGETT
2   statements appeared in your answer.
3            MR. RADZIK:  Possibly.  That was
4   our previous understanding.
5        Q.   Do you know if anyone within the
6   Wellington organization was aware of this
7   claim in May of 2004?
8        A.   No.
9        Q.   No, you don't know or are you
10  saying outright that you've checked and
11  nobody knows?
12       A.   To my knowledge, nobody at
13  Wellington knows.  Sorry, sorry, knew,
14  before December.
15       Q.   Who was it?  Bryn Thomas came to
16  you in December.  Did he say this is a new
17  claim?
18       A.   I don't recall specifically
19  recall the exact words of the
20  conversation.
21       Q.   Well, what was the basis on
22  which he approached you?
23       A.   He brought the file to me, put
24  it in front of me, and it was clearly the
25  first advice.  I'm sure there was a
```

50

```
1                    HODGETT
2   conversation about that, but I don't
3   recall the specific content.
4        Q.   It was the first advice to you?
5        A.   Yes.
6        Q.   Are you the only claims agent
7   that deals with Borison's claims?
8        A.   Where?
9        Q.   At Wellington.
10       A.   No.
11       Q.   Who else knows?
12       A.   Who else deals with the claim?
13  Any one of us could deal with them.
14       Q.   How many claims agents are you
15  aware of that would deal with this type of
16  claim?
17       A.   Eight.
18            MR. KOSTER:  It's going on
19  11:25.  Can we take a ten-minute break?
20            MR. RADZIK:  Okay.
21            (Discussion held off the
22  record.)
23            (Brief recess.)
24       Q.   Mr. Hodgett, the document that's
25  been marked Exhibit 3, the AON notice in
```

51

```
1                    HODGETT
2   May 17, 2004, did you eventually see this
3   particular document?
4        A.   Yes.
5        Q.   And when did you first see this
6   document?
7        A.   December 2004.
8        Q.   And did you at that point note
9   the date on it?
10       A.   Yes.
11       Q.   And did you ask the
12  representative of JLT that brought to your
13  attention about discrepancy between a May
14  document and a December arrival at your
15  office?
16       A.   I don't recall asking that
17  specific question, but I would have made
18  some comments about the late notification
19  of this claim to the broker.
20       Q.   Do you recall what your comments
21  were?
22       A.   Not my specific verbal comments.
23       Q.   I'm going ask to have marked for
24  identification a batch of messages that
25  bear Bates stamp A 0081 that were produced
```

52

```
1                    HODGETT
2   by AEGIS .
3            (Plaintiff's Exhibit 4, document
4   Bates stamp A 0081, marked for
5   identification, this date.)
6        Q.   Mr. Hodgett, I'm going to ask
7   you to look at Exhibit 4, and let's look
8   at page 5, which is A 0085, and referring
9   to the top there are a number of
10  addressees, parties involved.  Do you know
11  who Jim Montano is?
12       A.   He works for AON in Texas.
13       Q.   And do you know who John
14  McHentin is?
15       A.   No.
16       Q.   Do you know who Liz Monroe is?
17       A.   I can tell from the address
18  where she worked, but I don't know her.
19       Q.   What does the address tell you
20  about where she works?
21       A.   She works for Excel.
22       Q.   And who is that?
23       A.   They're an insurance company.
24       Q.   And do you know what relation
25  they played, role if any they played in
```

53

HODGETT

1
2  this claim?
3       A.    No.
4       Q.    Who is Mike Ticcelli?
5       A.    I don't know.
6       Q.    Anthony Schiavone?
7       A.    From the address, I see he works
8  for Liberty.
9       Q.    Mike Roberts?
10      A.    Works for JLT.
11      Q.    Colin Williams?
12      A.    I know he works for the
13 Steamship Mutual.
14      Q.    And Ron White?
15      A.    I don't know.
16      Q.    Referring then to page 3 of that
17 same series of documents, there's a
18 message from Jim Montano at the bottom on
19 May 17, 2004 to Colin Williams, with
20 various copied parties, and it says, "With
21 respect to coverage under the assured's
22 M & M policy on the Gulf Horizon, such
23 cover does indeed apply to collision
24 and/or contact with fixed and floating
25 objects."  Do you see that?

54

HODGETT

1
2       A.    Yes.
3       Q.    Do you agree with that?
4       A.    The policy provides that
5  coverage, yes.
6       Q.    And referring to the first page
7  of that series of documents, it is a
8  message from Jim Montano at AON to Colin
9  Williams with various copy parties, and
10 I'm reading from the second sentence, and
11 it says, "The claims arising from the
12 event have indeed been referred to M & M
13 Underwriters and we recently sent them a
14 package of correspondence, pleadings,
15 reports and other documents so that they
16 can become familiar with the claims."  Do
17 you see that?
18      A.    Yes, I do.
19      Q.    And that message is dated June
20 10, 2004; correct?
21      A.    Yes.
22      Q.    Do you have any reason to
23 believe that's an inaccurate or incorrect
24 statement?
25      A.    I'm sure that Jim Montano

55

HODGETT

1
2  believed it to be true.  He sent the
3  documents to JLT, but they didn't send
4  them to me, or bring them to me.
5       Q.    Well, he talks about a package
6  of correspondence, pleadings, reports, and
7  other documents.  Was that batch of
8  documents ever brought to Wellington?
9       A.    A batch of documents were
10 brought to Wellington on the 1st of
11 December 2004, which I have no personal
12 knowledge if those are the same ones he's
13 referring to, but no reason to believe
14 they aren't.
15      Q.    They are not?  Did you say you
16 have no reason to believe that they are
17 not or are?
18      A.    That they aren't, are not.
19      Q.    Whatever you saw in December, do
20 you recall seeing pleadings?
21      A.    I believe they were pleadings in
22 the batch of documents I first saw.
23      Q.    Within Wellington, basically
24 involving claims, how are claims for
25 attorney' fees handled?

56

HODGETT

1
2       A.    If it's not any kind of coverage
3  dispute, just a normal defense cost, the
4  broker would collect them from the
5  underwriters and pay the attorneys.  For
6  coverage disputes, they would be paid
7  direct by underwriters through Lloyd's --
8  sorry, Lloyd's underwriters would be paid
9  direct by Lloyd's to the attorneys.
10      Q.    And when Wellington learned
11 about this claim, at whatever time it
12 learned about it, you became aware of the
13 NIPA litigation, did you not, the
14 underlying litigation --
15      A.    Yes.
16      Q.    -- that's the subject matter of
17 the dispute?
18      A.    Yes.
19      Q.    Had you previously been aware of
20 that, had Wellington previously been aware
21 of that?
22      A.    I had not previously been aware
23 of that.  And, to my knowledge, Wellington
24 had not been previously aware of that.
25      Q.    You testified before that, as we

57

HODGETT

1
2  sit here today, Wellington has not denied
3  cover on this claim; is that correct?
4      Q.    Correct.
5      Q.    Do you plan to deny cover?
6      A.    I don't know.
7      Q.    When will that decision be made?
8      A.    I don't know.
9      Q.    Well, it's July, it's been six
10 months, and you've notified at least since
11 December?
12     A.    Uh-hum.
13     Q.    Is there a time-frame within
14 which you normally take action on claims?
15     A.    We have taken action on the
16 claim.
17     Q.    And what's the action you have
18 taken?
19     A.    We have referred it to our
20 lawyers. We will accept their advice.
21     Q.    Well, can I take it then, since
22 you've not declined cover, that their
23 advice has not been -- has been to not
24 decline cover?
25         MR. RADZIK:  Object to the form

58

HODGETT

1
2  of the question. I think you started to
3  probe into attorney/client privileged
4  information.
5      Q.    Have you at this point received
6  advice from your attorneys?
7      A.    We have received a lot of advice
8  from our attorneys.
9      Q.    And you have not yet declined
10 cover --
11     A.    No.
12     Q.    -- as of this date?
13     A.    Correct.
14     Q.    If Lloyd's had received the
15 notice that it received at some point in
16 2004 in February or March of 2003, would
17 its response have been different?
18     A.    Yes.
19     Q.    And how would it have responded?
20     A.    I would have instructed a
21 surveyor, I would have instructed whatever
22 experts were there. We could have become
23 involved in the repair that, at that time,
24 would have been ongoing, we could have had
25 some say in that, we would have instructed

59

HODGETT

1
2  counsel. At that time, we could have
3  investigated certain possibilities at that
4  time. We could have done all manner of
5  things at that time. We could have --
6  and -- but we were denied that
7  opportunity.
8      Q.    Would you have advised the
9  insured not to defend the matter?
10     A.    I don't know what my advice to
11 the insured would be.
12     Q.    Would Wellington have instructed
13 the insured not to retain expert
14 witnesses?
15     A.    Wellington would have retained
16 its own experts and would have judged the
17 claim on the merits of what those experts
18 said. Wellington would have instructed its
19 own surveyors and would have judged the
20 matter on the basis of what they said and
21 Wellington would have instructed counsel
22 on behalf of itself and probably the
23 insured jointly.
24     Q.    When you were notified, did you
25 instruct experts or surveyors?

60

HODGETT

1
2      A.    No.
3      Q.    Do you know if there are any
4  defenses that Iroquois asserted in the
5  NYP/NIPA litigation that you would have
6  directed them not to assert if you had
7  been advised earlier of the claim?
8      A.    I don't know.
9      Q.    Are there any defenses that you
10 would have demanded that Iroquois assert?
11     A.    I don't know.
12     Q.    Have you ever been precluded
13 from participating in the litigation?
14     A.    We have been precluded from
15 participating in the litigation, certainly
16 for in excess of a year, because we were
17 unaware of it.
18     Q.    But since that time?
19     A.    Since that time, I believe we've
20 joined the litigation.
21     Q.    And how have you joined the
22 litigation, the underlying litigation?
23         MR. ZERBE:  I'm going to object
24 to the form. Could we get some
25 clarification? There's been a lot of

61

```
                    HODGETT
 1
 2   reference to "the litigation."
 3          MR. KOSTER:  I'm referring to
 4   the underlying litigation surrounding the
 5   claim.
 6          MR. ZERBE:  The limitation
 7   proceeding?
 8          MR. KOSTER:  The limitation
 9   proceeding.
10      Q.    Have you participated in that at
11   all?
12      A.    I don't know what my lawyers
13   have done regarding that.
14      Q.    Let me ask you to refer again to
15   Exhibit 2, I believe it is, and page 10,
16   and just above -- about the middle of the
17   page, there's a portion that says "Agree
18   allow 20 percent no claims bonus hereon,
19   based on net premiums paid, collectable at
20   expiry, subject no paid claims hereon in
21   respect of the following security only."
22   What's a no claims bonus?
23      A.    It means that they would receive
24   a return of 20 percent of the premium if
25   they didn't make a claim on the policy
```

62

```
                    HODGETT
 1
 2   during its period.
 3      Q.    Do you know if that provision
 4   was contained in the provided documents in
 5   Exhibit 1?
 6      A.    Provided by whom to whom?
 7      Q.    I assume provided by the brokers
 8   to Horizon and then to Iroquois?
 9      A.    This?
10      Q.    Yes.
11      A.    Without looking, I don't know.
12      Q.    Referring to page 210 of
13   Exhibit 2.
14      A.    Uh-hum.
15      Q.    It says, "In the event of a loss
16   to this policy involving two or more
17   deductible, the single highest deductible
18   shall apply."  Do you know what the basis
19   for that clause was?
20      A.    It means that the insured would
21   never have to bear more than one
22   deductible if an accident or a mishap
23   involves more than one section of the
24   policy.
25      Q.    Do you know when it was agreed
```

63

```
                    HODGETT
 1
 2   to?
 3      A.    Do I know when it was agreed
 4   to?  I imagine it's in the original slip.
 5      Q.    And that would be the basis for
 6   your answer?
 7      A.    Yes.
 8      Q.    Did you at any point establish a
 9   reserve for this claim?
10      A.    No.
11      Q.    Do you know if Wellington was
12   ever advised of this claim via the
13   Skufilis law firm --
14      A.    No.
15      Q.    -- or Horizon?
16      A.    I'm sorry, or -- what do you
17   mean?
18      Q.    Or by Horizon.
19      A.    No.
20      Q.    When were you first notified of
21   the claim by Horizon?
22      A.    I have never been advised of the
23   claim direct by Horizon.
24      Q.    Have you communicated on this
25   matter with Colin Williams at Steamship
```

64

```
                    HODGETT
 1
 2   Mutual?
 3      A.    No.
 4      Q.    Have you communicated with a
 5   Willie Farmer?
 6      A.    No.
 7      Q.    When's the last time you
 8   communicated with anybody, apart from your
 9   attorneys, on this matter?
10      A.    Last Thursday or Friday.
11      Q.    And who was that?
12      A.    Tim Friday.
13      Q.    At?
14      A.    Price Forbes.
15      Q.    And what was the nature of that
16   exchange?
17      A.    I asked for copies of the JLT
18   files.
19      Q.    And did you receive copies of
20   these files?
21      A.    Yes.
22      Q.    And what was the purpose for
23   your asking for those files?
24      A.    Because my attorney asked me to
25   obtain them.
```

65

HODGETT

1
2          (Plaintiff's Exhibit 5,
3  documents Bates stamped A 180 and A 181,
4  marked for identification, this date.)
5      Q.   Mr. Hodgett, I place before you
6  a document which is an e-mail exchange
7  between the JLT Group and Colin Williams
8  of Steamship Mutual for AEGIS, dated 4
9  March 2005, and there is a quote, down
10  about the middle of the page, quoting from
11  a message from Colin Williams, saying,
12  "Accordingly, please advise whether hull
13  underwriters accept that this matter is a
14  matter for them, rather than AEGIS..." Do
15  you see that?
16      A.   Sorry.  Where?  Show me where it
17  is.
18      Q.   It's the quote right here.
19      A.   Yes, I see that.
20      Q.   And were you asked about that in
21  March of this year?
22      A.   I believe I received a copy of
23  this from Paul Bennett.
24      Q.   And that's date March 4 --
25      A.   Yes.

66

HODGETT

1
2      Q.   -- 2005?
3      A.   Yes.
4      Q.   When did you receive a copy?
5      A.   I assume the same day.
6      Q.   Okay.
7          MR. KOSTER:  And the documents
8  that were produced here today, let's mark
9  those as Exhibit 6.  Can you mark this and
10  give it to the witness.
11          (Plaintiff's Exhibit 6, batch of
12  printed out e-mail exchanges comprising
13  documents from witness's file commencing
14  April 1st, marked for identification, this
15  date.)
16      Q.   Now the batch of documents we've
17  mark as Exhibit 6 were documents produced
18  to us by your counsel this morning, and I
19  believe you describe those as comprising
20  documents from your file; correct?
21      A.   They actually came from JLT's
22  file.
23      Q.   Did they include exchanges with
24  you?
25      A.   Yes, they do.

67

HODGETT

1
2      Q.   And they commence on April 1st,
3  correct?
4      A.   Yes.
5      Q.   So this document marked
6  Exhibit 5 that was sent on March 4, which
7  you said you received shortly thereafter,
8  is not included in that batch; is that
9  correct?
10      A.   If you say so.
11      Q.   Well, I'm just referring to the
12  documents.  Let me clarify again.  I'm
13  unclear.  Have you produced what's in your
14  file to your attorneys or what's in JLT's
15  file that JLT gave to you?
16      A.   Both.
17      Q.   And which documents came from
18  your file?  Any documents produced here
19  today -- did any of the documents produced
20  here today come from your file, that exist
21  only in your file?
22      A.   No.
23      Q.   So if I understand it, the only
24  things you've produced are things that
25  have been produced to you by other people;

68

HODGETT

1
2  you haven't produced any part of your
3  file?
4      A.   The only things I have in my
5  file are things that are produced to me by
6  other people.
7      Q.   Well, just to state this as an
8  example.  If you sent the matter to
9  Mr. Kimmitt, did you send a letter to him?
10      A.   I forward things by e-mail to
11  Mr. Kimmitt.
12      Q.   So there's an e-mail?
13      A.   There are e-mails in my file
14  from me to my lawyer.
15      Q.   And are there e-mails in your
16  file to you from anybody else --
17      A.   No.
18      Q.   -- that haven't been produced?
19      A.   I don't know what's being
20  produced here.
21      Q.   Well, I'm going to ask that you
22  examine that and ask your counsel to
23  report back to me if there's something
24  that has not been produced that's in your
25  files?

69

HODGETT

1
2     A.    Well, my counsel has a full copy
3  of my file.  I'm sure that my counsel has
4  produced to you everything that, in his
5  opinion, you should have.
6     Q.    Are you aware that there was a
7  4/4ths running down cover for this type of
8  loss on both the hull policy and the P & I
9  policy?
10    A.    I became aware of that.
11    Q.    And is that in your experience
12 unusual?
13    A.    Yes.
14    Q.    Have you ever seen it before?
15    A.    I don't remember.
16    Q.    Do you know why, from your
17 experience, in circumstances where a loss
18 would be covered by two policies, why one
19 would be notified and not the other?
20    A.    I'm sorry, can you repeat that.
21          (Question read.)
22    A.    No.
23    Q.    Let me direct your attention to
24 the documents that were produced this
25 morning, and those have now been placed

70

HODGETT

1
2  before you as Exhibit 6.  Are there any
3  documents missing from this series?
4     A.    I don't know.
5     Q.    Well, let's cover the first
6  message, which is the message of April 1,
7  2005, from yourself to Paul Bennett.
8     A.    Uh-hum.
9     Q.    And what was the purpose of that
10 message?
11    A.    To inform Paul Bennett that the
12 e-mail that he had sent to me I had
13 forwarded to my lawyer.
14    Q.    And that e-mail was the one from
15 Willie Farmer to Paul Bennett?
16    A.    Yes.
17    Q.    Did you respond to this at all
18 verbally?
19    A.    No.
20    Q.    And the comment is WBF Willie
21 Farmer?  It's at the bottom of the page?
22    A.    Yes.
23    Q.    And he states at the end of
24 this, his middle paragraph there, the long
25 paragraph, "I am not sure the

71

HODGETT

1
2  unintentional delay in their received
3  notification would have affected the
4  situation."  Did you see that?
5     A.    I see that.
6     Q.    Did you comment on that that?
7     A.    No.
8     Q.    Did you deny it at the time?
9     A.    No.
10    Q.    And in the middle of that
11 paragraph, he states: "Granted the towers
12 clauses request the underwriters provide
13 in writing permission to enter into a
14 limitation action, but in this instance we
15 believe such permission would have been
16 granted with the circumstances known at
17 the time."  Did you comment to him
18 verbally on that?
19    A.    No.
20    Q.    Did you dispute it?
21    A.    No.
22    Q.    Did you review the section of
23 the policy itself to determine whether
24 permission was required with respect to
25 the limitation action portion of that

72

HODGETT

1
2  clause?
3     A.    No.
4     Q.    Do you have any opinion on that?
5     A.    No.
6     Q.    Referring then to the -- it's
7  about the fifth document.  It's from Paul
8  Bennett to Willie Farmer, at the top,
9  dated April 8, 2005, and at the bottom of
10 the page is a message from Paul Bennett to
11 John Hodgett.  It says  -- I'm sorry, I'm
12 referring to the one at the very bottom,
13 which is from Willie Farmer to Paul
14 Bennett.  It says "The assured has been
15 awaiting a response from H & M
16 Underwriters regarding their coverage in
17 this matter since December 2004, following
18 referral to coverage counsel."  Did you
19 respond to that in April?
20    A.    Yes.
21    Q.    And how did you respond?
22    A.    By the e-mail that's dated the
23 8th of April.
24    Q.    And could you read that,
25 please.

73

HODGETT

1
2      A.    "No answer is due from us until
3   the 19th of April.  Meantime, Jerry
4   Kimmitt is in contact with Horizon and he
5   tells me that they have no problem with
6   his or our position.  Jerry will be
7   issuing a full coverage opinion in the
8   next week or so.  And on receipt of name,
9   we will provide our considered response.
10      "Please also remind Willie that
11   it took the insured or their brokers 22
12   months to advise us of this loss and their
13   current pressure is not appreciated."
14      Q.    What was the basis of your
15   statement that no answer was due until
16   April 19th?
17      A.    The action that was taken
18   against us -- I think -- I think there
19   should be another e-mail from me to Paul
20   Bennett on the 11th of April clarifying
21   that.
22      Q.    Can you tell me how many pages
23   down you are?
24      A.    It's 1 of 4 on the third --
25      Q.    How many down from the top?

74

HODGETT

1
2      A.    Of the third batch.  I'm sorry,
3   it's five batches down from the top.
4      Q.    I'm sorry, I'm still not finding
5   it.
6      MR. SCHMIDT:  It's about four
7   pages down from where we were.
8      Q.    And what's the date of that?
9      A.    The 11th of April.
10      Q.    10:50?
11      A.    Yes.
12      Q.    And what was that response?
13      A.    "Paul, 19th of April is the day
14   our answer is due in Iroquois' demand for
15   additional insured status, which to my
16   knowledge is the only claim being made
17   against us.  Horizon have made no demands
18   upon us for either defense or indemnity.
19   Or am I missing something?"
20      Q.    Going back to the reference that
21   I directed you to initially, which was the
22   message of April 8 that you're referring
23   to, you state that Jerry Kimmitt is in
24   contact with Horizon and he/me that they
25   have no problem with his or our position?

75

HODGETT

1
2      A.    Sorry, where am I looking?
3      Q.    You're looking at the message of
4   April 8.
5      MR. SCHMIDT:  First page of the
6   third bundle.
7      A.    Okay.
8      Q.    What was your position at that
9   time?
10      A.    My position was that Gerry
11   Kimmitt was dealing with it.
12      Q.    Well, that's not what you say.
13   You say that "Horizon has no problem with
14   his or our position."
15      A.    Uh-hum.
16      Q.    And your testimony is that the
17   position you were referring to was simply,
18   what?
19      A.    Is the position that Gerry told
20   Horizon on our behalf.
21      Q.    And what did he tell Horizon on
22   your behalf?
23      A.    I don't know.
24      Q.    Was there a difference between
25   his position and your position?

76

HODGETT

1
2      A.    He's my lawyer.  He expounds my
3   position.
4      Q.    Do you know what he expounded on
5   your behalf to Horizon?
6      A.    No.
7      Q.    Referring to your response,
8   which was on the 11th, there is a message
9   at the bottom there from Willie Farmer to
10   Paul Bennett.
11      A.    Uh-hum.
12      Q.    It says, at the top of the next
13   page, "Regardless, my main objective is to
14   secure focus on the claim being presented
15   by NAPA/Iroquois/Thales, try and work
16   through the difficulty of the delayed
17   report and hopefully equally place the
18   responsibility for this claim on the
19   rightful parties."  And did you receive a
20   copy of that?
21      A.    Yes.
22      Q.    And did you respond to that?  Or
23   is that your response of April 11th?
24      A.    That seems to be the next e-mail
25   in the sequence.

77

HODGETT

Q.    Am I correct that the next
document is just a duplicate in the packet
that I have, is just a duplicate of the
prior one?  It has Paul Bennett April 11
up on top, 10:52.  Now there's another one
at 10:54.  Is that a different document?

A.    I don't -- I mean, this
(indicating) has just got a thanks to me
from Paul Bennett.

Q.    Now, the following document is
also dated April 11 and it's time dated
1613 hours, and that is a continuation of
this series;correct?

A.    It's a continuation of
correspondence between Paul Bennett and
Willie Farmer, but not copied to me.

Q.    Was that copied to you at the
time?

A.    These, the top two e-mails, were
not copied to me at the time.

Q.    And you came into possession of
them when?

A.    Last Friday.

Q.    And how did that -- because you

78

HODGETT

went to JLT and asked -- I'm sorry, to --

A.    Because Price Forbes provided me
with copies of JLT's files.

Q.    And this one is from Paul
Bennett to Willie Farmer saying, "Can you
contact Horizon to see if a cert was
issued by AON to Horizon for contract work
with Iroquois on this policy 12 months
1/5/2000." Do you know what that's in
reference to?

A.    No.

Q.    Do you know if it's in reference
to this claim?

A.    The heading is this claim.

Q.    Now, referring to the last -- I
believe it's the last batch of documents
in Exhibit 6, again, is this documents
produced to you or did you see these
documents at the time?

A.    The correspondence after --
after my e-mail of 10:50 on April the
11th, I did not see at the time.

Q.    At the bottom of the first page,
in a message from Willie Farmer to Paul

79

HODGETT

Bennett, it says, "Thanks, Paul, for
John's response."  I take it that's a
reference to your response?

A.    I think so, yes.

Q.    "Perhaps we are getting the cart
before the horse or maybe I am the one
missing something.  I will be having some
discussions here before going further.  I
had thought a request to consider defense
and indemnity had been provided to H & M
Underwriters.  Will revert soonest."  Do
you know what request he's referring to
there, whose request?

A.    Previous correspondence in that
sequence discusses Horizon.

Q.    And so it's based on your
response that Horizon have made no demands
upon us for either defense or indemnity?

A.    I imagine so.

Q.    Is that a correct statement?

A.    Yes.

Q.    And what did you examine or who
did you ask to determine whether Horizon
had made no request for defense or

80

HODGETT

indemnity?

A.    Horizon have made no request of
me for either defense or indemnity.

Q.    Of you?

A.    Of Wellington.

MR. KOSTER:  Let me have just a
few minutes.

(Brief recess.)

Q.    Mr. Hodgett, we dropped off by
saying that Horizon had made no demand for
either defense or indemnity.  You don't
dispute, do you, that Iroquois has
incurred legal fees on this limitation
action, do you?

A.    I don't dispute that.

Q.    And Iroquois has sought coverage
for those fees; correct?

MR. ZERBE:  Objection to form.

A.    So I don't really understand
what you mean by that, "has sought
coverage for those fees."

Q.    Iroquois has submitted a claim
for those fees to the hull underwriters?

MR. RADZIK:  Objection to the

81

HODGETT

form. .

    MR. ZERBE:  Objection to form.

    A.    I don't recall specifically
seeing a demand from Iroquois for
reimbursement of specific fees.

    Q.    Of specific fees?

    A.    Uh-hum.

    Q.    But they have made a claim for
attorneys' fees; correct?

    MR. RADZIK:  Are we talking
about by virtue of the client that was
filed against its underwriters?

    MR. KOSTER:  The limitation
action.  Fees arising out of the
limitation action as claimed in the
action.

    MR. RADZIK:  In this action?

    MR. KOSTER:  Yes.

    A.    Sorry, backtrack.

    Q.    I'm just asking you if Iroquois
has made a claim for their legal fees;
isn't that correct?  They have?

    A.    Yes.

    MR. KOSTER:  Now, a couple of

82

HODGETT

documents that were produced the day
before yesterday --

    MR. RADZIK:  Last Friday, I
believe.

    MR. KOSTER:  -- let's mark as --
you wanted to mark the first one first.
This one doesn't have a date. I can't
tell.

    MR. RADZIK:  I think the
signatures are dated.

    MR. KOSTER:  Let's mark this --
let's mark the document dated November 15,
2004 as 7 and the document with the words
"assured Horizon offshore, Inc., as 8.

    (Plaintiff's Exhibit 7, document
dated November 15, 2004, marked for
identification, this date.)

    (Plaintiff's Exhibit 8,
Reservation of Rights letter with the
words "Assured Horizon Offshore, Inc.,"
marked for identification, this date.)

    Q.    Now, referring to these
documents, which your counsel has
produced, the first one, No. 7, dated

83

HODGETT

November 15, 2004, is from Jim Montano,
who is at AON -- correct?

    A.    Correct.

    Q.    -- to Paul Bennett at JLT;
correct?

    A.    Yes.

    Q.    And this recites the claim by
Healy & Baillie acting for Iroquois for
defense and indemnity; correct?

    A.    Yes.

    Q.    And when did this come to your
attention?

    A.    Either on or shortly before the
1st of December.

    Q.    On or shortly before the 1st of
December?

    A.    The 1st of December.

    Q.    And in what context did it come
to your attention?

    A.    It was brought to me by JLT.

    Q.    Along with everything else at
that time?

    A.    Along with whatever else that
was in their file at that time.

84

HODGETT

    Q.    And the handwriting at the
bottom, whose handwriting is that?

    A.    Mine.

    Q.    And I think I can read it, but
just in case we run into trouble later,
could you read what you inscribed down
there.

    A.    It says "WF, leader has referred
file to Jerry Kinmitt of Legge Farrow,
etcetera, Houston, for opinion regarding"
late -- sorry, "for opinion regarding
coverage/late notice and will respond when
received.  Meantime, insured must act as
prudent uninsured."

    Q.    And what are the words to the
left of "meantime"?

    A.    To the left of that, it says,
"if package policy is alleged to provide
cover," and there is following on in
that -- this is not a complete copy.  The
bottom has been cut off of this.

    Q.    Can you tell me, do you recall
what you wrote down there?

    A.    It says something along the

85

HODGETT

1 lines of broker to provide full coverage
2 details.
3     MR. KOSTER:  Could I ask for a
4 full copy of this in due course.
5     MR. RADZIK:  I'll try to get it,
6 but this will be in the original file of
7 JLT.  We don't have copies of it.
8     MR. SCHMIDT:  That would be the
9 claims file you're speaking of, Ed?
10    MR. RADZIK:  Yes.
11    Q.   Where do you keep a note of what
12 you wrote on this?
13    A.   On the broker's file.
14    Q.   So if JLT brings you this and
15 you write a note on it and you give it
16 back to him --
17    A.   Yes.
18    Q.   -- what if later on there's any
19 dispute as to what was said or what you
20 wrote?  Don't you keep a log or some
21 indication of what it is -- what action
22 you take when claims are brought to you?
23    A.   No.
24    Q.   None whatsoever?

86

HODGETT

1     A.   Not always.  Or not often.
2     Q.   Do you make an entry into a
3 computer file?
4     A.   In this instance, I don't recall
5 precisely what I sent to Gerry that day.
6     Q.   Well, I'm not talking
7 specifically about what you said to
8 Gerry.  I'm talking about you taking
9 action on a claim --
10    A.   Yes.
11    Q.   -- and presumably for
12 Wellington's own protection -- and
13 yours  -- you would want to make an
14 internal record of the action you took,
15 not just write it down on somebody else's
16 piece of paper and give it back to them.
17    MR. RADZIK:  Objection to the
18 form of the question.  You can answer.
19    A.   There's a system of trust in the
20 London market where if I write something
21 on a broker's file, I don't feel the need
22 to copy it, to take a copy in the
23 assumption that he might destroy it if he
24 doesn't like it.

87

HODGETT

1     Q.   So, in any event, since you
2 recently asked JLT for a copy of their
3 file, do I still have -- is this the copy
4 that they provided you with?
5     A.   Yes.
6     Q.   So if you called them back and
7 said, "Could you give me a full copy,"
8 they'd presumably send it over?
9     A.   Yes.
10    Q.   Based on this trust?
11    A.   Yes.
12    Q.   Let's refer then to Exhibit 8.
13 Can you tell me what that is?
14    A.   That's a reservation of rights
15 letter.
16    Q.   And I notice it doesn't bear a
17 specific date?
18    A.   Each individual signature bears
19 its own date.
20    Q.   And who prepared this document?
21    A.   This was actually prepared by
22 Zurich.
23    Q.   And is Zurich one of the
24 underwriters on the loss?

88

HODGETT

1     A.   Well, the leading company on the
2 loss.
3     Q.   Define "leading company" as
4 opposed to "lead underwriter."
5     A.   The slip comprised -- is a
6 subscription slip comprising both Lloyd's
7 syndicates and insurance companies in
8 London.  Wellington is the lead
9 underwriter by virtue of being the first
10 signature on the slip.  Zurich is the lead
11 company by virtue of being the first
12 insurance company that signed up to the
13 slip.
14    Q.   And it starts out by saying,
15 "This notification constitutes ZGE's
16 first advice of the existence of this
17 loss."  And where is ZGE's signature and
18 date?
19    A.   Immediately underneath, dated
20 the 9th of December '04.
21    Q.   And whose signature is that?  Do
22 you recognize it?
23    A.   That's Jeff Jones.
24    Q.   And when he says at the end of

89

HODGETT

1             HODGETT
2  the first paragraph, "Such reservation of
3  rights to include all brokers involved in
4  the advising of underwriters," what does
5  that mean, to you?
6      A.    That means he's including in the
7  reservation both AON and JLT.
8      Q.    Reserving rights against them or
9  reserving their rights?
10     A.    Reserving rights against them.
11     Q.    Second paragraph says that
12  "Insurers would point out..." and it
13  continues, "... that they require copies
14  of all correspondence related to the
15  loss." Did you provide them with copies
16  of all correspondence related to the loss?
17     A.    This reservation of rights is
18  addressed to the insured.
19     Q.    Well, to whom was it delivered?
20     A.    To JLT.
21     Q.    And I notice at the top it says
22  page 1 of 2.  What was the second page?
23     A.    It doesn't.  That doesn't appear
24  to be actually a part of this document.
25  It appears to be a document that was

90

HODGETT

1  underneath it, at the point of photocopy.
2     Q.    And this obviously came off a
3  file someplace, because there are file
4  holes in the top?
5     A.    Yes.
6     Q.    And would that be JLT's file?
7     A.    JLT's file.
8     Q.    Did you keep a copy of this file
9  in your files at all?
10     A.    No.
11     Q.    Of this document, rather?
12     A.    No.
13     Q.    Now, at the bottom, it says "ZGE
14  do not concur with the Lloyd's leaders'
15  instruction of Gary Kimmitt of Legge,
16  Farrow & Kimmitt.  ZGE will discuss with
17  the leader and revert."
18     A.    Yes.
19     Q.    The word "ambiguous," does it
20  mean that they -- does it mean, to you,
21  that they don't agree with Mr. Kimmitt's
22  advice or that they don't agree that you
23  ought to have sent it to Mr. Kimmitt, or
24  do you know?

91

HODGETT

1     A.    At the 8th of December, Zurich
2  did not agree that I should have sent it
3  to Gerry Kimmitt.
4     Q.    Was there any particular reason
5  that they gave you for that --
6     A.    Yes.
7     Q.    -- verbally?
8          What was that?
9     A.    The reason was that they had
10  been advised that the firm of Legge Farrow
11  had accepted a case of a plaintiff against
12  the London market that subsequently turned
13  out to be untrue rumor, and as you will
14  see underneath, Jeff Jones has crossed
15  that out and has put, "having discussed
16  with leaders at GE, now agree the
17  instruction of Gerry Kimmitt."
18     Q.    And who are the other signatures
19  on here?  Can you just give me briefly the
20  identities, if you can tell from the
21  markings?
22     A.    The noted and agreed immediately
23  below Jeff Jones is me.  The signature in
24  the bottom corner with all the numbers

92

HODGETT

1  against it is John Gaughan.  The writing
2  in the bottom left-hand corner, which is
3  incomplete on this copy, is Pat Gleason at
4  the Munich Re, and the other four, I don't
5  specifically recall.
6     Q.    Referring to Exhibit 5 of the
7  documents produced by your counsel, July
8  14, 2005, can you tell me what that
9  document is.  It's entitled "Master
10  Service Agreement No. 98-3083."
11     A.    No.
12     Q.    You don't know what it is?
13     A.    Well, I know it's a master
14  service agreement between Horizon
15  contractors and Racal.
16     Q.    Do you know why it was produced?
17     A.    No.
18     Q.    Have you ever seen it before?
19     A.    No.
20          MR. KOSTER:  No further
21  questions.
22  EXAMINATION BY MR. ZERBE:
23     Q.    Good afternoon, Mr. Hodgett.  My
24  name is Rodney Zerbe.  I am an attorney

93

```
 1              HODGETT
 2  representing AON Risk Services of Texas,
 3  Inc. in this matter.  I'm just following
 4  up on some of the questions from this
 5  morning.  Have you had any communications
 6  with any employees of Horizon with respect
 7  to this claim?
 8      A.    No.
 9      Q.    You referenced the engagement of
10  Gerry Kimmitt of Legge, Farrow & Kimmitt.
11  On whose behalf was Mr. Kimmitt engaged,
12  or is he currently engaged?
13      A.    Underwriters.
14      Q.    Which underwriters?
15      A.    Underwriters subscribing to the
16  hull and machinery policy.
17      Q.    That would include Zurich and
18  other non Lloyd's underwriters?
19      A.    Yes.
20      Q.    Has he been retained on behalf
21  of all of the underwriters subscribing to
22  the hull and machinery policy?
23      A.    Yes.
24      Q.    I'm asking you to look at the
25  larger policy document attached as
```

94

```
 1              HODGETT
 2  Exhibit 1 to Lloyd's supplemental
 3  production of July 12th.
 4          MR. RADZIK:  Marked here as
 5  Exhibit 2?
 6          MR. ZERBE:  Marked as Exhibit 2
 7  today.
 8      A.    Okay.
 9      Q.    Looking on the first page of
10  that document, do you recognize the
11  initials at the bottom of that page?
12      A.    I recognize one of them.
13      Q.    Which one?  There is one that is
14  slightly above the other.
15      A.    The lower of the two.
16      Q.    And whose initials are those, to
17  your understanding?
18      A.    That's Tim Burrows.
19      Q.    And who is Tim Burrows employed
20  with?
21      A.    Wellington.
22      Q.    And there's a date there.  Do
23  you have an understanding of what this
24  date reference indicates?
25      A.    That would be the date that Tim
```

95

```
 1              HODGETT
 2  Burrows saw it.
 3      Q.    Okay.  It's dated 7/4/05.  Would
 4  that be April 7th of '05?
 5      A.    Yes.
 6      Q.    And if you'll go to the last
 7  page of Exhibit 2, which is page 234 --
 8      A.    Uh-hum.
 9      Q.    -- again, do you recognize
10  either of the initials on that page?
11      A.    Yes, the lower one.
12      Q.    Is that Mr. Burrows's initials
13  as well?
14      A.    That, too, is Tim Burrows.
15      Q.    And does that bear the same
16  April 7th, 2005 date?
17      A.    Yes.
18      Q.    What is the purpose of those
19  signatures, to your understanding?
20      A.    Is to signify that the
21  underwriters have seen the full wording of
22  the policy.
23      Q.    And is it, to your
24  understanding, customary that all
25  underwriters subscribing to the policy
```

96

```
 1              HODGETT
 2  would initially a policy for this purpose?
 3      A.    No.  Just the leaders.
 4      Q.    And would it be customary that
 5  the leader would initial the first and the
 6  last pages of the policy?
 7      A.    Yes.
 8      Q.    But not every individual page?
 9      A.    Not every individual page.
10      Q.    So, to your understanding, the
11  initialing of this policy was in
12  accordance with the ordinary custom of
13  Lloyd's?
14      A.    Somewhat late, but yes.
15      Q.    If you'll turn to page 9 of
16  Exhibit 2, the paragraph about a third of
17  the way down, being "It is understood and
18  agreed," I'll ask you to read that to
19  yourself and then indicate to me when
20  you've finished reading it.
21      A.    "It is understood and agreed --"
22      Q.    No, you don't have to read it
23  for the record.
24      A.    Yes.
25      Q.    Have you reviewed that provision
```

97

HODGETT

```
1
2   prior to just now in connection with your
3   role with regard to the February 27th,
4   2003 casualty involving the New York Power
5   Authority cable?
6       A.    No.
7       Q.    I believe you testified earlier
8   today about a provision in the policy
9   about providing coverage for additional
10  assureds where required by contract.  Do
11  you recall that testimony?
12      A.    I recall it being brought up.  I
13  don't recall specifically.
14      Q.    Could you look in the AON notice
15  of Plaintiff's Exhibit 3.  There is
16  handwriting which is partially obscured by
17  some fax lines at the top of this
18  Plaintiff's Exhibit 3 --
19      A.    Yes.
20      Q.    -- appears to be attention Paul
21  Bennett.  Do you recognize that
22  handwriting?
23      A.    No.
24      Q.    That's not your handwriting?
25      A.    No.
```

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                              516-608-2400

98

HODGETT

```
1
2       Q.    Below that, there is
3   handwriting -- and I'll just read it --
4   LD 0280715/005.  Do you have any
5   understanding as to the significance of
6   that number?
7       A.    I imagine it's JLT's reference
8   number.
9       Q.    The same number -- well, there's
10  a number that appears at the bottom of
11  this exhibit, under claim number --
12      A.    Uh-hum.
13      Q.    -- which indicates LD 0290715.
14  So is it your testimony that this would be
15  the claim number assigned by JLT Risk?
16      A.    Yes.
17      Q.    Did Lloyd's use this claim
18  number or did Wellington use this claim
19  number with respect to any dialogue
20  arising out of this notification?
21      A.    It's not a number that is of any
22  use or reference to Wellington, but I may
23  have used the number, if I had copied and
24  pasted a heading back to Paul Bennett, but
25  I don't recall doing so.
```

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                              516-608-2400

99

HODGETT

```
1
2       Q.    Is it your understanding that it
3   would be similar for JLT Risk to assign
4   its own claim number upon receiving notice
5   of the claim on a hull insurance policy?
6       A.    Yes.
7       Q.    I believe you were asked these
8   questions, but just to clarify:  There's
9   two, appears to be, receipt stamps on this
10  document.  One appears to be dated 18th of
11  May 2004 and the other appears to be dated
12  25th of May 2004.  You don't recognize the
13  format of either of those stamps?
14      A.    No.
15      Q.    You have no knowledge as to who
16  placed the stamps on this copy --
17      A.    No.
18      Q.    -- of the document?
19            Do you recognize the initials
20  beneath the May 25th, 2004 stamp?
21      A.    No.
22      Q.    Now, this report appears to
23  indicate the listing of the interests of
24  the various participants in the hull
25  insurance.  Do you see that, under the
```

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                              516-608-2400

100

HODGETT

```
1
2   caption "Security"?
3       A.    Yes.
4       Q.    And there was some testimony
5   with regard to Zurich.  Would Zurich be
6   included within the underwriters at
7   Lloyd's's 90 percent interest in this
8   policy?
9       A.    It says underwriters at Lloyd's
10  and insurance companies in Zurich would be
11  included in that.
12      Q.    And this indicates that the
13  notification to underwriters at Lloyd's
14  and insurance companies was addressed care
15  of JLT Risk Solutions, Ltd.  Do you see
16  that?
17      A.    Yes.
18      Q.    To your understanding -- well,
19  did you have any direct communications
20  with any representative of AON Risk
21  Services of Texas, Inc. -- and from here
22  on out I will refer to that entity by the
23  name AON -- with regard to this
24  circumstance?
25      A.    No.
```

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                              516-608-2400

101
HODGETT

Q.    Was there a, to your
understanding, a custom or practice with
regard to the channel of communication to
underwriters having the 90 percent
interest in the hull insurance policy,
and, in particular, whether such
communications should be addressed to JLT
Risk Solutions, Ltd?

MR. RADZIK:   I object to the
form of the question.  If you can
understand it.

A.    How many questions were in
there?

Q.    Was it your understanding that
that communications to the insurers
subscribing to the 90 percent interest on
the marine and hull insurance for Horizon
were to receive communications through JLT
Risk?

A.    It would be customary for the
routing to be from AON to JLT to
underwriters.

Q.    Are you aware that any facts
with regard to this circumstance indicate

102
HODGETT

that that was not the method of
communication that was followed?

A.    I'm not aware of any
circumstance in this particular loss that
would change that routine of
communication.

Q.    Are you aware of any
communications that were done outside that
ordinary, customary routine of
communication?

A.    Whilst they were the brokers,
no.

Q.    They, being?

A.    AON and JLT.

Q.    Was there a change in the
channels of communications with regard to
this circumstance at some point in time?

A.    Yes.

Q.    And when did that change occur?

A.    I don't know exactly when it
occurred, but the American broker changed
from AON to a firm called McGriff Siebels
and the London broker changed from JLT to
Price Forbes.

103
HODGETT

Q.    Just, again, another question on
Plaintiff's Exhibit 3.  There is a
signature line at the bottom left corner
of this document.  Do you recognize that
signature?

A.    Not with certainty.

Q.    Are you familiar with Paul
Bennett's signature?

A.    I believe that is Paul Bennett's
signature.

Q.    Have you seen an original of
this document which bears an ink signature
at the line we were just discussing?

A.    Not to my recollection.

Q.    Now, there's a fax line at the
top of this document -- actually, there's
at least three.  Starting with the second
one, which says, "Received," and then it
appears to be obscured, picking up,
"7/2004, 9:06 p.m.," and then there's
a -- some numbers there.

A.    Uh-hum.

Q.    Do you see that 02075583 and
then, again, it appears to be obscured?

104
HODGETT

A.    Yes.

Q.    Do you recognize that sequence
of numbers at all?

A.    It looks like the beginning of a
London telephone number.

Q.    Can you determine whether that
would be Wellington's telephone number or
--

A.    It's not any Wellington
telephone number.

Q.    Do you know whether that is JLT
Risk Solution's telephone number?

A.    There are three numbers missing
from the end of it, so I can't know that,
but JLT's dialing code is 558.

Q.    In the course of reviewing JLT's
files, did you attempt to determine
whether any documents indicated a date on
which Plaintiff's Exhibit 3 was received
by JLT Risk?

A.    I'm not sure I understand.

Q.    Let me back up then.  You
indicated that you have requested JLT
Risk's files on, I guess, several

105

HODGETT

1
2  occasions; is that correct?
3      A.    Yes.
4      Q.    The first was at or around
5  December of 2004 or slightly before that;
6  is that correct?
7      A.    The first time they presented it
8  to me.  I didn't request it.
9      Q.    On what occasions did you
10  request that JL -- the opportunity to
11  review JLT Risk Solution's files, with
12  respect to this circumstance?
13      A.    The only occasion I can recall
14  specifically requesting a file was either
15  Thursday or Friday of last week.
16      Q.    Do you recall reviewing the file
17  at any point in time other than Thursday
18  and Friday of last week?  And by "the
19  file," I'm referring to the materials of
20  JLT Risk Solutions.
21      A.    Yes.
22      Q.    On what occasions do you recall
23  reviewing the JLT Risk Solution files?
24      A.    When they presented it to me on
25  or about the 1st of December and, again,

106

HODGETT

1
2  on or about the 21st of December when I
3  read this reservation of rights letter,
4  and any other date that my signature
5  appears on that file, if any.
6      Q.    Do you recall whether a copy of
7  Plaintiff's Exhibit 3 was in JLT Risk's
8  files?
9      A.    It was in JLT Risk's file.
10      Q.    Did you initial that document
11  when you saw it for the first time?
12      A.    No.
13      Q.    Did you examine that document to
14  determine whether there was any indication
15  on the face of the document indicating
16  when JLT Risk received the document?
17      A.    I thought it spoke for itself.
18      Q.    Was it your understanding that
19  JLT Risk Solutions received the document
20  on or about May 17th, 2004?
21      A.    Yes.
22      Q.    And what is that understanding
23  based upon?
24      A.    Based upon the date that is on
25  it.

107

HODGETT

1
2      Q.    Did you also have a
3  conversations with Mr. Bennett about the
4  date on which you received Plaintiff's
5  Exhibit 3?
6      A.    Not specifically.
7      Q.    Did you have conversations with
8  any other employee of JLT Risk Solutions
9  concerning the date on which JLT Risk
10  Solutions received Plaintiff's Exhibit 3?
11      A.    Not specifically.
12      Q.    I'm going to ask a few questions
13  about the process for opening a claim at
14  Wellington and at Lloyd's.  At what point
15  in time, if any, is a claim number
16  assigned by Wellington or Lloyd's with
17  respect to a claim under a hull insurance
18  policy?
19      A.    Wellington did not assign their
20  own claim number.  And Wellington has seen
21  the file and written whatever comment upon
22  it.  The broker would then take the file
23  to Lloyd's's claims office, and Lloyd's's
24  claims office would allocate the number,
25  such that there is just one claim number

108

HODGETT

1
2  for all Lloyd's syndicates.
3      Q.    Did you have an understanding as
4  to when with regard to this particular
5  claim the broker would have taken the file
6  to the Lloyd's's claims office for the
7  assigning of a claim number?
8      A.    Yes.
9      Q.    When was that, to your
10  knowledge?
11      A.    1st of March, 2005.
12      Q.    Who was the broker that took the
13  file to the Lloyd's's claims office at
14  that point in time?
15      A.    I don't know.
16      Q.    Would you know which
17  organization the broker was employed with?
18      A.    It would be JLT.
19      Q.    Where is the Lloyd's's claims
20  office located, physically?
21      A.    At 34 Leadenhall Street.
22      Q.    You are not employed by the
23  Lloyd's's claims office; correct?
24      A.    No.
25      Q.    How many individuals are

109

HODGETT

1  involved -- how many individuals work in
2  the Lloyd's's claims office, to your
3  understanding?
4      A.   I don't know.
5      Q.   Is it more than a hundred, less
6  than a hundred?  Do you know?
7      A.   I don't know.  It's a lot.
8      Q.   Have you had any communications
9  with the Lloyd's claims office with
10  regard to the matters in dispute in this
11  litigation?
12     A.   Yes.
13     Q.   Who have you had communications
14  with?
15     A.   John Gaughan.
16     Q.   And the spelling of his name is?
17     A.   G-a-u-g-h-a-n.
18     Q.   And what is his position?
19     A.   I don't know his exact title,
20  but he's a claims adjustor.
21     Q.   When did you first have
22  communications with Mr. Gaughan, with
23  respect to this matter?
24     A.   I believe I copied John on a

110

HODGETT

1  number of exchanges of e-mails between
2  myself and my lawyer.
3      Q.   That was Mr. Kimmitt?
4      A.   Yes.
5      Q.   What is the role of the
6  Lloyd's's claim office in making a
7  determination on whether or not to decline
8  coverage for a particular claim, if any?
9      A.   I don't really understand the
10  question.
11     Q.   Does the Lloyd's's claims office
12  participate in the decision making process
13  on denial or payment of claims submitted
14  on Lloyd's policies?
15     A.   Yes.
16     Q.   In what way?
17     A.   They represent all syndicates
18  that don't represent themselves.
19     Q.   Could you go back to Plaintiff's
20  Exhibit 2.
21     A.   Uh-hum.
22     A.   I believe at some point in this
23  document there is an identification of the
24  subscribing underwriters on the various

111

HODGETT

1  coverages.  Let's look at Exhibit 1.  If
2  you turn to page 306 through 309 of
3  Plaintiff's Exhibit 1.
4      A.   There's very likely 300 pages in
5  there.
6           MR. RADZIK:  I think he's
7  referring to these numbers at the bottom.
8      A.   Sorry.
9      Q.   Actually, starting on page Bates
10  number IRO/AE 00305.  First of all, are
11  you familiar with the participation of
12  other Lloyd's syndicates on the Horizon
13  hull insurance policy at issue in this
14  matter?
15     A.   Yes.
16     Q.   I believe you've indicated that
17  the first underwriter at Lloyd's syndicate
18  number 2020 is Wellington; is that
19  correct?
20     A.   Yes.
21     Q.   If this refers to sections 1. A.
22  and 1. B., are those the sections that
23  would be implicated with regard to the
24  Horizon limitation proceeding?

112

HODGETT

1      A.   They are the sections under
2  which a claim is being made, yes.
3      Q.   So this schedule on page Bates
4  number 305 is the schedule of the
5  underwriters subscribing to that
6  particular risk; correct?
7      A.   Yes.
8      Q.   Underwriter at Lloyd's syndicate
9  No. 510, do you have an understanding of
10  who that refers to?
11     A.   That's Kiln Syndicate.
12     Q.   Are they one of the syndicates
13  for whom the Lloyd's claims office is
14  representing their interest?
15     A.   Yes.
16     Q.   The next listing is Underwriters
17  at Lloyd's Syndicate No. 2791.  Do you
18  have an understanding of who that refers
19  to?
20     A.   I don't know who that syndicate
21  number is.
22     Q.   The next is Underwriters at
23  Lloyd's Syndicate No. 457.  Do you have an
24  understanding as to the name of that

113

HODGETT

1
2  syndicate?
3       A.    No.
4       Q.    There's a reference to Zurich
5  and Great Lakes Reinsurance, then
6  Underwriters at Lloyd's Syndicate No.
7  2323.  Do you have an understanding as to
8  the name of that syndicate?
9       A.    I don't know the name of that
10 syndicate.
11      Q.    The next listing is Underwriters
12 at Lloyd's Syndicate No. 2987.  Do you
13 know the name of that syndicate?
14      A.    I don't know the name of that
15 syndicate.
16      Q.    Then skipping over,
17 International Company of Hanover,
18 reference to Lloyd's Syndicate No. 1183.
19 Do you know the name of that syndicate?
20      A.    I believe 1183 is the Watkins
21 Syndicate.
22      Q.    And is the Lloyd's claims office
23 representing the Watkins Syndicate's
24 interest with respect to this
25 circumstance?

114

HODGETT

1
2       A.    No.
3       Q.    Have you had communications with
4  anyone at the Watkins Syndicate with
5  regard to this matter?
6       A.    Yes.
7       Q.    Who?
8       A.    Paul Stratton.
9       Q.    What do you recall about the
10 communications that you had with
11 Mr. Stratton regarding this matter?
12      A.    Paul was on the copy list for
13 the same communications that I had with my
14 lawyer that I copied to John Gaughan.
15      Q.    I'm going to ask you some
16 questions about Plaintiff's Exhibit 6, the
17 series of e-mails that were produced
18 today.
19           There's one other syndicate on
20 Exhibit 1.  It's Syndicate 382, with 1.5
21 percent.  Do you know the name of that
22 syndicate?
23      A.    No, I don't.
24      Q.    Mr. Hodgett, just some questions
25 about Exhibit 6.

115

HODGETT

1
2           The second page of Exhibit 6,
3  which is a description of Wellington, do
4  you see that at the bottom of the page?
5       A.    Yes.
6       Q.    There's a reference to
7  Wellington Underwriters PLC, Wellington
8  Underwriters Agencies, Ltd., Wellington
9  Services, Ltd.
10      A.    Yes.
11      Q.    Which entity was involved as
12 participant among the underwriters for the
13 Horizon hull insurance policy, of these
14 three or some other Wellington entities?
15      A.    Syndicate 2020 is partly owned
16 and 100 percent managed by Wellington
17 Underwriting Writing Agency, Ltd.
18      Q.    Does Wellington Underwriting
19 Agencies, Ltd. have a majority ownership
20 interest in that entity, to your
21 knowledge?
22      A.    Of Syndicate 2020?
23      Q.    Yes.
24      A.    Yes.
25      Q.    Going back to the portion of

116

HODGETT

1
2  Exhibit 6, about five, six pages back.
3  There's a document starting page 1 of 3?
4       A.    What's the date of first e-mail
5  on it?
6       Q.    April 8th, 2005, at 164.
7       A.    Okay.  I got 1626.
8       Q.    Okay.
9           MR. KOSTER:  It's the one before
10 that?
11      A.    So these are all out of order,
12 so bear with me a bit.
13      Q.    And the second e-mail in that
14 document from the top of page 1 of 3, is
15 that an e-mail that you wrote on or about
16 April 8th of 2005 to Mr. Bennett?
17      A.    Yes.
18      Q.    There's a reference to "no
19 answer being due from us until 19th of
20 April."  By that, you're referring to the
21 answer in the litigation commenced by
22 Iroquois against Lloyd's, AEGIS, and other
23 parties?
24      A.    I'm referring, as I believe I
25 answered earlier and explained in a

117

HODGETT

1  subsequent e-mail as to what that answer
2  was or what that 19th was.  And I
3  specifically said in that e-mail what that
4  answer was to.
5      Q.   I think if we go back there's a
6  document, page 1 of 4, the first e-mail in
7  that chain is April 11th, 2005 at 10:52.
8  Do you see that?
9      A.   Yes.
10     Q.   And then the second e-mail in
11 that, is that the e-mail that you were
12 just testifying to?
13     A.   Yes.
14     Q.   And this refers to "the date our
15 answer is due at Iroquois's demand for
16 additional insured status." By that,
17 you're referring to this litigation?
18     A.   Yes.
19     Q.   Now, you testified that it's a
20 correct statement that Horizon has made no
21 demands upon us for either defense or
22 indemnity.  And the "us" that you're
23 referring to there is whom?
24     A.   Wellington.

118

HODGETT

1      Q.   Does that continue to be a true
2  statement as of today that Horizon has not
3  made demands of Wellington?
4      A.   Yes.
5      Q.   Are you aware of whether Horizon
6  has made demands addressed to any
7  underwriter under the hull insurance
8  policy?
9      A.   I don't know, but I can't
10 imagine they would demand things from the
11 following underwriters and not the lead.
12     Q.   There is one of these e-mails --
13 there's a three-page one.  I'm looking at
14 page 1 of 3 and the first e-mail is April
15 8th, 2005 at 164.
16     A.   Yes.
17     Q.   The second e-mail in that chain,
18 again, refers to Mr. Kimmitt being in
19 contact with Horizon.  Have you seen any
20 written documentation relating to any
21 contact between Mr. Kimmitt and Horizon?
22     A.   Not to my knowledge.
23     Q.   This indicates that Gerry -- I
24 take that to be Gerry Kimmitt?

119

HODGETT

1      A.   Yes.
2      Q.   -- will be furnishing a full
3  cover opinion in the next week or so?
4      A.   Yes.
5      Q.   Have you received a full cover
6  opinion?
7      A.   No.
8      Q.   Was that a single document or
9  did you receive more than one document
10 from Mr. Kimmitt with regard to the
11 opinion on coverage?
12     A.   I received a report for a number
13 of pages.
14     Q.   One of the last documents in
15 this Exhibit 6 is a five-page exchange of
16 e-mails.  The first one is April 11th of
17 2005?
18     A.   Uh-hum.
19     Q.   On this one, there appears to be
20 a recurring use of the same subject line
21 in the -- on all of these e-mails, and it
22 references a number 917-241.  Do you see
23 that number?
24     A.   Yes.

120

HODGETT

1      Q.   Does that number have any
2  significance to you?
3      A.   No.
4      Q.   Do you know the number that was
5  assigned by the Lloyd's claims office to
6  this circumstance?
7      A.   Three numbers were assigned by
8  Lloyd's claims office, which are the three
9  numbers in the bottom right-hand corner of
10 the reservation of rights letter.
11     MR. RADZIK:  That's Plaintiff's
12 Exhibit 8.
13     Q.   So those numbers would be
14 M 05030030 -- is it 5 or 8?
15     A.   5.
16     Q.   And M 050300325?
17     A.   Yes.
18     Q.   And M 050300335?
19     A.   Yes.
20     Q.   And do you have an understanding
21 as to when those numbers were placed on
22 Plaintiff's Exhibit 8 or who placed them?
23 Let's take it one at a time.  Do you know
24 when they were placed on Exhibit 5?

121

```
              HODGETT
 1
 2     A.    The date of the signature is the
 3  1st of March 2005.
 4     Q.    And I believe you testified
 5  that's John Gaughan's signature?
 6     A.    Uh-hum.
 7     Q.    And do you have an understanding
 8  as to why three different numbers were
 9  assigned by Mr. Gaughan on March 1st of
10  2005?
11     A.    Yes.
12     Q.    What is your understanding?
13     A.    On Plaintiff's Exhibit 1 that we
14  were discussing earlier at page 00305, you
15  will see that syndicates of Lloyd are in
16  three separate batches.
17     Q.    Which page are you referring to
18  of the Plaintiff's Exhibit 1?
19     A.    00305.
20     Q.    Okay.
21     A.    There are three distinct
22  groupings of Lloyd's syndicates on that
23  list of underwriters.  Each of those would
24  have had a different signing number and
25  date and each of those would have a
```

122

```
              HODGETT
 1
 2  different claim number.
 3     Q.    Mr. Hodgett, are you familiar
 4  with any reinsurance maintained by
 5  Wellington with regard to the hull
 6  insurance policy issued to Horizon?
 7     A.    No.
 8     Q.    Have you had any direct role in
 9  providing any notification to any
10  reinsurers?
11     A.    No.
12     Q.    Do you know who at Wellington
13  would have had a role, if any person, in
14  providing notification to reinsurers?
15     A.    We have a separate department
16  for outward reinsurance.
17     Q.    Do you know the name of any
18  particular individual that had -- that in
19  fact was involved in providing notice to
20  reinsurers on behalf of Wellington with
21  regard to this particular matter?
22     A.    No.
23     Q.    Do you know the name of the
24  individual Wellington underwriter that was
25  involved in the negotiation of the
```

123

```
              HODGETT
 1
 2  underwriting of this coverage?
 3     A.    No.
 4     Q.    Have you spoken to any employee
 5  of Wellington who had any involvement in
 6  the underwriting or placement of this hull
 7  insurance --
 8     A.    No.
 9     Q.    -- coverage?
10           You referenced in one of your
11  responses earlier to a requirement for
12  Lloyd's or LIRMA to inform the following
13  market -- and I'm not sure if I got that
14  correctly --
15     A.    Yes.
16     Q.    -- but I want to just clarify
17  what your reference to the following
18  market indicated.
19     A.    If you go back to page 308 --
20  sorry, 305 of Exhibit 1, and take as an
21  example the top group of four Lloyd's
22  underwriters, Wellington would see the
23  claim and the following three underwriters
24  will be represented by Lloyd's claims
25  office and Lloyd's claims office will tell
```

124

```
              HODGETT
 1
 2  them of the existence of this claim, as an
 3  example.  And following on down, if there
 4  is a batch in London, excluding the
 5  American companies at the bottom, if there
 6  is a batch of underwriters, generally only
 7  the first one will see it and the
 8  following market is informed by the
 9  agencies.
10     Q.    So, with regard to this
11  coverage, the following market to whom
12  Wellington communicated was syndicate
13  numbers 510, 27 --
14     A.    No.  Wellington doesn't
15  communicate to the following market.
16  Lloyd's claims office do.
17     Q.    Lloyd's claims office do.  I
18  apologize.
19           There was a reference to LIRMA.
20  Is that an acronym for --
21     A.    It is an acronym, but I cannot
22  recall what it means.
23     Q.    Would Wellington report to any
24  of the underwriters on page 305 upon
25  receiving any information with regard to a
```

125

HODGETT

1 claim, in the ordinary course?

2    A.    No.

3    Q.    There were some questions about

4 the limitation proceeding.  Is it correct

5 that Lloyd's is now participating in some

6 way in the limitation proceeding?

7    A.    I don't know the answer to that.

8    Q.    To your knowledge, has Lloyd's

9 taken any action with regard to the

10 limitation proceeding?

11    A.    I don't know the answer to that.

12    Q.    Is Wellington taking any action

13 with regard to the limitation proceeding?

14    A.    I don't know the answer to that.

15    Q.    Now, with regard to JLT Risk's

16 files, is it fair to say that it is within

17 Wellington's rights to request access to

18 the files of JLT Risk on coverages placed

19 by JLT Risk with underwriters?

20    A.    Yes.

21    Q.    Do you recall the contents of

22 the JLT Risk files which were produced to

23 you at various points with regard to this

24 matter?

25

126

HODGETT

1    A.    I don't have a photographic

2 memory of everything that was in it, but

3 there were various documents.

4    Q.    What was the volume of it, to

5 your recollection?

6    A.    I need to think.

7    Q.    Did they produce a placement

8 file for your review?

9    A.    No.

10    Q.    Was it, to your understanding,

11 the claims file maintained by JLT Risk?

12    A.    Yes.

13    Q.    Did you request the placing

14 file --

15    A.    No.

16    Q.    -- at any point in time of JLT

17 Risk?

18    A.    No.

19    Q.    And is it correct that you have

20 provided to Mr. Radzik or attorneys in his

21 firm a copy of the materials included, to

22 your understanding, in the JLT Risk claim

23 file?

24    A.    Yes.

25

127

HODGETT

1    Q.    Are you aware of whether or not

2 there is any written agreement between

3 Wellington and JLT Risk Solutions in which

4 there is an appointment of JLT Risk

5 Solutions as an agent of Wellington for

6 any purpose?

7    A.    JLT is not an agent of

8 Wellington.  They are an agent of the

9 insured.

10    Q.    Are you aware of any agency

11 agreement between Wellington and AON Risk

12 Services of Texas?

13    A.    AON Risk Services of Texas are

14 an agent of the insured, not of

15 Wellington.

16    Q.    The same question with regard to

17 Lloyd's.  Did you know whether there is

18 any agency agreement between Lloyd's and

19 AON Risk Services of Texas?

20    A.    Same answer.

21    Q.    And also with regard to the

22 relationship between Lloyd's and JLT Risk

23 Solutions.

24    A.    Same answer.

25

128

HODGETT

1    Q.    Did you have any direct

2 communications with Jim Montano of AON

3 Risk Services of Texas with regard to this

4 claim?

5    A.    No.

6    Q.    Did you have any direct

7 communications with any employee of AON

8 Risk Services of Texas with regard to this

9 claim?

10    A.    No.

11    Q.    With regard to the participation

12 by Zurich on this risk, you have indicated

13 that Zurich was involved in preparing

14 Plaintiff's Exhibit 8 --

15    A.    Yes.

16    Q.    -- that Zurich actually prepared

17 that document.

18    A.    Yes.

19    Q.    Could you explain the

20 responsibilities of Zurich as leading

21 company and why it was that Zurich was

22 leading company on this policy prepared

23 Plaintiff's Exhibit 8, the reservation of

24 rights.

25

129

HODGETT

A.    Zurich has responsibility only
to themselves on this policy. They chose
to write that and all following
underwriters agreed.

Q.    Is Wellington a following
underwriter to Zurich on this coverage?

A.    No.   But in this instance, I
agree that their letter was -- should be
sent, on behalf of us all.

MR. ZERBE:   Bear with me.   Maybe
if I can make two or three minutes.

(Brief recess.)

(Plaintiff's Exhibit 9,
four-page document, second, third, and
fourth pages dated June 7, June 24, and
September 20, 2004, respectively, marked
for identification, this date.)

Q.    Mr. Hodgett, I just have a few
more questions.   I've asked the court
reporter to mark four pages as Exhibit 9.
Have you, starting with the first page of
Exhibit 9, have you seen that document
before today or a form of that document?

A.    I don't specifically recall it.

130

HODGETT

If it's JLT's file, I've seen it.

Q.    The same question with regard to
the second page, which is dated June 7th,
2004?

A.    I don't specifically recall it.

Q.    Same question with regard to the
third page, June 24th, 2004.

A.    I don't specifically recall it.

Q.    Same question with regard to the
fourth page, dated September 20th, 2004.

A.    I don't recall it.

Q.    There's a reference in the
fourth page to underwriters requesting an
update on the loss and requesting
assured's advices to Adam's & Reese
instruction.   Do you know what either of
those items are referring to?

A.    No.

Q.    Does reviewing this document
refresh your recollection in any way as to
when JLT Risk Solutions had communications
with underwriters with regard to this
matter?

A.    Whoever those underwriters were

131

HODGETT

requesting the assured's advices, it
wasn't me.

Q.    Was there any other employee of
Wellington that was involved in the claim
on the hull insurance policy issued to
Horizon for the February 27th, 2003
striking of the New York Power Authority
cable, other than yourself?

A.    No.

Q.    Have you reviewed any
underwriters or placing files maintained
by Wellington with regard to this hull
insurance policy?

A.    I wouldn't say reviewed, but I
procured them and sent them to our
lawyers.

Q.    Were those files of Wellington,
as opposed to Lloyd?

A.    They are Wellington's file.

Q.    Did you make any request for any
underwriting files maintained by Lloyd's
as opposed to Wellington with regard to
this hull insurance policy?

A.    Lloyd's would not maintain an

132

HODGETT

underwriting file.   Lloyd's, as an entity,
does not insure this risk.

Q.    In connection with the -- is it
the signing of the policy, the Lloyd's
policy signing department?

A.    Yes.

Q.    Would they maintain a file for
any of their involvement with regard to
the hull insurance policy?

A.    I believe they would maintain a
copy of the signing slip.

Q.    To your understanding, would the
Lloyd's signing office maintain any other
documentation relating to policies issued
in some way to the Lloyd's signing office?

A.    No, the Lloyd's policy signing
office, it is just a department which
signs policies and collects and
distributes premium.   It has nothing to do
with particular insurance.

Q.    Are you familiar with the
deductible under the hull policy?

A.    Yes.

Q.    What is your understanding as to

133

HODGETT

1  the deductible with regard to the claims
2  that have been asserted respecting the
3  limitation proceeding?
4      A.    It's half a million dollars.
5      Q.    That's a per claim deductible;
6  correct?
7      A.    Yes.
8      Q.    Is there also an aggregate
9  deductible under the Lloyd's policy?
10     A.    Not to my knowledge.
11     Q.    On policies on which there is
12 both a per claim deductible and an
13 aggregate deductible, do both deductibles
14 have to be satisfied prior to the payment
15 of the claim?
16     A.    Yes.
17     Q.    If you could look at one other
18 aspect of Exhibit 2, the Velo bound
19 document.
20     A.    Uh-hum.
21     Q.    It appears on, I think, every
22 page of this document in the upper right
23 corner a legend, "Attached to and forming
24 part of cover note number ARS 3246." Is
25

134

HODGETT

1  that, in your experience, a customary
2  provision in a policy issued by Lloyd
3  underwriters?
4      A.    You mean the phrase --
5      Q.    Yes, it wouldn't all refer to
6  ARS 3246, but, in general -- well, first
7  of all, what is your understanding as to
8  the meaning of that legend?
9      A.    My understanding is it's a way
10 of, A, attaching the policy, and that it
11 indicates which policy it belongs to
12 should it ever become adrift.
13     Q.    It's your understanding, then,
14 that the cover note is a part of the
15 policy?
16     A.    No.
17     Q.    Well, what is your understanding
18 of the term "attached to and forming part
19 of cover note number ARS 3246"?
20     A.    The cover note is generally the
21 document issued by the broker to the
22 client. They prepare it, they hand it to
23 the client. It should be a true and
24 accurate copy of the policy itself.
25

135

HODGETT

1      Q.    Do you know whether the
2  underwriters subscribing to the Horizon
3  hull insurance policy were in possession
4  of the cover note ARS 3246 prior to the
5  signature on this policy?
6      A.    I don't know.
7      Q.    Mr. Hodgett, did you participate
8  at all in preparing any responses to
9  discovery requests on behalf of Lloyd's
10 underwriters in this matter?
11     A.    No.
12     Q.    Have you seen any of the final
13 responses that were served on behalf of
14 Lloyd's underwriters in this matter?
15     A.    I've seen it.
16     Q.    I'm going to show you a document
17 which -- this is my only copy. I think
18 others might have this. This is Lloyd's
19 Underwriters Answers to Plaintiff's First
20 Interrogatories, dated June 21st, 2005.
21     MR. ZERBE:  Do you have a copy
22 for the witness?
23
24     MR. RADZIK:  I have my office
25 copy.

136

HODGETT

1      MR. KOSTER:  What are you asking
2  for?
3      Q.    Mr. Hodgett, do you have in
4  front of you what appears to be a five- or
5  a six-page document, bearing the caption,
6  "Defendant Lloyd's Underwriters Answers
7  to Plaintiff's First Interrogatories," and
8  there's a date on page 5 of June 21st,
9  2005?
10     A.    Yes.
11     Q.    Have you seen that document
12 before today?
13     A.    I believe so.
14     Q.    There's a question 7 about
15 identifying every document that forms a
16 part of the Lloyd's hull policy, and
17 there's a reference to Exhibits A and B
18 attached to Lloyd's Underwriters's
19 Response to Plaintiff's Request for
20 Production of Documents. Did you provide
21 any documents for use in responding to
22 interrogatory 7?
23     A.    Not specifically.
24     Q.    Do you agree that Exhibits A and
25

137

```
            HODGETT
 1
 2   B to Lloyd's Underwriters Response to
 3   Plaintiff's Request for Production of
 4   Documents comprise the Lloyd's policy?
 5        A.    Yeah.  I mean, it's a document
 6   that bears the stamp of Lloyd's's policy
 7   signing office.
 8            MR. SCHMIDT:  Is this the LPSO
 9   version of the policy that you referred to
10   earlier?
11            THE WITNESS:  Yes.
12            MR. SCHMIDT:  Thank you.
13        Q.    Back to the interrogatories.
14   No. 8 is a request for the identification
15   of each person with knowledge or
16   information concerning the relationship
17   between Lloyd's underwriters and AON,
18   including specifically each person with
19   knowledge or information concerning any
20   instruction, protocol, or guidance
21   provided by the Lloyd's underwriters with
22   respect to the underwriting of coverage
23   and the reporting of claims and losses.
24   And in the answer, it identifies yourself
25   as being a person with knowledge.
```

138

```
            HODGETT
 1
 2            Do you have any knowledge, first
 3   of all, about any instruction, protocol or
 4   guidance provided by Lloyd's Underwriters
 5   to AON with respect to the underwriting of
 6   coverage on the Horizon hull insurance
 7   policy?
 8        A.    No.
 9        Q.    Do you have any knowledge of any
10   information concerning the reporting of
11   claims and losses by -- instructions given
12   by Lloyd's Underwriters to AON concerning
13   the reporting of claims and losses on the
14   Horizon hull insurance policy?
15        A.    I'm trying to read this, related
16   to your question.  I frankly don't
17   understand what it is you're asking me.
18        Q.    Okay.  I'm sorry.  Do you have
19   any knowledge of any instruction, protocol
20   or guidance provided by Lloyd's
21   Underwriters to AON on the reporting of
22   claims and losses as respects the Horizon
23   hull insurance policy?
24        A.    I know of no guidance which
25   would be given by Wellington to AON
```

139

```
            HODGETT
 1
 2   regarding the reporting of claims.
 3        Q.    Looking at the first portion of
 4   interrogatory B, do you have any knowledge
 5   or information concerning the relationship
 6   between Lloyd's underwriters and AON,
 7   other than what you've testified to
 8   already today?
 9        A.    Is that AON completely?
10        Q.    No, we're referring to, I
11   believe, the defendant in this action, AON
12   Risk Services of Texas, Inc.
13        A.    I know of no relationship
14   directly between Wellington and AON of
15   Texas.
16        Q.    If I could go to another
17   discovery response.  This one is a
18   Response to Supplemental Response to
19   Plaintiff's Document Request, dated July
20   14th.  Off the record.
21            (Discussion held off the
22   record. )
23        Q.    Mr. Hodgett, you have in front
24   of you a copy of the July 14th, 2005
25   Second Supplemental Response to
```

140

```
            HODGETT
 1
 2   Plaintiff's Request for Production of
 3   Documents by Lloyd's Underwriters.  Have
 4   you seen this document before today?
 5        A.    I don't recall seeing it.
 6        Q.    If you go to paragraph 1 of
 7   Lloyd's second supplemental response,
 8   there's a reference to the AON report of
 9   loss dated May 17th, 2004, and it states
10   in this response:  "It was not transmitted
11   by JLT to Lloyd's Underwriters until
12   September 20th, 2004."
13            Are you aware of any documents
14   that indicate that the AON May 17th, 2004
15   report of loss was not transmitted by JLT
16   to Lloyd's Underwriters until September
17   20th of 2004?
18        A.    That's incorrect.  It was not
19   transmitted to Lloyd's Underwriters until
20   December of 2004.
21        Q.    Okay.
22            MR. RADZIK:  That was a
23   misunderstanding on my part, from previous
24   knowledge.
25            MR. ZERBE:  Okay.
```

141

HODGETT

Q.   I believe you testified that you
did not have any direct communications
with Colin Williams with regard to this
matter.

A.   Correct.

Q.   Let's start with Wellington.
Does Wellington have a protocol with
regard to maintenance of e-mails with
respect to claims reported to?

A.   Yes.

Q.   What is that policy or practice?

A.   The practice is that we keep
them all personally.  I open a subfolder
and put everything to do with the Horizon
loss in a subfolder for Horizon.

Q.   That would include e-mails that
you send, as well ones that you receive?

A.   Yes.

Q.   Have you reviewed that subfolder
recently for any purpose?

A.   No.

Q.   Do you know the volume of
e-mails that would be contained in the
subfolder for Horizon?

142

HODGETT

A.   As a guess, 60, 70, somewhere
around there.

Q.   Other than the e-mail subfolder,
do you personally maintain any records
with regard to the Horizon claim in any
electronic format?

A.   No.

Q.   Do you maintain any hard
copy --

A.   Sorry, let me qualify that.
There is the basic entry in our management
systems.

Q.   What is included in the basic
entry on the management system?

A.   Just name of assured, policy
number, our line, the Lloyd's signing
number and date, the Lloyd's claim number,
the broker's reference, and bare bones of
the coverage limits, deductibles.  Just --
and all that kind of thing.

Q.   Other than those two items, do
you maintain any hard copy document files
with regard to the Horizon claim?

A.   I have a paper file as well.

143

HODGETT

Q.   As I understand it, you have
reviewed the various notice provisions
under the Horizon hull insurance policy as
part of your claims review; is that
correct?

A.   Uh-hum.

Q.   Have you formed a view of
whether the hull insurance policy issued
to Horizon requires prompt notice as a
condition precedent to coverage under the
policy?

A.   In my opinion, it does.

Q.   Does the policy use the term
"condition precedent" with regard to
prompt notice?

A.   Not to my knowledge.

Q.   Have you reviewed the policy for
that purpose, to determine whether there
is phrasing in the policy about prompt
notice being an express condition
precedent?

A.   No.

Q.   Have you had any discussions
with JLT Risk as to whether they received

144

HODGETT

notification of the February 27th, 2003
casualty involving the New York Power
Authority cable with respect to any
coverages other than the Lloyd's hull
policy?

A.   No.

Q.   Just I'm a little bit unclear on
one point.  You indicate that the file was
brought in by JLT Risk on December 1st,
2004 but that a claim was not opened by
the Lloyd's's claim office until four
months later on March 1st, 2005.  Do you
have any understanding as to the reason
for the four-month gap?

A.   I assume that JLT didn't take
the file to Lloyd's's claims office for
four months.

Q.   That would have been JLT's
responsibility?

A.   JLT's responsibility to do
that.

Q.   Do you have any knowledge as to
whether any security was posted on behalf
of Horizon in the limitation proceeding

145

HODGETT

that is pending in Texas?

    A.    No.

    Q.    I take it then you have no understanding as to whether any of Horizon's insurers were involved in any way with respect to that security for the limitation proceeding?

    A.    I have no knowledge of whether security was put up, if it was, what it was, or who put it there.

    Q.    To your knowledge, Wellington has at no point participated in any security posted in the limitation proceeding?

    A.    Wellington has not posted any security for anybody.

    MR. ZERBE:  Just bear with me. I think I'm finished.

    Q.    Mr. Hodgett, do you have an understanding as to the nature of the specific legal fees that Iroquois is requesting coverage for in this action?

    A.    No.

    Q.    Have you seen any submissions

146

HODGETT

that detail what is comprised within those legal fees for which Iroquois is requesting payment?

    A.    No.

    Q.    Have you handled any claims arising out of the Lloyd hull policy issued to Horizon, other than the claims involving the New York Power Authority cable and the February 27th, 2003 incident?

    A.    Not to my knowledge.

    Q.    Do you know whether any other claims have been asserted under Horizon's hull insurance policy for this policy period?

    A.    I don't know.

    Q.    Is there an individual at Lloyd's who would know whether or not other claims had been asserted or would there be some computer database or document which would indicate that?

    A.    Yes.

    Q.    Would that be in the document or database?

147

HODGETT

    A.    If there are other claims on that policy year for Horizon, they would be on our database, assuming the broker had told us about them.

    Q.    By "our database," you're referring to Wellington?

    A.    Wellington.

    Q.    And do you have access to that database?

    A.    Yes.

    Q.    But as you sit here today, you're not aware of any other claims other than the circumstances involved in this litigation?

    A.    Not here, not now.

    Q.    Are you aware of whether or not any portion of the aggregate deductible has been satisfied on the Lloyd's's hull policy?

    A.    I don't know.

    MR. ZERBE:  Thank you very much, Mr. Hodgett.

EXAMINATION BY MR. SCHMIDT:

    Q.    Mr. Hodgett, my name is Charles

148

HODGETT

Schmidt. I represent American Home Assurance Company in this action.

    Maybe we can solve the LIRMA mystery. If I suggested to you that it stood for London International Insurance and Reinsurance Market Association, would that sound right to you?

    A.    That sounds absolutely right.

    Q.    Okay. If we could solve all the mysteries that quickly, we'd be much better off.

    A.    And very wise.

    Q.    Mr. Hodgett, if you do me a favor and look at Exhibit 2 -- that's the big Velo bound policy -- I'd like to refer you to the page marked page 3 in the lower right-hand corner.

    A.    Okay.

    Q.    Starting a bit below the bottom of the page -- excuse me, below the middle of the page, we've got, where it's beginning, "Including collision and tower's liability" and ending at the bottom of the page with a provision

149

HODGETT

1

2  relating to deductibles.  Do you see that
3  material?
4      A.    Yes.
5      Q.    Could you read that to yourself
6  and let me know when pure done.
7      A.    Yes.
8      Q.    I had thought I understood you,
9  the answer I think to one of Mr. Zerba's
10  questions, by indicating there was a
11  one-half million dollar deductible --
12      A.    Yes.
13      Q.    -- that would be applicable to
14  this claim if there was coverage, and I
15  know that's what we're all here to
16  debate --
17      A.    Yes.
18      Q.    -- so I know I'm not asking you
19  that question, but I think you also
20  answered him by saying that there was no
21  aggregate deductible applicable to this
22  incident, and I'm a little confused by
23  that, based on the language on this page.
24  Could you help straighten me out.
25      A.    If I said that, I was wrong.

---

150

HODGETT

1

2      Q.    Okay.  And how would that annual
3  aggregate deductible operate?
4      A.    The annual aggregate deductible
5  would operate in addition to the each
6  accident deductible, in that the first, as
7  an example, the first loss on any policy
8  year would not be recoverable until it
9  exceeded $2 million, being the total of
10  the 500,000 and the one and a half
11  million, unless it was a total loss.  And
12  all losses after that would be payable
13  excess of half a million.
14      Q.    And if you could look up just a
15  little higher than that, there's a
16  reference to a separate minimum limit of
17  one million dollars each accident or
18  occurrence.  Could you explain to me what
19  that wording means, "subject to a separate
20  minimum limit of one million dollars"?
21      A.    Yes.  It means for the collision
22  and tower's liability, the -- there is a
23  limit of either a million dollars for
24  vessels valued at less than a million
25  dollars or the vessel hull value,

---

151

HODGETT

1

2  whichever is the greater.  For example, if
3  a vessel on the schedule is only valued at
4  $700,000, it has a hull -- collision and
5  tower's limit of one million.
6      Q.    Coming back to LIRMA for a
7  minute, you explained to us what LCO's job
8  was in terms of informing followers in the
9  Lloyd's market.  Could you compare and
10  contrast for us LIRMA's job in the
11  company's market, as you understand it?
12      A.    To the best of my knowledge,
13  LIRMA doesn't actually have a role in
14  that, other than as a disseminator of
15  information.  They don't represent
16  anybody.
17      Q.    Whereas LCO represents the
18  syndicates in respect of the claim
19  presented?
20      A.    The following syndicates, yes.
21      Q.    But LCO do disseminate
22  information generally, as well as
23  representation?
24      A.    They do both, yes.
25      Q.    Could we talk a little bit about

---

152

HODGETT

1

2  the manner in which claims paper is
3  presented to underwriters at Lloyd's, such
4  as yourself.  We talked about the JLT
5  file, for example.  What is the practice
6  in terms of the assembly of the claims
7  file, the presentation of the claims file,
8  the maintenance of a claims file, and who
9  has what roles as between the broker and
10  the insurer with respect to these kinds of
11  issues?
12      A.    The broker receives all the
13  information from his file and assembles it
14  in a way that he sees fit for presentation
15  to the underwriters and presents it to
16  underwriters.  We have no role whatsoever
17  in the assembly of that information or the
18  formation of what's in the file that is
19  shown to us.
20      Q.    Now, when you talk about
21  presented to you, or shown to you, what do
22  you mean literally?  Does a fellow come
23  over from JLT with the file in hand?
24      A.    Yes.
25      Q.    And what happens?

153

HODGETT

1
2     A.     Yes.   A JLT representative will
3  come to our office and physically present
4  his file.
5     Q.     And that's your opportunity to
6  review the claims file?
7     A.     Yes.
8     Q.     And I imagine, depending on the
9  claim, there are many different things
10  that might happen --
11     A.     Yes.
12     Q.     -- but when you finished looking
13  at the claims file and you finished making
14  such claims decisions as you as an
15  underwriter would wish to make at that
16  point, what do you do with the file and
17  what does the broker do with the file?
18     A.     I write my comments,
19  instructions, whatever on that file, and
20  hand it back to him.
21     Q.     And when there are more than one
22  insurer in a subscription policy setting
23  such as we have here, what is your
24  understanding with respect to the broker's
25  obligation, if he has one, to make a

154

HODGETT

1  presentation to any of the other
2  underwriters on the file?
3     A.     The broker will then take that
4  file to whatever following market there is
5  in each, we say, batch of the following
6  market; for example, Lloyd's
7  underwriters.   He would just see the
8  leading underwriter in Lloyd's's claims
9  office, he would say -- he would take the
10  file to Lloyd's's claims office, he would
11  take the file to the leading company, and
12  the leading company would enter it onto
13  the LIRMA system for dissemination to his
14  following market.
15     Q.     And when would you typically see
16  a file come back to you from the broker in
17  the usual course of events?
18     A.     When the broker has some more
19  information to present to me.
20     Q.     Okay.   And then you would go
21  through the same process again and make
22  notes and give it back to him?
23     A.     Absolutely.
24     Q.     Do you know an attorney named

155

HODGETT

1  Charley Cerise --
2     A.     No.
3     Q.     -- from new Orleans?
4     A.     No.
5     Q.     Have you ever heard of a firm
6  called Adams & Reese in New Orleans?
7     A.     I have heard of a firm called
8  Adams & Reese.
9     Q.     Have you ever employed them or
10  engaged them on behalf of an insured?
11     A.     No.
12     Q.     Have you ever been on a slip
13  where a leader has engaged them on behalf
14  of underwriters or on behalf of an
15  insured?
16     A.     I don't remember.
17     Q.     Okay.   When you saw the file
18  that the JLT representative brought to
19  you, I think you mentioned an answer to
20  perhaps it was one of Mr. Koster's
21  questions, that it may have included
22  pleadings.   Does it also include, to the
23  best of your general recollection --
24  because I do remember you said you don't

156

HODGETT

1  have a photographic memory -- any survey
2  reports, experts' reports, or other
3  information of that kind relating to the
4  damage, alleged damage --
5     A.     No.
6     Q.     -- in the cable?
7     A.     No.   Sorry.   No, it doesn't --
8     Q.     It did not have that?
9     A.     It didn't include any of those.
10     Q.     Have you, through any other
11  means, acquired any information of the
12  identities of the surveyors and experts
13  and others who were retained by Horizon in
14  connection with the casualty that is the
15  subject of the limitation action?
16     A.     No.
17     Q.     So, at this moment, you have no
18  reason to question the technical
19  competence of these persons who were
20  hired?   I'm not saying you approved them,
21  but you don't have any particular reason
22  to question them.
23     A.     I have no knowledge of whoever
24  was hired.

157

HODGETT

Q.    And have you by any means
acquired any knowledge of the actions that
were taken by Horizon in connection with
the activities that took place after the
incident which is the subject of the
limitation action?

A.    What do you mean by
"activities"?

Q.    Repair of the cable, for
example.

A.    I have no knowledge of what
happened with it.

Q.    So you have no particular
reason, one way or another, to question
what was done?

A.    I have no knowledge of it.

Q.    Right.  I think in answer to one
of Mr. Koster's questions, you observed
that you were aware that there was a P & I
cover in place on Horizon and that it
included 4/4ths running down coverage as
well.  Do I remember that right?

A.    I said I became aware of it.

Q.    You became aware of?

158

HODGETT

A.    Uh-huh.

Q.    On the surface of things,
stopping with that information, it would
sound like there's kind of an overlap in
coverage.  Would you agree?

A.    On the face of it, yes.  I mean,
I haven't seen the club rules.

Q.    That's what I was going to ask
you.  Have you seen the terms of the rules
of entry?

A.    No.

Q.    And have you seen the terms of
the AEGIS policy?

A.    No.

Q.    Have you seen the terms of the
American Home policy?

A.    No.

Q.    Are you aware of the existence
of something that's I think referred to
here as a conglomerate excess policy?

A.    I'm aware of an excess policy,
but I'd never heard it called that before.

Q.    Neither have I.  Well, in terms
of coordinating the payment, if any

159

HODGETT

payment were ever to be made in respect of
this casualty, who would make the
determination about which policies would
respond for which amounts?  In other
words, assuming coverage, and assuming
that, you know, all debates are off, and
it's a matter of simply looking at the
terms and conditions and picking out the
deductibles and the coordination of the
benefits under the different policies, who
would make that determination?

A.    No.

Q.    Or how would that be done?
Let's -- how would that happen?

A.    There's a lot of if's in there,
but if there was a determination of
coverage that involved all of us, then I
would hope that we -- that the
underwriters collectively between them
would come to some amicable arrangement
over that.  I wouldn't predict what that
arrangement might be.

Q.    Is there a mechanism in place in
general, in your market, where, in a case

160

HODGETT

where there are multiple policies that are
involved in a particular casualty, someone
sits down and makes an evaluation of which
policies respond and at what levels of
financial interest?

A.    Excuse me.  There is no formal
mechanism, and there is no someone.

Q.    If the broker presenting the
claim to the hull underwriters happened to
also be the broker on other policies that
were involved in the casualty, it would be
fair to say that the broker would have
knowledge of the conditions and the
deductibles and limits of each of those
policies?  Is that fair to say?

MR. RADZIK:  Note my objection.
Go ahead.  You can answer.

A.    It would be fair to say that.

Q.    Have you seen the circumstance
where a broker will present an adjustment
in the kind of a circumstance we've been
talking about, say, okay, policy A starts
here and ends here, policy B starts here
and ends here, and so on, and then bring

**161**

HODGETT

it around to all of the underwriters
concerned for them to approve?

   A.   Yes.

   Q.   Okay.  Does part of your paper
file, or on your electronic file for that
matter, include communication you have
received from Mr. Kimmitt?

   A.   Yes.

   Q.   In any of his communications,
has he included statements of what has
been said to him by Horizon?

   A.   Yes.

   Q.   And we don't have that in front
of us today in any form, do we, in terms
of what has been said to Horizon to
Mr. Kimmitt, not that you've seen going
through the papers here today?

   A.   No.

   Q.   Okay.

     MR. SCHMIDT:  I know we have one
request on the record.  Let me see if we
can get a complete copy of Exhibit 7, that
is to say, one that's long enough to cover
the material that's cut off at the bottom.

**162**

HODGETT

     I think we have the same problem
with Exhibit 8 in terms of a note that was
made by Pat Gleason in the lower
right-hand corner.

     THE WITNESS:  Left-hand corner.

     MR. SCHMIDT:  Excuse me, you're
right, you're correct.  I don't know if we
asked for Exhibit 8 to see the rest of
Mr. Gleason's comment if we didn't, could
we add that to the request.  I have
nothing further.

EXAMINATION BY MR. VAYDA:

   Q.   Mr. Hodgett, my name is Jack
Vayda and I represent AEGIS on this.  Is
it correct that you're actually employed
by Wellington Underwriting Agencies,
Ltd.?

   A.   My employer is Wellington
Underwriting PLC.

   Q.   PLC, Ltd.?

   A.   No.  Just PLC.

   Q.   Just PLC.  You testified that
the claim was presented to Lloyd's on
March 1st of 2005; is that correct?

**163**

HODGETT

     MR. ZERBE:  Objection to form.

   A.   The signature of Lloyd's's
claims office on that document is dated
the 1st of March, 2005.

     MR. RADZIK:  Referencing?

   A.   On the reservation of rights
letter, Exhibit 8.

     MR. RADZIK:  Exhibit 8, right.

   Q.   It's that data that's the basis
of your knowledge for the dates; right?

   A.   Yes.

   Q.   Thank you.  That answers the
question.

     You were talking a moment ago
about an annual aggregate deductible.

   A.   Yes.

   Q.   And you said that that excludes
total loss.

   A.   Yes.

   Q.   I'd like to probe and understand
a little bit more by what you mean by
"total loss" in that phrase.

   A.   Total loss --

   Q.   Let me finish the question.

**164**

HODGETT

What I'm wondering is whether that refers
to physical loss of a vessel or a loss
which has the value stated to be of the
vessel in the policy, or is it the same
thing?

   A.   It refers to the total loss of
the vessel, whether that loss be actual,
constructive, or compromised.

   Q.   And does it also include payment
under the policy of the total value of the
vessel?

   A.   No.

     MR. VAYDA:  Thank you.  Nothing
further.

     MR. ZERBE:  Some more questions

REEXAMINATION BY MR. ZERBE:

   Q.   Mr. Hodgett, looking again at
this exhibit, I believe you indicated your
handwriting is in the lower portion of
this document.  And I apologize if you've
been asked this question.  Do you recall
before you put that handwriting on the
document?

   A.   Yes.  The complete copy will

165

HODGETT

2  have my signature or initial at the bottom
3  and the date the 1st of December '05.
4       Q.    And do you know whether
5  Mr. Kimmitt has requested information from
6  Adams & Reese with regard to this claim?
7       A.    I don't know.
8       Q.    Okay.
9            MR. ZERBE:  Could we mark this
10  next.
11      Q.    Mr. Hodgett, have you seen this
12  document before?
13      A.    No.
14            (Continued on following page.)

166

HODGETT

2       Q.    Actually, there's a reference to
3  a number of requests for documentation.
4  Do you know whether that documentation --
5  those requests have been responded to?
6       A.    No.
7            MR. ZERBE:  Okay.
8            (Time noted: 3:10 p.m.)

13  _____
14  ~~~~~~~~~Hodgett~~~~~~~~~ .
                JOHN HODGETT
17  Subscribed and sworn to before me
18  this 4th day of _August_ , 2005
20  _____
21  Solicitor, England & Wales .

167

C E R T I F I C A T I O N

6       I, ABNER D. BERZON, a Registered
7  Professional Reporter, Certified Realtime
8  Reporter and Notary Public, do hereby
9  certify that the foregoing witness, JOHN
10  HODGETT, was duly sworn on the date
11  indicated, and that the foregoing is a
12  true and accurate transcription of my
13  stenographic notes.
14      I further certify that I am not
15  employed by nor related to any party to
16  this action.

22  _____
23  ~~~~~~~ABNER D. BERZON, RPR, CRR

168

E X H I B I T S

3
4  Plaintiff's
5  NO.        DESCRIPTION                PAGE
6  1    document Bates stamped           30
7       IRO/AE 00300 through
8       IRO/AE 00326
9  2    insurance policy involved in     31
10      this litigation
11  3    document on the stationery of    47
12      AON Natural Resources Group,
13      dated May 17, 2004
14  4    document Bates stamp A 0081      52
15  5    documents Bates stamped A 180    65
16      and A 181
17  6    batch of printed out e-mail      66
18      exchanges comprising documents
19      from witness's file commencing
20      April 1st
21  7    document dated November 15,      82
22      2004
23
24      (Exhibits Continued on following page.)

169

```
 1
 2              E X H I B I T S  (Continued)
 3
 4   Plaintiff's
 5   NO.      DESCRIPTION                 PAGE
 6   8    Reservation of Rights letter    82
 7        with the words "Assured Horizon
 8        Offshore, Inc."
 9   9    four-page document, second,    129
10        third, and fourth pages dated
11        June 7, June 24, and September
12        20, 2004, respectively
13
14
15
16
17
18
19
20
21
22
23
24
25
```

170

```
 1
 2              EXAMINATION INDEX
 3
 4
 5   WITNESS:
 6
 7   JOHN HODGETT
 8
 9   BY                        PAGE(S)
10   MR. KOSTER:               4
11   MR. ZERBE:                92, 164
12   MR. SCHMIDT:              147
13   MR. VAYDA:                162
14
15
16
17
18
19
20
21
22
23
24
25
```

171

```
 1
 2          LITIGATION SUPPORT INDEX
 3
 4
 5       DIRECTION TO WITNESS NOT TO ANSWER
 6       Page        Line        Page        Line
 7                    (None)
 8
 9
10
11       REQUEST FOR PRODUCTION OF DOCUMENTS
12       Page        Line        Page        Line
13       28          12          68          21
14       85          4           161         21
15
16
17       INFORMATION TO BE FURNISHED
18       Page        Line        Page        Line
19                    (None)
20
21
22
23       QUESTIONS MARKED FOR A RULING
24       Page        Line        Page        Line
25                    (None)
```

EXHIBIT "BB"

1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------

     IROQUOIS GAS TRANSMISSION SYSTEM L.P.,

4

                        Plaintiff,

5

          -against-

6

     ASSOCIATED ELECTRIC & GAS INSURANCE

7    SERVICES LTD., Hamilton, Bermuda; CERTAIN
     UNDERWRITERS AT LLOYD'S; AON RISK SERVICES

8    OF TEXAS, INC.; and AMERICAN HOME
     ASSURANCE CO.,

9

                        Defendants.

10

     05 CV 2149 (JSR)

11

12   ------------------------------------------

                        August 3, 2005

13                      10:16 a.m.

14

15

16

17          DEPOSITION of MICHELLE L.

18   WIELER, taken by Defendants, pursuant to

19   Notice, held at the offices of HEALY &

20   BAILLIE, LLP, 61 Broadway, New York, New

21   York before Wayne Hock, a Notary Public of

22   the State of New York.

23

24

25

6

1  defendants by Judge Rakoff on July 22
2  with the exception of these two
3  depositions going forward, and we
4  reserve our rights with respect to
5  this deposition as well.
6
7  M I C H E L L E  L.  W I E L E R, having
8      been first duly sworn by a Notary Public of
9      the State of New York, upon being examined,
10     testified as follows:
11 EXAMINATION BY
12 MR. RADZIK:
13    Q.   Could you state your name for
14 the record, please.
15    A.   Sure. It's Michelle Lynn
16 Wieler.
17    Q.   Can you state your address
18 please.
19    A.   Sure. It's 441 Dayton Road,
20 Trumbull, Connecticut 06611.
21    Q.   Ms. Wieler, my name is Edward
22 Radzik. Myself and my associate, we
23 represent the hull underwriters of
24 Horizon. We're here to take your
25 deposition today.

7

1            M. L. Wieler
2      Have you had your deposition
3  taken before?
4     A.   No.
5        MR. RADZIK: It's a question and
6  answer period. I ask the questions
7  and you respond to the questions with
8  the best answer. The court reporter
9  is going to require you to answer
10 verbally.
11       THE WITNESS: Okay.
12       MR. RADZIK: I'll assume that if
13 you answer my question, that you
14 understand the question and that
15 you're giving a truthful answer. If
16 you don't understand my question,
17 please tell me, I'll try to rephrase
18 it in a way that is understandable.
19       At times you may hear objections
20 from various of the attorneys in the
21 room. We still require an answer
22 notwithstanding these objections.
23       MR. SINGLETON: Unless I instruct
24 her not to answer on the grounds of
25 privilege.

8

1            M. L. Wieler
2     Q.   By whom are you employed?
3     A.   Iroquois Pipeline Operating
4  Company.
5     Q.   What is your occupation?
6     A.   I'm a senior accountant.
7     Q.   What are your duties as a senior
8  account?
9     A.   I do SEC reporting for the
10 company, year-end financial statements, I
11 do some system administration for our
12 accounting system, and I also do some
13 insurance duties.
14    Q.   Do you have any duties with
15 respect to contracts that Iroquois enters
16 into?
17    A.   Yes, just recently I've been
18 reviewing the contracts that Iroquois
19 enters into. If Iroquois enters into a
20 contract and there's an insurance section
21 in it, I would look over that insurance
22 section to make sure we have the required
23 insurance and I also would take the lead
24 in instructing Marsh to issue an insurance
25 certificate.

9

1            M. L. Wieler
2     Q.   And Marsh is your insurance
3  broker; is that correct?
4     A.   Yes, Marsh is our insurance
5  broker that I work closely with.
6     Q.   Can you give me a thumbnail
7  sketch of your educational background,
8  please.
9     A.   Sure.
10       I have a four-year degree from
11 Sacred Heart University in accounting, a
12 bachelor's degree. And after college I
13 went to work for KPMG Peat Marwick in
14 accounting and tax fields for about four
15 and a half years.
16    Q.   Since that time have you been
17 with --
18    A.   And I took a couple of years off
19 to start my family and I've been with
20 Iroquois for ten years, about '95 to 2005.
21    Q.   My questions are going to
22 pertain to an incident back on
23 February 27, 2003.
24    A.   Okay.
25    Q.   When I refer to the incident,

14

M. L. Wieler
1  Home?
2  A.  Yes.
3  Q.  And the next page with Bates
4  stamped 588, do you also recognize that to
5  be a letter from you dated March 18, 2003
6  addressed to American Home care of
7  American International Marine Agency,
8  Inc., the excess liability underwriters
9  for Horizon?
10 A.  I do.
11 Q.  And the following page bearing
12 Bates stamp 589, do you recognize that to
13 be the return receipt information for
14 certified mail going to American Home?
15 A.  I do.
16 Q.  The next page bearing Bates
17 stamp 590, is that a letter dated
18 March 18, 2003 also addressed to American
19 Home care of American International Marine
20 Agency of Houston, Texas with respect to
21 Horizon's general liability policy?
22 A.  Yes.
23 Q.  And the next page is the return
24 receipt information for that mailing?
25

15

M. L. Wieler
1  A.  Yes.
2  Q.  The next page bearing Bates
3  stamp 582 is a letter from you dated
4  March 18 addressed to Navigators Insurance
5  Company via Navigators Insurance Services
6  of Texas, Inc., Houston, Texas with
7  respect to Horizon's excess liability
8  policy.
9      Do you recognize that to be the
10 case?
11 A.  I do.
12 Q.  The next letter, which is a
13 piece of correspondence bearing Bates
14 stamp number 583 addressed to the
15 Steamship Mutual Underwriting Associates
16 Bermuda LTD in London, England, do you
17 recognize this to be a letter dated
18 March 17, 2003 to that company?
19 A.  I do.
20 Q.  The next document bearing Bates
21 stamp 596 is a letter dated March 17, 2003
22 addressed to Liberty Insurance
23 Underwriters with respect to Horizon's
24 excess liability policy.
25

16

M. L. Wieler
1  Do you recognize that to be the
2  case?
3  A.  I do.
4  Q.  And the next page bearing Bates
5  stamp 597, is that the return receipt
6  information with respect to the mailing to
7  Liberty Insurance Company -- Liberty
8  Insurance Company?
9  A.  I do.
10 Q.  The next letter in the
11 Exhibit 11 bears Bates stamp 600 addressed
12 to Navigators with the address crossed out
13 is 2121 Sage, suite 145, Houston, Texas,
14 is that your writing?
15 A.  It is.
16 Q.  Is that a mailing that you sent
17 to Navigators Insurance Company on or
18 about March 17, 2003?
19 A.  It is.
20 Q.  And the next document is a
21 document bearing Bates stamp 601, is that
22 the return receipt information with
23 respect to the mailing to Navigators
24 Insurance?
25

17

M. L. Wieler
1  A.  It is.
2  Q.  The next document bearing Bates
3  stamp 602, is that a letter dated
4  March 17, 2003 addressed to Excess
5  Specialty Insurance Company, also one of
6  Horizon's excess liability underwriters,
7  from you on that date?
8  A.  It is.
9  Q.  And the next document in the
10 package is -- bears Bates stamp
11 number 603, is that the return receipt
12 information with respect to the mailing to
13 Excess Specialty Insurance?
14 A.  Yes.
15 Q.  What was your purpose in sending
16 these notifications to Horizon's
17 underwriters?
18 A.  I was requested by the legal
19 department to do so.  We had asked Horizon
20 to provide copies of their notifications
21 to us and they had not so we had decided
22 to be cautious and send our own
23 notifications as well.
24 Q.  Are you claiming as an initial
25



22

M. L. Wieler
1   the carrier, but that's who I obtained it
2   from. We had been asking Horizon if they
3   notified the hull carrier and they told us
4   they did so we asked them to provide us
5   with the documentation and we didn't get
6   it from them, but I was dealing with Willy
7   Farmer getting these drafts circulated to
8   the various parties and I was able to get
9   this from Willy Farmer.
10      Q.   And Willy Farmer is with
11  McGriff?
12      A.   Yes.
13      Q.   He's the present broker for
14  Horizon?
15      A.   Present broker for Horizon, yes.
16      Q.   Who has replaced Aon?
17      A.   That's correct.
18      Q.   Do you know when that change
19  took place?
20      A.   I believe he told me that it was
21  recent so I want to say in November, 2005,
22  you know, a couple of months prior to
23  that.
24          MR. SINGLETON: You mean 2004.

23

M. L. Wieler
1       Q.   November, 2004?
2       A.   Yes.
3       Q.   November, 2005 hasn't occurred
4   yet.
5           So around November of 2005, you
6   had a conversation with Willy Farmer of
7   McGriff's and he advised you that hull and
8   machinery underwriters had been put on
9   notice of the claim?
10      A.   Yes, and he helped us get the
11  copy of the contractual settlement
12  agreement over to the hull underwriters
13  and the other underwriters of Horizon.
14      Q.   But the contractual settlement
15  has nothing to do with the February 27
16  incident?
17      A.   Yes, other than that being
18  around the time that we found out or that
19  we had heard that the hull policy might
20  have some bearing in the case.
21          MR. SINGLETON: Ed, let me just
22  interject here, there are actually
23  three separate litigations.
24          MR. RADZIK: We'll get into that.

24

M. L. Wieler
1           MR. SINGLETON: But you keep
2   flopping back and forth. There was
3   the limitation action in Texas that
4   deals with the anchorage, there was --
5           MR. RADZIK: We haven't gotten
6   there.
7           MR. SINGLETON: Then there was
8   the initial cable strike that occurred
9   around November of 2002. Then there
10  was a separate suit that Horizon
11  started in New York State court to
12  resolve contractual suits and Iroquois
13  counterclaimed in that. That is the
14  settlement that Michelle was talking
15  about that was the driving force
16  behind sending a settlement notice.
17      Q.   You indicated earlier in your
18  testimony that you were not aware that the
19  hull and machinery policy had collision
20  and liability features to it; is that
21  right?
22      A.   Yes.
23      Q.   Did you take any part in
24  drafting or putting together the contract

25

M. L. Wieler
1   that's before you which is marked as
2   Exhibit 12?
3       A.   No, the contract was drafted by
4   the legal department. I did take a look
5   at the insurance section to see if there
6   was anything that I thought needed to be
7   added, but this is the standard
8   requirements that we require from
9   contractors.
10      Q.   Did you review the insurance
11  provisions of this contract before it was
12  signed?
13      A.   Before it was signed? Yeah, I
14  sent it over to Marsh, checked with them
15  to see if they noticed anything.
16      Q.   Could you refer to the insurance
17  provisions in the contract? I believe
18  they're starting at page 0026. It looks
19  like they run from 0026 to 0031.
20      A.   (Reviewing).
21      Q.   I want to refer you specifically
22  to page 0027.
23          Do you see that?
24      A.   Okay.



**Page 30**

1  M. L. Wieler
2  Iroquois at the time?
3  A.  For Iroquois it was Ken Webb.
4  Q.  And did Ken Webb at some point
5  in the context of the limitation action,
6  as we call it, pending in Houston, did he
7  prepare an affidavit to be submitted in
8  that case?
9  A.  I'm really not familiar with it.
10  MR. RADZIK: I'm going to show
11  you what's been not previously marked
12  but -- can you mark this as the next
13  exhibit.
14  (Whereupon, a document entitled
15  Affidavit of Ken Webb in Support of
16  Motion to Transfer Venue was marked
17  Deposition Exhibit 13 for identification.)
18  Q.  I hand you a document that's
19  been marked as Exhibit 13.
20  Now, you indicated that Ken Webb
21  was the project manager?
22  A.  Yes.
23  Q.  And do you know how long Mr.
24  Webb has been working with Iroquois?
25  A.  He's not working with Iroquois

**Page 31**

1  M. L. Wieler
2  any longer as an employee.
3  Q.  But he was at the time of this
4  -- of the incident; is that correct?
5  A.  That's correct.
6  Q.  And do you know how long he had
7  been an employee of Iroquois?
8  A.  Several years, but I'd be
9  guessing as to how many.
10  Q.  Now, at paragraph two on page
11  two of Exhibit 3 Mr. Webb states that
12  Iroquois is the owner of a three hundred
13  seventy-seven-mile natural gas pipeline
14  extending from the Canadian border through
15  the State of New York and across western
16  Connecticut and Long Island Sound to
17  Huntington, Long Island, New York.
18  Do you see that statement?
19  A.  Yes.
20  Q.  To your knowledge, is that a
21  true and correct statement?
22  A.  Yes.
23  Q.  And in connection with the
24  thirty-five-mile extension, did Iroquois
25  first have to go out and obtain permits

**Page 32**

1  M. L. Wieler
2  for that pipeline construction from
3  various agencies within the State of New
4  York?
5  A.  I'm sure that they did, but
6  again, that's not my area. I wouldn't
7  have been involved in it.
8  Q.  From an insurance standpoint,
9  would any part of the project which
10  Iroquois wished to obtain the status of an
11  additional insured on Horizon's policy
12  have any risk outside the State of New
13  York?
14  A.  Can you repeat the question?
15  MR. RADZIK: Can you read it
16  back.
17  (Whereupon the requested portion
18  was read back by the reporter)
19  MR. SINGLETON: Objection.
20  Q.  Do you understand the question?
21  A.  I'm not sure I'm qualified to
22  answer that.
23  Q.  Did you have any involvement in
24  the preparation of Mr. Webb's affidavit
25  which he submitted to the district court

**Page 33**

1  M. L. Wieler
2  in Houston in connection with the
3  limitation action?
4  A.  No.
5  Q.  Did you have any involvement
6  with the preparation of any pleadings that
7  were submitted in the limitation action in
8  Houston on behalf of Iroquois?
9  A.  No.
10  Q.  Was it your understanding that
11  the incident was covered by one of
12  Horizon's policies which would give, also
13  give Iroquois additional insured status?
14  A.  Under the contract, they were
15  required to name Iroquois as an additional
16  insured for these types of matters. Yes,
17  it's my understanding that Iroquois would
18  be covered under Horizon's policy for
19  liability.
20  Q.  To your knowledge, would that
21  risk be covered by Horizon's protection
22  and indemnity policy?
23  A.  As we're an additional insured
24  under there, I would believe so.
25  Q.  Are you familiar with the



38

M. L. Wieler

1 answer?
2    MR. SINGLETON: Yes, you can
3 answer.
4    A.  I understand, pursuant to the
5 contract and the insurance contracts that
6 we were issued, that Iroquois is an
7 additional insured under Horizon's
8 policies.
9    Q.  For what?
10    A.  For liabilities.
11    Q.  Is it your understanding that
12 Iroquois, as an additional insured, would
13 enjoy the same coverage as was afforded to
14 Horizon?
15    A.  I believe so, that the intent
16 was to have Horizon's insurance be primary
17 on matters arising out of the construction
18 events.
19    Q.  Would it be your understanding
20 that the hull and machinery policy covers
21 for Horizon's contractual liabilities?
22    MR. SINGLETON: I object.
23    A.  I'm not really sure how
24 Horizon's insurance applies.
25

39

M. L. Wieler

1    Q.  Do you believe or does Iroquois
2 take the position that it is covered under
3 Horizon's policies for faults that may be
4 attributed to Iroquois?
5    A.  For what that may be attributed
6 to?
7    Q.  Faults.
8    A.  Faults?
9    Q.  Yes.
10    MR. SINGLETON: Objection.
11    A.  It sounds like a legal matter to
12 me.
13    Q.  Is it Iroquois' position that
14 Horizon's policies cover for Iroquois' own
15 negligence?
16    A.  Insurance policies are taken out
17 to cover negligence, I would think they
18 cover negligence. I'm not sure negligence
19 is involved; I have no knowledge of that.
20    Q.  To your knowledge, has there
21 been any adjudication holding Horizon at
22 fault for the incident?
23    A.  It's not my area. I'm really
24 not sure. It sounds like a legal matter.
25

40

M. L. Wieler

1    Q.  To your knowledge, has Iroquois,
2 in the context of the limitation
3 proceeding in Houston, energetically
4 prosecuted its claims against Horizon in
5 an effort to show that Horizon was at
6 fault?
7    A.  I'm really not familiar with the
8 proceedings, that's not my area.
9    Q.  Besides notification of the
10 various underwriters of the incident, what
11 matters were you involved in?
12    MR. SINGLETON: It's a little
13 broad. Can you narrow that down a
14 little bit? What matters in
15 connection with what?
16    MR. RADZIK: With the incident.
17    A.  With this incident?
18    Q.  Correct.
19    A.  The cable incident?
20    MR. SINGLETON: I object to the
21 form of the question.
22    A.  I'm not sure I understand.
23    Q.  Earlier you testified that one
24 of the first things you did was you put
25

41

M. L. Wieler

1 the various underwriters on notice, those
2 being Iroquois' own underwriters and those
3 of Horizon's.
4    Besides that, what activity did
5 you have with respect to this matter?
6    MR. SINGLETON: To be fair, she
7 testified to more than that, Ed. I'm
8 not going to characterize it, but I
9 object to the way you phrased her
10 prior testimony.
11    A.  Again, I notified the insurance
12 companies under the direction of legal.
13 Under the direction of legal, I circulated
14 the settlement agreement that settled the
15 contractual claims so as not to prejudice
16 the insurance in this matter. I had
17 contact with Willy Farmer to get the
18 document showing that they notified the
19 hull carriers. I'm not really sure what
20 else you're talking about.
21    Q.  The settlement that you're
22 speaking of is totally separate from the
23 February 27, 2003 incident.
24    A.  It is. Again --
25

46

M. L. Wieler

1  next exhibit — of the Iroquois gas
2  transmission system map.
3       (Whereupon, a seven-page
4  document was marked Deposition
5  Exhibit 16 for identification.)
6       Q.   Does this Exhibit 16 accurately
7  depict the pipeline and the various gas
8  compressors, substations in the Iroquois
9  gas transmission system; to your
10 knowledge?
11      A.   Well, it's not complete, it's
12 not a complete map.
13      Q.   I think the map goes over onto
14 the second page.
15      A.   Okay.
16           (Reviewing).
17           It looks accurate.
18      Q.   And do the photographs starting
19 on the second page depict the various
20 compressor stations that Iroquois
21 maintains throughout the pipeline?
22           MR. SINGLETON: I object to the
23 form.
24           Are you asking whether that's

47

M. L. Wieler

1  what it says or whether she's been
2  there and seen these things and it's
3  an accurate representation?
4       Q.   Have you been to any of the
5  facilities that Iroquois maintains
6  throughout --
7       A.   I have been to one facility, one
8  compressor facility.
9       Q.   Where is that?
10      A.   The Athens.
11      Q.   And do these pages give an
12 accurate depiction of --
13      A.   This picture looks like it
14 (referring).
15      Q.   Which one is that?
16      A.   The one that says Athens.
17      Q.   There's several that say Athens.
18      A.   Yes, there are.
19           The green building.
20           MR. SINGLETON: For the record,
21 the one the witness said looks like
22 Athens is labeled Croton.
23           THE WITNESS: It was a while ago.
24 And there's pictures on the wall at

48

M. L. Wieler

1  the company so that's why it might
2  look familiar.
3       Q.   As far as you know, these are
4  the stations that Iroquois maintains
5  throughout the pipeline system?
6       A.   You say this was posted on our
7  Web site?
8       Q.   Yes.
9       A.   Yes, I'm sure that they are.
10          MR. SINGLETON: The question he's
11 asking you is do you know.
12          THE WITNESS: Do I know?
13      A.   I didn't put them on the Web
14 site, no, and I haven't been to most of
15 them so I guess I can't know personally.
16      Q.   To your knowledge, in
17 preparation for this pipeline or
18 Eastchester project, extension project,
19 did Iroquois have to obtain easements from
20 the Town of Huntington and from the City
21 of New York to drill horizontally,
22 directionally drill holes?
23      A.   I believe they did.
24      Q.   And to your knowledge, did

49

M. L. Wieler

1  Iroquois have to obtain permits from the
2  department of -- New York Department of
3  Environmental Conservation?
4       A.   It sounds reasonable, but I
5  don't have personal knowledge of it.
6       Q.   And to your knowledge, did
7  Iroquois have to obtain permits from the
8  Office of General Services of New York
9  State?
10      A.   I'm not sure.
11      Q.   Do you know, after this
12 incident, whether Iroquois brought the
13 United States Coast Guard's office in New
14 York on notice of this incident?
15      A.   I don't have personal knowledge.
16      Q.   Do you know whether, in
17 connection with the Eastchester extension
18 project, Iroquois had to obtain permits
19 from the New York office of the Army Corps
20 of Engineers?
21      A.   I don't have personal knowledge.
22 Again, the permitting area is not my area.
23      Q.   Who within Iroquois would
24 know --



54

M. L. Wieler

1
2   agreements between Iroquois and Con Edison
3   had a provision for the application of New
4   York law?
5       A.   I don't know.
6       Q.   Do you know whether the crossing
7   agreement between Iroquois and Long Island
8   Power Authority had a provision for New
9   York law?
10      A.   I don't know.
11          MR. SINGLETON: I object to the
12      form of the question.
13          Go ahead and answer it.
14      A.   I don't know.
15      Q.   Now, in addition to notifying
16  Iroquois' own insurers, those being
17  Liberty Mutual, AEGIS, and Energy
18  Insurance Mutual and all of Horizon's
19  underwriters except for hull and
20  machinery, did Iroquois also independently
21  notify the insurers of any other entity in
22  connection with this incident?
23      A.   Yes.
24      Q.   And whom did they notify?
25      A.   Pegasus.

56

M. L. Wieler

1
2       Q.   Ms. Wieler, I'm going to show
3   you a document that has been produced by
4   Iroquois in this litigation and we've
5   marked it as Exhibit 19.
6          Is that a letter from yourself
7   to Thales' excess liabilities insurers,
8   National Union Insurance Company of
9   Pittsburgh dated March 17, 2003?
10      A.   Yes.
11      Q.   Is that the notice you were
12  referring to --
13      A.   Yes.
14      Q.   -- in your prior answer?
15      A.   Yes.
16      Q.   What was your purpose of putting
17  Thales insurers on notice of the incident?
18      A.   I was asked to by the legal
19  department.
20      Q.   Was it your understanding or had
21  you been informed that Thales had an
22  agreement whereby they agreed to indemnify
23  or insure Horizon and its customers?
24      A.   I don't have any knowledge of
25  that. My only knowledge would be that

55

M. L. Wieler

1
2       Q.   Would you tell us who Pegasus is
3   and how they relate to this incident?
4       A.   They were construction manager,
5   Bob Yetton of Pegasus was a construction
6   manager I think on the marine portion of
7   the project.
8       Q.   Are you familiar also with a
9   company by the name of Thales or Thales?
10      A.   Only in that I remember sending
11  notification to their insurers as well.
12      Q.   You sent notifications to the
13  insurers of Thales?
14      A.   Yes.
15      Q.   And do you know approximately
16  when you put Thales underwriters on notice
17  of the incident?
18      A.   I believe the copy should be in
19  the documents.
20          MR. RADZIK: Let's mark this next
21      page bearing Iroquois -- IRO/AE 00704
22      as the next exhibit.
23          (Whereupon, a letter dated
24      March 17, 2003 was marked Deposition
25      Exhibit 19 for identification.)

57

M. L. Wieler

1
2   Iroquois requires its subs to also carry
3   insurance.
4       Q.   Now, could you describe, to your
5   knowledge, what services Thales provided
6   in connection with the Eastchester
7   extension pipeline project?
8       A.   The whole project?
9       Q.   Yes.
10      A.   I'm not very familiar. They
11  were a subcontractor of Horizon, that's
12  about the extent of my knowledge.
13      Q.   Do you know whether they had
14  also been employed independently by
15  Iroquois prior to the project to locate
16  the electrical -- the subsea electrical
17  cables?
18      A.   I really don't know.
19      Q.   Are you familiar with the master
20  service agreement that exists between
21  Horizon and Thales?
22      A.   I don't have any knowledge.
23  It's not in my area.
24          MR. RADZIK: Mark these next
25      three, please.



62

M. L. Wieler

1    read that provision to yourself.
2        A.    (Reviewing).
3        Q.    Now, this is a provision, is it
4    not, for the application of New York law
5    with respect to any disputes between your
6    excess liability insurer?
7        A.    I would have to check with
8    legal.
9
10       Q.    Does this provision provide for
11   New York law with respect to any disputes
12   between the companies?
13       A.    I never -- it's not in my
14   authority to interpret law.
15       Q.    Is that the responsibility of
16   the legal department?
17       A.    That's correct.
18       Q.    Would that also hold true for
19   the provisions on the fourth page with
20   respect to New York arbitration or
21   arbitration in New York City and if not
22   arbitration in New York City, arbitration
23   in the jurisdiction of the Southern
24   District of New York?
25           MR. SINGLETON: What was your

63

M. L. Wieler

1    question?
2        Q.    Would these provisions also be
3    handled by the legal department --
4        A.    Legal department.
5        Q.    -- as opposed to yourself?
6        A.    Yes.
7        Q.    Finally I'm going to hand you
8    what's been marked as Exhibit 22, which is
9    also documents produced in this litigation
10   by Iroquois.
11           Do you recognize these, Ms.
12   Wieler, as documents relating to excess
13   policy -- excess liability policy issues
14   by AEGIS?
15       A.    Yes.
16       Q.    Again on the third page of that
17   exhibit there is an arbitration provision
18   in paragraph three which provides for the
19   arbitration of any disputes under that
20   policy.
21           Is that something that you in
22   your capacity of senior accountant at
23   Iroquois would have anything to do with?
24       A.    No.

64

M. L. Wieler

1        Q.    Would that be something that
2    would be handled by the legal department?
3        A.    Yes.
4        Q.    If we can look at the last page
5    of this exhibit, it bears Iroquois Bates
6    stamp 541.
7            Is this another amendment to the
8    watercraft exclusion endorsement --
9        A.    Yes.
10       Q.    -- which provides for coverage
11   of watercraft in connection with the
12   Eastchester extension project?
13       A.    It does.
14       Q.    Besides putting Horizon's
15   underwriters with the exception of the
16   hull and machinery underwriters, the
17   underwriters of Thales, the underwriters
18   of Pegasus, did Iroquois, to your
19   knowledge, put any other insurers on
20   notice of this incident?
21           MR. SINGLETON: I object to the
22   form of the question.
23       A.    I don't believe so. I would
24   check through my correspondence to see if

65

M. L. Wieler

1    I did any others, but nothing comes to
2    mind.
3            MR. RADZIK: I'm going to show
4    you what has been produced today by
5    your attorneys prior to the deposition
6    bearing Bates stamp numbers IRO/AE 874
7    through 892.
8            Could you mark this.
9            (Whereupon, a document entitled
10   Certificate of Liability Insurance
11   was marked Deposition Exhibit 23
12   for identification.)
13       Q.    Ms. Wieler, I'm going to hand
14   you what's marked as Exhibit 23. I'll ask
15   you if you can go through each page and
16   ask you how the document relates to the
17   incident that's under discussion today.
18       A.    The first page is an insurance
19   certificate for Pegasus International, who
20   was a contractor of Iroquois on the
21   contract.
22       Q.    That certificate is issued in
23   favor of whom?
24       A.    Iroquois.

70

M. L. Wieler

1  this is a letter we received from NYPA
2  about the incident that we forwarded on to
3  the insurers, to the broker, to forward to
4  the insurance companies.
5      Q.   These documents that you've
6  identified within Exhibit 23, were those
7  documents that were kept in your own file?
8      A.   Yeah. I had a folder that had
9  some documents in it. We went through
10  them.
11     Q.   If you can continue on.
12     A.   887.
13     Q.   What is that?
14     A.   This is notification on April 8,
15  2003.
16     Q.   And that is notification from
17  yourself to whom?
18     A.   This is notification from myself
19  to the insurers of Odyssea Marine, Inc.
20     Q.   Who in the whole realm of things
21  is Odyssea Marine, Inc.?
22     A.   I don't recall their
23  involvement. I just received instructions
24  to notify the insurers.
25

71

M. L. Wieler

1      Q.   Was that also sent certified
2  mail?
3      A.   Yes. I'm sorry, it says UPS
4  mail overnight.
5      Q.   Do you recall receiving a
6  response from Odyssea or its underwriters?
7      A.   No.
8      Q.   Can you tell us what the next
9  document in that stack is?
10     A.   888.
11     Q.   What is that?
12     A.   This is from letter from me
13  again regarding Odyssea Marine sent to JLT
14  Risk Solutions notifying them of the
15  incident in question.
16     Q.   Who is JLT Risk Solutions, to
17  your knowledge?
18     A.   I believe they're the
19  London-side broker that worked with Aon
20  for Horizon's placements. I would imagine
21  they're similar for Odyssea.
22     Q.   The next document in the stack.
23     A.   889 dated April 8, a letter from
24  myself to American Home Assurance Company.
25

72

M. L. Wieler

1      Again the insured is Odyssea Marine, Inc.
2  and it's notification to the insurer about
3  the incident in question.
4      Q.   The next page?
5      A.   890 is the return receipt,
6  certified mail receipt.
7      891, and this is correspondence
8  from the claims manager at Marsh dated
9  April 4, 2003 to Ken Mahoney of Liberty
10  Mutual. And it just says encloses
11  additional correspondence for your
12  information. I don't see an attachment so
13  I'm not really sure what was attached.
14     The next one is 892, same date,
15  April 4, 2003. It's a letter from Linda
16  Boyd, the claims manager at Marsh,
17  submitting additional information to John
18  Fetterly of Chubb Insurance -- Chubb
19  Financial Solutions.
20     Q.   How is Chubb Financial Solutions
21  involved in this case, if at all?
22     A.   Actually, we put them on notice
23  of the incident. We purchased an
24  insurance policy for pollution from them;
25

73

M. L. Wieler

1  we weren't sure if there was going to be
2  any pollution arising out of the event so
3  we put them on notice.
4      MR. RADZIK: The next exhibit is
5  also part of documents that was
6  produced by your counsel in this
7  litigation
8      (Whereupon, a document entitled
9  Amendment of Limits of Insurance
10  was marked Deposition Exhibit 24
11  for identification.)
12     Q.   I'm going to show you what's
13  been marked as Exhibit 24 and this was
14  excerpted from your CGL policy.
15     Is that an endorsement related
16  to your designated locations that are
17  owned and operated by Iroquois in New York
18  or Connecticut?
19     A.   I'm not really sure what it is.
20     Q.   Do you recognize the addresses
21  on the second page?
22     A.   Yes.
23     Q.   Can you tell me, are those
24  Iroquois places of business?
25

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868
516-608-2400

78

M. L. Wieler

1  focus again on section 2.1.8.
2  A.   (Reviewing).
3  Q.   Now, with respect to hull and
4  machinery insurance requirements, these
5  are requirements that Iroquois has of the
6  contractor, in this case Horizon; is that
7  correct?
8  A.   Yes. I think they originally
9  came from the contract of our previous
10  marine -- when we did the first part of
11  the marine contract with McDermott. I
12  think these are pro forma in there.
13  Q.   First part of the marine
14  contract with McDermott.
15       Is that part of the original
16  pipeline construction, four hundred eleven
17  miles that went from Waddington, New York
18  to Huntington?
19  A.   Yes.
20  Q.   And McDermott contracted with
21  Iroquois for the undersea part of that?
22       MR. SINGLETON: It's a small
23  point but it went from Waddington to
24  Commack, just so we're clear.

79

M. L. Wieler

1  A.   Yes.
2  Q.   But the undersea part --
3  A.   Yeah, and I believe that's where
4  the terms and conditions came from.
5  Q.   My question is these are
6  requirements that Iroquois expects that
7  the contractors are going to meet; is that
8  correct?
9  A.   Correct.
10  Q.   So Iroquois would have an
11  expectation that if it's required by the
12  contract, that the contractor is going to
13  go out and get the type of policies that's
14  described in the contract?
15  A.   Correct.
16  Q.   When did -- actually, when did
17  you or anyone from Iroquois become aware
18  that there was a potential for the hull
19  and machinery policy to provide coverage
20  in this case?
21  A.   I thought I answered that. It
22  was around November or December of 2004.
23  Remember I said 2005?
24  MR. SINGLETON: By mistake.

80

M. L. Wieler

1  A.   And that was around the time
2  that it was time to circulate the
3  settlement agreement for the contractual
4  disputes and legal counsel had instructed
5  me to do the hull and -- the hull carriers
6  as well because there was some question
7  about whether they had some kind of
8  implication.
9  Q.   I wasn't clear, but at that time
10  did you put the hull and machinery
11  carriers on notice for the February 27,
12  2003 incident?
13  A.   No, I don't believe so. I think
14  we got from Willy Farmer the piece of
15  paper indicating that Horizon had at that
16  time but we did not.
17  Q.   And the piece of paper from
18  Willy Farmer was what, notes or e-mail?
19  A.   No, it was a slip from Aon
20  reporting the loss.
21  MR. SINGLETON: To whom?
22  THE WITNESS: To the hull
23  carriers. It's in the exhibits
24  somewhere.

81

M. L. Wieler

1  Q.   Now, you've described these
2  along-the-pipeline compressor stations and
3  meter stations.
4       Are those places where Iroquois
5  has employees?
6  A.   Not at meter stations.
7  Q.   At the compressor stations?
8  A.   Yes.
9  Q.   How many employees per station?
10  A.   A few, a couple.
11  Q.   What do they do?
12  A.   Monitor the stations. I think
13  maybe some field personnel are stationed
14  out of the field offices.
15  MR. RADZIK: That's all I have.
16  (Whereupon a break was taken)
17  MR. SINGLETON: Would you mark
18  this, please, as the next exhibit.
19  (Whereupon, a one-page document
20  was marked Deposition Exhibit 26
21  for identification.)
22  MR. SINGLETON: And if you could
23  put a sticker on this book.
24  (Whereupon, a document entitled

86

M. L. Wieler

1
2 actual policies described in these
3 certificates?
4      A.   I believe after the first
5 incident occurred that we talked about in
6 November of 2002 the legal department put
7 a request in to Horizon to produce copies.
8 I don't --
9      Q.   How about at the time the
10 contract was entered into, do you know if
11 anyone --
12      A.   Not to my knowledge.
13      Q.   -- of Iroquois had requested --
14      MR. SINGLETON: Let him finish
15 the question.
16      Q.   -- Horizon or its broker to
17 provide copies described in the
18 certificates of insurance?
19      A.   I'm not aware of such a request.
20 We typically only request -- we don't
21 request the policies when we sign the
22 contract.
23      MR. RADZIK: Thank you very much.
24      (Whereupon a break was taken)
25      MR. SINGLETON: Can you mark

87

M. L. Wieler

1
2 this.
3      (Whereupon, a document entitled
4 Certificate of Insurance was marked
5 Deposition Exhibit 28
6 for identification.)
7      MR. SINGLETON: When we went off
8 the record last time, we realized what
9 we marked as Exhibit 27 were actually
10 notices to NYPA and not the Horizon
11 Offshore certificate. So we've now
12 marked as Exhibit 28 a document
13 consisting of Bates numbers IRO/AE 678
14 through 682.
15 EXAMINATION BY
16 MR. SINGLETON:
17      Q.   Ms. Wieler, are these the
18 documents -- is this the document that you
19 reviewed in determining which insurer to
20 provide notice to?
21      A.   That's correct.
22      Q.   As you testified in your earlier
23 testimony today?
24      A.   That's correct.
25      MR. SINGLETON: Is there anything

88

M. L. Wieler

1
2 else on the record?
3      MR. ZERBE: Off the record.
4      (Discussion held off the record)
5      Q.   When you were deciding which
6 insurers to notify, did you look at both
7 twenty-seven and twenty-eight or just
8 twenty-eight?
9      A.   I believe it was just
10 twenty-eight. This certificate was issued
11 -- Exhibit 27, the certificate of
12 insurance, was issued to NYPA, not to
13 Iroquois. I looked at the one issued to
14 Iroquois.
15      (TIME NOTED: 12:41 p.m.)
16 _____ (Signature of witness)
17 Subscribed and sworn to
18 before me this_____
19 day of_____.
20 2005.
21 _____
22
23
24
25

89

1
2           *   *   *
3
4              I N D E X
5 WITNESS       EXAMINED BY      PAGE
6 M. L. Wieler  Mr. Radzik  6, 77, 84
7              Mr. Singleton  77, 82, 87
8      E X H I B I T S
9 DEPOSITION FOR IDENTIFICATION      PAGE
10 11 Letter with attachments dated
11    March 17, 2003            11
12 12 Document entitled Construction
13    Contract            18
14 13 Document entitled Affidavit of
15    Ken Webb in Support of Motion to
16    Transfer Venue         30
17 14 E-mail dated June 10, 2004     34
18 15 One-page document         36
19 16 Seven-page document         46
20 17 Document entitled Crossing
21    Agreement Long Island Sound     50
22 18 Document entitled Certificate of
23    Insurance         51
24 19 Letter dated March 17, 2003     55
25 20 Letter dated August 14, 2002     58

VERITEXT/NEW YORK REPORTING COMPANY, LLC
212-267-6868                                    516-608-2400

EXHIBIT "CC"

1

1   UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
3   ------------------------------------------

    IROQUOIS GAS TRANSMISSION SYSTEM L.P.,
4
                        Plaintiff,
5
            -against-
6
    ASSOCIATED ELECTRIC & GAS INSURANCE
7   SERVICES LTD., Hamilton, Bermuda; CERTAIN
    UNDERWRITERS AT LLOYD'S; AON RISK SERVICES
8   OF TEXAS, INC.; and AMERICAN HOME
    ASSURANCE CO.,
9
                        Defendants.
10
    05 CV 2149 (JSR)
11
    ------------------------------------------
12
                        August 9, 2005
13                      10:06 a.m.
14
15
16
17          DEPOSITION of JAMES I. MONTANO,
18   taken by Plaintiff, pursuant to Notice,
19   held at the offices of DECHERT, LLP, 30
20   Rockefeller Plaza, New York, New York
21   before Wayne Hock, a Notary Public of the
22   State of New York.
23
24
25

4

6

T. I. Montano
1  acquired by Aon in 1987.
2  Q.  What was the previous company?
3  A.  Adams and Porter.
4  Q.  And where was Adams and Porter
5  located?
6  A.  Houston, Texas.
7  Q.  How long have you been in the
8  insurance business?
9  A.  Twenty-eight years.
10  Q.  And before entering the
11  insurance business, what was your
12  education?
13  A.  Bachelor's of arts from the
14  University of New Mexico in Albuquerque, a
15  master of arts from Villanova University,
16  and a juris doctorate degree from the
17  Villanova School of Law.
18  Q.  Did you practice law at all?
19  A.  No.
20  Q.  Did you go straight from law
21  school into the insurance business, to
22  Adams and Porter?
23  A.  No.
24  Q.  Can you tell me what connected

7

T. I. Montano
1  the two?
2  A.  I was -- I worked for the
3  Insurance Company of North America after
4  graduation from law school.
5  Q.  When you began to work with
6  Adams and Porter, that was in Texas?
7  A.  Yes.
8  Q.  And you've been in Texas ever
9  since?
10  A.  I was in Texas before I was
11  hired by Adams and Porter.
12  Q.  And so you've been in Texas
13  since you were hired by Adams and Porter
14  through your employment with Aon?
15  A.  Yes.
16  Q.  Have you always been with Aon's
17  office in Houston?
18  A.  Yes.
19  Q.  And with Adams -- with Aon, I'm
20  just going to refer to Aon to cover your
21  twenty-six years -- what positions have
22  you occupied over those years?
23  A.  Always in the claims department.
24  Q.  And are you licensed?

8

T. I. Montano
1  A.  Licensed to do what?
2  Q.  As an insurance broker, as a
3  claims broker.
4  A.  Yes.
5  Q.  And in what state are you
6  licensed?
7  A.  Texas.
8  Q.  Are you licensed anyplace other
9  than Texas?
10  A.  No.
11  Q.  Do you have any background in
12  marine insurance?
13  A.  Yes.
14  Q.  And how long have you been in
15  the field of marine insurance generally?
16  MR. ZERBE: Objection to form.
17  You can answer.
18  A.  Approximately twenty-eight
19  years.
20  Q.  The entire time has been
21  involved in marine insurance?
22  A.  Yes.
23  Q.  Have you handled other types of
24  insurance as well as marine insurance over

9

T. I. Montano
1  the period of time?
2  A.  Yes.
3  Q.  And what types are those?
4  A.  General liability, products
5  liability, Workers' Compensation, U.S. L
6  and H. Did I say automobile liability?
7  Directors and officers, kidnap and ransom,
8  crime, fiduciary liability.
9  Q.  Are you the manager of the
10  claims department?
11  A.  I am.
12  Of what claims department?
13  Q.  Well, I'm looking at your card,
14  sir, Aon Natural Resources Group?
15  A.  Yes.
16  Q.  How many people work in that
17  department?
18  A.  Presently eleven.
19  Q.  Do they all report to you?
20  A.  Not directly but indirectly,
21  yes.
22  Q.  Can you tell me what you
23  reviewed in connection for preparing for
24  your testimony here today?

10

T. I. Montano
1
2    A.   Various items of correspondence
3  and documents.
4    Q.   Did you read any prior testimony
5  given in this case?
6    A.   No.
7    Q.   Who is Peter Matlock?
8    A.   Peter Mortlock, M O R T L O C K?
9    Q.   Yes.
10    A.   Who is Peter Mortlock?
11    Q.   Yes.
12    A.   He's a human being living in
13  Texas.
14    Q.   Is he employed by Aon?
15    A.   No.
16    Q.   Who is he employed by; do you
17  know?
18    A.   I believe he's employed by JLT.
19    Q.   Risk?
20    A.   I don't recall their full name.
21    Q.   The insurance that's the subject
22  matter of this claim was placed by Aon; is
23  that correct?
24    A.   Yes.
25    Q.   And who in Aon's office placed

11

T. I. Montano
1
2  the insurance or dealt with the placing of
3  the insurance?
4    A.   Peter Mortlock.
5    Q.   And he was in Aon's office at
6  that time?
7    A.   Yes.
8    Q.   And is he a licensed Texas
9  broker?
10    A.   I can't say for sure.
11    Q.   How long had he been with Aon at
12  the time you knew him there?
13    A.   I have no idea.
14    Q.   Did he subsequently leave Aon?
15    A.   Yes.
16    Q.   And when was that?
17    A.   I believe it was in 2004.
18    Q.   And he went from Aon to live in
19  London and work for JLT Risks?
20    A.   No, no, JLT has an office in
21  Houston.
22    Q.   And since last year he's worked
23  at that office?
24    A.   Yes, as far as I know.
25    Q.   Can you tell me what position he

12

T. I. Montano
1
2  held at Aon when he was there?
3    A.   Title or function?
4    Q.   Either.
5    A.   Account executive, relationship
6  manager, producer, I don't know what
7  titles they went under.  But he was
8  responsible for placing insurance and
9  handling accounts.
10    Q.   Now, when did this claim come to
11  your attention?
12       MR. ZERBE: Objection to form.
13       Can you be more specific in
14  terms of definition of a claim?
15    Q.   When did the claim involving the
16  Gulf Horizon in an incident that occurred
17  on or about February 27, 2003 first come
18  to your attention?
19    A.   My recollection is the event was
20  reported to me on February 28, 2003, the
21  day after.
22    Q.   And who made that report to you?
23    A.   Bill Arnold.
24    Q.   Bill Arnold is whom?
25    A.   Bill Arnold was the risk manager

13

T. I. Montano
1
2  at Horizon Offshore Contractors.
3    Q.   And how did that notice come to
4  you?
5    A.   Via e-mail.
6    Q.   Have you produced that e-mail?
7    A.   I believe I have.
8    Q.   After receiving that notice,
9  what then did you do?
10    A.   Undertook to notify the P and I
11  underwriters of the vessel as instructed
12  by Mr. Arnold.
13    Q.   What was the purpose in
14  notifying the P and I underwriters?
15       MR. ZERBE: Objection to form.
16       The purpose of whom?
17    Q.   What was the purpose of Aon
18  being requested to notify the P and I
19  underwriters?
20    A.   Well, as the insurers of
21  Horizon, they should know of a loss that
22  could possibly arise in a claim under the
23  coverage.
24    Q.   Were there other liability
25  underwriters on this risk?

14

T. I. Montano
1
2  A.  Yes.
3  Q.  And --
4  A.  On what risk, the Horizon
5  Offshore Contractors risk?
6  Q.  The Gulf Horizon incident on
7  February 27, 2003.
8  A.  Yes.
9  Q.  And did you notify those
10  underwriters?
11  A.  Yes.
12  Q.  And can you tell me what
13  underwriters those were that you notified?
14  A.  My recollection is excess P and
15  I underwriters and general liability and
16  excess liability underwriters.
17  Q.  Can you tell me, if you can,
18  regarding the policy itself, where did you
19  go in your office to locate the policy?
20  MR. ZERBE: Objection.
21  Q.  Policies.
22  A.  I suppose a file cabinet.
23  Q.  Do you know where -- do you know
24  if this policy was placed through Aon's
25  office in Houston?

15

T. I. Montano
1
2  MR. ZERBE: Objection.
3  I'm not sure we have a common
4  understanding in terms of which policy
5  is encompassed within your question.
6  MR. KOSTER: I'm talking about
7  all the policies that were carried by
8  Horizon.
9  A.  You said this policy.
10  Which policy?
11  Q.  I'm going to place before you a
12  certified copy or a copy IRO/AE 00300 and
13  ask if you recognize it.
14  A.  (Reviewing.)
15  Are both of these the same?
16  Q.  Yes.
17  A.  Yes, I've seen this policy
18  before.
19  Q.  And how long had Aon placed
20  policies for Horizon before this policy;
21  can you give me an estimate?
22  A.  My recollection is not ever.
23  Q.  Do you know if this policy -- if
24  this is the policy that was provided to
25  Iroquois?

16

T. I. Montano
1
2  MR. ZERBE: Objection.
3  Provided by whom?
4  MR. KOSTER: By Aon or by
5  Horizon.
6  MR. ZERBE: Objection to form.
7  Q.  Was it provided by Aon?
8  A.  My understanding is that we
9  provided a copy of this policy to Horizon
10  -- when I say we, I did not do this, it
11  was not requested of me to do this. It
12  was provided to Horizon to provide to
13  Iroquois.
14  Q.  And was that provided to Horizon
15  in Texas?
16  A.  Yes.
17  Q.  And if I could direct your
18  attention to the first sheet and ask you
19  just to read the notice on that.
20  A.  You're calling this the notice,
21  the words in the box?
22  Q.  Yes.
23  A.  "This insurance contract is with
24  an insurer not licensed to transact
25  insurance in this state and is issued and

17

T. I. Montano
1
2  delivered as a surplus lines coverage
3  pursuant to the Texas insurance statutes.
4  The state board of insurance does not
5  audit the finances or review the solvency
6  of the surplus lines insurer providing
7  this coverage and this insurer is not a
8  member of the Property and Casualty
9  Insurance Guarantee Association created
10  under Article 21.28(c) insurance code.
11  Article 1.14-2 insurance code requires
12  payment of 4.85 percent tax on gross
13  premium."
14  Q.  Is that a form required by Texas
15  law?
16  A.  I don't know.
17  Q.  Do you know if the 4.85 tax was
18  paid with respect to this coverage?
19  A.  No.
20  Q.  You don't know?
21  A.  Yes, I don't know.
22  Q.  Who would know that in Aon?
23  A.  Who would know that? I don't
24  know.
25  MR. KOSTER: Can we have this

18

T. I. Montano
1
2    marked as the next exhibit.
3         (Whereupon, a multi-page
4    document was marked Deposition
5    Exhibit 29 for identification.)
6    Q.   Mr. Montano, where would a
7    holder of such a policy go to register a
8    complaint in a case such as this?
9         MR. ZERBE: Objection to form.
10        MR. KOSTER: In what respect?
11        MR. ZERBE: It's ambiguous. Your
12   question referred to a case such as
13   this.
14   Q.   If someone had been issued a
15   policy with this cover sheet on it by Aon
16   and they had a complaint, does it tell
17   them where to go to register their
18   complaint?
19   A.   Unless it's in the policy, I
20   don't see it. But I will assume that --
21   Q.   What does it say on the first
22   page?
23   A.   The state board of insurance.
24   It does not say where to go with regard to
25   filing a complaint, but the second page

19

T. I. Montano
1
2    does.
3    Q.   What does that say?
4    A.   "You may contact the Texas
5    Department of Insurance to obtain
6    information on companies, coverages,
7    rights, or complaints at 1-800-252-2439.
8    You may write the Texas Department of
9    Insurance, post office box 149104, Austin,
10   Texas 78714-9104. Fax number (512)
11   475-1771.
12   Q.   And did that document entitled
13   Important Notice apply to this policy?
14        MR. ZERBE: Objection to form.
15   A.   I can only assume so since it's
16   part of the policy.
17   Q.   What was the coverage of the
18   hull policy; do you know?
19   A.   What --
20   Q.   I'm sorry, what was the
21   geographical coverage of the hull policy?
22   A.   My recollection? I can look in
23   the policy or do you want me to give you
24   my recollection of what it was?
25   Q.   Give me your recollection.

20

T. I. Montano
1
2    A.   Worldwide.
3    Q.   Subject to institute and
4    warranty limits?
5    A.   Yes.
6         There should be a navigation
7    provision on navigation limits in here
8    somewhere, trading on page --
9         MR. ZERBE: You can refer to the
10   Bates number on the bottom right-hand
11   corner.
12   A.   IRO/AE 00303 "trading worldwide
13   subject to American Institute Trading
14   Warranties, clause 1.210," parentheses,
15   "July 1, 1972," closed parentheses, "or
16   held covered at rates to be agreed by
17   leading underwriters only and war, et
18   cetera risks worldwide subject to London
19   Market War Risk Trading Warranties
20   including any subsequent amendments
21   thereto during the term of this policy.
22   Tows in excess of seven hundred fifty
23   nautical miles or outside the Gulf of
24   Mexico held covered at rate, terms and
25   conditions to be agreed. Warranted tug,

21

T. I. Montano
1
2    tow, towage and stowage arrangements
3    approved by agreed surveyor and warranted
4    all recommendations complied with."
5         MR. ZERBE: For the record,
6    that's pan page IRO/AE 00303 on
7    Exhibit 29.
8    Q.   So losses or claims might have
9    occurred anywhere in the world and still
10   constitute a claim covered by this policy?
11   A.   Yes.
12   Q.   After the original notice by
13   e-mail from Horizon, what further
14   correspondence did you have in the
15   immediate aftermath of the incident?
16   A.   My recollection is we started
17   receiving some reports from attorneys that
18   were appointed in New York by Horizon to
19   attend to the situation.
20   Q.   Do you recall those attorneys by
21   name?
22   A.   Skoufalos --
23   Q.   It's the Skoufalos firm?
24   A.   Yes.
25   Q.   Anyone else?

22

T. I. Montano
1
2   A.   I don't recall.
3   Q.   Were you in touch with JLT
4 Risks?
5   A.   Yes.
6   Q.   Does Aon have an internal system
7 that permits reconstruction of e-mail
8 tapes?
9   A.   I don't know.
10   Q.   Have you attempted to collect
11 the documents that were relevant to this
12 claim from Aon?
13   A.   Yes.
14   Q.   And are the documents that were
15 produced and delivered to us last night
16 from that file?
17   A.   I don't know what was delivered,
18 produced and delivered to you last night.
19   Q.   (Handing).
20     MR. KOSTER: Let the record show
21     that I've placed a batch of documents
22     before the witness that was delivered
23     to us last evening.
24   A.   Do you want me to go through all
25 of these?

23

T. I. Montano
1
2     MR. KOSTER: Let me just note for
3     the record that they bear Bates stamp
4     ARS-TX 0001 to ARS-TX 0101 and that
5     four more documents were produced this
6     morning bearing the same prefix
7     from 0102 to 0104.
8     THE WITNESS: I'm sorry, could
9     you repeat the question?
10     (Whereupon the requested portion
11     was read back by the reporter)
12   A.   Could you clarify what you mean
13 by that file?
14   Q.   Well, from Aon's files.
15   A.   These are from our files, yes,
16 sir.
17   Q.   How many files would Aon keep
18 regarding cover that it's placed on a
19 claim that it's received?
20   A.   It would be -- of course there
21 would be the placement file, the
22 underwriting file.
23   Q.   Hold on.
24     What's in the placement file?
25   A.   I can't say for sure, I'm not on

24

T. I. Montano
1
2 that side of the business, but I believe
3 it would be correspondence with
4 underwriters, submission of the
5 underwriting information, that sort of
6 thing.
7   Q.   And the next file you mentioned?
8   A.   There would probably -- there
9 could be a separate underwriting file or
10 policy file.
11   Q.   And what would that contain?
12   A.   Primarily the policy and
13 endorsements, amendments, that sort of
14 thing.
15   Q.   And what other files?
16   A.   If there would be a loss then
17 there would be a claim file.
18   Q.   And any other files?
19   A.   Not that I know of.
20   Q.   What about accounting files?
21   A.   Accounting files?
22   Q.   The claims or premiums, are they
23 segregated within --
24   A.   There would be records. I can't
25 say there would be a file with regard to

25

T. I. Montano
1
2 premiums or that sort of thing.
3   Q.   Mr. Montano, how many people
4 work in the Aon office in Houston, Texas
5 at present?
6   A.   Approximately four hundred, four
7 hundred to four hundred fifty.
8   Q.   And is that true as of three
9 years ago, the same estimate?
10   A.   I wouldn't say so.
11   Q.   Fewer people?
12   A.   Fewer people back then.
13   Q.   How many people back then?
14   A.   I can't say for sure.
15   Q.   Before coming here today, did
16 you review the placement file?
17   A.   No.
18   Q.   Have you ever reviewed the
19 placement file?
20   A.   No.
21   Q.   Did you review the underwriting
22 file?
23   A.   No.
24   Q.   Have you ever reviewed the
25 underwriting file?

26

T. I. Montano

1    A.  No.
2    Q.  When a claim comes to you, what
3 would be your normal practice, wouldn't
4 you have to look at the policy to
5 determine coverage in your handling of the
6 claim?
7      MR. ZERBE: Objection to form.
8    A.  Would you repeat the question?
9    Q.  In your normal practice, what do
10 you do when a claim comes in to you, to
11 your office?
12   A.  Take down the information from
13 whoever calls the information in, get as
14 much information as I can, then yes, I
15 would look at a copy of the policy.
16   Q.  Where would you get that from?
17   A.  I may have a copy in my area.
18   Q.  So there would be a duplicate of
19 the underwriting file in your area
20 containing the policy?
21   A.  No, there would be probably,
22 possibly be a copy of the policy but not a
23 copy of the underwriting file.
24   Q.  What determines whether or not

27

T. I. Montano

1 there's going to be a copy of the policy
2 in your area?
3    A.  Generally if there's been
4 previous claims under the policy or as a
5 matter of course if I should have gotten a
6 copy of the policy as it was produced.
7    Q.  In this particular case
8 involving the Gulf Horizon in the
9 February, 2003 incident, did the claim
10 come to you personally?
11   A.  Yes, via e-mail by Bill Arnold.
12   Q.  And it came to Jim Montano, not
13 to any of your subordinates?
14   A.  Correct.
15   Q.  And did you have that policy at
16 your disposal?
17   A.  My recollection is that I did.
18    MR. ZERBE: Objection to form.
19 What policy?
20    MR. KOSTER: The policy we've
21 been talking about that's Exhibit 29,
22 the produced documents.
23   A.  ARS 3246? I believe I did.
24   Q.  Did you have any other policies

28

T. I. Montano

1 at your disposal?
2    A.  Yes.
3    Q.  Can you tell me what they were?
4    A.  I can't list them all, but I
5 think my recollection is I had a couple of
6 -- one notebook full of Horizon policies.
7    Q.  And it's a notebook?
8    A.  A binder, a looseleaf binder.
9    Q.  Has that been produced?
10   A.  I don't know. Not to my
11 knowledge.
12   Q.  Have you produced it to your
13 counsel?
14   A.  I don't know. I have not.
15   Q.  And what was in that binder?
16   A.  Horizon policies.
17    MR. KOSTER: We're going to
18 reserve our rights on that.
19   Q.  Does Aon in its Houston, Texas
20 office have information posted
21 electronically that all departments can
22 access?
23   A.  Yes.
24   Q.  And what type of information

29

T. I. Montano

1 would that be in relevance to claims?
2    A.  The only thing I can think of
3 offhand is who the relationship manager
4 would be on an account if I need to know
5 that, the relationship manager, the
6 account executive with regard to an
7 account, who it would be in case I would
8 want to know that.
9    Q.  Now, the other document that was
10 produced this morning, ARS-TX 0102
11 through 0104 --
12    MR. KOSTER: Let's mark that as
13 the next exhibit.
14    (Whereupon, a letter dated
15 February 21, 2005 was marked
16 Deposition Exhibit 30
17 for identification.)
18   Q.  Referring now to Exhibit 30, the
19 cover letter of which is dated
20 February 21, 2005 to a Mr. Willy Farmer at
21 the McGriff firm signed by yourself, could
22 you have a look at that, please.
23   A.  (Reviewing).
24   Q.  Does that indicate that you sent

30

T. I. Montano

1
2 your files to the McGriff firm?
3    A.   This indicates that I sent
4 certain files to the McGriff firm, yes,
5 sir.
6    Q.   Did you keep copies of the
7 materials that you sent to the McGriff
8 firm?
9    A.   Yes.
10    Q.   And have you produced copies of
11 those files that you kept?
12    A.   Produced to whom?
13    Q.   In response to this notice of
14 deposition calling for Aon's files
15 regarding underwriting and claims
16       MR. ZERBE: I'll just note for
17 the record that we have objected to
18 the attempt to serve document requests
19 by means of a notice of deposition of
20 a party witness and I'll also note for
21 the record that the issue of the
22 document production prior to Mr.
23 Montano's deposition has been
24 discussed among counsel and we've
25 provided these documents as a result

31

T. I. Montano

1
2 of those discussions to the extent
3 they relate to the issue of the
4 reporting of notice under the Lloyd's
5 policy.
6       I'll also note for the record
7 that I've reviewed the transcript from
8 the proceedings before Judge Rakoff on
9 July 22 and there was no request for
10 production of documents that was
11 raised in the course of that dialogue
12 before Judge Rakoff.
13       Nonetheless, we have provided
14 the documents which were sent to you
15 yesterday as well as this morning for
16 the purpose of presenting documents
17 relevant to the issue of notification
18 under the Lloyd's hull policy.
19       MR. KOSTER: Mr. Montano, a
20 document that was previously referred
21 to as the documents produced today or
22 last night, rather, ARS-TX 0001
23 to 0101, let's mark that as the next
24 exhibit.
25       (Whereupon, a multi-page

32

T. I. Montano

1
2 document was marked Deposition
3 Exhibit 31 for identification.)
4    Q.   And these documents which were
5 produced and have now been marked
6 Exhibit 31, did you have a hand in
7 selecting those documents as documents
8 relating to the claim and the notice?
9    A.   Can I confer with counsel?
10    Q.   I'd rather you didn't.
11    A.   My recollection is we received a
12 subpoena for various documents at one
13 point. The subpoena called for
14 information with regard to the claim. It
15 also asked for information, documents with
16 regard to the placement. I would have
17 gone through the documents pertinent to
18 the claim. Somebody else would have gone
19 through the documents pertinent to the
20 placement and I did not have a hand in
21 doing that.
22    Q.   The placement?
23    A.   The placement side.
24    Q.   But so far as the claim side is
25 concerned you did?

33

T. I. Montano

1
2    A.   Yes.
3    Q.   And I notice --
4    A.   And some of the materials in
5 there are with regard to the placement or
6 the servicing of the account rather than
7 the claim.
8    Q.   I notice in here that there are,
9 so far as I can tell, very few handwritten
10 notes with one exception of something on a
11 pad of Aon Risk Services dated 1/23/03.
12       Actually, can you tell me what
13 that is? It's within the Exhibit 31,
14 it's 0006A.
15       Can you tell me whose
16 handwriting that is and what that is?
17    A.   Well, according to the form, it
18 says it's prepared by B. Chaloupka, and
19 that's Bernice Chaloupka who works in our
20 office.
21    Q.   And what did Miss Chaloupka have
22 to do with relation to the claim?
23    A.   Nothing.
24    Q.   Is she a claims agent?
25    A.   No.

34

T. I. Montano
2   Q.   Does she work in your
3 department?
4   A.   No.
5   Q.   What department does she work
6 in?
7   A.   She works in the placement
8 department.
9   Q.   And what does the notice say,
10 the memo?
11   A.   "Telecon at Margie.  Needs
12 certified copies of policies certified to
13 Iroquois on COI," which means certificate
14 of insurance.  "Need to white out premium
15 and rates.  Stamped certified on each
16 copy.  Maintain a copy for our file.  Send
17 to Bill."
18        This was per a conversation
19 apparently that she had on the 23rd of
20 January, 2003 at 10:30 a.m. with Bill
21 Arnold.
22   Q.   Who is Bill Arnold?
23   A.   Previously identified as the
24 risk manager for Horizon Offshore
25 Contractors.

35

T. I. Montano
2   Q.   Now, in my quick review of those
3 documents, that's the only handwritten
4 notes that appear in there.
5        Would you expect to find
6 handwritten notes in your claims file?
7   A.   Would I expect to find
8 handwritten notes in a claims file?
9   Q.   Yes.
10   A.   Yes.
11   Q.   Did you make handwritten notes
12 in your claims file?
13   A.   I made handwritten notes and may
14 have entered them in the claims file or
15 may not have.
16   Q.   Well, if you didn't enter them
17 in the claims file, where would you have
18 entered them?
19   A.   Just on a pad of paper for
20 reference.
21   Q.   Would you keep those notes?
22   A.   Generally, yes.
23   Q.   And do you know where those
24 notes are today?
25   A.   No.

36

T. I. Montano
2   Q.   Well, would the notes that were
3 prepared and put in the claim file still
4 be in the claim file?
5   A.   If they were, yes.
6   Q.   Now, after you received notice
7 of this claim, did you have discussions
8 with Horizon?
9   A.   I believe I did, yes.
10        Just for clarification, we did
11 not receive notice of a claim, we received
12 notice of an occurrence.
13   Q.   And what did you do after you
14 received this notice?
15   A.   Prepared a notice of loss to
16 send to P and I underwriters.
17   Q.   Did you discuss the claim
18 further with Horizon?
19        MR. ZERBE: Objection to form.
20   A.   Yes.
21   Q.   How many discussions did you
22 have with Horizon?
23   A.   I don't recall.
24   Q.   Could you give me an estimate?
25   A.   Three, four.

37

T. I. Montano
2   Q.   And that would have been within
3 the year 2003 or 2003 until --
4   A.   2003 and 2004.
5   Q.   You had three or four
6 discussions with Horizon?
7   A.   Or more.
8   Q.   Well, if more, how many more?
9   A.   Two or three more.
10   Q.   And were these telephone
11 discussions or were they meetings?
12   A.   Primarily telephone.
13   Q.   And who did you speak to on the
14 telephone?
15   A.   Bill Arnold and then after he
16 left I may have spoken once or twice with
17 Bill Gibbens.
18   Q.   Can you tell me when the first
19 of these conversations occurred with Bill
20 Arnold, approximately, in relation to the
21 notice?
22   A.   No, not exactly.  I would
23 presume early March.
24   Q.   And what was discussed at that
25 meeting?

38

T. I. Montano

1
2     A.   Which meeting?
3     Q.   The one in early March that you
4  just referred to.
5     A.   I didn't refer to a meeting.  It
6  was a discussion probably over the
7  telephone.
8     Q.   What was discussed by telephone?
9     A.   What was going on with the loss,
10  who was assigned, what was being done with
11  regard to hiring surveyors or experts,
12  that sort of thing.
13     Q.   And did you have any input into
14  that?
15     A.   No.
16     Q.   Were you satisfied that Horizon
17  was taking the appropriate measures?
18     A.   I was satisfied, yes.  They were
19  -- I guess they had -- appointed attorneys
20  in the area very quickly and I knew that
21  Mr. Arnold was a very experienced
22  sophisticated insurance person and I
23  figured he was handling the loss.
24     Q.   When is the next time you recall
25  being in contact with somebody at Horizon?

39

T. I. Montano

1
2     A.   I don't have specific
3  recollection of that.
4     Q.   Did you have any meetings with
5  Horizon personnel?
6     A.   I recall one meeting with
7  Horizon pertinent to this.
8     Q.   And can you tell me
9  approximately when that was?
10     A.   I think it was in May of 2004.
11     Q.   And who attended that meeting?
12     A.   Margie Goodall and Bill Gibbens.
13     Q.   Who is Margie Goodall?
14     A.   Margie Goodall, after Peter
15  Mortlock's departure, became primarily
16  responsible for the servicing of the
17  account in our office.
18     Q.   She was in placement?
19     A.   Yes.
20     Q.   And you attended that meeting?
21     A.   Yes.
22     Q.   What was discussed at that
23  meeting?
24     A.   Various items of insurance
25  including this claim, the NYPA claim as we

40

T. I. Montano

1
2  refer to it.
3     Q.   As a result of that meeting, did
4  you take any action with respect to the
5  NYPA claim?
6     A.   Yes.
7     Q.   Let me go back first.
8         What caused such a meeting to
9  take place?
10     A.   I think there was a number of
11  things to be discussed with Mr. Gibbens
12  that had been in abeyance since Mr. Arnold
13  had left at the end of 2003 and we finally
14  were able to -- Margie and I were finally
15  able to have a meeting with him.
16     Q.   Who initiated the meeting?
17     A.   I don't recall.
18     Q.   Now, as a result of that
19  meeting, did you take any action?
20     A.   Yes.
21     Q.   What did you do?
22     A.   I put the underwriters on the
23  marine policy on notice of the loss.
24     Q.   When you refer to the marine
25  policy, you're talking about the hull

41

T. I. Montano

1
2  policy?
3     A.   Well, it's more than the hull
4  policy on ARS 3246, but that's, as you
5  referred to it, would be the hull policy.
6     Q.   And had they not been put on
-7  notice before?
8     A.   No.
9     Q.   And who made that decision not
10  to put them on notice?
11     A.   Horizon.
12     Q.   Was there a specific reason why
13  they made that decision?
14     A.   I can't speak for them.
15     Q.   I understand.
16         But as a result of this meeting,
17  did that subject come up as to why they
18  had not previously notified the hull?
19     A.   No.
20     Q.   That discussion -- nobody
21  discussed that?
22     A.   What we discussed was that we
23  had received inquiries from the P and I
24  insurer about the position that the hull
25  underwriters were taking and so I did

42

T. I. Montano

1  address that with Mr. Gibbens and he
2  decided to instruct me to notify the hull
3  underwriters.
4      Q.   When had you begun getting
5  inquiries from the P and I insurer about
6  the hull policy?
7      A.   I don't recall but it must have
8  been sometime in 2003.
9      Q.   Would you say within months of
10 the incident?
11     A.   I can't say for sure.
12     Q.   But it was certainly before this
13 meeting in the summer of 2004?
14     A.   Yes.
15         MR. ZERBE: I believe the meeting
16 was May of 2004.
17     Q.   Now, when you received those
18 inquiries from P and I, did you follow up
19 on them?
20     A.   Yes, I passed the inquiries on
21 to Horizon.
22     Q.   And did Horizon provide you with
23 information to respond?
24     A.   Some information, yes.
25

43

T. I. Montano

1      Q.   What was that information?
2      A.   I don't recall everything.
3         MR. KOSTER: Let's mark a
4  document that bears a Bates stamp
5  A 0012 and ask that it be marked as
6  the next exhibit.
7         (Whereupon, an e-mail dated
8  May 12, 2003 was marked Deposition
9  Exhibit 32 for identification.)
10     Q.   I'm going to place before you a
11 document identified as Exhibit 32 which
12 appears to be an e-mail from Colin
13 Williams to Bill Gibbens dated May 12,
14 2003.
15         Have you ever seen that document
16 before?
17     A.   (Reviewing).
18         I don't recall seeing this
19 before.
20     Q.   With respect to this incident,
21 what was Aon's relationship with JLT
22 Risks?
23     A.   JLT Risks in London, they were
24 the placing, we were the retail broker,

44

T. I. Montano

1  they were the placing broker with regard
2  to this marine package policy.
3      Q.   And did you retain --
4      A.   And other policies.
5      Q.   Did Aon retain JLT to do this?
6      A.   Yes.
7      Q.   JLT London?
8      A.   Yes.
9      Q.   And there was testimony by Mr.
10 Hodgett in this case and he said it was
11 customary that reporting would go from Aon
12 to JLT to the underwriters.
13         Do you agree with that?
14     A.   Yes.
15     Q.   And is that how the reporting
16 took place in this case?
17     A.   The reports that were destined
18 to underwriters, yes.
19     Q.   And inquiries back from
20 underwriters, is that the channel that
21 followed?
22     A.   Yes.
23     Q.   Were you ever in direct contact
24 with the underwriters?
25

45

T. I. Montano

1         MR. ZERBE: Underwriters under
2  which coverage?
3         MR. KOSTER: Of the hull policy.
4      A.   No.
5      Q.   Were you ever in direct contact
6  with P and I underwriters?
7      A.   I believe so, yes.
8      Q.   And when did that communication
9  commence?
10     A.   I don't recall.
11     Q.   Mr. Hodgett also talked about
12 entries on Lloyd's system, electronic
13 system.
14         Do you have direct access to
15 that system?
16     A.   No.
17     Q.   Does Aon generally have direct
18 access to that system?
19     A.   I can't say for sure. Our
20 London office may but I don't know.
21     Q.   Have you seen the JLT files on
22 this claim?
23     A.   No.
24     Q.   Did you ever ask for the JLT

46

T. I. Montano

1
2 files on this claim?
3     A.   No.
4         MR. KOSTER: I'm going to ask
5     that another series of e-mails be
6     marked, this one from Colin Williams
7     bearing the date 20 May, 2003, 17:16.
8         (Whereupon, an e-mail dated
9     May 20, 2003 was marked Deposition
10    Exhibit 33 for identification.)
11    Q.   Would you have a look at
12 Exhibit 33 and see if you recognize any of
13 the messages on it.
14    A.   (Reviewing).
15    Q.   Have you had an opportunity to
16 look at it?
17    A.   I'm not through.
18         (Reviewing).
19         I've looked at this.
20    Q.   Now referring to A 0014 which
21 contains a message to Terry Cornick at the
22 JLT Group I believe from yourself, do you
23 recall that?
24    A.   Which run are you referring to?
25    Q.   It's the second page now,

47

T. I. Montano

1
2 April 16, 2003.
3     A.   I recall it now, yes.
4     Q.   And that was within a few weeks
5 of the incident?
6     A.   Well, the incident was on the
7 27th of February and the 16th of April is
8 within a few weeks, yes.
9     Q.   And does that refer to a meeting
10 with Horizon?
11    A.   Yes.
12    Q.   Does that refresh your
13 recollection as to an additional meeting
14 then with Horizon?
15    A.   Yes. This is the one I'm
16 referring to on the 15th of April was a
17 large meeting, there were probably ten or
18 twelve people there, including -- well,
19 the people who are mentioned in the
20 message.
21    Q.   Plus a number of other people?
22    A.   Yes.
23    Q.   Do you recall who they are?
24    A.   Of course Bill Gibbens was
25 there, Bill Arnold was there, Marge

48

T. I. Montano

1
2 Goodall was there. There were a couple of
3 other people from Horizon that were there.
4     Q.   Was this meeting held at
5 Horizon's offices?
6     A.   Yes.
7     Q.   And where are they located?
8     A.   In Houston out on City Park
9 Drive, I don't remember.
10    Q.   Was there any reference at that
11 meeting to potential liability for this
12 incident on the hull policy?
13    A.   I don't recall if the subject
14 came up.
15    Q.   What discussion was there
16 generally about insurance at this meeting?
17    A.   Well, primarily P and I
18 insurance because the P and I insurer, the
19 underwriter was actually there at the
20 meeting, the claims man, Mark McAleer, was
21 there at the meeting. It was a
22 relationship between one of the members of
23 the steamship club; it was primarily a
24 relationship meeting.
25    Q.   And were you in the view at the

49

T. I. Montano

1
2 time that the steamship policy was
3 implicated?
4     A.   Yes.
5     Q.   As opposed to the AEGIS policy?
6         MR. ZERBE: Objection to form.
7     A.   As opposed to the AEGIS policy?
8         MR. KOSTER: Strike that.
9     Q.   Did you view the AEGIS policy as
10 being implicated for P and I?
11    A.   I don't recall if I did at that
12 meeting or not, I don't know if that was
13 raised.
14    Q.   Did you view the Steamship
15 Mutual policy as being implicated?
16    A.   Yes.
17    Q.   Now, referring to the next
18 e-mail which is from Jim Montano dated
19 May 1 to Terry Cornick at the JLT Group on
20 page A 0013, could you just take a look at
21 that.
22    A.   (Reviewing).
23         I'm not sure where we're getting
24 these page numbers from.
25    Q.   Down in the lower right corner.

50

T. I. Montano

1   A.   Okay. I've looked at it.
2   Q.   What caused you to change your
3   mind?
4   A.   I do not recall.
5   Q.   Did you review the policies?
6   A.   Probably.
7   Q.   Did you review all the policies
8   potentially applicable to this claim at
9   that time?
10   A.   I don't recall if I reviewed all
11   the policies, no.
12      MR. KOSTER: I'm going to show
13   you another series of documents, a
14   series of e-mails that bear the Bates
15   stamp numbers A 0034 to A 0040, and
16   ask that they be marked as the next
17   exhibit.
18      (Whereupon, an e-mail dated
19   August 15, 2003 was marked Deposition
20   Exhibit 34 for identification.)
21      MR. ZERBE: Do you want the
22   witness to read the entire --
23   Q.   I'm just going to ask you, are
24   you familiar with this document? You've

51

T. I. Montano

1   seen it before?
2      MR. ZERBE: Well, I'll note for
3   the record this appears to be a number
4   of e-mails, over seven pages, from
5   August of 2003.
6      MR. KOSTER: I'll note that the
7   last one was from -- to Mr. Montano so
8   presumably he was privy to everything
9   that followed.
10   A.   Could you repeat the question,
11   please?
12   Q.   Yes.
13      Are you generally familiar with
14   this e-mail exchange?
15   A.   Now that I see it, I have some
16   recollection, yes.
17   Q.   Referring to page six of the
18   series Bates stamp number A 0039, do you
19   see there an e-mail that you sent to
20   somebody named Charlie, I believe Charlie
21   Cerise?
22   A.   Yes.
23   Q.   And regarding the posting of an
24   LOU, are you familiar with that?

52

T. I. Montano

1   A.   Yes.
2   Q.   And can you tell me what
3   information or input you had with respect
4   to that?
5   A.   It looks like I was telling
6   Charlie Cerise, who is the attorney from
7   Horizon with regard to the limitation
8   action in Houston, who the underwriters
9   are that would have to post security.
10   Q.   And the posting of security was
11   for purposes of a limitation action?
12   A.   Yes, sir.
13   Q.   And was it also required that
14   you obtain counter-security?
15   A.   I see that that was -- that's in
16   the message. I don't recall if that was
17   actually at the end of the day required or
18   was done.
19   Q.   And the security that was
20   posted, to your understanding, was posted
21   in lieu of a bond being posted to
22   represent the value of the vessel?
23   A.   Yes, sir.
24   Q.   Were the hull underwriters

53

T. I. Montano

1   notified of this at any point?
2   A.   Notified of any of this, what do
3   you mean?
4   Q.   This being the posting of an
5   LOU.
6   A.   At any time?
7   Q.   Yes.
8   A.   I would have to say yes.
9   Q.   At what time?
10   A.   I can't say for sure, but I
11   would guess that when they were placed on
12   notice under the hull policy or shortly
13   thereafter.
14   Q.   By the way, did you suspect any
15   hull claims as a result of this incident
16   for damage to the hull of the Gulf
17   Horizon?
18   A.   No, I was never notified that
19   the hull was damaged.
20   Q.   Was that discussed at any of the
21   meetings you had with Horizon or any
22   telephone conversations you had?
23   A.   I don't recall.
24      MR. KOSTER: I'm going to ask

54

T. I. Montano

1              T. I. Montano
2  that another batch of e-mails be
3  marked constituting A 0081 to A 0086.
4       (Whereupon, an e-mail dated
5  June 10, 2004 was marked Deposition
6  Exhibit 35 for identification.)
7     Q.  Exhibit 35 appears to be some
8  exchanges you had with Colin Williams;
9  correct?
10     A.  Yes.
11     Q.  Now, referring to page four --
12       MR. ZERBE: Bates number?
13       MR. KOSTER: Bates number 0084.
14     Q.  -- Mr. Williams writes to you
15  and says, "dear Jim," the first paragraph
16  he recites, "apart from lawyer's report on
17  the merits of the case generally" --
18     A.  I'm sorry, what page are you on?
19     Q.  Page four of the exchange in
20  paragraph one of his e-mail beginning
21  "firstly."
22       Do you see that?
23     A.  Yes.
24     Q.  And then there's a parenthetical
25  comments that goes on. "Apart from a

55

T. I. Montano

1              T. I. Montano
2  lawyer's report on the merits of the case
3  generally, there's the question of why
4  this is not covered under member's hull
5  policy. See the fourth paragraph of our
6  e-mail message of 16th April. We await
7  your further news in this regard."
8       Do you see that?
9     A.  Yes.
10     Q.  There does not appear to be a
11  copy of the e-mail message of April 16.
12       Would your file have that in it?
13     A.  Does my file have an e-mail
14  message of April 16?
15     Q.  Yes.
16     A.  I can't say for sure. The
17  fourth paragraph says our e-mail message
18  of 16th April which I would guess would be
19  his.
20     Q.  Presumably it was to you?
21     A.  Yes.
22     Q.  And did you respond to it?
23     A.  I don't recall.
24     Q.  Well, did you respond to the
25  message that he sent you that we just

56

T. I. Montano

1              T. I. Montano
2  referred to dated May 14, 2004?
3     A.  It looks like I responded on
4  May 17, 2004.
5     Q.  And what did you advise?
6     A.  You want me to read it?
7     Q.  Yes, please.
8     A.  "Colin, we have conferred with
9  the assured regarding coverage, claims,
10  and counterclaims arising from the subject
11  casualty and respond to your queries as
12  follows. With respect to coverage under
13  the assured's H and M policy on the Gulf
14  Horizon, such cover does indeed apply to
15  collision and/or contact with fixed and
16  floating objects. Horizon's CGL insurers
17  are aware of all claims and counterclaims
18  so far asserted. No additional
19  information regarding claims for damage
20  and/or fines and penalties regarding
21  archeological sites has been forthcoming.
22  Regards, Jim."
23     Q.  When you say you conferred with
24  the assured, that was Horizon?
25     A.  Yes.

57

T. I. Montano

1              T. I. Montano
2     Q.  And was that at the meeting you
3  earlier referred to?
4       MR. ZERBE: Objection. There was
5     testimony about two meetings.
6     A.  No.
7     Q.  Was that at the May, 2004
8  meeting?
9     A.  Yes.
10     Q.  And had you previously reviewed
11  the hull policy to determine whether there
12  was cover?
13     A.  I don't recall if I did or not.
14     Q.  Mr. Williams comes back to you
15  in the next message in the chain of
16  May 18, the following day, and says,
17  "please advise why H and M underwriters
18  were not involved in the first claim,"
19  that is the claim for damage to the power
20  cables, "B the Gulf Horizon."
21       Do you see that?
22     A.  Yes.
23       He does say are, not were.
24     Q.  Excuse me?
25     A.  I think you read it are, not

58

T. I. Montano

1    where.
2
3    Q.   And you reply on June 7 and say,
4    "sorry for belated reply but, as you know,
5    the account has been active lately."
6        What does that mean?
7    A.   Very active.  This particular
8    vessel, the Gulf Horizon, was involved in
9    a major casualty on May 18, 2004 which
10   took up a lot of interest and time.
11   Q.   What was that casualty?
12   A.   Fire.
13   Q.   Was this while she was on her
14   way to Israel or something?
15   A.   Yes.
16   Q.   And did you ever answer Mr.
17   Williams' comment as to why H and M
18   underwriters are not involved in the first
19   claim?
20   A.   I believe you started to read my
21   reply dated 7th of June, 2004.
22   Q.   And what did you tell him?
23   A.   "Colin, sorry for belated reply
24   but, as you know, the account has been
25   active lately.  Your reference to the

59

T. I. Montano

1
2    'first claim' I take to mean the alleged
3    damage to the LIPA power cable in
4    November, 2003.  That claim arises from
5    damage to the cable allegedly by the Motor
6    Vessel Mr. Sunny which is owned and
7    operated by Cal Dive International.
8    Nothing associated with the D/B," which
9    stands for derrick barge, "Gulf Horizon is
10   alleged to have caused the damage to the
11   cable.  Thus the collision liability
12   cover," open parens, "including FFO,"
13   closed paren, "featured in policy is not
14   involved as that cover is limited to
15   damage caused by the insured vessel.
16   Regards."
17   Q.   The first message that you
18   received of May 14 that raised the issue
19   generally about hull policy referred
20   specifically to the incident of
21   February 27, 2003.
22        Why would you assume he's
23   talking about the M/V Sunny?
24   A.   Because there's an interceding
25   message that you've already discussed

60

T. I. Montano

1
2    which is dated May 18.
3    Q.   And what led you to believe that
4    changed the subject from the Gulf Horizon
5    to the Sunny?
6    A.   The words "not involved in the
7    first claim."
8    Q.   What was the first claim?
9    A.   The LIPA claim.
10   Q.   Well, referring back to your
11   response to him where you say the claim
12   has been active -- that's the one at
13   June 7, 2004 --
14   A.   No, I say the account has been
15   active.
16   Q.   Referring to the last sentence,
17   "nothing associated with the D/B Gulf
18   Horizon is alleged to have caused the
19   damage to the cable.  Thus the collision
20   liability cover including FFO in the H and
21   M policy is not involved."
22        Do you see that?
23   A.   Yes.
24   Q.   Was that your opinion at the
25   time?

61

T. I. Montano

1
2    A.   Yes.
3    Q.   And did you change your opinion
4    on that?
5    A.   No.
6    Q.   Well, did there come a time when
7    you took action to place those
8    underwriters on notice?
9    A.   No.
10   Q.   The hull at all with respect to
11   this claim?
12        MR. ZERBE: Objection to the
13   form.
14   A.   The claim that we're referring
15   to here is the LIPA claim.
16   Q.   That's the Sunny?
17   A.   That's the Sunny.
18   Q.   Mr. Williams comes back to
19   you on --
20        MR. ZERBE: Let me just, for the
21   record, when the witness in his answer
22   said the claim that we're referring to
23   here is the LIPA claim, are you
24   reflect what you're referring to?
25        THE WITNESS: Yes, the e-mail

62

T. I. Montano

1  message from me dated 7th of June,
2  2004 to Colin Williams. "Your
3  reference to the first claim I take to
4  mean the alleged damage to the LIPA
5  power cable in November, 2003. That
6  claim arises from damage to the cable
7  allegedly by the Motor Vessel Mr.
8  Sunny which is owned and operated by
9  Cal Dive International." And I think
10  that must be a misprint because I
11  think that must have been November,
12  2002 when that occurred. "Nothing
13  associated with the D/B Gulf Horizon
14  is alleged to have caused the damage
15  to the cable. Thus the collision
16  liability cover including FFO in the H
17  and M policy is not involved as that
18  cover is limited to damage caused by
19  the insured vessel."
20    Q.  Did Mr. Williams reply to you on
21  June 9?
22    A.  Yes.
23    Q.  And did he clarify what he was
24  referring to?

63

T. I. Montano

1    A.  Yes.
2    Q.  Did you reply to that?
3    A.  I see that I did on June 10,
4  although I've answered and referred to him
5  as Mike.
6    Q.  It was sent to Colin Williams
7  but it's addressed to Mike?
8    A.  I greeted him as Mike, which was
9  my error.
10    Q.  And Mike you were referring to
11  would be --
12    A.  I probably was thinking of Mike
13  McAleer, to tell you the truth.
14    Q.  Not Mike Roberts at JLT?
15    A.  No, probably not. Probably Mike
16  McAleer who is the steamship P and I guy,
17  claims guy.
18    Q.  And in that e-mail message that
19  you sent on June 10, 2004, you keep
20  referring to the assured, "led the assured
21  to believe the first line of coverage with
22  its entry was with you."
23    On what did you base that
24  statement?

64

T. I. Montano

1    A.  Conversations with Bill Arnold.
2    Q.  In June of 2004 or prior to that
3  time?
4    A.  Prior to that time. He was
5  already gone by that time I believe from
6  -- yeah. he was gone from Horizon.
7    Q.  Did you make a separate analysis
8  about the cover of this claim?
9    MR. ZERBE: Objection to form.
10    A.  I may have. I don't recall.
11    Q.  You then say, "the claims
12  arising from the event have indeed been
13  referred to H and M underwriters and we
14  recently sent them a package of
15  correspondence, pleadings, reports, and
16  other documents so that they can become
17  familiar with the claims."
18    Do you see that?
19    A.  Yes.
20    Q.  What did you send and to whom?
21    A.  To all the underwriters listed
22  on the policy. What did I send? My
23  recollection is a lot of correspondence,
24  pleadings, reports, reports from attorneys

65

T. I. Montano

1  primarily.
2    Q.  And when you said on the policy,
3  you're referring as well to ARS 3246?
4    A.  Yes, sir.
5    Q.  And to whom did you send that
6  material?
7    A.  I'd have to look. It would have
8  been underwriters at Lloyd's through JLT,
9  Continental Insurance Company via MOAC. I
10  can't recall which office of MOAC it went
11  to. American Employers Insurance Company,
12  Fireman's Fund Insurance Company, Markel
13  Insurance Company, and Royal Insurance
14  Company through Gulf Coast Marine in New
15  Orleans.
16    Q.  And when it says on --
17    MR. ZERBE: Just for clarity,
18  could we get the answer read back from
19  the reporter.
20    (Whereupon the requested portion
21  was read back by the reporter)
22    Q.  On Exhibit 31, which is the
23  ARS 3246, in looking down the list of
24  underwriters, where it says via JLT Risk,

66

T. I. Montano

1  what does that mean?
2     A.   That means the placement with
3  underwriters at Lloyd's was done through
4  JLT Risk Solutions in London. In other
5  words, they were the placing broker, we
6  were the retail broker or the producing
7  broker.
8        As you know, to place business
9  at Lloyd's, you have to be a Lloyd's
10  broker.
11       MR. KOSTER: We've been going for
12  an hour and a half.
13       Do you want to take a short
14  break?
15       MR. ZERBE: Sure.
16       (Whereupon a break was taken)
17       MR. KOSTER: Can you mark these.
18       (Whereupon, a three-page
19  document was marked Deposition
20  Exhibit 36 for identification.)
21       (Whereupon, a letter dated
22  May 17, 2002 was marked Deposition
23  Exhibit 37 for identification.)
24    Q.   I had just asked the reporter to

*(Note: lines misnumbered in original)*

67

T. I. Montano

1  mark a document just for identification,
2  one of which refers to a James Isidro
3  Montano, and I want to ask if those are
4  particulars pertaining to you.
5     A.   (Reviewing).
6        Yes.
7        MR. KOSTER: Let the record show
8  that Exhibit 36 is a listing with the
9  Texas Department of Insurance
10  consisting of three pages.
11    Q.   Can you tell me what those
12  reflect as to your qualifications or your
13  licenses?
14    A.   Well, there's three types of
15  licenses listed here: Surplus lines
16  agent, adjuster, and general lines agent.
17    Q.   And do you hold all three of
18  those?
19    A.   Yes.
20    Q.   And the next page?
21    A.   It says the license types are
22  general lines agency, surplus lines
23  agency, and reinsurance broker.
24    Q.   And the next page?

68

T. I. Montano

1    A.   Employment from Citadel
2  Insurance Company.
3    Q.   Who is Citadel Insurance
4  Company?
5    A.   Citadel Insurance Company is a
6  Texas company, C I T A D E L, wholly owned
7  by Aon Risk Services of Texas, Inc.
8    Q.   So are you a licensed broker?
9    A.   I'm a licensed, according to
10  this, reinsurance broker. Or the agency
11  is. Because the agency profile shows Aon
12  as -- refers to Aon Risk Services of
13  Texas, Inc. as reinsurance brokers.
14    Q.   Not specifically to you?
15    A.   No, that's not to me.
16       MR. ZERBE: You were referring in
17  your last answer to which page of
18  Exhibit 36 as far as the reinsurance
19  broker listing?
20    Q.   Is that the one that just refers
21  to Aon generally?
22       MR. ZERBE: Is that the second
23  page?
24       THE WITNESS: That's the second

69

T. I. Montano

1  page, yes.
2        MR. KOSTER: They all say page
3  one of one so we'll staple them
4  together.
5        With your permission, I'll just
6  mark them one, two, three.
7    Q.   And I've asked the reporter to
8  mark another document on the letterhead of
9  Aon, a letter dated May 17, 2002 directed
10  to Horizon from Bernice A. Chaloupka.
11    A.   (Reviewing).
12    Q.   Have you had a look at that?
13    A.   Yes.
14    Q.   Have you seen that before?
15    A.   Yes.
16    Q.   Were you aware that on the
17  certificate attached, Iroquois Gas
18  Transmission System was a co-assured?
19       MR. ZERBE: Objection to form.
20       MR. KOSTER: In what respect?
21    A.   I was not --
22       THE WITNESS: Do you want me to
23  answer the question?
24       MR. ZERBE: You used the term

70

T. I. Montano

1  "co-assured" and I'm not sure -- the
2  document will reflect what it
3  reflects. I think you were
4  characterizing this document as
5  reflecting Iroquois as a co-assured.
6  Q.   Did Aon issue a certificate of
7  insurance in favor of Iroquois?
8  A.   I'm sorry but I didn't answer
9  the previous question.
10      Do you want me to answer that
11  question?
12  Q.   Please do.
13      THE WITNESS: Could you repeat
14  the question?
15      (Whereupon the requested portion
16  was read back by the reporter)
17  A.   I don't know. When you say was
18  I aware, I was not aware that they were on
19  this certificate of insurance until it was
20  shown to me by Mr. Zerbe within the last
21  few days. So I have not seen this until
22  yesterday.
23  Q.   I thought you told me you had
24  seen it before and when you told me that

*(line numbering 1–25 on left)*

71

T. I. Montano

1  you were referring to yesterday? Had you
2  seen it before yesterday?
3  A.   Had I seen this certificate of
4  insurance before yesterday?
5  Q.   This cover letter from Aon.
6  A.   No.
7  Q.   Were you aware that Iroquois Gas
8  was issued a certificate of insurance by
9  Aon?
10  A.   Was I aware before yesterday?
11  Q.   Yes.
12  A.   I don't recall. I believe they
13  were, yes.
14  Q.   And when did you form that
15  belief?
16  A.   I don't recall.
17  Q.   You've referred to at least two
18  meetings with Horizon personnel at
19  Horizon.
20      Do you recall any others?
21  A.   With Horizon at Horizon?
22  Q.   With Horizon at Aon or at
23  Horizon or at a hotel or anyplace.
24  A.   With regard to?

72

T. I. Montano

1  Q.   The incident we're discussing.
2  A.   No.
3  Q.   There were just the two meetings
4  that you can recall?
5  A.   Yes.
6  Q.   And you referred to other phone
7  calls with either Mr. Arnold or Mr.
8  Gibbens; correct?
9  A.   Yes.
10  Q.   And do you recall how many of
11  those there might have been?
12  A.   No.
13  Q.   Do you recall whether at any of
14  the meetings or the phone calls that you
15  had with -- meetings you had with or phone
16  calls with Horizon there was any
17  discussion about Iroquois' rights under
18  these insurance policies?
19  A.   No.
20  Q.   None whatsoever?
21  A.   That's my recollection, yes.
22      MR. KOSTER: I'm going to ask
23  that this be marked as the next
24  exhibit, which is Exhibit 38.

73

T. I. Montano

1  (Whereupon, a letter dated
2  August 21, 2003 was marked Deposition
3  Exhibit 38 for identification.)
4  Q.   The document that's now been
5  marked as Exhibit 38 contains on its top a
6  letter dated August 21, 2003 from Bill
7  Gibbens to Jeff Bruner at Iroquois and it
8  contains underneath a letter dated
9  August 21, 2003 to Jeff Bruner I believe
10  from yourself.
11      Do you recall that?
12  A.   Do I recall --
13  Q.   Your letter.
14  A.   Yes.
15  Q.   And what was the purpose of your
16  writing that letter on August 21, 2003?
17  A.   I guess the gist of it, the
18  purpose of this letter was to inform Mr.
19  Bruner about the contractual liability
20  provisions and how they applied and the
21  Horizon general liability policy.
22  Q.   And that went direct to Mr.
23  Bruner; correct, at Iroquois?
24  A.   Not correct. I believe I sent

74

T. I. Montano
1
2  it to Mr. Gibbens who sent it to Mr.
3  Bruner.
4     Q.  But it's addressed by you to Mr.
5  Bruner at Iroquois; correct?
6     A.  Yes.
7     Q.  So you knew Iroquois had rights
8  under these policies; correct?
9     A.  Yes.
10    Q.  And you say on page two of the
11  letter, the second paragraph that begins
12  "you;" do you see that?
13    A.  Yes.
14    Q.  "You should also be aware that
15  Horizon's entry in the Steamship Mutual"
16  -- I'm sorry, it's the next paragraph
17  down.
18       "When Aon became Horizon's
19  insurance broker in December, 2001, we
20  undertook an analysis of Horizon's
21  coverages."
22       Do you recall that?
23    A.  Do I recall what?
24    Q.  Do you recall --
25    A.  Do I recall writing it?

75

T. I. Montano
1
2     Q.  Let's start with that.
3       Do you recall writing it?
4     A.  Yes.
5     Q.  Do you recall participating in a
6  review or analysis of Horizon's coverages?
7     A.  No, because I did not.
8     Q.  Well, what was the basis for
9  your making that statement?
10    A.  I was speaking Aon in general, I
11  wasn't speaking specifically to me. I did
12  not work on the account at that time.
13       MR. ZERBE: I believe his
14    question was what was the basis for
15    your saying that Aon undertook an
16    analysis of Horizon's coverage.
17    A.  What was the basis; is that your
18  question?
19    Q.  Yes.
20    A.  I believe that's what I was told
21  by Margie Goodall.
22    Q.  And refresh my recollection
23  again, Ms. Goodall is?
24    A.  She was responsible after Peter
25  Mortlock left for the servicing and

76

T. I. Montano
1
2  placement of Horizon's coverages.
3     Q.  But this was back in August of
4  2003; correct?
5     A.  Yes.
6     Q.  So that was while Mr. Mortlock
7  was still there; correct?
8     A.  When this was written?
9     Q.  When this was written.
10    A.  Yeah, I think so, I think he was
11  still there.
12    Q.  Do you know how the commissions
13  were paid on this insurance?
14    A.  No.
15    Q.  In the normal course would they
16  have been paid by Horizon to Aon for
17  division with JLT Risks?
18    A.  In the normal course,
19  commissions would have been paid by the
20  underwriters back to us, to Aon. Or we
21  would withhold our commission before we
22  would send the premium to underwriters,
23  JLT.
24    Q.  The premium would be paid by
25  Horizon to Aon?

77

T. I. Montano
1
2     A.  Yes.
3     Q.  And Aon would do what with it?
4     A.  Well, we would keep our
5  commissions and send the rest on to
6  underwriters.
7     Q.  And would you send that directly
8  to underwriters or JLT in this case?
9       MR. ZERBE: We're referring to
10    the marine insurance?
11       MR. KOSTER: Yes.
12    A.  I call it the marine package,
13  what you call the hull.
14       Well, there were other
15  underwriters on that package so we would
16  send premium to all the underwriters and
17  withhold our commission depending upon our
18  arrangement with the particular
19  underwriter.
20    Q.  If there was a loss, how would
21  the underwriter pay the money to the
22  assured?
23    A.  Primarily through us.
24  Underwriters could send funds directly to
25  the assured.

78

T. I. Montano

1         T. I. Montano
2    Q.  Did you handle the loss
3  regarding the fire on board the Gulf
4  Horizon?
5    A.  The fire of May 18?
6    Q.  Yes.
7    A.  I'm still involved in that
8  claim, yes, sir.
9    Q.  In a claim such as that, if
10  there's a claim on the hull policy for the
11  hull damage, does that come back through
12  you?
13    A.  Generally yes, but that hasn't
14  occurred yet.
15    Q.  I understand.
16      Were there any rebates on this
17  or any special commissions?
18    A.  Not that I know of.
19    Q.  Do you know what the regulatory
20  requirements are under Texas law for the
21  sale of a policy such as this?
22    A.  No.
23    Q.  Do you know if the insurance has
24  to be on file or approved by the Texas
25  Department of Insurance?

79

T. I. Montano

1    A.  No.
2    Q.  Do you know if the carrier has
3  to be authorized by the Texas Department
4  of Insurance to write that insurance?
5    A.  Do I know that it has to be?
6    Q.  Yes.
7    A.  No, I don't know that.
8    Q.  Did you know anything about the
9  underlying construction contract in terms
10  of handling this claim?
11    A.  No.
12    Q.  Just referring to section three
13  which is Exhibit 29 on page 00323, there
14  is a provision regarding builder's risks
15  for is it a premium based on a percentage
16  of value of the contract?
17    A.  I believe that's what those
18  numbers refer to.
19    Q.  And in the normal course of
20  placing that part of the insurance with
21  the underwriters who covered that part of
22  the insurance, would you provide them with
23  those figures, with the contracts and with
24  the contract values? Would Aon?

80

T. I. Montano

1    A.  Would Aon provide underwriters
2  on builder's risks of contract values?
3  Yes.
4    Q.  Do you know if that was done in
5  this instance?
6    A.  I don't know.
7    Q.  Do you know who within Aon would
8  know that?
9    A.  Yes.
10    Q.  Who?
11    A.  Margie Goodall.
12    Q.  Did you become aware that the
13  AEGIS policy provided for four-fourths
14  cover? You're familiar with the
15  breakdown, the traditional breakdown
16  between three-quarters on the hull of RDC
17  and one-quarter with the P and I club?
18    A.  Yes.
19    Q.  And that's how P and I clubs
20  developed; right?
21    A.  Right.
22    Q.  To cover that one-fourth?
23    A.  Right.
24    Q.  And more recently -- by recently

81

T. I. Montano

1  in the terms a few decades -- they began
2  to write four-fourths; right?
3    A.  They who?
4    Q.  P and I underwriters.
5    A.  Yes. Some do, some don't.
6    Q.  And some hull underwriters carry
7  P and I; correct?
8    A.  Correct.
9    Q.  Were you aware that there was
10  duplicate four-fourths cover between the P
11  and I and the hull policy regarding
12  certain losses?
13    A.  Horizon's coverages?
14    Q.  Yes.
15    A.  I don't recall.
16    Q.  Well, did you become aware of
17  that?
18    A.  Did I become aware that there
19  was duplicate coverage under the hull and
20  P and I?
21    Q.  Yes.
22    A.  I never thought of it as being
23  duplicate coverage.
24    Q.  Well, if it potentially covers

82

T. I. Montano

1  the same risk, why wouldn't you think of
2  it as being duplicate coverage?
3  A.  I thought there would be other
4  insurance clauses that might have come
5  into play, but that would be my opinion.
6  Q.  Well, apart from other insurance
7  clauses, what would be the point of
8  selling an assured duplicate cover for the
9  same risk?
10  A.  There would be no point.
11  Q.  Would there be added premium if
12  that was done?
13  A.  I suppose if you get a premium
14  for each cover, then two covers cover the
15  same risk.
16  Q.  Wouldn't such double cover cause
17  confusion as to notification of an
18  incident or a claim?
19        MR. ZERBE: Objection to form.
20  A.  I suppose it would.
21  Q.  Would an assured or a co-assured
22  have reason to assume that there was
23  double coverage for the same risk?
24        MR. ZERBE: Objection to the

83

T. I. Montano

1  form. You're asking for speculation.
2  A.  I can only speculate.
3  Q.  Go ahead.
4  A.  Yes.
5  Q.  Yes, an assured or a co-assured
6  should assume there was double coverage
7  for a risk?
8  A.  No, I don't think that was your
9  question. I think your question was would
10  an assured be confused or lead to
11  confusion --
12  Q.  That was my prior question.
13  A.  Repeat the question then.
14  Q.  Would an assured have any reason
15  to assume there was double cover for the
16  same risk?
17  A.  Again, I'm speculating that the
18  answer would be no.
19  Q.  Did you at any point become
20  aware of the insurance requirements that
21  were contained in the Horizon/AEGIS
22  construction contract?
23  A.  No.
24        MR. ZERBE: I'm sorry, I think

84

T. I. Montano

1  you referred to the Horizon/AEGIS
2  construction contract.
3  Q.  The Horizon/Iroquois
4  construction contract.
5  A.  No.
6  Q.  Referring back to Exhibit 38
7  which is your letter of August 21, 2003 to
8  Jeff Bruner, so when you wrote in that
9  letter at the conclusion, "thus we would
10  concur with Horizon as stated in their
11  letter to you of July 23 that there should
12  be no issue of coverage for Horizon's
13  direct liability, if any, or for Horizon's
14  contractual indemnity liability to
15  Iroquois, if any, with regard to the
16  either the LIPA or NYPA claims," you had
17  not reviewed the contract?
18  A.  My recollection is I had not
19  ever reviewed the contract.
20  Q.  What was your statement based
21  on, or did you not need to see the
22  contract to make that statement?
23  A.  My recollection is I would not
24  need to see the contract to make that

85

T. I. Montano

1  statement.
2  Q.  Am I correct that the FFO cover
3  or the RDC was limited to the value of the
4  vessel during the policy period?
5  A.  Under the hull policy?
6  Q.  Yes.
7  A.  That's my recollection, yes.
8  Q.  And do you know what the limit
9  was for the Gulf Horizon at the time of
10  this incident?
11  A.  If this is the policy that
12  applies, then this says $15,200,000.
13        MR. ZERBE: Referring to page
14  IRO/AE 00318 of Exhibit 29.
15  Q.  Two more pages down.
16        Is there a very different
17  reference there?
18  A.  This is headed Horizon Offshore
19  Contractors, Inc., section one,
20  war/terrorism, et cetera worksheet and
21  this page IRO/AE 00320, the Gulf Horizon
22  across from that agreed value is USD
23  nineteen million and across from that is
24  Ecuador and I don't know why Ecuador is in

86

T. I. Montano

1    there.
2    Q.    As we sit here today, do you
3    know what the appropriate value is?
4    A.    The appropriate value of the
5    Gulf Horizon today?
6    Q.    For purposes of hull insurance.
7    A.    As the vessel presently sits
8    today?
9    Q.    I'm sorry, your knowledge today
10   interpreting the document as of the date
11   of the policy.
12       MR. ZERBE: I'll object to the
13   form.
14   A.    Yes, I would say $15,200,000.
15   Q.    And what's the basis for that?
16   A.    Because of the page IRO/AE 00318
17   is labeled at the top section one, hull
18   and machinery worksheet, vessel Gulf
19   Horizon, under hull USD $15,200,000.
20   Q.    And the reference later on to
21   the higher value, what's the significance
22   of that?
23   A.    That's a different cover because
24   this marine package policy not only covers

87

T. I. Montano

1    hull and machinery risk, it covers war and
2    terrorism risks. That's what I would take
3    that to be.
4        Let me clarify that because the
5    second page, the page in between is
6    increased value coverage, IRO/AE 00319
7    which is Horizon Offshore Contractors,
8    Inc. disbursements worksheet, a list of
9    vessels, one of the Gulf Horizon, then the
10   second list is increased value USD
11   $3,800,000. So, as you know, the way
12   increased value works, it would be added
13   to the hull $15,200,000 plus $3,800,000.
14   Q.    So does that confirm or cause
15   you to alter your view for purposes of the
16   value of the Gulf Horizon in respect of an
17   FFO claim? Is it nineteen million or is
18   it 15.2?
19   A.    It's 15.2.
20   Q.    That's your view?
21   A.    Yes.
22       MR. KOSTER: Let me mark another
23   document, which is Exhibit 39.
24       (Whereupon, a one-page document

88

T. I. Montano

1    was marked Deposition Exhibit 39
2    for identification.)
3    Q.    And this is a page entitled to
4    and attached to forming part of cover note
5    number ARS 3246 and in the middle of it it
6    says, "agree allow twenty percent no
7    claims bonus hereon, based on net premiums
8    paid, collectible on expiry, subject no
9    paid claims hereon in respect of the
10   following security only," and then it
11   refers to the various sections.
12       Do you see that?
13   A.    Yes, sir.
14       MR. ZERBE: Just for the record,
15   I don't see a Bates number on this.
16       Is there some representation as
17   to providence?
18       MR. KOSTER: I believe it came
19   from Mr. Radzik.
20   Q.    Do you know why this was not
21   sent to Iroquois?
22   A.    Do I know?  No, I don't know.
23   Q.    Do you know if there was a no
24   claims bonus paid during the policy year

89

T. I. Montano

1    that this incident occurred in?
2    A.    No, I don't know.
3    Q.    Do you know if any contingent
4    commissions were paid in respect to this
5    cover?
6    A.    I don't know.
7    Q.    Were you at any time told by
8    Horizon not to lodge a claim under the
9    hull policy?
10   A.    I don't recall, no.
11   Q.    Would you have recalled such a
12   thing in the normal course?
13   A.    Yes, I would have.
14   Q.    Were there any discussions
15   concerning the lodging of a claim against
16   the hull policy prior to May of 2004?
17   A.    I believe when I got some e-mail
18   from Colin Williams that I passed it on to
19   Bill Arnold and it may have been a
20   telephone discussion with him.
21   Q.    And what would the substance of
22   that discussion have been?
23   A.    They were requesting an
24   underwriter's view and I passed it on to

90

T. I. Montano

1  him and asked him to respond.
2      Q.    Now, you've testified that you
3  notified JLT Risks regarding the hull in,
4  was it June of 2004?
5      A.    No, I believe it was May.
6      Q.    May of 2004.
7          And would you have expected JLT
8  Risks to pass that directly on to the
9  concerned hull underwriters?
10     A.    Yes.
11     Q.    Do you know if they did that or
12 not?
13     A.    When I talk about the hull
14 underwriters, the hull underwriters at
15 Lloyd's, because there were other hull
16 underwriters on the slip that I reported
17 to directly and sometime we forget about
18 those other companies.
19         With respect to the London
20 placement on the hull risk, yes.
21     Q.    Have you disclosed your direct
22 correspondence with the other underwriters
23 on the hull risk?
24     A.    I'm sorry?

91

T. I. Montano

1      Q.    You said you had direct
2  correspondence with others on the hull
3  risk.
4      A.    Well, when you see my notice
5  under the report of loss under the hull
6  policy, it includes other insurers besides
7  London underwriters and so I would have
8  sent those directly to those companies, so
9  I would have sent those to Continental,
10 American Employers, Firemans Fund, Markel,
11 and Royal.
12         MR. ZERBE: Let the record note
13     the witness is referring to
14     ARS-TX 0043.
15     Q.    And this -- that document is
16 what you sent directly to them?
17     A.    I sent this document directly to
18 everyone listed here.
19     Q.    Including the underwriters at
20 Lloyd's?
21     A.    Care of JLT Risk Solutions, so I
22 would have not sent this directly to the
23 underwriters at Lloyd's, I would have sent
24 this to JLT.

92

T. I. Montano

1      Q.    But you sent it direct to the
2  other parties?
3      A.    Yes.
4      Q.    Had you notified those other
5  parties at any time before May, 2004?
6      A.    My recollection is no.
7      Q.    Would you have expected JLT
8  Risks to relay that notice direct to the
9  underwriters at Lloyd's?
10     A.    Yes, sir.
11     Q.    And do you know if that was
12 done?
13     A.    Yes.
14     Q.    Was it done?
15     A.    As far as I know it was done.
16     Q.    By whom?
17     A.    My recollection it was Paul
18 Bennett.
19     Q.    There's been testimony in this
20 case by a Mr. Hodgett that he did not
21 receive actual notice until December 1,
22 2004.
23         Did you investigate that at all?
24     A.    Yes.

93

T. I. Montano

1          MR. ZERBE: Objection to form.
2      Go ahead.
3      A.    Yes, I did.
4      Q.    And what did you discover?
5          MR. ZERBE: Can we get a time
6      frame on this?
7      Q.    When did you investigate?
8      A.    I think it was last week.
9      Q.    And what did you determine as a
10 result of your investigation?
11     A.    I determined that what he said
12 was more or less accurate.
13     Q.    And did you determine why that
14 was the case?
15     A.    I was told why that was the
16 case.
17         Did I determine that was the
18 case?
19     Q.    What were you told?
20     A.    I was told by Paul Bennett that
21 when I inquired about that, because
22 obviously I was surprised that if the
23 notice went in in May was not reported to
24 underwriters under December which would be

94

T. I. Montano

1
2 extraordinary, I was told by Paul Bennett
3 that Mr. Hodgett told him he wasn't
4 accepting notice until he was able to
5 provide him with the full wording of the
6 policy. Apparently the full working of
7 the policy was not available from JLT in
8 May of 2004.
9      Q.   Let me see if I understand what
10 you understand to have been the case.
11      Paul Bennett from JLT Risks went
12 to see Mr. Hodgett at some point in May?
13      A.   Yes.
14      Q.   And Mr. Hodgett told him that he
15 would not accept the notice of claim until
16 the full policy was produced?
17      A.   The full wording, that's the
18 gist of what Mr. Bennett told me.
19      Q.   And Mr. Bennett told you that
20 last week?
21      A.   I believe so, yes.
22      Q.   And where does Mr. Bennett --
23 where is he employed now?
24      A.   He's still with JLT.
25      Q.   He's the one that's with JLT in

95

T. I. Montano

1
2 Texas?
3      A.   No, no, no, he's with JLT in
4 London. Mr. Mortlock went to JLT in
5 Houston.
6      Q.   Sorry.
7      Was Mr. Bennett able to provide
8 you with any documentary evidence to
9 support this?
10      A.   Support?
11      Q.   This scenario under which he
12 went to present the claim and was told by
13 Mr. Hodgett not to present it until he had
14 the policy?
15      A.   No, and I didn't ask for any.
16      Q.   That would have been my next
17 question.
18      Would that be a normal request
19 from an underwriter, to your knowledge, or
20 do you have any knowledge on that
21 procedure?
22      A.   I'm familiar with the London and
23 the Lloyd's system so that would be -- I
24 think that would be unusual.
25      Q.   And do you know why it took so

96

T. I. Montano

1
2 many months to comply with that condition,
3 if that's what it was, that Mr. Hodgett
4 placed on the presentation of the claim?
5      A.   Do I know why? I can only
6 speculate.
7      Q.   No, why it took so long to
8 produce the policy.
9      A.   I'd be speculating as to why it
10 took so long to present the policy.
11      Q.   Give us your best speculation.
12      A.   Inefficiency at JLT. They were
13 responsible for producing the full wording
14 and having it agreed.
15      Q.   Do you know if the full policy
16 was otherwise available to Lloyd's?
17      A.   No, I don't.
18      Q.   Were there any other claims
19 pending on this policy at this point?
20      A.   I don't recall.
21      Q.   What about Mr. Sunny, did that
22 involve the same policy?
23      A.   Mr. Sunny was not reported to
24 the hull underwriters.
25      Q.   Why not?

97

T. I. Montano

1
2      A.   Because the vessel itself was
3 not damaged nor any appurtenance of the
4 vessel caused the damage.
5      Q.   What about the fire claim, had
6 that occurred at this time?
7      A.   The fire claim had not occurred
8 until May 18, 2004 and it was -- the
9 coverage is under a totally separate
10 towage policy.
11      Q.   In terms of protecting the
12 interests of a liability underwriter,
13 whether it's FFO or P and I in with
14 respect to this incident, were necessary
15 actions taken by the P and I cover that
16 was invoked, AEGIS?
17      A.   To protect the interest of the P
18 and I underwriter?
19      Q.   Yes, the liability underwriter.
20 Were --
21      A.   I don't understand the question.
22      Q.   Were surveyors appointed, expert
23 and so on?
24      A.   Yes.
25      Q.   In the case of a Lloyd's claim,

98

T. I. Montano
1  T. I. Montano
2  would Lloyd's normally look to Aon's
3  office in Texas for an incident arising
4  out of a claim there to make
5  recommendations regarding expert or
6  surveyors or would they make their own?
7     A.  It works different ways.  Often
8  they would look to us, often they have
9  their own surveyors, adjusters, and
10  attorneys in mind on the point of a major
11  casualty or any casualty.
12    Q.  Was Aon involved in the renewals
13  of this policy after 2003?
14    A.  Yes, I believe so.
15       MR. ZERBE: I'll just clear up in
16  your question, you said renewals,
17  plural?
18    Q.  Renewal of the policies.
19    A.  Yes, I believe so, yes.
20    Q.  And in conjunction with
21  renewals, do you report claims?
22    A.  If requested.
23    Q.  Were you requested to advise on
24  claims pending at the time of these
25  renewals?

99

1  T. I. Montano
2     A.  I don't recall if loss
3  information was requested from them on
4  renewal of the hull policy.
5     Q.  Would your records reflect that?
6     A.  No.
7     Q.  Would the placement department's
8  records reflect that?
9     A.  Reflect that I was not
10  requested --
11    Q.  No, reflect what was reported to
12  the hull underwriters for a renewal.
13    A.  It should.
14    Q.  Mr. Hodgett testified that he's
15  never been advised of a claim by Horizon
16  as opposed to Iroquois for this cover.
17       Do you know that to be the case?
18    A.  Do I know that's what he
19  testified to?
20    Q.  Do you know whether Horizon ever
21  submitted a hull claim regarding this
22  incident for liability cover?
23    A.  Per our notice of May 17, 2004,
24  we notified underwriters of the
25  occurrence.  To my knowledge, Horizon has

100

1  T. I. Montano
2  not made a claim under this policy for
3  coverage or reimbursement by underwriters
4  for this occurrence.
5     Q.  But it is a party to the notice?
6  The notice was made on its behalf.
7     A.  On behalf of Horizon?
8     Q.  Yes.
9     A.  Yes.
10    Q.  Do you know Mr. Kimmitt, an
11  attorney in Texas?
12    A.  No.
13    Q.  Were you privy to any
14  discussions regarding obtaining an opinion
15  from Mr. Kimmitt on cover?
16    A.  No.  I think one of the items of
17  correspondence saying it was being
18  referred to Mr. Kimmitt, but I don't
19  recognize his name.
20    Q.  Do you know -- at some point Aon
21  in combination with JLT sent the files to
22  McGriff?
23       MR. ZERBE: Objection to form.
24    Q.  Well, Aon sent files to McGriff;
25  correct?

101

1  T. I. Montano
2     A.  Correct.
3     Q.  What was the reason for the
4  change of brokerage?
5     A.  I can't speculate.  I would only
6  be speculating.
7     Q.  Well, did anybody tell you?
8     A.  No.
9     Q.  Did you ask anybody, did you say
10  it's a big account, why are we losing it?
11    A.  I think so, yes, I think I asked
12  somebody.
13    Q.  And what were you told?
14    A.  I think they were -- I was told
15  that they were unhappy with the service on
16  the fire claim of May 18, 2004.
17    Q.  Do you know of an organization
18  entitled either North Bank Towing or
19  Odyssea?
20    A.  Do I know of those
21  organizations?
22    Q.  Yes.
23    A.  Yes, sir.
24    Q.  And does McGriff act as broker
25  for those organizations?

102

T. I. Montano

1
2  A.  I don't know.
3  Q.  Do you know if those
4  organizations are shareholders,
5  stockholders, or noteholders of Horizon?
6  A.  I don't know.
7  Q.  Do you know if there was any
8  reinsurance placed by Lloyd's with respect
9  to the cover that we're talking about?
10  A.  I don't know.
11  Q.  Has Aon placed JLT Risk on
12  notice on a claim that Aon may make on
13  JLT?
14  A.  Not that I know of.
15  MR. KOSTER: I'm going to mark
16  again another document that I believe
17  has already been marked.
18  (Whereupon, a memorandum dated
19  September 20, 2004 was marked
20  Deposition Exhibit 40
21  for identification.)
22  Q.  Referring to Exhibit 40, Mr.
23  Montano, do you recall receiving that?
24  A.  No.
25  Q.  You do not recall receiving

103

T. I. Montano

1
2  that? It's addressed to you from Paul
3  Bennett.
4  A.  Yes, I see that, but do I recall
5  actually receiving it? No.
6  Q.  Do you recall reading it at any
7  point?
8  A.  Yes.
9  Q.  When?
10  A.  No, I don't recall exactly when
11  I read it for the first time.
12  Q.  I'm a little confused.
13  Was it misrouted; you never saw
14  it?
15  A.  No, I'm saying I don't remember
16  actually receiving this piece of paper and
17  reading it on 20th of September, 2004. Or
18  maybe it came in after hours and I read it
19  on the 21st of September. Or maybe it
20  came in on a late Friday and I didn't read
21  it until Monday. I don't recall
22  specifically reading this message.
23  Q.  Well, let me ask you about it.
24  It says, "we refer to your loss
25  advice dated 17 May, 2004. We would

104

T. I. Montano

1
2  advise that we have received a request
3  from leading underwriters for an update on
4  this loss."
5  And that's referring to the Gulf
6  Horizon; correct?
7  A.  All I can do is assume that my
8  reference refers to -- I'd have to refer
9  to the notice of loss dated May 17 which
10  has my file number 03M58-A, then yes.
11  MR. ZERBE: That number is
12  03-M5058-A.
13  There's some initials on the
14  upper right-hand corner of that
15  document. Do you recognize those
16  initials?
17  THE WITNESS: Yes.
18  MR. ZERBE: Or the handwriting.
19  THE WITNESS: That's my
20  handwriting.
21  Q.  So that would indicate you saw
22  it at some point?
23  A.  Yes.
24  Q.  Would that indicate to you that
25  the notice of loss that you sent was

105

T. I. Montano

1
2  received?
3  A.  Yes.
4  Q.  At least as of September?
5  A.  Yes, sir.
6  Q.  And it says, "we have received a
7  request from leading underwriters."
8  Who do you understand leading
9  underwriters to be?
10  A.  Leading underwriters at Lloyd's
11  and I don't recall who the particular
12  syndicate was.
13  Q.  In light of your prior
14  testimony, are you now suggesting this was
15  misleading advice from JLT?
16  A.  In that underwriters had not
17  been advised of the loss or the report?
18  Q.  Well, he represents as a fact
19  that something was reported to them and
20  they made a request for an update on the
21  loss, not a request for the policy.
22  A.  That's right.
23  Q.  Do you know whether that request
24  was -- did your investigation last week
25  indicate or disclose anything regarding

106

T. I. Montano

1
2  whether that part of it was true?
3        MR. ZERBE: What part?
4    A.  Which part?
5    Q.  That Mr. Bennett was not only
6  asking for a copy of the policy but that
7  they asked for updated information.
8    A.  This led me to believe that he
9  advise the underwriters that the loss
10  underwriters asked for additional
11  information. I can only assume that if
12  underwriters ask for additional
13  information with regard to the loss, they
14  know about the loss. That would be common
15  logic.
16    Q.  Just a couple of follow-up
17  questions.
18        Regarding this fire claim, where
19  did that occur?
20    A.  Off the east coast of the United
21  States in the Atlantic Ocean.
22    Q.  Where was the vessel enroute to?
23    A.  Israel, offshore Israel in the
24  Mediterranean Sea.
25    Q.  And that claim is still pending?

107

T. I. Montano

1
2    A.  Yes.
3    Q.  And that's being handled in your
4  office?
5    A.  Yes, certain aspects of it, yes.
6    Q.  And you expect that when it's
7  resolved, it will be paid through your
8  office, the loss will be paid?
9    A.  Yes.
10    Q.  Going back to your testimony
11  regarding the vessel valuation, would the
12  actual value for purposes of the insurance
13  be something that the placement office
14  would be in a better position to answer
15  than you in the claims department?
16    A.  Well, once it's in the policy,
17  this is an agreed value policy. I mean,
18  it is what it is as written in the policy.
19        MR. KOSTER: Give us two minutes.
20        (Whereupon a break was taken)
21    Q.  Would you look at 321 in the
22  Bates stamps.
23        Now, I'd like you to look at
24  page 338, specifically line eighty-four
25  where it refers to "subscriptions hereto

108

T. I. Montano

1
2  there to the value of the vessel hereby
3  insured provided always that our liability
4  in respect of any one such casualty shall
5  not exceed our proportionate part of the
6  value of the vessel hereby insured."
7        Do you see that?
8    A.  Yes, sir.
9    Q.  Now, would you go to the
10  previous page and take a look at lines
11  twelve through fourteen where it says --
12  actually eleven through fourteen where it
13  says, "the subject matter of this
14  insurance is the vessel called the blank
15  and by whatsoever name or names said
16  vessel is or shall be called which, for
17  purpose of this insurance, shall consist
18  of and be limited to her hull, launches,
19  lifeboats, rafts, furniture, bunkers,
20  stores, supplies," and it goes on.
21        Do you see that?
22    A.  Yes, sir.
23    Q.  Now referring back to 321, why
24  wouldn't that value be $19 million?
25    A.  I believe this is, since it says

109

T. I. Montano

1
2  total value, that is total value and the
3  parts we were just reading referred to the
4  hull and machinery cover. Total value
5  refers to both the hull and machinery
6  cover and the IV, the increased value
7  cover which we discussed earlier.
8    Q.  I'm not sure I understand.
9        Which now are you saying in your
10  view it is, 15.2 or nineteen?
11        MR. ZERBE: I'm sorry, what is?
12    Q.  The value for purposes of
13  liability cover, not hull cover.
14        What's the hull value for
15  purposes of this cover that we're talking
16  about? What's the vessel value?
17    A.  The vessel value for hull and
18  machinery coverages, which include the
19  collision liability, is the 15.2 or 15.6,
20  whatever it was. Page 00321 where it
21  lists the total value of nineteen million,
22  that's the cover under the H and M policy
23  plus the value under the IV. As you know,
24  the IV refers to primarily total losses of
25  the vessel.

110

T. I. Montano

1
2    Q.   Define IV.
3    A.   Increased value.
4        MR. KOSTER: We're getting
5    argumentive and I don't want to get
6    argumentive.
7        I have no further questions. We
8    have a dispute regarding the
9    interpretation of that policy that's
10   not immediately relevant.
11       MR. ZERBE: Do you have any
12   questions?
13       MR. RADZIK: Yes.
14   EXAMINATION BY
15   MR. RADZIK:
16       MR. RADZIK: Good afternoon, Mr.
17   Montano. I'll try to speak up so you
18   can hear my questions.
19       My name is Ed Radzik and I
20   represent underwriters at Lloyd's and
21   certain insurers. I just have some
22   follow-up questions to ask you.
23   Q.   First of all, could you refer to
24   what's been marked as Exhibit 31, which
25   was the stack of documents that were

111

T. I. Montano

1
2    delivered to us by Mr. Zerbe last evening.
3    A.   Yes, sir.
4    Q.   And I'd like you to look at your
5    letter of July 17, 2003 addressed to Mr.
6    Jeffrey Bruner of Iroquois Gas
7    Transmission. It starts at Bates stamp
8    ARS 058 and it continues through 060.
9        Do you have that letter in front
10   of you, sir?
11   A.   Yes, sir.
12   Q.   This letter is a follow-up or a
13   response to Mr. Bruner's letter to you
14   dated June 9, 2003; is it not?
15   A.   That's what it states, yes, sir.
16   Q.   Do you have that letter in your
17   file packet anywhere?
18   A.   I don't have it with me.
19   Q.   Is that something that would be
20   contained in your file back in Texas?
21   A.   It should be, yes, sir.
22   Q.   Is that something that you can
23   provide for us at the conclusion of this
24   deposition? Through your counsel, of
25   course.

112

T. I. Montano

1
2    A.   Yes, sir.
3    Q.   In other words, you can send it
4    to Mr. Zerbe and he can distribute it to
5    us.
6    A.   Yes, sir.
7    Q.   But the upshot of your letter
8    indicates that it encloses nine separate
9    notifications of occurrences that you sent
10   out with respect to two losses, one having
11   to deal with the vessel Sunny and the
12   other having to deal with the Gulf
13   Horizon; is that correct?
14   A.   Yes, sir.
15   Q.   And on the second page of the
16   letter you state, "we believe the
17   enclosures clearly evidence notice to all
18   appropriate insurers with respect to the
19   subject casualties."
20       Those are your words, sir?
21   A.   Yes, sir.
22   Q.   Now, none of the nine notices
23   that you included in this letter went out
24   to any of the hull and machinery
25   underwriters; is that correct?

113

T. I. Montano

1
2    A.   That's correct.
3    Q.   As a matter of fact, the first
4    notice or attempt to notify hull and
5    machinery insurers occurred almost one
6    year later on May 17, 2004; correct?
7    A.   Correct.
8    Q.   Now, in your letter you go on to
9    explain about the specialist operations
10   feature contained in the P and I club
11   rules, specifically Rule 17B.
12       Do you see that, sir?
13   A.   Second paragraph on page two?
14   Q.   Correct.
15   A.   Yes, I see it.
16   Q.   Am I correct in stating that the
17   specialist operations feature of the P and
18   I cover deals specifically with
19   contractual liability of Horizon arising
20   out of things like pipe laying operations;
21   is that your understanding of what the
22   specialists operations feature is?
23   A.   No, that's not my recollection.
24   Q.   What is your recollection?
25   A.   I think it also would apply to

114

T. I. Montano

1
2  direct liability, not only contractual
3  liabilities, but I could be wrong.
4      Q.   So it's not only contractual but
5  direct liability for pipe laying
6  operations?
7      A.   Yes, sir.
8      Q.   So in your view, the AEGIS
9  policy would clearly cover the events as
10 they were described in connection with
11 this occurrence?  And I mean the
12 occurrence of February 27, 2003.
13     A.   That was my view, yes.
14     Q.   And is it still your view today?
15     A.   Yes.
16     Q.   And further in the same letter
17 we have a reference to the P and I club
18 Rule 25XX as it pertains to contract and
19 indemnities.
20         Do you see that reference, sir,
21 in the bottom paragraph on page two?
22     A.   Yes, sir.
23     Q.   Am I correct in stating that
24 this feature of the P and I cover would
25 extend to Horizon's contractual liability

116

T. I. Montano

1
2  Arnold that you referred to earlier in
3  your testimony --
4      A.   Yes.
5      Q.   -- in response to questions from
6  Mr. Koster as to your first notification
7  of the February 27, 2003 occurrence?
8      A.   Yes, sir.
9      Q.   And if we could now refer to, in
10 the same batch of documents, to Exhibit 31
11 Bates stamp 0038.
12         Do you see the exchange there
13 between yourself and Mr. Simon Dawes of
14 the JLT Group on that page?
15     A.   Yes.
16     Q.   Am I correct in stating that Mr.
17 Simon Dawes at the time was your liaison
18 or your contact at JLT solutions for the
19 purposes of this claim?
20         MR. ZERBE: Objection to form.
21     A.   Simon Dawes was my primary
22 contact with regard to this account, yes,
23 at JLT.
24     Q.   And what was the purpose of this
25 e-mail to Mr. Dawes?

115

T. I. Montano

1
2  with respect to the occurrences occurring
3  on February 27, 2003?
4          MR. ZERBE: Objection to form.
5      A.   Sorry, could you repeat that?
6          MR. RADZIK: Could you read it
7  back.
8          (Whereupon the requested portion
9  was read back by the reporter)
10     A.   Yes.
11     Q.   And was it your view then back
12 in July of 2003 that that feature of the P
13 and I cover came into play in this
14 incident?
15     A.   Yes.
16     Q.   And does it remain your view
17 that that coverage so extends?
18     A.   Yes.
19     Q.   In the same group of Exhibit 31,
20 I'd like to now focus your attention to
21 Bates stamp ARS-TX 0035, the lower
22 right-hand corner Bates stamp, do you see
23 that e-mail, sir?
24     A.   Yes, sir.
25     Q.   And is that the e-mail from Bill

117

T. I. Montano

1
2      A.   To advise him of what I exactly
3  say in there, "please notify underwriters
4  to determine if they wish to appoint
5  someone on their/insured's behalf."
6      Q.   You recognized at that point
7  that it was important for underwriters to
8  have someone appointed on their behalf to
9  investigate; is that a fair statement?
10     A.   That's a fair statement, yes,
11 sir.
12     Q.   And at that time --
13         MR. RADZIK: Strike that.
14     Q.   Is it your understanding that
15 the FFO features of both the P and I
16 policies and the collision provision in
17 the hull and machinery policies require a
18 determination of fault, of actual
19 negligence on the part of the assured in
20 order for there to be a trigger?
21         MR. ZERBE: Objection to form.
22     A.   Would you repeat the question,
23 please?
24         MR. RADZIK: Would you read the
25 question back.

118

T. I. Montano

1
2     (Whereupon the requested portion
3     was read back by the reporter)
4     A.   It requires legal liability of
5  the assured to the claimant, whether
6  that's based on negligence or some other
7  theory of coverage.
8     Q.   Now, the contractual indemnity
9  features of the P and I policy, which
10  include specialist operations under
11  Rule 17B and contractual indemnities under
12  25XX, to your knowledge are those same
13  features extended or covered by the hull
14  and machinery policies?
15     A.   My understanding of the coverage
16  under the hull is that there is
17  contractual liability under that policy.
18     Q.   What provision in the hull
19  policy would you refer me to for
20  contractual liability?
21     A.   I'd have to refer to the policy,
22  but that's my recollection. It would be
23  on page IRO/AE 00316 in the middle of the
24  page, "it is understood and agreed that
25  where required by contract bid or work

119

T. I. Montano

1
2  order, additional assured and/or waivers
3  of rights of subrogation are automatically
4  included hereunder subject further to
5  notice clauses as may be required by
6  written contract only and that coverage
7  provided hereunder shall be primary in
8  respect of any coverage carried by said
9  additional assureds where required by
10  written contract."
11     Q.   That provision seems to allow
12  and permit additional assureds to be
13  added; is that correct?
14     A.   Yes, sir, as required by
15  contract.
16     Q.   As required by contract?
17     A.   Yes, sir.
18     Q.   Is it your understanding that
19  that provision also extends the hull and
20  machinery cover to contractual
21  liabilities, contract indemnity of these
22  additional assureds?
23     MR. ZERBE: Objection to form.
24     A.   I'm not sure I can answer that
25  question.

120

T. I. Montano

1
2     My opinion is that this clause
3  allows the assured to assume the indemnity
4  of its contracting partner for any losses
5  that are covered by this policy.
6     Q.   Now, are you aware that Iroquois
7  itself undertook to notify the
8  underwriters of this occurrence?
9     A.   Yes.
10     Q.   And do you know whether Iroquois
11  made any notification to the hull and
12  machinery underwriters?
13     A.   No.
14     Q.   You don't know?
15     A.   Yes. I don't know.
16     Q.   And to your knowledge, had
17  Iroquois been provided with copies of the
18  policies in question, all of the policies
19  in Horizon's insurance program prior to
20  this lawsuit?
21     A.   I don't know that.
22     Q.   Is there indications in your
23  file that Aon had forwarded policies to
24  Horizon which included both certificates
25  in favor of Iroquois and the policies

121

T. I. Montano

1
2  themselves?
3     A.   I don't recall. Just in the
4  last few days I saw that letter from
5  Bernice Chaloupka to Bill Arnold and, to
6  tell the truth, I don't remember now if it
-7  included certificates or policies. I'm
8  looking at the letter now and it does say
9  that it's certificates, so I would guess
10  then that they did not send copies of the
11  policy to Iroquois but what Bernice sent
12  were what she says, certificates of
13  insurance.
14     Q.   You're looking, are you not, at
15  the letter Bates stamped ARS-TX 001?
16     A.   00001, yes.
17     Q.   Dated May 17, 2002?
18     A.   Yes.
19     Q.   Let me refer you to what's been
20  Bates stamped ARS-TX 0007. This is a
21  letter dated January 24, 2003 from Pamela
22  Smith.
23     Do you know who Pamela Smith is?
24     A.   No.
25     Q.   Does she work for Aon Risk

122

T. I. Montano

1 Services?
2    A.   I can only assume at the time
3 she did. I don't know if she works there
4 today.
5    Q.   Does this letter predate the
6 occurrence which gives rise to this
7 lawsuit?
8    A.   Yes.
9    Q.   And does the letter also
10 indicate that it encloses to Horizon
11 certified copies of the policies which
12 make up Horizon's insurance program?
13    A.   Generally, yes. But you'll
14 notice that the marine package ARS 324,
15 has an asterisk and says that, "note that
16 we have enclosed our confirmation of
17 coverage as the policy is in the process
18 of being issued," so I would take that to
19 indicate that the entire policy was not
20 sent to Mr. Arnold at the time.
21    Q.   What would have been included if
22 the complete policy was not?
23    A.   Just as it says, a confirmation
24 to coverage, probably something from JLT

123

T. I. Montano

1 indicating that the coverage has been
2 placed.
3    Q.   Would the slip policy have been
4 included?
5    A.   I don't know.
6    Q.   I'm going to refer you to in
7 that same stack Bates stamp ARS-TX 0097.
8        Do you see that, sir?
9    A.   Yes, sir.
10    Q.   Am I correct that this was faxed
11 to you from Paul Bennett of JLT Risk --
12    A.   Yes.
13    Q.   -- at some point?
14    A.   Yes, sir.
15    Q.   On or about what date?
16    A.   I would take it to mean 17th of
17 December, 2004.
18    Q.   Do you see the note at the
19 bottom, the handwritten note?
20    A.   Yes.
21    Q.   Is this note addressed to you
22 from Mr. Bennett?
23    A.   The note at the bottom?
24    Q.   Yes.

124

T. I. Montano

1    A.   No. I don't think so.
2    Q.   Do you recall the circumstances
3 under which you received this document?
4    A.   No.
5    Q.   Do you understand what this
6 document is?
7    A.   It has something to do with
8 Zurich Global Energy's position.
9    Q.   What do you understand their
10 position to be based on this document?
11    A.   It's a reservation of rights.
12    Q.   Are you familiar with
13 reservation of rights letters received
14 from the London market?
15        MR. ZERBE: Objection to form.
16    A.   I'm familiar with reservation of
17 rights letters.
18    Q.   How they do it in the London
19 market?
20    A.   Generally, yes.
21    Q.   Is this customary in how a
22 reservation of rights is accomplished,
23 from your experience, in the London
24 market?

125

T. I. Montano

1    A.   No.
2    Q.   What is different about this
3 reservation of rights?
4    A.   Usually what I get -- what I've
5 seen in the past is that if underwriters
6 reserve their rights, they would mark it
7 on the file and then the placing broker
8 would transcribe in the letter or a fax or
9 an e-mail message back to me to transmit
10 back to the assured.
11    Q.   Is it usual when you have one of
12 these reservation of rights letters that
13 all of the underwriters would sign off
14 behind the LOU?
15    A.   Not that I've seen, no.
16    Q.   You passed this letter out to
17 Horizon on or about December 20; is that
18 correct?
19    A.   Yes, sir.
20    Q.   And at that time Aon had been --
21 their services had discontinued?
22    A.   Yes, sir, that's correct.
23    Q.   And that your files were on the
24 way or in the process of being transferred

126

T. I. Montano

1
2  over to the new broker McGriff?
3      A.   Correct.
4      Q.   And did you ever receive a
5  response from Mr. Phillibus regarding this
6  notice?
7      A.   My recollection is that I did
8  not.
9      Q.   I refer you in the same stack of
10  documents ARS-TX 0094.
11          Do you have that document, sir?
12      A.   Yes, sir.
13      Q.   Is that the notice that Horizon
14  sent out basically advising to
15  underwriters and others whom it may
16  concern that Aon was essentially being
17  replaced by McGriff, Seibels and Williams
18  of Texas, Inc.?
19      A.   That's correct.
20          MR. RADZIK: I have no further
21      questions. Thank you very much, sir.
22  EXAMINATION BY
23  MR. ZERBE:
24      Q.   Mr. Montano, I wanted to just
25  ask a few questions following up on some

127

T. I. Montano

1
2  testimony you gave in response to Mr.
3  Koster's questioning with regard to
4  notification to the various underwriters
5  under the hull insurance policy.
6          I'll ask you to look again at
7  Exhibit 31.
8          You testified about giving
9  notice directly with respect to the
10  carriers listed on ARS-TX 043, the various
11  underwriters on the security below
12  underwriters at Lloyd's; is that correct?
13      A.   That's correct.
14      Q.   Could you go to the next page
15  ARS-TX 0044.
16          Do you recognize this document?
17      A.   Yes.
18      Q.   What does this reflect; how is
19  this different from the prior page 0043?
20      A.   Well, at the bottom of it it
21  says, "please acknowledge receipt by
22  signing and returning a copy of this
23  notice" and it's signed by Gina Hartigan,
24  who I believe is with Gulf Coast Marine
25  Insurance Company in New Orleans for Royal

128

T. I. Montano

1
2  Insurance Company, and her claim
3  number 014857, I believe.
4      Q.   And does 0044 reflect when this
5  document was received by Aon?
6      A.   0044?
7      Q.   Yes.
8      A.   No, that's a Bates stamp.
9          What do you mean?
10      Q.   Does the face of this document
11  indicate when you received this page in
12  any way?
13      A.   It would be May 18, 2004,
14  Tuesday at 11:06, on.
15      Q.   Turning to the next page
16  ARS-TX 0045, do you recognize the
17  signature under the acknowledgment of
18  receipt portion of this document?
19      A.   I'm assuming it's Brenda
20  Bowman's signature. I haven't seen it
21  before.
22      Q.   And who was Brenda Bowman with?
23      A.   CNA Marine which must have been
24  part of MOAC for Continental Insurance
25  Company.

129

T. I. Montano

1
2      Q.   Were they a participant in the
3  hull insurance policy?
4      A.   Yes.
5      Q.   And turning to ARS-TX 0046, do
6  you recognize this document?
7      A.   Yes.
8      Q.   Is that your handwriting in the
9  upper right-hand corner?
10      A.   Yes.
11          Do you want to know what it
12  means?
13      Q.   Yes.
14      A.   The F stands for file and I
15  think the rest of that says hull.
16      Q.   You received this -- you believe
17  you received it on or about the date of
18  the document?
19      A.   Yes.
20      Q.   Turning to the next page
21  ARS-TX 0047, is that your signature?
22      A.   Yes, it is.
23      Q.   Do you recall sending this
24  document on or about June 7, 2004 to the
25  various addressees?

130

T. I. Montano

1
2  A.  Yes.
3  Q.  And who did you send this to?
4  A.  I sent it to JLT, I sent it to
5  MOAC, All American Employers, Fireman's
6  Fund, Markel, and Royal.
7  Q.  And turning to ARS-TX 0048, is
8  that your signature?
9  A.  Yes, sir.
10  Q.  And did you send this document
11  to the addressees on or about June 24,
12  2004?
13  A.  Yes, sir.
14  Q.  That was sent to the same
15  addressees that received -- to which you
16  addressed a copy of your June 7, 2004
17  letter?
18  A.  Yes.
19  Q.  I believe you might have
20  testified then in response to a question
21  early on in the deposition from Mr. Koster
22  that you were never in direct contact with
23  the underwriters under the hull policy.
24  Does reviewing these documents
25  refresh your recollection on the issue of

131

T. I. Montano

1
2  whether you were ever in direct contact
3  with any of the hull underwriters?
4  A.  Yes, I need to clarify that I
5  was not in direct contact with
6  underwriters at Lloyd's or other companies
7  in the London market that the business was
8  placed into through JLT but I was in
9  direct contact with the other underwriters
10  on the hull policy.
11  MR. ZERBE: Thank you.
12  MR. KOSTER: Nothing further.
13  (Whereupon a break was taken)
14  MR. SCHMIDT: On behalf of
15  American Home, I have no questions but
16  I would like to reiterate American
17  Home's reservation of rights with
18  respect to the conduct of this
19  proceeding in light of Judge Rakoff's
20  stay and to specifically reserve the
21  right to take further testimony if and
22  when that stay is ever lifted.
23  MR. KOSTER: Let me just add to
24  that that this witness was provided in
25  response to a 30(b)(6) motion and

132

T. I. Montano

1
2  while counsel agreed that he would be
3  provided regarding claims and the
4  other portion was stayed, if the stay
5  is lifted at some point then that
6  agreement remains in effect.
7  Am I correct?
8  MR. ZERBE: Yes, if the stay is
9  lifted, to the extent there is a
10  request for a further deposition with
11  regard to subjects unrelated to claims
12  covered by your 30(b)(6) notice, we
13  will then consider your request at
14  that time and produce the appropriate
15  person.
16  (TIME NOTED: 1:26 p.m.)
17  _____ (Signature of witness)
18  Subscribed and sworn to
19  before me this_____
20  day of_____,
21  2005.
22  _____
23
24
25

133

1
2              *   *   *
3
4              I N D E X
5  WITNESS      EXAMINED BY          PAGE
6  J. I. Montano  Mr. Koster          5
7              Mr. Radzik          110
8              Mr. Zerbe          126
9         E X H I B I T S
10     DEPOSITION FOR IDENTIFICATION    PAGE
11  29  Multi-page document          18
12  30  Letter dated February 21, 2005    29
13  31  Multi-page document          31
14  32  E-mail dated May 12, 2003      43
15  33  E-mail dated May 20, 2003      46
16  34  E-mail dated August 15, 2003    50
17  35  E-mail dated June 10, 2004      54
18  36  Three-page document          66
19  37  Letter dated May 17, 2002      66
20  38  Letter dated August 21, 2003    73
21  39  One-page document          87
22  40  Memorandum dated
23      September 20, 2004          102
24
25

134

```
 1
 2
 3
 4              I N D E X (continued)
 5
 6
 7          INSERTIONS
 8      Page        Line
 9        (NONE)
10
11
12          REQUESTS
13      Page        Line
14        (NONE)
15
16
17          RULINGS
18      Page        Line
19        (NONE)
20
21          *   *   *
22
23
24
25
```

135

```
 1
 2          CERTIFICATION BY REPORTER
 3
 4      I, Wayne Hock, a Notary Public of the
 5  State of New York, do hereby certify:
 6      That the testimony in the within
 7  proceeding was held before me at the
 8  aforesaid time and place;
 9      That said witness was duly sworn
10  before the commencement of the testimony,
11  and that the testimony was taken
12  stenographically by me, then transcribed
13  under my supervision, and that the within
14  transcript is a true record of the
15  testimony of said witness.
16      I further certify that I am not
17  related to any of the parties to this
18  action by blood or marriage, that I am not
19  interested directly or indirectly in the
20  matter in controversy, nor am I in the
21  employ of any of the counsel.
22      IN WITNESS WHEREOF, I have hereunto
23  set my hand this        day of
24  , 2005.
25      _____
```

EXHIBIT "DD"

# AON

*Aon Risk Services*

**CERTIFICATE OF INSURANCE**

*Natural Resources Group*

DATE: November 20, 2002

CERTIFICATE ISSUED TO:
New York Power Authority
123 Main Street
White Plains, NY 10601
Attn: John M. Hoff

COPY TO:
New York Power Authority
123 Main Street
White Plains, NY 10601
Attn: Charles Lipsky

This is to certify that the policies of insurance listed below have been effected for the insured named below for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies. Limits shown may have been reduced by paid claims.

NAME OF ASSURED:
Horizon Offshore Contractors Inc. and/or
associated and/or affiliated and/or subsidiary companies

REFERENCE:
Y 49 Cable Crossing Agreement

| TYPE OF INSURANCE | POLICY NO. | POLICY PERIOD | AGREED VALUE OR LIMITS OF LIABILITY |
|---|---|---|---|
| A) Protection & Indemnity as per Rules and Statutes for P&I of The Steamship Mutual Underwriting Association (Bermuda) Limited as modified by ORIGIN/AEGIS (including Maritime Employers Liability). | ARS-3175 | 20 FEB 2002 1 MAY 2003 | US$950,000 any one accident or occurrence excess of US$50,000 any one accident or occurrence; subject to a general aggregate limit of US$15,000,000. |

Insured with: Associated Electric & Gas Insurance Services Limited (AEGIS)

| | | | |
|---|---|---|---|
| B) Protection & Indemnity as per Rules and Statutes for P&I of The Steamship Mutual Underwriting Association (Bermuda) Limited. | ARS-3176 | 20 FEB 2002 1 MAY 2003 | As per the Rules and Statutes of The Steamship Mutual Underwriting Association (Bermuda) Limited excess of A) above. |

Insured with: The Steamship Mutual Underwriting Association (Bermuda) Limited

| | | | |
|---|---|---|---|
| C) U.S. Worker's Compensation/ Employers' Liability – New York only | WC 9307517-00 | 20 NOV 2002 01 MAY 2003 | Workers' Compensation – Statutory Employers' Liability – US$1,000,000 each accident US$1,000,000 each employee US$1,000,000 policy aggregate |

Insured with: Zurich American Insurance Company

*Aon Risk Services of Texas, Inc.*
1330 Post Oak Blvd., Suite 900 • Houston, Texas 77056 • tel: (832) 476-6000 • fax: (832) 476-6590

EXHIBIT
27
8/3/05  WH

IROQ 0042586

IRO/AE 00676

---

*Aon Risk Services*

*Natural Resources*
*Group*

Certificate of Insurance
November 20, 2002
Page 2

| | TYPE OF INSURANCE | POLICY NO. | POLICY PERIOD | AGREED VALUE OR LIMITS OF LIABILITY |
|---|---|---|---|---|
| D) | Excess Liabilities (including Excess Protection & Indemnity - Difference in Conditions with B) above | ARS-3177 | 09 APR 2002 1 MAY 2003 | US$4,000,000 any one accident or occurrence excess of scheduled underlying. |

Insured with:   American Home Assurance Company

Subject always to policy terms, conditions and exclusions, New York Power Authority is named as Additional Assured but only insofar as required by signed written contract and only insofar as liability is assumed by the Assured under signed written contract.

Several Liability Notice:   The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

This Certificate of Insurance is issued as a matter of information only and confers no rights upon the Certificate Holder. This Certificate of Insurance does not amend, extend or alter the coverage afforded by the policy(ies) shown hereon.

Aon Risk Services of Texas, Inc. are not insurers hereunder, and Aon Risk Services of Texas, Inc. are not nor shall be in any way or to any extent liable for loss or claim whatsoever in connection with the policies evidenced hereon.

AON RISK SERVICES OF TEXAS, INC.

BY: _Marjorie C. Goodell_

TOTAL P.09

IROQ 0042587

IRO/AE 00677

EXHIBIT "EE"

**AON**

*Aon Risk Services*

*Natural Resources*
*Group*

## CERTIFICATE OF INSURANCE

**DATE:** May 17, 2002

**CERTIFICATE ISSUED TO:**

Iroquois Gas Transmission System, L.P.
Suite 600
One Corporate Drive
Shelton, CT 06484
Attn: Robert Yetton

This is to certify that the policies of insurance listed below have been effected for the insured named below for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies. Limits shown may have been reduced by paid claims.

**NAME OF ASSURED:**

Horizon Offshore Contractors Inc. and/or
associated and/or affiliated and/or subsidiary companies

**REFERENCE:**       N/A

| TYPE OF INSURANCE | POLICY NO. | POLICY PERIOD | AGREED VALUE OR LIMITS OF LIABILITY |
|---|---|---|---|
| A) Protection & Indemnity including Pollution as per Rules and Statutes for P&I of The Steamship Mutual Underwriting Association (Bermuda) Limited as modified by ORIGIN/AEGIS including other Marine Liabilities (including Maritime Employers Liability). | ARS-3175 | 20 FEB 2002 1 MAY 2003 | US$950,000 any one accident or occurrence excess of US$50,000 any one accident or occurrence; subject to a general aggregate limit of US$15,000,000. |

Insured with: Associated Electric & Gas Insurance Services Limited (AEGIS)

| | | | |
|---|---|---|---|
| B) Protection & Indemnity including Pollution as per Rules and Statutes for P&I of The Steamship Mutual Underwriting Association (Bermuda) Limited. | ARS-3176 | 20 FEB 2002 1 MAY 2003 | As per the Rules and Statutes of The Steamship Mutual Underwriting Association (Bermuda) Limited excess of A) above. |

Insured with: The Steamship Mutual Underwriting Association (Bermuda) Limited

| | | | |
|---|---|---|---|
| C) General Liabilities | ARS-3177 | 09 APR 2002 01 MAY 2003 | US$1,000,000 each occurrence US$2,000,000 general aggregate US$2,000,000 Prod/Comp Ops aggregate limit excess of US$50,000 each occurrence. |

Includes Comprehensive Form; Premises/Operations; Explosion, Collapse and Underground Hazard; Contractual Liability, Broad Form Property Damage; Personal Injury; Cross Liability Clause.

Insured with: American Home Assurance Company

*Aon Risk Services of Texas, Inc.*
2000 Bering Drive, Suite 900 • Houston, Texas 77057-3790 • tel: (713) 430-6000 • fax: (713) 430-6590



EXHIBIT
28
8/3/05   WH
PENGAD 800-631-6989

IROQ 0042588

**IRO/AE 00678**

*Aon Risk Services*

*Natural Resources*
*Group*

Certificate of Insurance
May 17, 2002
Page 2

| | TYPE OF INSURANCE | POLICY NO. | POLICY PERIOD | AGREED VALUE OR LIMITS OF LIABILITY |
|---|---|---|---|---|
| D) | U.S. Worker's Compensation/ Employers' Liability | WC 9303611-00 | 09 APR 2002 01 MAY 2003 | Workers' Compensation – Statutory Employers' Liability – US$1,000,000 each accident US$1,000,000 each employee US$1,000,000 policy aggregate |
| | Includes USL&H. | | | |
| | *Insured with:* Zurich American Insurance Company | | | |
| E) | Automobile Liability (US/Canada) | TAP 9303610-00 | 09 APR 2002 01 MAY 2003 | US$1,000,000 Bodily Injury and Property Damage Combined Single Limit |
| | Includes all Owned/Non-Owned/Hired automobiles. | | | |
| | *Insured with:* Zurich American Insurance Company | | | |
| F) | Automobile Physical Damage | TAP 9303610-00 | 09 APR 2002 01 MAY 2003 | $500 Deductible Comprehensive $500 Deductible Collision any one accident or occurrence. |
| | Includes all Owned/Non-Owned/Hired automobiles. | | | |
| | *Insured with:* Zurich American Insurance Company | | | |
| G) | Excess Liabilities (including Excess Protection & Indemnity - Difference in Conditions with B) above | ARS-3177 | 09 APR 2002 1 MAY 2003 | US$10,000,000 any one accident or occurrence excess of scheduled underlying. |
| | *Insured with:* American Home Assurance Company | | | |
| H) | Excess Liabilities | ARS-3215 | 09 APR 2002 01 MAY 2003 | US$90,000,000 each occurrence excess of scheduled underlyings. |
| | *Insured with:* 20.00% XL Specialty Insurance Company 25.00% Liberty Insurance Underwriters 26.43% American Home Assurance Company 28.57% Navigators Insurance Company | | | |
| I) | Contractors Equipment | ARS-3246 | 01 MAY 2002 01 MAY 2003 | US$2,000,000 any one item in respect of Equipment and Property rented, purchased, leased, hired or operated by the Assured. |
| | *Insured with:* Underwriters at Lloyd's and certain insurance companies | | | |

IROQ 0042589

IRO/AE 00679

*Aon Risk Services*

*Natural Resources Group*

Insurance

| TYPE OF INSURANCE | POLICY NO. | POLICY PERIOD | AGREED VALUE OR LIMITS OF LIABILITY |
|---|---|---|---|
| Machinery | ARS-3246 | 01 MAY 2002 01 MAY 2003 | US$ Per Schedule Attached |
| Underwriters at Lloyd's and certain insurance companies | | | |
| Value | ARS-3246 | 01 MAY 2002 01 MAY 2003 | US$ Per Schedule Attached |
| Underwriters at Lloyd's and certain insurance companies | | | |
| Risks and War P&I Risks | ARS-3246 | 01 MAY 2002 01 MAY 2003 | US$ Per Schedule Attached |
| Underwriters at Lloyd's and certain insurance companies | | | |

ways to policy terms, conditions and exclusions, Certificate Holder and its parental, partner, divisional, affiliate, or companies and all employees thereof are named as Additional Assured but only insofar as required by signed ract and only insofar as liability is assumed by the Assured under signed written contract.

ways to policy terms, conditions and exclusions, Waiver of Subrogation is granted in favor of Certificate Holder or partner, divisional, affiliate, or subsidiary companies and all employees thereof but only insofar as required by ten contract and only insofar as liability is assumed by the Assured under signed written contract.

ways to policy terms, conditions and exclusions, Certificate Holder is named as Loss Payee but only insofar as signed written contract and only insofar as liability is assumed by the Assured under signed written contract.

of the above described policies be canceled before the expiration date thereof, this agency on behalf of the issuing s) will endeavor to mail 30 days' written notice to the above named certificate holder, but failure to mail such impose no obligation or liability of any kind upon the company(ies) or this agency.

notice in respect of War Risks and 10 days notice in respect of non-payment of premium.

certified hereon are primary only insofar as liability is assumed by the Assured under signed written contract and ways to policy terms, conditions and exclusions.

iability Notice: The subscribing insurers' obligations under contracts of insurance to which they subscribe are and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not ible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

IROQ 0042590

**IRO/AE 00680**

*Aon Risk Services*

*Natural Resources*
*Group*

...icate of Insurance
...2002

...ificate of Insurance is issued as a matter of information only and confers no rights upon the Certificate Holder.  This
...fic of Insurance does not amend, extend or alter the coverage afforded by the policy(ies) shown hereon.

...k Services of Texas, Inc. are not insurers hereunder, and Aon Risk Services of Texas, Inc. are not nor shall be in any
... any extent liable for loss or claim whatsoever in connection with the policies evidenced hereon.

AON RISK SERVICES OF TEXAS, INC.

BY: _____

IROQ 0042591

**IRO/AE 006**

*Aon Risk Services*

*Natural Resources*
*Group*

Insurance

## VESSEL SCHEDULE

| Vessel | Hull & Machinery Agreed Value | Increased Value Agreed Value | War Risk Agreed Value |
|---|---|---|---|
| American Horizon | $8,000,000 | $2,000,000 | $10,000,000 |
| Atlantic Horizon | $17,000,000 | $4,125,000 | $21,125,000 |
| Brazos Horizon | $8,000,000 | $2,000,000 | $10,000,000 |
| Cajun Horizon | $5,600,000 | $1,400,000 | $7,000,000 |
| Canyon Horizon | $19,200,000 | $4,800,000 | $24,000,000 |
| Gulf Horizon | $15,200,000 | $3,800,000 | $19,000,000 |
| Horizon MB100 | $2,400,000 | $600,000 | $3,000,000 |
| Lone Star Horizon | $19,200,000 | $4,800,000 | $24,000,000 |
| Pacific Horizon | $24,000,000 | $6,000,000 | $30,000,000 |
| Pearl Horizon | $6,400,000 | $1,600,000 | $8,000,000 |
| Pecos Horizon | $16,000,000 | $4,000,000 | $20,000,000 |
| Phoenix Horizon | $12,000,000 | $3,000,000 | $15,000,000 |
| Sea Horizon | $20,000,000 | $5,000,000 | $25,000,000 |
| Stephaniturm* | $0 | $0 | $0 |

*on long term charter to others

IROQ 0042592

IRO/AE 00682

EXHIBIT "FF"



*Aon Risk Services*

*Natural Resources*
*Group*

<u>*VIA HAND DELIVERY*</u>

January 24, 2003

Mr. Bill Arnold
Horizon Offshore Contractors, Inc.
2500 City West Blvd., Suite 2200
Houston, Texas 77042

Re:     **Certificate of Insurance**
**Iroquois Gas Transmission System, L.P.**
**Certified Copies of Policies/Cover Notes**

Dear Bill:

Further to your telephone conversation with Marjorie Goodall on yesterday regarding the above, attached please find certified copies of the following policies/cover notes:

- P&I Aegis – ARS-3175
- P&I SSM – ARS-3176
- Excess Liabilities ($140m xs $10m ) – ARS-3215
- Liabilities Package – ARS-3177
- Automobile – TAP9303610-00
- Workers' Compensation – WC9303611-00
- Marine Package – ARS-3246*

* Note that we have enclosed our Confirmation of Coverage as the policy is in the process of being issued.

For your convenience, we have also included a copy of the certificate of insurance for Iroquois Gas Transmission System, L.P.

We trust you will find the enclosed in good order. If you have any questions or concerns regarding this matter, please do not hesitate to contact our office.

Very truly yours,

Pamela Smith
Associate Client Specialist

Enclosure(s)

**ARS-TX 0007**