**DONOVAN PARRY McDERMOTT & RADZIK**
Edward C. Radzik (ER-2473)
Carolyn Elizabeth Meers (CM-1464)
Attorneys for Defendants, Lloyd's Underwriters
Wall Street Plaza
88 Pine Street - 21st Floor
New York, New York 10005-1801
(212) 376-6400

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

IROQUIS GAS TRANSMISSION SYSTEM, L.P.,

                                Plaintiff,                (ECF Case)

           - against -                   05 Civ. 2149 (JSR)

ASSOCIATED ELECTRIC & GAS INSURANCE     **DEFENDANTS' RESPONSE TO**
SERVICE LTD., Hamilton Bermuda, CERTAIN     **PLAINTIFF'S STATEMENT**
UNDERWRITERS AT LLOYD'S; AON RISK          **OF MATERIAL FACTS**
SERVICES OF TEXAS, INC.; and AMERICAN       **PURSUANT TO LOCAL**
HOME ASSURANCE CO.,                                   **RULE 56.1**

                                Defendants.
-----------------------------------------------------------x

        Defendants Underwriters at Lloyd's and Certain Insurers Subscribing to Hull and Machinery Policy No. L20280715 (Lloyd's Underwriters), by their attorneys, DONOVAN PARRY MCDERMOTT & RADZIK, hereby respond to Plaintiff's Rule 56.1 Statement, as follows:

**A.    The Parties**

        1.       Plaintiff Iroquois Gas Transmission System L.P. ("Iroquois") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in Shelton, Connecticut. Diehl Aff. [4].

**Response 1**: Admit.

2. Defendant Certain Underwriters at Lloyd's ("Lloyd's") are insurers and underwriters under a policy of insurance identified as LE0280715, covering the period May 1, 2002 through May 1, 2003 (the "Hull Policy"). Answer, Doc. No. 11, ¶ 8.

**Response 2**: Admit.


**B.    The Pipeline Extension**

3. Iroquois is the owner of a 412 mile natural gas pipeline that extends from the Canada-New York border to Bronx, New York. Diehl Aff. [4].

**Response 3**: Admit.

4. On April 12, 2002 Iroquois entered into a contract (the "Construction Contract") with Horizon Offshore Contractors, Inc. ("Horizon") for the construction of a 35 mile underwater extension to its existing pipeline. The extension was to be mostly in Long Island Sound, between Northport, New York and Hunts Point, New York. Diehl Aff. [4] (authentication); Admissions of Lloyd's, ¶ 9 (authentication); Wieler dep. [3] pp. 18, 24-25, ex. 12 (authentication); Construction Contract [7].

**Response 4**: Admit.

5. The Construction Contract required Horizon: (1) to "furnish and maintain, at its own expense" ten enumerated lines of insurance, including "Marine Protection and Indemnity Insurance" and "Marine Hull and Machinery Insurance"; (2) to name Iroquois as an additional insured; (3) to waive any right of subrogation against Iroquois; (4) to include a cross-liability provision "in the event of one insured incurring liability to any other insured"; and (5) to procure the policies subject to Iroquois' approval. Construction Contract [7] at IRO/AE 00026-00028.

**Response 5**: Deny. Admit that the Construction Contract required Horizon (1) to maintain ten (10) enumerated policies of Insurance including "Marine Protection and Indemnity" and "Marine Hull and Machinery," (2) to name Iroquois as an additional insured, (3) to waive the insurer's right to subrogation against Iroquois; and (4) that all policies maintained be acceptable to Iroquois. However, deny that the contract specifically required enumerated policies to include cross liability provisions. Except as specifically admitted, the remainder of this statement is denied.

6. The Construction Contract required Iroquois to maintain only one line of insurance: builders' risk insurance covering against loss or damage to the pipeline project itself. Id. at IRO/AE 00030-00031.

2

**Response 6**: Admit that the Construction Contract required Iroquois to maintain Builders' "All Risk" Property Insurance to cover both Iroquois and Horizon for loss or damage to the Pipeline Project itself. Except as specifically admitted, the remainder of this statement is denied.

7.  An earlier version of the Construction Contract, which required Horizon also to obtain builder's risk insurance, was modified after Horizon objected that Iroquois could more readily obtain builder's risk coverage. Wieler Aff. [5].

**Response 7**: Lloyd's Underwriters lack knowledge sufficient to admit or deny the contents of this statement. Notwithstanding, the statement is admitted.

8.  To complete the pipeline extension it was necessary to cross four undersea 345,000-volt electric transmission cables ("Cables") owned by The Power Authority of the State of New York ("NYPA"). NYPA refused to agree to such a crossing absent a written agreement with Iroquois regarding responsibility for any damage to its cables. Diehl Aff. [4].

**Response 8**: Admit.

9.  Accordingly, Iroquois and NYPA entered into a "Crossing Agreement" that allowed the Iroquois pipeline to cross the NYPA Cables. Diehl Aff. [4] (authentication); Wieler dep. [3] pp. 50-51, ex. 17 (authentication); Crossing Agreement [8].

**Response 9**: Admit.

10. The Crossing Agreement provided that Iroquois would indemnify NYPA against damage resulting from "the negligence, acts, omissions or willful misconduct of Iroquois Gas, its contractors, subcontractors, agents or employees." Crossing Agreement [8] at Art. III(G).

**Response 10**: Admit.

11. In addition, the Crossing Agreement provided that Iroquois indemnify NYPA from "all costs and expenses incurred as a result of damage to the [cables] arising out of [such circumstances]". Id. at Art. III(D).

**Response 11**: Admit.

### C.    The Hull Policy

12. AON Risk Services of Texas, Inc. ("AON"), Horizon's insurance brokers, issued a Certificate of Insurance showing that Iroquois was covered under Horizon's insurance policies. Montano dep. [2] pp. 69-71 (authentication); Certificate of Insurance [9].

3

**Response 12:**  Admit that AON did in fact issue a Certificate of Insurance to Iroquois, however, deny that the certificate establishes that Iroquois was covered by any of the policies enumerated in the certificate of insurance.

13.  The Hull Policy is governed by an 8-page "Slip Policy" that incorporates other forms and documents by reference. Montano dep. [2] pp. 15-16, ex. 29 (authentication); Hull Policy From AON [10].

**Response 13:**  Admit that the terms of the Lloyd's Policy are embodied by an eight page "Slip Policy," attached to the Radzik Aff. as Ex. "E," and that the "Slip Policy" incorporates forms and clauses not fully set forth therein. Except as specifically admitted, the remainder of this statement is denied.

14.  In addition to the Policy Slip itself and the Confirmation of Coverage and other appendices and attachments thereto, the forms and documents relevant here are the American Institute Hull Clauses (06/02/1977), the American Institute Tug Form (08/01/1976), and the Institute Service of Suit Clause (U.S.A.) (01/11/1992). Admissions of Lloyds, ¶ 2 (authenticity); Hull Policy From Lloyd's [11].

**Response 14:**  Deny. Admit that portions of the American Institute Hull Clauses (June 2, 1977), the American Institute Tug Form (August 1, 1976), and the Institute of Service of Suit Clause (U.S.A.) (January 11, 1992) are incorporated by the Lloyd's "Slip Policy." Except as specifically admitted, the remainder of this statement is denied.

15.  Horizon has its principal place of business at 2500 City West Boulevard, Suite 2200, Houston, Texas 77042. Diehl Aff. [4].

**Response 15:**  Admit.

16.  The GULF HORIZON is a barge owned by Horizon which was used by Horizon on the construction project here at issue. The barge is based in Texas and her home port is Houston, Texas.

**Response 16:**  Admit that the GULF HORIZON is a barge owned by Horizon which was used by Horizon in the Eastchester Extension project, however, deny that the GULF HORIZON is "based" in Texas as, with respect to the Eastchester Extension project, the GULF HORIZON was based in New York. Lloyd's Underwriters lack knowledge to admit or deny the location of the GULF HORIZON's "home port." Except as specifically admitted, the remainder of this statement is denied.

17.  Horizon purchased the Hull Policy and is the named insured thereon. Montano dep. [2] pp. 14-16. The GULF HORIZON is listed as a covered vessel under the Hull Policy.

**Response 17:**  Admit.

4

18.   AON is an insurance agent and broker licensed by the Texas Department of Insurance. Id. ex. 36.

**Response 18**: Admit.

19.   The AON offices involved in issuing the Hull Policy are or were in Houston, Texas. Id. pp 14-16.

**Response 19**: Admit that AON maintained its offices in Houston, Texas, and that AON acted as Horizon's agent in procuring the Hull Policy from Lloyd's Underwriters. However, deny that AON issued the Lloyd's Policy.

20.   The Hull Policy was addressed and delivered to Horizon at its Houston, Texas address. Id.; Hull Policy From Lloyd's [11] at p. 1.

**Response 20**: Admit.

21.   The Hull Policy delivered to Horizon included Texas Department of Insurance notices and directed the insured to contact the Texas Department of Insurance with any complaints. Montano dep. [2] at pp. 16-19; Hull Policy From AON [10] at IRO/AE 00300-00301.

**Response 21**: Deny. The document referenced by Iroquois is a "Confirmation of Coverage" which was delivered to Horizon by AON. The references to the Texas Department of Insurance were "cover sheets" included by AON and are not part of the Hull Policy. Radzik Aff., Ex. "I".

22.   According to AON, complaints about the Hull Policy should be directed to the Texas Department of Insurance at the address and phone number provided on the Hull Policy. Montano dep. [2] at pp. 18-19.

**Response 22**: Admit that James Montano, of AON, stated that complaints about the Hull Policy should be directed to the Department of Insurance. Except as specifically admitted, the remainder of this statement is denied.

23.   The Hull Policy provides coverage "Worldwide" subject to trading warranties. Hull Policy From AON [10] at IRO/AE 00303; Hull Policy From Lloyd's [11] at p. 3.

**Response 23**: Admit that the Hull Policy provides "Worldwide" coverage to Horizon, however, assert that coverage as to Iroquois is limited by the terms of the Construction Contract to the Eastchester Extension project in New York.

24.   There was another claim under the Hull Policy that occurred as a result of a May 18, 2004 fire on board the GULF HORIZON, while the vessel was in the Atlantic Ocean en route to

5

Israel, and this loss will ultimately be paid through AON's Houston, Texas office. Montano dep. [2] p. 106-07.

**Response 24**: Admit. However, this fact is not relevant to this litigation, as that claim involves a loss in a different policy year and will be settled with Horizon and not Iroquois, the party seeking coverage herein.

### D.     The Anchor Drag Incident

25.     On February 27, 2003 NYPA's No. 4 [sic] cable tripped while Horizon was working in Long Island Sound in the vicinity of the NYPA Cables pursuant to the Construction Contract. Diehl Aff. [4]. Subsequent investigation identified damage to this cable.

**Response 25**: Admit. However, assert that it was the Y-49 cable that was allegedly damaged.

26.     NYPA alleges that the damage occurred when one of the GULF HORIZON's anchors dragged and contacted the Cables (the "Anchor Drag"). Id.

**Response 26**: Admit that NYPA has made such allegations, however, deny the substantive validity of NYPA's claims.

27.     NYPA further alleges that, as a result of the Anchor Drag, the Cables were taken out of service and the damaged cable repaired, at substantial cost to NYPA and its underwriters. Id.

**Response 27**: Admit that NYPA has made such allegations, however, deny the substantive validity of NYPA's claims.

28.     The GULF HORIZON is an insured vessel under the Hull Policy. Answer, Doc. No. 11, ¶ 27.

**Response 28**: Admit.

29.     On March 25, 2003, NYPA put Iroquois on notice that it intended to hold Iroquois responsible for the damage to the Cables.

**Response 29**: Deny. NYPA put Iroquois on notice that it would be held responsible for all damages arising out of the February 27, 2003 Incident on March 13, 2003. Radzik Aff., Ex. "U", No. 49.

30.     Iroquois retained the firm of Healy & Baillie, LLP immediately after the February 27, 2003 incident to investigate the facts of the anchor drag incident, defend it in connection with NYPA's anticipated and threatened claims, and pursue Horizon and/or any other responsible party for indemnity for any liability Iroquois may be found to have to NYPA.

**Response 30:** Lloyd's Underwriters lack knowledge sufficient to admit or deny the contents of this statement.

### E. The Limitation Proceeding

31. On March 25, 2003, NYPA notified Iroquois that it intended to hold Iroquois fully responsible for all damage caused by the anchor strike.

**Response 31:** Deny, see Response 29.

32. On August 18, 2003, Horizon commenced a proceeding to limit its liability in the United States District Court for the Southern District of Texas (the "Limitation Proceeding"). See Limitation Complaint [17] from In re Horizon Vessels, Inc., No. H-03-3280, Doc. No. 1 (S.D. Tex.).

**Response 32:** Deny. The Limitation Complaint was filed with the United States District Court for the Southern District of Texas on August 13, 2003. In re Horizon Vessels Inc., et al., 4:03-CV-03280; Radzik Aff., Ex. "Z".

33. In its complaint, Horizon pleaded that while no written claims had been asserted as of the date of its Limitation Proceeding, it "anticipate[d] that the owner of the electric cable, as well as other persons or entities, may assert or attempt to assert claims or suits against [Horizon], alleging property damages, financial losses, and other damages, and/or the right to indemnity/contribution in connection with the aforesaid alleged incident." Id. at ¶ 16.

**Response 33:** Admit that Horizon pled in such a manner, however, deny the substantive validity of any claims that have been brought against Horizon in the Texas Limitation Action.

34. Iroquois instructed Healy & Baillie to file, and Healy & Baillie did file a claim in the Limitation Proceeding seeking indemnity for any liability Iroquois may be found to have to NYPA as a result of the anchor drag incident. Iroquois also filed certain other claims regarding damages resulting from a suspension of construction work, indemnity in the event Iroquois was held liable for damage to archaeological sites caused by Horizon, and damages for other contract breaches by Horizon (hereinafter "Unrelated Claims"). Diehl Aff. [4]; Claim of Iroquois [18] from In re Horizon Vessels, Inc., No. H-03-3280, Doc. No. 92 (S.D. Tex.).

**Response 34:** Admit that Iroquois filed claims in the Limitation Action, however, deny as to the substantive validity of Iroquois' claims, and Iroquois' instruction of Healy & Baillie to file Iroquois' claims.

35. Iroquois filed the Unrelated Claims in the Limitation Proceeding solely as a precaution to avoid losing the ability to assert the claims in the future in a separate proceeding. Id.

7

**Response 35**: Deny as Lloyd's Underwriters lack knowledge regarding Iroquois' motivations and reasons for filing the unrelated claims in the Limitation Proceeding.

36. On February 25, 2004, The Texas Limitation Proceeding court lifted the limitation injunction as to Iroquois, permitting Iroquois to pursue the Unrelated Claims outside of the Limitation Proceeding. Iroquois and Horizon thereafter litigated the Unrelated Claims in the Supreme Court for the County of New York in an action styled Horizon Offshore Contractors, Inc. v. Iroquois Gas Transmission System, L.P., et al. and bearing the docket number 600140/04 ("State Court Litigation"). Id.

**Response 36**: Admit and add that the Texas Court held that Iroquois was not a proper party in the Limitation Action. Radzik Aff., Ex. "X", p. 14.

37. In the State Court Litigation, Iroquois retained and was represented by Cullen & Dykman Bleakley Platt LLP, not Healy & Baillie, LLP. Id.

**Response 37**: Lloyd's Underwriters lack knowledge or information sufficient to admit or deny this statement.

38. The precautionary filing of the Unrelated Claims in the Limitation Proceeding was the only substantive involvement Healy & Baillie, LLP had in the litigation of the Unrelated Claims and the State Court Litigation. Id.

**Response 38**: Lloyd's Underwriters lack knowledge or information sufficient to admit or deny this statement.

39. On July 21, 2004 NYPA, Factory Mutual Insurance Company ("FMIC") the subrogated property insurer of the cable, and the Long Island Power Authority ("LIPA"), a user of the cable (hereinafter collectively referred to as the "NYPA interests"), asserted Cross-Claims against Iroquois, seeking to hold Iroquois liable for damages they sustained as a result of the alleged February 27, 2003 cable incident.

**Response 39**: Admit.

40. NYPA and FMIC's Cross-Claims relied on the terms of the Crossing Agreement and allege that the damage to the NYPA Cables "arose out of or was connected with the negligence, acts, omissions, or willful misconduct of Iroquois, its contractors, subcontractors, agents, or employees in connection with the Iroquois Pipeline Project." Id. at ¶¶ 36-38. NYPA and FMIC also allege claims in tort against Iroquois. LIPA has no contract with Iroquois. LIPA's Cross-Claims therefore are solely in tort alleging that Iroquois was negligent in connection with the pipeline's construction.

8

**Response 40**: Admit that the NYPA interests have filed cross claims against Iroquois, however, deny the remainder of the allegations asserted in this statement.

41. Healy & Baillie prepared and filed Answers to these Cross-Claims on behalf of Iroquois on September 1, 2004 and has since conducted a defense against NYPA's claims. Diehl Aff. [4]; Singleton Aff. [20]; See Cross-Claim [19] from In re Horizon Vessels, Inc., No. H-03-3280, Doc. No. 92 (S.D. Tex.).

**Response 41**: Admit that Healy & Baillie are defending the claims asserted against Iroquois, however, deny that Healy & Baillie are defending the liability of the GULF HORIZON or seeking to limit the vessel's liability. Except as specifically admitted, the remainder of this statement is denied.

42. Healy & Baillie's representation of Iroquois in its defense of the cable strike incident and the NYPA interests' Cross-Claims has included extensive document discovery, depositions, research, pleading and motion practice, the retention of expert witnesses, and continued prosecution of Iroquois' claim for indemnity from Horizon (the only Iroquois claim at issue in the Limitation Proceeding). Id.

**Response 42**: Admit that Healy & Baillie are defending the claims asserted against Iroquois, however, deny that Healy & Baillie are defending the liability of the GULF HORIZON or seeking to limit the vessel's liability. Except as specifically admitted, the remainder of this statement is denied.

43. As of June 30, 2005, Iroquois has incurred $975,064.46 in attorney's fees in its defense of the NYPA Cross-Claim. Id.

**Response 43**: Lloyd's Underwriters lack knowledge or information sufficient to admit or deny this statement.

### F.    Notice to Lloyd's

44. Shortly after the Anchor Drag, AON notified Horizon's protection and indemnity, liability, and excess carriers, but did not notify Lloyd's. Montano dep. [2] pp. 13-14, 31-32 (authenticating); AON's Notices [12] at ARS-TX 0036, 0040-0042.

**Response 44**: Admit that AON notified Horizon's carriers, except for Lloyd's, of the incident, however, deny that said notices, or lack thereof, were made on Iroquois' behalf. Radzik Aff. Ex. "P".

45. On July 17, 2003 AON advised Horizon and Iroquois that it (AON) had notified "all appropriate insurers." Montano dep. [2] pp. 111-15, ex. 38 (authentication); AON Coverage Letter [13].

9

**Response 45**: Admit that AON made such a representation to Horizon and Iroquois. Deny as to whether or not all appropriate insurers were actually notified. Further, deny that AON stated that they provided notice on behalf of Iroquois. Radzik Aff., Ex. "CC".

46. On or about July 17, 2003, AON created a chart showing applicable insurance coverage for liability claims arising from the Anchor Drag incident. This chart omitted any reference to the Hull Policy. AON Coverage Letter. [13].

**Response 46**: Admit that such a chart was created. Except as specifically admitted, the remainder of this statement is denied.

47. Iroquois sent its own notices to several of Horizon's insurers, but excluding Lloyd's. Wieler dep. [3] pp. 12-17, ex. 11 (authentication); Iroquois Notices [14] at IRO/AE 00584-00603.

**Response 47**: Admit.

48. Iroquois employee Michelle Wieler reviewed the Certificate of Insurance provided by AON in favor of Iroquois and did not send a notice to Lloyd's because the Certificate did not reflect that the Hull Policy covered liability claims. Wieler dep. [3] pp. 26-27.

**Response 48**: Admit that Michelle Wieler failed to notify Lloyd's Underwriters of the Incident on behalf of Iroquois and that she claims to have based Iroquois' decision on the fact that the Certificate of Insurance did not identify the Lloyd's Policy as including liability coverage, however, deny that this provides a legitimate excuse for Iroquois' failure to provide notice.

49. The coverage provided by the Hull Policy and the coverage provided by Horizon's protection and indemnity insurance was essentially duplicative insofar as coverage for liability resulting from the striking of fixed objects is concerned, and this could be a source of confusion for an insured. See Hodgett dep. [1] p. 69; Montano dep. [2] pp. 80-82.

**Response 49**: Object. The extent to which various policies provide coverage to Iroquois is a legal issue not appropriate for a Rule 56.1 Statement. However, deny that confusion as to policy coverage provides a legitimate excuse for Iroquois' failure to provide timely notice.

50. Colin Williams at Aegis recognized that the Hull Policy potentially applied to liability claims arising from the Anchor Drag as early as May, 2003. Admissions of Lloyds, ¶ 22 (authenticity); Colin Williams Emails [15] at A 0012.

**Response 50**: Admit that Colin Williams questioned whether the Hull Policy potentially applied to liability claims, but deny that the Hull Policy actually covers such risks, or that Colin Williams' beliefs regarding coverage are relevant.

10

51. On May 14, 2004 Colin Williams of Aegis requested an explanation from AON of why the Anchor Drag claims were not covered by the Hull Policy and indicated that he had made the same request on April 16. Montano dep. [2] pp. 53-55, ex. 35 (authenticity); Colin Williams Emails [15] at A 0083-0084.

**Response 51**: Admit that Colin Williams inquired to AON about coverage under the Lloyd's Policy, however, deny that his inquiries are relevant.

52. On May 17, 2004 AON transmitted a loss notice to Lloyd's via JLT Risk Solutions, Inc. ("JLT") in London. Montano dep. [2] pp. 31-32, 113, ex. 31 (authenticity); May 2004 Notice [16] at ARS-TX 0043.

**Response 52**: Admit that a "Report of Loss" dated May 17, 2004 was transmitted by AON, on behalf of Horizon only, to JLT on or about May 17, 2004. Radzik Aff. Ex. "J". Except as specifically admitted, the remainder of this statement is denied.

53. On May 17, 2004 AON also transmitted the Lloyd's notice of loss to Continental Insurance Co., American Employers Insurance Co., Fireman's Fund Insurance Co., Markel Insurance Co., and Royal Insurance Co. Montano dep. [2] pp. 91-92.

**Response 53**: Admit that the May 17, 2004 "Report of Loss" was also addressed to Continental Insurance Co., American Employers Insurance Co., Fireman's Fund Insurance Co., Markel Insurance Co., and Royal Insurance Co.

54. Continental Insurance Co. and Royal Insurance Co. confirmed receipt of the notice soon after May 17, 2004. Montano dep. [2] pp. 127-28, ex. 31 (authenticity); May 2004 Notice [16] at ARS-TX 0044-0045.

**Response 54**: Admit that James Montano claims he received confirmation of receipt of the "Report of Loss" from Continental on May 21, 2004 and Royal on May 18, 2004. Radzik Aff., Ex. "CC".

55. Lloyd's representative John Hodgett testified that he did not receive any notice of the Anchor Drag or of Iroquois' claim until December 1, 2004. Hodgett dep. [1] pp. 24-26, 47-49.

**Response 55**: Admit.

56. JLT confirmed receipt of AON's May 17, 2004 notice on June 1, 2004. Montano dep. [2] pp. 129, ex. 31 (authenticity); May 2004 Notice [16] at ARS-TX 0046.

**Response 56**: Admit that James Montano claims he received confirmation of receipt of the "Report of Loss" from JLT on or about June 1, 2004. Radzik Aff., Ex. "CC".

11

57. AON submitted two additional items to JLT for onward transmission to Lloyd's on June 7 and 24, 2004. Montano dep. [2] pp. 129-31, ex. 31 (authenticity); May 2004 Notice [16] at ARS-TX 0047-0048.

**Response 57**: Object as statement is unnecessarily vague.

58. On September 20, 2004 JLT advised AON that it had "received a request from leading Underwriters for an update on this loss." Montano dep. [2] pp. 102-05, ex. 40 (authenticity); May 2004 Notice [16] at ARS-TX 0052.

**Response 58**: Admit that quoted language appears in an e-mail exchanged between JLT and AON. Except as specifically admitted, the remainder of this statement is denied.

### G. Lloyd's Refuses to Respond

59. After Lloyd's became aware of Iroquois' claim for coverage under the Hull Policy, it referred the matter to outside counsel for an opinion. Hodgett dep. [1] pp. 35-36, 82-84, ex. 7.

**Response 59**: Admit that Iroquois referred coverage issues arising out of the Incident to outside counsel, however, deny that Lloyd's had actual notice of Iroquois' claim for coverage under the Lloyd's Policy until Iroquois filed its Second Amended Complaint in this Action. Except as specifically admitted, the remainder of this statement is denied.

60. After Lloyd's received its coverage opinion back, it refused to disclose the contents or conclusion thereof. Hodgett dep. [1] pp. 57-58, 73-76, ex. 6 (excerpt); see also Koster Aff. [6] (authenticity); Colin Williams Emails [15] at A 0370-0371, A 0385-0388.

**Response 60**: Admit that Lloyd's Underwriters declined to disclose information protected by the attorney-client privilege. Except as specifically admitted, the remainder of this statement is denied.

61. Lloyd's has stated that it has not denied coverage to Iroquois and that it has no plans of denying coverage, but has otherwise refused to respond to Iroquois' claim. Hodgett dep. [1] pp. 56-57; see also Colin Williams Emails [15] at A 0370-0371.

**Response 61**: The policy at issue is not effective until there has been an adjudication that an insured vessel is at fault, thus, admit that Lloyd's has not "denied" coverage, because a determination of coverage cannot yet be made.

62. Lloyd's refused to attend discussions initiated by Aegis concerning coverage under the Hull Policy. Colin Williams Emails [15] at A 0385-0388.

**Response 62**: Admit that John Hodgett decided not to attend discussions initiated by Aegis in light of the fact that this litigation was pending against Lloyd's Underwriters at the time. Deny that this fact is relevant. Except as specifically admitted, the remainder of this statement is denied.

### H. Recovery by Iroquois

63. The Hull Policy contains the quoted language under the American Institute Tug Form, as modified by the Policy Slip. Hull Policy From AON [10] at IRO/AE 00312; Hull Policy From Lloyd's [11] at 3, 30.

**Response 63**: Admit that the Hull Policy incorporates, with amendments, the American Institute Tug Form.

64. The Hull Policy contains the quoted "additional assured" clause. Hull Policy From AON [10] at IRO/AE 00316; Hull Policy From Lloyd's [11] at 9.

**Response 64**: Admit that the Hull Policy contains a provision which provides that additional insureds will be covered under the policy "where required by contract." Radzik Aff., Ex. "E".

65. The Hull Policy contains the quoted "cross liability" clause and the quoted incorporation "as required by contract" language. Hull Policy From AON [10] at 00316; Hull Policy From Lloyd's [11] at 9, 213.

**Response 65**: Admit that the Hull Policy will incorporate a cross liability clause where "required by contract," but deny that the Construction Contract required incorporation of the cross liability clause. Radzik Aff., Ex. "E" and "H".

66. The Construction Contract contains the quoted language at ¶ 2.4. Construction Contract [7] at IRO/AE 00028.

**Response 66**: Admit that the Construction Contract contains the following language:

> [A]ny requirement to name Company and its parent, partner, divisional, affiliate or subsidiary companies as an additional insured or waive subrogation on any of Contractor's policies or that contractor's policies shall be primary to those of company and its parent, partner divisional, affiliate, or subsidiary companies and that company's and its parent, partner divisional, affiliate, or subsidiary companies' policies shall be excess and non-contributing to any other policies of Contractor shall be limited to those risks covered by Contractor's insurances for which Contractor has agreed under the

>terms of the contract to assume responsibility or indemnify Company
>and it's parents, partner, divisional, affiliate or subsidiary companies.

67. Lloyd's representative testified that if Lloyd's had been earlier notified of the Anchor Drag and the Limitation Proceeding, it might have become involved in the litigation by retaining experts, attorneys and/or surveyors. Hodgett dep. [1] pp. 58-59.

**Response 67:** Admit.

68. Lloyd's representative testified that Iroquois had not prevented Lloyd's from participating in the Limitation Proceeding. Id. pp. 60-61.

**Response 68:** Admit, however, Lloyd's meaningful participation in the Limitation Action was precluded by Iroquois' failure to notify Lloyd's of the Incident.

69. Lloyd's representative testified that Lloyd's had no specific objection to any action taken by Iroquois in the Limitation Proceeding. Id. pp. 59-60.

**Response 69:** Admit that this statement was made, however, deny that this implies that Lloyd's has not been prejudiced by its inability to participate in the proceedings at an earlier date.

70. The Hull Policy contains the quoted deductible provision. Hull Policy From AON [10] at IRO/AE 00312; Hull Policy From Lloyd's [11] at 3.

**Response 70:** Admit that the Hull Policy contains the following provision:

>Deductibles: USD 500,000 each accident or occurrence including
>total loss. Subject to Annual Aggregate deductible of USD 1,500,000
>excluding total loss (Sections 1 & 2), to be reviewed by Leading
>Underwriters following a change in the fleet schedule hereon.

71. The Hull Policy contains a notice provision that grants Lloyd's the right to survey the vessel and direct where the vessel is repaired. Hull Policy From Lloyd's [11] at 26.

**Response 71:** Admit that the Hull Policy incorporates the following notice provision:

>In the event of any accident or occurrence which could give rise to a
>claim under this Policy, prompt notice thereof shall be given to the
>Underwriters, and: (a) where practicable, the Underwriters shall be
>advised prior to survey, so that they may appoint their own surveyor,
>if they so desire; (b) the Underwriters shall be entitled to decide
>where the Vessel shall proceed for docking and/or repair (allowance

to be made to the Assured for the actual additional expense of the voyage arising from compliance with the Underwriters' requirement)

## STATEMENT OF FACTS AS TO WHICH IROQUOIS CLAIMS THERE *IS* AN ISSUE TO BE TRIED

1. Whether JLT relayed the May 17, 2004 loss notice sent by AON to Lloyd's representative John Hodgett after May 17, 2004 but before December 1, 2004. Montano dep. [2] pp. 102-06, 92-93.

**Response 1**: Admit that this is an issue of fact, however, deny that it is material as regardless of when notice was conveyed to Lloyd's by JLT, it was untimely as a matter of law on May 17 2004, and further, notice was never made on behalf of Iroquois and is therefore irrelevant.

2. Whether, when JLT relayed the loss notice as stated above, Hodgett refused to accept it unless JLT also provided a copy of the policy language. Id. pp. 93-94.

**Response 2**: Deny. Regardless of whether or not Hodgett refused to accept notice, notice was already late as a matter of law on May 17, 2004.

3. Whether Lloyd's maintains copies of the relevant policy language in its Signing Office. Id. 34.

**Response 3**: Deny that whether or not Lloyd's maintains copies of the relevant policy language at its Signing Office is a material fact.

4. Thus, it is disputed whether Lloyd's received notice at some point between May 17, 2004 and December 1, 2004.

**Response 4**: Deny that this is a material fact. Even if Lloyd's received notice in the period between May 17, 2004 and December 1, 2004, notice was late as a matter of law.

15

Dated: New York, New York
September 9, 2005

                          DONOVAN PARRY McDERMOTT & RADZIK
                          Attorneys for Defendant Lloyd's Underwriters

            By: _____
                        Edward C. Radzik (ER-2473)
                        Carolyn Elizabeth Meers (CM-1464)
                        Wall Street Plaza
                        88 Pine Street - 21st Floor
                        New York, New York 10005-1801
                        (212) 376-6400
                        Our File: GM-05-3502 ECR/CEM

TO:    HEALY & BAILLIE, LLP
        Attorneys for Plaintiff, Iroquois Gas Transmission System L.P.
        61 Broadway, 32nd Floor
        New York, New York 10006-2701
        Richard V. Singleton, Esq.
        John C. Koster, Esq.
        David D. Jensen, Esq.

        NOURSE & BOWLES
        Attorneys for Defendant, Associated Electric & Gas
        Insurance Services Ltd., Hamilton, Bermuda (AEGIS)
        One Exchange Plaza
        55 Broadway - 30th Floor
        New York, New York 10006-3030
        John P. Vayda, Esq.

        DECHERT, LLP
        Attorneys for Defendant, AON Risk Services of Texas, Inc.
        30 Rockefeller Plaza - Room 2305
        New York, New York 10112
        Rodney M. Zerbe, Esq.
        James Tolan, Esq.

KENNEDY LILLIS SCHMIDT & ENGLISH
Attorneys for Defendant, American Home Assurance Company
75 Maiden Lane
New York, New York 10038
Charles E. Schmidt, Esq.